**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | October 26, 2007 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

---------------------------------------------------x

**DEFENDANTS' MOTION TO COMPEL DISCLOSURE OF**
**EXCULPATORY AND IMPEACHMENT INFORMATION**

Defendants John R. Kramer and Carlos Ortiz respectfully submit this motion pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), to compel the United States to disclose exculpatory and impeachment information that is essential to the defense. As set forth more completely in the accompanying Memorandum of Law, the defendants seek to compel the United States (1) to disclose the handwritten notes of FBI agents and other law enforcement officers who interviewed former Rhode Island State Senator John A. Celona, the government's key cooperating witness in this case, and (2) to identify the lies Celona told the government.

In accordance with Rule 12(c)(2) and (3) of the Local Rule Applicable to Criminal Proceedings, counsel for defendants hereby certify that they have conferred in good faith with counsel for the United States to determine whether the information sought by this motion would be provided without the need for the filing the motion. Despite conferring in good faith, counsel for defendants and the United States have been unable to resolve the dispute.

WHEREFORE, defendants John R. Kramer and Carlos Ortiz respectfully request that this Court issue an Order compelling the United States to disclose the handwritten notes taken by FBI agents and other government investigators who interviewed John A. Celona and to identify specifically and completely the lies Celona told the government.

Counsel for defendants hereby requests oral argument in connection with this motion, and estimate that one hour will be required for oral argument.

**STATEMENT PURSUANT TO LOCAL RULE 12(F)**

The filing and disposition of this motion constitutes excludable time as defined by 18 U.S.C. § 3161(h)(1)(f). It is not possible to estimate the amount of excludable time until the disposition of this motion. No motions dealing with the same subject matter have been filed in the past.

Dated: October 26, 2007

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase______________
Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
(203) 363-7676 (fax)
dfein@wiggin.com
scorrigan@wiggin.com

CARLOS ORTIZ,

By his Attorneys,

/s/ Mark L. Smith
Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com

**CERTIFICATE OF SERVICE**

I, **Scott D. Corrigan**, certify that on the 26th day of October, 2007, a copy of the foregoing document, the accompanying Memorandum of Law, and the accompanying Affidavit of David B. Fein were filed electronically and served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's electronic filing system. Notice of this filing will be sent by email to the following party by operation of the Court's electronic filing system:

- **Gerard B. Sullivan**
  gerard.sullivan@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---------------------------------------------------x
UNITED STATES OF AMERICA :
: CR 07-09-01 (MML)
v. :
: October 26, 2007
JOHN R. KRAMER and :
CARLOS ORTIZ :
---------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO COMPEL DISCLOSURE OF**
**EXCULPATORY AND IMPEACHMENT INFORMATION**

# TABLE OF CONTENTS


Page

**TABLE OF AUTHORITIES** ..... iii

**PRELIMINARY STATEMENT** ..... 1

**BACKGROUND** ..... 2

1. Kramer and Ortiz's relationship with Celona ..... 2
2. Celona's government interviews and the Composite FD-302 ..... 3
3. Observations on John Celona's credibility from the RWMC Trial ..... 5
4. The government's production of Celona discovery in this case ..... 6

**ARGUMENT** ..... 7

**I. THE COURT SHOULD COMPEL THE GOVERNMENT TO DISCLOSE THE AGENTS' HANDWRITTEN NOTES OF THE CELONA INTERVIEWS BECAUSE THEY CONTAIN EXCULPATORY AND IMPEACHMENT INFORMATION.** ..... 7

A. The Government Is Required To Produce Exculpatory And Impeachment Information. ..... 8

B. The Agent's Notes Contain *Exculpatory* Evidence Omitted From The Composite FD-302. ..... 10

1. Celona's pursuit of a consulting position at CVS ..... 11
2. Celona's motivation for Buy Back legislation ..... 11
3. Termination of the relationship ..... 12

C. The Agent's Notes Contain *Impeachment* Evidence Omitted From The Composite FD-302. ..... 13

1. The State House meeting ..... 13
2. Celona's request for a tour of CVS's Headquarters ..... 14
3. July 8, 1999 Meeting ..... 15

D. The Agent's Contemporaneous Notes Are The Most Reliable Evidence

Of Celona's Statements. ........ 16

II. THE COURT SHOULD COMPEL THE GOVERNMENT TO IDENTIFY CELONA'S LIES. ........ 18

A. The Government Must Identify The Lies Told By Its Cooperating Witness. ........ 18

B. The Government Has Made Varying And Inconsistent Statements Regarding Celona's Lies. ........ 20

C. The Government Must Specifically And Completely Identify Celona's Lies. ........ 22

CONCLUSION ........ 23

# TABLE OF AUTHORITIES

**Cases** **Page**

**United States Supreme Court**

*Berger v. United States*, 295 U.S. 78 (1935) ....................8

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................8

*Strickler v. Greene*, 527 U.S. 263 (1999) ....................9

*Giglio v. United States*, 405 U.S. 150 (1972) ....................9, 22

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................8, 9

*United States v. Bagley*, 473 U.S. 667 (1985) ....................8, 9

**United States Courts of Appeals**

*Conley v. United States*, 415 F.3d 183 (1st Cir. 2005) ....................9

*Moreno-Morales v. United States*, 334 F.3d 140 (1st Cir. 2003) ....................9, 19, 20

*Norton v. Spencer*, 351 F.3d 1 (1st Cir. 2003) ....................19

*United States v. Devin*, 918 F.2d 280 (1st Cir. 1990) .................... 18-19

*United States v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003) ....................8

*United States v. Osorio*, 929 F.2d 753 (1st Cir. 1991) ....................18, 21

*United States v. Soto-Beniquez*, 356 F.3d 1 (1st Cir. 2003) ....................19

**United States District Courts**

*United States v. Anderson*, 36 F. Supp. 2d 1264 (D. Kan. 1998) ....................10

*United States v. Owens*, 933 F. Supp. 76 (D. Mass. 1996) ....................9, 19

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) .................... 19-20

*United States v. Urciuoli*, 470 F. Supp. 2d 109 (D.R.I. 2007) .................... passim

## PRELIMINARY STATEMENT

Defendants John R. Kramer and Carlos Ortiz respectfully submit this memorandum of law in support of their Motion to Compel Disclosure of Exculpatory and Impeachment Information. Defendants seek from the government (1) the handwritten notes of FBI agents and other law enforcement officers who interviewed former Rhode Island State Senator John Celona, and (2) identification of the lies Celona told the government.

