**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF RHODE ISLAND**

FILED
MAR 13 2008
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL NO. 07-009-ML
)
JOHN R. KRAMER and ) In violation of 18 U.S.C. §§ 2, 371,
CARLOS ORTIZ ) 666, 1341 and 1346

## SUPERSEDING INDICTMENT

The Grand jury charges that:

### Introduction

At all times material to this Indictment:

### A. The Defendants

1. Defendant, JOHN R. KRAMER ("KRAMER"), was a Senior Vice President for Consumer Value Stores ("CVS"), whose duties involved, community relations, government affairs and charitable giving.

2. Defendant, CARLOS ORTIZ ("ORTIZ"), was a Vice President for CVS, whose duties involved government affairs.

### B. John A. Celona

3. John A. Celona ("Celona"), a co-conspirator who has been separately charged, was a State Senator elected to the Rhode Island General Assembly where he served from 1995 until he resigned in 2004.

4. From on or about January 2, 1995 through on or about March 9, 2004, Celona served as a member of the Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee ("Senate Corporations Committee").

From on or about January 4, 2001, through on or about December 11, 2003, Celona was Chairman of the Senate Corporations Committee. The Senate Corporations Committee possessed jurisdiction over legislation and matters affecting commerce, for-profit as well as not-for-profit business corporations, including but not limited to proposed legislation and matters affecting pharmacies.

5. From on or about January 2, 1995, through on or about June 30, 1999, Celona served as a member of the Senate Committee on Health, Education and Welfare ("Senate HEW Committee."). The Senate HEW Committee possessed jurisdiction over legislation and matters affecting health and human services, including but not limited to proposed legislation and matters affecting pharmacies.

6. From on or about March 1, 2000 to in or about March 2004, Celona also served, by designation of the Senate Finance Committee Chairman, as a member of the Rhode Island Student Loan Authority ("RISLA"). The RISLA is a not-for-profit State authority that provides loans for higher education, including but not limited to, loans for pharmacy students.

C. <u>CVS</u>

7. CVS was a corporation that was incorporated under the laws of the State of Delaware for the purpose of being a retail pharmacy chain. KRAMER and ORTIZ worked at CVS headquarters which is located in Woonsocket, Rhode Island.

8. A substantial portion of CVS's income was derived from retail sales of prescription drugs, an activity regulated by Rhode Island law. KRAMER's and ORTIZ's duties at CVS involved, in large part, monitoring and influencing the outcome of proposed legislation that might impact CVS. As part of the legislative process in Rhode Island, when issues concerning the regulation of pharmacies were addressed by the State Senate, they were routinely heard

before the Senate Corporations Committee and sometimes before the Senate HEW Committee, on which Celona served.

## D. The History of Freedom of Choice Legislation

### 1. Introduction

9. In the healthcare industry, networks existed between healthcare insurers, providers, and suppliers. In Rhode Island, the largest healthcare insurer, the identity of which is known to the Grand Jury, formed a network which included CVS as a pharmacy chain that distributed pharmaceuticals in a restricted benefit plan. The plan caused insured patients requiring prescription drugs to get prescriptions filled at participating pharmacies, including CVS. CVS financially benefitted from this restrictive network through the increased sales of prescription drugs and by the additional revenue generated by sales of other goods to consumers who visited CVS stores to get prescriptions filled.

10. Beginning in or about 1995, legislation was proposed in Rhode Island to allow those with pharmaceutical health insurance benefits to choose their own pharmacy, or to permit any pharmacy that was willing to accept the reimbursement rate, to participate in the restricted network which included CVS. That proposed legislation was sometimes known as "Any Willing Provider," "Pharmacy Freedom of Choice" or simply "Freedom of Choice" legislation ("Freedom of Choice"). Although Freedom of Choice enjoyed some support and success by passing in the Rhode Island House of Representatives at various times between 1995 and 2003, it never passed in the State Senate until after 2003.

11. CVS was opposed to Freedom of Choice which would have negatively impacted the financial advantage CVS enjoyed in restrictive prescription benefit plans.

12. The defeat of Freedom of Choice was a stated goal in ORTIZ's yearly Performance Plans and Evaluations from 1998 through 2000, as it was for KRAMER in the year 2000, and it was an objective on which KRAMER and ORTIZ were rated. For example, ORTIZ's 1998 Performance Plan and Evaluation directed him to "[m]onitor all legislation that [has] the opportunity to significantly impact CVS sales or operating expenses. This includes . . . 'any willing provider' legislation in RI."

13. From 1998 to 1999, Celona favored, publicly supported, voted for, and sponsored Freedom of Choice.

### 2. The 1998 Legislative Session
### Freedom of Choice Gets a Hearing in the Senate

14. On or about May 15, 1998, ORTIZ wrote a letter to Celona and other legislators stating CVS's opposition to Freedom of Choice.

