**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | May 5, 2008 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

## PRE-TRIAL MEMORANDUM OF DEFENDANTS JOHN R. KRAMER AND CARLOS ORTIZ

Defendants John R. Kramer and Carlos Ortiz respectfully submit this Pre-Trial Memorandum, which describes the factual background, outlines the applicable law, and raises anticipated legal and evidentiary issues in the above-captioned case.

## I. INTRODUCTION

On March 12, 2008, a federal grand jury returned a twenty-three-count superseding indictment against Mr. Kramer and Mr. Ortiz (the "Indictment"). The core accusation of the Indictment is that the defendants conspired to commit mail fraud, and committed mail fraud, with the intention to deprive the State of Rhode Island and its citizens of the honest services of John Celona, a member of the Rhode Island State Senate.

The defendants are charged with one count of conspiracy pursuant to 18 U.S.C. § 371 with the underlying substantive offense of honest-services mail fraud pursuant to 18 U.S.C. §§ 1341 and 1346. The defendants are charged with twenty-one counts of honest-services mail fraud under 18 U.S.C. §§ 1341 and 1346, alleging that the defendants caused twenty-one mailings for the purpose of executing the scheme to defraud. Finally, the defendants are charged with a single count of bribery pursuant to 18 U.S.C. § 666(a)(2).

The Indictment alleges that Mr. Kramer was a Senior Vice President for Consumer Value Stores ("CVS") whose duties included community relations, government affairs, and charitable giving, and that Mr. Ortiz was a Vice President at CVS whose duties involved government affairs. (¶¶ 1–2.)[1] The Indictment alleges that Mr. Kramer and Mr. Ortiz conspired with former Rhode Island State Senator John Celona ("Celona") to pay him pursuant to a consulting relationship and to give him gifts to cause him to take action favorable to CVS in connection with four pieces of legislation in the Rhode Island General Assembly. Specifically, the Indictment alleges that the following legislation was implicated in the scheme:

1. Legislation that would allow pharmaceutical health insurance beneficiaries to choose their own pharmacy ("Any Willing Provider" legislation) (¶ 10);

2. Legislation requiring pharmaceutical manufacturers to accept returns of recalled, withdrawn, or damaged pharmaceuticals from pharmacies ("Pharmaceutical Returns" legislation) (¶ 68);

3. Legislation that would allow for the importation of prescription medications from Canada ("Canadian Pharmacies" legislation) (¶ 79); and

4. Legislation that would allow pharmacies to accept electronic prescriptions ("Electronic Prescription" legislation). (¶ 84.)

The Indictment also alleges that the defendants sought to influence Celona improperly regarding a student loan reduction program for pharmacy students in Rhode Island (the "Pharmacy Student Loan" program) created by the Rhode Island Student Loan Authority ("RISLA"). (¶ 72.) Celona served as a member of the RISLA Board of Directors. (¶ 70.)

---

[1] Paragraph references refer to numbered paragraphs in the Indictment.

## II. FACTUAL BACKGROUND

The evidence at trial will show that Kramer and Ortiz did not intend to deprive the State of Rhode Island or its citizens of John Celona's honest services or to otherwise improperly influence or reward Celona in any way. On the contrary, Celona was hired to and did perform legitimate public-relations services for CVS, and he was hired only after he represented to Kramer and Ortiz that he had disclosed the relationship to the Rhode Island Ethics Commission and received oral approval to work for CVS. The official actions charged in the Indictment cannot form the basis of an honest-services fraud conviction because the subject legislation and loan program did not affect CVS alone, and Celona represented to Kramer and Ortiz, also prior to his hiring, that the Ethics Commission had told him he could participate in legislation that affected CVS so long as it did not affect CVS alone.

### A. Community Relations and Government Affairs

The evidence will show that Kramer's role managing CVS's community relations and as Chairman of the CVS Charitable Trust included promoting CVS and its charitable endeavors, and generally acting as the "public face" of CVS. Kramer did so by going out into the community and promoting CVS's public image, with a particular emphasis on promoting CVS's specific charitable programs and events such as the CVS Charity Classic golf tournament, the CVS Downtown 5K road race and the CVS Highlander Charter School.

Kramer and Ortiz's government relations responsibilities included monitoring proposed legislation and advocating with government officials on behalf of CVS. Kramer and Ortiz also authorized contributions (through CVS's political action committee) to legislators' campaigns and entertained legislators. As the First Circuit has repeatedly recognized, in the absence of an intent to influence an official action, "payments for [a legislator's] entertainment, lodging, golf,

sports events, and the like" do not constitute honest services fraud. See United States v. Sawyer, 85 F.3d 713, 741 (1st Cir. 1996) ("Sawyer I") ("The practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive . . . . [I]f Sawyer had this limited intent . . . the federal statutes here involved would not be violated."); United States v. Woodward, 149 F.3d 46, 55 (1st Cir. 1998) (benefits and gratuities to legislators may constitute "routine cultivation of friendship in a lobbying context which does not violate federal criminal law").

**B. Celona's Disclosure To The Ethics Commission**

The evidence at trial will demonstrate that CVS engaged Celona as a public-relations consultant only after: (1) the defendants specifically raised with Celona the question of whether the relationship would be acceptable to the Rhode Island Ethics Commission; (2) Celona informed defendants that he disclosed the CVS relationship to the Ethics Commission; and (3) Celona informed defendants that the Ethics Commission had told him that he could participate in legislation that affected CVS so long as it did not affect CVS alone. Further, Celona told the government that before he began consulting for CVS, he also discussed the potential conflict of interest with his attorney, who told him that as long he did not vote on something that affected CVS alone, there would be no conflict of interest.

