**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **CR 07-09 MML** |
| | : | |
| **JOHN R. KRAMER and** | : | |
| **CARLOS ORTIZ.** | : | |
| | : | |

# TRIAL MEMORANDUM OF THE UNITED STATES

The United States, by its undersigned counsel, files this memorandum to inform the Court of the general nature of this case and address certain legal and evidentiary issues that may arise during trial of this matter.

## TABLE OF CONTENTS

I. Status of the Case . . . . . 1

A. Indictment . . . . . 1

B. Jury Trial . . . . . 1

C. Discovery . . . . . 1

D. Pending Pre-Trial Motions . . . . . 2

E. Exhibits . . . . . 2

F. Jury Instructions . . . . . 2

II. Factual Summary . . . . . 2

A. The Defendants, Co-Conspirators, and Others . . . . . 3

B. Legislative Background . . . . . 5

C. Conduct of the Scheme . . . . . 6

III. Statutes and Elements of Offenses . . . . . 13

A. Count 1: Conspiracy to Commit Honest Services Mail Fraud . . . . . 13

B. Counts 2-22: Substantive Counts of Honest Services Mail Fraud . . . . . . . . . . . . 15

C. Count 23: Federal Program Bribery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D. All Substantive Counts: Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV. Evidentiary and Other Legal Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. Admissibility of Codefendant Statements by Admission . . . . . . . . . . . . . . . . . . . 21

1. Existence of a Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

2. In Furtherance of the Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3. Admissibility of Authorized Admissions . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B. Impeachment with Extrinsic Evidence and Prior Inconsistent Statements . . . . . 25

1. Inadmissibility of Collateral Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

2. Prior Inconsistent Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3. Impeachment with 302s or Rough Notes of Interviews . . . . . . . . . . . . . . . 31

C. Limited Role and Evidence on the R.I. Code of Ethics . . . . . . . . . . . . . . . . . . . . . 33

D. Inadmissibility of Certain Reciprocal Discovery Materials . . . . . . . . . . . . . . . . 35

1. Salvaged Fragments of Electronic Files . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2. Merits of the Defendants' Policy Positions . . . . . . . . . . . . . . . . . . . . . . . . 35

3. The Irons Advisory Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

4. Specific Instances of Good Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E. Evidence or Argument About the Government's Charging Decision . . . . . . . . . 38

F. Leading Questions During Direct and Cross Examination . . . . . . . . . . . . . . . . . 39

G. John Celona's Other Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## I. Status of the Case

### A. Indictment

On January 18, 2007, a federal grand jury in the District of Rhode Island returned a 23-count Indictment in this case. The indictment charged defendants John R. Kramer and Carlos Ortiz with one count of conspiracy to commit honest services mail fraud, in violation of 18 U.S.C. §§ 371 and 1341 (Count 1). The indictment further charged each defendant with substantive honest services mail fraud and aiding and abetting the same, in violation of 18 U.S.C. §§ 1341, 1346, and 2 (Counts 2-22), as well as with federal program bribery and aiding and abetting, in violation of 18 U.S.C. §§ 666 and 2 (Count 23).

On March 13, 2008, the grand jury returned a Superseding Indictment, pressing the same charges as the original indictment, but pleading Count 23, federal program bribery, with greater specificity, including the amendments identified in the government's previously filed unopposed motion to amend, and revising some of the language in the conspiracy and mail fraud counts.

### B. Jury Trial

Jury impanelment in this case is scheduled to begin May 5, 2008, with trial commencing May 12, 2008. No jury waiver has been filed. Because the government cannot predict the extent or duration of cross-examination, it is difficult to forecast the expected length of trial. At present, the government estimates that it may call approximately 20 to 25 witnesses and that its case-in-chief may require 14 or more trial days.

### C. Discovery

The United States has complied with its discovery obligations, including production of Jencks Act materials well in advance of trial. The government has undertaken an "open file" approach to discovery. The government has requested reciprocal discovery from each defendant. Defendant Ortiz has not produced any reciprocal discovery. Defendant Kramer has produced

one file folder of records, consisting predominantly of inadmissible materials, as discussed further below. Neither defendant has made any pre-trial reciprocal discovery of witness statements to the government. See Arraignment and Pretrial Discovery Order at 4 (Jan. 30, 2007).

### D. Pending Pre-Trial Motions

The final deadline for filing pre-trial motions was April 4, 2008. This Court conducted hearings on the defendants' pretrial motions on January 31, 2008 and on April 11, 2008. Two motions remain outstanding: a defense motion to preclude admission of defendant Ortiz's prior testimony in the defendants' joint trial, and another seeking disclosure of the Court's pre-sentence investigation report on Celona. In addition, the Court has taken under advisement a motion to strike the government's concealed conflict theory, treating it as a motion in limine.

### E. Exhibits

The government has supplied its current exhibit list to the Court and defense counsel under separate cover. That preliminary list will continue to be updated before and during trial to reflect additional exhibits that the government may find necessary to introduce.

### F. Jury Instructions

The government's proposed final jury instructions have been submitted to the Court and parties under separate cover. The government has requested leave to update the proposed charging language as the progress of trial may require.

## II. Factual Summary

The government contends that the admissible trial evidence will demonstrate that, over the course of several years, defendants Kramer and Ortiz participated in a bribery and honest services scheme by which they provided more than $45,000 in payments and things of value to then-Senator Celona. The defendants provided those benefits, at least in part, to influence

Celona's official actions on matters in which they and their employer had an interest. The payments were made under cover of a "consultation" arrangement. Through a variety of means, the defendants and their co-conspirator, Celona, took steps to conceal and minimize the risk that the financial relationship would become public. Although they supposedly paid Celona for consulting services, Celona provided little such work, and Kramer and Ortiz rarely asked him to provide any legitimate services for his pay. Rather, in dealing with Celona they focused their efforts on lobbying him about pending official matters, while hiding the fact of the payments from anyone to whom that fact might be material. Celona reciprocated: he never formally disclosed the payments and followed their instructions on legislation and other official business. As a result, instead of the honest and loyal services he was elected and bound to provide, Celona secretly served Kramer and Ortiz as a paid insider in the Senate.

**A. The Defendants, Co-Conspirators, and Others**

Defendant John Kramer was employed by CVS for approximately 14 years, beginning in 1991. At the relevant time, he was a Senior Vice President for CVS, whose duties involved community relations, government affairs, and charitable giving. Defendant Carlos Ortiz was employed by CVS for approximately 28 years, beginning in 1976. At the time of the incidents alleged in the indictment, Ortiz was a Vice President for CVS, whose duties involved government affairs.

John Celona was a State Senator elected to the Rhode Island General Assembly, where he served from 1995 until he resigned in 2004. During his tenure in office, Celona served on the Senate Corporations Committee and, in the 2001 legislative term, became Chairman of that committee, a position he continued to hold through the 2002 and 2003 sessions as well. Both committees had jurisdiction over matters affecting pharmacies such as CVS. From 2000 to 2004, Celona also served, by designation of the Senate Finance Committee Chairman, as a

member of the Rhode Island Student Loan Authority ("RISLA"), an official body of state government that provided loans for higher education, including loans to pharmacy students.

Celona was a co-conspirator who was separately charged. He pleaded guilty to three counts of honest services mail fraud. Each of those three counts related to a separate scheme, each of which involved a different corporation and various corporate executives. One of Celona's counts of conviction involved the scheme alleged in the indictment involving Kramer, Ortiz, and their employer, CVS. The other two schemes involved executives at Roger Williams Medical Center ("RWMC") and Blue Cross Blue Shield of Rhode Island ("Blue Cross").

Among the cooperation he has provided in these investigations, Celona testified at the trial of three RWMC executives, two of whom were convicted by a jury for their role in that scheme with Celona.[1] RWMC itself entered into a deferred prosecution agreement, and Blue Cross entered into a non-prosecution agreement. Each agreement imposed financial penalties, required acceptance of responsibility, and obligated the companies to cooperate with the investigation.[2]

Celona was sentenced below the guidelines because of the substantial assistance he provided. The sentencing court agreed with the government's recommendation to reduce Celona's sentence by one year based on the nature and extent of his cooperation.[3] Judge Torres

---

[1] The convictions of Robert Urciuoli and Francis Driscoll were reversed on appeal on a claim of legal error. United States v. Urciuoli, 513 F.3d 290 (1st Cir. 2008). They are awaiting re-trial.

[2] The government does not intend to elicit these facts during trial, unless the defense opens the door. The government will approach and address the matter with the Court before undertaking any attempt to do so.

