# EXHIBIT A

# Search Warrant

| | | |
|---|---|---|
| State Ex rel | Member of the Rhode Island State Police | County: Providence |
| vs. Respondent<br>: **A single family dwelling with a light colored brick façade, pale yellow/tan sides, without trim or shutters, having a single story window line and a two-story roof line, located at 51 Pinewood Drive, North Providence, Plat and Lot** | | TO: An Officer authorized by law to execute the within warrant, ______ |

Complaint and affidavit having been made to me under oath, ______ and as I am satisfied that there is probable cause for the belief therein set forth that grounds for issuing a search warrant exist, you are hereby commanded diligently to search the place or person herein described for the property specified and to bring such property or articles, and to summon the owner, or keeper thereof, if any be named in the complaint, if to be found by you, to appear before the District Court in the district where such property shall have been seized, namely the 6th Division of the District Court of Rhode Island.

Place or person to be searched: : **A single family dwelling with a light colored brick façade, pale yellow/tan sides, without trim or shutters, having a single story window line and a two-story roof line, located at 51 Pinewood Drive, North Providence, Plat 22C and Lot 1491.**

Property or articles to be searched for: **Any and all records or documents containing customer/employer information, general ledger, cash receipt journals, cash disbursement journals, check registers, appointment listings or books, billings, financial or investment accounts, bank records, cancelled checks, invoices, claims, telephones, phone books, phone bills, address books, correspondence, diaries, telephone message slips, memoranda, facsimiles or any other material which would substantiate criminal charges or indicate additional victims or suspects involved in the criminal misuse of the duly appointed powers of elected official John Celona from the time period ~~January 1, 1997~~ November 1, 1995 to the present.**
***See also attached Addendum**

Name of owner, or keeper, thereof if known to complainant: **John Celona**

Said warrant shall be served in the daytime -- may be served in the nighttime – within seven (7) days from the issuance hereof, AND IF NOT SERVED WITHIN SAID TIME TO BE RETURNED FORTHWITH TO A JUDGE SITTING IN THE ABOVE NAMED COURT.

Property seized by you hereunder shall be safely kept by you under the direction of the Court so long as may be necessary for the purpose of being used as evidence in any case. As soon as may be thereafter, if the same be subject to forfeiture, such further proceedings shall be had thereon for forfeiture as is prescribed by law.

Hereof fail not and MAKE TRUE RETURN PROMPTLY OF THIS WARRANT TO A JUDGE THERE SITTING with your doings thereon, accompanied by a written inventory of any property taken to a judge sitting in the above named court.

Issued at Providence in the county of Providence this 8 day of March, A.D. 2004

Judge of the District Court
Justice of the Supreme/Superior Court

# AFFIDAVIT

Your affiant upon oath states that he has reason to believe and does believe that grounds for such warrant exit and states the following facts on which such belief is founded on the following affidavit.

____See affidavit of Detective Shari L. Russell, attached hereto and made a part hereof.

X
X
X

X

X

X

X

X

X

X

3/8/04
Date

Affiant

Providence Sc.. In Providence this 8 day of March, 2004, before me personally came Detective Shari L. Russell and made oath to the truth of the foregoing.

Judge of the District Court
Justice of the Supreme/Superior Court

**AFFIDAVIT**

Your affiant, Detective Shari L. Russell, on oath, do depose and say, that I am a member of the Rhode Island State Police, and have been continuously employed in that capacity for the past twelve years. I am presently assigned to the Detective Bureau, Financial Crimes Unit, and as such am in charge of investigating violations of the Rhode Island General Laws.

On or about December 31, 2003, this department received a complaint against Senator John Celona alleging potential ethics and criminal violations due to his financial and/or other relationships with businesses and corporations whose legislation came before his committee. This complaint incorporated information from personal accounts, ethics filings and media reports. The purported allegations were that Blue Cross Blue Shield of Rhode Island (hereafter BCBS) sponsored a cable television program produced by C.R.I. Communications (hereafter CRI) and hosted by Senator Celona. Moreover, that Senator Celona helped CRI obtain $75,000 in sponsorship from BCBS for said show over the objections of BCBS staff members. It was further alleged that Senator Celona was a paid consultant for CVS Pharmacy (hereafter CVS) while chair of the committee that regulates the health-care and pharmacy industries, and, more specifically, that Senator Celona "killed" legislation opposed by CVS.

