**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR 07-09-01 (MML) |
| v. | : | May 21, 2008 |
| JOHN R. KRAMER and CARLOS ORTIZ | : | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR A DECLARATION OF MISTRIAL WITH PREJUDICE OR FOR OTHER APPROPRIATE RELIEF

Defendants John R. Kramer and Carlos Ortiz respectfully submit this Memorandum of Law in support of their Motion for a Declaration of Mistrial with Prejudice or for Other Appropriate Relief. Throughout this prosecution, it has been clear that the government's principal witness in this case, John Celona, is a profoundly flawed witness. The government, however, has insisted on pressing forward with this prosecution that is based largely (if not solely) upon Celona's testimony. What is even more troubling is that at every step leading up to trial, the government refused to acknowledge its star witness's shortcomings, and the government was reluctant to fulfill its constitutional duties to disclose information about Celona that might damage the prosecution's case.

Now that trial has begun, the very danger that the defendants envisioned has materialized: Celona has delivered, at the behest of the government, materially false testimony that the government knew or should have known to be false. Normally, the function of a trial is to find the truth, but the government and its star witness John Celona have now made attaining the truth impossible by introducing perjured testimony into the core of the case. And yet, when confronted with Celona's dishonesty and the fact that the government has aided him in perpetrating a fraud upon the Court and the jury, the government's only response is a cavalier acknowledgment that Celona is a "consistently inconsistent" witness. (Transcript of Trial Proceedings, dated May 20, 2008 ("May 20 Trial Tr."), at 13:2.) For the government to have built their case upon the testimony of so deceitful a witness is troublesome enough; for the government to have aided him in his deceit is unconscionable. For the reasons set forth below, the Court should declare a mistrial, with prejudice, or grant such other relief as may be appropriate under the circumstances.

What we knew about John Celona before this trial began is encapsulated in this excerpt from the trial in United States v. Urciuoli:

> THE COURT: So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?
> THE WITNESS: Yes, and then the next line says I faxed it also to my attorney for his approval.

(Transcript of Trial Proceedings, United States v. Urciuoli, dated Sept. 18, 2006 ("Sept. 18 Urciuoli Tr."), at 214:19–24.)

All that changed on May 19, 2008, when Celona testified in this trial as follows:

> Q. Did you, in fact, follow up on that request and contact the Ethics Commission?
> A. Yes, I did.
> Q. How did you contact the Ethics Commission?
> A. By telephone.
> Q. Do you know who you spoke to there?
> A. No, sir.
> Q. What, if anything, did you discuss with them?
> A. I discussed with them the issue in generalities without dealing in specifics about if a person was in the General Assembly, that if they were working or had the opportunity to work for a particular company, would they be permitted to work for that company as long as they didn't specifically benefit from the issues that they would be voting on.
> Q. Did you identify the company during that phone call?
> A. No, sir.
> Q. Why not?
> A. I didn't want to.
> Q. Why not?
> MR. SMITH: Objection.
> THE COURT: Overruled.
> A. I wanted to give myself some cover.

(Transcript of Trial Proceedings, dated May 19, 2008 ("May 19 Trial Tr."), at 123:2–25.)

With the government's assistance, Celona has unabashedly lied to this jury about the central issue in the case, then maintained an incomprehensible stance concerning his prior

contrary statements. By doing so, Celona has made himself uniquely and irreparably unreliable and undeserving of the jury's consideration.

## BACKGROUND

### A. The Government Failed To Satisfy Its Brady/Giglio Obligations With Respect To Notes Taken By Government Agents During Government Interviews With Celona.

As early as February 1, 2007, and continuing thereafter, the defendants sought copies of notes taken by government agents during Celona's initial nine interviews with the government. Despite proclaiming a policy of open-file discovery, the government refused to grant the defendants access to the notes. The defendants filed a motion with the Court seeking production of the notes, setting forth a good faith basis to believe that the notes contained discoverable exculpatory and impeachment material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). (See Memorandum in Support of Defendants' Motion to Compel Disclosure of Exculpatory and Impeachment Information, dated October 26, 2007 ("Agents' Notes Memorandum").)

In response, the government argued that it had satisfied its disclosure obligations by producing a composite report of the interviews prepared by an FBI agent and the results of a prior review of the notes conducted by other prosecutors in a different case involving different defendants, different facts, and different charges -- namely, the United States v. Urciuoli trial. (United States' Objection to Defendants' Motion to Compel Disclosure of Exculpatory and Impeachment Information, dated December 11, 2007 ("Agents' Notes Opposition"), at 2.) In the course of briefing and argument on the motion, the government revealed that, despite the government's earlier claims of full compliance with all discovery obligations, the prosecutors in this case had never even reviewed the notes for Brady/Giglio material. (See Transcript of Oral

Argument, dated January 31, 2008 ("January 31 Transcript"), at 28:15–16 ("I don't even know what's in the notes at this point").)

Despite the government's suggestion that the Court undertake to review the notes (Agents' Notes Opp'n at 2.), the Court agreed with the defendants that such an approach was "not an answer to the real question here" because at that time the Court was not yet fully familiar with the facts of the case. (Transcript of Chambers Conference, dated February 25, 2008 ("February 25 Transcript"), at 4:11–17.) Accordingly, the Court ordered the government to review the notes and later ordered the government to produce them to the defendants. (See Jan. 31 Tr. at 45:25–46:14; Feb. 25 Tr. at 4:24–5:8.) The defendants reviewed the notes and found that they did indeed contain substantial Brady/Giglio information that the government had not previously disclosed. (See Defendants' Motion for Disclosure of Exculpatory and Impeachment Information Contained in Presentence Report of John Celona, dated April 28, 2008 ("Celona PSR Memo"), at 4–6 (identifying exculpatory and impeachment information contained in agents' notes but omitted from FBI composite report).)

