UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF:

CVS PHARMACY

Testimony of JOHN A. CELONA, a Witness herein, heard before the SPECIAL JUNE 2005 GRAND JURY on TUESDAY, MAY 2, 2006, 9:50 A.M., in Room 126A of the John O. Pastore Federal Building, Two Exchange Terrace, Providence, Rhode Island.

PRESENTED BY:

GERARD B. SULLIVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

DULCE DONOVAN, ESQUIRE
ASSISTANT U.S. ATTORNEY

Diane J. DeStefano, RPR
15 Seabreeze Terrace
South Kingstown, Rhode Island 02879
(401) 782-4441

TUESDAY, MAY 2, 2006, 9:50 A.M.
JOHN A. CELONA,
called as a witness and having
first been duly sworn, testifies as follows:
EXAMINATION
BY MR. SULLIVAN:
Q. Please state your full name and spell your last for the record.
A. John A. Celona, C-E-L-O-N-A.
Q. Mr. Celona, you're familiar to this grand jury, they have heard testimony from you before, but in order to make a complete record here, I'm going to go over a couple of things with you that we did go over with you during the past presentation.
First of all, let me give you your target warnings here because you know that you are a target of this grand jury investigation, in fact, you have been charged, and we will talk about what's going on with the charges in a minute, however, this grand jury is conducting an investigation of possible violations of federal criminal laws involving the theft of honest services. You can refuse to answer any question if a truthful answer to the question would tend to incriminate you. Do you understand that?



A. Yes.
Q. Do you have any questions about that?
A. No.
Q. Anything that you do say can be used against you by the grand jury or in a subsequent legal proceeding. Do you understand that?
A. Yes.
Q. Do you have any questions about that?
A. No.
Q. If you have retained counsel, the grand jury will permit you a reasonable opportunity to step outside the grand jury room to consult with counsel if you so desire. Do you understand that?
A. Yes, sir.
Q. Do you have any questions about that?
A. No.
Q. Are you still represented by Mr. Dimitri?
A. Yes.
Q. And you can contact him if you need to?
A. Yes, sir.
Q. He's not present here this morning, but you can reach out and contact him; is that correct?
A. Yes.
Q. Are you still satisfied with the advice and representation and counsel that you're getting from



Mr. Dimitri?
A. Yes, sir.
Q. So if there is any time that you want to ask Mr. Dimitri a question, just tell us that you want to take a break to call your counsel and we'll allow you to do that for a reasonable period of time. Do you understand that?
A. Yes.
Q. Now, when you were last here, I believe I described for the grand jury a plea agreement that you had with the United States of America; is that correct?
A. Yes, sir.
Q. Could you remind them what the terms of your plea agreement are in your own words?
A. Well, the terms, in my own words -- I could leave something out -- was that I would cooperate in any and all matters with the federal government. I pleaded guilty regarding this -- these investigations and all investigations. I made -- the government has made no promises to me other than what they have included in their plea agreement.
Q. So you have agreed to plead guilty to the crimes you committed; is that correct?
A. Yes, sir.



Q. And that involves schemes to deprive the citizens of the State of Rhode Island of your honest services involving the -- Roger Williams was one scheme, another scheme was CVS Pharmacy and its executives, and another scheme involved Blue Cross and its executives; is that correct?
A. Yes, sir.
Q. And in exchange for your promise to plead guilty and your promise to cooperate, the government has agreed to do something for you; is that correct?
A. Yes.
Q. And in our sole discretion, if you fulfill all your obligations under the plea agreement, what has the government agreed to do for you?
A. Request a lower of the sentencing.
Q. Do you understand that you don't have a guarantee that we'll do that?
A. Yes.
Q. And do you understand that even if we do make that request of the Court, there is no guarantee that the Court will honor that request or grant that request; do you understand that?
A. Yes.
Q. Ultimately, the judge will describe what to sentence you to?

A. I understand.
Q. And you understand that you haven't been promised any particular sentence in this matter?
A. Yes.
Q. Then under those circumstances, would you remind the grand jury why you decided to do this?
A. Well, I think, as I've said before, I served there for many years, and I did do things wrong, got caught. I want to -- I know that other things are going on, were and are, and I want to clean up that hell hole, that garbage pit, if you want to call it that, perpetuating itself against the State of Rhode Island and its people, and I want to try to make my children proud of me again for what I'm doing.
Q. Now, since the last time you were here, has anybody promised you anything new or different or additional or done anything for you in exchange for your testimony?
A. No, sir.
Q. Has anyone threatened you in any way concerning your testimony here?
A. Concerning testimony?
Q. Yes.
A. No.



Q. You have had one change of circumstances since the last time you were here, is that correct, that is, you have now formally gone to court and entered a plea of guilty; is that correct?
A. Yes, sir.
Q. You appeared before Chief Judge Ernest Torres and pled guilty in open court to your crimes; is that correct?
A. Yes, sir.
Q. Your sentencing has been continued twice, first to May and now to November; is that correct?
A. Yes, sir.
Q. As far as you know, you will be sentenced in November of this year; is that correct?
A. So far, yes.
Q. Today, Mr. Celona, as you know, we're going to focus on two CVS executives, Jack Kramer and Carlos Ortiz, and your relationship with them. Before we do that, again, remind the grand jury what your official position was in this state and what dates you held those positions. You were elected as a state senator, is that correct?
A. Correct.
Q. What periods of time did you serve?
A. I was elected in 1994 November -- if you



can't hear me, please tell me -- and I began serving in January of 1995, and I served continuously until March of 2004.
Q. As a state senator serving in the legislature, did you hold any positions of authority in addition to that granted to you by the citizens of the State of Rhode Island?
A. Yes, sir.
Q. What were those positions?
A. Well, do you want all or the highest positions or --
Q. Why don't you tell us about your connection with the Senate Corporations Committee?
A. Okay. I was chairman of the Senate Corporations Committee beginning January 2001, appointed by Senator Irons, who was then the Majority Leader Elect, and then I was named chairman in January of 2003 of the Committee on Commerce, Housing and Municipal Government. I served in that capacity until the time -- well, just before I left the Senate in December of 2003.
Q. Okay. Now, the Senate Corporations Committee, that was known by another name at some point; is that correct?
A. Yes. As I stated, from 2003 January on,



and I believe it's still the same. It's called Commerce, Housing and Municipal Government.
Q. Even though there was a name change, I'm going to refer to that as the Senate Corporations Committee --
A. That's fine.
Q. -- so that we know we're talking about the same thing even thought there's been a name change over the course of the years. Were there any other committees that you served on?
A. Yes, sir.
Q. What was that?
A. From January 2 -- excuse me, from January 1995 until December 2002, I served on the Health, Education and Welfare Committee. And from January 2003 until I left, I served on the -- I forget the exact name, Constitutional and Gaming Issues Committee or something along those lines. I was a rank and file member.
Q. What were the duties and responsibilities of the Committee on Health, Education and Welfare?
A. It would deal both -- issues that dealt with the Department of Health, smoking in particular areas. We did have some areas where we dealt with minimum staffing on nursing, nurses, things along

Page 10

those natures.
Q. And you were just a member of that committee; is that correct?
A. Yes. I believe for one term, then Majority Leader Kelly made me secretary, which basically meant nothing.
Q. Okay. Tell us what the Senate Corporations Committee is empowered to do and hear.
A. The Senate Corporations Committee was empowered to act upon city and town legislation, insurance legislation, legislation dealing with health care and insurance health care legislation, auto body legislation, legislation of that nature. But those were the majority. Transportation issues from the Department of Transportation and things like that.
Q. As a member of that committee, you would sit and hear those types of matters; is that correct?
A. Yes, sir.
Q. But at some point, you became the chairman of that committee; is that fair to say?
A. Yes, sir.
Q. What were your additional powers and authority as the chairman of that committee?
A. Well, legally, under the rules, you have

Page 11

the right to call the meetings, set hearings, post the bills that you would like to post and post the bills that you would not like to post, and by posting, it means listing them for hearing.
Q. Drawing your attention then to the individuals that we're here to talk about, Jack Kramer and Carlos Ortiz, can you tell the grand jury how you know Carlos Ortiz, that is, when did you meet him, under what circumstances did you meet him, what was your relationship with him throughout the years, and what is your relationship with him now?
A. I'll start with the last. I haven't seen or heard from him since January of 19 -- from December of 2003. I got to know him as a lobbyist for CVS early on in my senate career, and that's how I came to know Carlos Ortiz.
Q. And was your relationship over the years purely professional? Did you have any social --
A. No, sir.
Q. -- relationship with him?
A. Other than sending him a Christmas card at home, something like that, nothing.
Q. Now, Jack Kramer, about when did you meet him? What has your relationship been over time?
A. I got to know him during one of the Any

