IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 06-02T |
| UNITED STATES OF AMERICA * | |
| VS. * | SEPTEMBER 18, 2006<br>9:30 A.M. |
| ROBERT A. URCIUOLI, et al * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE ERNEST C. TORRES,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: LUIS M. MATOS, AUSA
DULCE DONOVAN, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

FOR THE DEFENDANT, URCIUOLI: MICHAEL J. CONNOLLY, ESQ.
Hinckley, Allen & Snyder, LLP
28 State Street
2nd Floor
Boston, MA 02109

RICHARD M. EGBERT, ESQ.
99 Summer Street
Suite 1800
Boston, MA 02110

Q. Well, it was not just --
A. Yes.
Q. It was also with the Extended Care facility, too, wasn't it?
A. But the disclosure said the Village at Elmhurst.
Q. That's what you put down on it --
A. You asked me what I disclosed.
Q. And so you disclosed publicly that relationship and money which you received each time; right?
A. The Village at Elmhurst.
Q. Right?
A. Each time, yes.
Q. And with regard -- with regard to the Village at Elmhurst and Elmhurst Extended Care, right, you've already testified that you fully and completely, without any problem, would talk to anybody about them who would listen. You didn't hide your relationship to them from the public, did you?
A. It was publicized in the newspaper.
Q. So the answer simply is, you didn't hide your relationship from the public, did you?
A. I was trying to finish. It was in the paper; and no, I didn't.
Q. And so -- and with regard to that, you didn't go and sell your vote on legislation with regard to that

contract, did you?

MR. MATOS: Objection, your Honor.

THE COURT: Overruled.

Q. Did you?

A. Excuse me? Explain the question.

Q. You didn't go and sell your vote with regard to that contract, did you?

A. No, you're wrong.

Q. Oh, you did?

A. I did things for Roger Williams.

Q. What vote did you sell?

A. Specific votes?

Q. Yeah. What vote did you sell?

A. There were more than specific votes.

Q. What vote did you sell?

A. I can't give you exact votes standing here. There are thousands of votes, but I can --

Q. That's the essence -- sir, that's the essence of the issue here, isn't it?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. Well, let's see if we can juxtapose something, and that is you took a bribe from CVS; right?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. You pled guilty to taking a bribe from CVS?

MR. MATOS: Objection, your Honor.

THE COURT: What's your objection?

MR. MATOS: It's not what the charge was with CVS, your Honor.

THE COURT: Sustained.

Q. Well --

THE COURT: We can take that up at the end of the day if you wish to be heard on that, Mr. Egbert.

MR. EGBERT: That's all right, Judge.

Q. With regard to CVS, you took money with the specific intent to change your vote on pharmacy freedom of choice legislation; correct?

A. As a result of it.

Q. You took money -- strike that. You were a strong legislative proponent of pharmacy freedom of choice; correct?

MR. MATOS: Objection, your Honor. Relevance.

THE COURT: Overruled. You may answer.

Q. Correct?

A. Yes.

Q. And you had sponsored legislation for pharmacy freedom of choice; correct?

A. Correct.

Q. And CVS bought your vote; correct?

A. Yes.
Q. And you changed your vote for the pay they gave you; correct?
A. Yes.
Q. And you hid from the world that you had any relationship with CVS; correct?
A. Correct with an explanation.
Q. Pardon me?
A. Correct with an explanation.
THE COURT: What's the explanation?
THE WITNESS: Well, the explanation, your Honor, again, I'm not an attorney, but I wanted to explain the fact about -- I know the line of questioning where you're going.
THE COURT: Don't worry about where he's going. You answered -- I thought you answered his question. Is there something further you have to add in order for the jury to understand the answer properly?
THE WITNESS: Not at this point, but I want to --
THE COURT: Mr. Matos may get to that point when he questions you.
Q. And you hid from the world that you were receiving any money at all from CVS; correct?
A. Not from the total world.

Q. From the -- well, let's strike that. You never filed an ethics request on the CVS deal, did you?
A. No.
Q. And you never contacted Ethics at all concerning the CVS deal, did you?
A. No.
Q. And you never got any kind of oral opinion from Ethics on CVS, did you?
A. I don't believe so.
Q. And you lied before a grand jury about that, didn't you?
A. I don't -- I'd have to see that testimony. I know, Mr. Egbert, I told Bob and Fran before I took a position.
Q. Did Fran tell you to go to CVS and get bribed?
A. Bob said -- the meeting was held in -- would you let me finish?
Q. I would be happy to. My question, however, was whether or not you lied to the grand jury under oath about having gotten an oral opinion from --
MR. MATOS: Objection.
THE COURT: I think the pending question is whether Bob told him to go to CVS and get bribed.
MR. EGBERT: I think it was Fran, but I'll take Bob, too.

