IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * * * * * C.R. NO. 07-009ML
                              *
UNITED STATES OF AMERICA      *
                              *
    VS.                       * MAY 19, 2008
                              * 9:00 A.M.
JOHN R. KRAMER and            *
CARLOS ORTIZ                  *
                              *
* * * * * * * * * * * * * * * * PROVIDENCE, RI
```

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

while Walgreen's was such a proponent for the legislation, in other states the shoe was on the other foot.
Q. Now, during the course of that meeting, was there any discussion about this consultation situation?
A. Excuse me? I knocked the microphone.
Q. During the course of the meeting, was there any discussion about the consulting agreement?
A. Yes, sir.
Q. And can you tell us what was discussed in that regard.
A. They said that in light of the fact --
MR. CORRIGAN: Objection.
MR. SMITH: Objection.
THE COURT: Just a minute. Sustained. It may be stricken. Rephrase. Pin it down to who says what.
Q. Who was it that spoke about the topic of the consulting agreement?
A. At first it was Jack.
Q. Let's focus first, then, on what Mr. Kramer said about the consulting agreement. What did he say?
A. He said that you're active within your community, you do a fine job within your community with your seniors, and that CVS could use someone to -- of your assets to the seniors to bring forth the image of CVS

and the services that they provide.

Q. Did Mr. Kramer indicate to you what it was he expected you to do as a consultant for CVS?

A. Specifically, no.

Q. Did Mr. Kramer say anything about the consulting agreement during this meeting?

MR. CORRIGAN: Objection.

Q. Sorry. Did Mr. Ortiz say anything about the consulting agreement during this meeting?

A. Yes.

Q. And what, if anything, did Mr. Ortiz say?

A. He said that he had observed me during the Senate and had known about my background with my constituent services and dealt with constituents and that, again, I could be an asset to CVS.

Q. Did Mr. Ortiz mention to you or state to you what it was he expected you to do as a consultant with CVS during this meeting?

A. No.

Q. Following that discussion, was there any further discussion during the meeting?

A. No.

Q. Did the meeting at some point come to an end?

A. Yes, sir.

Q. How was it left? Did either Mr. Ortiz and/or

Mr. Kramer propose a next step to you?

MR. CORRIGAN: Objection to the leading question.

MR. SMITH: Objection.

THE COURT: Sustained as to form.

Q. What was the next step in the process?

A. The next step was for me to send along a proposal of ideas or suggestions that I could provide CVS as a consultant.

Q. And who was it, if anyone, that suggested that you submit such a proposal?

A. Jack Kramer.

Q. And did he indicate to you, that being Mr. Kramer indicate to you to whom you should send that proposal?

A. Yes.

Q. And who was that?

A. To him.

Q. And was there any discussion about what that proposal should contain?

A. No.

Q. Did you, in fact, submit a proposal to Mr. Kramer?

A. Yes, sir.

MR. DAMBRUCH: I'd ask for Government's Exhibit 98, please.

Q. Sir, do you have 98 in front of you?

contract.
Q. Did you, in fact, follow up on that request and contact the Ethics Commission?
A. Yes, I did.
Q. How did you contact the Ethics Commission?
A. By telephone.
Q. Do you know who you spoke to there?
A. No, sir.
Q. What, if anything, did you discuss with them?
A. I discussed with them the issue in generalities without dealing in specifics about if a person was in the General Assembly, that if they were working or had the opportunity to work for a particular company, would they be permitted to work for that company as long as they didn't specifically benefit from the issues that they would be voting on.
Q. Did you identify the company during that phone call?
A. No, sir.
Q. Why not?
A. I didn't want to.
Q. Why not?
MR. SMITH: Objection.
THE COURT: Overruled.
A. I wanted to give myself some cover.

Q. What do you mean by that?
A. I wanted to take the position, but I knew in some regards it would be wrong.
Q. Now, what, if any, advice did you receive back from this person at the Ethics Commission?
A. It was just a verbal advice, as I stated earlier, regarding the teacher legislation.
Q. You mentioned it was verbal advice. Did you ever receive any type of written opinion from the Ethics Commission on this topic?
A. No, sir.
Q. Did you know what the process was to obtain a written opinion?
A. Yes, sir.
Q. Why didn't you get one?
A. Because I didn't want to.
Q. Why not?
A. I didn't want --
MR. SMITH: Objection.
THE COURT: Overruled.
A. I didn't want to publicize my change in position so quickly from being an adamant anti-CVS person to being a proponent practically overnight.
Q. And why didn't you want to publicize that?
A. Because I felt that it would hurt my credibility

politically and then also I would be getting paid for a position and the public would feel that, because I was getting paid X amount of dollars, all of a sudden my feelings which were so strong and so adamant had been just changed.

Q. Did you have some follow-up communication with either Mr. Ortiz or Mr. Kramer after you had placed that call to the Ethics Commission?

