**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR 07-09-01 (MML) |
| v. | : | |
| | : | May 28, 2008 |
| JOHN R. KRAMER and | : | |
| CARLOS ORTIZ | : | |

# SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29

The defendants John R. Kramer and Carlos Ortiz hereby supplement their Memorandum in Support of their Motion for Judgments of Acquittal pursuant to Fed. R. Crim. P. 29 as follows:

## THERE IS INSUFFICIENT EVIDENCE OF THE CONSPIRACY CHARGED IN THE SUPERSEDING INDICTMENT.

In the Superseding Indictment, the government alleges that the defendants conspired "to improperly influence and affect John Celona's official actions by paying him money and providing him with gifts . . . ." (See Superseding Indictment, dated Mar. 12, 2008 ("Superseding Indictment") ¶ 22.) This allegation sets out two distinct species of benefits ("things") allegedly given by the defendant(s) and received by John Celona: (1) money paid to Celona for public relations consulting and campaign contributions made to him from CVS's Rhode Island political action committee; and (2) gifts of tickets, travel, golf accommodations and food provided in a "shared hospitality" setting.[1] (See Superseding Indictment ¶ 28 ("It was part of the conspiracy [the defendants] . . . caused CVS to enter into a consulting agreement with Celona as a means of paying Celona money in exchange for his political support and in order to influence him …"); ¶ 29 ("It was further part of the conspiracy [the defendants] . . . caused CVS to provide Celona

[1] It is worth noting right from the start the complete lack of evidence connecting Mr. Ortiz to such gifts and shared hospitality.

with gifts of meals, travel, lodging, golf, monetary contributions, admissions to corporate events and tickets to entertainment and sporting events . . . . "). Regardless of what "thing" was being provided, the government must prove beyond a reasonable doubt that the defendants' intent in connection with the giving was to improperly influence John Celona, with the specific intent that Celona abdicate his fiduciary duty to the Citizens of Rhode Island -- that they specifically intended to deprive those citizens of Celona's honest services.

In order to prove the conspiracy alleged in the instant indictment, the government must show that there was a "meeting of the minds" between Mr. Ortiz and Mr. Kramer with regard to the object of the conspiracy. Despite the testimony of numerous witnesses and the introduction of hundreds of documentary exhibits over ten days of trial, the government has failed to adduce sufficient evidence to establish an inference that the defendants were members of a conspiracy with each other and/or with Celona. There is no evidence that there was ever a meeting of the minds between the defendants, regardless of whether Celona believed he was involved in some criminal activity.[2]

The government's failure of proof begins with the lack of evidence of any communications between the defendants that they intended to agree with each other (or with Celona) to commit any offense. Compare United States v. Potter, 463 F.3d 9, 13–16 (1st Cir. 2006). Following the timeline of the government's evidence, beginning with the fundraiser for Senator McCaffrey in May of 1999, Celona testified that he had a conversation with Mr. Kramer in which Mr. Kramer suggested that there might be an opportunity for Celona to work as a

---

[2]Celona may simply be currently converting what was innocent and lawful during the relevant time period into something he now says was unlawful in order to justify his guilty plea and the obligations that flow from his plea agreement. Even if Celona believed then that what he was doing was criminal, there is no evidence that the defendants shared that belief or Celona's intent to break the law. The court has already recognized that Celona could have had a criminal intent but that the defendants did not share it. (See May 20 Trial Tr. 15:18–20 ([The

consultant for CVS. (See May 19 Trial Tr. 105:22–106:25). If such a suggestion was made, there is nothing wrong or unlawful about what was discussed during this meeting, and even Celona did not testify that there was anything of a criminal nature discussed at this event.

In roughly the same time frame, a State House meeting was arranged by Mr. Walsh, in which Celona and three colleagues, by Celona's own account, complained to Mr. Ortiz and Mr. Walsh that CVS was not respecting the minority faction in the Senate and that CVS should be more solicitous of this group -- hardly a communication between or among individuals entering a conspiracy together. (See May 19 Trial Tr. 102:17–104:8) And again, there is no evidence of any communication between the defendants concerning that meeting, what it might have meant to either of them, what they intended to accomplish through the meeting, or whether they accomplished anything in furtherance of any conspiracy.

Next, at the July 8, 1999 meeting at CVS between the defendants and Celona, according to Celona's testimony, Mr. Kramer asked Celona to send the defendants a proposal of what services he thought he could provide to CVS. (See May 19 Trial Tr. 113:7–17.) There is no evidence of any communications between the defendants before this meeting with Celona suggesting that they had any particular agenda with respect to conspiratorial conduct, or that the defendants communicated with each other before or after the meeting as to what the anticipated Celona proposal might contain and how it could further any conspiracy.

Celona testified that he sent his proposal to Mr. Kramer in September[3] (May 21 Trial Tr. 14:17–19), but there is no evidence in the case about receipt of that proposal letter. There is in

Court:] "Why he did it, I mean conceivably you could have a corrupt politician who's getting money from people who don't share that same intent.").)

