IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 12, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and *<br>CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

**I N D E X**

| GOVERNMENT WITNESS | PAGE |
|---|---|
| John Fegan | |
| Direct Examination by Mr. Dambruch | 103 |
| Cross-Examination by Mr. DiBiase | 119 |
| Cross-Examination by Mr. Kiley | 148 |

**E X H I B I T S**

| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| M-5 | | 132 |
| N-5 | | 132 |
| O-5 | | 132 |
| U-5 | | 145 |
| W-5 | | 135 |
| X-5 | | 146 |
| Y-5 | | 135 |

12 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. Members of the jury, before we begin, I need to ask a question of you. If you have an affirmative, that is, a yes, response to the question, I'll ask you to please raise your hand.

If you'll recall last week when we were going through the voir dire, which is jury selection, I told each of you to refrain from listening to or reading any news accounts about this case.

And I understand that sometimes it's hard to completely disregard or ignore something; and I wonder if in the past week, that is, since you were last here, any of you have seen, heard or read any news account involving this case. If you have, I ask you now to please raise your hand. Very good.

And I'll remind you that throughout this trial you must refrain from listening, reading or watching any news accounts involving this case.

If you would, please, now stand and raise your right hands.

(Jury sworn)

THE COURT: You may be seated. Members of the jury, before we begin with preliminary instructions which will help you understand the evidence as it's

presented, I want to introduce myself as well as members of my staff with whom you'll be spending some time over these next several weeks.

I'm Judge Lisi. I have two jobs during the course of trial. One is to rule on evidence as it's being introduced for your consideration. The other job is to provide you with the tools that you will need to decide this case, and those tools are instructions on the law.

I'll give you some this morning, and then at the very end of the case I will give you much more detailed instructions on the law which you must follow.

Over to my right is Karen Wischnowsky, our court reporter, who takes down every single word that is spoken in the courtroom. Because she takes down every single word, it's important not only that witnesses and lawyers speak loud enough for her to hear and also for you to hear.

So if any of you have any difficulty hearing, please let us know that, and I'll ask the individual to speak up.

It's also important that we not have people talking over each other, so people will wait until the other is finished so that Karen can take down every word.

Over to my left is John Duhamel, our courtroom deputy. John also has two jobs, one of which he has done here this morning. He administered the oath to all of you. He will also be administering the oath to all of the witnesses who testify.

His other job involves keeping track of all of the exhibits that are admitted into evidence so that at the end of the trial when you go back into the jury room to deliberate, they'll be in order. Generally they're numerical order for the Government and letters for the Defendants.

And so if you're looking for a particular item, they'll be in order so that you'll have the ability to find something quickly.

Finally, you've met Bob Sylvesta, our court security officer. And Bob just has one job, and that is to take care of all of you. So if there's anything at all that you need, ask Bob. If you need directions to a phone or a restaurant or whatever it may be, ask Bob, and he will point you in the right direction.

Now, each of you should have found on your seat a notebook with your name on it. If you wish to take notes during the trial, you may do so. You are not required to do so.

We provide the notebooks to all jurors because I

find that some jurors do take notes, others do not. It's really a matter of personal preference. The one thing I do remind you is that those notes are for your personal use only. They're not to be considered an unofficial record of the proceedings. The official record is taken down by Karen.

At the end of each session, those notebooks will be collected and locked away. No one ever looks at those. And at the beginning of each session, you'll find them again on your seats. Just check to make sure that you have your own notebook.

For now I ask that you give me your undivided attention as I provide you with these preliminary instructions which you must follow.

It will be your duty to find from the evidence what the facts are. You, and you alone, will be the judges of the facts. You will then have to apply to those facts the law as I will give it to you. You must follow that law whether you agree with it or not.

Nothing I may say or do during the course of trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits

and any facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

Now, certain things are not evidence, and I'll list those for you now. First, the statements, arguments and questions by lawyers are not evidence.

Second, objections to questions are not evidence. Let me just stop for a minute and say a few things about objections. The lawyers in this case have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Third, any testimony that the Court has excluded or told you to disregard is not evidence and must not be considered.

And fourth, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the basis of the evidence that is presented here in the courtroom.

Now, there are two kinds of evidence from which you may find the facts in a case, and you may have heard these terms before. One is direct evidence. The other is circumstantial evidence.

Direct evidence is direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

I'll give you further instructions on these as well as other matters at the end of the case; but keep in mind that you may consider both kinds of evidence, that is, both direct and circumstantial evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I'll give you some guidelines for determining the credibility of witnesses at the end of the case.

As you know, this is a criminal case, and there are three basic rules about a criminal case that you must keep in mind. First, the Defendant is presumed innocent until proven guilty.

The Indictment against the Defendant brought by the Government is only an accusation and nothing more. It is not proof of guilt or anything else. The Defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The Defendant has no burden to prove his innocence or to present any evidence or to testify.

Since the Defendant has a right to remain silent, the law prohibits you from arriving at your verdict by considering that the Defendant may not have testified.

Third, the Government must prove the Defendant's guilt beyond a reasonable doubt. I'll give you further instructions on this point at the end of the case, but bear in mind that in this respect a criminal case is very different from a civil case.

Now, as I said, at the very end of the trial I will give you some detailed instructions on the law that will govern your deliberations. However, now I will give you essentially a thumbnail sketch of the offenses that are charged and the essential elements of each which must be proven beyond a reasonable doubt.

The Superseding Indictment in this case, which I will refer to in these instructions simply as "the Indictment," contains 23 counts or charges. The Defendants in this case are John R. Kramer and Carlos Ortiz.

Count I of the Indictment charges that the

Defendants, John Kramer and Carlos Ortiz, conspired to commit an offense against the United States in violation of Title 18, Section 371.

Specifically, Count I charges that from a time unknown but from at least in or about May of 1999 and continuing until in or about December of 2003, the Defendants, Kramer and Ortiz, conspired to commit honest services mail fraud, an offense prohibited by Title 18, Sections 1341 and 1346.

Counts II through XXII charge the Defendants with the commission of specific acts of honest services mail fraud. Counts II through XXII pertain to mailings allegedly made or caused to be made by the Defendants.

Count XXIII charges that the Defendants committed federal program bribery in violation of Title 18, Sections 666(a)(2) and 2.

A separate crime is alleged against one or more of the Defendants in each count of the Indictment, and you must consider each alleged offense and any evidence pertaining to it separately.

I will now instruct you as to the legal elements of the crimes charged in the Indictment each of which, as I've already told you, the prosecution must prove beyond a reasonable doubt.

Because I believe it will assist your

understanding of my instructions on Count I, the conspiracy count, I will begin by instructing you on Counts II through XXII, the substantive mail fraud counts.

Counts II through XXII of the Indictment each charge that the Defendants committed honest services mail fraud in violation of Title 18, Sections 1341 and 1346, by using or causing the use of the United States mail.

The Indictment reads as follows, that from in or about May 1998 through in or about December 2004, in the District of Rhode Island and elsewhere, Defendants Kramer and Ortiz devised and intended to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

A violation of Section 1341 occurs when a Defendant, having devised or intending to devise any scheme or artifice to defraud for the purposes of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter any matter or thing whatever to be sent or delivered by the Postal Service.

Section 1346 of Title 18 defines a scheme or artifice to defraud as including a scheme or artifice to deprive another of the intangible right of honest services.

To sustain its burden of proof on a charge of mail fraud, the Government must prove each of the following elements beyond a reasonable doubt to each Defendant so charged: First, that a scheme to defraud existed substantially as charged in the Indictment; second, that the Defendant knowingly and willfully participated in this scheme with the intent to defraud; and third, that in furtherance of the scheme, the Defendant used or caused the use of the United States mail on or about the date alleged in the Indictment.

The Government may prove that a Defendant had an intent to defraud the public of former Senator Celona's honest services in two ways. The first way is through a bribery-like relationship, that is, that the Defendant gave former Senator Celona a financial benefit with the intent to influence his official actions.

The second way is through proof of a concealed conflict of interest, that is, that former Senator Celona engaged in undisclosed and biased decision making for his personal gain and that the Defendant

intended that he do so.

In order to determine if a Defendant intended to deprive the public of Senator Celona's honest services, you must consider Rhode Island law. In this regard, you should know that legislators in this state serve only part time and that Rhode Island state law permits them to hold jobs working for private entities.

Under Rhode Island state law, private citizens or entities who have hired a legislator may communicate with that legislator about legislation that would affect them, and under certain circumstances that legislator may act on such legislation.

Now I'll return to Count I, the conspiracy charge. Count I alleges that the Defendants, Kramer and Ortiz, in violation of Title 18, Section 371, engaged in a conspiracy to commit honest services mail fraud.

The Indictment alleges that from a time unknown but from at least in or about May of 1999 and continuing until in or about -- from in or about December 2003, in the District of Rhode Island and elsewhere, Defendants Kramer and Ortiz knowingly, willfully and unlawfully combined, conspired, confederated and agreed with each other and with John Celona to commit an offense against the United States,

specifically having devised and intending to devise a scheme and artifice to defraud the State of Rhode Island and its citizens of their intangible right to the honest services of John Celona and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment and for the purpose of executing that scheme and artifice to knowingly and willfully cause to be placed in an authorized depository for mail according to the directions thereon to the person to whom it was addressed matter to be delivered by the United States Postal Service in violation of Title 18, Sections 1341 and 1346.

To sustain its burden of proof as to the offense charged in Count I, the Government must proof each of the following elements beyond a reasonable doubt as to each Defendant:

First, that the agreement as set forth in the Indictment and not some other agreement existed between two or more persons; second, that the Defendant knowingly and willfully joined in that agreement; and third, that one of the conspirators committed at least one of the overt acts set forth in the Indictment in an effort to further the purpose of the conspiracy.

I now turn to Count XXIII. Count XXIII charges

that the Defendants committed federal program bribery in violation of Title 18, Sections 666(a)(2) and 2. The Indictment alleges that for each of the years 1999, 2000, 2001, 2002 and 2003, the State of Rhode Island received benefits in excess of $10,000 per year from federal programs involving grants, contract subsidies, loan guarantees, insurance and other forms of federal assistance.

From in or about May 1999 through in or about December 2003, in the District of Rhode Island and elsewhere, Defendants Kramer and Ortiz did knowingly and corruptly give, offer and agree to give something of value to any person with the intent to influence and reward an agent of the State of Rhode Island in connection with the business, transaction, and series of transactions of such government and involving something of value of $5,000 or more, namely, Defendants Kramer and Ortiz, as executives of CVS, caused CVS to make approximately $45,000 in payments and to provide other things of value to John Celona, a Rhode Island state senator and an appointed Senate member of the Rhode Island Student Loan Authority, to influence and reward him in connection with the business and transactions of the Rhode Island Senate concerning freedom of choice, pharmaceutical returns,

Canadian pharmacies and electronic prescription legislation and in connection with the business and transactions of the Rhode Island Student Loan Authority concerning the pharmacy student loan program.

In order to prove the Defendant under consideration guilty of bribery relating to an organization or government which receives federal funds, the Government must prove each of the following elements beyond a reasonable doubt:

First, that at the time alleged in the Indictment, John Celona was an agent of the State of Rhode Island as a Rhode Island state senator and as an appointed member of the Rhode Island Student Loan Authority; second, that in a particular one-year period charged in the Indictment, the State of Rhode Island received federal benefits in excess of $10,000; third, that the Defendant under consideration gave something of value to John Celona; fourth, that the Defendant under consideration acted corruptly with the intent to influence and reward John Celona with respect to a transaction of the Rhode Island General Assembly; and fifth, that the value of the transaction to which the payment related was at least $5,000.

Now, let me say a few words about your conduct as jurors throughout this trial. First, I instruct you

that during the trial you are not to discuss the case with anyone or to permit anyone to discuss it with you.

Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about the case at all with anyone.

Second, do not read or listen to anything touching on this case in any way. And if anyone should try to talk to you about the case, you must bring that matter to the Court's attention immediately.

Third, don't go out and try to do any research or make any investigation on your own. Remember, you are to decide this case solely on the basis of what you see and hear in the courtroom.

And finally, do not form any opinion until all the evidence is in. Keep in mind until you -- keep an open mind until you start your deliberations at the end of the case.

The trial will begin in just a moment. First, the Government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in.

Next, the Defendants' attorneys may, but are not required to, make an opening statement. Remember that an opening statement is not evidence.

The Government will then present its witnesses,

and counsel for the Defendants may cross-examine them. Following the Government's case, the Defendants may, if they choose, present witnesses whom the Government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you. After that, the Court will give you those final detailed instructions on the law. And after you receive those instructions, you will retire to deliberate on your verdict.

Are counsel ready?

MR. PETALAS: Ready, your Honor.

MR. FEIN: Yes, your Honor.

MR. KILEY: Yes, ma'am.

THE COURT: Mr. Petalas.

MR. PETALAS: May it please the Court, counsel. Members of the jury, let me briefly take a moment to introduce myself. My name is Dan Petalas. I'm here on behalf of the United States.

With me at counsel table is Stephen Dambruch. He is an Assistant United States Attorney from the District of Rhode Island. Beside him is Kimberly Lawrence. She is a special agent and an investigator on this matter. Behind us is Barbara Draughn. Ms. Draughn is our paralegal specialist who is charged

with keeping us on track and running the machinery that will, for example, bring up exhibits on the monitors in front of you.

Ladies and gentlemen, we are here to prove to you beyond any reasonable doubt that these two Defendants engaged in a scheme to defraud the people of Rhode Island and to commit bribery.

We'll prove to you that they paid a state senator, John Celona, an elected state official; that while paying him, they sought for him to take action on matters of importance to them and to their company.

And we'll prove to you that while taking these steps, they concealed and took steps to keep quiet these payments to John Celona and their requests related to those payments.

In the end, ladies and gentlemen, we will prove to you beyond any reasonable doubt that it was their intent to influence John Celona with those payments and to see that he kept quiet the relationship they developed with him.

I mentioned there are two Defendants. The Defendants are Jack Kramer, who is here in the first row. Jack Kramer was the senior vice president for corporate relations at CVS at the time that's relevant to this case.

Mr. Kramer was a high-level official at CVS. He directed the activities of the corporate relations department. He was the boss. That department included two areas. One was the government affairs area of the corporation. Another was the community relations area.

He had three people who reported to him directly, two people in community relations, and the other was Carlos Ortiz, who is the other Defendant in the back row.

Mr. Ortiz was the vice president in charge of government affairs for CVS. Carlos Ortiz worked with -- closely with Jack Kramer on government affairs matters. Mr. Ortiz had literally decades of experience, the evidence will show, in government affairs. He had been in the CVS government affairs department since the Eighties.

To the extent that the evidence shows Jack Kramer was the boss who made decisions, the evidence will show that Carlos Ortiz made them happen in government affairs.

Little need be said about CVS, but the evidence will show you that CVS is a large corporation headquartered here in Rhode Island. And as a pharmacy chain, it's a corporation that's heavily regulated, both at the state and the federal level.

And here in its home State of Rhode Island, CVS is regulated by two committees of the General Assembly. It is regulated by many committees, but the pharmacy matters that are important to CVS are regulated in the Corporations Committees of the House and of the Senate of the General Assembly.

This is where John Celona enters the picture. John Celona was a state senator. From '95 until 2004, John Celona was a member of the Senate Corporations Committee which heard a lot of legislation and matters affecting CVS's pharmacy business. From 2001 to 2004, John Celona was the chairman of the Senate Corporations Committee.

John Celona, in addition to those responsibilities, was the official legislative member of the Rhode Island Student Loan Authority, which is an authority of the State of Rhode Island that is responsible for matters relating to student loans, including student loans for pharmacy students. And he served in that capacity from 2000 to 2004.

Now, in addition to those political positions, you will hear that John Celona was a corrupt public official. You will hear that he sold his vote. He will admit that to you.

But, ladies and gentlemen, you'll also hear that

he was not always so forthcoming. When the federal investigators interviewed John Celona, he lied to them initially. He tried to minimize his conduct initially.

Later he admitted his conduct, and he entered into a plea agreement with the United States. In that plea agreement, he admitted to what he had done. He was convicted by a federal judge based on the plea agreement, and he was sentenced by a federal judge.

Now, in the plea agreement, Mr. Celona agreed to cooperate with the United States in its investigations of these matters related to him. And as such, the United States gave him a benefit in return for his cooperation.

The United States recommended to the federal judge that was sentencing him that the federal judge should reduce his prison term by 12 months. That federal judge agreed with the recommendation and, indeed, did reduce Senator Celona's prison term by 12 months.

So how did John Celona come into the picture with these Defendants? To set that picture, we need to go back in time.

The evidence will show that in the mid-Nineties, the largest health care insurer in Rhode Island, Blue Cross/Blue Shield, had developed a health insurance

plan that revolved around restricted pharmacy networks.