The importance of this motion to the defendants cannot be overstated. Kramer, 75, and Ortiz, 63, have never before been charged with a crime. They now face trial on felony charges that could result in their imprisonment. Celona will be the government's principal trial witness, so it is critically important that Kramer and Ortiz receive all Brady and Giglio information arising from his communications with the government.

When the government first interviewed Celona, he made statements that exculpated Kramer and Ortiz. Over the course of subsequent interviews, and after Celona spent many days with investigative agents who told him about the government's conflicting view of the facts, Celona's version of events changed substantially. In particular, certain of Celona's exculpatory statements evolved into statements that attempted to inculpate the defendants.

Federal law requires that Kramer and Ortiz be provided with all of the exculpatory information provided by Celona, as well as evidence of the evolution of his story. The government has provided the agents' formal reports of the Celona interviews, and those reports frequently omit or alter Celona's exculpatory statements and rarely reflect the evolution of Celona's version of events. The Court therefore should order the government to produce the agents' contemporaneous notes of Celona's interviews because those notes are most likely to

capture what Celona actually said, rather than what the agents chose to include in formal reports created after the fact.

Federal law also requires that Kramer and Ortiz be told specifically and thoroughly of the extent of Celona's lies to the government. The government has made varying and inconsistent statements about the nature and extent of the lies Celona told during his interviews with investigators. Celona's lies constitute critical impeachment material, and the government should be ordered to identify them accurately to the defendants.

## BACKGROUND

### 1. Kramer and Ortiz's relationship with Celona[1]

During the relevant time period, Kramer and Ortiz were employed by CVS/Pharmacy ("CVS"). Kramer's duties involved community relations, government affairs and charitable giving, and Ortiz's duties involved government affairs. (See Indictment ¶¶ 1-2 (Affidavit of David B. Fein, dated Oct. 26, 2007 ("Fein Aff."), Ex. A).) In 2000, Kramer and Ortiz caused CVS to engage Celona as a public relations consultant pursuant to a $12,000-a-year contract. (See Ind. ¶ 40 (Fein Aff. Ex. A).) Shortly after signing the consulting contract and throughout the existence of the consulting relationship with CVS, Celona hosted Kramer as a guest on Celona's local cable television show, where Kramer promoted CVS and CVS's charitable initiatives in Rhode Island. (See Ind. ¶¶ 51, 68 (Fein Aff. Ex. A).) The Indictment alleges that Kramer and Ortiz caused CVS to enter into the consulting agreement in order to buy Celona's political support, and that the public relations consulting arrangement was intended to disguise a corrupt scheme. (See Ind. ¶¶ 28, 31, 93 (Fein Aff. Ex. A).) In August 2003, Kramer informed

[1] Although a detailed recitation of the factual allegations is not required for purposes of this motion, certain pertinent background information is provided here.

Celona that CVS would discontinue the consulting relationship, which it did. (See Ind. ¶¶ 90-91 (Fein Aff. Ex. A).)

**2. Celona's government interviews and the Composite FD-302**

Between September 1, 2004 and November 17, 2004, government agents interviewed Celona on nine separate occasions. (See Fein Aff. Ex. B.) No prosecutor attended any of those interviews.[2] As required by FBI policy, the agents who interviewed Celona took notes at each of the interviews and preserved those notes. (See FBI Manual of Administrative Operations and Procedures ("FBI Manual") Part II, § 10-13.3(11)(d) (Fein Aff. Ex. C); FBI Manual of Investigative Operations and Guidelines, Part II, § 6-1.4.9 (Fein Aff. Ex. D); FBI Legal Handbook § 7-13 (Fein Aff. Ex. E).) Rather than create a report (referred to as an "FD-302") for each of the nine interviews, as is generally done, the agents created a composite FD-302 (the "Composite FD-302") that purported to describe Celona's statements from all nine interviews. The Composite FD-302 is dated November 19, 2004, two-and-one-half months after the government's first interview of Celona. (See Fein Aff. ¶ 3.)

The Composite FD-302 does not fully comply with the FBI's requirements for the creation of a composite FD-302. The FBI Manual provides that a composite FD-302 may only be prepared after an FBI supervisor determines that certain criteria have been met, including the concurrence of an Assistant United States Attorney. (See FBI Manual Part II, § 10-13.3 (11)(a)(4) (Fein Aff. Ex. C).) Defendants are not aware of any evidence indicating that an FBI supervisor made the required determinations or that government investigators obtained the concurrence of an Assistant United States Attorney. Furthermore, the FBI Manual recognizes the shortcomings of composite FD-302s and provides that the witness should adopt the

2 Two Assistant United States Attorneys appeared at the outset of the initial interview to sign a proffer agreement with Celona and promptly left before the interview began. (See Fein Aff. Ex. B.)

composite report as his statement in order to "provide a defense to any allegations that the report represented that which the interviewer wished the witness would say, rather than that which the witness intended to say." (FBI Manual Part II, § 10-13.3(11)(b) (Fein Aff. Ex. C).) The FBI Manual specifies three methods for adoption of a composite FD-302 by a witness, but Celona did not adopt the Composite FD-302 by any of the specified methods or any other method. Celona has testified that he never saw FD-302 reports of his interviews, including the Composite FD-302. (See United States v. Urciuoli, Transcript of Trial Proceedings ("RWMC Trial Tr."), Sept. 18, 2006, 26:10-27:16 (Fein Aff. Ex. F).)