15. On or about May 19, 1998, for the first time since Freedom of Choice legislation was originally proposed, House Bill 98-H-8016 Sub A received a hearing and was put to a vote in the Senate Corporations Committee. Celona voted in favor of the legislation but it was defeated.

16. After the defeat of Freedom of Choice legislation in 1998, on or about July 28, 1998, at Celona's invitation, ORTIZ sent Celona a political contribution in the form of a $50.00 check drawn on the CVS Political Action Committee ("PAC") account. Along with the check, ORTIZ sent a note to Celona in which he wrote, "I look forward to working with you in the future on other issues of mutual importance." Thereafter, KRAMER and ORTIZ caused CVS to make regular PAC contributions to Celona.

### 3. The 1999 Legislative Session

17. On January 6, 1999 and again on January 12, 1999, Celona co-sponsored Freedom of Choice legislation, Senate Bills 99-S-008 and 99-S-110.

18. Sometime between January 1, 1999 and May 27, 1999, KRAMER, ORTIZ and other representatives of CVS met with Celona at the Rhode Island State House to try to persuade him to stop supporting Freedom of Choice.

19. On or about March 3, 1999, KRAMER and ORTIZ met with KRAMER's Supervisor, a senior CVS executive whose identity is known to the Grand Jury ("CVS Executive #1"), to discuss legislative strategy for that year. Among the 1998 Government Affairs activities, KRAMER and ORTIZ listed the defeat of Freedom of Choice in Rhode Island. The presentation given by KRAMER and ORTIZ from that meeting also included the statement: "[t]he role of the Government Affairs Department is to impact the legislative and regulator[y] process in a manner that benefits CVS/Pharmacy, and its related businesses. This impact shall be accomplished via the following activities: developing the necessary contacts and relationships with key government officials . . . financially support[ing] those political candidates who support us either through direct contributions or the CVS Political Action Committees."

20. Between on or about April 12, 1999 and April 23, 1999, ORTIZ approved a request for a $100 PAC check to purchase a ticket for KRAMER to attend a Celona fund raiser. On April 23, 1999, the check was issued by CVS payable to the "Senator John A. Celona Committee." Thereafter, KRAMER and ORTIZ caused CVS to regularly purchase tickets for them to attend Celona fundraisers.

21. Also on or about April 23, 1999, ORTIZ sent a memorandum to a number of CVS employees, including CVS Executive #1, which, in part, concerned an upcoming vote on

Freedom of Choice. About Freedom of Choice, ORTIZ wrote, "[w]e are hopeful that we will be able to kill it in the Senate Corporations Committee."

22. On April 27, 1999, Freedom of Choice legislation was again put to a vote in the Senate Corporations Committee. Celona again voted for Freedom of Choice, Senate Bill 99-S-163, but the legislation was defeated.

### E. Honest Services

23. The State of Rhode Island and its citizens had an intangible right to the honest services of its officials and employees. As an elected public official of the State, Celona therefore owed the State and its citizens a duty to: (a) refrain from receiving payments and benefits that would, (i) improperly affect the performance of his official duties or (ii) influence his official action or inaction; and, (b) disclose conflicts of interest and other material information in matters over which he exercised influence, authority, and discretion that resulted in his personal gain.

## COUNT I
## (Conspiracy to Deprive the Citizens of Celona's Honest Services)

24. The Grand Jury realleges and incorporates by reference paragraphs 1 through 23 of this Indictment as though fully set forth herein.

25. From a time unknown but from at least in or about May of 1999, and continuing until in or about from December of 2003, in the District of Rhode Island and elsewhere, defendants KRAMER and ORTIZ, knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed with each other, and with Celona, to commit an offense against the United States, specifically, having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of Celona and to have those services performed free from deceit, favoritism, bias, conflict of

interest and self-enrichment and for the purpose of executing that scheme and artifice, to knowingly and wilfully cause to be placed in an authorized depository for mail, according to the directions thereon, to the person to whom it was addressed, matter to be delivered by the United States Postal Service, in violation of 18 U.S.C. §§ 1341 and 1346.

**A. The Objects of the Conspiracy**

26. It was the object of the conspiracy for defendants KRAMER and ORTIZ to improperly influence and affect Celona's official actions by paying him money and providing him with gifts, to cause him to use his influence, power, and authority as a State Senator, as a member and Chairman of the Senate Corporations Committee, as a member of the Senate HEW Committee and as a member of the RISLA, to benefit the political and financial interests of CVS.

27. It was further an object of the conspiracy to deceive the State of Rhode Island and its citizens concerning Celona's relationship with CVS to enable Celona to continue to promote the political and financial interests of CVS.

**B. The Manner and Means of the Conspiracy**

28. It was part of the conspiracy that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to enter into a consulting agreement with Celona as a means of paying Celona money in exchange for his political support and in order to influence him to use his political power to benefit CVS, including his support and influence on matters in which CVS had an interest which were pending before the General Assembly, the Senate Corporations Committee, the Senate HEW Committee and the RISLA.