**C. The Consulting Relationship**

The evidence at trial will show that the $12,000-per-year CVS consulting relationship with Celona was lawful, pursuant to which Celona performed beneficial and legitimate services for CVS. Celona offered his services as a public-relations consultant to numerous prospective clients, and several of them (including CVS) hired Celona to do public-relations work. From

1998 through December 2003, Celona earned more than $375,000 from his consulting clients, only $45,000 of which came from CVS.

As part of his consulting services to CVS, Celona hosted Kramer regularly on Celona's cable television program, 'The Celona State House Report.' Throughout the consulting relationship, Kramer appeared on Celona's program twice a year, each time joining Celona as the sole guest for the full 30-minute duration of the show. Kramer's appearances consisted of Celona and Kramer discussing and promoting the major CVS charitable initiatives and events for which Kramer was responsible. These included the CVS Charity Classic golf tournament, the CVS Downtown 5K road race, and the CVS Highlander Charter School. Each episode aired repeatedly, as many as thirty times or more, generally in the weeks leading up to the particular upcoming event that Kramer was promoting on that appearance.

From April 2000 until CVS terminated Celona's consulting arrangement in August 2003, Celona was paid $1,000 per month by CVS. The monthly invoices from Celona, which expressly stated they were for consulting services, were processed through CVS's Accounts Payable and Tax Departments, leading to the generation of a CVS check payable to John Celona and the filing of annual 1099 forms with the Internal Revenue Service.

**D. The Class Exception**

As stated above, the evidence at trial will show that before Celona was engaged to work as a CVS consultant, Celona affirmatively informed Kramer and Ortiz that the Ethics Commission told him that he could work for CVS and participate in legislation affecting CVS as long as that legislation did not affect CVS alone. Celona's statement to Kramer and Ortiz essentially set forth a provision of Rhode Island State law known as the "Class Exception." Where a legislator works for an entity outside the legislature, Rhode Island State law provides

that if a piece of legislation under consideration will not affect that entity to a greater degree than other similarly situated entities, then the legislator is permitted to participate in the legislation. R.I. Gen. Laws § 36-14-7. The Class Exception permitted Celona to vote on legislation affecting CVS, despite his consulting agreement with CVS, so long as the legislation affected CVS to no greater extent than it affected any other Rhode Island pharmacy. See Rhode Island Ethics Commission, General Advisory Opinion No. 13, dated Mar. 26, 1992 (stating that where a legislator's interests "are affected to no greater or lesser extent than the interests of all of the members of the affected group or profession to which the legislator . . . belongs, then any action on such legislation will probably not be deemed to be a conflict of interest"); Rhode Island Ethics Commission, Advisory Opinion No. 99-63, dated April 8, 1999 (stating that Any Willing Provide legislation, which "would impact all pharmacies in Rhode Island," is "precisely the type of legislative activity contemplated by the section 7(b) exception"). The official acts of Celona alleged in the Indictment did not create a disqualifying conflict.

## III. THE OFFENSES

### A. Conspiracy

Count One of the Indictment alleges that Kramer and Ortiz "knowingly, willfully, and unlawfully combined, conspired, confederated, and agreed with each other, and with Celona, to commit an offense against the United States, specifically, having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their right to the honest services of Celona . . . in violation of 18 U.S.C. §§ 1341 and 1346, all in violation of 18 U.S.C. § 371." (¶ 25.)

To establish a violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt that: (1) the charged conspiracy existed; (2) the defendant knowingly and

willfully joined the conspiracy; and (3) an overt act was committed in furtherance of the conspiracy. See Woodward, 149 F.3d at 68 (1st Cir. 1998). To establish a defendant's voluntary participation in the conspiracy, the evidence must establish not only the defendant's intent to enter into the unlawful agreement, but also his intent to effectuate the object of the conspiracy. Sawyer I, 85 F.3d at 742.

**B. Mail Fraud**

Counts Two through Twenty-Two of the Indictment allege that the defendants "devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of [John] Celona and to have those services performed free from deceit, conflict of interest and self-enrichment," and aided and abetted that offense, in violation of 18 U.S.C. §§ 1341, 1346, and 2. (¶¶ 96, 104.)

To prove the charged offenses, the government must prove beyond a reasonable doubt that: (1) a scheme or artifice to defraud existed as charged in the Indictment; (2) the defendant under consideration knowingly and willfully participated in the scheme or artifice to defraud, which includes a scheme to deprive another of the intangible right of honest services; and (3) the United States mail was used in furtherance of the scheme. See Sawyer I, 85 F.3d at 723; Woodward, 149 F.3d at 63.

In cases such as this one, where the government has charged private citizens with honest-services fraud in connection with the conduct of a public official, courts have recognized two different theories upon which the government can proceed. Under the first theory, the private citizen is alleged to have influenced or otherwise improperly affected the public official in the performance of his duties. Woodward, 149 F.3d at 57. Under the second theory, the private citizen is alleged to have aided and abetted a public official in concealing a conflict of interest

under which the official was allegedly acting. Id. Here, the government has primarily charged an improper-influence theory, but in four paragraphs, the government has tacked on language regarding concealed conflicts. Under both theories, the government must prove that the defendant under consideration intended to defraud the public.