[3] The Court determined that Celona's guideline range was higher than the range calculated in the Pre-sentence Report. The Court nevertheless agreed with the government's recommendation that Celona's assistance was worth one year off his sentence.

found that, but for Celona's assistance, he would have been sentenced to 42 months in prison. Instead, he received a prison sentence of 30 months. The reduced sentence took into account Celona's continuing cooperation in the present case. Accordingly, he has been advised that he will not receive any further sentence reduction for testifying at this trial.[4]

CVS is a Deleware corporation that operates a retail pharmacy chain. CVS derives income from retail sales of prescription drugs. That activity is regulated by state and federal law. Kramer and Ortiz were executives in the government affairs department, and their duties involved monitoring and influencing the outcome of proposed legislation that might impact CVS's pharmacy business. Those regulatory issues were routinely heard before the Senate Corporations Committee, on which Celona served initially as a member and later as its Chairman.

**B. Legislative Background**

Prior to the inception of the charged scheme, Blue Cross, the largest healthcare insurer in Rhode Island, had contracted with PharmaCare, a wholly owned subsidiary of CVS, to manage a restricted network of pharmacies for a particular Blue Cross plan. The network was restricted, in that those people who were covered were required to purchase prescriptions only at pharmacies that participated in the network. CVS was the largest provider admitted to the closed network.

---

[4] The United States also delayed the filing of Celona's Criminal Information and Plea Agreement for several days at his request to allow him to inform his family about the charges and the terms of his agreement. Celona was criminally prosecuted by the State of Rhode Island for the same or similar crimes but received no benefit from the United States in connection with that prosecution. He was also investigated, prosecuted, and fined by the Rhode Island Ethics Commission. In that proceeding, the government supplied a letter to the Ethics Commission confirming Celona's cooperation with federal authorities. Recently, Celona verbally inquired whether he would be subject to future prosecutions based on untruthful statements that he initially gave to federal agents, but later corrected. He was told that he would not be subject to additional prosecutions under 18 USC § 1001 for his initial misstatements, provided they have been corrected.

Maintaining the restricted nature of the network financially benefitted both CVS and Blue Cross.[5]

Beginning around 1995, legislation was proposed in the General Assembly to allow covered insureds to fill prescriptions at their choice of pharmacies, or to permit any pharmacy that was willing to accept the reimbursement rate under the restricted network to participate in it. The proposed legislation was known generally as “Any Willing Provider” or “Freedom of Choice” legislation (“AWP”).

Blue Cross and CVS were opposed to AWP legislation, while pharmacies that were shut out of the network strongly supported it. AWP legislation was an important piece of legislation to Kramer and Ortiz. Their yearly evaluations made specific reference to their efforts and successes aimed at defeating the legislation. The legislation was anticipated to have a significant financial impact on the company.

Prior to his retention by CVS, Celona was a vocal proponent of AWP. In the 1998 and 1999 legislative sessions, Celona sponsored AWP legislation and voted in favor of it.

**C. Conduct of the Scheme**

After vigorous campaigns conducted by pharmacies on both sides of the battle over AWP legislation, the proposed Senate bill was defeated in 1999. Shortly thereafter, Kramer and Ortiz began to focus their attention on Celona. They made political donations to his campaign and they attended his fund raisers. Through the course of the Summer and Fall of that year, Kramer and Ortiz also began to engage in discussions with Celona about retaining him as a paid consultant for CVS.

---

[5] CVS increased its share of pharmaceutical sales under the plan, enjoyed increased retail traffic, and secured PharmaCare’s profits as well; Blue Cross enjoyed volume discounts and reduced prices for prescription drugs.

Kramer and Ortiz eventually asked Celona to provide a proposal of what consulting services he could offer. On September 23, 1999, Celona sent Kramer a letter proposing to lead a marketing effort for CVS focused on senior citizens. He tied that undertaking to the bad publicity for CVS with seniors resulting from the public battle over AWP legislation, which he had sponsored and supported.

Around the time Celona gave the proposal to Kramer and Ortiz, he called an unknown member of the Ethics Commission about the possibility of work with CVS. At some point thereafter, but before discussing any particular terms or conditions of the relationship, Ortiz asked Celona whether ethics rules permitted Celona to work for CVS. According to Celona, he told them in substance that, he had called the Ethics Commission, and had "referred to what the Ethics Commission had stated, that a similar case with teachers in the legislature, if they voted on something that deals with teachers as a whole, they can vote on it but if it deals with them specifically, they cannot vote on it."

After that conversation, the topic never came up again. Neither Kramer nor Ortiz ever asked to see an Ethics Advisory Opinion, despite their knowledge of the preliminary phase of their dealings when Celona supposedly made the call, that Celona changed his position on AWP after they began paying him, and that the supposed opinion was not in writing. Likewise, they never formally tasked Celona with any significant consulting assignments or asked him to provide regular reports on his efforts while they were ongoing, but did ask him to perform official acts on their behalf.

To effect the agreement, Ortiz requested a form consulting agreement from Christine Egan, a lawyer in the CVS legal department. Ortiz prepared the final document himself. He did not tell Egan that the agreement was to be entered with a public official. Neither did he seek her

advice about the propriety of the proposed job, or of asking a public official to act on official matters on CVS's behalf while CVS was paying him.

Ortiz and Celona thereafter executed a one-year Consulting Agreement dated February 10, 2000. The original signed agreement was found in Ortiz's office, the only document located in his file labeled "John Celona." Another copy of the document was found in the search of Celona's home. Ortiz never provided Egan with a completed or executed copy of the agreement bearing Celona's name.

The agreement identified Celona as a "consultant" and further specified that he was "tasked with certain public relations services." The agreement provided that Celona would be paid $1,000 a month for his services. The agreement stipulated no reporting or performance requirements. When entering this agreement with Celona, Kramer and Ortiz failed to comply with related CVS corporate policies and procedures. They also failed to inform any relevant senior executives that they had hired a sitting State Senator that they, and the company under their direction, continued to lobby.[6] The few employees who knew about the agreement were administrative assistants for Kramer and Ortiz, or billing functionaries who processed CVS's numerous check requests.

Celona mailed monthly invoices to Ortiz for his services until September 2003. In all, Kramer and Ortiz caused 38 checks to be issued to Celona, delivered by mail, totaling approximately $45,000.

---

[6] In the summer of 2003, after Kramer was replaced as Ortiz's supervisor and Ortiz learned that the company wanted a line-by-line review of the government affairs section budget, Ortiz informed his new supervisor about the relationship during that budget review. Ortiz told the supervisor simply that the company was not getting value from its spending on Celona and suggested the company release him. It was the only budget item he recommended be cut.

In addition to those consulting fees, Kramer and Ortiz provided Celona with gifts of meals, travel, and entertainment. Those perks included attendance at CVS corporate events like the annual CVS Gala, tickets to professional sporting events including the CVS Charity Classic, tickets to attend the taping of an Oprah Winfrey television program, greens fees at various golf courses, as well as expenses covered by a retail association to which CVS belonged involving trips to Key Biscayne, Florida and San Diego, California. He was also provided with otherwise legitimate political funding from the corporation's PAC by Kramer and Ortiz.

After signing the agreement, Celona stopped sponsoring and voting in favor of AWP. Instead, Celona began to work to defeat the legislation. Approximately one month after hiring Celona, Ortiz testified against AWP before the Senate Corporations Committee. Although Celona attended State Senate sessions that day, he intentionally absented himself from the committee hearing when the AWP vote was being held. The Corporations Committee Chairman at the time, who Celona identified as closely aligned with CVS, asked him to leave the room and not vote. Celona asserts he agreed to that request, at least in part, because Kramer and Ortiz were paying him. After 2001, as Chairman of the Corporations Committee, Celona had the power to set the committee's agenda and would simply not post AWP bills for hearing. That act procedurally blocked the legislation. As a result, AWP legislation died in Celona's committee in both 2001 and 2002. Again, Celona admits that he procedurally killed the legislation because Kramer and Ortiz were paying him.

The consulting agreement was limited by its express terms to one year, a period that could only be extended in writing. Toward the end of 2000, Celona inquired about extending the agreement in e-mails with Ortiz. In response, for the first time, Ortiz asked Celona what work he had done for CVS over the year and what he intended to do in the next. By this time, Ortiz had already approved $11,000 in payments to Celona. Ortiz allowed the agreement to lapse, but

continued to authorize the monthly payments to Celona nonetheless. Ortiz characterized those payments in the Government Affairs budget as "political contributions."

While Celona and Ortiz were discussing the extension of the agreement, Celona was selected to become chairman of the Corporations committee, giving Celona more authority and also exposing him to greater public scrutiny. Around that time, Ortiz spoke to Todd Andrews, Director of Corporate Communications at CVS. Ortiz told Andrews that Kramer had hired Celona as a consultant. Ortiz also told Andrews that he thought it was a bad idea. Andrews stated his own disbelief and expressed concerns abut the propriety of the relationship. Although he did not believe there was any written ethics advisory opinion, Ortiz assured Andrews that there was an opinion on the matter. Andrews was concerned that the news media would discover the opinion and inquire about the legitimacy of the relationship, and wanted to be able to answer any such inquiry. The two therefore drafted a post hoc "Scope of Work" document purporting to describe Celona's legitimate work duties. In that regard, Andrews relied on Ortiz's description of what Celona was doing for CVS. The resulting document inaccurately suggested that Celona was closely supervised and had reporting requirements.