John A. Celona, DOB: 5/19/1953, of 51 Pinewood Drive, North Providence Rhode Island, was elected to the Senate in 1995. He is currently the senator for district 7 which encompasses Lincoln and North Providence. During all times relevant to this complaint, John Celona's senate district included North Providence and did not include any areas of Providence. Since being elected Senator, John Celona has served as member a of the Senate Committee on Corporations, later renamed the Senate Committee on Commerce, Housing and Municipal Government (hereafter Commerce Committee). In addition, John Celona was elected chair of said Commerce Committee in January of 2001 and served as such until stepping aside in mid- December of 2003 in the wake of the above public accusations.

The Commerce Committee considers, in part, legislation which affects businesses and corporations. As such, the committee considers legislation involving health insurance, pharmacy and health-care issues affecting businesses and corporations. Your affiant has learned that committee chairs are responsible for establishing the committee agenda. This includes determining which bills will be scheduled for hearing. Although there are senate rules that can circumvent this procedure, it should be noted that in the normal course, a bill must pass a committee in order to reach the senate floor for vote. It should be further noted that unless a bill is scheduled for a hearing in committee, it cannot be passed and, thus, is generally foreclosed from reaching the senate floor for vote.

As a Senator, John Celona is required to file financial statements with the Ethics Commission on a yearly basis. This filing requires the elected official to list all employers from which he/she receives $1,000 or more gross income. Or, if self-employed, to list any occupation from which he/she received $1,000 or more gross income. In 1996 and 1997, John Celona responded to this inquiry listing income sources as Celona, Inc. (owner) and State of Rhode Island (Senator). From 1998 through 2002 John Celona responded to this inquiry listing The Village at Elmhurst (consultant) and State of Rhode Island (Senator). It should be noted that filings occur after the end of the year, therefore 2003 filings will be reported sometime in 2004.

In response to the above CRI and BCBS accusations, it has been reported that Celona initially denied any involvement with the above cable show. Later, he withdrew his denial stating that he had in fact been involved in the show, but forgot because so much time had passed. Celona was then reported to have stated that he opted out of the show once he learned that BCBS was the sponsor, claiming that he did not want to be associated with a show that was sponsored by someone that came before him, it would not look proper. Celona also claimed that CRI had not yet paid him anything.

Investigation revealed that CRI produced a cable television show involving Celona called "Rhode Island Health Update". Investigation further revealed that in early spring of 2002, it was Celona who first "pitched" the show idea to a BCBS executive and a BCBS lobbyist at CRI's studio. This occurred following the appearance of the two on Celona's cable television show called "The Celona State House Report". Later, a proposal was submitted to BCBS which contained both CRI and John Celona's name (listed first) on the cover page. In the proposal, the format included a section entitled "Blue Cross Blue Shield Profile" naming "Senator John Celona" as the person to profile and interview guests from BCBS. Again, said proposal named "Senator John Celona" as the associate producer of the Production Team, listing his credentials. Your affiant was informed that Celona was provided with a copy of this proposal for his review prior to its submission to BCBS.

Your affiant learned that BCBS marketing staff received this proposal from BCBS Vice President of External Affairs and Lobbyist, Thomas Lynch, for their review and recommendation. It should be noted that Mr. Lynch has been BCBS's lobbyist since 1999. It should be further noted that said staff normally reviewed the numerous proposals that BCBS received for sponsorship. After review, marketing staff members generated a report listing several reasons why BCBS should not do the show. One such marketing staff executive reported circling Senator Celona's name and questioning the potential conflicts of the relationship. The recommendation (or lack thereof) was then reviewed by Mr. Lynch.

Despite the above recommendation against the proposal, the marketing staff was informed that BCBS was going to do the show. Staff from both CRI and BCBS reported first learning that the show was going forward at a meeting they were called to attend at Celona's state house office. BCBS staff reported being surprised that the show was going forward. One staff member reported that he believed that BCBS was doing the show because of political considerations. Said staff member defined "political considerations" stating because Senator Celona, a key legislator, asked them to do the show.