**B. The Government Failed To Satisfy Its Brady/Giglio Obligations With Respect To Lies That Celona Had Told The Government.**

The government also opposed the defendants' request that the government identify the lies that Celona had told during his government interviews, even though the government had made varying and inconsistent statements about the extent to which Celona had lied and the substance of the lies that he had told. The defendants filed a motion asking the Court to order the government to identify the lies that Celona had told the government. (See Agents' Notes Mem. at 18.) In response, the government made the inexplicable assertion that it would be "unwise to make the attempt" to "divine the truth" of Celona's statements. (Agents' Notes Opp'n at 4.) The Court ordered the government to interview Celona again to determine exactly what lies he had

told, and to identify those lies to the defendants. The government interviewed Celona and subsequently produced to the defendants a two-page summary of that interview. (See FD-302 Report, dated March 8, 2008 ("March 8 FD-302").) That summary provides that "Celona advised he does not specifically remember what lies he initially told the FBI." (March 8 FD-302 at 2.) It also included a sadly ironic quotation from Celona: "I don't want to lie about lying." (March 8 FD-302 at 1.)

### C. The Government Failed To Satisfy Its Brady/Giglio Obligations With Respect To Celona's Presentence Report.

The defendants filed a motion with the Court asking that the government be ordered to produce any and all Brady/Giglio information contained in the presentence investigation report pertaining to John Celona (the "Celona PSR"). (See Celona PSR Memo.) The government objected to the motion, but revealed that the prosecutors had not reviewed the Celona PSR for Brady/Giglio material. (See Government's Response to Defendants' Motion for Disclosure of Exculpatory and Impeachment Information Contained in Pre-Sentence Report of John Celona, dated May 1, 2008, at 4.) The Court ordered the government to review the Celona PSR and provide to the Court those portions that constituted discoverable Brady/Giglio material. (See Text Order, dated May 7, 2008, granting Defendants' Motion for Disclosure of Exculpatory and Impeachment Information Contained in Presentence Report of John Celona.) As a result, substantial portions of the Celona PSR were produced to the defendants.

## ARGUMENT

### I. AT TRIAL, THE GOVERNMENT HAS KNOWINGLY ELICITED AND FAILED TO CORRECT FALSE TESTIMONY FROM CELONA.

During the course of the government's direct examination of John Celona, the government elicited testimony from Celona that the government knew or should have known to be false and which related to crucial issues in the case, and the government allowed that perjurious testimony to go uncorrected. As the Supreme Court has repeatedly observed, the "deliberate deception of a court and jury by the presentation of known false evidence is incompatible with "rudimentary demands of justice." Giglio, 405 U.S. at 153; accord Mooney v. Holohan, 294 U.S. 103, 112 (1935). A mistrial is warranted where: (1) the prosecution has presented perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is any reasonable likelihood that the testimony could affect the verdict. See United States v. Agurs, 427 U.S. 97, 103 (1976) (noting that the Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair"); accord Napue v. Illinois, 360 U.S. 264, 269 (1959); United States v. Gonzalez-Gonzalez, 258 F.3d 16, 21 (1st Cir. 2001); see also United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) ("if it is established that the government knowingly permitted the introduction of false testimony, reversal is virtually automatic"). Here, the government has purposefully elicited material testimony that it knew to be false, thereby violating the defendants' due process rights. See United States v. Mangual-Garcia, 505 F.3d 1, 10 (1st Cir. 2007). The Court should therefore declare a mistrial with prejudice, or grant the defendants such other appropriate relief as is requested here.

**A. Celona's Testimony Is Crucial To The Present Case.**

Celona has previously testified about two conversations that are among the most important events in the entire case: (1) Celona's telephone call to the Ethics Commission in which he discussed working for CVS, and (2) Celona's subsequent report to Mr. Kramer and Mr. Ortiz regarding his call to the Ethics Commission. The defendants have long argued that, in light of these two conversations, a reasonable juror cannot find that Mr. Kramer and Mr. Ortiz possessed the requisite intent to deprive the public of Celona's honest services or the requisite intent to deceive the public about that deprivation. (See Defendants' Motion to Strike the Conflict-of-Interest Prosecution Theory, dated April 4, 2008, at 12–15; Pre-Trial Memorandum of Defendants John R. Kramer and Carlos Ortiz, dated May 5, 2008, at 4; Transcript of Trial Proceedings, dated May 12, 2008 ("May 12 Trial Transcript"), at 70:21–71:10.) In addition, these two conversations form one of the bases for the introduction of state law into this trial and the need for a preliminary jury instruction on state law (which the Court has already given).

In arguing that Celona's telephone call to the Ethics Commission and his conversation with the defendants were centrally important matters, the defendants relied, appropriately, upon Celona's prior testimony before the grand jury and at the Urciuoli trial. The government relied upon Celona's same prior testimony as well, as the government informed the Court in the Government Trial Memorandum, less than one week before trial and after *voir dire* proceedings had already begun, that "[a]round the time Celona gave the proposal to Kramer and Ortiz, he called an unknown member of the Ethics Commission about the possibility of work for CVS." (Trial Memorandum of the United States, dated May 6, 2008 ("Government Trial Memorandum"), at 7.) In addition, the government relied upon Celona's same prior sworn testimony in its opening statement. As the prosecutor explained, when Ortiz asked Celona what

the Ethics Commission would say about the consulting arrangement, "John Celona, the evidence will show, had an answer ready for them. He said, I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and I can work for CVS." (May 12 Trial Tr. at 28:16–19.)