Page 12

Willing Provider legislation hearings. I think it was 1999. And again it was in his capacity as a lobbyist for CVS. I have not heard from him since probably prior to December of 2003.
Q. How would you describe your relationship with him over the period of time that you knew him?
A. Between the time that I knew him and interacted?
Q. From the time you met him, until the time --
A. As a lobbyist and personal relationship.
Q. You had a personal relationship?
A. Well, I think he tried to cultivate that, and we had a private relationship.
Q. Describe that for the grand jury.
A. We played golf together. I think I played golf with Carlos once, maybe not. I played golf together with Jack Kramer and Paul DeRoche, who was officially with the Chamber of Commerce, and Jim Hagan, who was the president of the Chamber of Commerce or chairman. And I got to know Jack Kramer pretty well in different circles and he got to know my wife and so forth.
Q. So I understand, Carlos Ortiz you had primarily a business relationship, even though you might have taken the business onto the golf course, but

Page 13

Mr. Kramer, you developed sort of a more personal relationship that involved your families; is that correct?
A. Yes. He met my wife. I don't think he ever met my kids, I met his son.
Q. For example, had he been to your house or you to his house or anything like that?
A. No.
Q. But how would you characterize him, as an acquaintance?
A. Yeah, I guess a social acquaintance.
Q. And I'm sorry, what is your relationship with him now?
A. Nothing.
Q. You mentioned that you first met Mr. Kramer during some hearings on legislation involving Any Willing Provider; is that correct?
A. Correct.
Q. The legislation that's referred to as Any Willing Provider or sometimes Pharmacy Freedom of Choice, could you describe to the grand jury what that legislation was?
A. In simplified lay terms, it would give anyone with any type insurance, health care insurance coverage, the opportunity to go to the pharmacy of

Page 14

their choice.
Q. When that legislation was proposed, what was your position on that?
A. I was for that legislation.
Q. About when did that legislation begin to become proposed, do you recall?
A. Well, it may have been proposed before I got there but it really picked up steam I believe in '98, '99.
Q. In 1998 then, when that legislation was proposed, what was your position on it?
A. I was for the legislation.
Q. And why were you for Any Willing Provider or Pharmacy Freedom of Choice legislation?
A. Because I felt the people should have the right to go to the nearest pharmacy of their choice, and I also had a lot of seniors in my district and I felt that they also had the right to go to the pharmacy of their choice.
Q. And were different corporations within the pharmacy industry itself divided on that piece of legislation?
A. Yes, sir.
Q. Explain that to the grand jury.
A. During the most contentious hearing, there

Page 15

was a coalition that was formed. I forget the exact name of it. I believe it might have been the Coalition for Pharmacy Freedom of Choice or something like that, and that was put together with Stop & Shop, Walgreens -- I don't recall if the independents were involved -- Ann & Hope I think at the time, and maybe perhaps one other. And they were of the coalition that were working against CVS and working for the passage of Pharmacy Freedom of Choice.
Q. And, in fact, some chains like Walgreens actually sent you letters praising you for your support of this legislation and sent you campaign donations; is that correct?
A. Yes.
Q. Conversely, CVS also sent you campaign contributions in 1998; is that correct?
A. Yes, sir.
Q. What was CVS's position on Any Willing Provider or Pharmacy Freedom of Choice legislation?
A. One hundred percent against it.
Q. And how did they make you aware of that?
A. Through their testimony, through their -- basically, I was a back bencher back at that point, and by a back bencher, I was in the minority -- I'm sorry. I was a back bencher at the time, and by that

Page 16

I was in the minority.
Even though I was a Democrat and the Democrats were in control, Senator Kelly was the majority leader and he had a tight knit of inner circle people, and I was not part of that tight knit circle. I was part of the Montalbano faction, and so I wasn't privy to a lot of the meetings that they would have with the lobbyists and things like that, but I heard a lot at the hearings, and you would hear in the corridors where a lot of the lobbying goes on that CVS was against it.
Q. So at that period of time now -- we're talking about 1999 or so -- you were only a member but not the chairman of the Senate Corporations Committee; is that correct?
A. That's correct.
Q. And you said that one of the ways you became aware of CVS's position was through testimony?
A. Correct.
Q. That was testimony before the Senate Corporations Committee?
A. Yes, sir.
Q. And who from CVS, for example, would testify on issues?
A. I believe it was Carlos.

Page 17

Q. And in this testimony, did they explain CVS's position to you?
A. Yes, sir.
Q. What was your understanding of why CVS was opposed to this legislation?
A. Because it would hurt them financially. It would -- obviously, if you're going to lose a lot of your market share, you're going to lose a lot of your pharmaceutical monies, but you are also going to lose a lot of the ancillary sales.
I worked for a while in my previous life for a CVS as an assistant store manager when I wasn't in politics, and one of the things they always used to tell us -- they used to give us a big book and they always put the pharmacies in the back, and the reason why they put the pharmacies in the back was because people would walk through the store and so forth -- I'm sure you all know about it -- and purchase other items on a whim and so forth. I'm sure you all know about it. You're nodding. But they would lose a lot of money. That's why they were against it.
Q. In addition to sitting in the committee hearings and listening to testimony from Carlos Ortiz and presumably other members of the CVS Corporation --

A. Yes, lobbyists. Yeah.
Q. -- were you also approached by lobbyists?
A. Yes.
Q. Who did you know to be the lobbyist for CVS?
A. Joe Walsh, Patrick Lynch, who is now Attorney General. I don't remember if Gayle Wolf was on board at the time or Clark Curtis, but I know those two others were on board.
Q. So in addition to listening to testimony, you were also approached by lobbyists Walsh, Lynch and --
A. I believe there was Peter McGinn.
Q. And those people -- for the sake of the grand jury, explain to the grand jury what the function is of a lobbyist, how they interact with you as a legislator.
A. In layman's terminology, whether it's here, in Washington, or any of the other forty-nine states, lobbyists are hired guns. They're hired by the various groups pro and con, and they would work to try to lobby each and every member of the Senate or House or whichever chamber had a closer chance of either passing their bill or not passing their bill, and that's -- that was the function of the lobbyists, to try to meet with you one-on-one.
And a lot of the -- 90 percent of the work



-- 99 percent of the work was done in the corridors or the phones by the lobbyists, and then when the hearings were held, it was more of like a dog and pony show.
Q. So in addition to listening to testimony, being approached by lobbyists and being briefed on the positions of CVS, were there any other ways in which they communicated their positions on various pieces of legislation to you?
A. Through letters.
Q. And who did you get letters from?
A. I got letters from Walgreens, I got letters from Stop & Shop I believe. I believe I got letters from CVS.
Q. And who at CVS sent you letters?
A. Carlos Ortiz.
Q. And did Jack Kramer also send you letters?
A. I believe so, yes.
Q. So you didn't have to guess what CVS's position was, right?
A. Not at all.
Q. You were told what CVS's position was?
A. Yes, sir.
Q. And CVS's position was different than yours; is that accurate?



A. Yes, sir.
Q. You were for it, they were against it --
A. Right.
Q. -- is that correct?
A. Correct.
Q. And you supported it in '98, and now it's '99 and you're meeting Jack Kramer for the first time; is that correct?
A. '99.
Q. Can you tell the --
A. Correct.
Q. -- can you tell the grand jury under what circumstances you first met Jack Kramer?
A. I believe it was at a committee hearing in Room 212 during one of the hearings. I remember where he was sitting. He was sitting -- as a back bencher, you sit at a long table. There was a conference table in the hearing rooms until it got upstairs to a large hearing room. It would be a hearing room somewhat like this.
And -- but it was a long hearing room, and the chairman would sit at one table with all his officers and his people and the other people would sit towards the end. And I was sitting towards the end, and I remember Jack Kramer was sitting like in



the corner with a fancy shirt on. I remember that.
Q. At that period of time, the first time you met Mr. Kramer, you already knew Carlos Ortiz; is that correct?
A. Yes, sir.
Q. So tell us about meeting Jack Kramer. Who was there, under what circumstances, what was discussed?
A. I believe he introduced himself and he talked about the fact that he was with CVS. He stated that he had been with I believe Montgomery Ward before that. He was a smooth talker, talked about the fact that CVS had a lot of jobs in Rhode Island for Rhode Islanders and they kept their home in Rhode Island. And he was singing the praises of Tom Ryan, how he worked his way up from pharmacist to the president, CEO.
Q. And when you met him and talked with him, it was during a hearing on this Any Willing Provider legislation; is that correct?
A. Yes, sir.
Q. Did you talk about Any Willing Provider or Pharmacy Freedom of Choice in that first meeting?
A. Well, he -- I don't remember exactly. Jack was the type of -- he was a smooth operator. He seemed like he was really smooth. He would like lay

Page 22

the ground work, you know, he would try to become your friend first and then you would be like a sucker, you would get sucked in by this stuff.
Q. In 1999, there were actually three Any Willing Provider bills pending before the Senate; is that correct?
A. Correct.
Q. Handing you then what has been marked -- actually, I'll put it up on the ELMO, join the information age.
THE WITNESS: Oh, this is new since I was last here I think. I'll put my glasses on again.
Q. Showing you Grand Jury Exhibit 1A --
A. Yes.
Q. -- a five-page document. Do you recognize what that document is?
THE WITNESS: Can you bring it up a little further?
A. It's a Pharmacy Freedom of Choice legislation.
Q. This is one of the three pieces of legislation that was proposed that year; is that correct?
A. Yes, it is, sir.
Q. And this one is Senate 0163; is that correct?
A. Yes, sir.