THE COURT: I think that's what you said. Do you understand the question?

THE WITNESS: No, sir.

Q. Did you -- let me go back. Did you lie to the grand jury about -- under oath about going to the Ethics Commission and getting an oral opinion?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. You are obligated under your plea agreement to tell the truth; correct? Correct?

A. Yes. Easy.

Q. Did you lie to the grand jury --

A. Give me a chance to answer.

Q. "Correct" is a simple answer.

A. Well, give me a second.

Q. Did you lie to the grand jury about this issue?

MR. MATOS: Objection, your Honor.

THE COURT: You need to be more specific, Mr. Egbert.

Q. Did you lie to the grand jury when you told them that you called up the Ethics Commission and got an approval from the Ethics Commission on the phone to have a contract with CVS?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

MR. EGBERT: I'd like to be heard on this whole subject matter, Judge, at the end of the day.

THE COURT: You may be misunderstanding what the point is here, Mr. Egbert. Do you have the grand jury testimony?

MR. EGBERT: I do.

THE COURT: Instead of asking him general questions about what he did or didn't say to the grand jury, why don't you ask him specific questions based on what the transcript says.

MR. EGBERT: I will, Judge, but that doesn't change my request to the Court.

THE COURT: All right. You may be heard at the end of the day.

Q. Have you informed the Government, Mr. Matos, Ms. Donovan and Mr. Aiken, have you informed any of them that you lied before the grand jury in May of 2006?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. On May 2nd of 2006, did you appear before a federal grand jury and testify under oath?

A. I don't recall what date it was.

Q. Did you do it in May?

A. I don't recall.

Q. Did you do it, do you remember, in the last few months?
A. Yes.
Q. And if I suggested to you that one of the occasions was May 2nd, 2006, would you disagree with that?
A. I'd have to see it.
MR. EGBERT: May I approach, Judge?
THE COURT: You may.
(Witness peruses document)
A. Yes.
Q. Did you testify on May 2nd, 2006, before the federal grand jury?
A. Yes.
Q. Were you under oath?
A. Yes. I saw the cover sheet.
Q. Were you under oath?
A. Yes.
Q. Page 49. Were you asked the following question and provide the following answer?
(Reading)
Q. What did you do with that agreement?
A. After I left the meeting, I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I

should have gotten a written response. I should have gotten a written request, but I didn't; but hindsight is 20/20.

And they said, Well, if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it.

Do you recall testifying in that fashion before the federal grand jury?

A. Could I see that, please.

Q. No.

A. Then I can't answer it.

Q. So me having read it to you word for word, you can't tell if that's something you said?

A. I don't believe you. I'd like to see it. You don't want me to see it.

MR. EGBERT: Your Honor, may I put it on the ELMO?

THE COURT: Yes.

Q. Can you see that, Mr. Celona?

A. Yes.

Q. Were you asked the following question?

(Reading)

Q. What did you do with that agreement?

A. Yes.

Q. And did you give the following answer?

(Reading)

A. After I left the meeting, I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response, I should have gotten a written request, but I didn't; but hindsight is 20/20.

And they said, Well, if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it.

Is that the way you testified before a federal grand jury?

A. Yes.

Q. That was a lie, wasn't it?

A. No.

MR. MATOS: Objection, your Honor.

THE COURT: The question was answered, Mr. Matos.

Q. Did you call the Ethics Commission concerning CVS?

A. I did call them.

Q. Did you talk to them?

A. I called someone there.

Q. Did you talk to them?

A. I said I called someone there.

Q. And did they -- so now you say you did have a

conversation with the Ethics Commission concerning your so-called dealings with CVS?
A. And I also faxed a copy to my attorney.
Q. Now you're saying -- don't you recall just a couple of minutes ago saying you didn't notify Ethics at all about the CVS deal?
A. When I answered that, I thought -- I couldn't hear you, Mr. Egbert, and I thought you were talking about a written request.
MR. EGBERT: I see.
A. That's when I asked you to speak into the microphone.
Q. Well, could you hear the U.S. Attorney on the day where you pled guilty, could you hear him when he was talking about the conduct that you were involved in with regard to CVS?
A. Explanation.
Q. Pardon?
A. An explanation, please.
THE COURT: He wants an explanation. He doesn't understand the question.
MR. EGBERT: Oh, okay.
Q. Do you recall being here in court and pleading guilty to some crimes?
A. Yes.