A. Follow-up conversation?

Q. Yes.

A. Yes.

Q. Whom did you have that conversation with?

A. With Carlos Ortiz.

Q. And what was stated during that conversation?

A. The situation about the teacher legislation.

Q. Did you indicate to Mr. Ortiz whether or not you had obtained a written or verbal opinion?

A. I didn't say that I had a written or a verbal opinion. I just said that I had contacted them.

Q. Did you explain to Mr. Ortiz how it was you contacted them?

A. I don't recall how I -- if I specifically mentioned the phone call.

Q. Did you have any conversation following your call to the Ethics Commission with Mr. Kramer on this topic?

A. No, sir.
Q. Other than that one conversation you've described with Mr. Ortiz, did you ever have any subsequent conversations with Mr. Ortiz about the phone call or this opinion?
A. Yes.
Q. And when was that, sir?
A. In late 2003.
Q. Was that following the end of your consulting relationship with CVS?
A. Yes, sir.
Q. We'll get back to that later, sir. Other than that -- let me just rephrase that. During the course of your work as a consultant for CVS, did you have any further conversations with Mr. Ortiz about this topic?
A. No, sir.
Q. Going back to the January 7 meeting, was there any discussion about the terms of your agreement and/or compensation?
A. Yes.
Q. Who was it that discussed those items with you?
A. Mr. Kramer.
Q. What did Mr. Kramer say on those topics?
A. It would be $1,000 a month, and it would be a 12-month contract.

of review or report of your activities during the 2001 year?
A. Yes, sir.
Q. And how did you transmit or communicate those items to Mr. Ortiz?
A. Via e-mail.
Q. Now, during the 2000 year, from the time you signed the agreement on February 10 through the end of that year, what, if anything, had you done for CVS?
A. Contractually?
Q. Yes.
A. Other than take a walk on the bill, nothing.
MR. CORRIGAN: Objection, your Honor.
MR. SMITH: I can't hear it.
A. Contractually, other than to take a walk on the bill, nothing.
MR. CORRIGAN: Objection, your Honor. It's nonresponsive.
THE COURT: Are you moving to strike?
MR. CORRIGAN: I am, your Honor.
THE COURT: The answer may be stricken. The jury will disregard it.
Q. What did you do for CVS during the 2000 calendar year?
A. Nothing.

public and especially the senior citizen population about services provided by CVS. Did you do that?
A. No, sir.
Q. Now, sir, also at this point in time we've talked about the e-mail exchange or another e-mail exchange you had with Mr. Ortiz, and I direct your attention to Exhibit Number 348. Specifically, I'm going to direct your attention to the -- first off, the top half of that e-mail.
Looking at that, does that refresh your memory as to the date of the meeting that you had with Mr. Ortiz and Mr. Kramer?
A. Yes.
Q. And what was that, sir?
A. The e-mail date is January 4th, and it talks about schedule a meeting for January 25th at 9:30.
Q. And was that the date of your meeting with Mr. Ortiz and Mr. Kramer?
A. Yes.
Q. Now, I'd ask you to focus on the bottom half of that particular document. Is that an e-mail communication that you sent to somebody?
A. Yes.
Q. And who did you send it to?
A. Carlos Ortiz.

Q. And does that contain some sort of description of activities for 2000?
A. Yes, sir.
Q. And who prepared that description?
A. I did.
Q. Is there a reference to the cable television program in that description?
A. Yes. Yes, it -- the activities that I did for 2000.
Q. And here you reference three different programs; correct?
A. Yes.
Q. And were those the programs that you've described previously?
A. Yes, sir.
Q. Whose idea was it to host Mr. Kramer on those shows?
A. My idea.
Q. And why was it that you suggested that?
A. I was working for them. I wanted to try to justify it in some regard.
Q. Why did you want to justify it?
A. Because I wasn't doing anything else.
Q. Why did you need to justify it?
A. I just felt in some regard that I should.

MR. DAMBRUCH: Now, you also -- strike that. Other than the TV shows -- let's move on to the second page and, again, the top three quarters of the document if you could. I'm sorry, please, could you go back to the full document and then up until the point where the break is, so about three quarters of the way down, please. Further down. Yes, right there.
Q. I'd ask you to look at that. Do you talk in that particular section about what you intend to do for the year 2001?
A. Yes.
Q. And what was it that you proposed to do in 2001?
A. I was going to continue to preview and recap the CVS Charity Classic, talk about the charter schools, and also talk about the shortage of pharmacists and deal with a program that would contact various guidance counselors to try to get students into the pharmaceutical programs so that they could become pharmacists and add to our or help out with the shortage of pharmacists.
Q. And why was it that you proposed to do these TV shows in 2001?
A. Because I was on CVS's payroll.
Q. Had they asked you to do the TV shows?
A. No, sir.

Q. Then why were you doing them?
A. I just wanted to try to do something.
Q. Why?
MR. CORRIGAN: Objection, your Honor. Asked and answered.
THE COURT: Sustained.
Q. Now, also when you were recounting your accomplishments for the year 2000, I do see -- and let me direct your attention to a particular portion. That portion that I've just circled, you make reference to some senior housing issues. Did you do those things that you represented there in that e-mail?
A. No, sir.
Q. Did you have any communication with Mr. Ortiz about any senior issues during the 2001 calendar year?
A. No, sir. The -- I'm sorry.
Q. Yes. You were going to --
A. The only contact I had was when there was a situation about the unavailability of drugs in pharmacies, some CVS pharmacies, as I detailed a little bit further down.
Q. Okay. And is this the section where you talked about yourself being a sounding board with regard to the availability of a particular drug?
A. Yes.