[3]Although the credibility determination about how the proposal (GX 98) came into existence must be resolved in favor of the government at this stage, it is noteworthy that Celona, who by his own admission was in dire financial straits, and had sent out dozens of unsolicited offers of consultation, would have been asked for a proposal to actually do work and make money and then failed to respond to that request for more than two months.

fact no evidence that Mr. Ortiz ever even saw the letter, or, if he did, that he read it. And there is certainly no evidence that the defendants discussed it between themselves.

There is evidence that Mr. Ortiz requested and received from Attorney Christine Egan a consulting contract template (May 19 Trial Tr. 19:6–19; 20:19–23), and Celona testified that he received a draft agreement at a meeting with the defendants on January 7, 2000 (May 19 Trial Tr. 119:24–120:21) and a signed contract (possibly in the mail) sometime in February. There is absolutely no evidence, however, that the defendants communicated with each other about the contract, its formation, execution, delivery, or terms. There is likewise no evidence that the defendants communicated with each other about the signed contract having been received back at CVS. There is also nothing that occurred in February (or at any time before or after), when the contract was signed, that suggests that the defendants had any communication with each other detracting from the stated legal purpose or intent of the contract, specifically that there was an agreement to do something illegal. Aside from Mr. Ortiz' statement to Ms. Bibeault that hiring Celona was "something Jack wanted to do" (May 16 Trial Tr. 38:13–14), there is no evidence that Mr. Ortiz had any conversation or other communication with Mr. Kramer about it, or that Mr. Kramer himself said or did anything to give the contract a nefarious context.

All of the defendants' conduct is entirely lawful. Furthermore, if the defendants had by this time agreed with each other to enter into a conspiracy with Celona to commit a theft of honest services, it is unimaginable that Mr. Ortiz would have asked Celona at the January 7, 2000 meeting at CVS whether Celona had Ethics Commission approval for their arrangement.

The government's evidence fails in a second area. After the contract was signed in February of 2000, there is no evidence at all that either defendant asked Celona to provide political support for CVS with respect to Any Willing Provider legislation. Moreover, there is a

continuing failure of evidence to suggest that the defendants had any communication with each other about Celona and what he was doing. To the extent that Mr. Ortiz was involved in legislative activities with or through Mr. Walsh, there is no evidence that Mr. Kramer was aware of these activities; likewise, to the extent Mr. Kramer was involved in promoting the CVS image through Celona's media access, there is no evidence that Mr. Ortiz was aware of the particulars.

At the close of the government's case, nothing has changed since the sidebar on May 16 at which the government made its Petrozziello argument to the Court (see May 16 Trial Tr. 13:2–14:20) except the standard by which the existence of the alleged conspiracy must be judged, which is now the Rule 29 standard.

While the principal Memorandum in Support of the Defendants' Motions for Judgment of Acquittal explains thoroughly the lack of evidence of intent to commit the underlying offense, this supplemental memorandum seeks to demonstrate additionally that there was insufficient evidence of the intent to agree and the agreement itself that would allegedly form the conspiracy.

A most instructive analysis in this regard is the recent decision of Judge Wolf in United States v. Pappathanasi, 383 F. Supp. 2d 289 (D. Mass. 2005). There, the defendants, officers of a company that supplied products to local coffee-shop franchises, were charged in a tax-evasion conspiracy consisting of an arrangement between the defendants and the franchise owners involving rebates from defendants' company that the franchise owners could use to evade taxes, but which also had other purposes, such as facilitating credit to the franchise owners. Id. at 293. There was virtually no evidence that either of the defendants had actually discussed the tax implications of the rebate program with each other or any of the franchise owners. Id. at 293–94. The sole exception was one conversation that one of the defendants had with one of the coffee shop owners that could have been interpreted to reflect knowledge of the scheme, but there was

no evidence that this defendant told his co-defendant about this conversation. Id. at 294. Accordingly, the district court found that there was insufficient evidence to prove that the defendants intended to agree with each other and the franchisees to join a conspiracy, because there was insufficient evidence "to prove the necessary meeting of the minds." Id. at 296. As the court explained:

> The evidence is sufficient to prove that the defendants knew that the rebate program *could* be used by some franchisees if the franchisees decided to evade taxes. Indeed, such knowledge was alleged in the original indictment to be the essence of the conspiracy. There is no evidence, however, that [the defendants] discussed the use of the program to evade taxes with each other or with any [coffee shop] franchisee. . . . [T]he facts that the defendants knew about the rebate program and took actions to perpetuate it are not sufficient to prove that they intended to agree with each other and the . . . franchisees to join a conspiracy to impede the IRS.

Id. (citing United States v. Adkinson, 158 F.3d 1147 (11th Cir. 1998) (finding that evidence was insufficient to support conspiracy conviction where government "was unable to point to one conversation between the defendants regarding taxes, much less demonstrating an intent to avoid them"); United States v. Goldberg, 105 F.3d 770, 773–74 (1st Cir. 1997)).