And, in summary, what the evidence will show is that a restricted pharmacy network meant that those people covered by the plan were required to go to pharmacies that were in this restricted network in order to get the lowest price and to get their prescriptions filled with the most convenience.

They could still go to other pharmacies; but it would cost them more, and it wouldn't be as convenient if it was an out-of-network pharmacy.

Well, in the mid-Nineties, legislation was introduced here in Rhode Island in both the House and the Senate called freedom of choice legislation or, alternatively, any willing provider legislation, and the evidence will show they basically mean about the same thing.

The purpose of that legislation was to break open these restricted networks, to allow those pharmacies that were willing to pay the rates that Blue Cross required on this restricted plan to be included in the network.

And what the evidence will show, ladies and gentlemen, is that those pharmacies that were outside the network were in favor of the legislation that would break open the network.

Those pharmacies that were inside the network opposed that legislation. And the evidence will show that CVS Pharmacy was one of the major pharmacy chains that was inside this restricted network, and the evidence will show that it was very important to CVS and to their government affairs team that that freedom of choice legislation not pass.

The evidence will also show that there were other pharmacy chains that competed with CVS, including Stop & Shop, Walgreen's and others. And you'll hear from a representative of Stop & Shop about that legislation and about the effort that CVS and Stop & Shop and its coalition of out-of-network pharmacies took regarding lobbying to get that legislation passed or defeated, depending upon their position.

The lobbying effort came to a head in the '98, '99, 2000 time frame. Mr. Fegan, the representative from Stop & Shop, will describe what he personally observed about those efforts.

You will hear how John Celona, the senator at the center of this controversy, was a strong and vocal proponent of freedom of choice legislation. He made speeches about it. He sponsored it in 1998 and '99. He put his name on the bill. He spoke at hearings

about it, and he voted in favor of it both in '98 and in '99.

You will hear how busloads of -- you will hear about the intense lobbying effort that was undertaken, how people were bused in to lend support either against or for pharmacy freedom of choice.

You'll hear about the fact that the Senate committee, Corporations Committee hearings were televised on this matter in 1999 and, again, that Celona spoke and voted in favor of freedom of choice.

Mr. Fegan from Stop & Shop will also tell you about how Stop & Shop geared up for the 2000 campaign. In '98 and '99, the legislation was voted down in the Senate Corporations Committee. They lost.

Indeed, you'll see records from CVS that shows how important it was to Jack Kramer and Carlos Ortiz that they defeat that legislation. In fact, these two Defendants at least valued it at millions of dollars to the revenue of CVS and stressed how important it was to defeat the legislation.

Well, they succeeded in '98 and '99. It was defeated despite Celona's vote in favor of it. So 2000 comes around. And in 2000 Senator Celona does not sponsor legislation, but John Fegan from Stop & Shop will tell you he didn't expect -- that he still

believed Senator Celona was a strong proponent of the legislation.

And Mr. Fegan will take you through the day that he sat at the hearing on the matter in 2000 and how Senator Celona was present in the chamber that day; that when freedom of choice came up that day for a vote, Senator Celona had disappeared. His papers remained on the table where he was sitting, but he had absented himself from the chamber. You'll hear how he took a walk, didn't vote.

John Fegan had no idea, he'll tell you, what had changed. But the evidence will show, ladies and gentlemen, that unbeknownst to him, about a month earlier, Senator Celona had entered into an agreement with these two Defendants to pay him $1,000 a month as a consultant on health care matters and public relations issues.

The facts will show that after the big battle in '99 over that legislation, Jack Kramer and Carlos Ortiz reached out to John Celona and they began -- they had a number of meetings with Mr. Celona. They discussed freedom of choice and their position on it. They also discussed the prospect of hiring him by CVS.

Ladies and gentlemen, John Celona ultimately, at their request, provided a proposal of what he could do

for CVS; and that proposal described a senior citizens marketing effort that he thought -- that he described as an inexpensive way to address what he called in his proposal the public relations problem that freedom of choice legislation had posed in the senior citizens community for CVS.

He referred to that legislation, and he -- in fact, in his proposal, he refers to it as so-called freedom of choice legislation. Ladies and gentlemen, the evidence will show this is the legislation he was supporting and sponsoring and voting in favor of.

At some point thereafter, Carlos Ortiz, the evidence will show, asked the obvious question: What's the Ethics Commission going to say about you working for CVS?

John Celona, the evidence will show, had an answer ready for them. He said, I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and I can work for CVS.

The evidence will show Carlos Ortiz and Jack Kramer never asked about ethics again. The relationship went on for more than 40 months. They never again asked about ethics.

The evidence will show they knew at the time he had made that statement that they had not yet entered a

contract with him; that, therefore, they knew that he could not have told the Ethics Commission the details of the contractual relationship; and they knew that he described it as an oral discussion over the telephone.

The evidence will also show and we will prove to you that they didn't behave in the way that people would who believed that they were doing something legitimate.

When Carlos Ortiz went to obtain a contract to enter into the agreement with Senator Celona, he called the legal department of CVS; but the evidence will show he didn't ask about entering into a contract with the senator when he was talking to the lawyer and he didn't mention John Celona to the lawyer.

The evidence will show that he requested a form consultation agreement with blanks for the names of the people who were going in it and blanks for the matters that the consultant was going to be responsible for, and he filled it out himself.

And, ladies and gentlemen, the evidence will also show he did not provide a copy of that once it was complete back to legal. And the evidence will show he didn't take any other steps to check on the ethics of the matter with his own internal structure at CVS.

In addition, the payments to John Celona were

put in the political contributions budget of this corporate relations section that Jack Kramer headed up. The consulting agreement was for John Celona supposedly to provide public relations help.

It didn't go in the community outreach budget, the community outreach, the community relations section of the corporate relations department. It was -- it went in the budget of the government affairs section. And the government affairs section, again, you will hear, is the section responsible for monitoring and influencing legislation of importance to CVS. They put it under the budget line of political contributions.

Now, again, this is a month before John Celona left the chamber on freedom of choice, and he will tell you that one of the reasons he did so was because he was being paid by CVS.

Now, toward the end of the year 2000, about 11 months or so, maybe a few less, after the consultation agreement was signed, it was signed in February of 2000, a few events unfold.

You'll hear that John Celona, one, is being promoted to the chairman of the Corporations Committee, and with that elevation in his status comes new authority and more scrutiny. The evidence will show that he now can control the agenda of the Corporations

Committee, that he can control which bills are heard and voted on and which ones are not.

In addition, the written contract into which CVS, through Jack Kramer and Carlos Ortiz, and John Celona entered was set to expire after a year, and it could only be renewed in writing.

And the evidence will show that John Celona sent a message to Carlos Ortiz inquiring about extending the agreement for a further year, and this is after Carlos Ortiz authorized payments to John Celona of $11,000 at this point.

In Carlos Ortiz's response e-mail, he asked John Celona to tell him what he's been doing for the year 2000, to come prepared with a description of his activities in the year 2000. This is after Carlos Ortiz, the evidence will show, has been paying a senator who is lobbied by CVS $11,000.

Around the same time that it becomes public that Senator Celona is taking on this new mantle as chairman, Carlos Ortiz goes to talk to Todd Andrews in CVS who is responsible for press relations at CVS.

And he discloses to Todd Andrews the fact that he's been paying -- that the government affairs section has been paying Senator Celona. And the two of them put together, after $11,000 has already been paid, an

after-the-fact scope-of-work document, and you'll see that document. This is the first document that takes -- that makes any attempt to actually specify what it is John Celona's supposed to be doing for CVS.

And the purpose, you will hear, of creating that after-the-fact scope-of-work document is in case the press should learn about the relationship between CVS and Senator Celona so that they'll have an answer ready in case Todd Andrews receives a call about it.

Ladies and gentlemen, freedom of choice was not the only matter that John Celona took action on that favored CVS and which he will tell you he did because he was being paid by CVS.

At the end of the term, the 2001 legislative term, and you'll learn that the legislative term in Rhode Island is basically a six-month term every year, it's a part-time legislature, and you'll learn that around June is when it ends each year.

In June of '01, Carlos Ortiz asked Senator Celona to sponsor a bill relating to return of pharmaceuticals. And this bill basically, you'll learn, deals with allowing pharmacies to return to manufacturers expired or withdrawn or defective pharmaceutical products to the manufacturer. And that legislation, that proposed legislation would have a

financial benefit on CVS.

So at the end of the term, after all the -- as you'll hear, it's really too late to vote on a matter, Carlos Ortiz asked John Celona to sponsor that legislation. And the reason, you'll learn, is because they wanted to send a message to the manufacturers. It's what's called a message bill.

And John Celona agrees to it. While he's corporations chairman, he agrees to do it. No disclosure of his relationship by any party. John Celona sponsors the bill.

Another matter that was of interest to CVS has to do with the Rhode Island Student Loan Authority, which I've already mentioned to you briefly. In prior discussions with Jack Kramer and Carlos Ortiz, John Celona had discussed the shortage of pharmacy -- of pharmacists in Rhode Island, and that shortage had a negative effect on CVS's business in Rhode Island.

And so John Celona, as a member of the Rhode Island Student Loan Authority, agreed to propose a forgiveness program for student loans to pharmacy school students that would encourage them to stay as pharmacists in Rhode Island.

Jack Kramer had e-mailed to John Celona, asked him to keep both he and Carlos Ortiz up to date on the

progress of that effort. And John Celona happily reported back that he succeeded in introducing the measure and getting it passed.

Later on in the 2003 term, over two years has now gone by since this agreement was begun, Carlos Ortiz asks John Celona to oppose a measure pending before the Senate here in Rhode Island relating to reimportation of pharmaceuticals from Canada.

And essentially the measure that was pending would be to create a program in Rhode Island that would allow pharmaceuticals to be brought in from Canada and sold in Rhode Island.

And CVS believed that would have a negative impact on their business. And Carlos Ortiz, therefore, you will hear, forwarded a PowerPoint presentation to John Celona with CVS's official position on why it was a bad idea. Celona agreed to attempt to oppose that measure.

In that same PowerPoint presentation were materials reciting CVS's position on another piece of legislation called electronic prescription legislation.

What you will hear is that that legislation dealt with the ability of prescriptions to be accepted by pharmacies electronically rather than with the handwriting of doctors on them. CVS believed that that

sort of legislation would benefit its business.

And so in that PowerPoint that Carlos Ortiz sent to Celona, it also included CVS's position on electronic prescription legislation as well.

And Carlos Ortiz specifically asked John Celona to introduce and sponsor that legislation. And, indeed, he instructed their outside lobbyists, the firm that they -- that he and Jack Kramer had hired to be lobbyists on their behalf, he instructed them to forward to John Celona a draft bill that Celona could use to introduce the matter in the Senate.

When he did that with his lobbyists, Carlos Ortiz, the evidence will show, did not tell them that CVS was paying the person they instructed them to send that lobbying material to.

Carlos Ortiz, in fact, testified on that bill before the Senate, not in front of Celona's committee but in front of another one, and Celona voted in favor of it. Again, no recusal, no admission.

Now, it wasn't just the monthly payments that John Celona received from Carlos Ortiz and Jack Kramer. You'll hear that those payments totaled about $45,000. But he also received a stream of benefits valuable to him.

He went on multiple outings to exclusive country

clubs for golf games. He enjoyed two all-expense trips, one to Key Biscayne, Florida, where he stayed at the Ritz and played at Doral, another to San Diego where he played at Pelican Hill and stayed at the Four Seasons. Those were the result of CVS's relationship with him.

He received tickets. He received tickets near the dugout in Fenway Park. He received tickets to Oprah. He received invitations to the lavish CVS Gala.

Ladies and gentlemen, we'll prove to you that this stream of benefits, in addition to the $45,000 he was receiving, was intended to influence him in his official actions and was intended to be kept quiet.

Ladies and gentlemen, the 40-plus months that this agreement was going forward, there were -- the evidence will show there were numerous occasions when Jack Kramer, John Celona and Carlos Ortiz, either together or separately, were at events, were at luncheons, were at meetings with other people who it would have been natural for them to mention the relationship to, and the evidence will show they did not do so.

They were present together when other CVS employees, even in the community relations section, were together with John Celona and Carlos Ortiz or Jack

Kramer, and they don't mention the fact that John Celona is this asset they've retained for CVS on issues related to community relations.

The evidence will show they were present with lobbyists who lobbied the Senate on matters on behalf of CVS, and they don't tell those lobbyists that they're paying John Celona.

The relationship eventually comes to an end. John Celona learns about it on the golf course, and he'll tell you about that. You'll hear that Jack Kramer tells him that they need to let him go and that he then tells him, We're going to give you a trip to San Diego to a charitable event that we've sponsored. John Celona will tell you he's characterized that in the past as a consolation bribe.

Ladies and gentlemen, once all the evidence is before you, we will have proved to you that John Celona took actions and deferred from taking actions because he was -- in part because he was paid by CVS, and the evidence will prove to you that these Defendants knew it and condoned it.

In conclusion, the evidence will show that these Defendants tried to manipulate the system and to fool the people of Rhode Island.

We'll come back, and we'll speak to you again at

the conclusion of the trial, and we'll ask you to return the only verdicts that the evidence will support, that is guilty as to Jack Kramer of bribery, conspiracy and fraud and guilty as to Carlos Ortiz of bribery, conspiracy and fraud.

Thank you, ladies and gentlemen.

THE COURT: Thank you, Mr. Petalas. Just one minute, Mr. Fein.

(Pause)

THE COURT: Mr. Fein, please.

MR. FEIN: Thank you, your Honor. Ladies and gentlemen of the jury, before I begin my prepared remarks, I want to just address right away something that Mr. Petalas just told you.

He said that Mr. Kramer and Mr. Ortiz did not behave in a way that people would if this was a legitimate relationship. We disagree. We submit that the evidence will show you that is exactly how Mr. Kramer and Mr. Ortiz behaved in this relationship and that the Government will fail completely in its burden of proving to you that they intended to commit a crime, its burden of proving that to you beyond a reasonable doubt.

Mr. Petalas pointed to evidence that he says will support the Government in meeting its burden. For

example, Mr. Petalas said that Mr. Kramer and Mr. Ortiz used the wrong budget category to put Mr. Celona's consulting payments in at CVS, that the consulting payments were put in the government affairs budget, not the community relations budget and that they were categorized as political contributions when they were not.

The evidence will show that Mr. Kramer oversaw both the government affairs and the community relations departments and that the Celona consulting relationship arose out of conversations that Mr. Kramer had with John Celona while Mr. Ortiz was present.

And Mr. Ortiz worked on the government affairs side, so Mr. Kramer had Mr. Ortiz follow through and engage John Celona to provide the consulting -- to provide consulting services.

You will further learn that those preparing the budgets for government affairs used five categories for budgeting items, one of which, political contributions, they used for political contributions as well as for miscellaneous items.

You will see that John Celona's consulting payments weren't the only miscellaneous items in the political contributions budget category.

You will further see, when you look at the

budget documents, that next to John Celona's name and the monthly $1,000 payments, it indicates that he was being paid for consulting.

There is no evidence that that was used as a way of deceiving people to think that they were actually political contributions when the documents themselves say consulting.

The Government -- Mr. Petalas also points to an e-mail that Mr. Ortiz sent to Mr. Celona and told you that after a year of the consulting relationship, Mr. Ortiz needed to ask John Celona what he was doing.

I'm going to tell you today and we're going to show you at the trial what John Celona was doing during the first year of the consulting relationship, but you'll see when you look at the e-mail chain that Mr. Petalas referred to that it originates with John Celona asking for his consulting relationship to be renewed for another year.

In response to that request -- again, we're talking about whether or not the Defendants acted, behaved in a way that makes you think it's a legitimate relationship or a bribe. So Mr. Celona is asking to renew the relationship, and Mr. Ortiz's response was, Let's discuss it, let's set up a meeting with Mr. Kramer, and you should come prepared to that

meeting to review what you have done in the prior year and what you plan to do in the next year.

And what did John Celona do in response to that request? He didn't just come prepared to discuss that at the meeting; but he, on his own, wrote a response e-mail outlining exactly what he had done in detail to Mr. Ortiz in the first year and describing in further detail what he planned to do in the coming year because Mr. Celona wanted to renew the consulting relationship and was describing all the terrific things he had done for CVS in the first year and what he planned to do in the next year.

And many of those things that he did in the first year Mr. Ortiz did not have intimate knowledge of because, as I will describe to you today, they involved Mr. Kramer in particular.

The prosecution alleges and must prove beyond a reasonable doubt that Jack Kramer and Carlos Ortiz intended to defraud the citizens of Rhode Island of the honest services of state Senator John Celona and intended to deceive the citizens of Rhode Island about that fraud.

Although Defendants in a criminal case have no burden whatsoever, as Judge Lisi told you, we are going to show you that contrary to Mr. Petalas's statement,

Mr. Kramer and Mr. Ortiz acted without criminal intent in engaging John Celona to do consulting work for CVS for $12,000 a year.