In response to pre-trial motions by the defendants in the 2006 trial of three executives from Roger Williams Medical Center (the "RWMC Trial"), Judge Torres twice ordered the United States Attorney's Office to review the agents' actual notes of the Celona interviews, reasoning that the United States could not satisfy its Brady obligations if it did not even know what the notes contained. United States v. Urciuoli, 470 F. Supp. 2d 109, 112 (D.R.I. 2007). In response to Judge Torres' orders and after having previously informed defendants at least three times that any and all Brady and Giglio information had been provided, the government reviewed the agents' notes for the first time and produced limited portions to the RWMC defendants. Id.

Following the RWMC Trial, Judge Torres, while denying defense motions to dismiss the jury verdict based on Brady violations, criticized the practice of creating a composite FD-302:

> The government's production of a composite 302 summarizing the numerous agents' interviews of Celona rather than 302's for each individual interview is more troublesome because a composite 302 may reflect only the most recent statement made on a subject and might omit previous statements that, arguably, may be inconsistent and, therefore, used to impeach. In addition, composite 302's might prevent counsel from attempting to show how a statement might have been influenced by events occurring around the time

> that the statement was made. Accordingly, the practice of providing defense counsel with composite 302's of numerous interviews of a witness rather than contemporaneous 302's of each interview is a perilous one that the government would be well advised not to follow.

Id. at 116.[3]

**3. Observations on John Celona's credibility from the RWMC Trial**

Throughout the RWMC Trial, Celona's credibility -- both in government interviews and as a trial witness -- received a great deal of attention.[4] In its opening statement, the government informed the RWMC Trial jury that "when the FBI began investigating this matter, John Celona lied to the FBI regarding his conduct." (RWMC Trial Tr., Sept. 11, 2006, 57:18-20 (Fein Aff. Ex. F).) And Celona admitted, under oath, that he lied to the government on many occasions about a number of subjects during his interviews. (RWMC Trial Tr., Sept. 18, 2006, 8:21-9:5 (Fein Aff. Ex. F).)

Following Celona's six days of testimony at the RWMC Trial, the presiding judge, the jury, and even the prosecutors were critical of Celona's testimony and questioned his credibility.

- **Judge Torres**: "whether Senator Celona exaggerated the things that he claims to have done in furtherance of the conspiracy, which it seems to me he clearly did, or even whether he misrepresented or lied about some of those things, and certainly there's some reason to think that he may have done that as well." (RWMC Trial Tr., Sept. 29, 2006, 47:5-12 (Fein Aff. Ex. F).)

- **The jury**: The *Providence Journal* reported that a juror said that Celona's "testimony changed on certain points and he was so argumentative when cross-examined by defense lawyers. 'That took away from his credibility,' said the juror.

---

3 The appeals of the two defendants who were convicted, Robert Urciuoli and Francis Driscoll, are currently pending before the United States Court of Appeals for the First Circuit. See United States v. Urciuoli, No. 07-1297, and United States v. Driscoll, No. 07-1327

4 Celona testified at the RWMC Trial, and will testify at the trial of Kramer and Ortiz, pursuant to a cooperation agreement that Celona signed in connection with his plea of guilty to three counts of theft of honest services mail fraud. (See United States v. Celona, Government's Motion for Downward Departure Based on Substantial Assistance to Authorities, dated Jan. 26, 2007 ("Mot. for Downward Departure") (Fein Aff. Ex. G); Letter to Rhode Island Ethics Commission, dated Aug. 30, 2005 ("Ethics Commission Letter") (Fein Aff. Ex. H).)

'We couldn't tell when he was telling the truth.'" ("Urciuoli Guilty of Conspiracy," *Providence Journal*, Oct. 14, 2006 (Fein Aff. Ex. I).)

- **The government**:
  - "Celona's testimony was, at times, less than compelling. For example, under cross-examination he was frequently forgetful, sometimes evasive, and occasionally belligerent. Over the course of six days of testimony, he developed a combative style of responding to aggressive cross-examination." (Mot. for Downward Departure 3 (Fein Aff. Ex. G).)
  - Celona "had to overly rely on documents or recorded testimony in order to answer questions accurately." (Mot. for Downward Departure 3 (Fein Aff. Ex. G).)
  - "Under cross-examination Celona often could not, or would not, answer questions directly and without reference to documents." (Mot. for Downward Departure 5 (Fein Aff. Ex. G).)
  - "Just prior to trial, Celona also recovered memories not previously disclosed to investigators. While witnesses are certainly required to testify to their best recollection on the day they give testimony, at least some trial testimony, concerning when he first requested a job from Robert A. Urciuoli, contradicted prior statements and testimony." (Mot. for Downward Departure 5 (Fein Aff. Ex. G).)
  - "No one will ever call him a good witness." (United States v. Celona, Transcript of Sentencing Hearing, dated Jan. 31, 2007 ("Sentencing Tr.") 21:19-20 (Fein Aff. Ex. J).)