29. It was further part of the conspiracy that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to provide Celona with gifts of meals, travel, lodging, golf,

monetary contributions, admission to corporate events, and tickets to entertainment and sporting events as an additional means of influencing Celona to use his political power to benefit CVS.

30. It was further part of the conspiracy that defendants KRAMER and ORTIZ influenced and affected Celona in his official actions as a State Senator in a manner which benefitted CVS, including but not limited to causing Celona to use his influence, power and authority:

a. to take official actions and refrain from taking official actions all to benefit CVS;

b. to influence other legislators to act or fail to act in such a way as to benefit CVS;

c. to influence the RISLA in a manner intended to benefit CVS.

31. It was further part of the conspiracy that defendants KRAMER and ORTIZ, along with Celona, knowingly and willfully concealed from the public that CVS was paying money and providing other things of value to Celona and that he had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, by among other things, concealing, disguising, and withholding the true nature of Celona's relationship with CVS.

**C. <u>Overt Acts</u>**

In furtherance of the conspiracy and to accomplish its objectives and purposes, at least one of the following Overt Acts, among others, was committed by one or more of the co-conspirators in the District of Rhode Island.

### 1. **The Consulting Agreement With Celona**

32. After the defeat of Freedom of Choice in 1999 and one month after Celona last voted for the legislation, on or about May 27, 1999, KRAMER and Celona discussed the possibility of Celona becoming employed by CVS.

33. On or about July 8, 1999, KRAMER and ORTIZ met with Celona at CVS headquarters where they further discussed the prospect of Celona's employment by CVS. During this meeting, KRAMER, ORTIZ and Celona briefly discussed the ethical implications of Celona providing consulting services, considering his position as an elected official.

34. As a result of his employment discussions with KRAMER and ORTIZ, on or about September 23, 1999, Celona sent a letter to KRAMER outlining what he portrayed to be a marketing issue for CVS among senior citizens. Celona specifically addressed Freedom of Choice. He wrote, "[s]ince the so-called 'Freedom of Choice' legislation publicity, I have found that seniors have a feel for CVS that is not what it should be." Celona outlined his proposed solution to this problem and suggested a public relations program. He concluded the letter, "Jack, I feel that this program can be a relatively inexpensive way to continue to market CVS, its products and services and provide significant positive results. And as important, it would eliminate any bad perception left over from 'freedom of choice.' "

35. On a date between September 23, 1999 and February 10, 2000, ORTIZ requested a form consulting agreement from the CVS legal department. Instead of tasking the CVS legal department with drafting a consulting agreement for Celona, ORTIZ edited the agreement himself.

36. On or about November 23, 1999, in the CVS "Government Affairs 2000 Proposed Budget Overview," KRAMER and ORTIZ identified the "Defeat of 'any willing provider' in

Rhode Island (potential lost sales in millions)" as one of the Government Affairs achievements for 1999 and identified the "Defeat of new 'any willing provider' legislation in OH and RI" as an initiative for 2000.

37. On or about January 7, 2000, at a meeting at CVS headquarters, KRAMER and ORTIZ offered Celona a job as a consultant.

38. On or about January 13, 2000, in the self-review for his 1999 yearly Performance Plan and Evaluation, which was submitted to KRAMER, ORTIZ listed among his accomplishments, ". . . defeat of 'any willing provider' in RI which helped to protect millions of dollars of sales . . . ." KRAMER used this information to help support his nomination of ORTIZ to receive a President's Award from CVS for that year.

39. On or about January 17, 2000, ten days after he offered Celona a job, KRAMER wrote his self-review for his 1999 yearly Performance Plan and Evaluation. Among his "performance highlights" KRAMER commented on the strengths of the Government Affairs Department and noted, ". . . many new contacts and relationships were built."

40. On or about February 10, 2000, ORTIZ and Celona executed a one-year Consulting Agreement ("Agreement"). The Agreement identified Celona as a "consultant" and further specified that he was "tasked with certain public relations services," including but not limited to: (a) visiting various senior citizens apartment complexes, centers, and groups to discuss health care issues; (b) working with CVS to help educate the general public on various health care topics, through personal and television appearances; and (c) to serve generally as a consultant on various health care topics. The Agreement provided that Celona would be paid $1,000 per month for his services. In so doing, ORTIZ and KRAMER failed to obtain the review

and approval required of all new consulting agreements by the CFO of CVS and by the CVS Planning and Analysis Department as provided in the CVS "Consulting Services" policy.