The mail fraud statute "does not encompass every instance of official misconduct that results in [a public] official's personal gain," Sawyer I, 85 F.3d at 725, and thus the First Circuit has recognized that "[i]ntent is . . . a crucial aspect of proof in any [mail fraud] prosecution." United States v. Sawyer, 239 F.3d 31, 40–41 (1st Cir. 2001) ("Sawyer II")(internal citations and quotations omitted). Accordingly, in an honest-services fraud case such as this one, "[t]he government must prove that the accused acted with two kinds of intent: that she intended to deprive the public of [a public official's] honest services, and that she intended to deceive the public." Id. "While proof of the two kinds of intent might seem similar, these inquiries are distinct." Id. The requirement that the government demonstrate an intent to deprive the public of honest services "is not equivalent to, or subsumed within, the intent to *deceive* the public . . . . In addition to *deceit* (the gravamen of 'fraud'), the government must also show the intent to *harm* (in this case, to deprive of honest services)." Sawyer I, 85 F.3d at 729 n.12 (emphasis in original) (citing McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791–92 (1st Cir. 1990) (explaining that mail fraud requires both deceit and deprivation)).

**1. Intent to deprive the public**

Where, as here, a defendant who is not a public official "is prosecuted for scheming to defraud the public of an official's honest services, the government must prove that the target of the scheme is the deprivation of the official's honest services." Sawyer I, 85 F.3d at 725. And where, as in this case involving the hiring of a legislator to perform legitimate services and the

performance of those legitimate services, "the 'scheme' does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented" by the government. Id. "Only if . . . there is an intent to cause the recipient to alter her official acts may the jury find a theft of honest services . . . ." Id. at 741.

### 2. Intent to deceive

The First Circuit has cautioned that "not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud. . . . Rather, the scheme must be intended to *deceive* another, by means of false or fraudulent pretenses, representations, promises or other deceptive conduct." McEvoy, 904 F.2d at 791; see also Sawyer I, 85 F.3d at 732 (government cannot establish mail fraud unless "the alleged scheme . . . involve[s] deception in the deprivation of money, property, or the right to honest services"). "While a misrepresentation of fact is not required to establish mail fraud, a demonstrated intent to deceive is required." Sawyer I, 85 F.3d at 732 (internal citation omitted).

In an honest-services fraud prosecution involving a public official, the government must prove that the defendant "intended to deceive the public." Sawyer II, 239 F.3d at 46–47. Thus, in this case, "deceptive conduct toward [CVS], alone, cannot form the basis of this honest services fraud conviction. Rather, the alleged victims of the mail fraud -- here, the state and the public -- must be the ones deceived." see Sawyer I, 85 F.3d at 734 n.18.

## C. Bribery

Count Twenty-Three of the Indictment charges that the defendants committed federal program bribery in violation of 18 U.S.C. §§ 666(a)(2) and 2. (¶¶ 106–08.)

To establish a charge of federal program bribery in violation of 18 U.S.C. § 666(a)(2), the Government must establish beyond a reasonable doubt each of the following elements: (1) at the time alleged in the Indictment, John Celona was an agent of the government; (2) in a particular one year period, the state received federal benefits in excess of $10,000; (3) the defendants gave something of value to Celona; (4) the defendants acted corruptly with the intent to influence or reward Celona with respect to a transaction; and (5) the value of the transaction to which the payment related was at least $5,000. See 18 U.S.C. § 666(a)(2). In this case, the government must also establish that the payments to Celona by CVS did not constitute "bona fide salary, wages, fees or other compensation paid . . . in the usual course of business," to which the statute does not apply. 18 U.S.C. § 666(c).

## IV. LEGAL ISSUES

### A. Vagueness Of Honest-Services Fraud

The First Circuit recently expressed its unease and frustration with the ill-defined scope of honest-services fraud, explaining that "the central problem is that the concept of 'honest services' is vague and undefined by the statute," which "is built upon a single, archaic, 204-word sentence." United States v. Urciuoli, 513 F.3d 290, 293 (1st Cir. 2008). The court's comments echo a long-standing and widespread anxiety among federal courts in general and in the First Circuit in particular over the reach of honest-services fraud. As the First Circuit noted in Urciuoli, the mail fraud statute's "application to political misconduct and corruption, as opposed to ordinary private fraud . . . has been especially fraught," and "[p]rosecutors have sought to sweep much abusive political conduct within [the statute]; in a number of cases courts have been more guarded." Id. at 293–94. As the First Circuit has previously explained, "[t]he broad scope

of the mail fraud statute . . . does not encompass every instance of official misconduct that results in the official's personal gain." Sawyer, 85 F.3d at 725.

This is particularly true in honest-services fraud cases where the defendant is not a public official, but rather, a private citizen involved in lobbying government officials. The First Circuit has cautioned that in such cases, "it may become difficult to distinguish between lawful entertaining and acts that violate the honest services mail fraud statute." Sawyer II, 239 F.3d at 40–41; see also Sawyer I, 85 F.3d at 741.