Based on Ortiz's claim that Celona was actually doing work for CVS in the elderly community, Andrews coined the job title, "Community Service Consultant." After drafting the scope of work document, he gave it to Ortiz to review. Ortiz did not suggest any changes. Ortiz specifically asked Andrews not to mention their discussion to anyone.

On March 13, 2001, over one year after CVS began paying Celona $1,000 per month, and despite the lack of any valid written agreement with Celona, Ortiz instructed Celona that, "[i]f anyone asks you what you do for CVS you should identify your title as Community Service Consultant. How does that sound to you?" Despite the new title, Ortiz did not inform the two Community Relations Directors who shared his office location that their small department now

employed a sitting Senator who was hired to provide "consulting" services in their particular area of responsibility.

In addition to AWP legislation, CVS, and therefore Kramer and Ortiz, had an interest in hundreds of proposed bills that continued to pass through the General Assembly, including Celona's committee. As Chairman, Celona officially acted on all legislation assigned to his committee. The indictment specifies a number of particular official matters on which Celona acted, at least in part, as a result of his concealed financial relationship with CVS. These included legislation requiring pharmaceutical manufacturers to accept returns of drugs from distributors, legislation to permit pharmacies to accept electronic prescriptions, and legislation involving pharmaceuticals from Canada. Celona also used his official position on the Rhode Island Student Loan Authority to obtain a student loan benefit specifically for pharmacy students that CVS, Kramer, and Ortiz favored. On various occasions, either Kramer or Ortiz asked Celona to act on these pending matters, as did the CVS contract lobbyists whom the defendants employed to promote their regulatory agenda. Over the course of those more than three years of activity, none of the lobbyists were informed by Kramer or Ortiz that Celona was receiving payments from CVS. One lobbyist may have been told Celona was "doing something" with Kramer on charitable activities or television, which had been approved by the ethics commission.

The consultation relationship came to an end in Summer 2003, although the stream of benefits continued for a time thereafter. On August 22, 2003, Kramer played golf with Celona, which was paid for by CVS. During the golf match, Kramer mentioned a controversy surrounding another politician who had an employment relationship with a company that had matters pending before him. He informed Celona that CVS would no longer be able to pay him. Kramer then invited Celona to attend a charity celebrity golf tournament with him, at CVS's

expense, to be held at San Diego, California. Celona characterized the offer as a "consolation" bribe.

In September 2003, Celona received his last $1,000 payment from CVS, bringing the total to $45,000. During the period October 9-12, 2003, Celona traveled with Kramer on an all-expense paid trip to San Diego, California. He attended the Susan G. Komen Celebrity Golf Tournement which was held at the Four Seasons Hotel and the Pelican Hill Golf Course. CVS paid a $32,500 sponsorship fee, and received packages for four people providing, airfare, food, lodging, golf, and entertainment.

In early December 2003, Andrews received a call from a reporter for the Providence Journal. She asked specifically about Celona's relationship with the company. Andrews relayed the information in the scope of work document that Ortiz and he had drafted. As such, Andrews unwittingly disguised from the reporter the true nature of the relationship between CVS and Celona. He inaccurately suggested that Celona was actually performing consulting services in a supervised employment setting. He failed to say that Kramer and Ortiz, themselves and through the contract lobbyists who answered to them, had been asking Celona to take positions in furtherance of CVS's political objectives on official matters while, unknown to the public, CVS was paying him.

Later that same day Ortiz and Celona called Andrews. While Andrews was on the line, Ortiz told Celona what Andrews had told the reporter about the nature of the job, and added that Andrews had told the reporter that Celona had an ethics advisory opinion. Celona stated that he didn't have an advisory opinion. Ortiz remained quiet, expressing neither challenge, anger, or surprise. Celona asked Andrews what they should do. Andrews said that he could not provide them any direction and simply hung up.

Celona also responded to the media. Celona told the newspaper, "[i]f there is a perception that I voted a certain way on pharmacy issues because of my relationship with the charitable endeavors of CVS Pharmacy, Inc., then I should have recused myself from those matters." At the time this statement was made and published, Celona knew that it was incomplete, untruthful, and misleading. Celona's relationship with CVS was not limited to "the charitable endeavors of CVS Pharmacy," but included legislative functions and political favors.

## III. Statutes and Elements of Offenses

### A. Count 1: Conspiracy to Commit Honest Services Mail Fraud

Count 1 charges conspiracy to commit honest services mail fraud, in violation of 18 U.S.C. § 371. In order to prove the conspiracy charge, the United States must show:

(1) that the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to commit honest services mail fraud;

(2) that the defendant willfully joined in that agreement; and

(3) that one of the conspirators committed an overt act in an effort to further the purpose of the conspiracy.

First Cir. Pattern Jury Instr. § 4.03 at 60 (1998).

A conspiracy is an agreement to disobey or to disregard the law. United States v. Pacheco-Ortiz, 889 F.2d 301 (1st Cir. 1989); United States v. Flaherty, 668 F.2d 566, 580 (1st Cir. 1981). The government must prove "an intent to agree and an intent to effectuate the commission of the substantive offense. A defendant need not have had the intent personally to commit the substantive crime." United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994); see also United States v. Gomez-Pabon, 911 F.2d 847 (1st Cir. 1990). A conspiratorial agreement may be proved by either direct or circumstantial evidence. United States v. Concemi, 957 F.2d 942 (1st Cir. 1992); United States v. Notarantonio, 758 F.2d 777 (1st Cir. 1985). A defendant's

knowing participation in a conspiracy may be established by proof of surrounding circumstances. United States v. Paradis, 802 F.2d 553 (1st Cir. 1986). The agreement need not be express. It may consist of no more than a tacit understanding. United States v. Pacheco-Ortiz, 889 F.2d 301 (1st Cir. 1989).

The government must prove that the defendant had knowledge of the basic agreement. United States v. Marsh, 747 F.2d 7 (1st Cir. 1984). However, each defendant need not have knowledge of all of the details of the conspiracy nor of all the participants in the conspiracy nor of their acts. United States v. Williams, 809 F.2d 75, 86 (1st Cir. 1986); United States v. Arruda, 715 F.2d 671 (1st Cir. 1983). The defendant need not participate in all of the activities of the conspiracy in order to be held a member of the conspiracy. Id. The government must prove each defendant knowingly and intentionally joined the conspiracy. United States v. Pacheco--Ortiz, 889 F.2d 301 (1st Cir. 1989).

A coconspirator is responsible not only for his own acts, but also for the acts of other conspirators done in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640 (1946); United States v. Rengifo, 858 F.2d 800 (1st Cir. 1988). For purposes of criminal liability as a conspirator, one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of his coconspirators made after the formation of and in furtherance of the conspiracy. Thus, the defendant is bound by all acts committed by coconspirators in furtherance thereof, including those acts committed without his knowledge before he joined the conspiracy. United States v. O'Campo, 973 F.2d 1015 (1st Cir. 1992); United States v. Cintolo, 818 F.2d 980 (1st Cir. 1987).

**B. Counts 2-22: Substantive Counts of Honest Services Mail Fraud**

To establish a violation of 18 U.S.C. §§ 1341 and 1346, the government must prove three elements:

(1) a scheme, substantially as charged in the indictment, to defraud;

(2) the defendant's knowing and willing participation in this scheme with the intent to defraud; and

(3) the use of the United States mails, on or about the date charged, in furtherance of this scheme.

First Cir. Pattern Crim. Jury Instr. § 4.12 (1997); see United States v. Sawyer, 239 F.3d 31, 39-40 (1st Cir. 2001) ("Sawyer II").

With respect to the first element, 18 U.S.C. § 1346 provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346, and therefore § 1341, "reach[es] schemes to defraud individuals of the intangible right to honest services of government officials." United States v. Sawyer , 85 F.3d 713, 723-24 (1st Cir. 1996) ("Sawyer I") (citing United States v. Grandmaison, 77 F.3d 555, 565-66 (1st Cir. 1996)). Because the Superseding Indictment here alleges such a scheme, with respect to the second element, the United States must prove that the defendant "acted with two kinds of intent: that [he] intended to deprive the public of [Celona's] honest services, and that [the defendant] intended to deceive the public." Sawyer II, 239 F.3d at 41. The first kind of intent requires either that the defendant "intended to influence [Celona] in [his] official action" or intended that Celona fail to disclose a conflict of interest resulting in personal gain. Id. at 40-41. The United States may demonstrate intent to influence in several ways. "For example, a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific quid pro quo. Rather, . . . a person with

continuing and long-term interest before an official might engage in a pattern of repeated intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services." Id. at 41.