Your affiant learned further that sometime in February of 2003, Celona met with the Community Programming Manager and the Government Affairs persons from Cox to solicit airtime for the above show on Cox 3. Celona was granted the airtime and the show aired on Cox 3 in March of 2003. Your affiant also learned that there were four (4) prior shows that had aired on Cox public access channels beginning in September/October of 2002.

Investigation further revealed that Celona co-hosted the first 3 episodes of said show, then requested that he be taken off the show after reportedly receiving a phone call saying that his being on the show did not look good because it was sponsored by BCBS. Although no longer co-hosting, Celona continued to be active in the show's productions. Invoices from Celona to CRI and billing records indicate that Celona was paid in connection with this production beginning as early as November 2002, with payments continuing through September of 2003 (inclusive). Celona was paid approximately $1,200 per month initially and approximately $900 per month after he stopped co-hosting.

The income that Celona received from CRI was never reported on the financial statements that Celona filed with the Ethics Commission. Also, it was not until November 17, 2003 when Senator Celona finally sought an ethics advisory opinion relative to his ability to perform consulting work for CRI. (The media was already making inquiries into this issue.) His request, however, made no mention of his current affiliation, but instead merely indicated that this was for future employment.

Investigation further revealed that in February of 2000. Celona entered into a consulting agreement with CVS to provide public relations type services focusing on senior citizen health-care related topics and activities. Your affiant was advised that this relationship developed as a result of Celona approaching CVS executives and "pitching" this consulting position. CVS executives admitted to having concerns about the relationship based on Celona's political status, but reported that Celona informed them that he had called the Ethics Commission and was advised that there was no problem. It should be noted that the Ethic Commission has no record of this request and the office has no record of any contact with Celona pertaining to this issue. Further, your affiant was informed that advisory opinions are not offered over the telephone. It should be further

noted that CVS executives could not recall ever hiring other consultants to work in this same capacity.

Your affiant learned that Celona was paid $1,000 per month from February of 2000 until he was terminated in August of 2003. Celona's contact with his supervisor at CVS was described as minimal. The information or "feedback" that he offered was described as having little or no value. In the months following Celona's hire, said supervisor's concern about Celona's political status and his affiliation with CVS caused said supervisor to seek out assistance and generate an addendum to Celona's job description. Sometime after being transferred to a different department, this same supervisor again addressed his continued concerns about the above relationship with other CVS executives. This eventually lead to Celona's termination.

The income Celona received from CVS was never reported on the financial statements that Celona filed with the Ethics Commission. During the course of his employ with CVS bills/legislation affecting CVS and/or pharmacies were assigned to Celona's committee (Commerce Committee). Your affiant learned of at least one instance in 2003 (during Celona's employ with CVS) where a legislator presented a written request and then followed up with a verbal request for a hearing on a pharmacy bill that was assigned to Celona's committee. This bill was never scheduled for nor received a hearing in said committee. It should be noted that Celona was committee chair at the time. It should be further noted that this bill had been vehemently opposed for years in Rhode Island by CVS.

Your affiant learned of another instance in 2002 (during Celona's employ with CVS) when one of his committee members reported what was described as delay and hostility toward a pharmacy bill. Said committee member reported that prior to the bill being put on the agenda for a hearing, Celona first wanted to know how the bill would affect CVS. After informing Celona that there should be no negative affect, said committee member finally succeeded in getting a hearing. At the hearing, Celona was described as being hostile and constantly interrupting. Celona even requested that a fiscal impact report be done. This was characterized as highly uncommon for the type of legislation being proposed. Said committee member also reported that although the records indicate that the bill passed unanimously, it is only because Celona declined to verbally oppose the bill.

Your affiant was further advised by said committee member that despite its passage, this bill was again placed on the agenda for the following meeting. Said committee member further advised that senate rules prohibit a passed bill from being reconsidered once the meeting has adjourned. Said committee member reported that, although on the agenda, this bill did not get heard because said member informed Celona that he intended to raise the illegality of the proceeding at hearing. Your affiant reviewed the senate journals, the

corporations committee reports and the daily action sheets pertaining to the above matter and observed that said bill was heard, unanimously recommended for passage, then placed again on the following calendar, but no action was taken.