**B. The Government Elicited False Testimony From Celona At Trial.**

After one week of trial, during which the government failed to adduce evidence sufficient to support a conviction on any of the offenses with which the defendants have been charged, the government called John Celona to the witness stand and elicited testimony from him that directly contradicts his prior sworn testimony. Celona's trial testimony stands in stark contrast to his prior sworn testimony before the grand jury and during the Urciuoli trial, which both he and the government have repeatedly characterized as truthful. On direct examination at this trial, Celona testified that (1) contrary to the sworn testimony noted above, he did not identify CVS during his call to the Ethics Commission, and (2) contrary to other prior sworn testimony Celona has given, he did not discuss that call with Kramer. This sudden, dramatic alteration in Celona's testimony, years later, is not only disturbing but inherently suspect, given the manner in which the new testimony neatly supports the government's theory of prosecution with respect to the defendants' intent.

**1. The government elicited and failed to correct false testimony that Celona did not specifically identify CVS during his telephone call to the Ethics Commission.**

At trial, the government elicited from Celona a false account of his telephone call to the Ethics Commission that directly contradicts the prior sworn account of that incident Celona consistently delivered, both in the grand jury and at the Urciuoli trial. On those prior occasions, Celona testified under oath that after he met with Kramer and Ortiz, he called the Rhode Island

Ethics Commission and spoke with someone there about working for CVS. For example, when he appeared before the grand jury investigating this case, Celona testified as follows:

> A. After I left the meeting, I -- I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response -- I should have written a request, but I didn't but hindsight is 20/20. **And they said, "Well, if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it."** And I also faxed a copy of that to my attorney at the time prior to my signing it.
> Q. You mentioned that you made the call from the loaner van; is that correct?
> A. Yes, sir.
> Q. You have a firm memory of that?
> A. Oh, without a doubt I remember because I parked -- it was a beautiful new van because ours, we had purchased it used and it was in the shop. It was a beautiful new van. And I even remember where I was parked.

(May 2 Grand Jury Tr. at 49:15–50:8 (emphasis added).) Two weeks later, Celona appeared before the grand jury again and confirmed the substance of that call:

> Q. Mr. Celona, I just have a couple of questions for you. You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that **you had consulted the Ethics Commission regarding working for CVS as a consultant** on elderly affairs, correct?
> A. **Yes, sir.**

(May 16 Grand Jury Tr. at 85:8–13 (emphasis added).)

Several months later, when Celona appeared as a witness at the Urciuoli trial, Celona reaffirmed that the detailed account of the telephone call that he had given before the grand jury was truthful:

> Q. Were you asked the following question?
> (Reading)
> Q. What did you do with that agreement?
> A. Yes.

Q. And did you give the following answer?
(Reading)
A. After I left the meeting, I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response, I should have gotten a written request, but I didn't; but hindsight is 20/20. And they said, Well, **if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it.**
Is that the way you testified before a federal grand jury?
A. Yes.
**Q. That was a lie, wasn't it?**
**A. No.**

(Sept. 18 Urciuoli Trial Tr. at 206:21–207:15 (emphasis added).) Celona then repeated his testimony yet again:

Q. You said before the grand jury, I called the Ethics Commission to see if it was proper; right?
A. Yes.
Q. What? See if what was proper?
**A. To do some consulting work for CVS.**
Q. For what?
**A. For CVS.**
**Q. For money? For money; right?**
**A. Yes.**

(Sept. 18 Urciuoli Trial Tr. at 212:12–20 (emphasis added).)

Perhaps most significantly, in response to direct questioning from the Court, Celona confirmed that testimony in the clearest terms:

Q. What did you say to this person at the Ethics Commission?
A. Exactly what I said.
Q. What?
A. If I had a consulting agreement with CVS, could I vote on issues regarding pharmacy.
Q. I have a consulting agreement, can I vote on that; right?
MR. MATOS: Objection, your Honor.

> THE COURT: Did you say if you have a consulting agreement or you have a consulting agreement?
> THE WITNESS: Because I hadn't signed it yet.
> **THE COURT: So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?**
> **THE WITNESS: Yes,** and then the next line says I faxed it also to my attorney for his approval.

(Sept. 18 Urciuoli Trial Tr. at 214:7–24 (emphasis added).)

On direct examination at trial in the present case, however, when the prosecutor asked Celona what he had discussed with the Ethics Commission during his telephone call to them, Celona replied as follows:

> I discussed with them the **issue in generalities without dealing in specifics** about if a person was in the General Assembly, that if they were working or had the opportunity to work for **a particular company,** would they be permitted to work for that company as long as they didn't specifically benefit from the issues that they would be voting on.

(May 19 Trial Tr. at 123:10–16 (emphasis added).) This testimony flatly contradicts Celona's prior, sworn testimony.

Despite that contradiction, the prosecutor made no attempt to correct Celona. On the contrary, the prosecutor affirmatively encouraged Celona to continue providing false testimony:

> Q. Did you identify the company during that phone call?
> A. No, sir.

(May 19 Trial Tr. at 123:17–19.) Worse, the prosecutor then specifically asked Celona to explain to the jury why he had not done something that the government knew Celona had previously testified under oath that he had done.

> Q. Why not?
> A. I didn't want to.
> Q. Why not?

MR. SMITH: Objection.
THE COURT: Overruled.

A. I wanted to give myself some cover.
Q. What do you mean by that?
A. I wanted to take the position, but I knew in some regards it would be wrong.

(May 19 Trial Tr. at 123:20–124:3.)