Page 23

Q. Introduced in 1999?
A. Yes, sir.
Q. Who introduced that particular piece of legislation?
A. Senators Walsh, Paiva-Weed, Perry, Cicciline, Gallo, et al, which meant there were several others.
Q. Showing you Grand Jury 1B --
A. Okay.
Q. -- again marked 1B, today's date, and my initials, do you recognize what that piece of legislation is about?
A. Pharmacy Freedom of Choice.
Q. And that would be 1999 Senate No. 0110; is that correct?
A. Yes, it is.
Q. Who introduced this piece of legislation?
A. Senators Raptakis, Montalbano, myself, Igliozzi, Graziano, et al.
Q. So beyond supporting this, beyond being prepared to vote for it, you also proposed this legislation?
A. I was a co-sponsor. In the Senate, normally the first person is the sponsor and the other is the co-sponsor.
Q. But you co-sponsored this piece of legislation

Page 24

in 1999?
A. Yes, sir.
Q. And finally, in 1999, Senate 0008, Grand Jury Exhibit 1C, today's date and my initials, is this the third piece of Pharmacy Freedom of Choice legislation?
A. Yes, sir.
Q. And, again, who sponsored and co-sponsored this piece of legislation?
A. Raptakis, Graziano, myself, Alves, Montalbano, et al.
Q. Now, what happened to that legislation in 1999?
A. Didn't pass.
Q. And in the Senate and the Senate Corporations Committee, do you keep records of what actions are taken on different bills that are posted for hearing on different days?
A. Yes, sir.
Q. Showing you then what's been marked as Grand Jury Exhibit No. 2, today's date and my initials, what is this type of document?
A. It's -- this is the posting that has to be posted within at least 48 hours prior to the hearing, and it shows the bills that are going to be heard and/or considered on that particular date with what

Page 25

the history is of them and where it would be held and what committee it would be in.
Q. So these bills were going to be heard --
A. I think at the top it might say Corporation I would think. Yes.
Q. These bills were going to be heard on what date?
A. April 8th, 1999.
Q. And on April 8th, 1999, what is this document?
A. That's a quorum, an attendance record.
Q. And were you present on that day?
A. Yes, sir.
Q. This next document is -- what is this?
A. This is a report of the action.
Q. So on April 8th, what action was taken by your committee?
A. It was held for further study.
Q. And did you vote for that action to occur?
A. Yes.
Q. After further study, this matter came up again; is that correct?
A. I believe they are all the same day. Was that the year they were all the same day? Oh, 4/27.
Q. Showing you what is Grand Jury No. 3, today's date and my initials.
A. Okay.

Q. What is that document?
A. It's a posting of the daily action sheet that's put together by the clerk of the committee.
Q. To show what actions occurred before your committee on that day?
A. Yes, sir.
Q. What day did this action take place?
A. April 27th, 1999.
Q. And on April 27th of 1999, did your committee take up the acts on Pharmacy Freedom of Choice?
A. Yes.
Q. And this document is again what?
A. This is the roll call on the record of who voted for -- which way.
Q. On April 27th of 1999, what happened to Pharmacy Freedom of Choice?
A. It was defeated, and I believe that was the meeting where Senator Kelly and Algiere were at also if I'm correct if you look downward. I don't know. Yes, they were, which is out of the ordinary.
Q. Explain that.
A. The Majority Leader -- now they have president of the Senate and Senate Majority Leader but back then the Majority Leader was the head of the Senate, and the Minority Leader was the head of the



Republicans and they were ex officio, which meant they served on every committee, and it was very, very rare that these leaders would go to a meeting unless it was just to create a quorum and have their attendance and then turn around and walk out or if it was something that they were very, very concerned about passing or not passing, and their vote was needed. Because there was a lot of publicity -- I was making a lot of noise, and they were concerned with the fact that it may have passed.
Q. Was their attendance required on that day to institute a quorum based on this voting record?
A. No, sir.
Q. Did any of them tell you why they were there that day?
A. Initially, no, but we knew.
Q. I'm sorry?
A. Initially, they didn't tell me but you knew why they were there.
Q. So you're speculating that they were there because you were making a fuss about this legislation and they wanted to make sure it was defeated?
A. Yes.
Q. That's just your understanding or your speculation?



A. My speculation, yes.
Q. None of them told you that?
A. At that point, no.
Q. At some point, did they tell you that?
A. Yes.
Q. Who told you that?
A. Senator Kelly.
Q. What did he tell you?
A. He told me afterwards, maybe on the same day or the day after, shortly thereafter, in the Senate chambers right next to the Senate rostrum, his words were, "If you're going to back door me, let me know ahead of time." He was very upset.
Q. Why would he have been upset about that?
A. I don't know. I assume that he was aligned with Irons. He represented Woonsocket. I don't know if he had any relationships with CVS, but he was upset.
Q. When you say that he was aligned with Irons, do you know if Mr. Irons had any relationship with CVS?
A. Definitively no, but there were rumors that he did.
Q. What were the rumors that he did?
A. The rumors were that he had -- again, this is, you know, strictly rumors -- that he had all the



insurance coverage for CVS employees and he was as tight as a drum with Tom Ryan, and they used to play golf together as so forth and so on. They belonged to the same country club at Wannamoisett. He would take him to Augusta where they played a Master's Tournament and all that stuff.
Q. And so on April 27, of 1999, at least, Chairman Senator William Irons voted against this legislation; is that correct?
A. Yes, sir.
Q. And that occurred in your presence; is that correct?
A. Yes, sir.
Q. And Senator Paul Kelly, as an ex officio member, also appeared and voted against this legislation; is that correct?
A. Yes, sir.
Q. How did you cast your vote?
A. I voted for it.
Q. And you were in the minority; is that correct?
A. Yes, sir.
Q. So the legislation was defeated?
A. Correct.
Q. Now, do you know -- do you recall whether -- you indicated that you met Mr. Kramer at a hearing on Any

Page 30

Willing Provider in 1999. Do you recall whether it was on April 8th or April 27th?
A. I don't recall what date.
Q. But it was sometime around this; is that correct?
A. Yes.
Q. Now, in 1999, when these bills were defeated, was that the end of it for '99, or did you hear from CVS and others about this legislation --
A. Yes.
Q. -- after that?
A. Yes, sir.
Q. Tell the grand jury what happened after the vote.
A. Well, Joe Walsh, who I and many others called like the Michael Jordan of lobbyists and the closer, would show up at the end and try to get his bills passed and -- I think he had a thousand batting average -- and he met with myself, Ortiz, Montalbano, Alves and I believe Walaska in the Senate lounge because we hadn't had offices at the time, trying to smooth over -- and I believe Patrick Lynch was there also -- trying to smooth over the differences that we had with CVS.
And that's the type of lobbyist he was,

Page 31

basically trying to work on next year so there wouldn't be as much noise, because I was the one creating all the noise.
Q. Do you know the date that this meeting occurred?
A. No, I don't.
Q. But you do recall where it occurred?
A. I know it was in the Senate lounge, and I know it was right near the window. The window was open. It was in the spring. It was good weather.
Q. How did this meeting come about?
A. It was requested by Joe Walsh.
Q. When you refer to Joe Walsh as the Michael Jordan of lobbyists, could you explain that a little bit more?
A. Well, he had practically everybody who was anybody as clients and he, up until that point, I don't think ever lost a bill. He wouldn't show his face much until the end, and then he would come in. We used to call -- Michael Jordan was a big star then before he retired -- and he would come in and close the deal. Or if you want to put it in baseball terms, he was the closer.
Q. If we're going to go with sports analogies, just so everybody understands, Michael Jordan is a prominent basketball player; is that correct?