Q. And do you recall on that day being asked various questions by the Court?
A. Yes.
Q. And do you recall the Court then calling upon the United States Attorney to set out the statement of facts as it relates to your plea?
A. If it was, I don't know what the statement of facts is.
Q. Well, do you recall --
A. Wait a minute. Can I -- it's a legal term. I don't know what the statement of facts are.
Q. Do you recall the U.S. Attorney telling the judge what it was you did with regard to CVS?
A. Yes.
Q. Right. And did you have any trouble hearing the U.S. Attorney that day?
A. No. He was speaking up.
Q. And that was an important day for you; right?
A. He was speaking in the microphone. He wasn't walking around the room.
Q. Mr. Celona, do you think this is funny? Really, do you think this is a comedy act?
A. I didn't say that. Do you?
Q. I'm asking you a very simple question. Could you hear him?

A. Yes.
Q. And did you hear him say, quote, In this scheme, the Defendant never revealed his financial relationship with the pharmacy or the conflicts it created to the citizens of Rhode Island or the Ethics Commission at all? Did you hear him say that?
A. If you're reading from it.
Q. Want to take a look?
A. Yes, I would.
MR. EGBERT: May I approach?
THE COURT: Yes.
Q. That was basically the day that you had a colloquy before the Court.
A. Yes.
Q. I'm showing you -- this is a copy of the same page, 25. Does it appear to be? I've got some yellow markings on it.
A. Yes, sir.
Q. I want you to take a look at the yellow markings.
A. Okay.
Q. And tell me when you're done.
(Witness peruses document)
A. Okay.
Q. Have you read it?
A. Yup.

Q. And did the U.S. Attorney on that date say, In this scheme, the Defendant never revealed his financial relationship with the pharmacy or the conflicts it created to the citizens of Rhode Island or the Ethics Commission at all?
A. Right.
Q. Is that what he said?
A. Yes.
Q. And then you were asked by the Court, And do you agree that all those things are true and if this case went to trial, the Government would be able to prove them? And you answered what?
A. Yes.
Q. Yes, your Honor. Right?
A. (No verbal response).
Q. So it is true that you didn't contact the Ethics Commission --
A. No.
Q. -- about CVS at all?
A. Can I see that again, please, the yellow marking.
(Witness peruses document)
A. It said, In this scheme, the Defendant never revealed his financial relationship with the pharmacy or conflicts it created with the citizens of Rhode Island or the Ethics Commission.

Q. At all. Well, you say that the call that you had with the Ethics Commission was --

A. Let me --

THE COURT: Mr. Celona, you said what you had to say. Now let Mr. Egbert ask the next question.

Q. You say that the conversation you had with the member of the Ethics Commission was, I'm going to have a job with CVS and I'm going to get money from them, what can I vote on; right?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. You said before the grand jury, I called the Ethics Commission to see if it was proper; right?

A. Yes.

Q. What? See if what was proper?

A. To do some consulting work for CVS.

Q. For what?

A. For CVS.

Q. For money? For money; right?

A. Yes.

Q. So you're saying you called the Ethics Commission to say, I'm going to have a job with CVS or something with CVS where I'm going to get money; right?

MR. MATOS: Objection, your Honor.

THE COURT: Have you finished the question?

MR. EGBERT: No.
Q. And I want to know what I can vote on; right?
MR. MATOS: Objection, your Honor.
THE COURT: Overruled. You may answer. If that's not right, just say so.
A. Can you repeat the question, please.
Q. What did you say -- strike that. Tell me what you say you said to this representative at the -- does this representative at the Ethics Commission have a name?
A. I would like to have the question repeated.
Q. I'm asking first, does the person you spoke to at the Ethics Commission have a name that you can remember?
A. Not that I can remember.
Q. And you know, don't you, that a total search of the Ethics Commission records was made to find any and all calls from you, and there was no such call in their records? You know that, don't you?
A. No.
MR. MATOS: Objection.
THE COURT: Sustained. The question was answered. The jury will disregard the last answer.
Q. You know it because it was right in the investigation of you at the Ethics Commission. That was a very part of the complaint against you.