Here, the court is faced with similar facts. There is no evidence that the defendants had any communications with each other concerning anything illegal, whether or not related to Celona. The defendants attended meetings, some with Celona and each other, but there is no evidence of any illicit discussions on those occasions. There were other purposes for the consulting relationship with Celona, just as there were other purposes for the rebate program in Pappathanasi. Here, the purposes were to repair CVS' image with seniors (GX 98) and to promote CVS' charitable endeavors through Celona's media outlet (GX 348). As was the case in Pappathanasi, the payments to Celona, like the rebate payments, were part of the normal routine

of the business and were not in any way concealed. As in Pappathanasi, one defendant (Mr. Ortiz) had a conversation with someone (Mr. Andrews) in which Mr. Ortiz griped about his boss (Mr. Kramer) and, among other things, expressed discomfort with the consulting arrangement.[4]

As Judge Wolf observed in Pappathanasi,

> It is not sufficient for the government to prove only that a defendant acted in a way that would have furthered the goals of a conspiracy if there was one. . . . The mere collateral effects of jointly agreed-to activity, even if generally foreseeable, are not necessarily an object of the conspiracy. . . .

Pappathanasi, 383 F. Supp. 2d at 291; see also United States v. Corchado-Peralta, 318 F.3d 255, 258–60 (1st Cir. 2003) (defendant wife not guilty of conspiracy to commit money laundering where her openly spending husband's money, known by her to be tainted, insufficient to establish specific intent to conceal or disguise the transaction); see also United States v. Summers, 414 F.3d 1287, 1296–97 (10th Cir. 2005) (holding that evidence was insufficient to support conspiracy conviction where there were no communications between defendant and co-conspirators prior to bank robbery, defendant was present at scene but there was no evidence of direct participation, and defendant's flight caused inference of consciousness of guilt).

Not only must there be a meeting of the minds between the conspirators, but

> [a]mong other things, a single conspiracy requires an interdependence among participants. To be interdependent, "activities of one aspect of the scheme must be necessary or advantageous to the success of another aspect of the scheme. Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key" . . . .

Pappathanasi, 383 F. Supp. 2d at 296 (quoting United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999). There is absolutely no such evidence of interdependence here, nor is it possible, on

[4]By contrast, the third party conversation in Pappathanasi is actually incriminating.

these facts, to imagine how there could be, in light of the lack of evidence regarding any communication between the defendants.

The defendants respectfully submit that there has been a complete failure of proof on the threshold question of whether there was a meeting of the minds among them and John Celona to enter into a conspiracy, either with each other or with Celona.[5] Accordingly, the defendants are entitled to a judgment of acquittal on the conspiracy charges against them.

Respectfully submitted,

JOHN R. KRAMER,
By his Attorneys,

/s/ Peter DiBiase
Peter DiBiase
The Remington Building
91 Friendship Street, Third Floor
Providence, RI 02903-3819
(401) 831-5020
attorney_pad@yahoo.com

David B. Fein
Scott D. Corrigan
*Pro Hac Vice Counsel*
WIGGIN AND DANA LLP
400 Atlantic Street
Stamford, CT 06901
(203) 363-7600
(203) 363-7676 (fax)
dfein@wiggin.com
scorrigan@wiggin.com

[5] As Judge Wolf stated in Pappathanasi: "Jury verdicts have significant value to the administration of justice and this court has very rarely granted a motion for a judgment of acquittal. However, Federal Rule of Criminal Procedure 29(a) expressly states that the court must enter a verdict of acquittal if the evidence is insufficient to sustain the verdict. See Burks v. United States, 437 U.S. 1, 10 n. 5 (1978). The court has scrutinized the trial record in the context of the complex law and has concluded that it does not have the legitimate discretion to allow the jury to decide this case because the evidence presented is not sufficient." 383 F. Supp. 2d at 291. The same standard should apply here.

CARLOS ORTIZ,

By his Attorneys,

/s/ Mark L. Smith______________
Mark L. Smith
176 Eddie Dowling Highway
North Smithfield, RI 02896
(401) 769-4120
Lawmls@aol.com

Thomas R. Kiley
*Pro Hac Vice Counsel*
Cosgrove, Eisenberg and Kiley, P.C.
One International Place, Suite 1820
Boston, Massachusetts 02110
(617) 439-7775
trkiley159@aol.com

## CERTIFICATE OF SERVICE

I, **David B. Fein**, certify that on the 28th day of May, 2008, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's electronic filing system. Notice of this filing will be sent by email to the following party by operation of the Court's electronic filing system:

- **Stephen G. Dambruch**
  stephen.dambruch@usdoj.gov

- **Daniel A. Petalas**
  Dan.Petalas@usdoj.gov

- **Peter Sprung**
  peter.sprung@usdoj.gov

- **AnnaLou Tirol**
  annalou.tirol2@usdoj.gov