While the evidence will show that neither Mr. Kramer nor Mr. Ortiz committed a crime, I will focus my remarks this morning on my client, Mr. Kramer.

I'd like to introduce you to Mr. Kramer and to my co-counsel, Scott Corrigan, Peter DiBiase. And Derek Hain will be assisting us with the technology so we can show you documents, including some slides we have for you during my opening statement this morning.

I will not always take the time to say Mr. Kramer and Mr. Ortiz as I go through my statement because I know that my colleague, Mr. Kiley, who represents Carlos Ortiz, will be focusing his remarks this morning on his client, Mr. Ortiz.

An opening statement is not an opportunity for parties to present arguments to you. Rather, it's a chance for us to tell you what we believe the evidence will show.

I have organized my discussion of the evidence into three sections. So you know what to expect as I'm going through my statement, I want to summarize for you now what each of those three sections will address.

First, contrary to Mr. Petalas' statement that

Mr. Kramer had an intent to defraud or improperly influence John Celona, you will learn that Mr. Kramer did not conspire or hire John Celona to buy his vote on AWP, the legislation that is at the heart of the Government's case.

In that regard, you will hear evidence that in the year 2000, AWP legislation had no chance of getting passed at that time. You will also hear evidence that at that time John Celona's vote on AWP was meaningless.

You will see a complete lack of evidence that Mr. Kramer or Mr. Ortiz used the CVS consulting payments in an effort to buy John Celona's vote on AWP or any other official action.

The second topic I want to discuss with you this morning will be what the evidence will show as to the real reason Mr. Kramer engaged John Celona to provide services to CVS, and that reason was set forth in many documents that you will see in this trial, including many written by John Celona himself.

You will hear that Mr. Kramer engaged John Celona so he could perform legitimate public relations services, which John Celona did, in fact, perform, for $12,000 a year. And you will learn that before, during and after the relationship, John Celona described his work for CVS as legitimate and only months -- much

later, as Mr. Petalas described to you, when John Celona decided to seek leniency for himself when he faced investigations into his own conduct did he change the way that he described the relationship.

And Mr. Petalas told you that he received the benefit that he sought, a substantial reduction in his jail sentence for crimes that he committed.

And the third point I want to discuss with you this morning is that while the first two points I just summarized relate to an attempt to defraud and whether or not Mr. Kramer intended to defraud the citizens of Rhode Island, one of the essential elements the Government must prove in this case, the third point I want to discuss with you is whether or not Mr. Kramer intended to deceive the public, another essential element the Government must show.

The evidence in this case will concern disclosure, not deceit. In particular, you will learn that John Celona told Mr. Kramer and Mr. Ortiz that he had received approval to work for CVS from the Rhode Island Ethics Commission.

The Ethics Commission is a state agency entrusted with overseeing the rules regarding state officials and their outside employment.

I will review these three points with you now.

First, I want to take some time, because it's very important and at the center of the Government's case, to discuss with you the AWP legislation.

Mr. Petalas told you that the evidence will show that Jack Kramer approached John Celona in 1999 to buy his vote on AWP. We disagree.

Not only will the evidence show you that Mr. Celona pursued CVS, not Mr. Kramer reaching out to John Celona, but the evidence will also show you that he did so at a time when the legislation in question, AWP, had no chance of passing and when his vote on it was meaningless.

You will learn that the debate over AWP revolved around restricted health insurance networks in which pharmacies agreed to fill prescriptions at lower prices based on an expected increase in sales volume.

The proposed AWP legislation would have permitted any pharmacy to participate in the prescription drug benefit program.

Those in favor of AWP argued it would allow insureds to fill their prescriptions at more pharmacies. Those opposed to AWP argue that opening up the restricted network would result in higher prescription drug costs and higher insurance premiums because the discounts available to restricted networks

would be eliminated.

While the allegations in this case focus on the years 1999 and 2000, the relevant history for you to consider regarding AWP starts a few years earlier.

The evidence from 1995 to 1998 will show you that AWP could not pass both the House and the Senate, which was essential for a bill to become law. It needs to pass both houses, and it could not pass both houses in those years.

We will -- I will describe to you how in 1999 and 2000, the critical years here, AWP couldn't pass either house, let alone both houses.

But I'd like to start with 1995. And I apologize for looking away from you, but I need to look there to see the slide that you all can see right in front of you.

THE COURT: For members of the jury, if you see sort of a purple tinge on the screens, we were having some difficulty with them this morning. We hope to have them fixed by tomorrow. The purple is not a part of Mr. Fein's presentation.

MR. FEIN: Now, I see on this screen that the words House and Senate are off the screen. I don't know if yours are as well. Is the full word there? Thank you.

In 1995, AWP had support in the House and passed easily. But it did not have support in the Senate, did not even get a vote in committee, and it did not pass.

What happened in 1995 in the House and the Senate repeated in the next three years. In 1996, AWP passed the House easily and failed in the Senate. In 1997, same thing, passing easily in the House and failing in the Senate. And likewise in 1998, it passed again in the House and failed in the Senate by a vote in committee of 11 to 4.

To fully understand why AWP had no chance of passing in either the House or the Senate in the coming years, the years when Mr. Petalas alleges Mr. Kramer set out to buy John Celona's vote on this legislation, I will tell you what the evidence will show as to why AWP was supported in the House during those years where you see the green "yes."

You will learn that independent Rhode Island pharmacies, the mom-and-pop pharmacies, not part of a chain, supported AWP during those years, wanted it to be passed, because they were not in the largest pharmacy network in Rhode Island.

And the House leadership supported the independents, and that resulted in these green yes votes that were unanimous or nearly unanimous each year

in the House.

But the independents were not able to get similar support in the Senate where the views of the corporate community, which generally supported the limited networks as a way to keep prescription costs down, carried the day. So AWP did not even make it out of committee in any of those years on the Senate side.

You will learn that in 1998 a deal was struck that would mean that AWP in the future would lose in both houses, not just one. That deal admitted all of the independent pharmacies into the large pharmacy network.

As a result of that deal, all Rhode Island-based pharmacies, independents and the chains, such as CVS and Brooks, were in the network in 1999.

Because the independents were now in the network, they no longer supported the AWP legislation. As the independents withdrew their support, so did the House.

And you will learn that when -- with the independents now opposed to AWP along with CVS and Brooks, that left two out-of-state chains, Stop & Shop and Walgreen's, by themselves looking to support this legislation.

Despite the pattern of legislative defeats that

you see here in the four years, Stop & Shop and Walgreen's tried something new, a public relations campaign in 1999 to try to reverse the legislative failure of the prior years.

But you will hear that other than creating some bad press for CVS and others that were opposed to AWP, the publicity campaign was not successful and had no effect on the 1999 vote.

In fact, in April of 1999, because of the inclusion of the independents into the network, the House voted against the legislation.

This time, AWP's defeat in the House, not its passage, was by an overwhelming margin. The House committee voted against AWP by a unanimous vote of 17 to 0. So now it didn't even make it onto the House floor.

On the Senate side, the story remained the same. AWP was defeated again by a similar vote of 12 to 4 in the Senate committee, having been defeated the prior year 11 to 4.

Mr. Petalas told you that AWP legislation came to a head in 1998, 1999 and 2000. We disagree. If it came to a head at all, at least according to Stop & Shop, it might be in 1999 through this publicity campaign; but as this chart shows you, that campaign

failed and, in fact, resulted in the worst defeat for AWP in all of the years.

After the failure in both the House and the Senate in April 1999, despite the publicity campaign, the two remaining proponents, Stop & Shop and Walgreen's, pursued a different strategy, litigation rather than legislation. And Stop & Shop filed a civil lawsuit in June 1999, which Walgreen's later joined, suing, among others, CVS and Brooks.

That litigation strategy ultimately proved as unsuccessful as the legislative strategy, and the lawsuit against CVS was lost, was defeated.

On the heels of the most decisive rejection of AWP in this entire time period, this time by both the Senate and the House, the Government alleges that Mr. Kramer approached John Celona to buy his vote on that very same legislation.

The pattern of 1999 and -- excuse me, the pattern of 1998 and 1999 repeated in 2000. AWP lost again overwhelmingly in both the House and Senate by identical 12 to 2 votes in committee, never making it to the floor.

The evidence will show that AWP's defeat in both the House and the Senate in 2000 had nothing to do with CVS engaging John Celona to do public relations

consulting work, a $12,000 a year contract.

It happened because, first, the House was overwhelmingly against AWP because the independents were in the network; and it happened because the Senate, dating all the way back to 1995, had never supported the legislation, and 2000 was no exception.

While I am on the subject of AWP, let me turn to John Celona and his role in the Senate during this time period. You will learn that John Celona was not a part of the Senate leadership, was not a powerful senator at all during this period, the time when Mr. Petalas told you Mr. Kramer approached John Celona to buy his vote.

Indeed, far from it. John Celona was, along with a few other senators, by his own admission a back-bencher, a senator with no legislative power.

While he and several other back-benchers did support AWP from 1995 to 1999, you will see that they had no influence and their votes meant nothing because the legislation failed year after year, never even making it to the floor of the Senate.

The evidence will show that following the 1999 vote, far from coming to a head, AWP became a back-burner issue. Stop & Shop and Walgreen's had taken their best shot and had failed.

Mr. Petalas told you that John Celona did not

vote on AWP in 2000. He wasn't the only former supporter of AWP who did not vote. One of his fellow back-benchers along with him also did not vote. So the prior year's 12 to 4 vote against AWP in committee became 12 to 2.

You will learn that John Celona has offered a variety of reasons as to why he did not vote in 2000; but regardless of what he says, now eight years later, when he testifies in this trial, the evidence will show you two important facts. Celona's vote did not matter, AWP lost overwhelmingly in the House and the Senate in 2000, and also that in connection with the Senate's consideration of AWP in 2000, Jack Kramer and Carlos Ortiz did not ask John Celona to switch his vote or to abstain from voting.

One final point on AWP before I move on to what the evidence will show as to the actual reason that Jack Kramer engaged John Celona to work for CVS.

Before I do that, let me just tell you that you will hear that Jack Kramer was not going to earn more or less money based on the passage or defeat of AWP in Rhode Island or any particular piece of legislation in any particular state that CVS did business in.

Jack Kramer's salary was set not subject to changes based on legislative results, and his bonus was

based almost entirely on the company's overall financial performance. Even if AWP had passed in Rhode Island, it would not have had a material effect on CVS's overall performance. You see, AWP would only affect CVS's stores here in Rhode Island, which were 40 or so, and at the time they had more than 4,000 stores nationwide.

So it would have affected essentially one percent of their stores. And even as to that one percent of their stores, passage of AWP would not mean that those stores would have lost substantial business.

You will learn that approximately 80 percent of the pharmacies in Rhode Island were already in the largest network. So even if AWP had passed, very few stores would be added to the list of pharmacies that insureds would choose from to fill their prescription.

There was a small discretionary piece to Jack Kramer's bonus, and that was determined by his supervisor, which for some years was the company's chief executive officer and for other years was the company's chief financial officer.

That discretionary piece was based on the CEO or the CFO's overall impression of Jack Kramer and his effectiveness. And you will learn that Jack Kramer was very well regarded at CVS, not due to the success or

failure of a particular piece of legislation in a particular state but because of what he was known for at CVS, serving as the public face of CVS in the Rhode Island community and promoting CVS's charitable initiatives.

And that brings me to the second of the three points I want to cover with you this morning, and that is what the evidence will show as to why Jack Kramer engaged John Celona to work for CVS.

The evidence will show that whereas Jack Kramer had no reason to hire John Celona to buy his vote on AWP, Jack Kramer had every reason to hire John Celona to help promote CVS in its home state.

You will learn that during the years in question, 1999 and 2000, Jack Kramer was 67 and 68 years old and he and his wife Lynn, who have been married 45 years, were preparing for his eventual retirement.

The evidence will show that he had transitioned out of his position as head of CVS's advertising department where he supervised about 100 people to become the head of CVS's community relations and government affairs departments, where he supervised about 10 people.

No longer responsible for CVS's advertising

department, Jack Kramer was freed up to do what he enjoyed most. He spent much of his time going out in the community, especially in Rhode Island, to meet with business, community and government leaders promoting CVS.

This was a natural outgrowth of Mr. Kramer's prior work at CVS and his almost 50-year career in advertising and marketing. It resulted in Mr. Kramer developing a higher profile within the company and in Rhode Island.

You will learn that Mr. Kramer was not shy in seeking publicity for CVS, and there was rarely a camera or a microphone that Mr. Kramer didn't step right up to when given the opportunity to talk about CVS.

The evidence will show that Jack Kramer was the messenger and his basic message was that CVS is a terrific company that does a tremendous amount of good in and for the communities in which it operates.

He was given the role of a prominent elder statesman, removed from day to day operations of a huge department, able to spend his days meeting and greeting, planning and promoting, golfing and dining, and going on radio and TV, all in furtherance of improving CVS's image in the community.

You will hear that Jack Kramer embraced his new role with vigor and by all accounts did it quite well. He devoted a substantial amount of his time on CVS's various charitable endeavors, especially here in Rhode Island.

You will hear that Mr. Kramer didn't just talk about these subjects, he lived them. And these included, first and foremost, the CVS Charity Classic which Mr. Petalas referred to. It's an annual golf tournament featuring professional golfers from the PGA tour held right here in Rhode Island.

In 2000, at the time that Jack Kramer hired John Celona, CVS was preparing to run the Classic for the second year in its then form.

Mr. Kramer over the years personally grew the tournament to the point where it has become one of the single biggest charity events of the year, not just for CVS but for all of Rhode Island.

You will learn that Jack Kramer also spearheaded the CVS Downtown 5K road race, the largest road race in Rhode Island. In fact, in 2000, the year that Jack Kramer engaged John Celona, the lead sponsor for that road race withdrew and the race was in jeopardy.

One of Mr. Kramer's assistants suggested to him that CVS step in and rescue the race by becoming the

lead sponsor, and that's exactly what CVS did, and the race has grown stronger ever since under Jack's leadership.

Mr. Kramer was also behind CVS's promotion of the CVS Highlander School, the first independent charter school in Rhode Island, which was getting ready to open in the fall of 2000 with 75 students thanks to a $1 million commitment by CVS.

And Mr. Kramer played a lead role in the CVS Charitable Trust, a free-standing, not-for-profit organization that made charitable contributions to various charities.

With each of these charitable efforts, you will learn that Jack Kramer committed many of his working and evening hours and substantial CVS funds to promoting CVS in the Rhode Island community. You will learn that promoting these efforts was an important way to promote CVS.

I mentioned the Charity Classic, the CVS Downtown 5K and the CVS Highlander School because you will learn that they played a big role in why Jack Kramer engaged John Celona.

Mr. Petalas told you that Jack Kramer approached John Celona; but you will learn that it was, in fact, John Celona who reached out to CVS. He asked -- John

Celona asked Joe Walsh, CVS's top lobbyist in the state, to bring CVS's CEO to meet him.

Mr. Walsh didn't want to bother CVS's top executive to go meet John Celona and instead asked Mr. Kramer and Mr. Ortiz to pay a courtesy visit to John Celona. They did so, accompanied by Joe Walsh, and that visit led to Celona then visiting CVS's offices where he met again with Mr. Kramer and Mr. Ortiz.

In the course of their discussions and in a letter that Mr. Petalas referred, to a September 1999 letter that John Celona wrote to Mr. Kramer, John Celona suggested ways that CVS could improve its image in the community, especially with senior citizens whose impressions of CVS, John Celona said, were affected by the publicity campaign that Stop & Shop and Walgreen's had run earlier that year during the 1999 legislative session.

John Celona wrote, "Since the so-called freedom of choice," which as Mr. Petalas told you is another reference for AWP, "since the so-called freedom of choice legislation publicity, I have found that seniors have a feel for CVS that is not what it should be. In an effort to positively address this segment of the population, I feel that a program as follows should be

instituted in order to make CVS more personal in the eyes of the senior population. Jack, I feel that this program can be a relatively inexpensive way to continue to market CVS, its products and services and provide significant positive results. And, as important, it would eliminate any bad perception left over from freedom of choice."

So in the letter that Mr. Petalas told you was part of the bribery scheme, John Celona mentioned the very legislation that Mr. Petalas told you was the object of the bribe.

Unlike Mr. Petalas, we believe that the evidence will show that John Celona meant what he wrote in the letter; that a public relations effort on behalf of CVS making CVS more personal in the eyes of the senior population, could address the bad perception that was left over from the AWP public relations campaign earlier that year.

You will learn that it wasn't unusual for John Celona to meet with companies and discuss ways in which he could help them improve their images and how he could help them.

As a part-time legislator in Rhode Island earning only about $10,000 a year from his position, he was permitted to, and did, seek outside employment,

like his fellow senators. He held himself out as a public relations consultant.

While the term "consultant" can mean many things, in the case of John Celona it generally meant two types of services he could provide.