### 4. The government's production of Celona discovery in this case

The government has provided defendants with the Composite FD-302, FD-302s of subsequent Celona interviews, transcripts of Celona's grand jury appearances, and evidence seized at Celona's residence pursuant to a state authorized search warrant.[5] But the government has refused to provide defendants with the agents' notes of Celona's interviews, beyond the limited portions the government was ordered to disclose before the RWMC Trial. In addition, in response to a defense request to identify Celona's lies to the government, the government has

5 Although the agents created a composite FD-302 for Celona's initial nine interviews, they created separate FD-302s for each subsequent Celona interview.

responded that Celona told only one lie to the government, despite Celona's testimony that he told multiple lies about multiple subjects.

## ARGUMENT

Celona is a deeply flawed witness. He has admitted that he repeatedly lied to government agents about a number of subjects during his interviews. The government has acknowledged that Celona's version of events evolved over time. And Celona refused to answer questions at the RWMC Trial unless he was shown documentary evidence supporting the questions.

Despite this disturbing record, the government has withheld the best evidence of what Celona said when interviewed by investigators. And even though it has asserted on many occasions that Celona lied to investigators, the government has made inconsistent statements concerning those lies. Brady and Giglio require the government to produce the agents' notes and to identify Celona's lies.

### I. THE COURT SHOULD COMPEL THE GOVERNMENT TO DISCLOSE THE AGENTS' HANDWRITTEN NOTES OF THE CELONA INTERVIEWS BECAUSE THEY CONTAIN EXCULPATORY AND IMPEACHMENT INFORMATION.

In light of the government's own admissions acknowledging the changing and unreliable statements made by John Celona in his initial nine interviews with the government, the judicial criticism and skepticism spawned by the creation of composite FD-302s, and evidence (as shown below) that the FD-302s in this case conceal exculpatory and impeachment information, there is no justification for the government to withhold from the defense the best evidence of what John Celona said in his government interviews. The government is in possession of that evidence and should be ordered to disclose it.

### A. The Government Is Required To Produce Exculpatory And Impeachment Information.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. As Judge Torres observed in the RWMC Trial, exculpatory information under Brady is "evidence which, in the eyes of a neutral observer, could alter the outcome of the proceedings." Urciuoli, 470 F. Supp. 2d at 113 (quoting United States v. Jordan, 316 F.3d. 1215, 1252 (11th Cir. 2003)).

If material is arguably exculpatory, the government should produce it. Judge Torres remarked that, "[i]n cases where it is not clear whether a particular bit of evidence or information is materially exculpatory, the prosecutor should err on the side of providing the evidence." Id. (citing Kyles v. Whitley, 514 U.S. 419, 439 (1995)). The Supreme Court expressed the very same sentiment: "[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. This is as it should be." Kyles, 514 U.S. at 439 (internal citation omitted). Indeed, the Supreme Court has emphasized that "the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" United States v. Bagley, 473 U.S. 667, 675 n.6 (1985) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).[6]

---

[6] The United States Attorney's Manual ("USAM") recognizes these important principles. An October 19, 2006 Department of Justice policy published in the USAM instructs prosecutors to "disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime." (USAM § 9-5.001(C)(1) (Fein Aff. Ex. K).) The USAM instructs federal prosecutors to "err on the side of disclosure." (USAM § 9-5.001(E) (Fein Aff. Ex. K).)

Similarly, the government is required to disclose all impeachment material to the defendants. The Supreme Court has made clear that "Brady's disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness." Strickler v. Greene, 527 U.S. 263, 282 n.21 (1999); see also Giglio v. United States, 405 U.S. 150, 154-55 (1972). Impeachment evidence, by itself, "is evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." Bagley, 473 U.S. at 676 (internal quotation omitted). "In other words, '[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]'" Conley v. United States, 415 F.3d 183, 189 (1st Cir. 2005) (citation omitted).

The First Circuit has found Brady violations "where the Government failed to disclose impeachment evidence that could have been used to impugn the credibility of the Government's 'key witness.'" Id. (quoting Giglio, 405 U.S. at 154-55). In Conley, the Court reversed a defendant's conviction because the government should have disclosed a "highly impeaching" FBI memorandum that could have been used to discredit the key government witness's ability to recall certain facts. Id. at 189-90; see also Kyles, 514 U.S. at 434 (government should have disclosed statements by witness that varied from trial testimony).

Relying on First Circuit precedent, the federal district court in Massachusetts held: "[A]ny evidence that contradicts any government witness with respect to anything that witness is going to be inquired of on direct has to be disclosed." United States v. Owens, 933 F. Supp. 76, 87 (D. Mass. 1996) (internal quotation omitted). This includes disclosure of inconsistent and evolving information provided by a witness because such information can be used to impeach. See Moreno-Morales v. United States, 334 F.3d 140, 148 (1st Cir. 2003) (the First Circuit "acknowledges the impeaching power of a witness's evolving story"). More particularly, Judge

Torres cautioned that "a composite 302 may reflect only the most recent statement made on a subject and might omit previous statements that, arguably, may be inconsistent and, therefore, used to impeach." Urciuoli, 470 F. Supp. 2d at 116; see also United States v. Anderson, 36 F. Supp. 2d 1264, 1268-69 (D. Kan. 1998) ("variance between rough notes and 302s" considered "proper grist for impeachment").

### B. The Agents' Notes Contain *Exculpatory* Evidence Omitted From The Composite FD-302.

The Composite FD-302 omitted statements made by Celona, the government's principal witness, exculpating the defendants in this prosecution. This is demonstrated by the contemporaneous notes of the interviews taken by two independent sources.

The first source is the meager selection of agents' notes that the government produced to the RWMC Trial defendants. Those notes contain a plainly exculpatory statement by Celona that undermines the government's entire case against Kramer and Ortiz: "I don't believe I sold my office. I did not sell my vote or change position on any issue or take a position because of money I received." (Agents' Notes of Sept. 13, 2004 Celona Interview 4 (Fein Aff. Ex. L).) Yet the Composite FD-302 does not contain a single reference to that exculpatory statement or any reference whatsoever to Celona's belief that he did not sell his vote or change his official position based on consulting payments he received.