41. From on or about February 10, 2000, through in or about December 2003, after agreeing to pay Celona $1,000 per month for consulting services, KRAMER and ORTIZ personally and informally communicated CVS's position on various pieces of legislation to Celona at some of the luncheons, fundraisers, conferences, and golf outings they attended with him and often paid for. KRAMER and ORTIZ also informed Celona of CVS's position in letters and in electronic mail messages. They also communicated CVS's position on legislation to Celona by testifying, or causing others to testify, before the Senate Corporations Committee, the Senate HEW Committee and by directing CVS lobbyists to communicate with Celona about various pieces of legislation.

**2. Payment for Celona's Services**

42. On or about February 23, 2000, Celona sent his first billing statement for $1,000 to ORTIZ for consulting services purportedly rendered in the month of February 2000.

43. On or about March 14, 2000, ORTIZ approved a CVS check request for Celona's first $1,000 payment.

44. On or about April 10, 2000, CVS mailed a check to Celona for $1,000.

45. From on or about February 23, 2000, through on or before September 17, 2003, Celona continued to mail monthly invoices to ORTIZ for his services.

46. On diverse dates from on or about April 10, 2000, through on or about September 17, 2003, defendants KRAMER and ORTIZ caused 38 checks to be issued to Celona, delivered by mail, totaling approximately $45,000, which money was disguised as payments to Celona by CVS for consulting services.

47. In addition to the $1,000 monthly payments and other political contributions paid to Celona, between February 2000 and December 2003, KRAMER and ORTIZ caused CVS to provide gifts of meals, travel and entertainment to Celona including:

a. attendance at CVS corporate events;

b. tickets to professional sporting events;

c. tickets to attend the taping of a nationally syndicated television program;

d. greens fees at various golf courses;

e. expenses related to travel to Key Biscayne, Florida and San Diego, California.

### 3. <u>The 2000 Legislative Session</u><br><u>Celona's Change of Position on Freedom of Choice</u>

48. On or about March 9, 2000, one month after hiring Celona, ORTIZ testified against Freedom of Choice before the Senate Corporations Committee. On that day, and after ORTIZ testified, the Senate Corporations Committee voted on proposed Freedom of Choice legislation, Senate Bill 00-S-2774. Although Celona attended sessions that day and had previously supported Freedom of Choice, Celona intentionally left the committee hearing prior to any vote being taken. Celona intentionally withheld his vote in support of that legislation by leaving the hearing. After signing the Agreement, Celona stopped voting in favor of, sponsoring and supporting Freedom of Choice.

49. On or about March 27, 2000, KRAMER instructed ORTIZ, in a handwritten notation on an invitation to a Celona fund raiser, "Carlos, we should attend - either you or me." ORTIZ subsequently authorized a $100 PAC check to purchase a ticket for KRAMER.

50. On or about August 31, 2000, KRAMER provided ORTIZ with his midyear performance review. That review documented that ORTIZ successfully "[d]efeated the any

willing provider in Rhode Island [and] . . . identified key legislator supporters for greater CVS support from the PAC and corporate funding" in the first half of the year 2000.

51. From on or about May 6, 2000, through September 2003, ORTIZ and KRAMER caused the $1,000 monthly payments made to Celona, purportedly for consulting services, to be charged to the CVS Government Affairs Budget line item titled "political contributions." In so doing, KRAMER and ORTIZ failed to submit a "Consulting Service Request," notify the appropriate CVS personell, and get the project assigned a tracking number as required by the CVS invoicing and review process for consulting services.

**4. The 2001 Legislative Session**

**a. The Expiration of Celona's Written Agreement**

52. On December 21, 2000, ORTIZ sent an electronic mail message to Celona wishing him happy holidays and congratulating him on becoming the Chairman of the Senate Corporations Committee. Celona responded with his thanks and requested "to get together" with ORTIZ, "to do more television programs and outreach" for CVS. ORTIZ answered without acknowledging Celona's request "to get together."

53. On December 29, 2000, Celona sent ORTIZ another electronic mail message with his wishes for a happy new year and persisted with his request to get together, "[a]lso, when you get a chance I would like to sit down and discuss the renewal of my contract." Celona's one year Agreement with CVS specified that it could only be extended in writing.

54. On January 2, 2001, ORTIZ sent an electronic mail message to Celona to schedule a meeting at a time when KRAMER could be present and to ascertain what consulting services Celona had been providing for CVS. He wrote, ". . . could you come prepared with a description of activities in 2000 and suggested activities for 2001." At the time he requested

Celona to brief him on the type of consulting services he had been providing and intended to provide in the coming year, ORTIZ had already approved $11,000 in payments to Celona.

55. On January 3, 2001, at ORTIZ's request, Celona sent an electronic mail message to ORTIZ in which he attempted to detail the consulting services he had provided in the preceding eleven months and to legitimize his receipt of consulting fees in the coming year.