Thus, the First Circuit recognized in Urciuoli that there is a need for "cabining the statute -- a serious crime with severe penalties -- lest it embrace every kind of legal or ethical abuse remotely connected to the holding of a governmental position." Urciuoli, 513 F.3d at 294. And "as one moves beyond core misconduct covered by the statute (*e.g.*, taking a bribe for a legislative vote), difficult questions arise." Id. Accordingly, courts have not been able "to reduce the 'honest services' concept to a simple formula specific enough to give clear cut answers to borderline problems." Id. at 300. In light of the undefined contours of the statute, the recognized fine line between proper and improper lobbying, and the critical issue of intent, the particular features of Rhode Island's part-time legislature are vitally important to this case.

**B. Conflict of Interest and State Law**

As the First Circuit recently noted, the relationship between state law and federal honest-services fraud is "unsettled." Urciuoli, 513 F.3d at 298. The court acknowledged, however, that evidence of state law is admissible in an honest-services fraud prosecution with respect to a defendant's intent, and, depending on precisely what the government has charged, state law might also play a substantive role to "'immunize' conduct that would otherwise be a federal crime." Id. at 298–99.

**1. Evidence of Defendants' Intent**

It is well settled that in an honest-services fraud prosecution, state law is relevant to, at minimum, the issue of a defendant's intent or lack of criminal intent. Id. at 298; (see also Government's Objection to Defendants' Motion to Strike the Conflict-of-Interest Prosecution Theory, dated April 11, 2008, at 7 ("the jury should be instructed that evidence about [state law] may be considered . . . to the extent it bears on intent").) Accordingly, the defendants should be permitted to introduce evidence of, among other things: (1) Rhode Island's part-time legislature; (2) the fact that Rhode Island legislators are permitted to hold outside employment; (3) Rhode Island's Class Exception, which permits a legislator who works for a private entity to participate in legislation that affects that entity to no greater degree than any other similarly situated entity; and (4) the fact that Rhode Island legislators may, but are not required to, seek guidance and approval from the Rhode Island Ethics Commission concerning their relationships with the entities for whom they work. See R.I. Gen. Laws §§ 36-14-7; 36-14-11.

**2. Substantive Law Defining Conflict of Interest**

In this case, the government has charged its concealed-conflict-of-interest theory in a way that unavoidably implicates state law: the alleged conflict of interest consists of a state senator's participation in state legislation pending before a state legislature while working for CVS, all under a state law regime that, under certain circumstances, permits a state legislator to act on state legislation that would affect the private entity for whom he works. Where, as here, an honest-services fraud prosecution is based on the defendants' alleged aiding and abetting the concealment of a public official's alleged conflict of interest, state law necessarily provides the basis for making the threshold determination of whether an impermissible conflict of interest existed.

It cannot be presumed, however, that jurors will already know or understand the Rhode Island State law that applies to the conduct at issue in this trial. Those laws are idiosyncratic and unconventional; certainly, they depart from the rules governing federal legislators, and in many respects they defy intuition. It is not intuitive that it is lawful and legitimate for a private company to engage a legislator as a consultant. Nor is it intuitive that there are circumstances under which it is completely lawful for a legislator who works for a private company to take action on legislation affecting that company. In short, jurors' preconceptions about the propriety of relationships between legislators and private companies will most likely run directly contrary to the position that Rhode Island's laws actually take toward such relationships. See Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 637 (1st Cir. 1995) (Lynch, J. dissenting) (observing that "[t]he Rhode Island House presents a factual setting perhaps unique in this country").

It is also crucial in this case for jurors to understand that Rhode Island's conflict-of-interest laws are limited. Those laws do not apply to private citizens such as Kramer and Ortiz, and they do not impose upon private citizens any obligation to disclose any conflict of interest belonging to any public official. In addition, Rhode Island law imposed no duty upon Celona or Kramer to disclose Celona's consulting relationship with CVS during Kramer's appearances on Celona's cable television program. For jurors, none of these precepts will be self-evident or common knowledge.

In recognition of these issues, and in response to the Court's recent request for proposed pre-opening jury instructions that "will at least ameliorate the problem [identified in Urciuoli], if not eliminate it altogether" (Transcript of Proceedings, dated April 15, 2008, at 37:13–17), the defendants have drafted for the Court's consideration proposed preliminary jury instructions that

explain, among other things, certain relevant aspects of Rhode Island State law. Specifically, the defendants respectfully request that the Court instruct the jury that, among other things: (1) Rhode Island has a part-time "citizens' legislature" in which legislators can and do work for entities outside of the legislature; (2) under Rhode Island State law, not every conflict of interest prevents a legislator from acting on proposed legislation; and (3) a Rhode Island State legislator may nevertheless lawfully act on legislation that affects an entity for whom he or she works, as long as the legislation does not affect that entity to a greater degree than any other similarly situated entities.

## V. MOTIONS IN LIMINE[2]

### 1. MOTION IN LIMINE TO EXCLUDE EVIDENCE OF OTHER INVESTIGATIONS AND OTHER CVS FINANCIAL RELATIONSHIPS

The defendants respectfully request that the government be precluded from offering evidence regarding the (vacated) convictions of Robert Urciuoli and Francis Driscoll, and the deferred prosecution agreements entered into by Roger Williams Medical Center ("RWMC") and Blue Cross / Blue Shield ("BCBS"). Similarly, the defendants respectfully request that the government be precluded from offering evidence regarding investigation and/or prosecution of legislators other than Celona, as well as evidence of such legislators' financial relationships with CVS. Such evidence is wholly unrelated to the allegations in this case, and any remote probative value that the evidence might possess is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Accordingly, all such evidence is inadmissible in this trial under Rules 401, 402, and 403 of the Federal Rules of Evidence.