Regarding intent to deceive, the government may prove either that the defendants' themselves acted to deceive the public or that they intended for the official to conceal the conflicting relationship. At bottom, the government must present sufficient evidence to establish the defendants' intent that the public be deceived with respect to payments to the public official. Sawyer II, 239 F.3d at 48-49.

The jury therefore may not convict the defendants for honest services fraud only because Celona acted under a conflict. Urciuoli, 513 F.3d at 298-99. However, evidence of the defendants' disregard of an obvious conflict may be considered, in addition to other evidence, in making the intent finding. Woodward, 149 F.3d at 57. Ultimately, the jury must conclude that the particular defendant in question intended to influence the official and conceal the conflict from the public. Sawyer II, 239 F.3d at 41. That determination may be the result of any of a host of inferences a reasonable jury may chose to draw from the circumstantial evidence presented at trial. Woodward, 149 F.3d at 57.

In honest services cases, the injury to the public includes deprivation of the public's right to "full disclosure as to the official's potential motivation." Sawyer I, 85 F.3d at 724. Accordingly, the merits of the legislation or other official action that the scheme targets is irrelevant. United States v. Lopez-Lukis, 102 F.3d 1164, 1169 n.13 (11th Cir. 1997) ("That the result of the bribed commissioner's vote actually benefits the electorate would not change the fraudulent nature of her conduct. Sections 1341 and 1346 do not address the wisdom or results of a legislative decision; rather they concern the manner in which officials make their decision."); see Sawyer I, 85 F.3d at 724 (holding that "undisclosed, biased decision making for

personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services") (emphasis added); United States v. Jennings, 487 F.3d 564, 580 (8th Cir. 2007) (government need not prove actual harm to prove a scheme to defraud honest services). Cf. United States v. Segal, 495 F.3d 826, 834 (7th Cir. 2007) ("The unauthorized use of money from an insurance premium trust account is mail fraud even if the defendant did not gain and the victim did not lose.").

Nor does it matter that a public official would have acted as he did regardless of the payments, or that his efforts in furtherance of the scheme failed. United States v. Walker, 490 F.3d 1282, 1298 (11th Cir. 2007) (government need not show that the public official followed through on an agreement to take official action); United States v. Blumeyer, 114 F.3d 758, 766 (8th Cir. 1997) (noting "the public's right to honest services of a public officer is violated when the officer uses a public position to pursue dishonest ends, not merely when the officer achieves a dishonest goal"); United States v. Panarella, 277 F.3d 678 (3d Cir. 2002) (where official "takes discretionary action in his official capacity that the official knows will directly benefit the concealed interest, the official has deprived the public of his honest services, regardless of whether the concealed financial interest improperly influenced the official's actions").

It is also no defense that a defendant was merely "following orders." That defense has been roundly rejected in numerous contexts, including a fraud case in this circuit. United States v. Guerra-Garcia, 336 F.3d 19, 24 (1st Cir. 2003) (rejecting following orders defense in illegal alien case where defendant had knowledge); United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994) (rejecting following orders defense where defendant had knowledge in a fraud case); United States v. Azeem,1993 WL 5902 *5 (4th Cir. 1993) (unpublished) (in conspiracy and false statements case, rejecting defendants' claim that he was the "'low man on the totem pole' simply following orders"); see generally United States v. North, 910 F.2d 843, 880-81 (D.C. Cir. 1990)

("[O]ur criminal justice system, one based on individual accountability and responsibility, has historically recoiled" from a "following orders" or "Nuremberg" defense); United States v. Funmaker, 10 F.3d 1327, 1331 (7th Cir. 1993) (noting that federal government is entitled to prosecute individuals who follow orders that violate federal law). Such "justification" claims may be relevant for sentencing. Injecting justification at trial, however, confuses the issues and invites the jury to nullify. Under any name, the "following orders" defense simply is not available where a defendant has knowledge about the existence of fraud and actively participates in that scheme to defraud.

**C. Count 23: Federal Program Bribery**

To prove federal program bribery under Section 666(a)(2), (b), the government must establish each of the following five elements as to each defendant:

(1) that the defendant offered, gave, or agreed to give some thing of value to John Celona;

(2) that John Celona was an agent of a State government or agency thereof;

(3) that the defendant acted corruptly, with the intent, at least in part, to influence or reward John Celona in connection with some business, transaction, or series of transactions with the government or agency;[7]

(4) that the business, transaction, or series of transactions involved anything of a value of $5,000 or more; and

(5) that the government or agency, in a one-year period, received benefits of more than $10,000 under any federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other assistance.

18 U.S.C. § 666(a)(2), (b); see United States v. Castro, 89 F.3d 1443, 1454 (11th Cir. 1996). See Eighth Cir. Model Crim. Jury Instr. ¶ 6.18.666C at 179-80 (2008); accord Seventh Cir. Pattern

---

[7] Use of the phrase "at least in part" in the bribery instruction is appropriate if a defendant argues that a challenged bribe payment was made for a valid reason, because a "valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability." United States v. Coyne, 4 F.3d 100, 113 (2d Cir. 1993).

Crim. Jury Instr. at 178 (1998) (instruction for § 666(a)(1)(B)); Eleventh Cir. Pattern Crim. Jury Instr. ¶ 24 at 180-81 (2003) (instruction for § 666(a)(1)(B)).

The United States may prove the fourth element, that the business, transaction, or series of transactions involved anything of value of $5,000 or more through the value of the payments, which reflects the value the payor himself placed on the business or transactions at issue. United States v. Fernandes, 272 F.3d 938 (7th Cir. 2001); United States v. Zwick, 199 F.3d 672, 689 (3d Cir. 1999) (citing cases); see United States v. Marmolejo, 89 F.3d 1185, 1194 (5th Cir. 1996) (where prisoner was willing to pay jail employee $6,000 per month for permitting unauthorized conjugal visits plus $1,000 for each visit, the value of conjugal visit exceeded $5,000). Likewise, the total value of the stream of payments and benefits provided to Celona may be aggregated to satisfy the $5,000 requirement. Marmolejo, 89 F.3d at 1194; United States v. Cruzado-Laureano, 404 F.3d 470, 484-85 (1st Cir. 2005) (value of multiple acts of embezzlement from a program receiving federal funds were properly aggregated to satisfy $5,000 threshold). Accordingly, under the fourth element, the government can prove that the fair market value of the business or transactions involved in the bribery scheme were worth more than $5,000 based on the approximately $45,000 in known payments to Celona. Id.

To the extent the defendants may argue that the payment and things of value they caused CVS to provide Celona falls within the statutory exception for "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business," 18 U.S.C. § 666(c), the defendants would be mistaken. The statutory exception does not apply to bribes disguised as compensation. United States v. Grubb, 11 F.3d 424, 434 (4th Cir. 1993). Such corrupt payments are neither bona fide nor made in the usual course of business. Id.

**D. All Substantive Counts: Aiding and Abetting**

Defendants are also charged with aiding and abetting the honest services and bribery schemes, in violation of 18 U.S.C. § 2. A defendant may be treated as a principal even though he himself may not have actually consummated the crime. The government need not prove the identity of the principal, nor need the government convict the principal. The government need only prove that the substantive offense was committed by someone and that the defendant aided and abetted him. United States v. Campa, 679 F.2d 1006 (1st Cir. 1982). Aiding and abetting is not a separate charge, but a theory of prosecution. A court may always instruct on the theory of aiding and abetting if the evidence warrants such an instruction. United States v. Sanchez, 917 F.2d 607 (1st Cir. 1990).

Should the court conclude that an aiding and abetting instruction is appropriate, the First Circuit Pattern Criminal Jury Instructions provides that the government must establish the following two elements:

(1) someone else committed the charged crime, and

(2) the defendant willfully associated himself in some way with the crime and participated in it as he would in something he wished to bring about.

First Cir. Pattern Crim. Jury Instr. § 4.02.

Cases that have treated the matter indicate that, in the end, the government must prove that a defendant associated himself with the venture of a co-defendant, participated in it as something he wished to bring about, and sought by his actions to make it succeed. United States v. Bonfant, 851 F.2d 12 (1st Cir. 1988). Participation in every stage of the illegal venture is not necessary. It is sufficient if the participation occurs at some stage, accompanied by the knowledge of the result and a specific intent to bring about the result. United States v. Delgado Figueroa, 832 F.2d 691 (1st Cir. 1987).