Through investigation into the above complaint your affiant also received information that Celona was using his political position to obtain ambulance runs for and influence hospital contract bids for New England Ambulance. It should be noted that it had been reported that Celona had claimed that other than the above-discovered employment (including The Village at Elmhurst), he did not do consulting work for any other clients. Investigation revealed, however, that Celona was hired as a consultant for New England Ambulance, located in Providence, Rhode Island, in January of 2001.

According to the company owner, Celona was paid $1,200 per month to promote the company, to "spread the good word" and develop name recognition. However, said owner was unable to actually describe or explain what Celona did for his company. Said owner also admitted that Celona did not produce any work product or written reports and added that it would often be a month before he heard from Celona. Said owner also reported that although he has sales personnel whose job it is to negotiate contracts with nursing homes, hospitals, etc., it was possible that Celona approached people at area hospitals on his behalf. Said company owner admitted that Celona is a personal friend and he reported that the $1,200 per month figure was established after asking Celona "how much do consultants usually get?"

Your affiant is aware that Celona continues to be employed by New England Ambulance. The company owner admitted that he never provided Senator Celona with a 1099 or other tax reporting documentation for this work. The income Celona received from New England Ambulance was never reported on the financial statements that Celona filed with the Ethics Commission.

Through further investigation into the above complaint, your affiant received information from Mr. Dennis Moore, a former Vice President of Public Relations, Roger Williams Medical Center (hereafter RWMC) and a former member of the RWMC board of directors that Celona was hired by The Village at Elmhurst (hereafter The Village) in appreciation for his support of RWMC's position against the Hospital Conversion Act (1997). Subjects reported that The Village was a mere a "straw" for Celona's relationship with RWMC.

The Hospital Conversion Act was a highly publicized and controversial piece of legislation addressing whether for profit companies could purchase nonprofit or not-for-profit hospitals in Rhode Island. Prior to the passing of this legislation (July 22, 1997) Colombia/HCA was in negotiations with RWMC to acquire said hospital. According to the RWMC executives, the passing of this legislation, in effect, "killed the deal".

Investigation revealed that Celona was hired as a consultant by the management of The Village on February 1, 1998. (It should be noted that documents indicate that this relationship was being developed as early as December 4, 1997.) The Village is an assisted living facility located at 700 Smith Street, Providence, Rhode Island. The Village is a partnership between SANAT LLP and Roger Williams Realty Corporation. SANAT LLP owns approximately 10 assisted living facilities throughout the New England area (all being "The Village at" then a location attached). Roger Williams Realty Company is a subsidiary of RWMC (RWMC owns that land where The Village is located).

Under the terms of this consulting agreement, Celona was to provide services on behalf of The Village (assisted living) and Elmhurst Extended Care (a nursing home) in Providence. According to his contract, Celona's consulting responsibilities involved heightening the awareness of seniors of the greater Providence community as to the programs and services available at The Village and at Elmhurst Extended Care. It should be noted that Elmhurst Extended Care is another subsidiary of RWMC.

It has been maintained by Mr. Robert Urciuoli, President & CEO of RWMC and Mr. Peter Sangermano, Manager of The Village, that Celona was working as a consultant for The Village, promoting the facility and helping them to "fill beds". The substance of any connection between Celona and The Village is evidenced only in the documentation evidencing the relationship: the consulting agreements, Celona's invoices to said Village, Celona's paychecks from said Village, and Celona's letter of termination from said Village, effective January 31, 2004. Through investigation it appears that the actual relationship was primarily between Celona and RWMC.

Investigation revealed that Celona was hired by The Village at Mr. Urciuoli's direction. (Mr. Urciuoli admitted that Mr. Sangermano was not happy with this arrangement.) Mr. Urciuoli stated that he does not recall who approached whom about the consulting relationship. Moreover, documents and letters confirm that all payments to Celona were specially allocated and debited to the capital account of Roger Williams Realty Corporation. It should be noted that although an Ethics Advisory Opinion was issued pertaining to this consulting relationship, it was Mr. Sangermano's attorney's concern over the relationship, which lead to the request for same. Further, Mr. Sangermano could provide no paperwork or documentation of Celona's duties, schedule, itinerary or work product. Mr. Urciuoli claimed that Mr. Sangermano was Celona's supervisor. Mr. Sangermano, however, was unable to definitively identify who Celona's supervisor was at The Village.