Thus, the government not only elicited testimony from Celona that was clearly false, but also (1) failed to correct that falsehood after Celona uttered it, and (2) shockingly, chose to compound the harm by eliciting a fabricated, after-the-fact explanation for a decision that, according to Celona's prior testimony, he had never made.

The government met with Celona several times before trial and specifically discussed the testimony that Celona would be giving regarding the Ethics Commission call. (See May 20 Trial Tr. at 86:21–87:6.) In addition, the government reviewed Celona's grand jury testimony with him. (See May 20 Trial Tr. at 110:15–18.)

**2. The government elicited and failed to correct false testimony that Celona did not tell Kramer about his call to the Ethics Commission.**

Celona testified before the grand jury that after he called the Ethics Commission, he discussed that call with both Jack Kramer and Carlos Ortiz:

Q. Did you ever tell **Carlos Ortiz and Jack Kramer** anything concerning your contact with the Ethics Commission in connection with this consulting agreement?
A. **I told them** I had called them, and I referred to what the Ethics Commission had stated, that a similar case with teachers in the legislature, if they voted on something that deals with teachers as a whole, they can vote on it but if it deals with them specifically, they cannot vote on it.

(May 2 Grand Jury Tr. at 51:4–13 (emphasis added).) During further testimony before the grand jury, Celona confirmed that he had spoken to both Kramer and Ortiz about the call:

Q. You have testified in response to questions by Mr. Sullivan that you discussed **with Carlos Ortiz and Jack Kramer** the fact that you had consulted with the Ethics Commission regarding working **for CVS** as a consultant on elderly affairs, correct?
A. **Yes, sir.**

(May 16 Grand Jury Tr. at 85:8–13 (emphasis added).)

During direct examination at trial in the present case, however, when the prosecutor inquired into Celona's "follow-up communication with **either Mr. Kramer or Mr. Ortiz**" after placing his call to the Ethics Commission, and asked, "Whom did you have that conversation with?" Celona responded, "With Carlos Ortiz." (May 19 Trial Tr. at 125:12–13 (emphasis added).)

This testimony is misleading, and the wording of the questions suggests the prosecutor sought and expected to receive an answer that Celona had follow-up communication with only one of the two defendants. As explained above, at the grand jury Celona gave sworn testimony, which he later confirmed, that he had spoken to both Kramer and Ortiz about his call to the Ethics Commission. (<u>See</u> May 2 Grand Jury Tr. at 51:4–13; May 16 Grand Jury Tr. at 85:7–13.) Despite this fact, at trial the government ignored Celona's prior testimony and instead continued to inquire into the conversation as though it had in fact only involved Mr. Ortiz:

Q. And what was stated during that conversation?
A. The situation about the teacher legislation.
Q. Did you indicate to Mr. Ortiz whether or not you had obtained a written or verbal opinion?
A. I didn't say that I had a written or a verbal opinion. I just said that I had contacted them.
Q. Did you explain to Mr. Ortiz how it was you contacted them?
A. I don't recall how I -- if I specifically mentioned the phone call.

(May 19 Trial Tr. at 125:14–23.)

To compound the false nature of the entire exchange that was presented to the jury, the prosecutor then asked, "Did you have any conversation following your call to the Ethics Commission with Mr. Kramer on this topic?" to which Celona replied, "No, sir." (May 19 Trial Tr. at 125:24–126:1.)

**3. The government elicited and failed to correct false testimony that Celona did no work for CVS in 2000.**

Celona testified before the grand jury that in 2000, during the first year he worked as a CVS consultant, he had done work at senior centers promoting CVS:

> Q. What sort of things did you do?
> A. Before I got involved with CRI, I had done TV shows on my own concerning the Road Race charity. I had gone to the senior citizens homes, high-rises talking about the delivery programs advocating -- they had just come out with a CVS Extra Care Card, to make sure that when they go to CVS they get that because it saves them money. It gives them special deals off and things like that.

(May 16 Grand Jury Tr. at 51:22–52:5.)

At trial, however, Celona's testimony changed drastically. While discussing his visits to "various senior citizen apartment complexes, centers and groups," Celona testified as follows:

> Q. Did you represent or promote CVS during any of those appearances after you signed the agreement?
> A. No, sir.

(May 19 Trial Tr. at 130:24–131:1.) Indeed, when the prosecutor asked Celona, "What did you do for CVS during the 2000 calendar year?" Celona replied, "Nothing." (May 19 Trial Tr. at 142:23–25.) This last piece of testimony is directly contradicted by a prominent piece of evidence offered by the government itself: namely, the e-mail correspondence between Celona and Carlos Ortiz in December of 2000 and January of 2001, in which Celona recited a litany of

consulting services he had performed for CVS in 2000. (See Gov't Exhibit GX 348 (attached hereto as Exhibit A).)

**C. The Government Knew That Celona's Testimony Was False.**

As explained above, because Celona's testimony is so central to the prosecution's case, every word of Celona's prior testimony relating to his telephone call to the Ethics Commission and his discussion of that call with the defendants has been subjected to intense scrutiny -- both by the defendants and by the government -- through extensive briefing and oral argument over the course of several months. Thus, long before the present trial, the government was already well aware of the particulars of Celona's prior testimony as to the matters on which the government would ask him to testify at trial. It is unimaginable that the government was unaware of what Celona would say about those subjects.

Moreover, the government has vouched repeatedly for the accuracy and reliability of the testimony that Celona provided to the grand jury and at the Urciuoli trial. For example, in its motion in support of a reduction in Celona's sentence, the government asserted that it was "not aware of any instance in which Celona intentionally provided false testimony in [the] Grand Jury." (Government's Motion for Downward Departure Based on Substantial Assistance to Authorities, dated Jan. 26, 2007 ("Mot. for Downward Departure"), at 5.) The government asserted that, overall, "[o]nce Celona began truthfully cooperating, the United States believes that he did so to the best of his ability." (Mot. for Downward Departure at 6.)