Page 32

A. Oh, yes, I'm sorry.
Q. And a closer in baseball would be the pitcher that comes in to seal the win; is that correct?
A. Yes, that's correct. I'm sorry.
Q. You mentioned some of Mr. Walsh's lobbying practices. Could you describe that for the grand jury?
A. Well, after session, he would take out various lobbyists. He belonged to the Warwick Country Club -- excuse me, various senators, and I believe representatives also, to various -- the Warwick Country Club to a golf day, had lunch and maybe dinner, and Peter McGinn, people from his office and have a day of golf, just warm up, you know. It was like a courtship.
And then he was also -- I think he was president of PPAC, which I think he still is, the Providence Performing Arts Center, and he would also invite us to -- and this was all when -- it was calculated very carefully, when session was not in session, to go to PPAC to go to see various plays or whatever.
Q. Did you ever accept tickets to PPAC or golf rounds from him?
A. Yes, like many others.

Page 33

Q. Did he also have some practices involving fund-raising activities?
A. Yes, sir.
Q. What were those?
A. He would -- you would have your fund-raiser and people would walk in and they wouldn't pay, but then like two or three days later or three weeks later or whatever, Joe Walsh would come and visit you with an envelope with a stack of checks from all his clients.
Q. Those were people that -- I'm sorry, did this happen to you personally --
A. Yes, sir.
Q. -- or is this something you heard about?
A. It happened to me.
Q. These are individuals that would attend a fund-raiser without leaving a check; is that correct?
A. Yes. And they're not going to stop them at the door and say, "Hey, where's your check," you know.
Q. But then Mr. Walsh would appear later with all the checks for people that had not paid?
A. Yes, sir.
Q. What effect did that have on you?
A. Well, that has as effect. I believe it's

Page 34

all calculated. It creates more power for him with particular legislators to show that he has more umph behind him with all of these various clients.
Q. And their political contributions; is that correct?
A. Yes. I believe he had everybody from CVS to Fleet to whomever, to the dogs.
Q. So when Mr. Walsh asks you to attend a meeting in the Senate lounge about Any Willing Provider, you do it, right?
A. Yes, sir. And I had known him prior to that, not in a supportive fashion, but I knew him.
Q. We got off track a little bit, but who was at the meeting in the Senate lounge and what happened there?
A. Senator Montalbano, Senator Alves, myself, I believe Senator Walaska -- I'm not sure but I believe he was there -- Carlos Ortiz, Joe Walsh and Patrick Lynch.
Q. What was discussed at that meeting?
A. What our concerns were. Joe wanted to know what our concerns were about CVS, you know, why -- "Why are you so belligerent towards CVS? They're a Rhode Island company. This bohemouth, Walgreens, is coming in from Indiana or whatever they are. They

Page 35

don't provide jobs in Rhode Island other than menial jobs in the store," which I took offense to because I worked at CVS as an assistant manager. I basically loaded trucks and stuff in '93 -- yeah, '93.
And that's what he said. And I said to him that CVS has become out of touch with Rhode Islanders, they take us for granted. I said that they don't basically care much about Rhode Islanders, they care about certain Rhode Islanders but not the rank and file Rhode Islanders.
And then he said, "In what regard?" And I said, "Well, you know, they don't keep in touch with seniors. They don't tell people what they do." They're just a giant -- they were perceived, in my opinion, the constituents that I represented, as a corporate giant that just was concerned about people going through the turnstiles and paying their cash at the registers.
And Joe Walsh said, "Well, that's not the case." And I said, "Let me give you a for instance." I always had a practice where I would send a citation wishing a company good luck if they opened up, and I said, "I even sent them a citation. They didn't even put it up. They didn't care about us." I said, "They're just concerned about Kelly and his people

Page 36

because he controls who's who." And I said, "If Tom Ryan was here, I would tell him right to his face."
And he said, "Do you want to meet Tom Ryan?" And I said, "No, I don't care to meet Tom Ryan. He probably more likely than not filled my prescriptions when he was at the store," which was then across the street from the store that exists in North Providence now, because he started as a pharmacist right there. He's about my age. So that's how it ended.
Q. In addition to you then, the other senators who were attendance at this meeting were all people that supported Pharmacy Freedom of Choice; is that correct?
Yes, sir.
Q. And this was an effort to stop any Pharmacy Freedom of Choice legislation now for the next year, in 2000, they're already planning ahead; is that correct?
A. Oh, yes, plus the noise that came along with it that I was creating.
Q. Did you have any interaction with Carlos Ortiz at that meeting?
A. Yeah. We had interaction.
Q. What did he do?

Page 37

A. I think Joe Walsh, when I brought up the issue of the citation, he said to Carlos, "Carlos, make sure that citation goes up."
Q. Do you know if it ever did?
A. Yeah. It's still up. My name's faded. They probably did it on purpose. But it's still up. If you walk in, it's on the left, or it was anyway. I don't know if it still is. I have a problem going in there.
Q. After that, after that meeting, when was the next time you heard from CVS or the lobbyists Carlos Ortiz or Jack Kramer?
A. I believe it was in the summer, and I was asked to go up to the corporate headquarters in Woonsocket by Carlos and Jack.
Q. Where did that conversation take place?
A. I believe it was on the phone.
Q. Okay. Did you -- did you have any meetings with them, any chance encounters with them at any fund-raiser or anything of that nature?
A. I may have. Oh, yes. I'm sorry. Let me backtrack. At -- in the spring, prior to the summer, I had a meeting with -- it wasn't a meeting. Senator Michael McCaffrey, who is a senator from Warwick who was part of the Montalbano delegation, had a

fund-raiser at the Warwick Knights of Columbus Hall. It was -- I don't know the counsel number or the name of it, but it was set down low, and it was just before that big plaza where Warwick Ford used to be.
Q. You attended a fund-raiser for Senator Michael McCaffrey?
A. From Warwick, yes.
Q. On May 27th of 1999?
A. Yes, sir.
Q. Now, prior to going to that fund-raiser, did you know that Jack Kramer or Carlos Ortiz would be there?
A. No, not definitively.
Q. How was it that you came to go to that particular fund-raiser?
A. Well, Michael was my friend. Well, I thought he was my friend, and senators would have a practice to get complementary tickets to give to each other to go to their fund-raisers.
Q. So when you went to Michael McCaffrey's fund-raiser on May 27th, who did you encounter there?
A. Well, I -- I'm not a drinker, so I wasn't hanging around the bar. I don't drink. A lot of people were congregated around the bar area. But as you can tell I like to eat, and I had gotten a little stuff of maybe shrimp and cheese and crackers or



something, and I sat down alone at the table. It didn't bother me to sit alone. And then Jack Kramer moseyed up and sat next to me.
Q. What conversation did you have with Jack Kramer at the McCaffrey fund-raiser?
A. At first, it was small talk and then he started talking about CVS and Any Willing Provider, and he said, "I think CVS could use a consultant."
Q. How did you respond to that proposition?
A. I believe it was a proposition. I had basically no response because it was kind of a shock coming from someone who I was so diligent against, and maybe it was my naivete' or my beginning of going into the type of person I was at the time that I believe I'm not now.
Q. When you talk about becoming the kind of person that you were, you're talking about a corrupt politician; is that correct?
A. Yes, sir.
Q. How much discussion did you have with him on May 27th about the possibility of you becoming a consultant for CVS?
A. Not too much. It was like setting the bait. He through the bait out in the water, and I believe it was calculated by him.



Q. Did you firm up any definite plans on that date or anything like that?
A. No, sir.
Q. What did you do after you left the meeting?
A. I went home, and I said to my wife, "I think I got offered a job by CVS."
Q. Did you do anything about that?
A. No, at that point, no.
Q. What happened after that?
A. I got called up to the corporate office.
Q. By whom?
A. By Jack. Specifically, I believe it was by his secretary or their secretary, MJ McCosca I believe her name was to go up to a meeting there.
Q. So a secretary for Jack Kramer or Carlos Ortiz named MJ McCosca gave you a call and said she would like you to attend a meeting at CVS?
A. Yes, sir.
Q. Did she tell you who asked you to attend?
A. Yes. Jack and Carlos.
Q. Did she tell you what the meeting was about?
A. No, sir.
Q. Did you attend that meeting?
A. Yes, sir.
Q. And do you have a practice of keeping a



calendar?
A. Yes, sir.
Q. And showing you what has been marked as Grand Jury Exhibit No. 4, today's date and my initials, and drawing your attention to a notation on Thursday, July 8th, do you know what that reflects?
A. It reflects a meeting at twelve noon at CVS.
Q. Is that the meeting that you have just described?
A. Yes, sir.
Q. What happened at that meeting? What -- when we say CVS headquarters, what are you talking about?
A. In Woonsocket, the main headquarters in Jack Kramer's office.
Q. What happened on Thursday, July 8th, 1999, at the meeting at CVS in Jack Kramer's office?
A. They offered me a consulting position. They said they needed someone to reach out to the senior population because they knew that I had an extensive popularity with the seniors and they wanted someone to reach out to them.
Q. Who was present for that meeting?
A. Jack Kramer and Carlos Ortiz.
Q. Anyone else?