MR. MATOS: Objection, your Honor.

THE COURT: Sustained. Let the witness do the testifying, Mr. Egbert, or someone else who has knowledge of these things. There's no question pending.

THE WITNESS: Oh, I'm sorry.

Q. What did you say to this person at the Ethics Commission?

A. Exactly what I said.

Q. What?

A. If I had a consulting agreement with CVS, could I vote on issues regarding pharmacy.

Q. I have a consulting agreement, can I vote on that; right?

MR. MATOS: Objection, your Honor.

THE COURT: Did you say if you have a consulting agreement or you have a consulting agreement?

THE WITNESS: Because I hadn't signed it yet.

THE COURT: So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?

THE WITNESS: Yes, and then the next line says I faxed it also to my attorney for his approval.

Q. Well, okay. So let's go on for a minute. After

you testified in the manner that you did on or about the 2nd of May 2006 -- well, do you remember that you testified about your cell phone and the van and you went and got it and you remembered and everything -- it was a nice new van? Do you remember that?

A. It was a loaner van.

Q. Or whatever it was. And then you were asked the following question:

(Reading)

Q. You mentioned you made the call from the loaner van; is that correct?

A. Yes, sir.

Q. You have a firm memory of that?

A. Oh, without a doubt. I remember because I parked -- it was a beautiful new van because ours, we had purchased it used, and it was in the shop. It was a beautiful new van, and I even remember where I was parked. I was parked on like a parallel to an island in the front there.

That's the way you testified; right?

A. What's the beautiful have to do with it? Yes.

Q. You're the one who wanted to fight me on whether it was a new van or not.

A. I'm not fighting you.

Q. Mr. Celona, the fact of the matter is, to make a

long story short, that after giving that testimony under oath, the Government said, A-ha, here's what we should do, let's go check his cell phone records to see if he's telling the truth.

MR. MATOS: Objection, your Honor.

THE COURT: Sustained. You didn't say a-ha? No one said a-ha?

Q. Didn't Mr. Aiken take you aside and sit down with you somewhere between May 2nd and May 16th to go through your cell phone records with you?

A. Where are you getting this from?

Q. I don't know.

A. Well, thank you.

THE COURT: It doesn't matter where he's getting it from. The question is, did you or didn't you sit down and discuss that with Mr. Aiken?

THE WITNESS: I don't recall that.

Q. I don't know where I made it up from either; but let's take a look at the May 16th grand jury testimony, and let's see if you were asked the following questions and gave the following answers.

MR. MATOS: Page?

MR. EGBERT: Seventy-five.

Q. (Reading)

Q. Since the last time you testified, have you

had an opportunity to review your cell phone records with Special Agent Aiken?
A. Yes, sir.
Do you remember that now?
A. Okay.
Q. Did I make it up?
A. No.
Q. That's exactly the question you were asked some two weeks or so later; right?
A. If you say so.
Q. Well, I don't say so. That's your testimony, isn't it?
A. Okay.
Q. Isn't it?
A. Yes.
Q. And then you were asked:
(Reading)
Q. And what did you learn from your review of that record?
A. I did not -- although I thought that -- I did not call from my cell phone.
Right?
A. Yes.
Q. From my beautiful van?
MR. MATOS: Objection, your Honor.

MR. EGBERT: I'm sorry. Strike that.
Q. And then you went on to say, Well, I must have called from my house; right?
THE WITNESS: I don't have anything.
THE COURT: There's nothing that should be on your screen.
THE WITNESS: Oh, I'm sorry.
Q. Then you went on to say that I must have called from my house; right?
A. Yes.
Q. And you were making it up as you went along, weren't you?
MR. MATOS: Objection, your Honor.
THE COURT: Overruled.
A. No.
Q. I mean, you got caught in a bald-face lie by those records, and you just simply made up a new story, didn't you?
A. No.
Q. And after -- strike that. Now, with CVS, tell the jury how many financial disclosures you filed with the Ethics Commission concerning CVS.
A. Excuse me?
Q. Tell the jury, please, how many financial disclosures -- I can't even say it -- how many

financial disclosures you filed with the Ethics Commission naming CVS as a party to providing you income.