First and foremost, John Celona hosted a 30-minute television show on Rhode Island's cable television network that aired on Sunday mornings and repeated at different times on different days to maximize the viewing audience.

His show was called the State House Report. And his guests included prominent local and state citizens, such as the governor and the state Attorney General, as well as celebrities, like Chuck Norris.

To attract paying public relations clients, John Celona offered them the opportunity to appear on his show and promote their business.

The second thing that John Celona offered, and it was related to the State House Report, was that for companies with senior citizens as customers, John Celona was helpful because he was particularly popular among the senior community. He had lots of senior residences in his district. These were places that he frequently visited and took a special interest in. This related to John Celona's TV show because you will

learn that seniors were an important part of the viewing audience for his show.

The evidence will show that businesses and businessmen took a real interest in hiring John Celona and getting a chance to appear on his TV show and that these businesses and businessmen were pleased with the response they received from appearing on the show, often from seniors as paying customers after the appearance.

Jack Kramer and CVS were no exception. By CVS engaging John Celona as a public relations consultant, Jack Kramer appeared as a regular guest on John Celona's television show and spread the message of what a great company CVS is and promoted the charitable initiatives that were at the heart of Jack Kramer's job at CVS.

What's more, these appearances would be timed in a way to promote the particular event, such as the Charity Classic or the 5K.

The evidence will show that the cost for this service, $12,000 a year, was a very small amount when compared to what CVS paid for other on-air promotional activities, advertising, marketing, promotion of these very same events that Jack Kramer discussed on the show.

With the opportunity to spread the message of CVS's charitable deeds and the opportunity to be the messenger on a statewide TV show where people such as the governor appeared as guests, Jack Kramer said yes and engaged John Celona for $12,000 a year.

You will see the signed contract between CVS and John Celona which provides, among other things, that John Celona is tasked with certain public relations services, including personal appearances and TV appearances.

You will see the actual results of CVS's $12,000 a year spent, recorded video of Jack Kramer's appearances on John Celona's show. You will learn that from the outset of the relationship and throughout its three-and-a-half years, Kramer appeared regularly and repeatedly on John Celona's TV show to promote the CVS Charity Classic, the Downtown 5K, the Highlander School and CVS as well.

When Mr. Kramer appeared, he was the only guest on the show, 30-minute show. That appearance would run approximately six days a week for five straight weeks twice a year. In fact, sometimes the show was replayed so many times that, including the -- on the event that they were promoting, that CVS had to ask John Celona to please take the dated-off episode off the air.

I'd like to review with you the frequency and timing of Jack Kramer's appearances on the State House Report and what he promoted. Overall, you will see that Jack Kramer appeared twice a year during the life of the relationship and that it might have been three times in the last year had CVS not terminated the relationship.

So if you look at your monitors, you'll see that's the opening of what appears on TV for the State House Report. It was only -- wasting no time after the consulting relationship began, Jack Kramer quickly went on as a guest on the State House Report in approximately April of 2000 and promoted the upcoming CVS Charity Classic.

Let me just read one quick passage from John Celona's welcome to Mr. Kramer on this episode. "This evening on the Celona report I have a person who certainly is well-known in the corporate circles, in the government circles and also in the civic and charitable circles, and that's none other than Mr. Kramer, who is senior vice president of government affairs and community relations at CVS. Jack, welcome to my show, and it's a pleasure to have you."

This appears promoted the Charity Classic, featured the golfers who would be attending and

participating, discussed the charities that would benefit, and encouraged people to go out and buy tickets, as well as many other promotional messages about CVS. You'll see excerpts from a number of these shows.

On November 29th, 2000, Jack Kramer returned to the State House Report, this time to recap how CVS had sponsored for the first time the 5K.

In May of 2001, Mr. Kramer promoted again the upcoming Charity Classic, reported on how much money had been raised for charity in the prior year and their goals for the next year.

He appeared again in August of 2001, this time to promote the second running of the 5K. The same pattern repeated in 2002 with appearances on May 3rd, 2002, to promote the Classic and August 2002 to promote the 5K.

In January of 2003, they did a different kind of appearance, not to promote one of these sporting charitable events, but instead to promote an episode dedicated to the CVS Highlander School.

They discussed for most of that show the Highlander School that CVS had helped fund and start. And, in fact, on this episode, they included footage from the Highlander School and interviews with faculty

at the school.

In May of 2003, Mr. Kramer appeared again to promote the Charity Classic. And as I said, had the relationship not been terminated that summer, he likely would have appeared that August to promote the next 5K.

In addition to the videotapes, you will see communications between Jack Kramer -- among Jack Kramer, his administrative assistant and John Celona. In one e-mail, John Celona wrote that he had received rave reviews of these programs from many viewers across the state.

You will see that John Celona sent copies of the videotape to CVS and that Jack Kramer shared copies of the tape with others, proud of his appearances.

These were 30-minute shows, six days a week, five weeks running, sometimes even longer, twice each year. Assuming only the five weeks, that's 30 airings of each of the appearances or 60 airings a year, all for $12,000. Conservatively, that works out to $200 for 30 minutes of air time.

You will see John Celona's own words where he explained what he did for the $12,000 a year. In addition to putting Jack Kramer on the air, John Celona said he worked on producing each of the programs, including graphics and photographs depending on the

topic of the show. He said he conducted preproduction meetings, developed questions, and he said that he placed paid advertisements in the Providence Journal at his own expense to increase the viewership.

You will learn that hosting Jack Kramer on the show was not all that John Celona did for the $12,000 each year. Again, in his own words, in John Celona's own words, you will read that he visited senior housing complexes and senior centers to explain the services provided by CVS and reiterated the prior theme of CVS as today's neighborhood drugstore.

Mr. Petalas described for you other things of value, what he said was a stream of benefits provided to John Celona apart from the $12,000 a year for consulting.

The Indictment -- in the Indictment, these stream of benefits generally fit into two categories. One is PAC contributions, and two is meals and entertainment. And we submit to you that the evidence will show neither had anything to do with an intent to defraud or an intent to deceive.

The evidence will show that CVS, like other companies in the State of Rhode Island, had a PAC or political action committee through which it could make campaign contributions to candidates.

Jack Kramer played a big role in CVS's PAC, helped solicit contributions from CVS employees and helped decide to whom the PAC would make contributions.

John Celona was one of many, many state officials that received contributions from CVS's PAC, and his contributions over the years totaled $1,125, and represented the exercise of CVS's right to make contributions to politicians.

What's more, it was done openly with both CVS and John Celona filing reports regarding those contributions.

The evidence will show that CVS, like other companies in the state, hosted legislators and other state officials at corporate or charitable functions, like the CVS Charity Classic that Mr. Petalas referred to.

John Celona was one of many state officials whom CVS hosted at these events. You will see lists of the people that asked for tickets and received tickets to attend the gala that would accompany the CVS Charity Classic.

It was done openly. These events, these dinners in town often would have tables with the name CVS on the table where CVS was hosting a variety of legislators and other officials.

The evidence will show that Mr. Kramer hosted John Celona for golf games on a number of occasions, just as he did for other community, business and government leaders.

That was part of Jack Kramer's job, and it was done openly. In fact, Mr. Kramer and Mr. Celona even referred to it during the State House Report on-air.

The tickets to Oprah that Mr. Petalas referred to was a request that John Celona made to Mr. Kramer's administrative assistant because he wanted to give his wife a couple of tickets for Christmas.

And Mr. Kramer's admin took that request from Mr. Celona and called the local station and arranged for two tickets at no expense because Mr. Celona had requested them.

And as for the all-expense-paid trip to Key Biscayne and San Diego, you will learn that one of those trips was part of a national association of chain drugstores event, and the other I'm going to mention right now, which was the Susan G. Komen event in San Diego.

Mr. Petalas mentioned the circumstances of John Celona's termination. And you will learn that in 2003, when Mr. Kramer was 70, he took a further step toward retirement as he left government affairs in

approximately May of that year.

This left Mr. Kramer able to focus entirely on community relations and the CVS Charitable Trust, the Classic, 5K, the Highlander School.

Jim Smith took over government affairs and reviewed the government affairs budget with Mr. Ortiz. Mr. Ortiz, who did not appear as a guest on the State House Report, did not share Mr. Kramer's appreciation for the show, told Mr. Smith that he didn't see the value in continuing that relationship. So they terminated it, plain and simple.

Mr. Petalas said that was linked to this all-expense-paid trip and that Mr. Celona considered that all-expense-paid trip a consolation bribe. The evidence will show nothing of the sort.

By virtue of a charitable contribution CVS had made to the Susan G. Komen Breast Cancer Foundation, CVS received complimentary tickets to attend this charitable event.

At this point, in the fall of 2003, after a series of television appearances with John Celona, after golf games, charitable dinners and the like, John Celona and Jack Kramer had become friends.

They met each other's wives, and they enjoyed each other's company. The evidence will show that what

Mr. Petalas or actually Mr. Celona refers to as a consolation bribe, what he refers to today as a consolation bribe, is nothing more complicated than the Kramers inviting the Celonas to join them for this charitable event, which was at no charge to CVS because of its contribution.

The third and final point I want to review with you today is the evidence or the lack of evidence regarding Jack Kramer's intent to deceive. You will learn that this is a case about disclosure, not deceit.

Mr. Petalas told you that Mr. Kramer and Mr. Ortiz wanted to see that John Celona kept quiet about their relationship. But you will learn that right at the outset, before they even engaged John Celona, Mr. Ortiz asked John Celona in Mr. Kramer's presence whether working for CVS would be okay with the Ethics Commission.

That's the state agency I mentioned earlier that is responsible for administering the state's Code of Ethics for state officials.

And then John Celona specifically told Mr. Kramer and Mr. Ortiz that he had called the Ethics Commission, disclosed the fact that he would be working for CVS, and asked if that would be okay.

Mr. Celona then told Jack Kramer and Carlos

Ortiz what the Ethics Commission had told him, that it would be okay to work for CVS and that he could vote on legislation that affected CVS so long as it didn't affect CVS alone. And John Celona gave an example that they had given him of teachers in the legislature and whether teachers could vote on legislation that would affect teachers as a whole.

That's the discussion at the outset of this relationship. That is a discussion about disclosure, not deceit.

Further, in keeping with a modest $12,000 a year consulting relationship, you will learn that Mr. Kramer, Mr. Ortiz and even Mr. Celona mentioned the consulting relationship to some people and not to others.

Mr. Petalas told you that it wasn't mentioned to some people to whom it would have been natural to mention it to. The evidence will not show you who it would have been natural to mention it to, but the evidence will show you that Mr. Kramer and Mr. Ortiz did discuss it with various people, again, some they did, some they didn't, consistent with the magnitude of a $12,000 a year consulting relationship.

Mr. Kramer mentioned that he was doing something with John Celona related to TV and charities to CVS's

top lobbyist, Joe Walsh, that's disclosure, and that John Celona had received EC approval in that regard.

Mr. Ortiz mentioned that they had engaged Mr. Celona to several co-workers. And when he did, he shared his personal view about the relationship, which was a view different than and not expressed to Jack Kramer.

Mr. Ortiz thought that despite Ethics Commission approval, the hiring a state legislator could have a bad appearance, and he didn't see much value in what CVS was getting for the $12,000 a year.

You will learn that he didn't have the firsthand experience that Jack Kramer did of going on the shows and promoting the events that Jack Kramer spent so much time on, events that Mr. Ortiz was not tasked with promoting.

You see, Mr. Ortiz did not work on the charitable side of Mr. Kramer's work, didn't share Mr. Kramer's focus on those subjects and didn't even live in Rhode Island where John Celona's show aired on cable.

One place where Jack Kramer did not mention that CVS was paying John Celona to help promote CVS was when he actually made the appearances on the show. Not surprisingly, other paying clients did not do that

either, preferring not to advertise the fact that they were paying to promote their companies when they went on the State House Report.

But you will learn that John Celona's consulting relationship was handled like any other professional services relationship in the community relations and government affairs departments.

The consulting contract was maintained in a file marked "John Celona" alongside other contracts with other service providers in file folders marked with their name.

Prior to any payments being sent to John Celona, CVS had to, and did, receive an invoice from John Celona in his own name listing the month, the monthly fee and the nature of the services, consulting, not political contributions.

John Celona was assigned a CVS vendor number that could be used to access all payment information. Budget documents were maintained, as I mentioned earlier, listing the monthly payments of $1,000 to John Celona for consulting.

The Celona invoices, often accompanied by requests for payments, were prepared in the government affairs department and were sent to CVS's accounting and tax departments. Again, disclosure, not deceit.

Prior to payment, John Celona's checks were approved by CVS's accounts payable department. Monthly CVS corporate checks were issued. Payor was CVS, payee was John Celona. And these checks were mailed to John Celona.

In fact, the mailing of these CVS corporate checks each month during the consulting relationship form the basis for 22 of the Government's 24 counts in the Indictment, the mail fraud counts.

The cancelled checks that John Celona deposited were returned to CVS. At the end of the year, the first year, CVS issued a W9 questionnaire to John Celona in order to obtain from him the information required to be reported to the IRS. John Celona completed that form, indicating he was consulting for CVS.

CVS's tax department prepared 1099 forms for Celona for each year he was paid and sent these forms to the -- to John Celona and to the IRS.

Let me conclude my opening statement this morning, ladies and gentlemen, by discussing John Celona, the person who, according to Mr. Petalas, is at the center of this controversy.

John Celona will take the stand in this case and testify that he conspired with Jack Kramer and Carlos

Ortiz for $12,000 a year. The evidence will show that John Celona only started characterizing the relationship as criminal after he faced about a year of state and federal investigations into his own conduct. And even then, during the investigations, Mr. Petalas referred to lies that Mr. Celona told to agents.

You will learn that a search warrant was executed at his home, and lots of financial and other information was seized by the Government.

You will learn that questions were raised about whether he complied with state ethics laws, whether he made all the disclosures that he, as a state official, was required to make.

Questions were raised about his use of campaign funds. Questions were raised about whether he paid taxes on all of his outside income. It was at that time that John Celona decided to try pursuing a deal with the Government to see if he could help himself by implicating others in his misconduct.

Prior to saying that he believed that Jack Kramer and Carlos Ortiz intended to buy his vote when they hired him, John Celona said that his relationship with CVS was legitimate.

And let me give you but one example. After the Providence Journal reported on John Celona's consulting

relationship with CVS, John Celona wrote the following, apparently to his lawyers, about his position in the legislature at the time he entered into this consulting contract with CVS in the 2000 time period that I described for you during my AWP discussion.

He wrote about the fact that he was a back-bencher, and he said, and I quote, "In the minority. Therefore, I had no influence whatsoever because of my affiliation with the then so-called Montalbano faction as opposed to the faction that was in control with Senator Paul Kelly as the then-majority leader. So there was absolutely nothing that I could have done to influence legislation, and I was contracted by CVS as an independent contractor to do just what the contract stated, nothing to do with legislation."

The evidence will show that those statements were true at the time he made them, and they're true today. You will see many written communications during this trial regarding the legitimate nature of the consulting relationship, and you will see no written communications whatsoever in which Mr. Kramer or Mr. Ortiz sought to improperly influence John Celona's official actions with consulting payments or anything of value.

You will see the September 1999 letter that Mr. Petalas and I referred to. You will see the consulting contract. You will see e-mails regarding Mr. Kramer's appearances on the State House Report. You will see calendars and expense reports for Mr. Kramer's appearances on the show, transcripts and videos of those appearances, the e-mail when John Celona describes in detail what he did for CVS in the first year and what he intended to do in the next year if they renewed the relationship, letters by Mr. Celona to Mr. Kramer and Ortiz enclosing copies of the videotape, the monthly invoices, the budget documents, the payment process documents, all of that, and Mr. Celona's explanation when he wrote about the relationship after it was discussed in the Providence Journal where he said it had nothing to do with legislation.

I've outlined for you this morning what the evidence will show in this case. In short, you will learn that there was no legislative, professional, financial or personal reason for Mr. Kramer to bribe Mr. Celona, yet there was a simple, straightforward and lawful business reason for Mr. Kramer to engage John Celona for $12,000 a year.

You will see the result of that engagement,

Mr. Kramer's appearances on the State House Report, and John Celona's own descriptions of the other services he was providing, helping with seniors.

And you will see evidence of disclosure, not deceit, by Mr. Kramer and Mr. Ortiz, including the fact that prior to engaging John Celona, they were told by him that he had disclosed the relationship to the Ethics Commission and received approval to work for CVS.

At the end of the case, we will have another opportunity to speak before you. That's called closing argument. And at that time we will be able to present arguments to you about the significance of the evidence and the lack of evidence.

When we have that opportunity, we are going to ask you to consider all of the evidence and the lack of evidence that you have heard about Jack Kramer, and we're going to ask you to return a verdict of not guilty on all counts. Thank you very much.

THE COURT: Thank you, Mr. Fein.