The second source is the set of notes taken by Celona's attorney, William Dimitri, at the initial nine government interviews (the "Dimitri Notes" (Fein Aff. Ex. M)). Like the handful of agents' notes produced to the defendants, these notes also indicate that the Composite FD-302

omitted material exculpatory information. Presented below are three examples of exculpatory information found in the Dimitri Notes and omitted from the Composite FD-302.[7]

### 1. Celona's pursuit of a consulting position at CVS

Celona is expected to testify at trial that Kramer and Ortiz pursued him to work as a public relations consultant for CVS and that he did not pursue CVS. In light of this expected testimony, Celona's explanation of why he authored the only contemporaneous written communication -- a September 23, 1999 letter to Kramer -- will be significant. The Dimitri Notes reveal that Celona told the government that the September 23, 1999 letter was an effort by Celona to sell himself to CVS; he even referred to his letter as an "extortion letter." (Dimitri Notes (Fein Aff. Ex. M).) The Composite FD-302 omits those statements and tells a very different story: that Celona said he wrote the letter in response to a request by Kramer or Ortiz.

| **Dimitri Notes of Interviews on Oct. 25 and Oct. 28, 2004** | **Composite FD-302 dated Nov. 19, 2004** |
|---|---|
| **Oct. 25**<br>"12-23-99 letter sent to Kramer[8]<br>– CVS has bad rep w/ seniors<br>– CVS needs to improve its stores in these ways . . . .<br>'Veiled extortion'" | "Celona stated that he sent this letter to Kramer in response to a request from either Kramer or Ortiz asking what Celona could offer CVS in terms of consulting." |
| **Oct. 28**<br>"'extortion letter' (9-23)-99)" | • No mention of "extortion" |
| "sent letter – selling himself" | • No mention of "selling himself" |

### 2. Celona's motivation for Buy Back legislation

The Indictment alleges that Celona sold his vote to CVS on certain legislation, including legislation requiring pharmaceutical manufacturers to accept returns from pharmacies ("Buy

---

7 All excerpts from the Dimitri Notes can be found at Exhibit M of the Fein Affidavit. All excerpts from the Composite FD-302 can be found at Exhibit B of the Fein Affidavit.

8 Only one such letter exists, so the reference to a "12-23-99 letter" is almost certainly a reference to the 9/23/99 letter.

Back"). (See Ind. ¶¶ 65, 67 (Fein Aff. Ex. A.) The Dimitri Notes reveal that Celona offered an explanation for his actions on Buy Back that was completely unrelated to CVS. Yet that non-CVS reason was omitted from the Composite FD-302.

| **Dimitri Notes of Interviews on Oct. 25, 2004** | **Composite FD-302 dated Nov. 19, 2004** |
|---|---|
| "Introduced [Buy Back] legislation. . . .<br>- Thinks Matty Lopes[9] asked him to intro it.<br>- Shari Russell[10] says it's Ortiz." | • No mention of Buy Back legislation. |

### 3. Termination of the relationship

The Indictment alleges that on August 22, 2003, during a golf game, Kramer told Celona that CVS would no longer pay him a consulting fee, and "on that same day" Kramer invited Celona to attend a subsequent charity golf event. (Ind. ¶ 90 (Fein Aff. Ex. A).) The Composite FD-302 reports that Celona linked the termination of the consulting relationship and the golf invitation both temporally and substantively; they occurred on the same date at the same golf game. According to the Composite FD-302, Celona considered the invitation, coming right after termination of the relationship, to be a "consolation bribe." (Composite FD-302 16 (Fein Aff. Ex. B).) In contrast, the Dimitri Notes disclose that Celona himself did not link these events in his government interviews. Rather, he recalled the invitation occurring on a date prior to learning of his termination, and did not associate the invitation with his termination.

9 Matty Lopes was not affiliated with CVS.

10 Shari Russell is a Rhode Island State Police detective who participated in a number of the initial interviews of Celona.

| **Dimitri Notes of Interview on Sept. 7, 2004** | **Composite FD-302 dated Nov. 19, 2004** |
|---|---|
| "Golf Trip – California → Susan [Komen] Breast Cancer Research . . . Was a contribution CVS made → + they gave him the ticket . . . the invite – he thinks – was before termination of the contract but the trip was in October." | "While they were riding in the golf cart, Kramer told Celona . . . why don't they just terminate the contract . . . . At the end of the round of golf . . . Kramer handed Celona a brochure offering him a free trip to Newport Beach, California for the Susan B. Komen Breast Cancer Foundation. Celona stated that it was clear that Kramer was giving Celona the trip because they could no longer compensate him through the consulting contract – sort of a consolation bribe." |

### C. The Agents' Notes Contain *Impeachment* Evidence Omitted From The Composite FD-302.

The government has acknowledged that Celona's story evolved from his first interview through his ninth. For example, at Celona's sentencing hearing the prosecutor noted Celona's "lack of total candor when first approached." (Sentencing Tr. 21:18-19 (Fein Aff. Ex. J).) The Composite FD-302, however, rarely reflects Celona's initial lack of candor and the evolution of his version of events related to CVS. The defendants are entitled to see the agents' notes to understand how and why Celona's story evolved.

Presented below are three examples of impeachment material found in the Dimitri Notes that are altered significantly in the Composite FD-302. As a result of these alterations, the Composite FD-302 omits statements by Celona that (a) were contrary to the government's theory of the case, or (b) were contradicted by other witnesses or evidence.