56. On January 31, 2001, at ORTIZ's request, Celona sent an electronic mail message to ORTIZ indicating that his "objective" was to "educate the public, especially the senior citizen population, about the services provided by CVS/pharmacy and to acquaint them with the nearest store location, its hours of operation, management and employees." Celona also indicated that another objective was to have the public become better informed about the various types of coverage offered by CVS. In this electronic message, Celona additionally requested, "[a]lso, I know that you are busy, but there are a few outstanding invoices. If you could check into them, it would be appreciated."

57. On or about February 10, 2001, ORTIZ allowed the formal written Agreement with Celona to expire. Although he did not formally renew Celona's Agreement in writing, as required by the original Agreement, ORTIZ continued to approve monthly payments of $1,000 to Celona until on or about September 2003. ORTIZ continued to mischaracterize the additional payments to Celona in the Government Affairs budget as political contributions.

58. On March 13, 2001, over one year after CVS began paying Celona $1,000 per month, ORTIZ sent Celona an electronic mail message in which he instructed Celona that, "[i]f anyone asks you what you do for CVS you should identify your title as Community Service Consultant. How does that sound to you?"

59. On or about a date prior to April 5, 2001, ORTIZ and a CVS executive, whose duties involved public communications and whose identity is known to the Grand Jury (CVS Executive #2), discussed drafting a description of Celona's duties to be utilized in the event that CVS ever received media inquiries regarding Celona's relationship with CVS. Knowing that the information would be used in response to public inquiries concerning Celona's relationship with CVS, ORTIZ provided CVS Executive #2 with incomplete and misleading information. As a result of the misinformation that ORTIZ provided, CVS Executive #2 drafted a document entitled, "Consulting Description for John Celona: scope of work for CVS/Pharmacy community outreach specialist." ORTIZ asked CVS Executive #2 not to mention this to anybody.

60. On or about June 1, 2001, CVS transitioned to a new automated reporting, approval and tracking system for all consulting services requests which was designed to automate the review and approval process for consulting services ("Ariba system"). On and after the effective date of June 1, 2001 up to and including September 2003, KRAMER and ORTIZ failed to properly utilize the Ariba system to obtain the necessary approvals to continue paying Celona $1,000 per month, purportedly for consulting services being provided under the expired Agreement.

**b. <u>Freedom of Choice</u>**

61. In a memorandum to KRAMER outlining "2001 Government Affairs activities," ORTIZ indicated that his goals for Rhode Island included defeating Freedom of Choice legislation if introduced.

62. On January 4, 2001, Celona was sworn in as Chairman of the Senate Corporations Committee. In becoming Chairman, Celona gained the power to set the agenda for the Senate Corporations Committee including the power to schedule proposed legislation for hearings.

63. On or about January 10, 2001, in the self evaluation for his 2000 yearly Performance Plan and Evaluation, which was submitted to KRAMER, ORTIZ wrote, "I believe this has been a very good year with regards to expanding our relationships and influence with governors, legislators and regulators. This is demonstrated by our success of the following: Defeat 'Any Willing Provider' in RI OH & IN."

64. On January 24, 2001, KRAMER's 2000 Performance Plan and Evaluation also touted his work to defeat Freedom of Choice by noting that he assisted ORTIZ and worked with CVS lobbyists to defeat Freedom of Choice.

65. On February 13, 2001, a Freedom of Choice Bill, 01-S-0493, was introduced in the Senate and was referred to the Senate Corporations Committee. Celona used the power of his appointment as Chairman to intentionally fail to post the bill for a hearing, an action which blocked the bill's progress through the legislative process.

**c. Legislation Requiring Manufacturers of Pharmaceuticals to Accept Return of Their Product**

66. On or about June 11, 2001, Celona met with ORTIZ. At or before that meeting, ORTIZ asked Celona to introduce legislation requiring manufacturers of pharmaceuticals to accept returns from pharmacies, a law which would have financially benefitted CVS ("Pharmaceutical Returns" legislation).

67. On the same day, and immediately following that meeting with Celona, ORTIZ scheduled time to discuss the formulation of a new Political Activities Policy for CVS. Thereafter, KRAMER and ORTIZ assisted in drafting a Political Activities Policy. The policy addressed, "Giving of Gifts to Public Officials." The policy provided notice to CVS employees that almost all jurisdictions have strict rules on the extent to which gifts may be given to public officials and that in most cases they are subject to detailed disclosure. The policy further advised

that gifts to both state and local public officials can result in a public official's disqualification from participation in any governmental action affecting the interests of the donor. The policy identified the General Counsel for CVS as the administrative officer responsible for interpretation and application of this policy.

68. The next day, on or about June 12, 2001, at ORTIZ's request, Celona was the primary sponsor of Senate Bill 01-S-0993. This act would have required that manufacturers accept return or maintain adequate provisions to accept return of recalled, withdrawn, or damaged pharmaceuticals. It was referred to the Senate Corporations Committee.