---

[2] As the Court knows, the defendants are submitting this memorandum without the benefit of having fully reviewed the government's exhibit list. The defendants respectfully request the opportunity to submit additional motions in limine if necessary once the defendants have reviewed the exhibits the government intends to offer.

The evidence is simply irrelevant. "Evidence which is not relevant is not admissible." Fed. R. Evid. 402. The fact that two of the three Urciuoli defendants were convicted on at least one count, on a wholly different set of facts from those alleged here, has absolutely no bearing upon this case.[3] See United States v. Shea, 211 F.3d 658, 671 (1st Cir. 2000) (excluding evidence that another individual had committed crimes similar to those allegedly committed by defendants). The same is true for the entities that entered into deferred prosecution agreements. Furthermore, neither Urciuoli nor Driscoll nor RWMC nor BCBS is a party to this prosecution; none of them has been mentioned or described, let alone named, in the Indictment; and their convictions and deferred prosecution agreements are irrelevant to proving the elements of the charges against Kramer and Ortiz. See United States v. Lamberty, 778 F.2d 59, 61–62 (1st Cir. 1985) (reversing conviction where district court had admitted evidence that was not "in any way relevant to proving the elements of the counts charged"). Similarly, the Indictment in this case contains no reference to any relationship between CVS and any state official other than Celona, let alone any reference to Kramer or Ortiz being involved with any such uncharged relationship. Nor is there any evidence whatsoever that Kramer or Ortiz were involved in any way in alleged unlawful conduct involving any other legislators. In short, this evidence has no "tendency to make the existence of any fact [in this case] more probable or less probable than it would be without" the evidence. Fed. R. Evid. 401. For this reason alone, the evidence should be excluded.

Moreover, any probative value of the evidence would be substantially outweighed by the danger that the evidence would unfairly prejudice the defendants, mislead the jury, and result in a trial within a trial. See Fed. R. Evid. 403.

---

[3] Of course, the fact that not all of the Urciuoli defendants were convicted and that those convictions were vacated on appeal further reinforces the impropriety of allowing evidence of those convictions in this trial.

## 2. MOTION IN LIMINE TO EXCLUDE EVIDENCE OF NON-COMPLIANCE WITH CVS CONSULTING POLICY IN CONNECTION WITH HIRING OF CELONA

The government may attempt to offer evidence that when CVS hired John Celona as a consultant, Kramer and Ortiz did not follow CVS's written policy regarding the hiring of consultants. The defendants respectfully request that the government be precluded from offering such evidence since it is not probative of any crime.

Evidence that Kramer and Ortiz did not follow CVS's internal policy concerning the consulting contracts with Celona should be precluded because such evidence is not relevant. See Fed. R. Evid. 401, 402. This evidence is not relevant solely because it relates to an allegation included in the Indictment. (See ¶ 40); Lamberty, 778 F.2d at 61–62. Unless the government is able to establish that it was Kramer and Ortiz's customary practice to follow the consulting policy when hiring consultants -- which it cannot -- then evidence that Celona's hiring did not follow the policy is simply not relevant. See United States v. Lachman, 48 F.3d 586, 591 (1st Cir. 1995) (noting that "in order to have probative value, evidence must . . . tend to make an issue in the case ('a fact of consequence') more or less likely than would be so without the evidence").

Furthermore, even if the evidence were relevant in any way -- which it is not -- its probative value would be substantially outweighed by the risk of confusion of the issues, undue delay, and waste of time. Allowing the government to introduce evidence that Celona's hiring did not conform to CVS's written policy would force the defendants to offer evidence to explain and counter the government's evidence, resulting in a needless trial-within-a-trial on collateral issues such as whether the CVS consulting policy was even applicable to the hiring of Celona, and whether Kramer's approval of the hiring was sufficient to satisfy the written policy.

Such peripheral issues are entirely beside the point, and will simply confuse the jury and waste the Court's time on the determination of an issue that is itself wholly irrelevant.

### 3. MOTION IN LIMINE TO EXCLUDE LAY OPINION TESTIMONY AND EVIDENCE OF WITNESSES' REACTIONS TO THE CONSULTING AGREEMENT

The government may attempt to offer evidence and elicit testimony from witnesses regarding their personal opinions and reactions upon learning of the consulting agreement between CVS and John Celona. For the reasons discussed below, such evidence should be precluded.

Any expression of a witness's emotional state upon learning of the consulting agreement is simply irrelevant. The emotional state of a witness upon learning of CVS's consulting agreement with Celona has no bearing on any of the ultimate issues to be decided by the jury in this case, most importantly, Kramer and Ortiz's state of mind. See Fed. R. Evid. 401.

Any expression of opinion by a lay witness regarding the consulting agreement is inadmissible pursuant to Rule 701 of the Federal Rules of Evidence, which provides that opinion testimony by lay witnesses is inadmissible unless the opinion or inference is "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Id. A lay witness's opinion about the Celona consulting agreement necessarily fails this test. Such testimony is not predicated on concrete facts within the witness's own observation and recollection; rather, such testimony is merely a conclusion drawn from such perceptions about the agreement. See Fed. R. Evid. 701 advisory committee's note (noting that Rule 701 requires "firsthand knowledge or observation"). Nor can a lay witness's opinion about the consulting agreement be "helpful in resolving issues," Fed. R.

Evid. 701 advisory committee's note, because such an opinion about the consulting agreement merely answers the very question that the jury is to consider. See Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 701.06 (testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations . . . may be excluded as unhelpful").