Regarding the concept of "shared intent," the Supreme Court has recognized that "agreement remains the essential element of the crime [of conspiracy], and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact." Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975); see Pereira v. United States, 347 U.S. 1, 11 (1954) (noting that aiding and abetting is a crime of "broader application"); Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) (same). Therefore, the aiding and abetting instruction should not suggest that the government is required to prove that the defendant agreed to assist in the commission of the crime.

## IV. Evidentiary and Other Legal Issues

### A. Admissibility of Codefendant Statements by Admission

Federal Rule of Evidence 801(d)(2)(E) excludes from the operation of the hearsay rule "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The "government must show by a preponderance of the evidence that the defendant and declarant were in the same conspiracy and that the statement was made during the course and in furtherance of the conspiracy." Bourjailly v. United States, 483 U.S. 171, 175 (1987); United States v. Marino, 277 F.3d 11, 25 (1st Cir. 2002). A defendant who joins a conspiracy is deemed to have adopted prior statements made in furtherance of that conspiracy. See, e.g., United States v. Saccocia, 58 F.3d 754, 778 (1st Cir. 1995) (noting that defendant, "[b]y joining that conspiracy at a later date . . . effectively adopted co-conspirator declarations previously made").

To conserve judicial resources, the Court should conditionally admit the declaration and make its determination pursuant to United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1987) at the close of all of the evidence, on the record and out of the jury's presence. United States v. Ciampaglia, 628 F.2d 632 (1st Cir. 1980).

**1. Existence of a Conspiracy.**

"The touchstone of conspiracy is an agreement to do an unlawful act, but each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). "The jury may infer an agreement circumstantially by evidence of, inter alia, a common purpose, overlap of participants, and interdependence of various elements in the overall plan." Id. In addition, "[d]efendants may simultaneously be members of two conspiracies . . . . [A]nother conspiracy, larger than the one charged at trial, may provide the basis for the admission of the coconspirator's statements." Id. at 25-26 (citing United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993) ("Whether this was a separate conspiracy or part of the larger . . . conspiracy makes no difference so far as the admissibility of the statement . . . is concerned")); United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999); United States v. Orena, 32 F.3d 704, 713 (2d Cir. 1994).

A defendant need not be specifically aware of the details of the statement for it to be admissible against him, as recently stated by the First Circuit:

> [t]he rule is that as long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of.

Marino, 277 F.3d at 25 (citing United States v. Anguilo, 847 F.2d 956, 969 (1st Cir. 1988)).

**2. In Furtherance of the Conspiracy**

The term "in furtherance of the conspiracy" means that the statement must tend to advance the object(s) of the conspiracy as opposed to thwarting its purpose. United States v. Masse, 816 F.2d 805 (1st Cir. 1987). A defendant who joins a conspiracy is responsible for statements of other coconspirators made in furtherance of the conspiracy even if such statements

were made prior to his joining the conspiracy. United States v. Baines, 812 F.2d 41 (1st Cir. 1987). In making its Petrozziello findings, the Court may consider the hearsay statements themselves, but cannot rely solely on them in making its findings that Rule 801(d)(2)(E) has been satisfied. Bourjailly v. United States, 483 U.S. 171 (1987); United States v. Reynolds, 828 F.2d 46 (1st Cir. 1987).

Statements of a coconspirator which identify the participants, and discusses their continuing availability, are admissible. United States v. Crocker, 788 F.2d 802, 805 (1st Cir. 1986). Statements may be admitted as being "in furtherance" of the conspiracy, even if they do not achieve a goal of the conspiracy, if they reveal an intention to promote its objectives. United States v. Guerro, 693 F.2d 10, 13 (1st Cir. 1982). Other statements which have been held to be "in furtherance" of a conspiracy explain roles of the conspirators, discuss future plans of the conspirators, and report significant events.[8]

---

[8] See, e.g., United States v. Masse, 816 F.2d 805, 811 (1st Cir. 1987) (conspirator's statement to an undercover agent identifying the defendant as the source of the cocaine); United States v. Pelletier, 845 F.2d 1126, 1128 (1st Cir. 1988) (conspirator's statement identifying a fellow conspirator as the drug source); United States v. Flores-Rivera, 56 F.3d 319, 330 (1st Cir. 1995) (conspirator's statement to an informant that the defendant was a member of the drug conspiracy); United States v. Guerro, 693 F.2d 10 (1st Cir. 1982) (conspirator's statements to an undercover agent reflecting an unsuccessful attempt to conduct drug transaction because of a problem with the drug supplier); United States v. Kaplan, 832 F.2d 676, 685 (1st Cir. 1987) (physician and pharmacist's statements to each other regarding recruitment of a physician, referral system, and partial payment method with personal injury attorney in a false billing scheme involving a personal injury attorney and physicians); United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993) (statement by drug dealer to undercover agent that he was doing cocaine transaction with his brother even though the conspiracy between the brothers was not the conspiracy charged in the indictment); United States v. Sepulveda, 15 F.3d 1161, 1180-81 (1st Cir. 1993) (conspirator's reporting of significant events to another including the police's discovery of cocaine while executing a search warrant and conspirator's sharing of information to another conspirator about the operation of a drug ring); United States v. Diaz, 16 F.3d 401 (1st Cir. 1994) (conspirator's admission to undercover agent about the role of her husband in the drug operation assured the agent that the conspirator could carry out her end of the conspiracy without obstruction from her husband); United States v. Saccoccia, 58 F.3d 754, 779 (1st Cir. 1995) (statements between drug dealers regarding the sale of cocaine in a money laundering conspiracy were links in the lengthy chain of the narcotics trafficking cycle and ongoing

The government expects it may seek to elicit statements made by coconspirator declarants promoting various objects of the conspiracy, which will be admissible against both defendants under the co-conspirator hearsay exception. These include conversations between Carlos Ortiz and his fellow CVS employees Betty Bibeault, Robin Seeley, Todd Andrews, and James Smith. In brief, Ortiz statements' to Bibeault and Seeley were made in order to assure their assistance in processing the payments for Celona, a necessary step in the charged scheme. As such, those conversations were in furtherance of the conspiracy and are admissible against all members. Similarly, Ortiz's discussions with Andrews and Smith were both designed to disguise the true nature of the financial relationship with Celona. Those statements directly furthered the charged object of the conspiracy to conceal Colona's conflict from the public. Accordingly, those statements will be admissible against the co-conspirators as well.

**3. Admissibility of Authorized Admissions**

Many of the same admissions identified above as co-conspirator statements will also be admissible against defendant Kramer for the independent reason that they are statements "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D). Admissions resulting from the defendant's agency relationship with a declarant are not hearsay. Id.[9]

The coverage of the Rule includes statements by the agent or servant to the principal or employer, as well as to another agent or employee of the principal. Reid Bros. Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1306-07 & n.25 (9th Cir. 1983); Mahlandt v. Wild Canid

---

campaign to launder money).

[9] Such non-hearsay statements therefore do not fall within the reach of the Confrontation Clause under the "testimonial hearsay" rule announced in Crawford v. Washington, 124 S. Ct. 1354 (2004) and also do not give rise to a Bruton "confessional hearsay" problem.

Survival & Rsch. Ctr., Inc., 588 F.2d 626, 629-31 (8th Cir. 1978); Kingsley v. Baker/Beech-Nut Corp., 546 F.2d 1141 (5th Cir. 1977). "To qualify as nonhearsay under Rule 801(d)(2)(D), a statement must concern 'a matter within the scope' of the declarant's agency or employment. The statement itself is not required to be 'within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency.'" Larch v. Mansfield Mun. Elec. Dept., 272 F.3d 63, 72 (1st Cir. 2001) (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 801.33[2][c], at 801-69 (2d ed. 2001)).

Ortiz, Bibeault, and Seeley were all CVS employees and each worked in the section supervised by defendant Kramer. As such, any statements between or among those employees made during their employment relationship that concern or relate to the job will be admissible against defendant Kramer as an authorized admission under the Rule. See Larch, 272 F.3d at 72.

**B. Impeachment with Extrinsic Evidence and Prior Inconsistent Statements**

The defense may call witnesses for the sole purpose of impeaching the testimony of witnesses called by the government. The government anticipates that the defense may seek to impeach government witnesses by offering contradictory testimony or by the admission of prior inconsistent statements. While the government has no quarrel with the general proposition that a defendant may impeach by contradiction or by prior inconsistent statements, the government anticipates that one or more of the defendant's witnesses may be asked to offer testimony that is inadmissible either because (i) it is collateral to the issues at hand; (ii) it is not truly contradictory or inconsistent (and, therefore, is irrelevant); or (iii) it is so marginally relevant, if at all, that its probative value is substantially outweighed by the risk of confusing the issues, misleading the jury, and needlessly protracting the trial, all of which are grounds for excluding the evidence under Rule 403.