Your affiant also reviewed numerous documents dated from April, 15,1998 through January 1, 2001, not inclusive, that had been turned over by Mr. Moore which had been kept filed in the Public Relations Office prior to and during

his employ. The file was labeled "Senator John Celona". (Mr. Moore left with all of his office files when his employment ended in January 2003.) The documents indicate on-going contacts and communications between Celona, Mr. Urciuoli and Ms.Fran Driscoll (also a former Vice President of Public Relations). It should be noted that neither Ms. Driscoll nor Mr. Urciuoli admits to having had any appreciable involvement or contact with Celona. Your affiant observed numerous fax transmissions to Ms. Driscoll and Mr. Urciuoli on letterhead emblazoned "Senator John A. Celona". Celona also sent numerous Memorandums, primarily to Mr. Urciuoli, that were initialed and often containing comments and instructions from Mr. Urciuoli.

Your affiant observed faxes and memorandums pertaining to the following: information with attached bills inquiring if the hospital association had a position; copies of communications that were sent to Celona in his senatorial capacity from testimonial witnesses on bills; information sent to Celona in his capacity as senator regarding updates on labor disputes, hospital staffing issues and potential purchases involving other area hospital; memos with attached bills of proposed hospital legislation of possible interest to RWMC that was on the calendar of the Corporations Committee; information informing RWMC what legislative amendments to the Hospital Conversion Act would be needed to accomplish certain desired business transactions; memos relative to negotiating refunds on behalf of RWMC with the RI Convention Center (Celona indicated they were to waived "as a favor to me"); communications evidencing negotiations Celona was conducting on behalf of RWMC to effectuate certain business purposes, using letterhead identifying himself as a senator and signing the correspondences in his capacity as senator; communication indicating that another legislator was to "run any of her health care activities by me and RWMC prior to participation". It should be noted that few communications even mentioned work associated with or in promotion of The Village.

Your affiant observed additional correspondence which involved: obtaining more ambulance runs for RWMC from North Providence; obtaining guests associated with RWMC for upcoming spots on "For Your Health with John Celona"; and newspaper advertisements featuring Senator John A. Celona that promoted RWMC in an effort to overshadow events at other hospitals (even those located in Senator Celona's district).

Your affiant was informed by Mr. Moore that he held the position in Public Relations after Ms. Driscoll. Mr. Moore added that at the time that he was hired to the position (in July 2000), Celona was communicating directly with Mr. Urciuoli. Mr. Moore explained that this is why the communications into the file seem to drop off or virtually cease at or around this time. Mr. Moore stated that, prior to this, Ms. Driscoll handled much of the communication with Celona. Mr. Moore reported, however, that during his employ, Mr. Urciuoli would frequently come to him and relay information following reported contacts with Celona. Mr. Moore would then be instructed to conduct follow-up, draft new consulting agreements,

etc. Although Celona has claimed to be unaware of the financial arrangement between Roger Williams Realty Corporation and SANAT LLP as it relates to his pay, your affiant has been informed that his request for raises (he received two) were made to Mr. Urciuoli.

Whether or not Celona is required to make disclosures of the above income sources on his financial statements filed with the Ethics Commission, the Rhode Island Code of Ethics (Chapter 36 of the Rhode Island General Laws) dictates that he still may not vote on or participate in legislation in which he has an interest, financial or otherwise, which is in substantial conflict with the proper discharge of his duties or employment in the public interest. [36-14-5(a)] Said Code also requires a public official to avoid even an "appearance of impropriety" [36-14-1]. Although every "appearance" may not necessarily require a public official to recuse him/herself from voting or participation, the public official is still required to make disclosures. Further, said Code prohibits the use of public office to obtain financial gain for oneself or any business for which one is employed or represents. [36-14-5(d)] and [36-14-7(a)]. (Reference penalty section [36-14-19]). In addition, no public official in public or private employ shall corruptly solicit or accept any gift or valuable consideration as an inducement or reward for showing favor or disfavor to any person, in relation to the business of the state of which he is an official. [11-7-3]

Your affiant reviewed the recusals submitted by Senator Celona from 1997 to present. Your affiant observed numerous recusals by Senator Celona on assisted living issues. There were no recusals or disclosures filed for other subject matters.