Throughout pre-trial discovery in the present case, the government continued to maintain that Celona had testified truthfully in the grand jury and at the Urciuoli trial. For example, in response to the Defendants' Motion to Compel Disclosure of Exculpatory and Impeachment Information, the government asserted that "[t]o the extent Celona has lied to the United States,

the Government is aware of the lie, and defendants were previously unaware that Celona had lied, this information has been disclosed." (United States' Objection to Defendants' Motion to Compel Disclosure of Exculpatory and Impeachment Information, dated Dec. 11, 2007, at 9.) Indeed, when the government then confirmed for the defendants the extent to which Celona's prior statements and testimony had been untruthful (see March 8 FD-302), Celona's testimony regarding his call to the Ethics Commission was not included among those lies; nor was his testimony regarding his discussions with Kramer and Ortiz, or his work visiting senior centers for CVS.

From the very beginning of the actual trial proceedings in this case, the government has vouched -- both implicitly and explicitly -- for the truth of Celona's testimony before the grand jury and at the Urciuoli trial. During the government's opening statement, the government stated that "When the federal investigators interviewed John Celona, he lied to them **initially**. He tried to minimize his conduct **initially**." (May 12 Trial Tr. at 23:1–3 (emphasis added).) At the outset of Celona's testimony, before eliciting any substantive testimony from Celona, the government took great pains to confirm that he had been truthful when offering testimony pursuant to his plea agreement, including the testimony he provided before the grand jury and at the Urciuoli trial:

> Q. And what was your understanding when you signed the agreement as to what you were obliging yourself to through this provision?
> A. Agreeing to plead guilty and in total to cooperate and to tell the truth.

(May 19 Trial Tr. at 65:7–11.)

> Q. Now, sir, you are familiar with this particular provision of your plea agreement?
> A. Yes, sir.
> Q. And what do you understand this provision of your plea agreement to mean?
> A. Total cooperation and truthfulness.

Q. Did you make any specific agreements or oblige yourself to provide testimony?
A. Yes, sir.
Q. And what did you oblige yourself to do with regard to that testimony?
A. To testify truthfully in all legal proceedings, be it grand jury or at trials.
Q. Have you, in fact, testified before the grand jury?
A. Yes, sir.
Q. Have you, in fact, testified at trials?
A. Yes, sir.

(May 19 Trial Tr. at 67:14–68:6.)

A. That's the paragraph that I understand to mean where the Government would recommend a two-level reduction or downward departure.
Q. And based upon what, sir?
A. My cooperation and truthfulness.

(May 19 Trial Tr. at 69:25–70:4.)

In addition to endorsing Celona's prior testimony in general, the government has also vouched for the truth of Celona's specific testimony regarding his call to the Ethics Commission. As noted above, in the Government Trial Memorandum, the government stated that "[a]round the time Celona gave the proposal to Kramer and Ortiz, he called an unknown member of the Ethics Commission about the possibility of work for CVS." (Gov't Trial Mem. at 7.) Similarly, in the government's opening statement, the government stated that when Ortiz asked Celona whether he had Ethics Commission approval to work as a CVS consultant, Celona "had an answer ready **for them**. He said, I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and **I can work for CVS**." (May 12 Trial Tr. at 28:16–19 (emphasis added).) What's more, it was revealed during cross-examination of Celona that the prosecutors met with Celona in advance of trial and reviewed his prior testimony with him, even giving him copies of that testimony to review. (May 20 Trial Tr. at 110:9–24.)

Given the government's repeated endorsements of Celona's prior testimony regarding his call to the Ethics Commission and his subsequent conversation with the defendants, the government cannot claim that it was unaware that Celona's trial testimony on those subjects was false. On the contrary, the government was fully aware of the manifestly perjurious testimony it specifically elicited from Celona at trial. As the First Circuit has explained, even though the government is not forbidden to call witnesses "whose reliability in one or many particulars is imperfect or even suspect," the government nevertheless has an obligation "to make a clean breast of any evidence it has which may contradict such witnesses or undermine their credibility, and not to rest its case upon testimony which it believes to be incorrect." United States v. McGovern, 499 F.2d 1140, 1143 (1st Cir. 1974); see also United States v. Kelly, 543 F. Supp. 1303, 1311 (D. Mass. 1982) (holding that prosecutor who "remained silent about [witness]'s false testimony . . . seriously breached his responsibilities to the defendant and to the court"). Under this standard, the government's direct examination of Celona violated the prosecution's most basic responsibilities. Far from making a "clean breast" of the evidence, the government actually built upon the falsehood, polluting the trial record and denying the defendants their right to a fair trial.

### D. Celona's Responses To Questions During Cross-Examination Confirm That He Offered False Testimony At Trial.

When cross-examined as to the testimony elicited by the government at trial, Celona backtracked, contradicting himself and confirming that his trial testimony had indeed been false. In response to defense counsel's questioning regarding the call to the Ethics Commission, Celona stopped giving the short and responsive answers he had given during direct examination and instead resorted to circumlocutions. (See generally May 20 Trial Tr. at 86:1–114:6.) For example, in response to the question, "Didn't you tell the Ethics Commission that you were

calling about CVS?" Celona replied, "Well, I think there's a big difference, and the focus is on the word 'if' and not -- because if I did tell them I had a consulting agreement, the word 'if' would not exist in there." (May 20 Trial Tr. at 92:8–11.) In response to a similar question, Celona stated, "It was an abstract call then, as I stated it was an abstract call yesterday. It was an abstract in the fact that it said that I said if I had a conversation-- if I had a contract with CVS would it be permissible." (May 20 Trial Tr. at 93:24–94:3.)