A. No, sir.
Q. Other than Jack Kramer's mentioning it at the McCaffrey fund-raiser, had you done anything to encourage them or express any interest in meeting about being a consultant for CVS?
A. At that point, no.
Q. At that point or at any point, did you fill out an application to work for CVS or supply them with a copy of a resum, or curriculum vitae or anything that would describe your background and experience for a position of this type?
A. Regarding this?
Q. Yes.
A. No. But like I said, when I wasn't in politics I worked for them but they probably didn't even know it. They probably know that now but ...
Q. For now you're referring to the fact that coincidentally, in your youth --
A. Not my youth. It was when I got married.
Q. Okay. At some point in your life --
A. But I wasn't in politics then and I got it on my own.
Q. Okay. Tell us what your response was to their offer of a position of employment as a consultant?
A. Well, obviously, I wanted -- I needed to



feed my family, and I said, you know, "Draw up a proposal and I'll take a look at it."
Q. Did you do anything else that day, besides discuss the possibility of becoming a consultant for them?
A. I believe they took me on a tour of the facility. They took me into Ryan's office. He was busy and -- not that I cared, but he was busy, and they told me all about their golf tournaments and so forth.
Q. Besides showing you around the facility and talking about the golf tournament and attempting to introduce you to the president or CEO of that corporation, did they take you down to Human Resources or introduce you to anybody who would be involved in your hiring process or anything like that?
A. Absolutely not.
Q. When -- you say that definitively, "Absolutely not." Why are you responding that way?
A. Respectively, that would be the right way to do it.
Q. And that's not the way it happened?
A. No, sir.
Q. What happened after the July 8th meeting in



relation to your employment with CVS?
A. I believe there was another meeting where the proposal was given to me. I believe. Maybe you can refresh me.
Q. At some point -- when you say a proposal, at some point was a proposal drafted up?
A. Yes, sir.
Q. That was a result of the July meeting; is that correct?
A. Yes.
Q. Showing you what's been marked as Grand Jury No. 5, today's date and again my initials, do you recognize what that document is?
A. Yes.
Q. What is that document?
A. This is a letter from me sent to John, Jack Kramer or John R. Kramer known as Jack Kramer, at his request on what I could do, what my scope of responsibility, in my opinion, would be for CVS.
Q. Who drafted that proposal?
A. I did.
Q. Why did you draft that proposal?
A. At the request of Jack Kramer.
Q. And that was to be a consultant for CVS?
A. Yes.



Q. In drafting that proposal, if I could draw your attention to Page 3 of that document, you conclude the letter --
A. Do you want me to read it?
Q. Yes, if you would.
A. "Jack, I feel this program could be a relatively inexpensive way to continue to market CVS, its products and services, and provide significant positive results. As important, it would eliminate any bad perception left over from the Freedom -- 'Freedom of Choice.' If you have any questions, please free to contact me. With warm regards, Sincerely, John A. Celona."
Q. Why did you write in there that this would be an inexpensive way to market CVS and more importantly it would eliminate any bad perception left over from Freedom of Choice? What did you mean by that?
A. That I would sell my vote at their request. I feel terrible saying it but I did.
Q. Did CVS act on that proposal right away?
A. I don't believe it was right away.
Q. After you made that proposal on September 23 of 1999, you went into the fall session, the legislative session in 1999; is that correct?
A. That was '99, the letter?

Page 46

Q. Yes.
A. I think 2000.
Q. But in the fall of 1999 --
A. 1999, yes.
Q. -- you began the legislative session again; is that correct?
A. The session begins in January.
Q. What happened in the fall?
A. In the fall, you pre-file legislation.
Q. Was Pharmacy Freedom of Choice going to come up again?
A. I believe so.
Q. I'm showing you what has been marked as Grand Jury Exhibit 6, with today's date, and my initials. Did you have a follow-up meeting with CVS concerning your proposal for employment?
A. Yes, sir.
Q. When did that occur?
A. January 7th at 10:00 a.m. at the CVS headquarters. I specifically remember it because you notice the day before -- I call it a car but it was a van that was at Rizzo's, so I had bought a used van, a Windstar, and it was in for service. And they had given us a loaner, it was a nice one, and I even specifically remember where I parked.

Page 47

MR. SULLIVAN: This might be a good time to take a break.
(R E C E S S)
MR. SULLIVAN: All right, Mr. Celona, before we took a break here, we were at the point where you had told us about drafting a proposal for a consulting position at Mr. Kramer's instruction, that you mailed that on September 23, 1999, and that you didn't hear back from anyone until January 7th of 2000, or there was a meeting planned for January 7th of 2000.
A. Correct.
Q. So are you oriented to where we are now?
A. Yes.
Q. How did that January 7th meeting come about?
A. I was called by again the secretary, MJ McCosca, who I believed at the time and I still believe this, had been the secretary for Jack Kramer and Carlos Ortiz.
Q. Did she tell you who was calling the meeting?
A. Jack and Carlos.
Q. Did she tell you what the nature or purpose of the meeting was?
A. No, sir.
Q. But you attended that meeting; is that correct?

Page 48

A. Yes, sir.
Q. And presumably, it's going to be about your proposal?
A. Yes, sir.
Q. Now, you wrote that proposal back in September and now you're meeting in January. What happens in the legislature in January?
A. The legislature conveniently begins.
Q. So as the legislative session for the year 2000 is beginning, you now get called into CVS headquarters?
A. Yes, sir.
Q. Where did you meet on this occasion?
A. In Jack Kramer's office.
Q. Who was present?
A. Jack Kramer and Carlos Ortiz.
Q. What was the discussion?
A. It was about hiring me as a consultant or an independent contractor. I guess it's one in the same.
Q. Were you presented with anything?
A. I believe so, yes.
Q. Showing you what's been marked as Grand Jury No. 7, today's date and my initials, do you recognize that document?

Page 49

A. Yes.
Q. What is that document?
A. That's a consulting agreement that they had drafted up for me to work for CVS.
Q. Did you write that agreement?
A. No, sir.
Q. Do you know who drafted that agreement?
A. No.
Q. Who presented you with that agreement?
A. It was presented at that meeting by both Jack and Carlos.
Q. Did you sign that agreement immediately?
A. No, sir.
Q. What did you do with that agreement?
A. After I left the meeting, I -- I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response -- I should have written a request, but I didn't but hindsight is 20/20. And they said, "Well, if it specifically deals with CVS you can't vote on it, but if it does not specifically deal with CVS, you can vote on it." And I also faxed a copy of that to my attorney at the time prior to my signing it.
Q. You mentioned that you made the call from the

Page 50

loaner van; is that correct?
A. Yes, sir.
Q. You have a firm memory of that?
A. Oh, without a doubt I remember because I parked -- it was a beautiful new van because ours, we had purchased it used and it was in the shop. It was a beautiful new van. And I even remember where I was parked. I was parked on like parallel to an island in the front there.
Q. And putting back up Government's or Grand Jury No. 6, that's reference to the entry on Thursday, January 6th, "Car at Rizzo's 8 a.m."; is that correct?
A. Correct.
Q. And that's where you got the loaner van --
A. Yes, sir.
Q. -- from which you placed the call? Why did you call the Ethics Commission after meeting with Jack Kramer and Carlos Ortiz?
A. I still had some conscience at the time I think maybe, not enough, but I had a little bit. Again, hindsight is 20/20. I had some, but not as much as I should have.
Q. After you called the Ethics Commission that one time, did you do anything else that you were supposed

Page 51

to do concerning the Ethics Commission concerning your employment with CVS?
A. No, sir.
Q. Did you ever tell Carlos Ortiz and Jack Kramer anything concerning your contact with the Ethics Commission in connection with this consulting agreement?
A. I told them I had called them, and I referred to what the Ethics Commission had stated, that a similar case with teachers in the legislature, if they voted on something that deals with teachers as a whole, they can vote on it but if it deals with them specifically, they cannot vote on it.
Q. And in your mind, did Any Willing Provider or Pharmacy Freedom of Choice have a specific and identifiable impact on CVS?
A. Yes, sir.
Q. Did you ever recuse yourself on any action on that legislation?
A. I didn't go to one meeting, but I never recused myself or filled out a Section whatever it is.
Q. 6?
A. 6. Never filled one of those out.
Q. We'll get to that in a minute, but there's a