A. None.

Q. And with regard to CVS, you were approached by someone at CVS in the late fall of 2003, mid-November or so 2003, and told, were you not, that -- strike that.

With CVS, when you became chair of the Corporations Committee, do you remember that?

A. With CVS I became chairman --

Q. Strike that. You became chair of the Corporations Committee at some point; correct?

A. Yes.

Q. And at that time, even though you had had dealings with CVS for a good year or two before that, you and CVS got together and concocted, right, a job description for yourself, didn't you?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

MR. EGBERT: Again, I'd like to be heard, Judge.

Q. When the CVS contract -- strike that. In the fall of 2003, someone at CVS said to you, didn't they, that they wanted to terminate the contract?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

MR. EGBERT: Your Honor, I offer it not for the truth but for the fact that it was said as a contractual matter.

THE COURT: Sustained.

Q. You believed that what you did with CVS was dirty; right?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

Q. You told the FBI that you believed what you did with CVS was dirty; right?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

MR. EGBERT: Your Honor, may I be heard for a moment, please?

THE COURT: We're almost to the end of the day, Mr. Egbert. Why don't you move on to something else, and we can resolve this at the end of the day.

Q. Did you tell the Government, meaning the FBI, in interviews in October of 2004 that you didn't return for any further ethics opinions because you didn't think it was necessary and it never became an issue because of no specific legislation? Did you tell them that?

MR. MATOS: Objection, your Honor.

THE COURT: Now, are we talking about this case, the Roger Williams case?

MR. EGBERT: Yes.

THE COURT: What's the objection?

MR. MATOS: I'm not sure he is talking about this case, your Honor.

MR. EGBERT: Well, I'm sure I'm talking about this case.

THE COURT: Why don't you rephrase the question just to make it clear, Mr. Egbert.

Q. Did you, on or about October 28th of 2004, tell members of the FBI that you didn't think you needed a separate opinion, one, because it indicates that Roger Williams owns the Village and you never thought differently? Did you tell the FBI that?

A. I don't recall that.

Q. And did you tell the FBI back in October of 2004 that you abided by the decision, which meant you had to refrain from voting on legislation with regard to the Village or its affiliates, but that you could vote on -- vote and participate on legislation involving general health care matters? Did you tell them that?

A. I don't recall that at all.

Q. And -- oh, that one you say you don't recall that at all. Do you recall the others a little bit?

A. No. Please.
Q. By the way, was your -- do you remember, was your attorney taking notes during these meetings when he was there?
A. I don't recall. He may have.
Q. Well, it was important, wasn't it, for somebody to make a record of what you were saying?
MR. MATOS: Objection, your Honor.
THE COURT: Overruled. You may answer.
Q. Right?
A. Yeah.
Q. And there was no court reporter, like there is here; correct?
A. No.
Q. So people were left to their -- to either use a recording device or pen and paper; correct?
A. Yeah.
Q. Was a recording device used?
A. Not to my knowledge.
Q. Okay. So -- and it was important for you and your -- strike that. On your behalf, it was important that your attorney accurately be able to recount what you said to the Government authorities; isn't that right?
A. I would think so, but I'd have to ask him. I

can't say yes or no.
Q. And --
A. And if he did, I can't say in what depth.
Q. When's the last time you talked to Mr. Dimitri?
MR. MATOS: Objection, your Honor.
THE COURT: Overruled. You may answer that. Just tell us the date. That's all. Don't tell us what he said.
A. Thursday morning.
Q. I'm sorry?
A. Thursday morning.
Q. This past Thursday morning?
A. Yes. Actually, he left a voice mail for me.
Q. And how about before the voice mail?
A. What do you mean?
Q. Before that occasion, when did you actually speak with him?
A. I don't recall exactly when.
Q. Did you call him back after the voice mail?
A. No. I e-mailed him.
Q. So you've communicated with him since?
A. Yeah, just about small, small things.
Q. And did you also tell the FBI back in October of 2004 that all the information you provided to Mr. Urciuoli or Roger Williams Hospital or the like was

public information and you didn't think there was anything wrong in providing it? Didn't you tell them that?

A. I don't recall that.

Q. Do you deny that you said that?

A. I don't recall I said it.

MR. EGBERT: May I approach, Judge?

THE COURT: Yes.