Members of the jury, we're going to take a break, 15 minutes. Please fold up your notebooks, leave them on your seats. I remind you that you're not to discuss the case at all during the recess.

(Recess)

THE COURT: Mr. Kiley, please.

MR. KILEY: Thank you, your Honor. And like my brothers, I'm going to start by introducing myself and who I am accompanied by.

I'm Tom Kiley. I represent Carlos Ortiz. I'm joined in that by Mark Smith and Anthony Traini. Together we represent Mr. Ortiz.

In a sense, the way I introduce myself to you is a little disingenuous, if you will. I'm not just Tom Kiley. I'm the low-tech guy that's going to be sitting over there at the corner of the courtroom while others are going to be talking to you and using the monitors in the modern way that people do.

I am truly at the level that I can tell you there's hardware, there's software, that's it. That's the level of my knowledge. So the tool, to use the judge's word, that I'm going to be using as we go through this is my God-given common sense. And the things I'm going to be pointing out to you with respect to the evidence are going to turn on that kind of common sense approach.

Now, there's good news in that for you because the material that's in this notebook that I have prepared, a lot of that is unnecessary for me to say at this point because so much of it has been said by

Mr. Fein. I have no less to say than Mr. Fein, but I am not going to necessarily say it now.

I do want to suggest to you, though, that there are some points that have not been brought out that I want to highlight for you in the evidence that I will ask you to use that filter on.

Both Mr. Petalas and Mr. Fein have alluded to the fact that when the contract with Mr. Celona was first put in place, it was done through the political contribution account, one of five within government relations.

The evidence will be that that is the only account in government relations for unbudgeted expenses.

The evidence will be that CVS has a budgeted process, as many big corporations do, and that the place for unexpected expenses, unbudgeted expenses was in that political contribution account.

But you're also going to hear that the way CVS made political contributions in most instances was not through that account at all; that they had a PAC, a political action committee. Just like Stop & Shop and other corporations might have done it, contributions came elsewhere. So thinking that political contributions might signal something within the

corporation would simply be an erroneous use of the tools that we have.

I also want to point out to you and highlight for you -- and, again, you've heard a lot about AWP, and I'm not going to do a whole lot of it; but what I do want you to focus on is not just what you hear but what you don't hear in this case.

And to the extent that Mr. Petalas tells you that the linchpin of the Government's case, that what my client and Mr. Kramer were trying to do is buy John Celona's vote on -- or vote by his action on that matter, you're not going to hear a single word of testimony that says that Mr. Kramer and Mr. Ortiz, the schemers, the conspirators, ever discussed that matter between the two of them.

And you are not going to hear -- actually, I shouldn't say that because I'm not quite sure what Mr. Celona is going to say. But Mr. Celona has said in the past, and there will be evidence before you of what he has said in the past, that following the arrangement with CVS, neither Mr. Kramer nor Mr. Ortiz ever asked him to take action on AWP.

That is a critical point for you in focusing on the bribery aspect of the case as well as the theft of honest services aspect of the case.

Your role, the role I want to help you with with my limited tool, is essentially to be a detective in this case and figure out what was in Carlos Ortiz's head, and I only speak for Carlos Ortiz here, what was in Carlos Ortiz's head as he interacted with John Celona.

The things that I will ask you to focus on are the things that Carlos Ortiz said and the actions that he took at the points in time that mattered in this case, as the events -- and the judge has told you and you'll see in the Superseding Indictment, the time period goes from 1998 to 2004.

It's a long time ago, so you are going to be having to try and figure out what somebody thought in that point in time.  And what you are going to have to try and figure out, as the judge has explained to you, is whether my client, and for that matter Mr. Fein's, had a conscious intent, a desire, a plan to affect Mr. Celona's vote.

So the first point in time that I am going to ask you to focus on is that very first meeting between Mr. Celona, Mr. Ortiz and Mr. Kramer.  And the very first words out of Mr. Ortiz's mouth virtually are, Do you have ethics approval?  The answer is in the affirmative.

Now, Mr. Petalas wants to suggest that that's the only time on which the question of ethics approval comes up. Respectfully, whether that's true or not, there's not going to be any evidence that one would be required to ask on multiple occasions.

The evidence in this case is going to be that Mr. Ortiz, like his colleagues at CVS, including those who the Government is going to produce to you as witnesses, accepted the statement of an Ethics Commission opinion at face value.

Does asking whether ethics approval has been required suggest an honest intent, as I will be arguing, or a dishonest intent?

The next series of events or nonevents in this arrangement, this business relationship with Mr. Celona, are all public relations events. They are the TV shows which you have seen highlighted in Mr. Fein's presentation.

Now, the reality is, again, that Carlos Ortiz, who Mr. Petalas describes to you as a person with government affairs experience for decades, is first and foremost a lobbyist -- I'm sorry, first and foremost a pharmacist. He is trained as a pharmacist, and he is a pharmacist put in the government affairs unit.

The evidence will be, as has been suggested by

both Mr. Petalas and Mr. Fein, that the division within Mr. Kramer's area of responsibility is between community affairs, public relations on the one side and government affairs on the other.

While I ask you, and indeed by cutting down my argument, rely upon Mr. Fein, I do not want to suggest to you for a second that their perspectives on the relationship with Mr. Celona are one in the same.

My client, Mr. Ortiz, had reservations about the arrangement from the beginning. It's why he asked about Ethics Commission approval. You will hear that he questioned it on other occasions with respect to its wisdom.

But what you are not going to hear in this case is that there was lobbying of Mr. Celona during the period 2000 during that first year of interaction with -- under the terms of the contractual arrangement.

All of the interaction that you will hear about in 2000 is going to relate to the public relations side of things as was Mr. Kramer's desire.

There is a suggestion, the Government has suggested to you that the contract itself gives rise to an inference of a scheme. Again, focus on -- I'm going to ask you to pay attention to the evidence of what Mr. Ortiz did when he followed through to implement his

boss's desire to have the contract with John Celona.

He went to the legal department, and that, I would suggest, invites further inquiry. And I would ask you to use that filter with respect to going to the legal department.

And the evidence I will suggest is -- and I will ask you to pay careful attention to the testimony of Tina Egan. The testimony is going to be that there was a request for -- with respect to a contract, but the evidence is not going to be -- you're not going to hear from Tina Egan that Carlos Ortiz wanted to draft this contract on his own or anything of that nature.

And what you're going to hear from her with respect to what happens with the contract afterwards and whether it was properly returned to her, again, the evidence will be that Carlos Ortiz was somebody that she relied on and she would not have expected a contract to come back to her unless there were material changes. That's what the Government witness is going to say to you.

But the evidence is also going to be from the CVS employees from whom you are going to hear that you didn't even need a written contract in the first place.

If you wanted to make payments to a consultant or to somebody whose vote that you had bought, a

written contract is not necessarily what you would have needed at CVS.

So in January of 2001, you are going to see an e-mail chain that both Mr. Fein and Mr. Petalas have alluded to which asks -- starts with Mr. Celona asking for a renewal and with Mr. Ortiz pointing back to him and saying, Let's get together, Mr. Kramer wants to participate in that matter, and please come prepared to discuss what you have done as well as what you will do in the future.

Now, the Government wants to suggest that that's the very first time that our scope of services is discussed or laid out. But you're going to be looking at that written contract that was entered into in February of 2000; and that written contract, which will be a key exhibit for you, certainly lays out the scope of services.

And that scope of services, I would suggest to you, will be, the evidence will show, that the scope of services in that document is reflective of the proposal that Mr. Celona submitted in the first instance, and it is also consistent with the scope of services that Mr. Andrews subsequently writes in April of 2001.

Mr. Kramer made a decision following that meeting, not in a rush, not -- if you have an asset, as

Mr. Petalas suggested, if you bought an asset, the asset is asking for renewal, what are the words and actions of Mr. Kramer and Mr. Ortiz following the meeting that they had in January of -- January 25th of 2001? The words are, We'll get back to you following the decision. This man who has been described by both parties as a back-bencher is moving into leadership at some point in 2001. We'll get back to you.

The decision is made to renew or at least to continue the arrangement, and the evidence will be that Carlos Ortiz did not necessarily agree with the decision to continue the arrangement.

And the evidence with respect to that will come in the form of a gripe session, will be the phrase that you will hear, with Todd Andrews that comes shortly thereafter, which includes a number of matters, one about Mr. Kramer, his boss, one of which includes the decision to keep going with Mr. Celona.

And what you're going to hear from the witnesses is that Jack Kramer, perhaps a little vainly, but vanity is not a crime, liked going on the TV show, liked promoting the interests of CVS; but Carlos Ortiz had no responsibilities in that public relations area.

He was carrying forward his boss's desires, having been assured that the Ethics Commission approved

of the type of action that was going on, and was carrying through on a business decision with which he did not agree.

And in that gripe session, the two participants were Carlos Ortiz and Todd Andrews. And Mr. Andrews is going to testify that he, too, had an initial reaction based upon his federal experience that there might be a question of hiring a state legislator within a corporation. And the testimony will be that he, too, accepted at face value the notion that there was an Ethics Commission opinion.

Mr. Petalas suggests that the April 2001 scope of services not only is the first evidence of what it is that there was an engagement for but that it was written in case the newspapers ultimately found out about it.

The testimony that you will hear that I will ask you to pay attention to will be that when the inevitable occurred and an inquiry was made about the job, Mr. Andrews would have talking points with respect to the job.

Now, again, the point that I will ask you to use your filter on is that this gripe session is initiated by Mr. Ortiz. It is a session that he is having with the head spokesman for CVS, the person who interacts

with the public.

Once he makes his statements to that spokesperson, he loses control over the further dissemination of it.

So his actions, I will ultimately submit, the evidence with respect to his actions are that he is initiating disclosing, to use Mr. Fein's words, not hiding.

The Government also argues that in the administration of the contract, the steps that Mr. Ortiz took are suggestive of an improper intent.

The evidence will show, as Mr. Fein has suggested, that the contract was placed in a file by -- at Carlos Ortiz's direction, that written contract preserved. The payments, the multiple payments over the course of time, handled in the normal course of business through CVS personnel in multiple departments, including accounting and tax departments over which Mr. Ortiz had no control, and resulted ultimately in the issuance of 1099s to Mr. Celona which were sent to the Government. So, again, the regime is one of disclosure.

The contract is not written in a corporate name, when you will be examining it. That contract is in John Celona's name. Nothing done to hide who it is

that the individual checks were going to or the invoices were going to.

Mr. Celona's name appears on the contract, the invoices, the check request forms, the budget documents and the tax documents, all of which are going to be before you.

And the evidence is going to be that Mr. Ortiz told numerous people about the arrangement with Mr. Celona. They do include Mr. Andrews, the spokesman for the company. They do include Mr. Walsh. There was a discussion with Mr. Walsh, who is a lawyer and the company's chief lobbyist, and it does follow on the contact that Mr. Kramer had.

And he made it clear in his discussions with those other people at CVS from whom you will hear that he was not a fan of the agreement. He was candid in telling people within CVS that although he knew that Mr. Celona had Ethics Commission approval, he thought that the idea was a bad one. It had a bad appearance.

Not trained in public relations, he nevertheless thought that the public relations downside to having hired a senator when the inevitable occurred might outweigh the thing he really did not value, which was Mr. Kramer getting on TV to promote the CVS charities.

Now, it isn't that Mr. Ortiz devalues the

charities, the charitable Classic, the 5K. The evidence will be that he volunteered with respect to those events. But with respect to his job, those things had no value.

He never pretended within the company at all that the agreement was anything more than it was, and that is a PR-oriented agreement to enable Jack to perform his side of the job duties.

So at the end of the first year, he asks Mr. Celona to explain what it is he has said and done, and there are other interactions that come during the course of this contract that also you should pay attention to. I will ask you to pay attention to what he said and did with respect to it.

After that event, there will be testimony that Mr. Celona asked for a raise. He asked to take the thousand-dollar payment that he had been receiving, the Government tells you as an asset, and he asked to have it raised to $1,200.

And the evidence that you will see will be that that was the going rate that Mr. Celona charged for people appearing on the TV show that mattered to Mr. Kramer but not to Mr. Ortiz. And what you will hear is that Carlos responded to the asset, It's not budgeted, and that was that. Mr. Celona did not get

that modest $200 raise that he wanted.

And then the contractual arrangement continues. And it continues to a point in 2003, the evidence will suggest, when there is a reorganization within CVS and Carlos Ortiz is reassigned -- the responsibility for supervising Carlos Ortiz and government relations shifts, and it shifts from Jack Kramer as the executive vice president to an individual named Jim Smith from whom you will also hear.

And at the time of that reorganization when the first budget appears, Mr. Ortiz causes the contractual arrangement to be terminated. And he causes it to be terminated, the evidence will point out, because it really is not a government affairs expense at all. It is a public relations expense.

The Government would have you believe otherwise based upon communications that you will see that do relate to legislation.

Her Honor will be giving you all of the instructions on the law, and I'm not going to step on her toes one little bit. But I am going to suggest to you that as you evaluate whether my client formed a bad intent as opposed to whether he was acting as an earnest employee with an honest set of interest at every point in time, I'm going to ask you to look at

the legislation that is being discussed.

And that legislation, you've heard everything that is worth absorbing in a single morning with AWP. Again, the yin and the yang of that was whether you would have lower prices or more convenience. And that matter was resolved, the convenience matter was resolved when the independents came in.

Again, what were the actions of my client with respect to AWP post hiring Mr. Celona? No communication whatsoever with respect to AWP.

The other legislation sequentially that Mr. Petalas identified included first a pharmaceutical return bill. And it would have provided, and this is a 2001 bill that is after the renewal, it would have provided, as a requirement of licensure, manufacturers of drugs, medicines and poisons shall maintain adequate provisions to accept for the return of all recalled, withdrawn, damaged, excess or outdated drugs, medicines and poisons.

You will hear testimony on what the ask was of John Celona with respect to this legislation in 2001, and it was to allow the bill to be withdrawn, to be committed to further study. That will be the ask that you will hear from the government relations component.

The next bill that you will hear about I think

sequentially is the electronic prescription bill. And this legislation amended existing law that, quote, and this is from the law, "pertained to every licensed Rhode Island physician."

The legislation authorized electronic prescriptions in addition to the other forms of prescriptions that we use now to keep pace with that technology that I can't keep pace with. That's what this bill was.

The third bill was a Canadian pharmacies bill, and it would have provided that any pharmacy located in the province of Canada which maintains a valid, unexpired license, permit or registration to operate the pharmacy in compliance with the laws of said province shall be licensed in this state upon payment of a license fee as determined by the director and annually thereafter.

The evidence will show that CVS's position with respect to this bill was that it violated federal law if written.

All of these bills, we will argue to you at some point in time, fall within the circumstances that the judge told you it is permissible to communicate with your employees on and they can vote on.

The lens that I'm going to ask you to use, the

common sense lens as we go through things, will ask you at the end of the day whether Carlos Ortiz's communications on those bills, Carlos Ortiz's communications on other matters, were those of an honest, earnest employee or those of somebody intent on scheming to deprive the public of honest services.

Now, you will hear or read Carlos Ortiz's testimony, prior testimony, with respect to this -- these questions in this case. That testimony is in the past at the point in time as I have suggested to you, contemporaneous events, at the point in time when there was no motive to lie, shift position, et cetera.

You will hear from all of the -- virtually all of the witnesses pay homage to his earnesty, his earnestness. You will hear the merits of the positions. And at the end of the day, I, like my brothers, will be returning to you when we are in final argument and suggesting to you that you need to return a verdict of not guilty on all of these matters because the evidence will not support a conviction against my client. Please use that common sense as you listen to the witnesses.

Thank you, your Honor.

THE COURT: Thank you, Mr. Kiley.

Members of the jury, before I ask the Government

to call its first witness, there are two stipulations that the parties have entered into. A stipulation is simply an agreement between the parties that certain facts exist. And because there this agreement, there's no need for additional evidence to be submitted on these points.

In my final instructions to you, I'll tell you how to deal with stipulated facts. These are in written form and will be part of the record of exhibits that you will have at the end of the case; but for now I will read these stipulations to you, and I'll take them in reverse numerical order.

The first is Exhibit Number 363, and it is a stipulation that deals with exhibits in the case. I should tell you as an aside that this was something I suggested to the attorneys as a way of saving some time during the course of trial, and they have come to terms as to certain exhibits so that the exhibits I'm about to tell you about will come in as full exhibits without any objection.

The stipulation reads as follows: The United States of America and the Defendants, John Kramer and Carlos Ortiz, all stipulate and agree to the following. Government Exhibits 1 through 172 and 175 through 361 are authentic, admissible and should be admitted as

full exhibits; and Defendant's Exhibits Kramer A through Kramer L-5 are authentic, admissible and should be admitted as full exhibits.

So when those exhibits are introduced during the course of trial, there will not need to be any discussion about their authenticity and so on and so forth.