#### 1. The State House meeting

The Indictment alleges that Kramer, Ortiz and other CVS representatives met Celona at the Rhode Island State House sometime between January 1, 1999 and May 27, 1999 in an effort to persuade him to withdraw his support for Freedom of Choice legislation. (Ind. ¶ 18 (Fein Aff.

Ex. A).) Celona's testimony likely will be the government's only support for this allegation at trial, but the Dimitri Notes reveal that Celona provided inconsistent statements to the government in that he (a) did not recall any CVS-related State House meeting in 1999, (b) recalled a CVS-related State House meeting in 1997 or 1998, and (c) did not believe Kramer attended the CVS-related State House meeting. The Composite FD-302 omits these statements and provides instead an account that supports the government's allegation.

| **Dimitri Notes of Interview on Sept. 1, 2004** | **Composite FD-302 dated Nov. 19, 2004** |
|---|---|
| "→97/98 – met with Joe Walsh/ Ortiz in Senate/ lounge And a couple of other senators (Montalbano?/Alves?) + that meeting was about pharmacy choice<br>- does not believe Kramer there"<br><br>"Any meeting with Ortiz in 1999?? don't believe so—" | "Celona recalls meeting with Ortiz, Walsh and possibly . . . Kramer regarding [pharmacy choice] in the Senate lounge. Senators [Alves and Montalbano] were possibly present for that meeting. The CVS personnel were lobbying Celona not to support [pharmacy choice]. Celona does not recall if this meeting was before or after the Senate vote, but believes it likely took place in early 1999."<br><br>• No mention of the meeting occurring in 1997 or 1998.<br><br>• No mention of Celona's belief that Kramer was not at the meeting. |

### 2. Celona's request for a tour of CVS's headquarters

In the initial interviews, Celona was pressed on whether he requested a tour of CVS's headquarters during the State House meeting. According to the Dimitri Notes, Celona repeatedly denied that he requested a tour of CVS. Other witnesses contradict Celona's denial. The Composite FD-302 ignores Celona's four separate denials that he requested a tour of CVS and reports instead that he stated that he could have made such a request.

| **Dimitri Notes of Interviews on Sept. 1 and Sept. 7, 2004** | **Composite FD-302 dated Nov. 19, 2004** |
|---|---|
| **Sept. 1**<br>"Did you ask for tour of facility? No."<br><br>"Denies requesting tour of CVS @ end of July 1999 meeting."<br><br>**Sept. 7**<br>"Ortiz says JC asked for a tour of CVS - NO - did have tours w/ the committee."<br><br>"Never asked for a tour." | "Celona stated that he could have requested a tour of the CVS headquarters facilities in Woonsocket, RI at this [State House] meeting, however, he has no independent recollection of making a request for a tour."<br><br>• No mention of Celona repeatedly denying that he asked for a tour. |

### 3. July 8, 1999 meeting

The Indictment alleges that Celona met with Kramer and Ortiz on July 8, 1999 at CVS headquarters, where they discussed the prospect of CVS hiring Celona as a consultant. (Ind. ¶ 33 (Fein Aff. Ex. A).) It is anticipated that Celona will be the only witness to support this allegation. Again, the Dimitri Notes contradict this allegation. They reveal that Celona had no recollection of the meeting, even after being told by the agents that a meeting appeared on his calendar. He also did not recall the consulting agreement being discussed in July 1999. In contrast, the Composite FD-302 reflects no lack of recollection on Celona's part. To the contrary, the Composite FD-302 affirmatively recounts that Celona recalled the meeting on July 8, 1999, and that he discussed the consulting agreement with Kramer and Ortiz at that meeting.

| Dimitri Notes of Interview on Oct. 25, 2004 | Composite FD-302 dated Nov. 19, 2004 |
|---|---|
| " May 99 – Feb 00<br>in between – no meetings that he recalls"<br><br>"July 8 – on his book too! -<br>don't recall meeting – but – if it's there – must have gone"<br><br>"Any conversations with Kramer between May 99 and Jan → Feb 2000 not that he recalls" | "Celona subsequently met with Kramer and Ortiz at CVS on July 8, 1999 . . . . Celona stated that at this CVS meeting, Ortiz was the first to mention the possibility of Celona entering into a consulting agreement with CVS." |
| "Still don't remember July meeting"<br><br>"Do not specifically recall consulting agreement being discussed in July" | • No mention of Celona's repeated statements that he did not recall the meeting. |

The examples provided in sections I.B. and I.C. illustrate the fact that the agents' decision to deviate from standard FBI procedure and policy in creating the Composite FD-302 was, as Judge Torres noted, a "perilous" practice. Urciuoli, 470 F. Supp. 2d at 116. It is, of course, too late to order the FBI to create individual FD-302s for each of the initial nine interviews with Celona, but it is not too late to order the government to produce the agents' contemporaneous handwritten notes for each Celona interview.

**D. The Agents' Contemporaneous Notes Are The Most Reliable Evidence Of Celona's Statements.**

Further evidence of the unreliability of the FD-302s in this case (whether composite or individual) and their tendency to omit and alter exculpatory and impeachment material can be found by comparing Celona's grand jury testimony with another FD-302. On May 2, 2006, Celona provided unambiguous testimony in the grand jury concerning the defendants' intentions when they hired Celona. He testified that Kramer and Ortiz hired him only after he informed them that he (i) had disclosed the CVS consulting relationship to the Rhode Island Ethics

Commission (the "Ethics Commission" or "EC") and (ii) was told by the Ethics Commission that he could participate in legislation that affected CVS as long as it did not affect CVS specifically. However, the agents' FD-302 report of an April 30, 2006 interview of Celona, dated May 2, 2006 (the "May 2 FD-302") -- written the same day as Celona's grand jury testimony -- provides a dramatically less favorable account for defendants.