69. On August 31, 2001, KRAMER sent a letter to Celona in which he said, "John, you are a great supporter of CVS and I thank you too for the opportunity to talk about our events on your Rhode Island cable show." KRAMER had appeared on a cable television program entitled, "The Celona State House Report." During his several appearances with Celona on public television, neither KRAMER nor Celona disclosed that Celona was a paid consultant for CVS.

### 5. The 2002 Legislative Session

#### With no Freedom of Choice Legislation in the Senate, Celona Works on Another Program for CVS

70. As early as on or about April 5, 2000, ORTIZ had first spoken with Celona regarding his concern about the shortage of pharmacists in Rhode Island and elsewhere. The shortage of pharmacists had a negative financial impact on CVS. After Celona was named as a legislative designee to the RISLA in 2000, Celona undertook efforts to address the shortage of pharmacists in Rhode Island by establishing a student loan reduction program for pharmacy students (the "Pharmacy Student Loan" program).

71. On January 10, 2002, at a meeting of the RISLA, Celona brought the issue of pharmacist shortage to the attention of the RISLA.

72. On January 23, 2002, KRAMER sent an electronic mail message to Celona thanking him for his efforts regarding the student loan reduction program for pharmacy students and asking that Celona keep him and ORTIZ updated.

73. On or about January 23, 2002, KRAMER, ORTIZ, and Celona attended a social function at the home of CVS Executive #1. At that function, CVS Executive #1 recognized and thanked Celona for his official acts for and on behalf of CVS concerning the student loan reduction program for pharmacy students.

74. On January 24, 2002, Celona sent an electronic mail message to KRAMER and ORTIZ reporting, "Dear Jack: it was nice to see you last night at [CVS Executive #1's] home. As I told you, I am a member of the Board of Directors of the RI Student Loan Authority and we will begin to initiate the program re: the student loan reduction program for pharmacy students."

75. On March 14, 2002, at a meeting of the RISLA, Celona suggested that the RISLA adopt a student loan program for pharmacy students. Celona seconded a motion to develop a pharmacist reward program, which motion was then passed by the Board with Celona's vote of approval.

76. On March 19, 2002, Celona reported his success to ORTIZ by electronic mail, "Good news! The student loan reduction program is officially passed. At the meeting of the Rhode Island Student Loan Authority of March 14, 2002 of which I sit on the Board of Directors, we officially passed it. I had the occasion to be at headquarters last Friday and gave the particulars to Jack . . . ."

### 6. The 2003 Legislative Session

#### a. Freedom of Choice

77. On or about April 14, 2003, ORTIZ sent a memorandum to KRAMER entitled, "March Government Affairs Update." It read in part, "[i]n RI due to some in fighting between the House and Senate, both the 'Any Willing Provider' and the Canadian Importation Legislation were passed in the House. I feel fairly confident that we will be able to kill both pieces of legislation in the Senate."

78. On or about May 15, 2003, after the House passed two proposed pieces of Freedom of Choice legislation, 03-H-5828 Sub A as amended and 03-H-5215, they were referred to the Senate Corporations Committee. Celona exercised his power as Chairman and intentionally failed to post the legislation for hearings before the Senate Corporations Committee, an action which blocked the progress of the legislation.

#### b. Canadian Pharmacy Legislation

79. In 2003, KRAMER and ORTIZ worked to defeat legislation that would have allowed for the importation of prescription medications from Canada ("Canadian Pharmacies legislation"). Canadian Pharmacies legislation would have had a negative financial impact on CVS.

80. On or about Friday, February 7, 2003 ORTIZ sent an e-mail to lobbyists regarding Canadian Pharmacies legislation indicating, ". . . this is a bad bill that we need to oppose. Can you tell me who the Senate sponsors are on this bill? I want to talk about this at our lunch Monday, but don't want to embarrass anyone. Thanks, Carlos."

81. On or about Monday, February 10, 2003, ORTIZ met with Celona and asked him to oppose Canadian Pharmacies legislation. After his meeting with Celona, ORTIZ sent Celona

an electronic mail message providing Celona with a copy of his presentation, which included material on the CVS position on a variety of legislative topics including opposition to Canadian Pharmacies legislation.

82. On or about May 22, 2003, KRAMER sent an "urgent" facsimile to Celona providing him with "talking points" against Canadian Pharmacies legislation.

83. On June 26, 2003, after the Canadian Pharmacy legislation had passed in the House of Representatives and was referred to the Senate Corporations Committee, Celona voted to hold Canadian Pharmacies legislation, 03-H-5478 Sub A, for further study, an action that blocked the progress of the legislation.

**c. <u>Electronic Prescription Legislation</u>**

84. On or about February 10, 2003, ORTIZ met with Celona. Later in the day, ORTIZ sent an electronic mail message to Celona requesting that Celona sponsor legislation which would allow pharmacies to accept electronic prescriptions ("Electronic Prescription" legislation). Electronic Prescription legislation would have benefitted CVS.