Furthermore, the minimal probative value of any testimony regarding a witness's response to the consulting agreement or a witness's opinion about the agreement is substantially outweighed by the danger that such testimony will unfairly prejudice the defendants, confuse the issues, and mislead the jury by suggesting improperly that simply because a witness had a low opinion of the agreement, the consulting relationship with Celona was somehow unlawful. See United States v. Benedetti, 433 F.3d 111, 118 (1st Cir. 2005) ("Evidence is generally deemed unfairly prejudicial if it has an undue tendency to prompt a decision by the factfinder on an improper basis.").

**4. MOTION IN LIMINE TO EXCLUDE EVIDENCE OF SUBSEQUENT ACTIONS TAKEN AT CVS**

The defendants respectfully request that the government be precluded from offering evidence regarding actions taken at CVS after the alleged conspiracy ended. For example, the government may seek to introduce evidence concerning the defendants' having been placed on a leave of absence from their positions at CVS during this investigation. Whatever actions CVS may have taken after the fact are wholly irrelevant to whether the defendants committed the acts alleged in the Indictment. See United States v. Reeder, 170 F.3d 93, 107 (1st Cir. 1999) (noting that exclusion was proper where evidence of "elaborate accounting transactions" undertaken after the fact was "irrelevant to [defendant's] state of mind at the time that he misappropriated [funds]"); United States v. Wilson, 798 F.2d 509, 516 (1st Cir. 1986) (noting that "it is not

required that post-indictment evidence be admitted, and like all evidence, it must survive threshold challenges to relevancy") (emphasis in original); United States v. Gordon, 634 F.2d 639, 644 (1st Cir. 1980) (holding that district court did not err in excluding testimony regarding "matters two years after the matter at issue, and with regard to a transaction totally different from that covered in the trial"). Such evidence has no relevance to proving the allegations and charges in the Indictment.

In any event, the probative value of such evidence is substantially outweighed by the risk of unfair prejudice and confusion of the issues. See Reeder, 170 F.3d at 108 (holding that "the district court did not exceed its discretion in determining that the relevance of that testimony [of elaborate after-the-fact accounting transactions] was substantially outweighed by the confusion it would bring to the case"); United States v. Wade, 203 Fed. App. 920, 929 (10th Cir. 2006) (affirming trial court's exclusion of evidence of defendant's accountant's after-the-fact conduct from tax evasion trial because "we fail to see how the attempts to settle defendant's tax debt after the charged offenses are relevant to his conduct beforehand"). In particular, evidence of the defendants' leave of absence would unfairly prejudice the defendants to a degree that substantially outweighs any probative value such evidence might have, by leading jurors to the improper conclusion that the defendants must have done something wrong, otherwise they would not have been placed on leave. This presents a grave danger that the defendants will be convicted on grounds wholly unrelated to the offenses charged in the Indictment. See United States v. Aguilar-Aranceta, 58 F.3d 796, 801 (1st Cir. 1995) (reversing conviction where "the most powerful inference that the jury was likely to make . . . is also the forbidden one").

## 5. MOTION IN LIMINE TO EXCLUDE, AS AGAINST DEFENDANT KRAMER, EVIDENCE OF DEFENDANT ORTIZ'S CONVERSATIONS REGARDING THE CONSULTING RELATIONSHIP

The defendants respectfully request that the government be precluded from offering against defendant Kramer any evidence of conversations that defendant Ortiz may have had with co-workers or others regarding Ortiz's personal opinions about CVS's consulting relationship with Celona. Such evidence may be admissible against Ortiz as admissions of a party-opponent, see Fed. R. Evid. 801(d)(2), but it is clearly inadmissible hearsay as to Kramer.

Although Kramer and Ortiz are alleged to be co-conspirators, the Ortiz conversations do not fall under Rule 801(d)(2)(E) of the Federal Rules of Evidence. Rule 801(d)(2)(E) provides that a hearsay statement is nevertheless admissible against the declarant's co-conspirator where the statement was made "during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E); see also United States v. Fahey, 769 F.2d 829, 838–39 (1st Cir. 1985) (noting that "in furtherance" requirement of Rule 801(d)(2)(E) was motivated in part by "the need to protect the accused against idle chatter of criminal partners"). All of Ortiz's conversations with his co-workers are inadmissible against Kramer because such conversations did not in any way "tend[] to advance the objects of the conspiracy as opposed to thwarting its purpose," and thus they were clearly not "in furtherance of" the alleged conspiracy. United States v. Tom, 330 F.3d 83, 93 (1st Cir. 2003); see also United States v. LiCausi, 167 F.3d 36, 50 (1st Cir. 1999) (holding that alleged co-conspirator's statements "cannot fairly be considered in furtherance of the conspiracy" where declarant "was merely blowing off steam or venting anxiety"). In addition, any conversations between Ortiz and his co-workers that took place after the alleged conspiracy had ended are inadmissible against Kramer because they did not take place "during the course" of the alleged conspiracy. Fed. R. Evid. 801(d)(2)(E).

Accordingly, the Court should exclude evidence of any such conversations or comments by Ortiz, or, in the alternative, the Court should provide a limiting instruction advising the jurors that they may consider such evidence only against Ortiz, and not against Kramer.