The government here advises the Court of its position on these matters to allow it to seek appropriate evidentiary rulings and to ensure that proper limiting instructions are given when and where appropriate relating to the defendants' efforts to conduct impeachment. These matters are entrusted to the broad discretion of this Court. See United States v. Walker, 930 F.2d 789, 791 (10th Cir. 1991) ("it is well settled that it is not improper for the trial judge to limit impeachment on matters that are deemed collateral or irrelevant"); United States v. Mulinelli-Navas, 111 F.3d 983, 988 (1st Cir. 1997) ("The inquiry into what is collateral is squarely within the trial court's discretion"); United States v. Hale, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness. As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent"); United States v. Agajanian, 852 F.2d 56, 58 (2d Cir. 1988) ("the determination of whether statements are in fact inconsistent is committed to the sound discretion of the district court").

**1. Inadmissibility of Collateral Evidence**

A defendant may impeach a government witness "by contradiction," that is, by offering evidence which contradicts the witness's testimony on a material issue. United States v. Fonseca, 435 F.3d 369, 375 (D.C. Cir. 2006); United States v. Halperin, 441 F.2d 612, 617 (5th Cir. 1971). This does not mean, however, that the defendants may seek to contradict a witness's testimony in whatever way, and to whatever extent, they desire. The law is well settled that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral or irrelevant matter elicited on cross-examination. Mulinelli-Navas, 111 F.3d at 988; United States v. Beauchamp, 986 F.2d 1, 3 (1st Cir. 1993); accord United States v. Ford, 21 F.3d 759, 764 (7th

Cir. 1994); United States v. Tarantino, 846 F.2d 1384, 1409 (D.C. Cir. 1988).[10] "This rule stems from the trial judge's power under Fed. R. Evid. 403 to exclude evidence which is more prejudicial, misleading, or confusing than probative," Walker, 930 F.2d at 791, to maintain a level of "concentration of attention," Tarantino, 846 F.2d at 1409 (internal quotation marks omitted), to avoid "undue extension of the trial," id., and "to avoid holding mini-trials on irrelevant or collateral matters." Beauchamp, 986 F.2d at 3 n.1.

An issue is collateral if it is not relevant, and thus not admissible, for any purpose other than mere contradiction of the witness's testimony. Beauchamp, 986 F.2d at 4; United States v. Payne, 102 F.3d 289, 294 (7th Cir. 1996). The "offered testimony must not only contradict a statement of [the witness], but must also be material to [the defendant]'s guilt or innocence." Mulinelli-Navas, 111 F.3d at 988. To the extent that the defense intends to offer any evidence solely to contradict a witness on a collateral matter, "it [i]s clearly exclud[a]ble." Beauchamp, 986 F.2d at 4.

For example, in Mulinelli-Navas, a witness on cross-examination referred to an interview that he previously had with an attorney named Murray. 111 F.3d at 988. The witness's in-court testimony regarding his interactions with the defendant differed from statements that he had made during his interview with Murray. Id. The witness testified that he lied during that interview because Murray had told him that the purpose of the interview was to "protect" the defendant. Id. At trial, the defendant sought to call Murray to impeach the witness's testimony that Murray had told the witness that the interview was intended to protect him. Id. The trial court refused to allow the testimony, and the court's ruling was upheld on appeal because the

[10] "'Evidence is "extrinsic" if offered through documents or other witnesses, rather than through cross-examination of the witness himself or herself.'" United States v. Boulerice, 325 F.3d 75, 82 n.5 (1st Cir. 2003) (quoting Weinstein's Federal Evidence § 608.20[1] (2d ed. 2003)) (emphasis added).

defendant had failed "to indicate any independent and material ground for admitting Murray's testimony as to what he told [the witness] at the time of the interview" and the testimony "was relevant only to [the witness'] credibility on a matter immaterial to [defendant]'s guilt." Mulinelli-Navas, 111 F.3d at 988; see also Beauchamp, 986 F.2d at 4 (no abuse of discretion in refusing to allow defendant to present testimony impeaching the credibility of a government witness who testified that he lived at a certain address; the proposed testimony was properly excluded not only because it was collateral but because it was "inconclusive," "said little about [the witness'] personal involvement in the crime," and the "marginal relevance" of the proposed testimony was outweighed by "time and effort" required to present the testimony).

A related problem may arise if the defense attempts to contradict through impeachment with extrinsic evidence that, even if not on a collateral issue, is nonetheless not authenticated or otherwise admissible for its truth. In such circumstances, the party may expose the jury to inadmissible evidence in the guise of impeachment with the hope that the jury will impermissibly use the evidence as substantive evidence. Any such attempt would be improper under Rule 403, as the probative value of the evidence (as impeachment) would be substantially outweighed by the danger of unfair prejudice (that the jury will use the evidence substantively). See Beauchamp, 986 F.2d at 4 (holding that "extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence") (emphasis added).

**2. Prior Inconsistent Statements**

Just as Rules 402 and 403 govern the use of extrinsic evidence to impeach a witness by contradiction, those same rules govern the use of extrinsic evidence to impeach a witness with a prior inconsistent statement. Before a defendant may present evidence of a prior inconsistent statement, he must establish (i) that the statement is in fact inconsistent with the witness's trial

testimony; (ii) that the subject matter of the statements is relevant; and (iii) that the requirements of Fed. R. Evid. 613 are satisfied. United States v. Strother, 49 F.3d 869, 874 (2d Cir. 1995); United States v. Thompson, 708 F.2d 1294, 1302 (8th Cir. 1983); United States v. Rogers, 549 F.2d 490, 495-97 (8th Cir. 1976). Rule 613 expressly requires that the prior statement "be shown or disclosed to opposing counsel" on request, Fed. R. Evid. 613(a), that the witness be afforded the opportunity "to explain or deny the [statement]," Fed. R. Evid. 613(b), and that the opposing party be afforded an opportunity "to interrogate the witness thereon." Id.

In order for a prior inconsistent statement to be used to impeach, it is necessary that the prior statement actually be inconsistent with the witness's in-court testimony. If, during the trial, a witness cannot recall making a prior statement, that does not automatically open the door for the defendant to admit extrinsic evidence of the prior statement. See Westinghouse Elec. Corp. v. Wray Equipment Corp., 286 F.2d 491, 493 (1st Cir. 1961) ("When a witness is unable to recall a past transaction, the majority of the cases do not allow a prior statement of the witness concerning that transaction to be introduced as a prior inconsistent statement"); United States v. Grubbs, 776 F.2d 1281, 1287 (5th Cir.1985) ("a claim of faulty memory does not constitute an inconsistent statement"); United States v. Palumbo, 639 F.2d 123, 128 n.6 (3d Cir. 1981) ("[s]everal courts have recognized that lack of memory as to the substance of a prior statement may not be inconsistent in certain circumstances with the prior statement"). See generally United States v. Guaranty Trust of New York, 100 F.2d 369, 372 (2d Cir. 1938) (holding that, where two witnesses testified with specificity about what was said concerning a particular issue during a meeting, while a third witness present at the meeting testified that he "did not believe" anything was said on the topic in question, but "he had no definite recollection of what occurred there," the testimony of the third witness could "hardly be deemed to be a contradiction of the

occurrences remembered by" the first two witnesses, in light the third witness's admission regarding his memory.)

Where a witness openly admits to having made a prior inconsistent statement, admission of evidence of the prior statement may be unnecessary or unwarranted. See, e.g., United States v. Soundingsides, 825 F.2d 1468, 1470 (10th Cir. 1987) ("the witness is thereby impeached and further testimony is not necessary") (internal quotation marks omitted); United States v. Dennis, 625 F.2d 782, 796 (8th Cir. 1980) (same). Courts and commentators recognize the significant danger of permitting the jury to receive extrinsic evidence on an already admitted point of impeachment that the jury would not be permitted to consider substantively. There appears to be no settled rule of inadmissibility in this situation, although some commentators identify exclusion as the "prevailing view" among the Circuits. See, e.g., 28 Charles Allen Wright & Victor James Gold, Federal Practice & Procedure § 6206, at 537-40 & nn. 19-20 (2008) (citing cases and treatises). Again, admissibility will turn on how the balance under Rule 403 is struck in a particular instance. See id. at 539-40.

Attempts at impeachment by omissions from prior statements also warrant careful scrutiny, as the test for admission of such evidence is "plainly elastic:" "Prior statements that omit details covered at trial are inconsistent if it would have been 'natural' for the witness to include them in the earlier statement." United States v. Stock, 948 F.2d 1299, 1301 (D.C. Cir. 1991). "[T]he 'naturalness' of a witness's decision to omit a point may depend on nuances of the prior statement's context, as well as on his own loquacity." Id.; Grubbs, 776 F.2d at 1287; compare United States v. Ayotte, 741 F.2d 865, 870-71 (6th Cir. 1984) (trial court erred in not allowing cross-examination of an agent who testified about a matter to which he had not testified in the grand jury and which was omitted from his report), with Leonardi, 623 F.2d at 756-57 (witness's trial testimony was mere "augment[ation]" of prior statements omitting facts).