Under the terms of his consulting agreement with The Village, Celona was not to be provided with an office, instead, he was requested to establish an office in his home necessary to satisfy the terms of the agreement. Since resigning as Commerce Committee chair in December of 2003, it is your affiant's current understanding that Celona no longer maintains an office at the state house. Also, your affiant observed that all communications and invoices since November of 1998 indicate an address for personal, business and political purposes of 51 Pinewood Drive, North Providence, Rhode Island. Based on a review of faxes, memorandums and other communications, it appears that John Celona and Senator John Celona's communications were often faxed from a number designated to Celona's North Providence home exchange.

Contrary to reports relative to his other consulting positions, Mr. Moore has described Celona as being prolific in his communications with RWMC, written and telephonic. Based on a review of invoices, letterheads, cover sheets, and narratives, it is believed that said documents were computer generated based on the type style, print and fonts. Your affiant also observed that the wording and spacing are consistent with computer generated documents. Your affiant believes that these types of records and files are normally kept in the

etc. Although Celona has claimed to be unaware of the financial arrangement between Roger Williams Realty Corporation and SANAT LLP as it relates to his pay, your affiant has been informed that his request for raises (he received two) were made to Mr. Urciuoli.

Whether or not Celona is required to make disclosures of the above income sources on his financial statements filed with the Ethics Commission, the Rhode Island Code of Ethics (Chapter 36 of the Rhode Island General Laws) dictates that he still may not vote on or participate in legislation in which he has an interest, financial or otherwise, which is in substantial conflict with the proper discharge of his duties or employment in the public interest. [36-14-5(a)] Said Code also requires a public official to avoid even an "appearance of impropriety" [36-14-1]. Although every "appearance" may not necessarily require a public official to recuse him/herself from voting or participation, the public official is still required to make disclosures. Further, said Code prohibits the use of public office to obtain financial gain for oneself or any business for which one is employed or represents. [36-14-5(d)] and [36-14-7(a)]. (Reference penalty section [36-14-19]). In addition, no public official in public or private employ shall corruptly solicit or accept any gift or valuable consideration as an inducement or reward for showing favor or disfavor to any person, in relation to the business of the state of which he is an official. [11-7-3]

Your affiant reviewed the recusals submitted by Senator Celona from 1997 to present. Your affiant observed numerous recusals by Senator Celona on assisted living issues. There were no recusals or disclosures filed for other subject matters.

Under the terms of his consulting agreement with The Village, Celona was not to be provided with an office, instead, he was requested to establish an office in his home necessary to satisfy the terms of the agreement. Since resigning as Commerce Committee chair in December of 2003, it is your affiant's current understanding that Celona no longer maintains an office at the state house. Also, your affiant observed that all communications and invoices since November of 1998 indicate an address for personal, business and political purposes of 51 Pinewood Drive, North Providence, Rhode Island. Based on a review of faxes, memorandums and other communications, it appears that John Celona and Senator John Celona's communications were often faxed from a number designated to Celona's North Providence home exchange.

Contrary to reports relative to his other consulting positions, Mr. Moore has described Celona as being prolific in his communications with RWMC, written and telephonic. Based on a review of invoices, letterheads, cover sheets, and narratives, it is believed that said documents were computer generated based on the type style, print and fonts. Your affiant also observed that the wording and spacing are consistent with computer generated documents. Your affiant believes that these types of records and files are normally kept in the

ordinary course of business and believe it is reasonably unlikely that they would have been destroyed or discarded. Further, there is reason to believe that the only existing copies of related documents may be in the possession of Celona, in physical form or computer stored. Also, your affiant has reason to believe that if notified to produce same by subpoena, said information is subject to being altered, removed, concealed or destroyed.