Given the government's extensive familiarity with Celona's prior testimony on the crucially important subjects of his call to the Ethics Commission and his discussion with Kramer and Ortiz, as well as the government's preparation of Celona for trial and its review of his prior testimony with him, the government must have acted knowingly when it elicited materially false testimony from Celona on those vital subjects and then failed to correct the falsehood. Accordingly, the Court should declare a mistrial with prejudice in the present case.

## III. THE GOVERNMENT ELICITED CELONA'S FALSE TESTIMONY IN BAD FAITH AND WITH THE INTENT TO GOAD DEFENDANTS INTO SEEKING A MISTRIAL.

The precise, focused manner in which the government elicited Celona's false testimony belies any claim that the eliciting of such testimony was the result of mere carelessness. Indeed, even if the government's questioning had not been so plainly designed to lead Celona into testifying as he did, Celona's telephone call to the Ethics Commission and his subsequent conversation with the defendants are such critically important subjects that the government cannot have prepared to elicit testimony from Celona on those subjects with anything less than the utmost degree of forethought and planning. Indeed, Celona confirmed that the prosecutors specifically discussed with him "the testimony that [he] would be giving about the Ethics Commission call." (May 20 Trial Tr. at 87:3–5.) Under these circumstances, the only

reasonable conclusion is that the government's eliciting of the false testimony from Celona was an intentional effort to provoke the defendants into moving for a mistrial.

Where, as is the case here, a prosecutor engages in misconduct intended to "goad" the defendant into moving for a mistrial, a mistrial granted upon the defendant's motion precludes retrial. Oregon v. Kennedy, 456 U.S. 667, 674–76 (1982); accord United States v. McIntosh, 380 F.3d 548, 557 (1st Cir. 2004) ("It is settled law that the Double Jeopardy Clause provides a defendant with a shield against prosecutorial maneuvering designed to provoke a mistrial."); United States v. Gary, 74 F.3d 304, 315 (1st Cir.1996) (noting that defendant cannot be retried "where the misconduct of the prosecutor is undertaken . . . to prevent an acquittal that [he] believed at the time was likely to occur in the absence of his misconduct") (quoting Wallach, 979 F.2d at 916).

It would be unjust to send this case to the jury, there to be decided on the basis of wildly misleading and knowingly false testimony. It would be equally unjust to reward the government's blatant misconduct with a second chance to gain a conviction, and one in which the government will be prepared and informed as to what they will face from the defense. Accordingly, the prosecution's conduct compels the declaration of a mistrial and dismissal of the charges with prejudice, and without the possibility of retrial.

The defendants are vehemently opposed, however, to any remedy that would involve retrial. The defendants do not seek -- and would object to -- a mistrial without prejudice, as it would reward, rather than sanction, the government for its misconduct at this trial.

## IV. IF THE COURT IS UNWILLING TO DECLARE A MISTRIAL WITH PREJUDICE, THE COURT SHOULD GRANT AN ALTERNATIVE FORM OF RELIEF.

Celona's perjured testimony on direct examination, as well as his evasive exchange with defense counsel on cross-examination concerning the phone call to the Ethics Commission and the subsequent conversation with the defendants, were not merely shameful, but fraudulent. The government is complicit in that fraud, because the government not only allowed Celona's false testimony to stand, it affirmatively elicited the testimony with deliberate questions that could have had no purpose other than to enable Celona's perjurious testimony. Prior to trial, the government had vouched for Celona's credibility (when it was beneficial to the government to do so) and elicited truthful testimony on this most crucial point of evidence in every previous circumstance, but now the government disavows that testimony when seeking to avoid responsibility for Celona, simply shrugging off Celona's appalling conduct as attributable to him being "consistently inconsistent" as a witness. Hanging in the balance at this trial are the lives and reputations of two men with unblemished personal and professional records. In light of this, it is outrageous for the government to adopt such a cavalier attitude about Celona's manifestly fraudulent testimony and the wholesale violation of the defendants' due process rights.

The government's method of presenting this witness to this Court and to this jury is, at best, reckless. Regardless of the government's intent, whether rising to that of prosecutorial misconduct or not, the government is clearly responsible for John Celona. He is the government's witness; he is the government's case. Wholly apart from whether Celona testified falsely on his own initiative, or at the urging of the government, or only with the government's reckless assistance, is the devastating effect of his perjury on the jury.

The damage is that this witness has made the jury in this trial the target of deceit and fraud. The most appropriate remedy is to dismiss the indictment or declare a mistrial with prejudice. If the Court is unwilling to do so, this does not mean that the defense is left without a remedy. In this case, Celona has demonstrated that his testimony, as offered by the government, cannot be trusted. Not only is Celona's testimony at trial flatly inconsistent with sworn testimony he has given elsewhere, but after more than two years of establishing Celona's original testimony on the most critical point in this case, the government has assisted Celona in making his entirely contradictory and false statements to this jury.

The government should not be allowed to proceed with this trial while relying upon testimony from Celona, for reasons similar to those set forth in the cases outlining the doctrine of judicial estoppel. The doctrine is intended to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment. It has long been the law that, under the judicial estoppel doctrine:

> where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

Davis v. Wakelee, 156 U.S. 680, 689 (1895); see also SEC V. Happ, 392 F.3d 12, 19–21 (1st Cir. 2004); Patriot Cinemas, Inc. v. Gen. Cinema Corp., 834 F.2d 208, 212 (1st Cir. 1987) (noting that "judicial estoppel should be employed when a litigant is playing fast and loose with the courts, and when intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice") (internal quotation omitted).