Page 52

difference between just not showing up and recusing yourself, right?
A. Right.
Q. If you don't show up, nobody knows why you're not there; is that correct?
A. Correct.
Q. But if you recuse yourself, everyone knows about your relationship, right?
A. Correct.
Q. We'll get to that session in a minute. But the bottom line is you never recused yourself?
A. No, sir.
Q. So after you left the meeting with this consulting agreement, how did you handle it from that point on?
A. I called the Ethics Commission and I faxed a copy to my attorney.
Q. And did you talk to your attorney about it?
A. Yeah, yes.
Q. What was -- did that conversation have anything to do with ethics or conflict of interest, or was it simply a review of the contract?
A. It was a review of the legality of the contract.
Q. How -- did you at some point decide to accept

Page 53

that consulting agreement?
A. Yes, sir.
Q. Did you make any changes or additions or deletions to that document, or did you sign the one that they prepared?
A. I signed the one that they prepared.
Q. How did you return it to them?
A. I believe I mailed it to them.
Q. Showing you then the signature page on Page 6 --
A. Yes.
Q. -- do you recognize whose signature that is?
A. Yes, that's mine.
Q. And did you sign that document?
A. Yes, sir.
Q. The date that's written in there, February 10th of the year 2000, is that your handwriting?
A. No, sir.
Q. Did you sign it sometime before February 10th?
A. The wording February 10th?
Q. Yes. Did you place your signature on there sometime before February 10th?
A. I believe so.
Q. And do you recognize the other signature on that document?
A. Carlos R. Ortiz.

Q. Do you know if that date reflects when Carlos Ortiz signed that document?
A. Yes.
Q. Do you believe it does?
A. Yes.
Q. What else happened on February 10th of 19 -- I'm sorry of 2000?
A. There was a bill introduced by I believe Senator Patrick McDonald before the Rhode Island Senate, Pharmacy Freedom of Choice legislation.
Q. Putting up then what has been previously marked Grand Jury No. 8, today's date and my initials, what was that piece of legislation?
A. Pharmacy Freedom of Choice.
Q. And this was the 2000 version?
A. Yes, sir.
Q. Specifically then, 2000 Senate 2774?
A. Correct.
Q. Who introduced that piece of legislation?
A. Senator Patrick McDonald.
Q. On what date did he introduce it?
A. February 10th, 2000.
Q. The same day your consulting agreement was signed?
A. Yes, sir.



Q. Now, in the year 2000, after signing the consulting agreement, what action, if any, did you take on the Pharmacy Freedom of Choice legislation that year, that is Senate 2774?
A. I did not support it. I was not vocal like I had been in the past.
Q. First of all, you didn't co-sponsor this one, right?
A. No, sir.
Q. And you didn't speak in favor of it; is that correct?
A. Correct.
Q. And when it came up for hearing -- showing you Grand Jury No. 9, today's date and my initials, on what day did Senate 2774 come up for hearing?
A. March 7th, 2000.
Q. And that was after the day that you entered into the consulting agreement; is that correct?
A. Correct.
Q. Now, on this date, besides not co-sponsoring it, besides not vocally supporting it or speaking in favor of it, did you vote on the bill?
A. I don't believe so.
Q. Showing you the voting record, what did you do?
A. I didn't go to the meeting.



Q. Explain that.
A. The hearing -- you want me to go through the whole Fatima scenario or no?
Q. Mr. Celona, just explain --
A. Okay.
Q. -- what --
A. I -- I did not go to the hearing because I was under CVS's employ.
Q. You mentioned something about Fatima?
A. Yes.
Q. What was that about?
A. Saint Joe's, our Lady of Fatima Hospital, had a presentation from two to three o'clock that afternoon, and as many businesses would, and hospitals are businesses in addition to health care facilities, and they would show -- they would demonstrate to us what services they provide, what their legislative agenda is. And it was between two to three o'clock, and a lot of us didn't get back until just before session for the hearing.
And I got back more likely than not for session, and I know I didn't go in after session to act upon the Pharmacy Freedom of Choice when the meeting reconvened.
Q. Had you been present at the State House any time



on March 9th, the day this matter came --
A. Was it March 9th or March 7th?
Q. March 9th.
A. March 9th, yes.
Q. Could you have been present if you wanted to for this vote?
A. Yes.
Q. Why did you not appear for this vote?
A. Because I was employed by CVS.
Q. Were there any other reasons?
A. Yeah. I was asked to take a walk by Chairman Irons.
Q. Explain that.
A. Take a walk means, in senate terms, the slang where you're asked not to attend, or if there's a vote on the floor, take a walk to the men's room so you're not voting on it. Or the complete meaning of take a walk means walk out of the room while the vote is being taken.
Q. Was your decision not to cast a vote influenced by the consulting agreement that you just signed with CVS?
A. Yes.
Q. How so?
A. Because I was getting paid by them.

Q. Why didn't you just recuse yourself?
A. I didn't want people to know.
Q. Why not?
A. Because it was a position that I had not agreed with.
Q. Up until this time, you had been a very vocal supporter and had voted for the bill; is that correct?
A. Correct.
Q. And now you didn't attend the meeting because you were being paid by CVS?
A. Correct.
Q. Where did the conversation with Senator Irons occur when he told you to take a walk?
A. Just before the meeting. I think more likely than not it was in his office.
Q. Had he ever asked you to take a walk before?
A. Prior to that, no.
Q. Did he explain to you why he wanted you to take a walk?
A. No.
Q. Do you know why he asked you to take a walk?
A. Definitivley I can say that I know he was a strong proponent of being against the bill in the past or a strong opponent of the bill in the past,



and there were also rumors in the past or there were rumors at the time that he had financial ties, significant financial ties with CVS.
Q. But in the past, even when you were voting for it, he didn't come in and order you to take a walk or tell you to take a walk, correct?
A. Correct.
Q. What was different now? Did you ever tell him that you were accepting money from CVS?
A. No, sir.
Q. Did he indicate to you that he knew you were accepting money from CVS?
A. No, sir.
Q. But for this vote, this one time, he told you to take a walk on this piece of legislation?
A. Yes, sir.
Q. And you did that?
A. Yes, sir.
Q. And taking a walk is just an informal way of recusing yourself; is that right?
A. Well --
Q. You don't change your vote on the public record?
A. Yes.
Q. Without disclosing your financial interest?
A. I'm ashamed to say.



Q. Had you disclosed your financial conflict of interest, what affect would that have had on you and with your employment?
A. I think they probably would have got rid of me.
Q. Why?
A. In retrospect, they bought me for my vote I'm ashamed to say.
Q. Well, let's look at what you did then for consulting work after you signed that agreement. When you signed and returned that agreement to CVS, did you ever have a first day at work at CVS?
A. No, sir.
Q. Did you ever have a meeting at which you were given an orientation about the policies, practices and procedures of CVS or the nature and scope of your duties?
A. No, sir. Other than a tour of the facility and saying hello to people, nothing.
Q. Did they ever call you in and sit you down and explain what your duties were or what expectations they had of you under the consulting agreement?
A. No.
Q. Did they ever assign you to a supervisor?
A. No.



Q. Did any managerial member of CVS routinely meet with you and review your work and give you oversight on your job?
A. No, sir.
Q. Did you have any reporting requirements at the beginning?
A. No, sir.
Q. Did you ever receive any assignments from anybody at CVS?
A. No, sir.
Q. When did you begin getting paid?
A. I believe it was in February or March of 2000.
Q. Shortly after signing the agreement?
A. Yes, shortly after signing the agreement.
Q. So even though you were getting money now -- how much money were you getting?
A. One thousand dollars a month.
Q. Even though they were paying you one thousand dollars per month, you have never been brought in or oriented or given a supervisor or been assigned any duties and responsibilities?
A. No. Never brought to Human Resources, nothing.
Q. What do you think you were supposed to be doing

for your thousand dollars a month?
A. The items that were in the contract.
Q. Did you try to do anything of a consulting nature for CVS?
A. Yes.
Q. Was that all the self-directed work then?
A. Yes.
Q. What sorts of things did you do?
A. I visited senior complexes, I facilitated the television program to talk about the shortage of pharmacists. I went to the CVS 5K Road Classic at like six o'clock in the morning and tried to get involved with a lot of different things, called them if there were shortages of prescriptions or if there was problems in the store that I was -- you know, the store that I would frequent and things like that. I would try to do some things for my money.
Q. Were you required to report what you were doing to anyone?
A. No, sir.
Q. Did you report what you were doing to anyone?
A. At that time, no, sir.
Q. Who were you -- at CVS, who did you have contact with?
A. At that time, other than -- I would send



the invoices to Carlos Ortiz.
Q. Do you know what title Carlos Ortiz holds at CVS?
A. I think it was government relations or -- I don't know exactly what his official title was.
Q. But it had to do with the government, right?
A. Yes.
Q. Not with senior citizens or consulting?
A. No, sir.
Q. Public relations?
A. Not to my knowledge, no.
Q. Besides sending him bills, did you ever have trouble getting paid or were any of the checks late?
A. Yes.
Q. Who did you call for that?
A. Carlos.
Q. You didn't call anyone in personnel or public relations?
A. No, sir.
Q. Were Carlos and Jack the only two people, at least initially, that you ever spoke to about your consulting agreement?
A. Yes, sir.
Q. When you went out and you tried to do some of these self-directed things, did you get up and say,