Q. Mr. Celona, would you read to yourself the three pages that I've -- this page and then the two after it. Just read it to yourself.

A. I don't know who wrote it, but I'll read it.

Q. Do you want to know who wrote it?

MR. MATOS: Objection, your Honor.

THE COURT: Sustained.

(Witness peruses document)

THE WITNESS: Your Honor, I can't understand some of it.

THE COURT: Just do your best. And if you can't read it, you can tell Mr. Egbert you can't read it.

THE WITNESS: How many pages is he looking for, three?

MR. EGBERT: That one and the two behind it.

THE WITNESS: I'm trying to read it as best I can, Mr. Egbert.

Q. Does any of that refresh your memory as to what you told the FBI back in October of 2004? Yes or no?
A. One thing that I -- that Fran called me on Election Day, I saw that, I can understand that, in 1998, like five times when my son was in Hasbro and they thought he had spinal meningitis. That's a serious matter, Mr. Egbert.
Q. Does it refresh your memory --
A. Mr. Egbert, that's a serious matter.
Q. Does it refresh your memory that you told the FBI that the ethics opinion was accurate when -- the ethics request was accurate when filed?
A. No.
Q. Does it refresh your memory that -- with regard to you telling the FBI that the request for the advisory opinion does not hide the relationship with Roger Williams Hospital?
A. No.
Q. Does it refresh your memory that you told the FBI that you didn't think you needed a separate opinion because it indicates that Roger Williams owns the Village and you never thought differently?
A. No.
Q. Does it refresh your memory that you thought that the information -- any information you passed on to

Robert Urciuoli or Fran Driscoll was public information and was not a violation of any ethical rule?

A. No.

Q. Does it refresh your memory that you said to the FBI that if there was legislation that affected all hospitals, you could vote?

MR. MATOS: Objection, your Honor.

THE COURT: Form of the question?

MR. MATOS: Yes, your Honor.

THE COURT: Mr. Egbert, I think you're missing the word "whether."

MR. EGBERT: I'm sorry, Judge?

THE COURT: I think you're trying to ask him if it refreshes his recollection as to whether he said those things.

MR. EGBERT: That's fine. I mean, I'll accept that change in my question.

Q. Does it refresh your memory in that regard?

A. No.

Q. Did you -- does it refresh your memory as to whether or not you told the FBI that you didn't seek -- that you didn't return to the Ethics Commission because it never became an issue because there was no specific legislation voted on?

A. No, sir.

Q. And does it -- also, did you tell the FBI on or about November of '04 that by April, you did not know the letter to the Ethics Commission to be untrue in any way?
A. It doesn't recollect anything.
Q. Doesn't recollect?
A. I couldn't even read some of it, most of it.
Q. Whether or not you can read it, as you stand here now, do those documents refresh your memory or has your memory been refreshed by anything as to the statements I just indicated to you?
A. Not by those statements, but the one thing I read about my son being in the hospital, yes. That's the one thing I saw because it said in the hospital I was paged three to five times, and my son was in the hospital.
Now, if you laugh like you did before, shame on you because they thought he was dying with spinal meningitis.
Q. And I feel very bad about that.
A. He was four years old at the time, and there was a spinal meningitis outbreak in the state.
Q. And I think we all feel sorry for him.
A. And it was Election Day 1998.
Q. With regard to my question, your memory is not

refreshed at all, is it?
A. No, sir.
THE COURT: Are you about to move on to another subject, Mr. Egbert?
MR. EGBERT: I am, Judge.
THE COURT: We'll adjourn now and resume tomorrow morning at 9:30, ladies and gentlemen.
(The jury is not present for the following)
THE COURT: You may step down, Mr. Celona. Anyone who wishes to leave, you may do so now.
Mr. Egbert, you wanted to be heard on the CVS -- some questions about CVS.
MR. EGBERT: Judge, I am attempting to introduce events concerning CVS which will demonstrate his state of mind, his guilty state of mind as it relates to CVS as distinguished from his nonguilty or nondishonest state of mind from Roger Williams Medical Center.
And so, for example, when I said the contract was -- that you were informed that your contract with CVS was terminated by, I think it was, Mr. Kramer or Mr. Ortiz, I know in a proffer to you, I've seen testimony in this regard where he said, They told me the contract was terminated when things started to get public, so to speak, and it was a total load off my shoulders, all right, and a load off my mind because I