The next stipulation is Exhibit Number 362 in this case. It is entitled stipulation regarding any willing provider legislation, which you've heard about this morning, sometimes referred to as AWP.

The Defendants and the United States hereby agree and stipulate to the following facts. From 1995 until 2003, health insurance companies provided health care insurance to certain Rhode Island residents or subscribers through a variety of health care plans.

Those plans included a variety of prescription drug benefit programs which covered a portion of the subscriber's prescription drug costs.

The prescription drug benefit programs offered by the health insurance companies were serviced by two pharmacy networks, an open pharmacy network and a restricted pharmacy network.

In an open pharmacy network, subscribers could purchase prescription drugs at any pharmacy that met

certain minimum requirements. In a restricted pharmacy network, in order to get full reimbursement benefits, subscribers were required to fill prescriptions at pharmacies that were part of the network.

The pharmacies in a restricted pharmacy network expected an increase in sales volume and, therefore, agreed to fill prescriptions at lower prices. In turn, the health insurance companies charged lower insurance premiums to their subscribers whose prescription drug benefit program was serviced by a restricted pharmacy network.

In the Rhode Island General Assembly, legislation on any particular subject can be proposed in the House, the Senate or both in the same legislative session.

From 1999 to 2003, certain legislation called any willing provider or pharmacy freedom of choice legislation, which I'll refer to as AWP, was proposed in the Rhode Island General Assembly.

AWP, if enacted, would have prevented health insurance companies from denying any pharmacy the right to participate as a contracting provider in any policy or plan offered by the insurance company and would have mandated that any subscriber could fill his or her prescriptions at any pharmacy of his or her choice and

still receive full reimbursement benefits.

The proponents of AWP argued that the proposed legislation, if enacted, would have allowed individuals to fill their prescriptions at more pharmacies.

The opponents of AWP argued that the legislation would have resulted in higher prescription drug costs and, thus, higher insurance premiums because the discounts available through restricted networks would be eliminated.

From 1995 through 2003, CVS Pharmacy and Brooks Pharmacy opposed AWP. From 1995 through 2003, Stop & Shop and Walgreen's supported AWP. From 1995 until 1998, many independent Rhode Island pharmacies generally supported AWP.

Prior to 1999, Blue Cross/Blue Shield of Rhode Island offered a restricted pharmacy network that essentially included all CVS pharmacies, some Brooks pharmacies, and some Rhode Island independent pharmacies.

In May 1998, an agreement was reached such that all independent pharmacies and all Brooks pharmacies would be included in the Blue Cross/Blue Shield restricted network.

As of January 1st, 1999, therefore, Blue Cross/Blue Shield offered a restricted pharmacy network

that was expanded so that it included all CVS pharmacies, all Brooks pharmacies and all Rhode Island independent pharmacies.

As a result of this expansion, approximately 80 percent of all pharmacies in Rhode Island were included in the Blue Cross/Blue Shield restricted network, and none of the independent pharmacies supported AWP any longer.

In 1995, the House Committee on Corporations voted 11 to 3 in favor of AWP, and the full House voted 88 to 2 in favor of AWP.

In 1995, the Senate Committee on Corporations did not hold a vote on AWP; and, therefore, the proposed legislation did not come to a vote in the full Senate and, thus, did not pass in the Senate.

In 1996, the House Corporations Committee voted 9 to 0 in favor of AWP, and the full House voted 80 to 0 in favor of AWP.

In 1996, the Senate Corporations Committee did not hold a vote on AWP; and, therefore, the proposed legislation did not come to a vote in the full Senate and, thus, did not pass in the Senate.

In 1997, the House Corporations Committee voted 8 to 1 in favor of AWP, and the full House voted 84 to 0 in favor of AWP.

In 1997, the Senate Corporations Committee did not hold a vote on AWP; and, therefore, the proposed legislation did not come to a vote in the full Senate and, thus, did not pass in the Senate.

In 1998, the House Corporations Committee voted 10 to 1 in favor of AWP, and the full House voted 74 to 2 in favor of AWP.

In 1998, the Senate Corporations Committee voted 11 to 4 against AWP; and, therefore, the proposed legislation did not come to a vote in the full Senate and, thus, did not pass in the Senate.

In 1999, the House Corporations Committee voted 17 to 0 against AWP; and, therefore, the proposed legislation did not come to a vote in the full House and, thus, did not pass in the House.

In 1999, the Senate Corporations Committee voted 12 to 4 against AWP with two legislators absent for that vote; and, therefore, the proposed legislation did not come to a vote in the full Senate and, thus, did not pass in the Senate.

In the year 2000, the House Corporations Committee voted 12 to 2 against AWP; and, therefore, the proposed legislation did not come to a vote in the full House and, thus, did not pass in the House.

In the year 2000, the Senate Corporations

Committee voted 12 to 2 against AWP with two legislators absent for that vote; and, therefore, the proposed legislation did not come to a vote in the full Senate and, thus, did not pass in the Senate.

In the year 2001, neither the House Corporations Committee nor the Senate Corporations Committee held a vote on AWP; and, therefore, the proposed legislation did not come to a vote in either the full House or the full Senate and, thus, did not pass in either the House or the Senate.

In 2002, neither the House Corporations Committee nor the Senate Corporations Committee held a vote on AWP; and, therefore, the proposed legislation did not come to a vote in either the full House or the full Senate and, thus, did not pass in either the House or the Senate.

In 2003, the House Corporations Committee voted 12 to 0 in favor of AWP, and the full House voted 57 to 0 in favor of AWP. The House Health, Education and Welfare Committee voted 10 to 0 in favor of a different AWP bill, and the full House voted 62 to 0 in favor of that AWP bill.

In 2003, the Senate Committee on Commerce, Housing and Municipal Government, formerly the Senate Corporations Committee, did not hold a vote on AWP;

and, therefore, the proposed legislation did not come to a full vote -- did not come to a vote in the full Senate and, thus, did not pass in the Senate.

Mr. Dambruch.

MR. DAMBRUCH: Yes, your Honor. The Government's first witness is Mr. John Fegan.

**JOHN FEGAN, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: My name is John Fegan.

THE COURT: Mr. Fegan, you can move that microphone so that it's comfortable. You will need, however, to speak directly into it and to keep your voice up.

THE WITNESS: Okay. My name is John Fegan, F as in Frank, E-G-A-N, as Nancy.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, sir.
A. Good morning.
Q. Sir, by whom are you employed?
A. Stop & Shop.
Q. And how long have you been employed by Stop & Shop?
A. Twelve years.

Q. And in what capacity have you been employed by Stop & Shop?
A. First as vice president of pharmacy and, secondly, senior vice president of pharmacy.
Q. And are you a trained pharmacist?
A. Yes, I am.
Q. And have you practiced as a pharmacist?
A. Yes, I have.
Q. And where have you practiced?
A. I have practiced in the State of Illinois.
Q. Now, when was it that you joined Stop & Shop as an employee?
A. I joined Stop & Shop in 1996.
Q. And what was your title at that point in time?
A. At that particular moment, it was vice president of pharmacy.
Q. As vice president for pharmacy, what were your duties and responsibilities with Stop & Shop when you joined the company in 1996?
A. I had responsibility for everything associated with pharmacy, which included pharmaceutical buying, third-party prescription insurance plans, pharmacy marketing, pharmacy operations, professional services, which is legal compliance, and pharmacy systems.
Q. Did your responsibilities include any type of

oversight of Stop & Shop's pharmacy government affairs operation?
A. Yes, it did.
Q. And what was your specific duties and responsibilities in that regard?
A. As I previously said, professional services reported to me; and professional services was the arm of our operation that monitored all the activities associated with laws, regulations that were impacting pharmacy, compliance issues, anything that could impact us from a legal perspective.
Q. Now, sir, as a person who had some responsibility for government affairs, at some point did you become aware of a piece of legislation pending in Rhode Island known alternatively as any willing provider or pharmacy freedom of choice legislation?
A. Yes, I did.
Q. And when was it that you first became aware of the pendency of that particular form of legislation?
A. I actually first became aware of it in 1997.
Q. And in 1997, did you, on behalf of Stop & Shop, take any action or direct anyone to take any action with regard to that particular piece of legislation?
A. I did not. At that point it was still new enough, I didn't have enough background as to understand what

it really entailed.
Q. Did that approach change in 1998?
A. Yes, very much so. Yes, it did.
Q. And what did you do in 1998 different than your approach in 1997?
A. In 1998, we began the formal lobbying effort to work with the legislators in the State of Rhode Island to have the bill pass that would allow us to fill prescriptions.
Q. Now, when you say you began a formal lobbying effort, what steps did you take in that regard?
A. We actually got together through -- with legal counsel, got together with a number of organizations in the state and began discussing our approach to it and how we would approach the legislators.
It was kind of an informal approach at the time, getting together, but we put on a full-court press as a company to go out and talk to the individual legislators.
Q. And did you retain any lobbying consultants or contract lobbyists in furtherance of that effort?
A. Yes, we did. We had a group here out of Rhode Island that we contracted with.
Q. Now, you mentioned that as part of your efforts in 1998 you reached out to members of the Rhode Island

General Assembly; correct?
A. Correct.
Q. And did that include members of the Rhode Island state Senate?
A. Yes, it did.
Q. And in that effort, did you have any contact with a person by the name of John Celona?
A. Yes, we did.
Q. And can you please describe the nature and substance of your contact with Mr. Celona in 1998.
A. In 1998, we -- through the lobbying process, we identified four individuals that were sympathetic to the any willing provider, pharmacy freedom of choice initiative, and Senator Celona was one of those people.
Q. And other than just being a member of the state Senate, did Senator Celona hold or belong to a particular body that was of interest to you in your effort?
A. Yes, he did.
Q. And what was that, sir?
A. That was the corporations council, the group that was hearing the bill every year that it became available.
Q. Now, sir, as you began to promote the legislation in 1998, were there any other organizations or groups

allied with you in that effort?
A. Yes, there were. There were several groups.
Q. And who were they?
A. Walgreen's was part of the group. We had a couple of independents that were part of the group. We had reached out to a group that actually is no longer here, and I can't remember the name of the drug company. It was a small independent operator, four or five stores.
But we had reached out to Wal-Mart, we had reached out to Shaw's, people that were not able to fill prescriptions in the state.
Q. And would it be fair to say at that time Stop & Shop was not part of the restricted network?
A. Stop & Shop was not part of the restricted network.
Q. Now, how about your opponents, did you become aware of what corporate entities or organizations were aligned with the other side working to defeat any willing provider legislation?
A. Yes, I did.
Q. And who were they?
A. CVS was the main proponent.
Q. Now, you mentioned that among the senators that you had contact with, one was John Celona. Can you please describe for us what was the nature and

substance of your contact and/or conversations with Mr. Celona in 1998.
A. Well, again, because he was an advocate of pharmacy freedom of choice, we made appointments, we called on him, we had regular meetings with him, asked for advice, asked for counsel as, you know, we maneuvered through the maze of the legislature, the Senate side.
And so it was meetings. I can't remember particular conversations that took place, but we met regularly.
Q. Now, you said that he was an advocate. How did you become aware that Mr. Celona was an advocate of the any willing provider legislation?
A. Well, in 1998, again, through the lobbying efforts and talking to him, we -- you know, it was brought to our attention.
Q. Now, did you follow the -- sort of the track or the routing of the any willing provider legislation through the state legislature in 1998?
A. Yes, we did.
Q. And what, if anything, happened before the House of Representatives that year?
A. In the House, Brian Patrick Kennedy was the head of the committee that was hearing it, and Brian Patrick

Kennedy was a strong advocate. And it always, when it came before the House side and was heard and testimony was given, it always passed on the House side out of that committee.

And then from there it had to go to the Senate side to the committee to be heard, and that's the corporations council that you just referenced earlier.

Q. Now, at some point did you become aware whether or not the Senate Corporations Committee scheduled a hearing on any willing provider legislation in 1998?

A. In 1998, because of the advocacy and the lobbying that we had gone through, they did schedule a hearing.

Q. And did you attend that hearing?

A. Yes, I did.

Q. And were you present for the entire hearing on any willing provider before the Corporations Committee that year, that being 1998?

A. Yes, I was.

Q. And did you make any observations as to which senators were present for the hearing?

A. As I remember, the best of my recollection, there were 12 senators at the hearing, and they were all present.

Q. And did that include Senator John Celona?

A. Yes, it did.

Q. And what did you observe of Senator John Celona during the course of that particular hearing?
A. Senator Celona was one of four senators that voted in favor of the legislation.
Q. Now, as well as observing the vote in that -- on that particular day, did you witness people presenting testimony during the hearing?
A. Yes, I did.
Q. And were there any representatives of CVS present who testified during the course of that hearing?
A. Yes, there were.
Q. And who was present and testified on behalf of CVS on that particular day of the hearing?
A. Carlos Ortiz was a person that testified that I remembered that I knew. There were other people that advocated the position. I can't be certain that they were from CVS.
Q. Now, how did you know Carlos Ortiz?
A. Being from the pharmacy industry, Carlos was well recognized within our industry.
Q. And he was someone who was present and testified at that hearing?
A. Yes. Correct.
Q. And what position did he take on that day when he testified about the legislation?

A. Carlos was against the legislation.
Q. And was Mr. Celona present for that testimony?
A. I believe he was.
Q. And what was the ultimate outcome of the hearing and vote that year?
A. The vote was 8 to 4, as I remember, and it was killed in committee.
Q. And on what side did Mr. Celona vote?
A. Mr. Celona voted in favor.
Q. Now, did Stop & Shop renew its efforts in support of any willing provider legislation in 1999?
A. Yes, we did.
Q. And what type of efforts did you make on behalf of Stop & Shop in the 1999 legislative session?
A. We became part of a larger group, the Coalition For Pharmacy Freedom of Choice. We actually hired an outside public relations group, McDermott/O'Neil, and basically had the same group of retailers involved in order to do a marketing and a lobbying effort.
Q. And did you become aware of the position that CVS was taking during the 1999 legislative session on any willing provider?
A. Yes. It was the same as 1998. They were opposed to it.
Q. Did you again have contact with Mr. Celona during

the 1999 legislative session on the any willing provider issue?
A. Yes, we did.
Q. And can you please describe the nature of that contact that occurred in 1999.
A. It was very similar to what occurred in 1998. We went in and presented our case. Again, he indicated he was still an advocate of any willing provider, pharmacy freedom of choice, and was telling us we were doing a good job, keep up the good work, giving us hints. And so it was basically a lobbying effort with some advice coming from him.
Q. And were there actually bills introduced before the state Senate in 1999 on the any willing provider issue?
A. Yes, there were.
Q. Are you aware of who the sponsors or at least some of the sponsors of those bills were?
A. I was, and Senator Celona was one of those -- sponsoring one of those bills.
Q. Did you become aware about whether or not Senator Celona made any public statements or -- et cetera, about any willing provider?
A. You know, it's tough to answer that. I can't -- at this point in time can't be certain. I don't

remember reading anything, but I'm almost certain he would have said something; but I don't remember anything particular.
Q. Now, again, did the legislation, the any willing provider legislation in 1999, did it proceed at some point to a hearing before the Senate Corporations Committee?
A. Yes, it did.
Q. Were you present for that hearing?
A. Yes, I was.
Q. And can you describe for us what went on at that particular hearing.
A. This was a very significant hearing. It was held -- I can't remember which room it was in, but it was a huge room. Busloads of people had been brought in to rally on behalf of the hearing -- the legislation, and testimony went on -- it was televised in the State of Rhode Island. The testimony went on late into the night.
Q. And were you present for that testimony?
A. Yes, I was.
Q. And did anyone testify on behalf of CVS?
A. Yes, they did.
Q. And who was that?
A. Carlos Ortiz testified.

Q. And when Mr. Ortiz testified in 1999, what position did he advocate on the any willing provider legislation?
A. He was opposed.
Q. Now, at some point after the televised hearing had taken place, did the committee vote on the legislation?
A. Yes. The vote was taken at a later date because of the lateness of the testimony that took place.
Q. And were you also present for the committee session when that vote you've just referred to was taken?
A. Yes, I was.
Q. And what was the outcome of that vote?
A. The vote was that -- it was defeated.
Q. Did Mr. Celona participate in voting on the bill before the Corporations Committee that year?
A. Yes, he did.
Q. And how did he vote?
A. He voted in favor of the bill.
Q. Did you once again renew your efforts in support of any willing provider legislation in the year 2000?
A. In the year 2000, our efforts were directed more on a lawsuit. We still had the effort to lobby, but it wasn't in depth as it was back in 1998, 1999. We had instituted a lawsuit, and we felt that was enough.