During his May 2, 2006 grand jury appearance, Celona testified that he "called the Ethics Commission to see if [the CVS consulting agreement] was proper" and was told by the Ethics Commission that "'if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it.'" (Transcript of Grand Jury Proceedings, dated May 2, 2006 ("May 2 Grand Jury Tr."), 49:16-22 (Fein Aff Ex. N).) Celona subsequently testified as follows:

> Q. Did you ever tell Carlos Ortiz and Jack Kramer anything concerning your contact with the Ethics Commission in connection with this consulting agreement?
>
> A. I told them I had called them, and I referred to what the Ethics Commission had stated, that a similar case with teachers in the legislature, if they voted on something that deals with teachers as a whole, they can vote on it but if it deals with them specifically, they cannot vote on it.

(May 2 Grand Jury Tr. 51:4-13 (Fein Aff. Ex. N).)

This critical exculpatory evidence -- Celona's recollection that he told Kramer and Ortiz that he disclosed the relationship to the Ethics Commission and received oral approval to work for CVS *before* Kramer and Ortiz hired him as a consultant -- receives a fairly shocking makeover in the May 2 FD-302. It reads: "Celona stated that he has no specific recollection of any discussion with Ortiz or Kramer about his call to the EC but he could have told Ortiz or Kramer about the call." (May 2 FD-302 1 (Fein Aff. Ex. O).)

This example demonstrates that it is not only the Composite FD-302 that omits and alters exculpatory and impeachment material arising from Celona's government interviews. Accordingly, the defendants seek an order requiring the production of the agents' notes from *all* of Celona's government interviews.

## II. THE COURT SHOULD COMPEL THE GOVERNMENT TO IDENTIFY CELONA'S LIES.

To date, the government has made varying and inconsistent statements about the lies Celona told in his government interviews. At one extreme, the government suggested in a letter to the Rhode Island Ethics Commission that Celona did not lie to the government. On two other occasions, the government identified one lie that Celona told, but on each occasion the government identified a different lie. And at the other extreme, the government has stated that Celona engaged in a "pattern of dishonesty" during his initial government interviews, supporting Celona's own testimony that he lied to the government about a number of subjects on many occasions. Most recently, in response to a defense request that the government identify Celona's lies, the government indicated that Celona lied to the government only once.

By providing conflicting, vague and incomplete accounts of Celona's lies, the government has not fulfilled its Brady and Giglio obligations. Therefore, defendants request an order compelling the government to identify correctly, specifically and thoroughly Celona's lies to the government.

### A. The Government Must Identify The Lies Told By Its Cooperating Witness.

The First Circuit has stated that "[a]n Assistant United States Attorney using a witness with an impeachable past has a constitutionally derived duty to search for and produce impeachment information requested regarding the witness." United States v. Osorio, 929 F.2d 753, 761 (1st Cir. 1991); see also United States v. Devin, 918 F.2d 280, 289 (1st Cir. 1990)

("Information useful to impeach prosecution witnesses falls within [the Brady] rubric"). Impeachment information includes lies that could be used to impeach a prosecution witness. Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003); United States v. Soto-Beniquez, 356 F.3d 1, 39 (1st Cir. 2003) ("lies to the government would certainly have constituted a basis for impeaching" the witness) (citing Giglio, 403 U.S. at 153-54; Moreno-Morales, 334 F.3d at 145); Owens, 933 F. Supp. at 87 ("any self-contradiction of the witness by any prior inconsistent statement or act prior to trial," including "specific acts which point to the witness having lied on other occasions" and "lying or failing to tell the truth" must be revealed to the defense). Where a prosecution witness provides "uncorroborated and essential" testimony, the failure to disclose the lies by the witness has been deemed material. Norton, 351 F. 3d at 8-9.

The Second Circuit recently addressed the scope of the government's obligation to disclose a cooperator's lies. In United States v. Rodriguez, 496 F.3d 221 (2d Cir. 2007), a cooperating witness testified on direct examination at trial that she lied "about everything" during her more than ten initial government interviews, until she signed a cooperation agreement and started telling the truth. Id. at 223. The defendant challenged the government's failure to take any notes of the cooperator's initial government interviews and its refusal to disclose the cooperator's lies. See id. at 222. The government contended that it satisfied Brady by eliciting testimony from the cooperator on direct examination that she lied "about everything" in her initial interviews with the government. See id. at 227.

The Second Circuit rejected the government's argument and remanded the case to the district court to determine what the lies were and whether their non-disclosure prejudiced the defendants. In its determination to remand the case, the court observed: "[T]elling the defendant that a witness lied, but leaving it for defense counsel to find out what the lies were by

questioning the witness before the jury, might as a practical matter foreclose effective use of the impeaching or exculpatory information." Id. The court explained that Brady and Giglio disclosures "must be sufficiently specific and complete to be useful." Id. at 226.[11]

### B. The Government Has Made Varying And Inconsistent Statements Regarding Celona's Lies.

Set forth below chronologically are statements made by the government and Celona regarding Celona's lies to the government:

- **Nov. 19, 2004 Composite FD-302**:
  - "On 9/1/04, Celona insisted that these were true statements in that his failure to disclose income from CVS was unintentional. This question was reviewed during Celona's 11/18/04 interview. Celona readily admitted that his 9/1/04 statement that his omission of CVS income from his 2000, 2001 and 2002 financial statements was unintentional was a lie." (Composite FD-302 14 (Fein Aff. Ex. B).)
  - "Celona stated that he understood and agreed that the lie about financial statements could cause the government to negate any and all agreements and use Celona's statement against him." (Composite FD-302 14-15 (Fein Aff. Ex. B).)
- **August 30, 2005 Government Letter to Ethics Commission**: "Celona has met with government representatives as often as necessary and has provided what he has represented to be truthful information." (Ethics Commission Letter 1 (Fein Aff. Ex. H).)
- **Sept. 11, 2006 Government Opening at RWMC Trial**: "You will hear that when the FBI began investigating this matter, John Celona lied to the FBI regarding his conduct." (RWMC Trial Tr., Sept. 11, 2006, 57:18-20 (Fein Aff. Ex. F).)
- **Sept. 11, 2006 Government Statement at RWMC Trial**: "[Celona] lied to the FBI about his improper relationships which we have turned that over in regard to the lies that are in the 302s, your Honor." (RWMC Trial Tr., Sept. 11, 2006, 89:8-10 (Fein Aff. Ex. F).)