85. Also on February 10, 2003, ORTIZ sent an electronic mail message to three lobbyists, whose identities are known to the Grand Jury, informing them that he had spoken to Celona about introducing Electronic Prescription legislation and that Celona was "agreeable." ORTIZ requested that one of the lobbyists provide Celona with language for the bill and "get it drafted into bill form." ORTIZ did not inform the lobbyists that Celona was being paid by CVS.

86. On February 10, 2003, at ORTIZ's request, a CVS lobbyist, whose identity is known to the Grand Jury, sent a facsimile to Celona with proposed language for Electronic Prescription legislation.

87. On February 11, 2003, a CVS lobbyist, whose identity is known to the Grand Jury, sent a facsimile to ORTIZ, attaching a copy of 03-S-0568, the electronic prescription bill which Celona had agreed to introduce at ORTIZ's request and on which Celona was listed as the primary sponsor.

88. On February 13, 2003, Celona officially introduced Senate Bill 03-S-0568, an act which would allow for electronic prescriptions.

89. On April 2, 2003, ORTIZ testified in favor of the Electronic Prescription legislation before the Senate HEW Committee.

90. On April 23, 2003, the Rhode Island Senate voted to pass Electronic Prescription legislation sponsored by Celona. Celona voted for passage. That legislation was ultimately passed in the Rhode Island House of Representatives and enacted into law.

### 7. <u>The Termination of Payments To Celona and Public Discovery of His Financial Relationship with CVS</u>

91. On or about August 22, 2003, KRAMER played golf with Celona, paid for by CVS. During the golf match, KRAMER informed Celona that CVS would no longer be able to pay him a consulting fee due to increased public scrutiny. However, on that same day, after telling Celona that CVS would stop paying him monthly, KRAMER invited Celona to attend a charity celebrity golf tournament with him, at CVS expense, to be held at San Diego, California.

92. In September 2003 Celona received his last $1,000 payment from CVS.

93. In October 2003, Celona traveled with KRAMER on an all expense paid trip to San Diego, California.

94. In or about the beginning of December 2003 a reporter for a newspaper of wide spread local circulation, called CVS Executive #2 inquiring about Celona's relationship with

CVS. In response, CVS Executive #2 read to the reporter the information contained in the "Scope of Work" document that he had created with ORTIZ in 2001 just for that purpose. By doing so, CVS Executive #2 unwittingly repeated the incomplete and misleading information that ORTIZ had supplied to disguise the true nature of the relationship between CVS and Celona, by omitting the work that Celona had been doing for KRAMER and ORTIZ to further the legislative and political objectives of CVS.

95. In or about the beginning of December 2003, Celona also responded to a media inquiry. Celona told a reporter for the newspaper, "[i]f there is a perception that I voted a certain way on pharmacy issues because of my relationship with the charitable endeavors of CVS Pharmacy, Inc., then I should have recused myself from those matters." At the time this statement was made and published, Celona knew that it was incomplete, untruthful, and misleading, in that Celona's relationship with CVS was not limited to "charitable endeavors of CVS Pharmacy," but included legislative functions and political favors for CVS.

All in violation of 18 U.S.C. §§ 371, 1341 and 1346.

**COUNTS 2-22**
**(Scheme to Defraud the Citizens of Celona's Honest Services)**

96. The Grand Jury realleges and incorporates by reference paragraphs 1 through 23 of this Indictment, as though fully set forth herein.

97. The Grand Jury further charges that from in or about May 1998 through in or about December 2004, in the District of Rhode Island and elsewhere, defendants, KRAMER and ORTIZ, devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

### A. <u>The Objects of the Scheme</u>

98. It was the object of the scheme for defendants KRAMER and ORTIZ to improperly influence and affect Celona's official actions by paying him money and providing him with gifts, to cause him to use his influence, power, and authority as a State Senator, as a member and Chairman of the Senate Corporations Committee, as a member of the Senate HEW Committee and as a member of the RISLA, to benefit the political and financial interests of CVS.

99. It was further an object of the scheme to deceive the State of Rhode Island and its citizens concerning Celona's relationship with CVS to enable Celona to continue to promote the political and financial interests of CVS.

### B. <u>The Manner and Means of the Scheme</u>

100. It was part of the scheme that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to enter into a consulting agreement with Celona as a means of paying Celona money in exchange for his political support and in order to influence him to use his political power to benefit CVS including his support and influence on matters in which CVS had an interest which were pending before the General Assembly, the Senate Corporations Committee, the Senate HEW Committee and the RISLA.

101. It was further part of the scheme that defendants KRAMER and ORTIZ, as corporate executives, caused CVS to provide Celona with gifts of meals, travel, lodging, golf, monetary contributions, admissions to corporate events, and tickets to entertainment and sporting events as an additional means of influencing Celona to use his political power to benefit CVS.