## 6. MOTION IN LIMINE TO ADMIT EVIDENCE IMPEACHING GOVERNMENT WITNESS JOHN CELONA

John Celona's testimony, and thus his credibility, will be critical to the government's case. The defendants intend to impeach Celona with his own statements pursuant to three appropriate theories: (a) prior inconsistent statements; (b) impeachment by contradiction; and (c) bias.

### a. Impeachment by Prior Inconsistent Statements

Defendants expect to impeach Celona with his prior inconsistent statements as recorded in his many statements to law enforcement authorities, and as recalled in the testimony of law enforcement agents who took notes at Celona's interviews with the government. As demonstrated below, such impeachment is entirely proper.

Rule 613(b) of the Federal Rules of Evidence permits impeachment by prior inconsistent statements when a statement made at trial is irreconcilably at odds with a statement previously made by the witness. See United States v. Pridgen, 518 F.3d 87, 90–91 (1st Cir. 2008) (holding that defense should have been permitted to introduce extrinsic evidence of prior statements where witness's description of assailant was inconsistent with description witness had given earlier to defense investigator). In such circumstances, "the cross examiner is permitted to show the discrepancy by extrinsic evidence if necessary -- not to demonstrate which of the two is true, but, rather, to show that the two do not jibe and thus calling the declarant's credibility into question." United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999). Accordingly,

pursuant to Rule 613(b), the defense should be permitted to impeach John Celona using extrinsic evidence of prior inconsistent statements by Celona.

**b. Impeachment by Contradiction**

The defendants respectfully request that they be permitted, during both cross-examination and the defense case, to offer evidence and testimony that contradicts material testimony offered by the government's witness, John Celona. Although extrinsic evidence of specific instances of conduct may not be used for purposes of impeachment, see Fed. R. Evid. 608(b), the impeachment by contradiction doctrine provides that extrinsic evidence is admissible to contradict a witness's testimony "when [the evidence] satisfies the Rule 403 balancing test and is not barred by any other rule of evidence." Fryar v. Curtis, 485 F.3d 179, 184 (1st Cir. 2007); see also United States v. Perez-Perez, 72 F.3d 224, 227 (1st Cir. 1995) ("Impeachment by contradiction is a recognized mode of impeachment . . . governed by . . . common-law principles") (emphasis in original); 2A Wright & Gold, Federal Practice and Procedure, § 6119 at 116–17 (1993) (noting that impeachment by contradiction doctrine "has been justified on the grounds that the witness should not be permitted to engage in perjury, mislead the trier of fact, and then shield himself from impeachment by asserting the collateral fact doctrine"). Accordingly, during cross-examination and on the defense case, the defendants should be permitted to offer evidence and testimony, including extrinsic evidence, that contradicts material testimony offered by Celona. See United States v. Norton, 26 F.3d 240, 244 (1st Cir. 1994) (stating that "Evidence which tends to disprove a witness's testimony about a material issue in the case is relevant."); United States v. Cudlitz, 72 F.3d 992, 996 (1st Cir. 1996) (stating that witness who testifies to a fact may be cross-examined "to elicit testimony contradicting his prior testimony for the purpose of showing that the witness is a liar and should not be believed").

**c. Impeachment to Demonstrate Bias**

The defendants respectfully request that they be permitted to offer extrinsic evidence to demonstrate Celona's bias and his motive to slant his testimony in favor of the Government. Although the Federal Rules of Evidence do not specifically address bias, evidence of bias is properly admitted to impeach a witness's credibility by proving that the witness has "a relationship [with a party] which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against the party," whether motivated by "dislike or fear of a party or by the witness's self-interest."[4] United States v. Abel, 469 U.S. 45, 51–52 (1984). Here, extrinsic evidence, including the evolution of John Celona's account of his disclosures and relationship with Jack Kramer and Carlos Ortiz as memorialized in interview notes, is admissible to demonstrate Celona's bias and his motive to slant his testimony in favor of the Government. See United States v. Tse, 375 F.3d 148, 166 (1st Cir. 2004) (holding that where proper foundation is laid, defendant has right to cross-examine prosecution witness concerning matters that might cause witness to be biased against defendant).

**7. MOTION IN LIMINE TO ADMIT GOVERNMENT STATEMENTS**

The defendants will seek to offer statements by the government pursuant to Rule 801(d)(2) of the Federal Rules of Evidence as non-hearsay admissions by a party-opponent. Rule 801(d)(2) provides in pertinent part that a statement is not hearsay if it is "offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth . . . ." Fed. R. Evid. 801(d)(2).

---

[4] Although the Federal Rules of Evidence do not specifically address bias evidence, the 2003 Advisory Committee Note to Rule 608 observes that "[b]y limiting the application of the Rule to proof of a witness' character for truthfulness, the amendment leaves the admissibility of extrinsic evidence offered for other grounds for

For example, the defendants will offer the government's statements concerning Celona's credibility, such as the government's motion for downward departure in connection with Celona's sentencing. (See Motion for Downward Departure Based on Substantial Assistance to Authorities, dated January 26, 2007 ("Motion for Downward Departure").) The Motion for Downward Departure details numerous instances in which Celona was not candid, and casts doubt on Celona's veracity and ability to testify accurately and truthfully:

- "Celona's testimony was, at times, less than compelling. For example, under cross-examination he was frequently forgetful, sometimes evasive, and occasionally belligerent. . . . He had to overly rely on documents or recorded testimony in order to answer questions accurately." (Mot. for Downward Departure at 3.)

- Celona "sometimes recalled events in such a way as to make it look better for himself." (Mot. for Downward Departure at 4.)

- Celona "lied to the FBI" about when and why he changed his vote on the Any Willing Provider legislation. (Mot. for Downward Departure at 4-5.)

- Celona's "mistaken" grand jury testimony was "representative of the way in which Celona sometimes attempted to explain his own behavior." (Mot. for Downward Departure at 5.)

- "Under cross-examination Celona often could not, or would not, answer questions directly and without reference to documents." (Mot. for Downward Departure at 5.)

- "Just prior to trial, Celona also recovered memories not previously disclosed to investigators." (Mot. for Downward Departure at 5.)

- "[A]t least some trial testimony [from the Urciuoli trial], concerning when he first requested a job from Robert A. Urciuoli, contradicted prior statements and testimony." (Mot. for Downward Departure at 5.)

---

impeachment (such as contradiction, prior inconsistent statement, bias and mental capacity) to Rules 402 and 403." Fed. R. Evid. 608 advisory committee's note.

- "Indeed, Celona has admitted that he lied to his colleagues, his constituents, the Ethics Commission, the public and even to his accomplices." (Mot. for Downward Departure at 6.)

In addition, at Celona's sentencing hearing, the government made statements disparaging Celona's credibility. For example, the prosecutor remarked, with regard to Celona, that "No one will ever call him a good witness." (Transcript of Sentencing Hearing, dated Jan. 31, 2007 ("Sentencing Tr."), 21:19-20.) These statements and representations by the government easily satisfy the test of relevance and admissibility under Rules 401 and 402.

In circumstances where the government has adopted or expressed belief in the truth of a statement, that statement is admissible against the government in a criminal case. United States v. Kattar, 840 F.2d 118, 130–31 (1st Cir. 1988). This includes statements made by the prosecution in prior, related litigation. In Kattar, the First Circuit held that prior statements made by the government in a sentencing memorandum and brief filed in separate, related litigation were admissible against the government as party-opponent admissions under Rule 801(d)(2) because "the assertions made by the government in a formal prosecution . . . establish the position of the United States and not merely the views of its agents who participate therein." Kattar, 840 F.2d at 131. In this case, the statements in the government's Motion for Downward Departure, like the statements in the Kattar sentencing memorandum and brief, fall squarely within Rule 801(d)(2). The statements were made by the government, the party against whom they will be offered here; indeed, they were made by the very same prosecutors' office. Kattar, 840 F.2d at 130–31 (noting that "The government cannot indicate to one federal court that certain statements are trustworthy and accurate, and then argue to a jury in another federal court that those same assertions are hearsay."). Accordingly, those statements should be admitted to impeach Celona.

Accordingly, government statements such as "No one will ever call [Celona] a good witness" (Sentencing Tr. 21:19–20) and the government's letter to the Rhode Island Ethics Commission regarding Celona (see Letter from Assistant United States Attorney L. Matos to J. Gramitt, dated August 30, 2005) are admissible against the government as party-opponent admissions under Rule 801(d)(2). The same is true of the Information to which Celona pleaded guilty. (See Information, dated June 27, 2005 ("Information").) Unlike an indictment, which can be construed as a statement of the grand jury, see United States v. GAF Corp., 928 F.2d 1253, 1261 (2d Cir. 1991), an information is drafted, signed, and authorized entirely by the government. See United States Dep't of Justice, Federal Grand Jury Practice § 11.3 at 340 (noting that "The prosecuting attorney, rather than grand jury, files the information with the presiding judge or magistrate."). Indeed, it is difficult to imagine a document in which the government more clearly manifests its belief in the truth contained therein than a criminal information, carefully drawn pursuant to the rules of criminal procedure, subscribed by the United States Attorney in the name of the United States government, charging a United States citizen with a crime, and filed with the United States District Court. Under the circumstances here presented, and pursuant to the foregoing authority, the Information should be admitted against the government pursuant to Rule 801(d)(2)(B).[5]

[5] Where a government statement consists of factual findings resulting from an investigation made pursuant to authority granted by law, such a statement is also admissible against the government as a public report pursuant to Rule 803(8)(C) of the Federal Rules of Evidence. For example, the Information is clearly admissible on this ground. See Davignon v. Hodgson, No. 06-1191, 2008 WL 1822375, at *18 (1st Cir. April 24, 2008) (noting that Supreme Court has interpreted Rule 803(8)(C) broadly "to include both conclusions and opinions of public offices and agencies") (internal quotation omitted).

For the foregoing reasons, the defendants respectfully request that the motions in limine set forth herein be granted.

Dated: May 5, 2008

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase______________

Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
(203) 363-7676 (fax)
dfein@wiggin.com
scorrigan@wiggin.com

CARLOS ORTIZ,
By his Attorneys,

/s/ Mark L. Smith______________

Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com

## CERTIFICATE OF SERVICE

I, **David B. Fein**, certify that on the 5th day of May, 2008, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's electronic filing system. Notice of this filing will be sent by email to the following parties by operation of the Court's electronic filing system:

- **Stephen G. Dambruch**
  stephen.dambruch@usdoj.gov

- **Daniel A. Petalas**
  Dan.Petalas@usdoj.gov

- **Gerard B. Sullivan**
  gerard.sullivan@usdoj.gov

- **Peter Sprung**
  peter.sprung@usdoj.gov

- **AnnaLou Tirol**
  annalou.tirol2@usdoj.gov