### 3. Impeachment with 302s or Rough Notes of Interviews

The defendants may argue that they should be permitted to introduce extrinsic evidence of, or impeach witnesses with agents' summaries of witnesses' prior voluntary statements to law enforcement agents. They may further seek to introduce or impeach with the rough notes of third-parties who were present during some of Celona's statements to law enforcement agents. The defendants may only delve into what a witness has said previously and the circumstances under which the witness said it if they are attempting to contradict the witness's testimony at trial. See Fed. R. Evid. 611(b) (limiting the scope of cross examination); United States v. Marrero-Ortiz, 160 F.3d 768, 775 (1st Cir. 1998) ("Managing the scope of cross-examination is a matter that falls within the district court's sound discretion."); Delaware v. VanArsdall, 475 U.S. 673, 679, 106 S. Ct. 1431 (1986) (the "trial judge retains wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant").[11]

Three types of documents in this matter refer to prior witness statements: grand jury transcripts; summary memoranda prepared by investigating agents after a witness interview, commonly referred to as "302s;" and rough notes of third parties – agents and Celona's defense counsel -- who attended a multi-day proffer session with Celona, which the defense has in its possession.

[11] For example, the defendants may not conduct a putative cross-examination merely to impeach the agent's investigatory methods, the government's charging decision, or the scope of the government's production of discovery materials. It is axiomatic that the purpose of a criminal trial is to determine whether the government has met its burden of proof as to the charged crimes, not to examine how the government conducted the investigation or why it decided to seek the indictment against these defendants.

Clearly, it would be proper for the defendants to cross-examine a witness regarding discrepancies between the witness' testimony before the grand jury and at trial, so long as such cross examination does not violate Rule 403. However, the Supreme Court has long recognized that it would be "grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations, and interpolations." Palermo v. United States, 360 U.S. 343, 350 (1959). As such, it is proper to preclude use of an agent's 302 to impeach a witness because "a witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." United States v. Saget, 991 F.2d 702, 710 (11th Cir. 1993). In preparing 302s, which are summaries of information provided by a witness, the investigating agents necessarily exercise editorial discretion by including their characterization of only those segments of a witness's interview to which they assign importance and relevance. Therefore, absent a showing that the witness adopted a 302 in some fashion, the defense should not be permitted to impeach the witness with a 302. Palermo, 360 U.S. at 350.

Even more unfairly prejudicial would be impeachment through the rough notes of a third party. Such notes are the very exemplar of "the product of the investigator's [or defense counsel's] selections, interpretations, and interpolations." Palermo, 360 U.S. at 350. Rough notes are not a substantially verbatim recitation of a witnesses' remarks. They lack finality, completeness, and do not intend to communicate to anyone other than the note-taker. Indeed, for these reasons notes are not considered "statements" of a witness. United States v. Marrero-Ortiz, 160 F.3d 768, 775-76 (1st Cir. 1998) (rough agent notes must be formally adopted by witness to

become a Jencks Act "statement").[12] Impeachment with snippets of a third-party's rough notes would disregard context, reliability, and innocent omissions, whether intentional or inadvertent. See Palermo, 360 U.S. at 352 ("Quoting out of context is one of the most frequent and powerful modes of misquotation.") In short, the "grossly unfair" prejudice of impeachment through an unadopted 302 is compounded further when that examination is conducted through rough notes.[13]

### C. Limited Role and Evidence on the R.I. Code of Ethics

The government's case avoids any contention that mere proof of a violation of the Rhode Island Code of Ethics would be sufficient to prove honest services mail fraud or conspiracy against the defendants. See Sawyer I, 85 F.3d at 729. The government's case is premised on the fiduciary duty Celona owed the public generally, beyond any duties imposed by state ethics rules or regulations. Sawyer I, 85 F.3d at 733 n.17; Woodward, 149 F.3d at 62; accord Sawyer II, 239 F.3d at 40.

In this case, both defendants had professional responsibility for several years over government affairs at CVS. Both signed lobbying reports, themselves conducted and directed outside lobbying activities, and were regularly engaged in the efforts of the company to advance

[12] Cf. United States v. Hinton, 719 F.2d 711, 717-18 (4th Cir. 1983) (describing majority position characterizing agent notes as "'rough notes' or 'jottings' 'not intended as a final report' made during an investigation by a government agent to 'serve only a limited and temporary purpose' of providing a 'guide' for the agent's subsequent formal interview report . . . .") (citations omitted).

[13] Under Fed. R. Crim. P. 106 and 801(d)(1)(B), if the Court nonetheless were to permit the defendants to use a third-parties' rough notes to impeach a witness's trial testimony, the government should be afforded the opportunity to rehabilitate with its own selections from the notes that corroborate the witness. As prior-consistent "statements," such evidence would be substantive evidence admissible for its truth as well as for its rehabilitating effect. Fed. R. Evid. 801(d)(1)(B). This would be an imperfect cure, of course, for the same reasons recited above. The better solution is to prohibit improper impeachment outright.

its political agenda within Rhode Island and elsewhere through the lobbying process. Although as non-officials they were not themselves subject to the state's Code of Ethics, the jury may properly infer from the relevant admissible evidence that the defendants would be well familiar with the fact that public officials serve as fiduciaries to the public, that they knew their activities with Celona violated that general principle, and that they intended that result.

Thus, evidence the defendants knew about Celona's violation of state law may only be considered as evidence of their intent. Cf. United States v. Woodward, 149 F.3d 46, 62 (1st Cir. 1998) (non-disclosure in face of legal disclosure obligations is evidence of official's requisite intent). Nor would the defendants' claimed belief that Celona made an initial statement indicating compliance with state laws be an affirmative defense; rather, the jury may weigh that along with all the other relevant evidence when considering the defendants' state of mind. Woodward, 149 F.3d at 57. In sum, any evidence about state laws is relevant only as it may bear on the question of intent. Urciuoli, 513 F.3d at 298-99; accord United States v. Walker, 490 F.3d 1282, 1299 (11th Cir. 2007); United States v. Jennings, 487 F.3d 564, 580 (8th Cir. 2007). And therefore only those particular state laws they were actually aware of should be admissible.

The government contends that the relevant admissible evidence on the matter of state ethics rules should be cabined to a few discrete points. These should include evidence (i) concerning the discussion between Celona and the defendants about his preliminary telephone call to the Ethics Commission; (ii) that no defendant ever inquired about the matter further; and (iii) that the Code that the Ethics Commission enforced applied only to Celona. These topics should be subject to straightforward evidentiary presentation. The jury should be cautioned to consider the issue of state law only to the extent that such evidence, together with any additional probative evidence, may indicate an intent to defraud on the defendants' parts.

### D. Inadmissibility of Certain Reciprocal Discovery Materials

Defendant Kramer has provided the government with a single file folder of materials as reciprocal discovery. Those materials mainly fall into four categories: (i) electronic files removed from the hard drive disk space of several computers previously seized from Celona's home, including fragmented materials and apparent communications with his attorney; (ii) materials from various sources critical of the merits of AWP legislation; (iii) an opinion purporting to suggest that AWP legislation would affect members of the pharmacy sector the same; and (iv) materials recognizing defendant Kramer for the charitable activities he administered on behalf of CVS. The government contends that none of these types of records should be admissible at trial.

#### 1. Salvaged Fragments of Electronic Files

The electronic file fragments are likely inadmissible hearsay. Even if an exception may apply, however, the files are unreliable records of the statements they purport to contain and should be precluded under Rule 403. The statements necessarily are divorced from context as a result of their fragmented state. Context is particularly important for many of these files, as they appear to include fragments of self-serving correspondence from Celona to his attorney that apparently were written while Celona still sought to avoid accountability for his corrupt conduct. Nor is it possible to conclude from many of these records with any degree of confidence how closely the statement approximates a complete and intended communication between the apparent parties to it.

#### 2. Merits of the Defendants' Policy Positions

Materials favoring the defendants' position on the merits of the official actions that are the subject of the charged honest services and bribery schemes have no place in this trial. They do not tend to make it any more or less likely that either defendant committed the crimes for

which they are being tried. Claimed beneficial or moral reasons for violating a criminal law are no defense to the charges that result from that conduct. See, e.g., Lopez-Lukis, 102 F.3d at 1169 n.13. Thus, materials that are offered to support the merits of a policy position on a particular official act plainly are inadmissible.

### 3. The Irons Advisory Opinion

Defendant Kramer includes among his file folder of reciprocal discovery an advisory opinion regarding Senator Irons and the application of the "class exception" to AWP legislation. The validity of that opinion is currently the subject of an Ethics Commission challenge, as it was allegedly obtained based on incomplete factual representations. Further, the opinion is irrelevant to this action. "[E]vidence regarding the knowledge of individuals other than the defendant should be admitted only if there is some other evidence in the record from which to conclude that the defendant would have the same knowledge." United States v. Kaplan, 490 F.3d 110, 120 (2d Cir. 2007). Accordingly, extrinsic evidence of ethics opinions obtained by another legislator under distinct circumstances should be admitted only if the defendants can produce evidence showing that they were aware of the opinion at the relevant time. Id. Further, even if construed as relevant, which it is not, the distinct and questionable circumstances involved in the acquisition of that opinion, and the mini-trial its admission would provoke, make admission substantially more unduly prejudicial than probative. Fed. R. Evid. 403.

### 4. Specific Instances of Good Conduct

Another general category of documents provided among defendant Kramer's reciprocal discovery are materials that purport to identify specific instances of his putative good character. These items include newspaper reports about awards or recognition of Kramer for his management of CVS's charitable activities, or his interviews and statements concerning philanthropic functions and events sponsored by CVS. The government recognizes that, to some

extent, Kramer's employment duties relating to CVS's charitable activities is a part of his background and will be introduced in the case. However, that does not permit the defendant to admit evidence of good conduct generally, or extrinsic evidence of specific instances of good conduct. Rather, the defendants must comply with the rules governing admission of character evidence of an accused. This applies as much to argument as to eliciting evidence.

Federal Rule of Evidence 404(a) generally controls the admissibility of character evidence. Once it is determined that character evidence is relevant under that Rule, the method in which evidence of character may be elicited is governed by Rule 405. Rule 404(a) allows the accused to introduce "[e]vidence of a pertinent trait of character." Fed. R. Evid. 404(a) (emphasis added). Presentation of character witnesses to testify about a defendant's character for "law abidingness" or honesty is pertinent and thus permissible. See, e.g., United States v. Angelini, 678 F.2d 380, 381-82 (1st Cir. 1982). Testimony regarding character traits that do not tend to make a fact of consequence to the determination of the case more or less likely is not pertinent and, thus, not permitted. Id.; United States v. Santana-Camacho, 931 F.2d 966, 967 (1st Cir. 1991) (character traits as a good family man and kind person inadmissible because not pertinent to alien smuggling); United States v. Nazzaro, 889 F.2d 1158, 1168 (1st Cir. 1989) (character traits of bravery and attention to duty inadmissible because not pertinent to mail fraud and perjury). The Rule allows introduction of relevant "traits" only, not of a defendant's good character generally. Angelini, 678 F.2d at 382. That a defendant has received awards or recognition for charitable activities is not a pertinent trait of character to mail fraud, conspiracy, or bribery.

Moreover, the defendants' relevant character traits may only be elicited through witness testimony concerning the witness's opinion of, or knowledge of the defendant's reputation for, the identified pertinent character trait. The defendant may not introduce evidence of specific

instances of his claimed good character. See Fed. R. Evid. 405; Michelson v. United States, 335 U.S. 469, 477 (1948).[14]

**E. Evidence or Argument About the Government's Charging Decision**

The government does not know what particular defenses, if any, the defendants intend to present at trial. In the event their trial strategy may include challenges to the government's decision to bring the specific charges in the indictment, the methods employed by law enforcement agents in conducting the investigation, the fact that these defendants were charged with federal crimes while others were not, or the different charging decisions of state and federal prosecutors, such claims are not the proper subject of evidence, cross-examination, argument, or comment before the trial jury. See generally United States v. Johnson, 565 F.2d 179, 181 (1st Cir. 1977) ("[T]he determination of the lawfulness of the Government's conduct must be made – as it is on all questions involving the legality of law enforcement methods – by the trial judge, not the jury.") (citations and internal quotation marks omitted). A defendant must properly address any claimed improprieties in the investigation or charging decision through pre-trial motions. See Fed. R. Crim. P. 12(b)(3). Because the charging decision of the United States presents solely a legal question for the Court's consideration, argument and examination that invite the jury to nullify based on the government's charging decision or its manner of conducting the investigation have no place at trial on the merits.

[14] Because a defendant's character witnesses cannot be expected to know the legal limits of their testimony, it is reasonable to require defense counsel to instruct those witnesses in that regard. In particular, the witnesses should be told to avoid testimony regarding specific good acts and conduct, or the absence of bad conduct on the part of the defendant. Such instructions by counsel will prevent the accidental injection of impermissible evidence.

**F. Leading Questions During Direct and Cross Examination**

The defendants' alleged scheme involved CVS employees and close friends, both as fact witnesses and, in some cases, unwitting participants. As a result, some witnesses called by the government will be reluctant to testify for the prosecution, or alternatively, anxious to testify for the defense. Current and former CVS employees and contract lobbyists might see their employment or reputation adversely affected should the jury convict the defendants. As a result, the government anticipates that a few of its witnesses may be reluctant to answer direct questions fully and truthfully and will qualify as adverse witnesses subject to leading questions under Fed. R. Evid. 611(c).

That Rule provides that, "[o]rdinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." Fed. R. Evid. 611(c). See generally United States v. American Radiator & Standard Sanitary Corp, 433 F.2d 174, 194 (3rd Cir. 1970) (upholding hostility finding where witnesses were "defense oriented" in that they were employees of the defendant corporations); Chonich v. Wayne County Community College, 874 F.2d 359, 368 (6th Cir. 1989) (employee of party); United States v. Shursen, 649 F.2d 1250, 1253 (8th Cir. 1981) (leading questions permitted where witnesses were friends of the defendants "who gave inconsistent and evasive answers."). In the use of leading questions, "much must be left to the sound discretion of the trial judge who sees the witness and can, therefore, determine in the interest of truth and justice whether the circumstances justify leading questions to be propounded to a witness by the party producing him." United States v. Brown, 603 F.2d 1022, 1025-26 (1st Cir. 1979). The Rule limits the use of leading questions not only on direct examination but also, when appropriate, on cross examination of a witness closely identified with the examining party. Id. The Advisory Committee's note to subsection (c)

explains: "[t]he purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the 'cross-examination' of a party by his own counsel after being called by the opponent . . . ." Fed. R. Evid. 611(c). See generally Schultz v. Rice, 809 F.2d 643, 654 (10th Cir. 1986) (cross examination by leading questions of witness adverse to the opponent who called him may be inappropriate depending on the circumstances).

The government calls this issue to the Court's attention to permit the Court to exercise its judgement concerning the appropriate presentation of witness testimony during this matter.

**G. John Celona's Other Crimes**

Celona has pleaded guilty in this District to three schemes to defraud the citizens of Rhode Island of his honest services – the CVS scheme and two additional schemes involving RWMC and Blue Cross. Although defendant must have the opportunity to cross-examine Celona, the United States submits that the defendants should not be afforded the opportunity to conduct a mini-trial on those schemes. Such inquiry will not be relevant to the matters at hand and will only tend to confuse and divert the jury from the issues relevant to the crimes charged in this case. See Fed. R. Evid. 403, 608(b), and 611.

Respectfully submitted,

ROBERT CLARK CORRENTE
United States Attorney

/s/ Stephen G. Dambruch
STEPHEN G. DAMBRUCH
Assistant United States Attorney
United States Attorney's Office
50 Kennedy Plaza
Providence, RI 02903
(401)709-5000 - phone
(401)709-5001 - fax
stephen.dambruch@usdoj.gov

WILLIAM M. WELCH, II
Chief, Public Integrity Section

/s/ Daniel A. Petalas
DANIEL A. PETALAS
Trial Attorney
Criminal Division
1400 New York Avenue N.W., 12th Fl.
Washington, D.C. 20530
(202) 514-1412 - phone
(202) 514-3003 - fax
dan.petalas@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of May, 2008, I caused the within Government's Memorandum to be filed electronically and is available for viewing and downloading from the ECF system.

Electronic notification:

David B. Fein, Esq.
Wiggin and Dana LLP
400 Atlantic Street
Stamford, CT 06911

Mark L. Smith
Law Offices of Mark L. Smith
176 Eddie Dowling Highway, Suite 101
North Smithfield, RI 02896

Thomas R. Kiley, Esq.
Cosgrove, Eisenberg and Kiley
One International Place, Suite 1820
Boston, MA 02110

Peter DiBiase, Esq.
91 Friendship Street, 3rd Floor
Providence, RI 02903

/s/ Daniel A. Petalas
DANIEL A. PETALAS
Trial Attorney