Based upon the facts as recited above, your affiant has probable cause to believe that the items described in the attached Addendum, which is hereby incorporated by reference, and the following additional records are located at the home and/or home office of John Celona and contain evidence of the crimes described:

Any and all records or documents containing customer/employer information, general ledger, cash receipt journals, cash disbursement journals, check registers, appointment listings or books, billings, financial or investment accounts, bank records, cancelled checks, invoices, claims, telephones, phone books, phone bills, address books, correspondence, diaries, telephone message slips, memoranda, facsimiles or any other material which would substantiate criminal charges or indicate additional victims or suspects involved in the criminal misuse of the duly appointed powers of elected official John Celona from the time period November 1, 1995 to the present.

Date: 3/8/04 Affiant: [signature]

Providence, SC.
Subscribed and sworn to before me on the 8 day of March 2004, in the City of Providence, County of Providence, State of Rhode Island and the Providence Plantation.

[signature]
~~Judge of the District Court~~
Justice of the Supreme/Superior Court

# ADDENDUM

Your affiant knows that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be the instrumentality, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Your affiant requests that a warrant be issued for the search and seizure of computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentality, fruits, or evidence of crime; (2) storage devices for information about crime; (3.) all stored communications and other files reflecting communications to or from John Celona;(4.) all files that have been accessed John Celona or are controlled by user accounts associated with John Celona; (5.) all connection logs and records of user activity for John Celona [Email Account /User name / IP Address or Domain Name, including;

1. Connection date and time;
2. Disconnect date and time;
3. Method of connection (e.g., telnet, ftp, http);
4. Type of connection (e.g., modem, cable / DSL, T1/LAN);
5. Data transfer volume;
6. User name associated with the connection and other connection information, including the Internet Protocol address of the source of the connection;
7. Telephone caller identification records;
8. Records of files or system attributes accessed, modified, or added by the user;
9. Connection information for other computers to which the user of the [Email Account / User name / IP Address or Domain Name connected, by any means, during the connection period, including the destination IP address, connection time and date, disconnect time and date, method of connection to the destination computer, the identities (account and screen names) and subscriber information, if known, for any person or entity to which such connection information relates, and all other information related to the connection from ISP or its subsidiaries.

As described above, the computer hardware, software, related documentation, passwords, data security devices, and data were integral tools of this crime and constitute the means of committing it, specifically because of the computer generated invoices, memoranda, correspondences and faxes by Celona. As such they are instrumentality and evidence of the violations designated. Your affiant requests that this warrant authorize the Rhode

Island State Police to make an exact duplicate of or seize and retain evidence of instrumentality of a crime for a reasonable time, and to examine, analyze and test those computer devices which may include but are not limited to:

(1) Hardware

Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

(2) Software

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

(3) Documentation

Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

(4) Passwords and Data Security Devices

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that

search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

If, after inspecting the I/O devices, software, documentation, back up tapes, and data security devices, the analyst determines that these items are no longer necessary to retrieve and preserve the data evidence, the government will return them or an exact duplicate within a reasonable time.

Based upon the facts as recited above, your affiant has probable cause to believe the following additional records are located at the home and/or home office of John Celona and contained evidence of the crimes described:

Any and all records or documents containing customer/employer information, general ledger, cash receipt journals, cash disbursement journals, check registers, appointment listings or books, billings, financial or investment accounts, bank records, cancelled checks, invoices, claims, telephones, phone books, phone bills, address books, correspondence, diaries, telephone message slips, memoranda, facsimiles or any other material which would substantiate criminal charges or indicate additional victims or suspects involved in the criminal misuse of the duly appointed powers of elected official John Celona from the time period November 1995 to the present.

RETURN OF SERVICE
SEARCH WARRANT
57 PINEWOOD DRIVE,
N. PROV RI

LOCATION: FAMILY ROOM / SUN ROOM

1) GATEWAY PC SERIAL# 0021753806

LOCATION: GARAGE

1) Assorted documents

Addendum Return of Service
- search warrant 51 Pinewood Drive
North Providence, R.I.

Location: OFFICE

1. box assorted documents (floor behind desk)
2. assorted documents (file cabinet top drawer
3. Assorted documents (floor behind desk)
4. assorted documents (floor behind desk)
5. tapes - assorted (cabinet)
6. assorted documents (floor - SE corner)
7. assorted documents (under desk)
8. brief case containing assorted files
9. assorted documents (floor - SE corner)
10. assorted documents (desk top)
11. assorted documents (desk top)
12. assorted documents (right side desk drawer - bottom)
13. assorted files (top drawer - file cabinet)
14. agendas - (top drawer left of desk)

Addendum Return of Service

- Search warrant 51 Pinewood Drive, North Prov, RI

Location: office

1) Compaq Laptop, State ID # 0001458 w/ power cord, RJ-11 /phone cord attached, laptop bag with network cables, manual, floppy drive

2) Packard Bell Executive 466 computer, S/N N25402 1846

3) Assorted documents (floor of office)

4) Assorted document (ontop of chair)

5) Assorted records (filing cabinet)

6) Draw with records from filing cabinet

7) Assorted records filing cabinet (lower draw) —

8) Assorted records (underneath computer desk)

9) Assorted records (computer desk draw)

10) Assorted records right/middle main desk draw

11) Assorted records filing cabinet

12) Assorted records (center desk draw /main desk

13) Assorted records (top/right desk draw/ main desk

# RETURN OF SERVICE

SEARCH WARRANT 51 PINEWOOD DRIVE
N. PROV. RI

LOCATION:

BASEMENT BOXES / DOCUMENTS

1) ASSORTED DOCUMENTS (#15)
2) ASSORTED DOCUMENTS (#93)
3) ASSORTED DOCUMENTS (#53 1 of 6)
4) ASSORTED DOCUMENTS (#53 2 of 6)
5) ASSORTED DOCUMENTS (#53 3 of 6)
6) ASSORTED DOCUMENTS (#53 4 of 6)
7) ASSORTED DOCUMENTS (#53 5 of 6)
8) ASSORTED DOCUMENTS (#53 6 of 6)

# State of Rhode Island and Providence Plantations
# Complaint to Search and Seize Property / or Person

TO [signature] Justice of the Supreme, Superior Court, or Judge of the District Court of the State of Rhode Island

a) Detective Shari L. Russell, Member of the Division of State Police.

b) ______ a person authorized by law to bring complaints for violation of the law which it is my responsibility to enforce/a person who has a right to possession of the property stolen, embezzled, or obtained by false pretense or pretenses:

ON OATH COMPLAINS THAT:

(1) Certain property has been stolen or embezzled, or obtained by false pretenses, or pretenses, with intent to cheat or defraud within this state or elsewhere.

(2) Certain property has been kept, suffered to be kept, concealed, deposited, or possessed in violation of law, or for the purpose of violating the law;

(3) Certain property is designed or intended for use, or is or has been used in violation of law, or as a means of committing a violation of law;

(4) Certain property contains evidence of a crime

and prays that a warrant to search for and seize said property/person be issued and if the same be subject to forfeiture, that the property be forfeited.

The person/property or articles to be searched for and/or seized is described as follows: **Any and all records or documents containing customer/employer information, general ledger, cash receipt journals, cash disbursement journals, check registers, appointment listings or books, billings, financial or investment accounts, bank records, cancelled checks, invoices, claims, telephones, phone books, phone bills, address books, correspondence, diaries, telephone message slips, memoranda, facsimiles or any other material which would substantiate criminal charges or indicate additional victims or suspects involved in the criminal misuse of the duly appointed powers of elected official John Celona from the time period ~~January 1, 1997~~ November 1, 1995 SLR to the present.**
***See also attached Addendum**

The name of the owner or keeper, thereof (if known) is: John Celona

The place or person to be searched is described as follows: **A single family dwelling with a light colored brick façade, pale yellow/tan sides, without trim or shutters, having a single story window line and a two-story roof line, located at 51 Pinewood Drive, North Providence, Plat 22C and Lot 1491.**

Your complainant prays that said warrant may be served in the night time for the reason that: ______
Your complainant request authorization to conduct a "NO-KNOCK" entry: ______
Subscribed and sworn to before me:

[signature] Date

Judge/Justice

Complainant