Whether or not the circumstances here fit squarely within the rubric of judicial estoppel, the application of the principles is the same insofar as it relates to Celona and his testimony. The

government has previously taken the position that Celona was truthful when he identified CVS in the phone call to the Ethics Commission. The government proffered that testimony to the grand jury that indicted these defendants and to a trial jury that convicted other individuals. And Celona himself took the same position with a judge of this Court in response to a direct question asked for the purpose of clarifying this very position. (See Sept. 18 Urciuoli Trial Tr. at 214:19–24.) Celona is an agent of the government in this case: a person for whom the government is inescapably responsible, and who has now adopted an entirely contradictory position from that taken in another forum. The government has elicited and therefore embraced this contrary evidence, and must claim ownership of Celona and his testimony. The same principles that underlie the doctrine of judicial estoppel should apply here to prevent this jury from being misled and to prevent the government and Celona from "playing fast and loose" with the court.

As noted earlier, the government has previously stated that it would be "unwise to make the attempt" to "divine the truth" of Celona's statements. (Agents' Notes Opp'n. at 4). Yet this is precisely what the government would have the jury do. The Court should take the government at its word and remove Celona from the equation by striking his testimony in its entirety.

Alternatively, the defendants propose that insofar as Celona's testimony is that he did not identify CVS in the phone call to the Ethics Commission, and that he did not subsequently speak with defendant Kramer about that phone call, this testimony should be stricken and the jury should be contemporaneously instructed that it was stricken because the Court finds it to be false and misleading. Celona's testimony on this point is "incredible or insubstantial as a matter of law" and should not be submitted for the jury's consideration. Cf. United States v. Martinez-Medina, 279 F.3d 105, 115 (1st Cir. 2002); see also United States v. Hernandez, 109 F.3d 13, 15 (1st Cir. 1997) (holding that conviction based solely upon uncorroborated testimony of alleged

co-conspirator cannot be upheld unless "the jury is properly instructed and the testimony is not incredible as a matter of law") (citing United States v. Andujar, 49 F.3d 16, 21 (1st Cir.1995)); accord United States v. Fernandez, 145 F.3d 59, 62 (1st Cir. 1998).

## CONCLUSION

For all the foregoing reasons, the defendants respectfully request that the Court declare a mistrial with prejudice. In the alternative, the defendants respectfully urge that the Court strike Celona's testimony and instruct the jury as requested.

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase
Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
dfein@wiggin.com
scorrigan@wiggin.com

CARLOS ORTIZ,
By his Attorneys,

/s/ Mark L. Smith
Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com

# EXHIBIT A

**Ortiz, Carlos R.**

From: Sen. Celona, John A. [sen-celona@rilin.state.ri.us]
Sent: Thursday, January 04, 2001 9:09 PM
To: Ortiz, Carlos R.
Subject: RE: Meeting/Report

Dear Carlos: That date and time is fine and I have scheduled it in.
Regards, John Celona

----------

From: Ortiz, Carlos R. [SMTP:CROrtiz@cvs.com]
Sent: Thursday, January 04, 2001 11:02 AM
To: 'Sen. Celona, John A.'
Cc: McCusker, Mary Jane
Subject: RE: Meeting/Report

John, I would like to schedule the meeting for Thursday morning, January 25th at 9;30 AM. If this is ok with you , please email me and MJ. Thanks,
Carlos.

-----Original Message-----
From: Sen. Celona, John A. [mailto:sen-celona@rilin.state.ri.us]
Sent: Wednesday, January 03, 2001 8:46 PM
To: Ortiz, Carlos R.
Subject: RE: Meeting/Report

Dear Carlos: The week of the January 22nd is fine. I am available all day Monday, January 22nd. I would be available Wednesday and Thursday mornings January 24th and 25th and all day Friday, January 26th.
As a description of activities for 2000 I have hosted and produced three(3) cable television programs. The programs were 3o minutes in length and ran state-wide and aired for five weeks each. In total, the programs aired 6 times each week at various times to maximize it reach. Two of the programs had Jack as a guest. The first previewed and promoted the 2000 CVS Charity Classic and the second recapped the CVS Classic and the road race and began the promotion of the 2001 events. As you have seen in the viewing of the video tapes provided, the production of the programs was professionally performed at my cost with state of the art graphics and photographs of the participating players in the golf tournament. In addition, prior to the taping of the programs, I conducted pre-production meetings with the producer and developed a line of questions. The history and services provided by CVS was researched and integrated into the programs. I have received rave reviews of these programs from many viewers across the state. To promote the programs, I placed advertisements

in the Providence Journal, at my cost to promote the programs and to increase their viewership. I have faxed Jack a copy of an advertisement. Moreover, I issued news releases promoting each program.

The other program featured Kurt Proctor of the NACDS and centered on the shortage of pharmacists in Rhode Island. All of the pre and post production efforts detailed in the preceding paragraph were duplicated with this program.

During the year, I visited senior housing complexes and senior centers to explain the services provided by CVS and reiterated the prior theme of CVS as "today's neighborhood drugstore."

I also was a sounding board for situations that occurred such as the problem that developed with the "unavailability" of the drug Gemfibrozil(as detailed in an e-mail to you).

For the year 2001, I plan on expanding the production of CVS related programs to again, preview the CVS Charity Classic and the Road Race. I also plan on producing a program the centers on CVS' involvement in the new charter school in the Wanskuck section of Providence and CVS' $1million commitment to it.

I plan on again producing a program dealing with the shortage of pharmacists and intend on contacting various guidance departments in area high schools to promote and encourage students toward a career as a pharmacist. And I plan on expanding my visitis to senior centers and housing complexes to promote CVS.

Per your instruction, I am forwarding this report and I am doing so prior to the meeting to aquaint you in advance.

Please advise regarding a meeting date.

Regards, John Celona

--------

From: Ortiz, Carlos R. [SMTP:COrtiz@cvs.com]
Sent: Wednesday, January 03, 2001 12:56 PM
To: 'Sen. Celona, John A.'
Subject: RE: Meeting

John, I believe that Jack Kramer would like to particpate in our meeting and unfortunately he will be out of the office until Monday, January 22nd. I would like to delay our meeting until he gets back. Could

you give
me some
datres and times that week when you might be available. I am fairly
flexible
that week and I will check on Jack's schedule once I have your
availability.
For the meeting could come prepared with a description of activities
in 2000
and suggested activities for 2001. I look forward to hearing from
you.
Thanks, Carlos.
-----Original Message-----
From: Sen. Celona, John A. [mailto:sen-celona@rilin.state.ri.us]
Sent: Wednesday, January 03, 2001 6:31 AM
To: Ortiz, Carlos R.
Subject: RE: Meeting

Carlos: I am available Thursday morning(tomorrow) or Friday morning
or
after lunch on Friday. Thursday morning(tomorrow would be best).
You can
call me on my cellular phone at 447-3117 or page me at 786-3330 or
simply
email. Thanks. John
----------
From: Ortiz, Carlos R. [SMTP:CROrtiz@cvs.com]
Sent: Tuesday, January 02, 2001 9:38 AM
To: 'Sen. Celona, John A.'
Cc: Kramer, Jack R.
Subject: RE: Holiday Greetings

Happy New Year John. Why don't you e-mail me with some
suggested
dates and
we'll sit down and talk. I am in this entire week, but Jack
is gone
at the
en of the week if you would like him there. I look forward
to
hearing from
you, Carlos.

-----Original Message-----
From: Sen. Celona, John A.
[mailto:sen-celona@rilin.state.ri.us]
Sent: Friday, December 29, 2000 8:12 PM
To: Ortiz, Carlos R.
Subject: RE: Holiday Greetings

Dear Carlos: I want to wish you and your family a Happy New Year.

Also, when you get a chance I would like to sit down to discuss the renewal of my contract.

Regards, John Celona

----------

From: Ortiz, Carlos R. [SMTP:CROrtiz@cvs.com]
Sent: Thursday, December 21, 2000 2:52 PM
To: 'Sen. Celona, John A.'
Subject: RE: Holiday Greetings

John, I saw a copy of the tape and I think it was GREAT.
Regards,
Carlos.

-----Original Message-----
From: Sen. Celona, John A. [mailto:sen-celona@rilin.state.ri.us]
Sent: Thursday, December 21, 2000 2:33 PM
To: Ortiz, Carlos R.
Subject: RE: Holiday Greetings

Carlos: Thank you. I want to get together to do more television programs and outreach. The latest program with Jack is still playing and he has a copy of the tape if you would like a copy let me know(the program recaps the golf tournament and the road race and previews the future events in addition to touting the services provided by CVS).
Regards, John

----------

From: Ortiz, Carlos R. [SMTP:CROrtiz@cvs.com]
Sent: Thursday, December 21, 2000 11:21 AM
To: 'Sen. Celona, John A.'

Subject: RE: Holiday Greetings

John, FIrst of all I too hope that you and your family have a very Merry Christmas (Feliz Navidad) and a healthy and Happy New Year (prosperoano nuevo. Secondly, I want to express my very sincere appreciation for the beautiful fruit basket from you and your wife. It was totally unexpected and a wonderful gesture. Thanks again and a Happy Holidays. Also congratulations on being named Chairman of Senate Corporations. It couldn't have happened to a more deserving person. Good luck, Carlos.

-----Original Message-----
From: Sen. Celona, John A. [mailto:sen-celona@rilin.state.ri.us]
Sent: Wednesday, December 20, 2000 9:04 PM
To: Ortiz, Carlos R.
Subject: Holiday Greetings

Carlos: I would like to wish you and you're a happy holiday season and a healthy and happy new year.
Sincerely, John Celona

----------
From: Ortiz, Carlos R. [SMTP:CROrtiz@cvs.com]
Sent: Sunday, December 03, 2000 8:19 PM
To: 'Celona, John'

Subject: RE: Taping of Program

John, send me the resume and I'll circulate it to our HR department. I am glad the taping went well. Good luck and I'll talk to you later, Carlos.

> ----------
> From: Sen. Celona, John A. [SMTP:sen-celona@rilin.state.ri.us]
> Sent: Sunday, December 03, 2000 7:16 PM
> To: Ortiz, Carlos R.
> Subject: Taping of Program
>
> Dear Carlos: Last week I taped a program with Jack Kramer. We touched on
> the history of CVS, the services that it provides both in store and on
> line.
> Additionally, we discussed the charities that benefited from the CVS
> Charity
> Golf Classic and talked about the road race. In the future, we plan on
> doing a program

specifically for the promotion of the road race and also
> another show specifically centered on the $1million CVS donation to the
> charter school.
> I will forward both you and Jack copies of the tapes.
>
> Also, my secretary at the state house has asked me to circulate the
> resume of her son. He is a Dean's List student at Franklin Pierce College
> in Rindge, NH majoring in Business Management and he will be graduating in
> May, 2001. If you would like to have a copy of the resume I can forward
> one
> to you. He is a fine young man.
> Regards, John Celona
>



Confidential Treatment Requested by CVS



CVS 92581