"I'm John Celona, a paid consultant for CVS," or did you introduce yourself some other way?
A. I didn't introduce myself as a paid consultant.
Q. You did not do that?
A. No, sir.
Q. Why not?
A. I didn't want people to know.
Q. How did you introduce yourself?
A. I think people who knew me, you know, they would introduce me as Senator Celona.
Q. And people would trust that as Senator Celona, you were doing this because you thought it was best, not because you were getting paid; is that correct?
A. Yes, I'm ashamed to say.
Q. And is that why you did not identify yourself as a paid consultant for CVS?
A. Yes.
Q. Did you ever identify yourself as a paid consultant for CVS in any public forum?
A. No, sir.
Q. Why not?
A. I didn't want them to know because I was ashamed of changing my vote.
Q. And we'll get into the mailings at a later



meeting, but presumably you submitted your invoices by mail and received your checks by mail in this case?
A. Yes.
Q. Except for that first telephone call from a van to the Ethics Commission, did you ever file anything with the Ethics Commission that identified you as a paid consultant for CVS?
A. Unfortunately, not.
Q. When you filed your yearly financial statements with the Ethics Commission, did you identify CVS as a person from whom you were deriving income?
A. No, sir.
Q. Why not?
A. I didn't want people to know.
Q. Was that to deceive the public?
A. Yes.
Q. If it was publicly known that you were receiving money from CVS, what affect would that have had on you, your ability to vote on matters of importance with CVS, and your employment with CVS?
A. I think my employment would have ended.
Q. And if your employment had ended, you wouldn't be able to vote on matters of importance to CVS; is that right?

A. Right.
Q. At any time after you signed the consulting agreement, did questions arise about what your duties were and how you would explain yourself publicly?
A. Yes.
Q. When did that happen?
A. When I became chairman of the committee.
Q. Explain that to the grand jury, please.
A. During the -- towards the end of the 2000 session, Senator Irons called me into his office and asked if I would support him for majority leader if he ran against Kelly, and I said, "Well, my allegiance is to Senator Montalbano," and I said I'd have to check with him. And he would always call him Joey. And he said, "I talked to Joey and he's on board." And I said, "Well, I still want to talk to him," and I talked to Senator Montalbano and he said, "Yes." So I told Senator Irons, "I'm all set. I'm on board."
We worked to try to get our candidates across the state elected that were supportive of Senator Irons, and we were successful. And Senator Irons became Majority Leader Elect, and the only promise prior to the election that he gave us was Senator Montalbano as Chairman of the Judiciary



Committee, and the others he -- would be left open.
Q. Could you please remember to keep your voice up?
A. I'm sorry. I apologize.
Q. Okay. So you threw your support behind Senator Irons as did Senator Montalbano?
A. Yes, sir.
Q. Why did you have to check with Montalbano, what was your relationship with him?
A. Well, we were what I thought were good -- good -- best friends, but apparently we're not, and I was loyal to him. I had supported him in the past. We were both from the same town. Our families, you know, our wives had known one another, and that was, I thought, the thing to do.
Q. In exchange for his support of William Irons, you say that Senator Montalbano was promised to be the chairman of the Senate Judiciary Committee; is that correct?
A. Yes, that's correct.
Q. How powerful is that committee?
A. Extremely powerful.
Q. Why is that committee powerful?
A. They confirm judges. Other than Supreme Court judges, the Senate Judiciary Committee has all the say on the confirmation of the judges, on drunk



driving legislation and a lot of legislation that deals with the attorney general, and despite what you read in the paper, I think that and Finance are the most powerful committees in the Senate, and it was an extremely, extremely powerful committee.
Q. How do you know that he was promised that?
A. It was publicly stated also.
Q. And after Senator Irons was elevated to the position of President Irons --
A. Majority Leader.
Q. Majority Leader, I'm sorry, did Senator Montalbano actually become the chairman of the Senate Judiciary Committee?
A. Yes, he did. In fact, Senator Irons said several times privately and publicly that Senator Montalbano would be like a co-majority leader for him.
Q. What was your reward for supporting Senator Irons?
A. Well, I went through an interview process. Senator Montalbano told me that he lobbied for me, and I went through an interview process with Senator Irons, and then I ended up getting appointed chairman of the Corporations Committee.
Q. Why did your get appointed as the chairman of



the Corporations Committee cause CVS or Carlos Ortiz any concern about how they would explain your position with CVS?
A. Because all of their bills -- 99.9 percent of their bills came before us, i.e. the Senate Corporations Committee.
Q. Most of the legislation that CVS was interested in would be heard by the Senate Corporations Committee; is that correct?
A. Yes, sir.
Q. And now you weren't just a member, but you were the chairman?
A. Yes, sir.
Q. Did that cause Mr. Ortiz some concern that you would be under greater scrutiny, or what? I'm trying to understand why --
A. Yes. Yes, sir.
Q. So what did he do after learning that you would become the chairman of that committee?
A. He asked me to come up with a report of what I was -- what I was doing and what I should be doing for CVS.
Q. When did you officially become the chairman of the Senate Corporations Committee?
A. Officially, I think it was like January 4th

of 2001 when it was announced in the Senate but he had told me -- they told me to keep it quiet in December of 2000, at the Rhode Island Chamber of Commerce dinner which was held at the Rhode Island Convention Center.
Q. And that was almost a year after you had been presented with a consulting agreement and began receiving money from CVS; is that correct?
A. Correct.
Q. Up to that point, except for becoming the chairman, had you ever had to explain to Carlos Ortiz what you did?
A. No, sir.
Q. How did you answer Mr. Ortiz?
A. Through an e-mail dated January 3rd, 2001.
Q. The day before you became chairman?
A. Yes, sir, officially. It was -- I believe it was reported in the paper it was happening, but he had known.
Q. So in this e-mail, you indicate your availability for a meeting; is that correct?
A. Yes.
Q. What was the meeting all about?
A. He wanted to come up with a strategy on what I should say if anyone asked what my title was



with CVS.
Q. Why was that?
A. I think he wanted to cover his rear end.
Q. For a year you didn't have a title?
A. I thought I did but I guess in his eyes I didn't.
Q. And you didn't have a job description?
A. I thought I did but I guess in his eyes I didn't.
Q. And you had to report to him about what you were doing; is that correct?
A. Correct.
Q. But the only thing that changed now is you were chairman of the Senate Corporations Committee?
A. Yes, sir.
Q. And you explained some of the things that you have been trying to do for CVS in that e-mail, is that correct, but at the end, you write, "Per your instruction, I am forwarding this report and I am doing so prior to the meeting to acquaint you in advance."
First of all, you indicate that it was he who instructed you to give him this report; is that correct?
A. Yes.



Q. This isn't something you thought up on your own?
A. Oh, no.
Q. And his instruction to provide him with this information arose a year from your consulting agreement?
A. Yes, sir.
Q. And when you say that you're doing so "prior to the meeting to acquaint you in advance," is that because he was not acquainted with what you were doing for a year while receiving a thousand dollars a month?
A. Anyone comprehending the written English language would have to assume so.
Q. Did you, in fact, arrange for and have a meeting with Carlos Ortiz as a result of sending this e-mail?
A. Yes.
Q. Okay. Where did that meeting occur?
A. At CVS.
Q. And who was present at this meeting?
A. I believe it was myself, Carlos and Jack. I know it was at least Carlos.
Q. Did you meet anyone new at this meeting?
A. Yes.
Q. Who was that?
A. Todd Andrews.



Q. And who is Todd Andrews?
A. He was what I was told and what I believed to be the spokesperson for CVS Corporation.
Q. Now, for the year that you've been receiving money from CVS, had you met with any other CVS executives, other than Carlos Ortiz and Jack Kramer, about your employment?
A. About my employment?
Q. Yes.
A. No, sir.
Q. Did you ever tell any other executives at CVS about your employment?
A. No, sir.
Q. Did any other CVS executives ever mention to you that they were aware that you were employed by CVS?
A. No, sir.
Q. So now, at this meeting, for the first time you meet Todd Andrews, and he is what? I'm sorry.
A. He was their spokesperson, and he had come to them from being a spokesperson for Senator Jack Reed. Any time the company had to have a public response, he was the person who was the public name to CVS.
Q. So he's their media representative person?
A. Yes, a media representative I guess you

Page 74

would call it.
Q. He puts out press releases, public statements, explains the company's position; is that it?
A. Yes.
Q. Did they tell you why you now needed to meet with Todd Andrews?
A. Yes.
Q. What was that reason?
A. In case someone asked me from the media what my position was with CVS or if they found out.
Q. For a year, had there been any public disclosures about hiring you?
A. No, sir.
Q. That is, did they ever do any of those things that companies sometimes do, you know, "Senator Celona has joined our staff," a big newspaper ad, that sort of thing?
A. No, sir.
Q. You never personally identified yourself in public as an employee; is that correct?
A. Correct.
Q. Did they ever tell you not to do that, or did you just do that on your own?
A. I did that on my own.
Q. Why?

Page 75

A. I didn't want people to know that I had changed my vote for them. But they did not tell me not to either, and by Carlos's e-mail and direction, one would have to deduct the fact that they did not want me to have people know.
Q. And by that, I understand you to mean -- this meeting wasn't to plan or prepare a public statement, it was only to prepare to answer if anybody found out?
A. Yeah. To prepare if someone finds out, damage control.
Q. So implicit in that is a continuing desire to keep it from the public; is that correct?
A. Yes, sir.
Q. I don't want to put words in your mouth. Is that what this meeting is about, to plan what to do in case it becomes public but keep it quiet until then?
A. Yes.
Q. In connection with that effort then, showing you Grand Jury Exhibit 11, today's date and my initials, do you recognize what that document is?
A. Yes.
Q. What is that document?
A. This was the document that was prepared, I

Page 76

assume, by Todd Andrews in response to that e-mail that I had sent.
Q. So now this document you didn't prepare?
A. No.
Q. Carlos or Jack did not prepare?
A. I don't believe so. They could have but I assume Todd Andrews did.
Q. Their public relations guy did?
A. Yes.
Q. And that's what they were going to provide to the public should anybody ever ask about what your relationship is with CVS?
A. Yes.
Q. Finally, showing you Grand Jury 12, today's date and my initials, do you recognize what that document is?
A. That's an e-mail from Carlos Ortiz dated March 13th, 2001.
Q. And in this e-mail, now more than a year into your employment, what did Carlos Ortiz inform you of?
A. "If anyone asks what you" -- I'm just giving the crux, what I feel. "If anyone asks what you do for CVS, you should identify your title as Community Service Consultant."
Q. "How does that sound to you?"

Page 77

A. "How does that sound to you?"
Q. So for thirteen months, you didn't have the title Community Service Consultant; is that correct?
A. No, sir.
Q. Now, Carlos Ortiz you said had a title that involves government relations. Do you know what Jack Kramer does?
A. He was the chairman of the CVS Golf Classic, and I don't know what else he did. The talk around the State House was that he had the best job in the state.
Q. Did you ever meet anyone at CVS whose job it was to work with its consultants?
A. No.
Q. Did you ever meet any other consultants for CVS?
A. No.
Q. Did you ever meet with anybody from CVS whose job it was to be involved in community relations?
A. Other than Jack, no. I believe I may have met some woman who had -- had the responsibility of taking care of the requests of people who wanted money as a result of the CVS Golf Classic but other than that, nothing.
Q. Was that somebody that you talked to about your employment relationship with CVS?

A. No, sir.
Q. Or what you were doing for CVS?
A. No.
Q. Now that you were the chairman of the Senate Corporations Committee, did you have other means at your disposal for defeating legislation?
A. Yes.
Q. Beyond just your vote?
A. Yes, sir.
Q. What was that?
A. Quite simply, not posting the bill.
Q. Explain that.
A. Not scheduling it for a hearing.
Q. So the next year, when this matter came up in 2001 -- showing you Grand Jury No. 13, today's date and my initials, what is that bill?
A. 2001 S-0493.
Q. And what was that bill about?
A. Pharmacy Freedom of Choice.
Q. That was the bill pending in 2001?
A. Yes, sir.
Q. Did that bill ever get a hearing before your committee?
A. Not to my knowledge.
Q. Why not?



A. Because I worked for CVS.
Q. But what did you do to prevent it from even getting a hearing?
A. Not post it.
Q. By not posting it for hearing, does that mean it doesn't come up, it just dies?
A. It just dies.
Q. So now you have gone from voting for, co-sponsoring, vocally supporting, trying to convince others to vote for, to taking a walk, to actively defeating this piece of legislation; is that correct?
A. Correct.
Q. Why in 2001, on S-0493, did you actively work to defeat this legislation by not posting it?
A. Because I was working for CVS, and I'm -- I'm sure if I posted it, Irons would have asked me not to post it or told me not to post it.
Q. Just following up then on Any Willing Provider or Pharmacy Freedom of Choice legislation that Mr. Irons -- in 2002, the bill didn't pass the House; is that correct?
A. I don't believe so.
Q. So it never made it to the Senate?
A. No.
Q. There was no senate bill in 2002?



A. I don't believe so.
Q. In 2003, there was a House bill that passed and then made it to your committee but it didn't get a hearing again; is that correct?
A. Correct.
Q. Your relationship with CVS became known publicly when?
A. In December of 2003.
Q. And in December of 2003, you were removed from the position of chairman of the Senate Corporations Committee; is that correct?
A. Yes.
Q. And subsequently you resigned from the Senate; is that correct?
A. Yes.
Q. What happened to Pharmacy Freedom of Choice or Any Willing Provider legislation in the year 2004, after your removal?
A. I don't read much in the papers but I believe it passed.
MR. SULLIVAN: I don't have any further questions. Ms. Donovan? Any questions by any members of the grand jury? Yes, ma'am?
GRAND JUROR: I was just wondering, when you received these payments, a thousand dollars a



month from CVS, did you file a 1099 form?
THE WITNESS: Yes.
GRAND JUROR: And no one ever looked -- well, what happened to that?
THE WITNESS: Well, you don't publicize them. That's your tax returns. They don't ask for us to publicize them.
GRAND JUROR: Okay.
MR. SULLIVAN: Any other questions? Yes?
GRAND JUROR: The checks you were given out, were they signed -- who were they signed by?
THE WITNESS: I don't recall.
MR. SULLIVAN: We'll have them eventually, sir.
THE WITNESS: I don't recall.
MR. SULLIVAN: Yes, ma'am.
GRAND JUROR: Did any -- to your knowledge, did any other committee members know that you were a consultant for CVS before the public was, you know, became aware?
THE WITNESS: Not to my knowledge.
MR. SULLIVAN: Any other questions? Yes, sir?
GRAND JUROR: The question that I have is that -- I believe it's Ortiz knew that you were going

to be the chairman of the Corporate (sic) Committee and, therefore, you signed your consulting agreement. Is that the reason?

THE WITNESS: No. I was still -- that's down the road. I was still on their payroll when I was chairman, up until the summer of 2003.

GRAND JUROR: And when you were on their payroll, you didn't have any IDs or anything else that identified what you were doing, so basically you were, shall we say, a ghost employee?

THE WITNESS: In their opinion, yes. I was trying to do stuff for them, but in retrospect I'm ashamed to say they just used -- well, it takes two.

GRAND JUROR: I don't want to cause any difficulty or remiss on your part, but my question is if these people are paying $1,000 or $12,000 a year and not giving you any direction, the normal worker, the five dollar worker, they've got a list about this long of what they are supposed to do.

THE WITNESS: That's what I have now.

GRAND JUROR: I don't have any further questions. I just can't comprehend.

MR. SULLIVAN: Anything else? And keep in mind that this witness will come back at another session. We aren't concluding his testimony today,



we just brought him in for Any Willing Provider legislation. So you're right, there are a lot of questions that would normally occur to you that you can continue to ask the next time he comes back.

GRAND JUROR: All right.

MR. SULLIVAN: All right. With that, you are excused for today.

THE WITNESS: Thank you.

(The witness was excused at 12:08 a.m.)



C E R T I F I C A T E

I, Diane J. DeStefano, hereby certify that the forgoing is a true and accurate transcript, to the best of my skill and ability, from my stenographic notes of this grand jury proceeding in the matter of CVS Pharmacy, on May 5, 2006.

______________ ______________________________
Date Diane J. DeStefano
Registered Professional Reporter