Q. Did you, however, still continue to interact with members of the Rhode Island legislature, state legislature on this issue?
A. Yes.
Q. Did that include Senator Celona?
A. Yes.
Q. And what were the nature and extent of your contacts with Senator Celona in 2000 on this issue?
A. Senator Celona had introduced a bill, and we felt very good that maybe we would have a better chance this year; but, again, we didn't go into the in-depth lobbying that we had the previous year.
Q. Now, at some point in time, did AWP legislation come up for consideration before the Senate Cooperations Committee in the year 2000?
A. Yes, it did.
Q. And were you present for that -- those proceedings?
A. Yes, I was.
Q. And did that include a hearing again?
A. Yes, it was. It did.
Q. And was there anyone present to testify on behalf of CVS in the year 2000?
A. Yes, there was.
Q. And do you recall who that was?

A. Carlos Ortiz.
Q. And what position, if any, did Mr. Ortiz take on any willing provider legislation in his testimony on behalf of CVS?
A. He was opposed to it.
Q. Was there a vote taken before the Senate Corporations Committee in the year 2000?
A. Yes, there was.
Q. And what was the result of that vote?
A. The vote was -- it was overridden. It was defeated.
Q. Did Senator Celona participate in that vote?
A. No, he did not.
Q. Were you present for the entire committee hearing or meeting on that particular day?
A. Yes, I was.
Q. When you first arrived and began to observe the proceedings, was Senator Celona present?
A. Yes, he was.
Q. What happened?
A. It came time for the vote, and his papers were at his space, and he wasn't there.
Q. Had he participated in other votes and committee matters before the AWP vote came up?
A. I can't answer that because we weren't in the room

for any other votes on any other matters.
Q. But he was there when you first arrived?
A. Yes, he was.
Q. And when the vote came up, was he present?
A. No, he was not.
Q. Did he participate?
A. No, he did not.
Q. Now, you mentioned that the committee again voted the piece of legislation down in 2000 as well?
A. Correct.
Q. Did you have any further involvement in promoting any willing provider legislation in the years 2001, 2 or 3?
A. We did not.
Q. Now, you mentioned that you had some professional interaction with Mr. Ortiz through your -- the fact that you're both in the pharmacy business?
A. That's correct.
Q. And during the course of these various -- the proceedings in the year 2000, did you have contact and communication with him while you were up at the State House and involved in your lobbying efforts?
A. If I saw Carlos, I would always say hi; but we did not talk about the case.
Q. And did you have contacts, professional contacts

with him subsequent to the year 2000 in other areas?
A. Yes, I did.
Q. And at any point in time did Mr. Ortiz ever mention to you that CVS had retained Mr. Celona as a paid consultant?
A. He did not.
MR. DAMBRUCH: May I have a moment, your Honor?
(Pause)
MR. DAMBRUCH: Your Honor, no further questions at this time.
THE COURT: Cross.

**CROSS-EXAMINATION**

**BY MR. DiBIASE**:
Q. Good afternoon, Mr. Fegan.
A. Good afternoon.
Q. Mr. Fegan, I would just like to very briefly -- excuse me. I would like to just very briefly touch upon the circumstances that you found when you first came to CVS -- to Stop & Shop in 1996 in terms of these restricted networks.
Is it fair to say that one of the first problems that you had to deal with when you came to Stop & Shop was its relationship with restricted networks that had been formed by two health care insurance companies in Rhode Island?

A. No, that's not quite correct. It wasn't one of the first things I had to deal with because it did not exist when I first got there.
Q. Well, was one of the first thing the history of Stop & Shop's relationship with United Health as it related to a 1995 RFP that United put out?
A. That is correct.
Q. So you first found out or became aware of the situation where United in 1995 sent out an RFP for pharmacies to participate in their insurance program; is that correct?
A. That's correct.
Q. And in response to that RFP, Stop & Shop felt that the reimbursement rates that were being proposed by United were too low, and Stop & Shop decided that they were not going to participate in the plan; is that right?
A. That's correct.
Q. So basically you opted out of United, not you but Stop & Shop, in 1995?
A. That's correct.
Q. And shortly thereafter or about the same time, I believe you've indicated in the past, Blue Cross decided to go with a restricted network, and it put out an RFP for any pharmacies that would be interested in

providing service to Blue Cross members; is that right?
A. Not quite, to the best of my memory.
Q. I'm sorry?
A. Not quite. It didn't happen that way, to the best of my memory.
Q. Well, what is the best of your memory?
A. As I remember, Blue Cross/Blue Shield was introducing a new program that was a restricted network. It was very slow to start, and its traditional Blue Cross/Blue Shield program was still available to the majority of the people in the State of Rhode Island.
Q. But it did put out an RFP; is that correct?
A. In 1997.
Q. Right. And Stop & Shop elected not to respond to that RFP; isn't that correct?
A. That's not correct. We responded to Blue Cross/Blue Shield and asked if we could partner with people.
Q. Before you did that, though, Mr. Fegan, you did not or Stop & Shop decided that it only had 15 stores and could not service 750,000 Rhode Island residents; isn't that right?
A. That's correct.
Q. So you couldn't bid on that part of the Blue Cross

RFP; is that correct?
A. That is correct.
Q. And what you did next is you went to, for lack of a better term, kind after middleman entity which was going to be a prescription benefits manager or they were trying to become the prescription benefits manager for Blue Cross; is that right?
A. That is correct.
Q. And you went to PharaCare and indicated that you wanted to partner with them, put in a bid so that you could then get into that Blue Cross network?
A. That is correct.
Q. And you also did another thing. One of the things you realized when you came in was that that was a mistake to opt out of United; isn't that correct?
A. It was a mistake to opt out of United, yes.
Q. And you went to United and you said, Look, I think we made a mistake, we now would like to come into the plan; is that right?
A. We had done that several times since 1996, yes.
Q. And each time they told you, No, we don't need any more members?
A. We do not need any more members, correct.
Q. So basically by doing all of that, you exhausted whatever business solutions you could come up with from

what you inherited when you came to Stop & Shop in 1995; is that right?
A. Correct.
Q. So now you turned to the Rhode Island legislature for a possible legislative solution to the problem of Stop & Shop and these restricted networks; is that right?
A. Correct.
Q. And the first solution that you saw or the primary solution was the AWP legislation that had been advanced for a few years particularly by Representative Brian Patrick Kennedy; correct?
A. Yes.
Q. And Kennedy had been taking it upon himself in '96 and '97 to try to get AWP passed; correct?
A. Yes.
Q. But the history, as you've indicated on direct examination, of AWP in Rhode Island for the years prior to you coming here in that '96, '97 time frame was that it would pass the House and couldn't get a hearing in the Senate, so essentially it died in the Senate; is that correct?
A. Yes.
Q. So you made a decision at that point, and I believe these are your words. You decided let's take

what Brian P. Kennedy had started, and let's see what we can do to put some oomph behind it. Does that sound familiar?
A. It doesn't, but the intent is there.
Q. Okay. And what you did is you began the process of lobbying senators because that's where the issues were going to be; is that right?
A. Correct.
Q. And I believe, again, in your words, you found four allies in the Senate?
A. Yes.
Q. And one of those allies was Senator Celona?
A. Yes.
Q. And as I understand it, as you discussed in direct examination, that in 1998, although you began to learn about this in '97, it wasn't until 1998 that, in your words, you put on a full-court press?
A. That is correct.
Q. And that press was to assist this legislator in trying to get AWP now into the Senate and hopefully passed as law; correct?
A. That is correct.
Q. Now, until 1998, did Stop & Shop have any contract lobbyists?
A. I can't answer that. I don't know for a fact if

they did.

Q. In 1998, did you hire two lobbyists?

A. Yes, we did.

Q. Who were they?

A. It was Bill Dolan's group, the Brown, Rudnick group.

Q. And in addition to hiring those lobbyists as part of this full-court press, you began to -- either you or members of Stop & Shop began to go to senior centers; correct?

A. That is correct.

Q. And the seniors were an important part of the community for AWP, not only because of their political support, but this was an important customer base; isn't that right?

A. Yes.

Q. And another important customer base was the patient care advocates, and you lobbied those folks as well for AWP; correct?

A. Yes, we did.

Q. And you created some outreach programs as part of this full-court press in '98; correct?

A. Yes, we did.

Q. Could you describe them for us.

A. Well, we basically, as you just said, we reached

out to people that were using prescription programs or getting prescriptions filled, the senior centers, the public that had said that they were being disadvantaged by not being able to go to certain pharmacies near their home. Anyone that basically let us know about the issue, we reached out to them.

Q. And in addition to that, you would also tell these folks to write to their legislators to support the legislation?

A. Yes, we did.

Q. Now, as you were doing all of this, did you pay attention to what piece of legislation was actually progressing through the legislature that year?

A. Yes, we did.

Q. And what piece of legislation was progressing?

A. Well, the any willing provider.

Q. You indicated that Senator Celona sponsored a bill in '98.

A. There were several bills.

Q. Which was the one that ultimately got a vote?

A. I don't know that.

MR. DiBIASE: Your Honor, may I have a moment, please?

(Pause)

MR. DiBIASE: Your Honor, may the witness be

shown Government Exhibit 1.
Q. Would you take a moment, Mr. Fegan, and I believe it would be the second page of that exhibit, if you could just look to the top portion, just study it for a moment. Can you tell us who sponsored that bill.
A. Kennedy.
Q. Okay. And if you continue to go through the pages of that exhibit, I would direct your attention to what appears to be the last page of the exhibit. Does that reflect the vote, sir?
A. To the best of my recollection, yes.
Q. And is that, to the best of your recollection, how the vote did go?
A. Yes, it was.
Q. Thank you. So to recap, as a result of all the efforts you put behind Brian Patrick Kennedy, the legislative process was moved to the point that for the first time a bill, his bill, actually got to a hearing in the Senate Corps Committee; is that right?
A. For the first time it did, yes.
Q. You personally were very heavily involved in the process?
A. I was.
Q. As you indicated, you were there when they voted, you were in the committee room; but despite all those

efforts, the legislation did fail?
A. Correct.
Q. But the one person who did, in a sense, benefit and produce something for you was Brian Patrick Kennedy whose bill got to be heard in the Senate?
A. For many times he has sponsored many, and this one got heard finally.
Q. I'd like to direct your attention now to the next thing you did after the defeat of Kennedy's bill in the Senate. Isn't it fair to say that you immediately began to plan strategy for the 1999 legislative session?
A. That is correct.
Q. And you were -- although it was defeated, you wanted to try again because you were optimistic; fair enough?
A. Fair enough.
Q. And one of the things that you did, and you touched on it on direct examination, is you put together a coalition that you called the Coalition For Freedom of Choice; correct?
A. Of Pharmacy Freedom of Choice.
Q. And that included Walgreen's, yourself, and any other people that weren't in the -- were outside the network; correct?

A. That is correct.
Q. You also hired a marketing firm called the McDermott/O'Neil?
A. Correct.
Q. And they did for you in advertising certain things. They produced television commercials for AWP for you; is that correct?
A. Yes.
Q. They bought radio time?
A. Yes.
Q. They took ads out or you took ads out in the Providence Journal?
A. Yes.
Q. You had billboards put up for AWP?
A. Yes.
Q. Again, you did the outreach type of contacts?
A. Yes.
Q. And the thing that was added this time is busloads of people that you could get to the State House to show support for AWP; correct?
A. Correct.
Q. And you started that full-blown approach as soon as the legislation started to be heard in January of that year; correct?
A. That is correct.

Q. Now, in terms of legislation on AWP in 1999, there were both House bills and Senate bills introduced; correct?
A. I'm assuming the House bills. I don't know the specifics; but yes, in order to get to the Senate, they had to have it.
Q. Well, you indicated that Senator Celona introduced the bill?
A. Yes, that is correct.
Q. And his bill got a hearing in the Senate Cooperations Committee that year; correct?
A. Correct.
Q. And on the evening of April 27th, that hearing was held in what you described as kind of a giant conference room?
A. Yes, that's correct.
Q. It was televised, many people spoke; is that right?
A. That is correct.
Q. And at the end of that session, what happened?
A. At the end of the session, the vote was delayed because of the lateness of the testimony, and the committee was going to be convened in a week or two.
Q. What happened when it reconvened?
A. The hearing took place, and it was defeated.

Q. Defeated by a vote of 12 to 4; is that correct?
A. I don't remember exactly, but yes.
Q. Sounds right?
A. Yes.
Q. Now, directing your attention to the 1999 House legislative piece of this, do you know whether Brian Patrick Kennedy sponsored or co-sponsored any AWP legislation for you that year?
A. I don't remember.
Q. Do you recall if there were any hearings held on any AWP bills in 1999?
A. Yes, there were.
Q. And do you know what the votes were on the AWP in the House in 1999?
A. I honestly don't remember. I can't tell you.

MR. DiBIASE: Your Honor, I'd like to have the following exhibits, which I believe the Government has stipulated to as full at this point, presented to the witness, M-5, N-5, 0-5.

THE CLERK: M-5?

MR. DiBIASE: M-5.

THE COURT: These are not part of the stipulation, but you're saying the Government has --

MR. DAMBRUCH: Yes, your Honor. Mr. DiBiase inquired before the start, and I agreed that we would

stipulate to the admissibility of these exhibits as well. It was just after we had prepared and signed the stipulation.

THE COURT: Okay. So Kramer M-5, N-5 and 0-5 are also admitted as full exhibits.

MR. DAMBRUCH: Yes, your Honor.

(Defendant Kramer Exhibits M-5, N-5 and O-5 were admitted in full)

MR. DiBIASE: There's three more, your Honor.

THE CLERK: I only go up to L-5 here.

MR. DiBIASE: I have copies, your Honor.

THE CLERK: I need originals as well.

MR. DiBIASE: Perhaps I can begin with these, your Honor, and maybe we can solve the problem.

THE COURT: Okay.

MR. DiBIASE: May the witness be shown the exhibits.

THE CLERK: If they're full, he can show them.

Q. Directing your attention to Exhibit M-5, can you see that, Mr. Fegan?

A. Yes, I can.

Q. And do you recognize that as a House bill for 1999?

A. Yes, it is.

Q. Can you see who introduced the bill?

A. Yes.
Q. And is it fair to say that Representative Kennedy is not one of the sponsors or co-sponsors of that bill?
A. Yes.
Q. And if we could go to N-5 next. This is a bad copy, but can you roughly make out what it is, sir?
A. It's tough to read it, but it's the vote -- it looks like the vote.
Q. It looks like the vote, and it looks like the vote's for no passage; is that correct?
A. It does.
Q. And who's the chairperson who voted no passage at the top of that list?
A. Brian Kennedy.
Q. Thank you, sir. So if we could go back to the night of the vote or the -- the night of the vote of April 27th, you knew before that vote was taken that your AWP bill had already been unanimously defeated in the House; isn't that right?
A. I honestly don't remember that.
Q. Well, the fact of the matter is it was defeated unanimously?
A. I saw that, yes.
Q. And you had been following all of this very carefully. You were attending sessions of the

legislature. You were monitoring this situation; isn't that right?
A. In the Senate.
Q. And you didn't look to the House bill that had passed a year before?
A. I did not personally.
Q. Well, one of the things that was clear at the end of all of this is that the legislative leader behind whom you, Stop & Shop, had placed its support not only didn't sponsor AWP legislation, he actually voted against it in 1999; isn't that right?
A. From what I just saw, yes.
Q. For all intents and purpose, this legislation was dead; isn't that right?
A. I don't know that.
Q. From your perspective, was it not dead?
A. Not going into the Senate and talking to the Senate, no.
Q. Isn't it a fact that it was so dead that within days of the vote you and Stop & Shop decided to pursue a litigation strategy to get Stop & Shop into the Blue Cross and United network?
A. That is correct.
MR. DiBIASE: I think the clerk has these, your Honor. I would ask for Exhibits W-5 and Y-5, please.

THE CLERK: Are these coming in full?

MR. DiBIASE: No. May I have a moment, please?

(Pause)

MR. DiBIASE: Your Honor, I believe the Government has no objection to either of these exhibits.

MR. DAMBRUCH: That's correct, your Honor.

THE COURT: All right. So Kramer W-5 and Y-5 are full.

(Defendant Kramer Exhibits W-5 and Y-5 were admitted in full)

MR. DiBIASE: Your Honor, may the witness be shown Exhibit W-5, please.

Q. Have you had a chance to take a look at that letter, sir? Take your time.

A. Yes. I've read it.

Q. Who is Peter Phillipes?

A. Peter Phillipes was our chief general counsel at Stop & Shop.

Q. And I see that you are cc'd on this document; is that correct?

A. That is correct.

Q. And is it fair to say that you had some role in the decision making that's part of this letter?

A. Yes. Correct.

Q. In this letter, which was drafted on May 3rd, 1999, only a few days after the vote, is it not the conclusion of your group that now having spent five years trying to obtain legislative relief, it no longer appears to us that this is a viable tactic? Is that what the group felt?
A. That's what the group felt. We tried to do the lobbying first. That was our first feeling to get it done successfully. And absent that, we thought we had to go the more severe route.
Q. And is it still your testimony that you feel that the legislation was not dead in 1999 in spite of this comment?
A. No. You asked me -- I understood the question, and I stand corrected, that was I aware -- because of the vote in the House, was I aware that legislation was dead, and I said no because we were still focused on the Senate.
Q. Now that it got defeated in the Senate, you knew it was dead; right?
A. Then I knew it was dead, yes.
Q. And you went ahead, and you actually initiated the lawsuit.
MR. DiBIASE: And may the witness be shown Y-5, please.

Q. And is it fair to say that you were one of the people that sent this memo out to all Rhode Island pharmacists and store managers?
A. That is correct.
Q. And is it also fair to say that the reason you sent it out is that day you had started the lawsuit?
A. That is correct.
Q. And you focused substantial energies now as a corporate entity on that antitrust lawsuit; correct?
A. Yes.
Q. And you put very little effort, if any, into the State House?
A. That is correct.
Q. I'd like to call your attention now to the 2000 legislative session. You testified about that in direct examination, and I believe you indicated that you thought Senator Celona had sponsored legislation for AWP for you that year; is that correct?
A. I thought he did, yes.
MR. DiBIASE: Your Honor, may we have Exhibit G-5, please. Your Honor, this is a full exhibit, I believe.
THE COURT: G-5 is full by virtue of the stipulation.
MR. DiBIASE: May that be published, also, your

Honor?

THE COURT: It may.

Q. Take a moment, Mr. Fegan. If you don't mind, could you look at the second page of that exhibit. And can you tell from that page who sponsored -- first of all, can you tell what it is?

A. Which one am I looking at, the paper document or the computer?

Q. Either. Whatever's better for you. I think you can see it on the computer now.

A. This is different.

Q. It's different?

A. That is not here.

Q. I think you're right. Well, let's go to the one that is on the screen. Who introduced that bill?

A. Senator Patrick --

THE COURT: First let's figure out what it is.

MR. DiBIASE: Thank you, your Honor.

Q. Directing your attention to the computer now and not the exhibit, can you tell us what this appears to be to you?

A. This is a bill that was introduced, Senate 2774, introduced on -- relating to business and professions, pharmacies, freedom of choice.

Q. So it's freedom of choice legislation, and it's

February 10th of 2000; is that correct?
A. That is correct.
Q. And who's the sponsor?
A. Patrick T. McDonald.
THE COURT: Mr. DiBiase, I'm sorry, what exhibit number is it?
MR. DiBIASE: I have it as Government's 5, but --
THE COURT: Oh, wait a minute.
THE CLERK: The problem is you called it G-5.
THE COURT: You called it G-5. That's Kramer G-5.
MR. DiBIASE: Oh, I'm sorry.
MR. DAMBRUCH: I believe it's Government Exhibit 5, Judge.
THE COURT: So it's just 5.
MR. DAMBRUCH: Just 5, yes.
THE COURT: Okay. And that is a full exhibit?
MR. DiBIASE: Yes.
Q. So going back to my question, this piece of any willing provider legislation was not sponsored by Senator Celona?
A. It was not.
Q. It was sponsored by Patrick McDonald; is that correct?

A. That is correct.
Q. Now, can we agree on this, that the legislature begins in January of 2000 that year?
A. Correct.
Q. And is it fair to say that at some point before that the bill had to be filed; correct?
A. Yes.
Q. So before you went into the session in 2000, you had to know that Senator Celona was no longer sponsoring or co-sponsoring legislation for you; isn't that right?
A. No.
Q. Well, where did he sponsor legislation for you in 2000?
A. I thought he had, very honestly.
Q. You were mistaken?
A. I'm sorry?
Q. You were mistaken?
A. My mistake.
Q. Probably due to the fact that now you had concentrated all your efforts on that lawsuit in 1999 and this was getting lesser consideration by you; is that right?
MR. DAMBRUCH: Objection, your Honor.
MR. DiBIASE: I'll withdraw the question, your

Honor.

Q. With regard to the House in the year 2000, do you know whether or not any legislation was submitted for AWP that year?

A. I honestly don't remember.

MR. DiBIASE: May I have a moment, your Honor?

(Pause)

MR. DiBIASE: I don't know if the clerk has this, Kramer's R-5.

THE CLERK: No. I go up to L-5. That's all I go up to.

MR. DiBIASE: That's fine, your Honor. I'll move on to something else.

Q. Do you have any general recollection as to whether there was any success in the House for AWP legislation in the year 2000?

A. I honestly don't remember.

Q. Well, obviously nothing got passed that year.

A. Nothing got passed.

Q. Now, in the year 1998 after the effort that was put on in support of your legislation by Senator Celona, did you send him a letter on May 22nd, 1998?

MR. DiBIASE: Your Honor, may I have a moment, please.

(Pause)

Q. I'm sorry if I distracted you. Do you recall whether or not you sent a letter to Senator Celona on May 22, 1998?
A. We sent a letter to Senator Celona, Senator Issa, Senator Palazzo and Senator Montalbano.
MR. DiBIASE: Your Honor, this is a full exhibit. May it be shown to the witness? This is Government 25.
THE COURT: Do you want this up on the screen, Mr. DiBiase?
MR. DiBIASE: Oh, please.
Q. Do you recognize that letter, sir?
A. I have something different in front of me.
Q. Would you go to the computer.
A. Okay. Yes.
Q. Do you recognize that to be the letter that you sent to him?
A. Yes.
MR. DiBIASE: Your Honor, I would ask that this be marked as whatever the next Kramer exhibit is.
THE CLERK: I'm not sure what it is. As I said, I only go up to L-5.
MR. DiBIASE: Can we take the next letter?
THE CLERK: This says U-5. Is that what you want?

MR. DiBIASE: U-5.

THE COURT: What's the number on it, Mr. DiBiase?

MR. DiBIASE: U-5, your Honor.

THE COURT: Kramer U-5. And is this coming in as a full exhibit?

MR. DAMBRUCH: May I have a moment, your Honor?

(Pause)

MR. DiBIASE: Your Honor, may we approach the bench for a moment?

THE COURT: You may. Would you step down, please.

(Bench conference held on the record)

MR. DAMBRUCH: Just for the record, the letter that was just shown to the witness is not Government 25.

MR. DiBIASE: What he had physically was not Government 25. What was on the computer was a different --

MR. DAMBRUCH: It's a different document. It's not been marked as an exhibit. So I'm just concerned that -- you know, I have no problem as to its admissibility. I just want the record to be clear that it's something else.

THE COURT: What number is it?

MR. DAMBRUCH: It's not Government anything.
MR. DiBIASE: It is your exhibit.
MR. DAMBRUCH: Initially when we sent the --
THE COURT: She can't hear you.
MR. DAMBRUCH: I'm sorry. I'm talking to them. There were questions about copies of exhibits, and I informed defense counsel, I believe it was Mr. Fein, that we had struck that from our list. In the final list we sent and the notebooks we sent, 25 is actually a press release from John Celona.
THE COURT: Okay.
MR. DiBIASE: Your Honor, may I make a suggestion? The witness saw the correct letter, and the jury saw the letter that he sent to Celona thanking him. Perhaps at the break we can get with John and do some kind of correction.
THE COURT: I think that's what you need to do. Can you move on with this witness?
MR. DiBIASE: Oh, yes. I only have two or three more questions.
MR. DAMBRUCH: I have no problem with it being marked.
(End of bench conference)
THE COURT: Members of the jury, there's a little bit of confusion over the correct identifying

number for the exhibit that you saw on the screen. I've asked counsel to deal with that after 1:00, and they will do that, and tomorrow we'll clear that up for you so that you'll have the correct identifying number. And Mr. DiBiase is going to continue with his cross-examination.

Q. I only have a few more questions, Mr. Fegan, and I apologize for the confusion; but I think the one thing that we did see and what you acknowledged was that in May, May 22nd, you sent a letter to Senator Celona and some other folks thanking them for their effort in this 1998 legislative season; is that correct?

A. That is correct.

Q. Now, I believe you should have another document in front of you.

MR. DiBIASE: And I believe this is agreed to as a full exhibit, your Honor.

THE COURT: And do we have a number on that?

MR. DiBIASE: U-5, your Honor.

THE COURT: This is Kramer U-5.

(Defendant Kramer Exhibit U-5 was admitted in full)

Q. They match this time; is that correct?

THE COURT: And this is a full exhibit, you said?

MR. DiBIASE: It's a full exhibit, yes, your Honor.
A. It matches.
Q. Do you recognize that document?
A. I don't remember it, but I see it.
Q. So it looks like on May 22nd, 1998, you sent a letter to John Celona thanking him for his efforts on your behalf; and on June 16th, 1998, he sends you this letter indicating that he's running for reelection and he's soliciting a campaign contribution from you; is that correct?
A. That's correct.
MR. DiBIASE: May the witness now be shown Kramer's X-5.
THE CLERK: Is this full?
MR. DiBIASE: I believe this is full, also.
THE COURT: Well, wait a second. Yes, Mr. Dambruch?
MR. DAMBRUCH: No objection to this coming in full, Judge.
THE COURT: So Kramer X-5 is full.
(Defendant Kramer Exhibit X-5 was admitted in full)
Q. And do you recognize this letter?
A. I honestly don't remember, but that is my

signature.
Q. And what it is is that he sent you a solicitation letter for a campaign contribution, and you sent him back a letter and a check; is that correct?
A. Correct.
Q. And when you wrote the letter and sent the check, you certainly weren't doing anything wrong when you did that; is that right?
A. Correct.
Q. And you certainly weren't trying to improperly influence Senator Celona for the next legislative session, were you?
A. No.
Q. And that really was just a way, in our system, you supported a legislator who was supporting your point of view; is that right?
A. That is right.
Q. One last question. I know you indicated that you had very little contact with legislation after that point that the AWP was defeated in 2000; but isn't it a fact that at some point in 2000, 2001, government affairs officials in your department still spoke with Senator Celona?
A. That is correct, people who reported to me did.
Q. And as a result of that lobbying somewhere in the

2001 time frame, you had to make a decision as to whether to accept Celona's support on either of two pieces of legislation, unit pricing or AWP; is that right?

A. I was informed by our lobbyist -- not our lobbyist, our government relations person that there were two bills before Senator Celona and that -- on the two issues you just talked about and that more than likely we would support his support of the bill that would support pricing, which is a bigger issue.

Q. Bigger issue because it was 95 percent of your volume as opposed to 5 percent for pharmacy products; right?

A. That is correct.

Q. But that was an option that was tendered by Senator Celona?

A. That was my understanding. I did not talk to Senator Celona personally on that.

MR. DiBIASE: Thank you very much, sir. I have no further questions, your Honor.

THE COURT: Mr. Kiley.

**CROSS-EXAMINATION**

**BY MR. KILEY**:

Q. Good morning -- good afternoon, Mr. Fegan. I'm Tom Kiley, and I represent Mr. Ortiz.

A. Good afternoon, Mr. Kiley.
Q. Prior to your engagement by Stop & Shop or Royal Ahold -- is it Royal Ahold who actually employed you?
A. That's senior vie president of pharmacy for Ahold, yes.
Q. And that's the company that owns Stop & Shop?
A. That is correct.
Q. Prior to that point, you were employed at Osco?
A. I was at, yes, Jewel-Osco.
Q. And was your position in some form of a pharmacy benefit manager?
A. No, I was director of pharmacy marketing systems and third party.
Q. Did you have responsibility for an entity that was involved with pharmacy benefit management at Osco?
A. No, we didn't have a pharmacy benefit management program.
Q. Do you know what I mean by a pharmacy benefit management program?
A. Yes, I do.
Q. And what is it?
A. Pharmacy benefit management program is a program or is an administrator, actually, of the prescription portion of a benefit package for a particular company or companies.

Q. And is the idea of pharmacy benefit management to reduce costs?
A. It is.
Q. And is one way that one reduces costs by restricting access to a network, at least theoretically?
A. Theoretically.
Q. And another might be using formularies to reduce the types of drugs that people pick?
A. That is correct.
Q. Now, you told us that Carlos Ortiz was well recognized in your industry?
A. Yes, he is.
Q. Was he in -- when you joined Stop & Shop?
A. Was he?
Q. Was he well recognized in 1997, I guess it is when you told us you joined Stop & Shop?
A. Carlos had been well recognized for a long time.
Q. Did you know Mr. Ortiz prior to joining Stop & Shop?
A. Yes, I did.
Q. And how did you know Mr. Ortiz?
A. Again, as part of the pharmacy profession, our network of pharmacy, there are many issues that confront us, and Carlos was a well-spoken person and

keeping pharmacy moving in the right direction on many of those issues.
Q. And in the right direction means in a policy sense?
A. In a policy stance, yes, on behalf of the industry.
Q. The industry operate through -- did the interactions between various pharmacy entities occur through organizations?
A. Yes, we have associations that represent us.
Q. And what are the most significant pharmacy associations in which -- of which you might have knowledge?
A. There are basically two for our industry, NACDS, which is National Association of Chain Drugstores, and FMI which is the Food Marketing Institute.
Q. Is the Food Marketing Institute involved in the Stop & Shop/Ahold side or on the drug side?
A. No, both of those organizations represent issues that are confronting our industry.
Q. And were you a participant in NACDS activities prior to joining Stop & Shop?
A. Yes, I was.
Q. And have you remained so since joining Stop & Shop?

A. Yes, I have.
Q. Now, with respect to the types of issues that you have dealt with -- let me be very specific. Are you familiar with the concept of electronic prescription?
A. Yes, I am.
Q. Has NACDS, during your period of involvement with it, taken positions on electronic prescription?
MR. DAMBRUCH: Objection.
THE COURT: Sustained.
Q. Has Stop & Shop taken a position under your direction on the electronic prescription bill which is in issue in this case?
MR. DAMBRUCH: Objection.
THE COURT: Overruled.
A. Could you repeat the question, please.
Q. Probably not. Are you aware that one of the bills that is in the Superseding Indictment is a 2001 electric e-prescribing bill in the State of Rhode Island?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: Relevance and competency of this witness to answer that question.
THE COURT: It's an "are you familiar," so overruled. That's a yes or no, sir.

A. I'm not familiar with it.
Q. Are you familiar with any electronic prescription legislation in the state of -- in the Rhode Island General Assembly?
A. No, I am not.
Q. Are you familiar with the Canadian pharmacy legislation which is identified in the Superseding Indictment in this case?
A. Only by hearsay.
Q. Are you aware of the Rhode Island student loan program that is mentioned in this Indictment?
A. I am not.
Q. And lastly, are you aware of pharmaceutical buy-back legislation that is involved in this case?
A. I am not.
Q. Now, could you tell us your own personal interaction with Carlos prior to joining Stop & Shop? Was it confined to NACDS and Food Institute sessions?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Just a minute. Sustained as to form.
Q. How long have you known Carlos Ortiz?
A. Probably 15, 20 years.
Q. And do you know his professional background? Is he a pharmacist as well?

A. He is a pharmacist.
Q. And in your interactions with him, do you interact on pharmacy-related issues?
A. Yes, we do.
Q. I want to fast forward to the -- because I'm conscious of time, your Honor, I want to fast forward to the political contributions that Mr. DiBiase asked you about. It is the case, isn't it, that other Stop & Shop officials also contributed to Mr. Celona in the relevant time period?
A. I can't answer that. I don't know that.
Q. Do you recall the letter from Peter Phillipes that you had before you of May 1999?
A. Yes, I do.
Q. I thought I saw you looking down to the cc's on the letter to see who was on it.
A. I did.
Q. And one of the individuals on it was Liz Chace-Marino?
A. That is correct.
Q. And Liz Chace-Marino -- is Liz Chace-Marino the government relations person that you alluded to with Mr. DiBiase in terms of contact on unit pricing and pharmacy freedom of choice?
A. Yes, she was.

Q. In terms of the organization at Stop & Shop, does Liz Chace-Marino answer to you?
A. No, she does not.
Q. When you talked about the way the professional services organization -- is that the right phrase?
A. Yes.
Q. Are there people within professional services who deal with government relations?
A. There's an individual in professional services, which is pharmacy, that deals with the pharmacy issues.
Q. Who is that?
A. At that time it was Gary Worth.
Q. And was he on -- he was not on that letter?
A. He was not on that letter.
THE COURT: Mr. Kiley, I think we're going to break for the day. Would you step down, please.
Members of the jury, as I told you last week, our sessions would run from 9 a.m. to 1 p.m. I intend to keep that promise to you. It's now 1:00, and I'm going to let you go for the day with this reminder. Don't talk to anyone about the case, don't permit anyone to discuss it with you, don't talk amongst yourselves about the case, don't read, listen to or watch any news accounts of the case.
Instead what I would suggest is you take the

afternoon off, relax, come in tomorrow well rested and ready to go back to work, again, from 9 to 1. Please leave your notebooks on your seats. They'll be collected.

Bob, you may see the jury out.

(The jury is not present for the following)

THE COURT: May I see counsel, please.

(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date