---

[11] The government's obligation to identify a cooperator's lies, as well as any exculpatory information he provided, exists even if they are not recorded in the agents' notes or some other tangible recorded form. Rodriguez, 496 F.3d at 226 ("The obligation to disclose information covered by the Brady and Giglio rules exists without regard to whether that information has been recorded in tangible form"); see also Moreno-Morales, 334 F.3d at 147 (citing Giglio, 405 U.S. at 154-55 (finding duty on part of prosecutor's office to reveal impeaching oral evidence)).

- **Sept. 13, 2006 Government Direct Examination of Celona at RWMC Trial**:

  Q. And, again, without asking you particulars, prior to entering into your plea of guilty, were you always truthful and honest with the FBI?

  Celona: No.

  Q. Why not, sir?

  Celona: Because I tried to get out of it.

  (RWMC Trial Tr., Sept. 13, 2006, 203:19-24 (Fein Aff. Ex. F).)

- **Sept. 18, 2006 Cross Examination of Celona at RWMC Trial**:

  Q: You have admitted that you have lied to the FBI on many occasions during your meetings with them, is that correct?

  Celona: Yes, initially.

  Q: And when you say yes, initially, you lied about a number of subjects; correct?

  Celona: Yes, initially.

  (RWMC Trial Tr., Sept. 18, 2006, 8:21-9:5 (Fein Aff. Ex. F).)

- **Jan. 26, 2007 Government Motion for Downward Departure for Celona**:

  - "Throughout his debriefings Celona provided largely truthful statements to investigators. Nevertheless, as he began to cooperate, he sometimes recalled events in such a way as to make it look better for himself. For example . . . Celona admitted that he had lied to the FBI and that he changed his [Freedom of Choice] vote because he was being paid by a corporation that had a financial interest in that legislation." (Mot. for Downward Departure 4 (Fein Aff. Ex. G).)

  - "Celona continued in that pattern of dishonesty when he was initially contacted by the FBI. Once Celona began truthfully cooperating, the United States believes that he did so to the best of his ability." (Mot. for Downward Departure 6 (Fein Aff. Ex. G).)

- **Jan. 31, 2007 Government Statement at Celona Sentencing**: "He's also done many things poorly. His lack of total candor when first approached." (Sentencing Tr. 21:18-21 (Fein Aff. Ex. J).)

- **Oct. 18, 2007 Government Statement to Counsel for the Defendants**: "In one instance Celona admitted that his initial statement about his motivation for changing his [Freedom of Choice] vote was untruthful. That is the only instance in which I can inform you that he was intentionally dishonest." (Fein Aff. ¶ 17.)

The government's current position -- that Celona told only one lie (concerning his vote on Freedom of Choice legislation) -- is contradicted by the record. It is contradicted by the Composite FD-302, which identifies a different lie (concerning Celona's annual financial statements).[12] It is contradicted by the government's own statement that when Celona was first interviewed, he continued his "pattern of dishonesty." And most importantly, it is contradicted by Celona himself, who testified under oath as the government's cooperating witness that he lied to the government on many occasions about a number of subjects.

### C. The Government Must Specifically And Completely Identify Celona's Lies.

The government has not met its Brady and Giglio obligations by providing defendants with varying and inconsistent statements about the lies to the government by this critical cooperating witness. At the RWMC Trial, John Celona admitted to lying on multiple occasions on multiple subjects during government interviews. Yet in response to the defense request for disclosure of Celona's lies, the government has identified only one Celona lie. If Celona was honest in his trial testimony about his lies to the government, which must be presumed for the government did not indicate otherwise, then the government's identification of only one lie is surely inadequate. Moreover, the government's current statement that Celona lied only once is at odds with another lie described in the Composite FD-302.

---

[12] Curiously, on the subject of Celona's Freedom of Choice vote, which the government now describes as Celona's only lie, the Composite FD-302 recounts what Celona purportedly told the government about his Freedom of Choice vote but does not describe it as a lie. Instead, the Composite FD-302 describes what Celona initially said on the subject and what he said after having been shown pertinent documentation. Absent from this account is any reference to his having lied or admitted lying on this subject, as the Composite FD-302 painstakingly recounts on the subject of Celona's annual financial statements. (See Composite FD-302 9 (Fein Aff. Ex. B).)

As a result, the defendants currently find themselves in a situation similar to the defendant in Rodriguez: Kramer and Ortiz do not know all the lies Celona told the government. Brady and Giglio, and clear First Circuit precedent, require the government to specifically and completely identify the multiple lies Celona told the government.

## CONCLUSION

For all the reasons discussed above, the government should be ordered to disclose the agents' contemporaneous notes of the Celona interviews and to identify specifically and completely the lies Celona told to the government.

Dated: October 26, 2007

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase
Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com
David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
(203) 363-7676 (fax)
dfein@wiggin.com
scorrigan@wiggin.com

CARLOS ORTIZ,

By his Attorneys,

/s/ Mark L. Smith
Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com