102. It was further part of the scheme that defendants KRAMER and ORTIZ, influenced and affected Celona in his official actions as a State Senator in a manner which

benefitted CVS, including but not limited to causing Celona to use his influence, power and authority:

a. to take official actions and refrain from taking official actions all to benefit CVS;

b. to influence other legislators to act or fail to act in such a way as to benefit CVS;

c. to influence the RISLA in a manner intended to benefit CVS.

103. It was further part of the scheme that defendants KRAMER and ORTIZ knowingly and willfully concealed and aided Celona in concealing from the public that CVS was paying money and providing other things of value to Celona and that he had an improper conflict of interest which deprived the State of Rhode Island and its citizens of their intangible right to his honest services, by among other things, disguising, concealing, and withholding the true nature of Celona's relationship with CVS.

104. It was further part of the scheme that defendants, KRAMER and ORTIZ, along with Celona, undertook the activities described in paragraphs 32–95 of Count 1 of this Indictment, as though fully set forth herein, on behalf of CVS.

**C. <u>Execution of the Scheme to Defraud</u>**

105. On or about the dates indicated below, in the District of Rhode Island, and elsewhere, for the purpose of executing the scheme and artifice to defraud described in paragraphs 98-104, defendants KRAMER and ORTIZ, did knowingly and willfully cause to be placed in an authorized depository for mail matter, checks from CVS and made payable to Celona, in the amounts stated in each Count below, which items were to be delivered by the United States Postal Service:

[redacted]

| | | | |
|---|---|---|---|
| 2 | 01/28/02 | 2165006 | $1,000.00 |
| 3 | 03/04/02 | 2197865 | $1,000.00 |
| 4 | 04/01/02 | 2222998 | $1,000.00 |
| 5 | 05/30/02 | 2285813 | $1,000.00 |
| 6 | 06/05/02 | 2295053 | $1,000.00 |
| 7 | 06/27/02 | 2314643 | $1,000.00 |
| 8 | 07/25/02 | 2344982 | $1,000.00 |
| 9 | 09/06/02 | 2387835 | $1,000.00 |
| 10 | 09/25/02 | 2405267 | $1,000.00 |
| 11 | 10/29/02 | 2441810 | $1,000.00 |
| 12 | 12/04/02 | 2482535 | $1,000.00 |
| 13 | 12/11/02 | 2490223 | $1,000.00 |
| 14 | 01/24/03 | 2539856 | $1,000.00 |
| 15 | 02/21/03 | 2569789 | $1,000.00 |
| 16 | 03/28/03 | 2605768 | $1,000.00 |
| 17 | 04/18/03 | 2632644 | $1,000.00 |
| 18 | 05/27/03 | 4014330 | $1,000.00 |
| 19 | 06/18/03 | 4039406 | $1,000.00 |
| 20 | 07/16/03 | 4067660 | $1,000.00 |
| 21 | 08/29/03 | 4114810 | $1,000.00 |
| 22 | 09/17/03 | 4133606 | $1,000.00 |

All in violation of 18 U.S.C. §§ 2, 1341 and 1346.

**COUNT 23**
**(Federal Program Bribery)**

106. The Grand Jury realleges and incorporates by reference paragraphs 1-23 and 32-95 of this Indictment, as though fully set forth herein.

107. For each of the years 1999, 2000, 2001, 2002, and 2003, the State of Rhode Island received benefits in excess of $10,000 per year from federal programs involving grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.

108. From in or about May 1999 through in or about December 2003, in the District of Rhode Island and elsewhere, defendants KRAMER and ORTIZ did knowingly and corruptly give, offer, and agree to give something of value to any person with intent to influence and reward an agent of the State of Rhode Island in connection with the business, transaction, and series of transactions of such government, and involving something of value of $5,000 or more, namely: defendants KRAMER and ORTIZ, as executives of CVS, caused CVS to make approximately $45,000 in payments and to provide other things of value to John Celona, a Rhode Island State Senator and an appointed Senate member of the RISLA, to influence and reward him in connection with the business and transactions of the Rhode Island Senate concerning Freedom of Choice, Pharmaceutical Returns, Canadian Pharmacies, and Electronic Prescription

legislation, and in connection with the business and transactions of the RISLA concerning the Pharmacy Student Loan program.

All in violation of 18 U.S.C. §§ 2 and 666(a)(2).

A TRUE BILL:

REDACTED

FOREPERSON

March 13, 2008

ROBERT CLARK CORRENTE
UNITED STATES ATTORNEY

LUIS M. MATOS
First Assistant U.S. Attorney

GERARD B. SULLIVAN
Assistant U.S. Attorney

WILLIAM M. WELCH II
CHIEF, PUBLIC INTEGRITY SECTION

DANIEL A. PETALAS
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice