IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * *   C.R. NO. 07-009ML
*
UNITED STATES OF AMERICA *
*
VS. *   MAY 13, 2008
*   9:00 A.M.
JOHN R. KRAMER and *
CARLOS ORTIZ *
*
* * * * * * * * * * * * * * * *   PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| John Fegan, Resumes | |
| Continued Cross-Examination by Mr. Kiley | 4 |
| Redirect Examination by Mr. Dambruch | 12 |
| Paul DeRoche | |
| Direct Examination by Mr. Dambruch | 16 |
| Cross-Examination by Mr. Fein | 31 |
| Cross-Examination by Mr. Smith | 45 |
| Joseph Walsh | |
| Direct Examination by Mr. Dambruch | 55 |
| Cross-Examination by Mr. Corrigan | 96 |
| Cross-Examination by Mr. Kiley | 129 |
| Redirect Examination by Mr. Dambruch | 145 |

# E X H I B I T S

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 364 | | 76 |
| 366 | | 88 |
| 367 | | 89 |

| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| B-9 | | 122 |
| D-6 | | 43 |
| D-9 | | 123 |
| E-2 | | 124 |
| F-2 | | 120 |
| F-9 | | 127 |
| Y-15 | | 126 |
| Z-15 | | 125 |

13 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. Are you all ready to work? Very good.

Is Mr. Fegan here? Mr. Kiley.

MR. KILEY: Ready, your Honor.

THE COURT: Good morning, Mr. Fegan. You are still under oath.

THE WITNESS: Yes, your Honor.

**JOHN FEGAN, GOVERNMENT WITNESS, RESUMES**

**CONTINUED CROSS-EXAMINATION**

**BY MR. KILEY**:

Q. Good morning, Mr. Fegan.

A. Good morning.

Q. I'm going to remind you of where we were at the end of yesterday. I had just asked you whether Gary Worth was one of the individuals cc'd on the Phillipes letter. That was Kramer W-5.

MR. KILEY: May I have the witness have Kramer W-5.

Q. I want to direct your attention to the cc's at the end of Kramer W-5.

A. Yes.

Q. Are there any individuals who are cc'd who work for Stop & Shop?

A. Three of the individuals on the page work for Stop & Shop on the carbons.
Q. Who are they, please?
A. Liz Chace-Marino, myself and Bill Gries.
Q. And what was Ms. Chace-Marino's job?
A. Liz Chace-Marino was in government affairs.
Q. And we talked about her a little bit yesterday?
A. Correct.
Q. What was Mr. Gries' job?
A. Mr. Gries was CEO of Stop & Shop.
Q. Were all of the -- those three individuals involved with Mr. Phillipes in the decision to go to a litigation mode?
A. Yes, they were.
Q. Now, you told us I think when we were talking about Mr. Worth that he was the individual in pharmacy services who dealt with pharmacy issues -- I'm sorry, within the pharmacy services unit who dealt with pharmacy issues on the government affairs side; is that right?
A. That is correct.
Q. But you qualified it with the words "at that time." Does that signify that there were other people who held that position at other times?
A. Well, there was a person in that position when I

first came to Stop & Shop, then Gary assumed the position after that individual left the business, and then Gary has left the business, and now there's a third individual in that position.
Q. When did that -- Gary leave the business?
A. Approximately 9 months, 10 months ago.
Q. Now, have you retained responsibility for oversight of government affairs relating to pharmacy issues throughout your tenure at Stop & Shop?
A. Yes, I have.
Q. And has that included Rhode Island at every point in time?
A. Yes, it did.
Q. You indicated, I think, that you attended the AWP hearings in 1998, 1999 and 2000?
A. Yes, I did.
Q. And made observations about what occurred at each of those -- on each of those occasions?
A. Yes, I did.
Q. Senator Celona, you told us, voted your way in 1998 and 1999?
A. That's correct.
Q. And then he was absent in 2000?
A. That's correct.
Q. Senator Celona was one of the four supporters that

you had in the Senate that you identified in 1998; is that not correct?
A. Yes.
Q. And Senator Montalbano was also one of those four, was he not?
A. Yes, he was.
Q. And Senator Montalbano also voted your way in 1998 and 1999, did he not?
A. I'm not sure about '99; but '98, yes.
Q. And when you were at the hearing in 2000, Senator Montalbano was absent as well, was he not?
A. I honestly don't remember.
MR. KILEY: May I have GX-5.9, which is in for all purposes.
THE COURT: You mean Government's?
MR. KILEY: I'm sorry, your Honor, Government Exhibit 5, page 9, which I think is in for all purposes, your Honor.
THE COURT: Well, there was some discussion about that this morning as to the precise meaning of the stipulation entered into by the parties.
My understanding was that all of the exhibits listed in the stipulation were admitted as full exhibits, and now apparently that's not the understanding. So we need to clear that up.

Are those in, Mr. Dambruch, or are they not?

MR. DAMBRUCH: This one is, your Honor. If we could approach briefly, I could explain.

THE COURT: Let's do it afterwards. Five is full.

Q. Would you turn your attention to page 9, and would you take a look at the members who are listed there with respect to the vote in 2000.

A. Yes, sir.

Q. Does it refresh your recollection as to Senator Montalbano's presence or lack of presence?

A. No, sir, it does not.

Q. Now, did you take particular -- did you pay attention to what happened with your supporters from 1998 forward as you were putting on this full-court press with respect to AWP?

A. Well, we actually -- with the lobbying effort, we continued to focus on all the senators, and certainly the people that had supported us in the past were prime.

Q. Senator Montalbano was one of the people you told us you wrote the thank you letter to in 1998?

A. Correct.

Q. And let me ask another question with respect to Senator Montalbano. Did you discuss in the year 2000

with your legislative supporters the effect your adoption of the litigation strategy in 1999 would have on the legislative efforts?
A. Could you ask that question again, please.
Q. You know the answer to that already.
A. I'm not sure what you said.
Q. No, I mean you know I can't. Following the change in direction on CVS -- on Stop & Shop's part in 1999, did you discuss with your legislative supporters the effect that shift would have on your legislative efforts?
A. Not to my knowledge.
Q. Now, you observed Senator Celona to act differently at the legislative hearing or not be present at the legislative hearing in 2000 whereas he had been in '98 and '99?
A. Correct. He was not there.
Q. Carlos Ortiz was present at each of the three hearings?
A. Yes, to the best of my knowledge.
Q. Carlos Ortiz presented testimony at each of the three hearings?
A. To the best of my knowledge, yes.
Q. On the merits, just as forcefully in 2000 as he had in '98 and '99?

A. To the best of my knowledge that I remember, yes, he was opposed.

Q. Do you remember the policy points that were being advanced in that testimony?

A. Generally, but not specifically.

Q. Do you recall him relying on the Federal Trade Commission's position on AWP?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Basis?

MR. DAMBRUCH: Relevance.

THE COURT: Approach. Step down for a moment, please.

(Bench conference held on the record)

MR. DAMBRUCH: Your Honor, first off, on direct exam, the focus was what positions CVS took and communicated. Secondly, it's the Government's position that the merits of the legislation are irrelevant. It's not a factor that can be considered as to whether or not there was any corrupt influence.

So whether the FTC was for it or against it is really irrelevant to this particular proceeding.

MR. KILEY: I think the relevance goes directly to the intent of Mr. Ortiz. We're being asked to draw inferences not from -- there's no direct testimony of any request for anything on AWP.

We're being asked to draw an inference from Mr. Celona's shift of position. I would like to be able to demonstrate that there's been no shift of position for Mr. Ortiz who has been, based upon this witness's testimony as to what he does, moving the industry in the right direction throughout.

That's why I think the question is relevant. And it's my last question on this subject, your Honor.

THE COURT: Well, I think you asked him if he remembers him saying it. If he says no, that's the end of it.

MR. KILEY: That's the end of it.

(End of bench conference)

Q. Do you remember the question?

A. No, I don't.

MR. KILEY: Could we have it read back?

THE COURT: Just a minute. The question was, do you recall him relying, him referring to Mr. Ortiz, relying on the Federal Trade Commission's position on AWP?

A. No, I don't.

Q. Thank you. One last question, Mr. Fegan. That litigation was to address or seek relief from the bad business decision made before you arrived; correct?

MR. DAMBRUCH: Objection.

THE COURT: Sustained.
Q. You lost the litigation, didn't you?
A. We lost the litigation.
MR. KILEY: Thank you, your Honor.
THE COURT: Any redirect?
MR. DAMBRUCH: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MR. DAMBRUCH**:
Q. Mr. Fegan, Mr. Kiley just asked you about whether or not you recall Mr. Montalbano's actions during the 2000 hearing, whether he was present or not. Do you recall that question?
A. Yes, I do.
Q. Do you recall whether he was ever present during the 2000 hearing that occurred on the day upon which the committee voted on AWP legislation?
A. I don't remember.
Q. How about with Senator Celona, was he ever present at the committee hearing on that day?
A. Yes, he was.
Q. Was he present when the vote took place on AWP?
A. He was not.
Q. Now, yesterday Mr. DiBiase asked you about a PAC contribution that Stop & Shop made to Senator Celona. Do you recall those questions?

MR. DiBIASE: Objection.
THE COURT: Basis?
MR. DiBIASE: It was not a PAC contribution, your Honor.
THE COURT: Approach. Step down.
(Bench conference held on the record)
MR. DiBIASE: It's my understanding there was no PAC. That was a personal check. I have no objection to the question. It's just my question was not a PAC contribution.
THE COURT: Why don't you rephrase your question, then, and establish what the nature of it was.
MR. DAMBRUCH: Sure, Judge. This isn't directed at Mr. DiBiase, but we've given defense counsel a copy of our exhibit binder, and we just don't have an exhibit binder from them. So it makes it difficult to figure out what their exhibits are. We would make that request.
THE COURT: Well, you can work on it this afternoon. I'm not going to deal with that now.
MR. DAMBRUCH: I'm not asking now. I'm just saying in general.
MR. KILEY: I don't think we have any exhibits on this particular point.

THE COURT: Okay.

(End of bench conference)

THE COURT: As I understand it, Mr. Dambruch, that question is withdrawn and you're going to rephrase.

MR. DAMBRUCH: It is, yes.

Q. Mr. Fegan, do you recall some questions asked to you yesterday by Mr. DiBiase about a political contribution, campaign contribution made to Senator Celona?

A. Yes, I do.

Q. And do you further recall Mr. DiBiase asking you if there was anything -- in your opinion, was there anything wrong with making that contribution to Senator Celona?

A. I'm not sure he asked me that question. I think he said it was okay under the current system that existed.

Q. Did Stop & Shop ever hire Senator John Celona?

A. No, they did not.

Q. Did they ever pay him any type of salary?

A. No, they did not.

Q. Do you recall, Mr. Fegan, that yesterday Mr. DiBiase asked you some questions about pharmacy benefit managers?

A. There were several, yes.
Q. And do you further recall that he mentioned a specific benefit manager that was involved with Blue Cross and their restricted network, PharmaCare?
A. I don't remember him saying PharmaCare.
Q. Okay. Are you familiar with PharmaCare?
A. Yes, I am.
Q. What is PharmaCare?
MR. DiBIASE: Objection.
THE COURT: Basis?
MR. DiBIASE: 401, 403.
THE COURT: Overruled.
A. PharmaCare is a pharmacy benefit management organization that is a part of the CVS -- was a part of the CVS Corporation.
Q. And was it a part of CVS Corporation in '98, '99, 2000?
A. Yes, it was.
MR. DAMBRUCH: No further questions, your Honor.
THE COURT: Anything further, Mr. DiBiase?
MR. DiBIASE: Only one matter, your Honor. I believe this is by agreement. The exhibit that I inaccurately referred to as a Government exhibit yesterday has now been marked as Z-5.
THE COURT: So this is Kramer Z-5, and would you

just identify it for the record so everyone knows what we're talking about.

MR. DiBIASE: It was a letter from Mr. Fegan dated May 22nd, 1998, to John Celona.

THE COURT: Okay.

MR. DiBIASE: Thank you.

THE COURT: Mr. Kiley, anything further?

MR. KILEY: No questions, your Honor.

THE COURT: Thank you. You may step down.

MR. DAMBRUCH: Your Honor, the next witness is Mr. Paul DeRoche.

**PAUL DeROCHE, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: My name is Paul DeRoche, D-E capital R-O-C-H-E.

Q. Good morning, Mr. DeRoche.

A. Good morning.

Q. Sir, by whom are you employed?

A. I'm employed by the Greater Providence Chamber of Commerce.

Q. And how long have you worked for the Greater Providence Chamber of Commerce?

A. I've been there for 21 years.

Q. And in what capacity do you currently serve with

the Chamber?
A. I'm vice president of government affairs.
Q. And has that been the same position that you've held during your 21-year tenure?
A. Yes, it is.
Q. Now, do you also hold any type of position with any other association or federation?
A. Under the umbrella of the Greater Providence Chamber of Commerce, we have an organization called the Rhode Island Retail Federation. That's a legislative group that retailers join so they'll have a presence in the General Assembly when legislation comes up, when bills are being heard. It's a retail federation.
Q. And what is your position with the Federation?
A. I manage it.
Q. Now, sir, does CVS belong to either the Greater Providence Chamber of Commerce and/or the Rhode Island Retail Federation?
A. CVS belonged to the Greater Providence Chamber of Commerce and belonged to the Rhode Island Retail Federation.
Q. And were they members of both of those organizations from the years 1998 through 2003?
A. Yes, they were.
Q. Now, sir, as the vice president of government

affairs for the Chamber and the manager of the Rhode Island Retail Federation, what are your duties and/or responsibilities?
A. Well, what we -- the Rhode Island -- the Chamber of Commerce government affairs council is broken down into three subcommittees. There's a federal subcommittee, there's a state subcommittee, and there's a city subcommittee.
It is my duty to get members of the Chamber to volunteer to serve on these particular subcommittees. For example, the state subcommittee obviously is concerned about legislation that takes place in the General Assembly.
We have members who volunteer to be on this committee. We talk about policy. We discuss issues. We form grassroots activities. We go to the State House and lobby for and against legislation that would be good for the business community or against the business community.
So that part, I manage that part of the General Assembly, plus we go before the city council and then we work with our two U.S. senators, the Congressional people.
Q. Now, with regard to the state legislative committee that you just described, during the years

1998 to 2003, did CVS have a representative on that particular committee?
A. Yes, they did.
Q. And who was that, sir?
A. Carlos Ortiz. Mr. Ortiz.
Q. Did CVS also, during those years or a portion of those years, have any representation on the Chamber's board of directors?
A. Yes, CVS had Mr. Kramer as a member of the board of directors.
Q. Now, you mentioned that among your duties and responsibilities is to lobby on behalf of the Chamber and the Federation?
A. Yes.
Q. Does that include lobbying at the Rhode Island General Assembly?
A. Yes.
Q. And as part of that process, are you required to complete any type of registration form or file any type of reports?
A. I file lobbying papers every session and every month throughout the session, which is normally from January 1st to June 30th.
Q. And have you been engaged in that lobbying activity during your entire 21 years at the Chamber?

A. Yes, I have.
Q. Now, based upon your familiarity with the General Assembly, are there particular committees that you deal with more frequently than others on legislation you're interested in?
A. I would say that basically I would spend more time working with the Labor Committee on both sides of the aisle as well as Corporations and sometimes Judiciary and sometimes Health and Welfare.
Q. How about the Senate Corporations Committee?
A. I have gone before the Senate Corporations Committee.
Q. And how frequently have you appeared before them in either -- in support of or in opposition to legislation?
A. Well, of course it depends on the amount of legislation that has been introduced. This particular session, I've been before the Senate Corporations Committee twice. I can remember other years where I was before the committee several times. It all depends.
There are over 2,000 bills that are introduced in the legislative session, so it's kind of hard to break it down.
Q. How about during the years 1998 to 2003?

A. I have testified in Senate Corporations Committee.
Q. And were you familiar or are you familiar with what the membership of the committee was during that time frame?
A. Are you asking me could I name every person?
Q. Just generally familiar, sir.
A. I knew people on it. I don't recall everyone. You're talking to '03.
Q. Do you recall if John Celona served as a member of the Corporations Committee from 1998 to 2003?
A. Yes, I do.
Q. And at some point did Mr. Celona obtain some type of leadership position with the Corporations Committee during that time frame?
A. Yes, he did.
Q. And what was that, sir?
A. He was elevated from a member of the Corporations Committee to the chairman of the Corporations Committee.
Q. And do you recall when that occurred?
A. You know, I don't know what exact year that was. I don't recall that.
Q. But sometime in that time?
A. Yes.
Q. Now, when you conduct your lobbying activities on

behalf of the Chamber, do you collaborate and work together with members of the Chamber?
A. Absolutely. We bring people in, we sit around, we have dialogue, we discuss the impacts of legislation on the business community.
Q. And during the years 1998 -- strike that. During the years 2000 to 2003, did you work together with representatives of CVS on particular pieces of legislation?
MR. SMITH: Objection.
A. Yes, I did.
MR. SMITH: Leading.
THE COURT: It is. The answer may be stricken. The jury will disregard. Rephrase.
Q. Do you recall working together with CVS on any issues from 2000 to 2003?
A. I recall we worked together on an any willing provider piece of legislation.
Q. Do you recall any other pieces of legislation?
A. There were two other bills that were introduced during that session or time. One was a Canadian drug bill, and the other one was an electronic bill.
Q. And who, if anyone, did you work with from CVS on those pieces of legislation?
A. Well, at the time when I described the Retail

Federation, again, under that umbrella, we had four pharmacies, Walgreen's, Brooks, CVS and Stop & Shop. So we called them the Committee For Pharmacy.

MR. SMITH: Objection. Move to strike, nonresponsive.

THE COURT: Overruled.

Q. And, sir, who from CVS, if anyone, did you work with on those pieces of legislation?

A. Mr. Ortiz.

Q. And during the course of your work on those three pieces of legislation you've described, did you have any contact with members of the state Senate?

A. In my capacity as a lobbyist, I testified on two of those three bills that you mentioned. That was my contact with them.

Q. And do you recall where it was that you went to testify on those pieces of legislation?

A. I testified in opposition to the Canadian drug bill before the Corporations. I don't really recall getting involved heavily with the electronic bill, but I remember the bill. And I did not go before the Corporations Committee or testify on the any willing provider issue.

Q. Now, with regard -- you mentioned Corporations Committee. Are you referring to House or Senate?

A. Senate. I'm sorry, Senate.
Q. Did you have any contact in your lobbying capacity with John Celona?
A. Only I saw him every day at the State House, I went before his committee, that I had contact with him in the -- as a lobbyist.
Q. And did that contact include contact on the three pieces of legislation we just discussed?
A. Two out of the three.
Q. And which two, sir?
A. The two were the Canadian drug bill and the electronic bill.
Q. Now, as well as having you as a lobbyist for the Chamber, did the Chamber also or at any time retain any type of contract or outside lobbyist?
A. Yes. In the years that you're discussing, the Chamber decided that since I did not have any legal background and more and more bills were being introduced each year, that it was time that they hired what they call a contract lobbyist to assist me in lobbying at the State House and to work on behalf of the Providence Chamber of Commerce.
Q. And who was it that the Chamber decided to hire during those years we've been speaking about?
A. Mr. Joseph Walsh.

Q. Now, sir, I've mentioned John Celona to you during my prior questions. Other than your contact at the State House, did you have any other contacts with Senator Celona from 1998 through 2003?
A. No. The only contact --
MR. SMITH: Objection as to the form of the question.
THE COURT: Overruled. It's a yes or no, sir.
A. I saw -- I belonged to the same church as John, so I saw him every Sunday at church. I saw him at church activities, but I had no relationship with him other than seeing him at these occasions because he lived in North Providence.
Q. Did you see him at any other social, charitable or other events?
A. I've seen him -- yes, I've seen him at other events.
Q. Could you describe some of those for us, sir.
A. There was once a conference that the national chain drugstore association put on in Key Biscayne, Florida, and the purpose of the conference was to --
MR. SMITH: Objection.
THE COURT: Sustained.
Q. And did you attend that conference, sir?
A. Yes, I did.

Q. Did John Celona attend?
A. Yes, he did.
Q. Were there any other folks from Rhode Island that attended that conference as well?
A. There was Mr. Kramer, Mr. Ortiz, and Mr. John Harwood.
Q. And during the course of that conference, were there any social or other outings that took place?
A. Basically the conference took place, they had seminars from 8:30 in the morning until 12:30. It was a two-and-a-half-day conference. On the first afternoon, Monday afternoon, they had a golf tournament for anyone who wanted to play golf.
Q. And do you recall where that golf tournament was held?
A. I guess it was on a Key Biscayne golf course.
MR. SMITH: Objection. Objection to the answer, "I guess."
THE COURT: Sustained. If you don't know, just say you don't know. Don't guess. That answer will be stricken. The jury will disregard it.
Q. And wherever that golf outing was, did you participate?
A. Yes.
Q. Did you participate in any other golf outings or

other social events during the time of that conference in Florida?
A. No.
Q. Now, other than the Key Biscayne conference you just referenced, were there other social events or outings, et cetera, that you saw Senator Celona at?
A. Yes. I played -- in one of those years in the summer, I played -- I was invited to play golf with him maybe three times throughout the summer.
Q. And when you say you were invited to play golf with him, were there other people playing golf together with the two of you on those occasions?
A. Yes.
Q. And who were those other people?
A. Mr. Kramer and Mr. Hagan.
Q. And who is Mr. Hagan?
A. Mr. Hagan at that time was the president of the Greater Providence Chamber of Commerce.
Q. And do you recall the years that those rounds of golf took place during?
A. I really don't.
Q. Do you recall where the rounds of golf were played?
A. It was at a course in Norton, Massachusetts, called TCP (sic).

Q. And who, if anyone, was hosting those rounds of golf?
A. Mr. Kramer.
Q. Other than the rounds of golf, were there any other events?
A. I remember once I went to a Governor's Ball in Newport, and Mr. Celona was there, and I talked to him at that particular one.
MR. SMITH: Excuse me, your Honor. May we have a time frame as to when that Governor's Ball was?
THE WITNESS: The Governor's Ball is every December, your Honor.
THE COURT: Just a minute. Just wait for Mr. Dambruch to pose a question.
Mr. Dambruch, please.
Q. Do you recall the month and year of that particular Governor's Ball?
A. December in probably 1999 or 2000.
Q. And how was it that you attended the ball?
A. Because the chairman of the ball was Mr. Kramer. It was a charitable event. And since he's on my board of directors, he invited me to attend.
Q. And do you know who had invited Mr. Celona?
A. I have no clue.
Q. Now, sir, at any point in time did you attend any

type of legislative luncheons during the years 2000 to 2003?
A. Yes, I did.
Q. Can you please describe those luncheons and when they occurred.
A. Well, they weren't lunches, but there was a lunch that I attended at that period that you asked me about that was sponsored by CVS. And it was at the CVS headquarters in Woonsocket, Rhode Island, and we were invited there to get a briefing on --
MR. SMITH: Objection. Beyond the scope.
THE COURT: Sustained.
Q. And what, if anything, do you recall occurring during that luncheon?
A. We arrived at the luncheon, and Mr. Ryan came out and greeted us. And then he left, and Mr. Ortiz put on a PowerPoint presentation on the new drugs that were being introduced by the manufacturers and the pharmacy issues that were taking place. And then we had a sandwich and a salad, and it lasted about an hour.
Q. And with regard -- when you say pharmacy issues, did any of those involve legislative issues?
A. No.
Q. Who was -- do you recall if there were any legislators present for that particular luncheon?

A. Yes. Senator Celona was there.
Q. Sir, at any point in time did you learn that Senator Celona was being paid as a consultant for CVS?
A. Absolutely not.
Q. Did Mr. Kramer or Mr. Ortiz ever tell you --
A. No.
MR. SMITH: Objection. Leading. Move to strike.
THE COURT: It may be stricken. The jury will disregard.
Q. Did any representative of CVS ever mention to you the fact that they were paying Mr. Celona as a consultant from the years 2000 to 2003?
MR. SMITH: Objection. Leading.
A. No.
THE COURT: Overruled.
Q. I'm sorry, your answer, sir?
A. No.
MR. DAMBRUCH: May I have a moment, your Honor?
(Pause)
Q. Mr. DeRoche, you mentioned that during those same years, 2000 to 2003, the Chamber had a contract lobbyist?
A. Uh-huh. Yes.
Q. Did your contract lobbyist ever tell you or anyone

on his behalf ever inform you that CVS was paying Mr. Celona as a consultant?
A. No.
MR. SMITH: Objection.
MR. FEIN: Objection, your Honor.
THE COURT: Sustained. The answer will be stricken. The jury will disregard.
MR. DAMBRUCH: No further questions, your Honor.
THE COURT: Cross.
MR. FEIN: Thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. FEIN**:
Q. Good morning, Mr. DeRoche.
A. Good morning, sir.
Q. My name is David Fein, and I represent Jack Kramer.
A. Yes, sir.
Q. Mr. Dambruch just asked you some questions about a luncheon that was held at CVS. Do you recall that?
A. I do, sir.
Q. And he asked you if Mr. Celona was present at that luncheon; correct?
A. Correct. Yes.
Q. And you said he was?
A. He was. To the best of my knowledge, he was

there.
Q. Was he the only state official who was present at that lunch?
A. I believe so.
Q. You don't remember other senators being in attendance at this lunch?
A. They could have been, but I don't know -- I forget who they were.
Q. You don't remember which senators were at the lunch?
A. That's right.
Q. But there were other senators at the lunch?
A. There could have been, but I don't really recall.
Q. When was this lunch?
A. It was -- I don't know the date. I don't recall the date.
Q. Do you recall the year?
A. No, I don't.
Q. Mr. Dambruch asked you some questions about the NACDS conference in Key Biscayne, Florida?
A. Yes, sir.
Q. And you attended that conference?
A. Yes, sir.
Q. Who paid for your attendance at that conference?
A. The national chain drugstore association.

Q. Was Rhode Island the only state represented at that conference?
A. No, sir.
Q. What other states were represented?
A. There were several other states.
Q. About how many?
A. I would say 12 maybe.
Q. And were those 12 or so other states asked by the NACDS to invite senators to come to the conference?
A. Yes, they were.
Q. And did they, in fact, do that?
A. Yes, they did.
Q. And did senators from those states attend the NACDS conference?
A. Yes, they did.
Q. And who paid for that attendance?
A. The national chain drugstore association.
Q. What was the purpose of having senators at the NACDS conference?
A. The purpose of the conference was strictly one of education. Chains in the pharmacy industry were coming rapidly, new drugs were coming on the market, and the national chain drugstore association said this is a wonderful opportunity to bring these people in and educate them on what was going on. And the senators

and reps who came in served on panels to discuss pharmacy issues.

Q. And did the senators from the 12 or so states also dine with the other members of the conference?

A. Yes, they did.

Q. And did they play golf with members of the conference?

A. Yes, they did.

Q. And there was nothing wrong with that, was there?

A. I don't see anything wrong with it, no.

Q. It wasn't unlawful?

A. No.

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained. Don't answer that question.

THE WITNESS: I'm sorry.

Q. Mr. DeRoche, you referred to other golf events that you've attended. Did the Chamber of Commerce have a golf event?

A. We had an annual golf event every May.

Q. And where did that golf event take place?

A. In the last several years, it's been at Ledgemont. Before that it was at, I believe, Wannamoisett.

Q. Who was responsible for that event?

A. I was the coordinator of it.

Q. And did you invite legislators to attend that golf event?
A. I did invite legislators.
Q. And about how many legislators attended these events each year?
A. I would say eight.
Q. And were those state legislators from Rhode Island?
A. They were from Rhode Island.
Q. State senators?
A. State senators and representatives.
Q. You referred to golf at, I think you said, TCP, but is it the TPC golf course?
A. I'm sorry, yes.
Q. The tournament players course?
A. Yes.
Q. Thank you. And did you understand that CVS had a corporate membership at the TPC?
A. Yes.
Q. And did you understand that Mr. Kramer was an authorized member -- person to use that corporate membership at the TPC?
A. Yes.
Q. What was the purpose of Mr. Kramer having that membership through CVS?

MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Did you understand that Mr. Kramer would host you and others at golf events at TPC?
A. I was invited. It wasn't a foregone conclusion.
Q. And when you were invited, did you understand that Mr. Kramer personally or CVS paid the greens fees and other associated expenses?
A. It was my understanding CVS was paying.
Q. Can you describe for the jury what you understood Mr. Kramer's responsibilities were at CVS.
A. I believe Mr. Kramer was the -- was in charge of government affairs at CVS. I think he came to CVS and was in the marketing department, and then I think he got transferred into the government affairs department.
Q. Did you understand his background was in marketing and advertising?
A. That's what I understood.
Q. And, in fact, he had headed up CVS's advertising department?
A. That's what I understood.
Q. And his prior experience at Sears, were you familiar with that?
A. I was told about it, yes.
Q. And that was in sales and marketing?

MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Did you understand that Mr. Kramer had a position -- had a role at CVS in promoting CVS in the community?
A. Yes.
Q. And what did he do to achieve that role?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained as to form.
Q. Did Mr. Kramer promote CVS in Rhode Island?
A. Yes.
Q. How did he do it?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained again as to form. As to what he knows.
MR. FEIN: Yes, your Honor.
Q. Could you please tell the jury what you observed in terms of Mr. Kramer promoting CVS in Rhode Island.
A. I observed that Mr. Kramer was chairman of the annual CVS golf tournament to raise money for charities. I observed that Mr. Kramer was chairman of the annual Governor's Ball and other fundraising or charitable events.
Q. Did you ever attend the Charity Classic, the CVS Charity Classic that you just referred to?

A. Yes.
Q. Did you attend on one occasion or many occasions?
A. Twice.
Q. Were you a guest of CVS?
A. Yes.
Q. And did you attend the gala dinner?
A. Yes.
Q. Could you describe to the jury the gala dinner.
A. I was invited to the gala dinner two years in a row. It's a dinner that precedes the golf tournament where all the vendors and the sponsors of the golf tournament would get together, and they would have an auction that evening at the dinner to raise money to give to local charities.
Q. And did you observe Mr. Kramer having any role at that dinner?
A. I believe he ran the dinner.
Q. And so what did he do in that regard that you saw?
A. Well, I just went to dinner and sat down; but, you know, there were speeches and there was -- the essence of that whole evening was an auction to raise money for charities.
Q. And Mr. Kramer played a public role in that evening?
A. Yes, he did.

Q. And did legislators attend that gala dinner?
A. I don't know.
Q. Approximately how many people would you say were at the gala dinner that you attended or the dinners?
A. Nine hundred.
Q. Nine hundred people?
A. Uh-huh.
Q. Were you familiar with Mr. Kramer's role with the CVS 5K road race?
A. Yes, I was.
Q. What was his role with regard to the road race?
A. I believe he also was a manager of that.
Q. And did he have a public role in that regard?
A. Yes, he did.
Q. And what did you observe in that regard?
A. Well, I remember going to watch the race one Sunday, and they had a podium, and Mr. Kramer was up there at the finish line greeting the over thousand people who ran that race.
Q. Did you ever see Mr. Kramer on television promoting CVS?
A. No.
Q. Did you ever hear him on radio?
A. No.
Q. And you saw him speak before a live audience that

you just described at the 5K?
A. In an open field.
Q. Did you -- you've testified previously, have you not, that you would, as part of your job -- part of your job involved attending charitable events very often, in fact every night, at the Chamber?
A. Yes.
Q. And in the course of your doing that, did you encounter Mr. Kramer on occasion?
A. I could have. I don't recall any particular time.
Q. You recall the Governor's Ball; is that right?
A. Yes.
Q. And was Mr. Kramer at that event?
A. Yes.
Q. And was Mr. Kramer's wife, Lynn, at that event?
A. Yes.
Q. And did you sit together?
A. No.
Q. At these events, would John Celona bring his wife, Karleen?
A. I believe I saw them once, yes.
Q. You referred to Mr. Kramer's position in government affairs at CVS; is that correct?
A. Yes.
Q. Do you recall testifying previously that

Mr. Kramer never manifested to you a lot of feelings about legislation?
A. Did I say that?
Q. Yes. Do you recall saying that?
A. I don't recall saying that.
MR. FEIN: Your Honor, may we show Mr. DeRoche his November 30, 2006, testimony at page 29. Page 29, line 22 to the bottom and then page 30, lines 1 and 2, your Honor.
THE COURT: Just a minute.
MR. FEIN: Thank you.
THE COURT: Any objection?
MR. DAMBRUCH: No, your Honor. This is just being shown to the witness; correct?
THE COURT: Correct.
Q. Mr. DeRoche, if you could just read to yourself quietly the highlighted portions.
A. I already have.
Q. Thank you. And the next page as well, the first two lines of the next page.
A. I said it, I guess.
Q. So you recall testifying that Mr. Kramer never manifested to you a lot of feelings about legislation?
A. Yes.
Q. Is that correct? Indeed, you testified that many

of your conversations with him were about sports and other things; is that right?
A. Yes.
Q. Mr. Dambruch asked you questions about Canadian pharmacy legislation. Do you recall that?
A. Yes.
Q. And you said that you -- you testified that you testified -- you testified here in court that you testified before the Senate Corporations Committee in opposition to that legislation; is that right?
A. I testified in the Senate Corporations Committee opposing the Canadian drug legislation.
Q. And that legislation would have, had it passed, permitted the importation of drugs from Canada, prescription drugs?
A. Yes.
Q. And you testified against it on behalf of your members; is that correct?
A. That's right.
Q. And did you state in your testimony that the proposed legislation was illegal due to federal law prohibiting reimportation?
A. I could have; but in my statement to the committee, we were more concerned about the dangers to senior citizens who would buy their drugs on the

Internet through Canada and we had no clue where Canada was bringing these drugs from. And it was very, very -- could be very harmful to senior citizens. That was my testimony.

MR. FEIN: Thank you. Your Honor, I'd like to offer by stipulation Kramer D-6.

THE COURT: This is full?

MR. DAMBRUCH: Yes, your Honor.

(Defendant Kramer Exhibit D-6 was admitted in full)

MR. FEIN: May it be shown to the witness, your Honor?

THE COURT: It may. Do you want it also published?

MR. FEIN: Yes, please, your Honor.

Q. Mr. DeRoche, do you recognize this document? I'm sorry. Let me give you a moment to look at it.

A. Yes.

Q. And is this a draft of your testimony in opposition to the Canadian pharmacy legislation?

A. Yes.

Q. If you would look at the second paragraph, Mr. DeRoche --

A. Yes.

Q. -- is it correct that you testified that according

to United States law, this proposed legislation in the State of Rhode Island was illegal?

A. Yes.

Q. And if you turn to the second page at the top of the second page, do you see that there's a sentence there, "Rhode Island community pharmacies are also concerned that the proposed legislation may compromise patient care"?

Is that what you were referring to earlier when you answered my question about your testimony?

A. Yes.

THE COURT: Mr. Fein, when you're reading, slow it down.

MR. FEIN: Yes, your Honor. I apologize.

Q. In the third paragraph on this page, do you see the language, "The community pharmacies in Rhode Island strongly believe that for the General Assembly to require the Rhode Island Board of Pharmacy to license a pharmacy that is engaged in an illegal activity is a very," in capital letters, "dangerous precedent"? Was that your testimony?

A. Yes.

Q. Was that on behalf of all Rhode Island pharmacies?

A. That was on behalf of four pharmacies because there were independent pharmacies who were not in my

association. The four pharmacies were Brooks, CVS, Walgreen's and Stop & Shop.

Q. Were there any Rhode Island pharmacies that you were aware of that were actually in support of this legislation?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Overruled. If he knows.

A. I don't recall anyone opposing it.

Q. Thank you. And, in fact, your letter itself refers to Rhode Island community pharmacies at the top of the second page, does it not?

A. Yes, it does.

MR. FEIN: May I have one minute, your Honor?

THE COURT: You may.

MR. FEIN: Thank you.

(Pause)

MR. FEIN: Thank you very much, Mr. DeRoche. No further questions, your Honor.

THE COURT: Mr. Smith.

MR. SMITH: Yes, your Honor.

**CROSS-EXAMINATION**

**BY MR. SMITH**:

Q. Good morning, Mr. DeRoche.

A. Good morning, sir.

Q. These events that you've been discussing here this

morning, they happened quite a while ago, did they not?
A. Yes.
Q. And is your memory keen as to each and every incident, or is it sometimes difficult to recollect?
A. It's sometimes difficult to recollect.
Q. Okay. The individual that you've told this jury about, this Carlos Ortiz, is that Carlos Ortiz that we're talking about?
A. Yes, sir.
Q. And how long have you known him?
A. I've been with the Chamber for 21 years, so whenever he came to CVS, that's when I've known him.
Q. With your own independent recollection, would that be 10 years?
A. I would say maybe 15 years.
Q. Okay. So you've known him for about 15 years?
A. Yes.
Q. You'd agree with me that you really don't socialize with Mr. Ortiz.
A. No.
Q. And so all of your connection with Mr. Ortiz would be as a result of his input as far as pharmacy issues are concerned?
A. Yes.
Q. Have you been able to rely on Mr. Ortiz's

experience in the pharmacy field to assist you when you were working for the Retail Federation?
A. Yes.
Q. And what portion -- I shouldn't ask you that. Would you rely upon Mr. Ortiz a great deal?
A. Yes.
Q. Did you feel that Mr. Ortiz was an experienced pharmacist?
A. He was an experienced pharmacist who had the expertise in pharmacy that I did not have, so yes.
Q. Okay. Was there anyone else in this area in your employ for the Retail Federation that you would also rely upon like Mr. Ortiz in the field of pharmacy?
A. Well, if you recall, I said that there were four pharmacies who belonged to the chain drugstore committee under the umbrella of the Rhode Island Retail Federation. So I relied on people from Brooks Pharmacy, Stop & Shop, and Walgreen's.
Q. Okay. Do you know who those people are?
A. You want me to name them?
Q. If you do know their names.
A. I'd discuss issues with John Fegan from Stop & Shop, I'd discuss issues with Ed King from Walgreen's, and I'd discuss issues with Dan Haron from -- Dan Haron from Brooks.

Q. Of the four, who would you consider to be the most knowledgeable in the pharmacy area?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. All right. When Mr. Ortiz would give you his input as far as pharmacy issues were concerned in your employ for the Retail Federation, would you rely upon the information that he provided?
A. To a certain extent.
Q. Did you ever question him?
A. Yes.
Q. And do you remember in what areas?
A. Well, I remember in the any willing provider legislation, I was confused on how that worked, and so I would ask him about that.
Q. Okay. You were confused about it?
A. Uh-huh.
Q. And he gave you his opinion?
A. Yes.
Q. All right. Now, you also said that you attended a luncheon, I think at CVS?
A. Yes, I did, sir.
Q. All right. And do you remember when that luncheon was?
A. No, I don't, sir.

Q. Have you ever looked at any documents to refresh your recollection as to this luncheon?
A. No, I haven't, sir.
Q. Okay. Can you tell us what year the luncheon was?
A. I don't recall.
Q. Okay. Was it between '99 and 2003?
A. Could have.
Q. It could have been before that?
A. I don't recall.
Q. Well, could it have been in 1990?
A. I don't recall.
Q. All right. I've asked you before if it's been a long time and it's sometimes difficult to recollect some of these things; true?
A. True.
Q. A lot of water has gone under the bridge since then? Yes? A lot of time has passed?
A. Time has passed, yes.
Q. And so when you're telling us about certain things that -- certain responses that you gave to the prosecution, do you feel that all of that information is accurate?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Rephrase.
Q. Are you having difficulty remembering some of the

occurrences of the events that were asked of you today?
A. The events that were asked of me today I remembered.
Q. Okay. Well, were there any other luncheons besides the one that you told us about at CVS?
A. There could have been.
Q. Do you recall any other luncheons?
A. No, I do not.
Q. All right. This particular luncheon, the date that you do not know, do you remember who was there?
A. Yes, I do.
Q. Who was there?
A. The lunch had opened up with Mr. Ryan greeting everyone. The people around the table were Senator Celona, I remember Joey Walsh, Mr. Kramer and Mr. Ortiz. There could have been another legislator there. I don't recall it because we just jumped into discussing pharmacy issues.
Q. How did you get there?
A. As a manager of the Rhode Island Retail Federation and the chain drugstore committee, I was invited.
Q. All right. Are you suggesting that it was just Mr. Ryan, Mr. Walsh, Mr. Kramer, Mr. Ortiz, you, and Senator Celona, that was it?
A. No. There could have been others, but I don't

recall who they were.
Q. Well, the others, would they have been state senators?
A. I don't know.
Q. Could they have been representatives?
A. I don't know.
Q. Were there others, do you recall?
A. I don't recall.
Q. All right. Do you know how long the meeting lasted?
A. I would say in the area of one hour and 15 minutes, maybe an hour and a half.
Q. All right. I think -- did you say there was a presentation?
A. There was a PowerPoint presentation.
Q. Okay. And was that PowerPoint presentation to the entire group?
A. Was it given to the entire group?
Q. Yes, sir.
A. Yes, sir.
Q. So however many people there may have been there at the time, the presentation was to the entire body that was present?
A. Yes, sir.
Q. And do you remember what the presentation was

about?
A. Well, I don't remember in detail, but it was about pharmacy issues, new drugs that manufacturers were bringing into the market. It was a whole litany of education that was presented on the screen, PowerPoint screen.
Q. Okay. And did you find it to be worthwhile, the presentation?
A. Yes, I did.
Q. Okay. You mentioned something about electronic legislation or something like that?
A. There was a piece of legislation that -- the language of the legislation is that they wanted doctors to start using an electronic method to prescribe prescriptions rather than the note that they just scribble out.
Q. Okay. And was that because it would facilitate the pharmacists to read the typed words rather than try to decipher some doctor's penmanship?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Well, were you well aware of that kind of proposed legislation?
A. I knew of the legislation because I track and monitor legislation every day.

Q. Were you tracking this legislation?
A. Yes.
Q. And on behalf of the Retail Federation?
A. Yes.
Q. And the four members that you mentioned, I think you said Stop & Shop, CVS, Walgreen's and --
A. Brooks.
Q. -- and Brooks, were they in favor of electronic prescription legislation?
A. I don't recall.
Q. Well, were you -- as the lobbyist for the Retail Federation, were you in favor of it?
A. Yes.
Q. So if you were in favor of it, would you not agree that they were in favor of it, that is, Brooks, CVS, Walgreen's and Stop & Shop?
A. No. Just because I was in favor doesn't mean everybody else was.
Q. Well, are you suggesting, then, there were occasions in which you as the lobbyist for the Retail Federation would be in favor of a piece of legislation and at the same time one of the four pharmacies that you were talking about would be against it?
A. Yes.
Q. And that wouldn't be unusual, would it, that

occurrence, where you would be for a particular piece of legislation --

A. It didn't happen often.

Q. But it wasn't unusual, was it?

A. No.

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Overruled.

Q. The answer's no, it was not unusual?

A. No.

MR. SMITH: Okay. May I have just a moment, please, Judge.

(Pause)

MR. SMITH: Thank you, your Honor.

THE COURT: Redirect?

MR. DAMBRUCH: No, thank you, Judge.

THE COURT: Did you say no?

MR. DAMBRUCH: No. Thank you.

THE COURT: You may step down.

THE WITNESS: Thank you, your Honor.

MR. DAMBRUCH: Your Honor, the Government's next witness is Mr. Joseph Walsh.

**JOSEPH WALSH, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Joseph Walsh, W-A-L-S-H.

THE COURT: Mr. Walsh, I usually have to tell people to speak up. In your case, I won't do that.

THE WITNESS: Thank you.

THE COURT: You can adjust that microphone, though, so it's comfortable for you.

THE WITNESS: Okay.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, sir.

A. Good morning.

Q. Sir, by whom are you employed?

A. I'm self-employed at the moment.

Q. And what is your profession, sir?

A. Attorney.

Q. And do you practice in any particular area of the law?

A. Several, government relations primarily.

Q. And how long have you practiced in the government relations area of the law?

A. Since '85.

Q. Now, you mentioned that you're currently self-employed. Is that a recent development?

A. Yes.

Q. And prior to being self-employed, were you associated with a law firm here in Rhode Island?

A. Yes.
Q. And what firm was that, sir?
A. Tillinghast Licht.
Q. And how long were you associated with Tillinghast Licht or whatever name it may have been known by prior to that?
A. Since '85.
Q. And when you were associated with Tillinghast Licht, what type of duties and/or responsibilities did you hold within the firm?
A. I was -- at different times I was in the management end of the firm and primarily doing government work.
Q. At any point in time when you were working with Tillinghast Licht, did you obtain a client by the name of CVS?
A. Yes.
Q. And do you recall when it was that you first began to represent CVS?
A. Ninety-eight, I believe.
Q. And what was the nature of that relationship? What type of services were you providing to CVS beginning in 1998?
A. Government relations.
MR. DAMBRUCH: Your Honor, I would ask that

Exhibit 26 be brought up to the witness.
THE COURT: This is a full exhibit?
MR. DAMBRUCH: It is, so I'd also ask that it be published to the jury as well.
Q. Sir, I'd ask you to look at the monitor and tell me if you recognize the first page of that document.
MR. SMITH: Your Honor, we --
MR. KILEY: Your Honor, our screen isn't working. It says "out of range."
THE COURT: Does the jury have it?
JUROR: You can't read it.
THE COURT: Well, we'll work on reading it, but do you have anything at this point? It's small. I understand that.
Mr. Kiley, you don't have it at all?
MR. KILEY: I can stand and look, your Honor.
THE COURT: That's fine. Can you enlarge that?
MR. DAMBRUCH: I just requested that, your Honor.
THE COURT: Mr. Walsh, it might actually be easier for you, if you have the paper document, to refer to that.
A. I have the paper document, and it's my signature.
Q. And, Mr. Walsh, do you recognize that letter?
A. I recognize the signature.

Q. Well, could you look at the letter, please, sir. Do you recognize that letter?
A. Yes, I recognize it. I mean, I don't remember exactly the letter from --
Q. What does that letter --
A. -- 1998.
Q. What issue does that letter deal with?
A. It sets up an agreement to enter a relationship between the law firm and CVS.
Q. Is it the retainer letter for the CVS relationship?
A. Yes.
Q. And what was the date on that letter, sir?
A. April 8th, 1998.
Q. You said you recognized a signature. Does your signature appear on that letter?
A. Yes.
MR. DAMBRUCH: Page 2, please. Your Honor, I apologize.
Q. Your signature appears on the letter. Is there another signature that also appears on that letter?
A. Yes.
Q. And whose signature is that, sir?
A. It appears to be Jack Kramer.
Q. Now, in that letter, does it establish the fee

that you and your firm would receive from CVS in exchange for your services?
A. Yes.
Q. And what was that fee, sir?
A. Five thousand per month.
Q. And did that fee remain the same during the entire course of your relationship with CVS?
A. No. I believe it -- I think it went up during that course.
Q. And how long did you represent CVS in this capacity?
A. From '98 to '04.
Q. So you believe there were some increases along the way?
A. I do.
Q. Who was it at CVS that first contacted you and inquired about retaining your services?
A. I believe it was Jack Kramer.
Q. Following their retention of your services, what type of work did you do for CVS?
A. Primarily General Assembly lobbying.
Q. When you say lobbying, what type of actual work would you do on behalf of CVS at the General Assembly?
A. We would represent their interest in legislation, either pro or con.

Q. And how was it that you would determine what legislation was of interest to CVS?
A. We would determine based on their advising us.
Q. And did you have certain points of contact at CVS who would inform you of that information?
A. Yes.
Q. And who were your points of contact at CVS for the period of 1998 through 2003?
A. The primary points of contact on a day-to-day basis would be -- in our outfit would be one of the people that would work with us, which changed during that time from '98 to '04; but it would have been Gail Wolf, Peggy Forbes, Jack Hogan or Patrick Lynch. And on the other side would be primarily Carlos Ortiz.
Q. Was there any contact with Mr. Kramer on legislative issues?
A. In general, yes. In specifics, not -- probably not.
Q. You just indicated that your points of contact as to what legislation was of interest, you've described them for us. How about as to what position you should take on CVS's behalf, how would you learn that?
A. As I said, in general, on a day-to-day basis, most of the give-and-take would be through somebody who worked with me and with primarily Carlos.

Q. Now, as a representative of CVS at the state legislature, were you required to file any type of reports or documents with the Secretary of State?
A. Yes.
Q. And can you describe those for us, sir.
A. Well, you have to file reports dealing with either the specific bills or the areas that you cover. We chose to list the specific bills. And you'd file that not every month, but it's changed over the years. It used to be monthly from January, and now it's March, but then it would be April, May and June during the session where each month you file a report saying what you favored, what you were opposed to and compensation.
Q. And during the years of 1998 from the time you were retained through 2003, did you file such reports in reference to your representation of CVS?
A. Yes.
Q. Now, you mentioned in response to an earlier question that you weren't the only person at your firm working on the CVS account; is that correct?
A. Correct.
Q. Who else from the years 1998 to 2003 assisted you in working on the CVS account?
A. I think in 1998 it was Jack Hogan and Peggy Forbes, and then it became Patrick Lynch and Peggy

Forbes and then Patrick Lynch and Gail Wolf and then Gail Wolf and Clark Curtis over the time frame.
Q. Of those people you just mentioned, are some of them also attorneys like yourself?
A. Only Patrick. Clark, Gail, Peggy are not.
Q. And you also mentioned, I believe, two --
A. Oh, Jack Hogan who was before that. Yes, he was.
Q. He was also an attorney?
A. Yes.
Q. And the other folks, you mentioned there were some that weren't attorneys. What was their exact role?
A. Their role was working at the State House, working for us at the State House.
Q. And were they all also required and did your firm and you require them to file those same lobbyist reports that you were filing?
A. Yes.
Q. Now, in 1998 and 1999, what were the major issues that you represented CVS on at the state legislature?
A. Freedom of choice.
Q. Was that also known as any willing provider?
A. Yes.
Q. And did CVS identify that as a piece of legislation they were interested in?
A. Correct.

Q. And what position did they ask you to take on that legislation on their behalf?
A. Take a position in opposition to the passage of any willing provider or freedom of choice.
Q. And did you, in fact, represent them in that fashion by opposing the legislation?
A. Yes.
Q. And in the course of that representation of CVS, did you have any contact with the members of the Senate Corporations Committee?
A. Yes.
Q. And can you explain what it was you did in relation to the membership of the committee on CVS's behalf with regard to that legislation.
A. Well, you would -- what one does is bring to the committees and individuals to the best that you can your client's position, you know, whether they favor or oppose a particular piece of legislation. So you try to bring your position for them to review that position.
Q. And did you, in fact, do that in '98 and '99?
A. Yes.
Q. To the members of the Corporations Committee?
A. Uh-huh.
Q. And did that -- do you recall if there was a John

Celona who was a member of that committee during those years?
A. Yes.
Q. And did you have any interaction with John Celona in that regard, representing CVS on any willing provider or freedom of choice?
A. Sure. Yes.
Q. And were you able or did you ascertain what Senator Celona's position was on any willing provider during the '98 and '99 legislative terms?
A. John Celona was in favor of passage of any willing provider.
Q. So that would have been the opposite side of the issue from CVS; correct?
A. Correct.
Q. Now, focusing on the '99 session, do you recall having conversations or any conversations with John Celona about CVS?
A. In general, yes. Not specifically, but in general, yes.
Q. Can you describe the nature and substance of those conversations.
A. Just to make a point, when you ask the question what was his position in '99, during the session, I wouldn't know how he was going to vote until he voted.

You know what I mean? So at the end of the day, he was on that side; but during the session, you're, you know, trying to talk to people about -- about the bill. So you're not sure exactly where they're going to be.

Yes, I tried to talk to him, as other people, during that session. And on several occasions John -- Senator Celona would mention that he wanted me to bring Tom Ryan to the State House.

Q. And was that in the context of your discussions on any willing provider?

A. It was in that context, you know, where -- whether I was actually talking to him on the merits of something or not; but several times he would say, Bring Ryan up here, you know, I want to -- we want to talk to Ryan, that kind of thing.

Q. And did you ever follow up on that request?

A. No, I did not.

Q. Did you ever make any arrangements on behalf of Senator Celona with CVS?

A. Yes, I did.

Q. And can you describe for us what it was you did.

A. Well, as I stated, during the -- several times during the session, Senator Celona would mention that he wanted to meet with Ryan, bring Tom Ryan up. I did not do that. I ignored that.

The vote came. Our side prevailed on that vote that year, '99; and subsequent thereto, the same request or suggestion was made about bringing up Ryan. So I called either Jack or Carlos and said, Can you meet with Senator Celona? He's constantly asking to meet with Ryan. I never brought that back to you; but maybe if you'd meet with him, that would take care of a meeting and we could go on with it. So they said okay, so I suggested that, and then that was the meeting that was set up.

Q. And was a meeting scheduled, sir?

A. Yes.

Q. And where was that meeting held?

A. At the State House.

Q. Do you recall the timing of that meeting?

A. I know it was after the session, so somewhere in the summertime. I can't remember exact time of the meeting.

Q. Excuse me if I missed it, but you mentioned that when you contacted Mr. Kramer to set this up, was that before or after --

MR. CORRIGAN: Objection, your Honor.

THE COURT: Just a minute. Sustained. That was not his testimony.

Q. I'm sorry. I apologize. Who did you contact at

CVS to start the ball rolling in setting up this meeting?

MR. CORRIGAN: Objection. Asked and answered.

THE COURT: Overruled.

A. I called either Jack or Carlos. I just don't remember which one I called.

Q. And with regard to the timing of that call, was that before or after the vote on any willing provider, freedom of choice legislation in the Senate Corporations Committee in 1999?

A. After, and the meeting was after the session was over.

Q. Who was present for the meeting, sir?

A. To the best of my recollection, it was Jack, Carlos, Senator Celona and myself. If there was somebody else there, I don't remember.

Q. And what was the nature and substance of the discussion that took place during this meeting?

A. From my standpoint, the meeting was a meeting because somebody was suggesting a meeting. There are a lot of meetings that go on at the State House with the entities and legislators.

I was looking at it as a meet-and-greet kind of meeting where they could have a conversation, and I assumed that the start of the conversation was some

discussion of any willing provider because that was just one of the biggest cases before the General Assembly that we've seen and the amount of effort and expense that the participants went through in going through that session with television, radio, newspapers.

So there was a lot of publicity on that case, so I assumed that if this is the -- right after that meeting, that there would have been some give-and-take about that issue.

And then the rest of it, I know CVS would make a case as to what -- who they are and what they're doing for the community and that kind of stuff, and there was a give-and-take kind of -- I don't have a clear recollection of the details of that meeting because it's a long time ago and it wasn't -- it wasn't an important meeting in the merits of it to me.

Q. Did you participate in any follow-up meetings between CVS and John Celona?

A. No.

Q. Other than the topics you discussed, that being any willing provider and whatever else you described, were there any other topics you can recall being discussed at that meeting?

A. I can't, no.

Q. Was there any discussion of employment or employment proposals?
A. Not to my knowledge, no.
Q. Now, moving on to the year 2000, were you also representing CVS at the State House during that year?
A. Yes.
Q. And do you recall what, if any, legislation was of interest to CVS during that particular year?
A. No.
MR. DAMBRUCH: May I have Exhibit 34, please.
Q. Have you had a chance to look at Exhibit 34, Mr. Walsh?
A. Yes, sir.
Q. Do you recognize that document?
A. Yes.
Q. And what do you recognize it to be?
A. It's a monthly lobbying report. And on the second page, it's signed by myself and John Kramer. And it lists one, two, three, four, five bills that CVS is opposed to.
MR. DAMBRUCH: May I have the second page, please.
Q. Now, sir, of the bills listed on the second page that CVS is opposed to, there's one listed as S-2774. Do you recall what that bill dealt with?

A. I do not.

MR. DAMBRUCH: Can we have Exhibit 5, page 2, please.

Q. I'd ask you to take a look at what's been marked as Exhibit 5 and, more particularly, page 2 of that document.

A. Yes.

Q. After looking at that document and reviewing it, do you now recall what S-2774 was about?

A. Yes.

Q. And what was that, sir?

A. Freedom of choice or any willing provider.

Q. And you listed on your lobbying report for January, February 2000 that you were against that bill?

A. Yes.

Q. And who were you opposing that bill on behalf of in 2000?

A. CVS.

Q. And was there a CVS representative that was -- that signed that lobbying form along with you?

A. Jack Kramer.

Q. Now, sir, moving on to 2001, do you recall what particular bills were of interest to CVS in that legislative session?

A. No.

MR. DAMBRUCH: May we have Exhibit 38, please.
Q. Do you recognize Exhibit 38, sir?
A. I do.
Q. And what do you recognize that to be?
A. A monthly lobbying report.
Q. Was that a report you filed in relation to your work for CVS?
A. Correct.
Q. And what month and year does that report reflect activity about?
A. May of '01.
Q. I'd ask you to direct your attention to page 2 of that document. I'd also ask that page 2 be displayed, please. Is there any legislation described or identified on page 2 that you were working on on behalf of CVS in May of 2001?
A. You mean the bill number?
Q. Is there any identification of what legislation you were working on on behalf of CVS in May of 2001?
A. Yes, 993.
Q. Are you familiar with what 993 was about?
A. Yes.
Q. And what was that, sir?
A. It was a bill that apparently CVS requested to get introduced into the session.

Q. And do you know who they requested to introduce that bill during the 2001 session?
A. I believe they requested through us.
Q. And was there a particular senator to whom you directed that request?
A. No.
Q. I'd ask you to take a look at -- strike that. Before we move on, with regard to this particular report, did you sign the report before its submission?
A. Which report?
Q. That would be Exhibit 38, sir.
A. This here?
Q. Yes, sir.
A. I signed that, yes.
Q. Did anyone sign that report on behalf of CVS?
A. Carlos Ortiz.
MR. DAMBRUCH: Carlos Ortiz. May I have Exhibit 51, please. May I have a moment, your Honor?
(Pause)
THE COURT: Is there any way she can center that?
MR. DAMBRUCH: Your Honor, I believe there's a problem. The computer monitor is giving her issues; and, therefore, she does not have control over the positioning or size of the document, which is causing

the problem, the technical difficulty.
THE COURT: Okay.
THE WITNESS: The sheet that I have is different than what's on the monitor.
THE COURT: John, this is Number 51.
MR. CORRIGAN: Your Honor, may I speak with Mr. Dambruch for a moment?
THE COURT: You may.
MR. DAMBRUCH: Mr. Fein has graciously offered the assistance of his technical person while we straighten out our problem.
THE COURT: Okay.
Q. Sir, directing your attention to that document, do you recognize that document?
A. Yes, I do.
Q. And what do you recognize it to be?
A. This is a memo to me from Gail Wolf re: CVS legislation for the 2001 session which was written in December of '01. So I assume it's like a year-end report or something.
Q. And does that memo reference the legislation we've just been discussing, that being S-993?
A. Yes.
Q. And could you please read what's written about S-993 at this point in time.

A. It says this Act requires manufacturers of recalled drugs to accept returns. This legislation was introduced late in the session, June 21, at the request of someone at CVS. After further discussion, it was decided to hold the bill, Senate Corporations --

THE COURT: Slow down when you're reading, please.

A. After further discussion, it was decided to hold the bill. Senate Corporations scheduled it for a hearing. After realizing that additional research was needed, Patrick and I discussed the issue with Senator Celona. He agreed at our request that the bill be held without testimony. The committee voted to hold for further study. Held in Senate Corp. at our request.

Q. Looking at that document, does that refresh your memory as to what, if any, involvement Senator Celona had in this particular piece of legislation?

A. Well, it refreshes my memory; but the question you had is, did I direct anything to Senator Celona, and the answer was no. If the question was did Senator Celona introduce the bill, the answer is yes.

Q. And does the document also reflect that either you or someone on behalf of your firm representing CVS had contact with Senator Celona on this legislation?

A. Yeah, I assume that.
Q. Well, does it say that?
A. It doesn't say that. It says Senator Celona put the bill in.
Q. Does the document not indicate that there were some discussions by members of your firm with Senator Celona on this legislation?
A. Yes, it does.
Q. So, again, my question, did your firm on behalf of CVS have contact with Senator Celona on this legislation?
A. I believe yes.
Q. Now, sir, was any willing provider also an issue in 2001?
A. I don't see it.
Q. Do you recall having any communication with any representatives of CVS with regard to any willing provider during the year 2001?
A. Not specifically.
MR. DAMBRUCH: Your Honor, I'm handing this up as Government's Exhibit 364.
THE CLERK: Full?
MR. DAMBRUCH: I believe there's no objection to it being marked in full.
MR. KILEY: Correct.

MR. CORRIGAN: No objection.
THE COURT: No objection to it being admitted as a full.
(Government Exhibit 364 was admitted in full)
Q. Sir, I'd ask you to take a look at what's now been marked as Government's Exhibit 364.
A. Okay.
Q. Does that refresh your memory as to whether you had any communication with representatives of CVS on the any willing provider legislation during 2001?
A. Direct communication, I don't recall. I'm not surprised that there is a memo asking the question on any willing provider. My response would have been that I assume it's not going anywhere because the battle, in my opinion, was over in '99.
Q. Who was chairman of the Senate Corporations Committee in 2001?
A. Senator Celona.
Q. And this is -- this document, is this an e-mail to you?
A. Yes, it is.
Q. And who sent that e-mail to you?
A. Carlos.
Q. And is anyone carbon copied on the e-mail?
A. Jack Kramer.

Q. Now, in the top of the document, there's some handwriting that refers to the names Patrick and Mary. Do you recognize who Patrick is?
A. I assume that is my secretary, Mary, sending a copy of this to Patrick Lynch, who worked with me. That's what I assume it is.
Q. And was Patrick Lynch one of the attorneys working on the CVS lobbying account in the year 2001?
A. Yes.
Q. Moving on to the year 2003, the legislative session of 2003, do you recall what, if any, issues, legislative issues were of importance and that you represented CVS on during that legislative session?
A. Yes. The issue that is most clear to me is the electronic filing.
Q. Do you recall any other issues that you worked on behalf of CVS on during that time frame?
A. I mean, I'm sure there were other issues. There are a lot of issues every year, and people who worked for me would be working on them on an ongoing basis. And I just want to make the distinction when you say you whether you're talking about me or people at Tillinghast because there were two or three other people working on accounts. But the one that I'd most clearly remember is the electronic filing.

Q. And was that something that you were working on on behalf of CVS at Tillinghast?
A. That's one where we received an e-mail from Carlos saying that this bill called electronic filing was something that -- I forget whether in the e-mail it said it came from the Quality Institute, but that's where -- I believe it came from the Quality Institute and that everybody supported it and the Health Department and the medical society and everybody and that he had talked to Senator Celona and he was willing to introduce it and would somebody -- I think that was sent to Paul DeRoche, myself and/or Gail Wolf, and I thought it was like would somebody get this bill moving and -- yeah, that's it, somebody get the bill moving.
Q. Did you take any steps on behalf of CVS with regard to the promotion of this legislation?
A. I personally -- when you say you, are you talking about me or the firm?
Q. You or people working, assisting you at your law firm on behalf of CVS.
A. My best recollection is that Clark, who worked with us, also represented I believe the pharmacists' association and that he wanted to run with the bill because he had his own client. He was not an employee, he was a subcontractor, and he had his own business

separate from us and that one of the people he represented was the pharmacists' association, I believe. And he asked if he could run with it because he had his own client.

So I said fine, and the -- you know, and I didn't look at that as a CVS bill in the same way you would have other bills because everybody under the sun was in favor of that bill, which was not just CVS, it was favored by the medical society and everybody else. And I believe it came from the Quality Institute.

Yes, we represented CVS. We put it on our report because anything you do you put on your report. I just make a distinction because it is a distinction.

MR. DAMBRUCH: May I have Exhibit 355, please.

Q. Sir, I'd ask you to take a look at Government's Exhibit 355.

A. Yes.

Q. What is that document?

A. This is -- I think this is the memo that I was just referring to from Carlos to myself, Gail Wolf, Paul DeRoche. You want me to read it?

Q. No, sir. What is the topic of that particular communication?

A. The topic is, I believe, electronic filing legislation.

Q. And is Mr. Ortiz requesting you and/or Mr. DeRoche to do something in support of that legislation?
A. Yes.
Q. And what did Mr. Ortiz request you to do as the CVS lobbyist on that piece of legislation?
A. Well, it says, "Could one of you" -- it's sent to Joe, Paul. "Could one of you take John Celona the actual language and get it drafted into a bill form."
Q. And do you know if either yourself -- well, if you or any representative of your firm acted on that request and forwarded those materials to Senator Celona?
A. Well, as you read down, it says, "I believe Clark Curtis represents the clinical psychologists, but I don't know who represents the nurse practitioners." Maybe he represented the nurse -- clinical psychologists. I thought it was the pharmacists' association; but I believe that, as it turned out, Clark may have taken the bill from his sense on behalf of his client and following through on that.
Q. And as a result of this e-mail, did you learn whether or not Mr. Ortiz had had contact with Mr. Celona on the issue?
A. No. I don't know any more than what's written on the sheet.

Q. Does the e-mail make reference to contact between Mr. Ortiz and Mr. Celona on this issue?
A. Yes.
Q. And that's an e-mail that you received on February 10th of 2003?
A. Correct.
Q. Now, other than electronic prescription -- strike that. Other than following up on this request from Mr. Ortiz, what, if anything else, did you or the people assisting you at your firm do on behalf of CVS with regard to electronic prescription legislation?
A. Specifically, I don't know.
Q. Do you recall any other pieces of legislation that you represented CVS on during the 2003 session?
A. I'm sure there were other pieces of legislation. I just don't -- I don't have the list in front of me.
MR. DAMBRUCH: I'd ask if you could bring up Exhibit Number 43, please.
THE WITNESS: Yes. This is a list of one, two, three, four, five, six, seven, eight, nine, ten -- ten pieces of legislation. Eight are marked against, and two are marked for.
Q. Before we get to the substance, sir, do you recognize what this document is?
A. Yes.

Q. And what is it, sir?
A. It's the form where you list the bills that you're for or against.
Q. Would it be fair to say that it's the final report you filed in reference to your work for CVS in 2003?
A. Yes.
MR. DAMBRUCH: Could I have page 2 of the document, please.
Q. Now, you mentioned that the document contains a list of legislation that you either supported or opposed on behalf of CVS?
A. Correct.
Q. Now, directing your attention to the first item on that list, 568, do you recognize that piece of legislation?
A. No.
Q. Just before we get to the next step, does it indicate whether you were for or against that legislation?
A. For.
MR. DAMBRUCH: Can we have Exhibit Number 11, page 2.
Q. Could you take a look at that document and tell me whether or not that refreshes your recollection as to what 568 concerned.

A. This is, I believe, the electronic filing bill.
Q. The one that you've spoken about; correct?
A. Yeah.
Q. And who introduced that or who was the primary sponsor of that legislation?
A. Senator Celona.
Q. And moving back to Exhibit Number 43, page 2, moving down on the list to a number 5478, do you recognize that piece of legislation?
A. Was he going to give me the legislation?
Q. We have to take this one step at a time, sir. Again, I'm directing your attention to Exhibit 43, which is the document that we had been talking about previously, and I'm directing your attention to a number that appears, 5478.
A. I see it, yup.
Q. Does the document indicate what position you took on behalf of CVS with regard to that particular piece of legislation?
A. Against.
Q. And do you recall what 5478 was?
A. No.
MR. DAMBRUCH: I'd ask if we could bring up on the screen Exhibit 9, page 3.
Q. If you take a look at the document, please, and

tell me if that refreshes your memory as to what 5478 was.
A. The so-called Canadian pharmacy bill, I think.
Q. And what was CVS's position on the Canadian pharmacy bill?
A. We list it as negative.
Q. And did you oppose that legislation on behalf of CVS during the 2003 legislative session?
A. At the front end of the 2003 legislation, we, I believe, got a position paper from CVS saying that or analyzing the bill, which we usually would get some kind of position paper or analysis of pieces of legislation, whether they were for or against it, because they had the expertise to put that together, and we marked it as negative.
But during the session, we were told not to pursue that position, and we didn't towards the end of the session.
Q. I'm sorry, but going back to Exhibit 43, that's a document that you filed at the end of the 2003 legislative session; correct?
A. Yeah, because we wouldn't change -- we never changed our position. We just weren't active.
Q. But CVS -- according to this document, you were opposed to that legislation on behalf of CVS?

A.    As far as we know because we were never told differently, we would consistently file the reports.
Q.    Now, with regard to the second bill that's listed on the document, 5215 --
THE COURT:  Mr. Dambruch, we'll take that up after the break.
MR. DAMBRUCH:  Thank you, your Honor.
THE COURT:  Would you step down, please.
THE WITNESS:  Thank you.
THE COURT:  Members of the jury, please fold up your notebooks.  We'll take a 15-minute recess. Remember, don't talk about the case at all during the break.
(Recess)
Q.    Mr. Walsh, before the break we were focusing on page 2 of Exhibit Number 43.  Specifically, I had directed your attention to the second number listed on that sheet, that being 5215.  What position does the sheet indicate you took on behalf of CVS on 5215?
A.    The sheet suggests against.
Q.    And that is your report that you filed with the Secretary of State's office?
A.    Yes.  I just make the distinction, when you say you, I filed it and that was the position that we had and we would all file the same bills whether I did

anything or not on it, just to make that distinction.
Q. And is this particular piece of -- this particular document, you mentioned you signed it. Did anyone sign this on behalf of CVS?
A. Yes.
Q. And who was that, sir?
A. It looks like Jack Kramer.
Q. Now, with regard to 5215, do you recall what that particular legislation dealt with?
A. No.
MR. DAMBRUCH: I'd ask for Exhibit 8, page 2.
Q. After having looked at page 2 of Exhibit 8, does that refresh your memory as to what 5215 dealt with?
A. It doesn't refresh my memory. What it tells me is that it was freedom of choice.
Q. And that was a bill that on your report you indicated you opposed on behalf of CVS in 2003?
A. Correct.
Q. And, again, when you use the term freedom of choice, is that also referred to as any willing provider?
A. Correct.
Q. Now, directing your attention to Government Exhibit 354, which is a single-page document, I'd ask you to take a look at that document and indicate if you

recognize it.
A. It's a document to Paul DeRoche and myself from Carlos Ortiz.
Q. And does it reference any legislation?
A. Yes, reimportation, which is the Canadian pharmacy bill.
Q. And does it reference what position, if any, CVS, that being Mr. Ortiz, is asking you to take on behalf of CVS?
A. Yes. It says, "Paul and Joe, this is a bad bill that we need to oppose. Can you tell me who the" --
THE COURT: You're reading it again. Slow it down.
A. "Can you tell me who the Senate sponsors are on this bill."
Q. What position does it ask you to take on behalf of CVS, for or against?
A. Against.
Q. Now, sir, showing you what's been marked as Exhibit Number 366.
MR. DAMBRUCH: Your Honor, I believe there is no objection to this being admitted as full.
MR. CORRIGAN: No objection, your Honor.
THE COURT: 366 is full.
MR. DAMBRUCH: Yes.

(Government Exhibit 366 was admitted in full)
Q. Page 1 of Exhibit 366, do you recognize or -- looking at this, do you recognize this piece of legislation?
A. It looks like the same, Canadian pharmacy.
Q. And what is the bill --
A. Maybe drugs, reimportation.
Q. Is the bill number reflected on the document?
A. The bill number is 299.
Q. Just briefly jumping back to Government's Exhibit 354, is that the same bill number that's reflected in that e-mail?
A. Yeah. At the bottom it says also has -- also been introduced in the Senate, 299.
Q. Now, sir, did you, in fact, make efforts to oppose this particular legislation on behalf of CVS?
A. I did not.
Q. Did someone from your firm assisting you take on that task?
A. Could have at the front end, not on the back end.
MR. DAMBRUCH: Showing you what's been marked as Government's Exhibit 367 -- and, Judge, again, there's agreement that this can be marked as a full exhibit.
MR. KILEY: Agreed.
MR. CORRIGAN: No objection.

THE COURT: This is 367. It's full.

(Government Exhibit 367 was admitted in full)

Q. And directing your attention to the portion of that page that references Senate Bill 299, do you recognize what this type of document is, sir?

A. It looks like a bill tracking.

Q. And is this the type of document that you would receive and review as part of your work as a lobbyist?

A. Well, you would -- you would look at bill tracking just to see -- you know, it tells you where things are and what's happened to them.

Q. And does this document contain the bill tracking for Senate Bill 299 we've just been discussing?

A. Yes.

Q. And does it indicate to which committee the bill was referred after introduction?

A. Yes, Senate Commerce, Housing and Municipal Government.

Q. Was that always the name of that committee?

A. No. I think that's the old Senate Corp. Committee.

Q. So at some point did the Senate Corporations Committee go through a name change?

A. Yes.

Q. And do you recall when that occurred?

A. Exact date, no.
Q. But clearly by 2003 that had happened?
A. Yes, I believe yes.
Q. And do you recall who was the chairman of the Senate Committee on Commerce, Housing and Municipal Government in 2003?
A. Senator Celona.
Q. And does this bill tracking document reflect what, if any, action the Senate Commerce Committee chaired by Senator Celona took on this particular piece of legislation?
A. It says it was introduced in February, and it was scheduled for hearing in June, and in June the committee recommends the measure be held for further study.
Q. And what does held for further study mean, sir?
A. It means it stays in committee.
Q. And what's the practical impact on a bill when it's held for study?
A. If it's held for study and stays there, it doesn't come out; and, therefore, for that session, the bill doesn't get to the floor, doesn't pass.
Q. Now, sir, at any point in time while you served as a lobbyist for CVS did you learn that CVS had some type of relationship with John Celona?

A. Yes.
Q. When was it that you first learned that fact?
A. It was sometime in early 2000. I was -- I was walking down the corridor of the State House. Jack Kramer said, Can I see you a second? He was there for something else, wasn't there with me. He said, I just want to let you know we're doing something with Celona, I thought he was -- referred to either television or charitable activities and said it was approved by the Ethics Commission.
Q. Was there any discussion about compensation or payment to Senator Celona?
A. No.
Q. Did Mr. Kramer ever volunteer that information?
A. No.
Q. On that occasion?
A. No.
Q. On any subsequent occasions?
A. That was the nuts and bolts of the conversation.
Q. And how long did that conversation last?
A. Just as long as it took me to say it.
Q. Did you ever have any other conversations about that same topic with any other representative of CVS?
A. Yes.
Q. And who was that, sir?

A. Shortly thereafter, I don't know exactly when, in a telephone conversation that I had with Carlos, he said, Did Jack mention Celona to you? And I said, Yes.
Q. During that telephone conversation, did Mr. Ortiz ever talk about compensation or payments going to Celona from CVS?
A. No. It was the basic point that was made. That was all.
Q. Now, with regard to that point, the call from Mr. Ortiz, have you testified about these matters previously?
A. Yes.
Q. And it would be fair to say you appeared before a grand jury looking into this matter; correct?
A. Yes.
Q. Did you ever tell that grand jury about the telephone call from Mr. Ortiz?
A. I can't remember. I told the -- I testified before the ethics committee, and I mentioned it there. And I was questioned about that at the grand jury, so I don't know whether I was asked that question as you just asked it or not at the grand jury.
Q. Well, is it your testimony that you told the Ethics Commission when you testified at a deposition that you received a call from Mr. Ortiz?

MR. KILEY: Objection.
THE COURT: Sustained.
Q. What was it you mentioned that you said -- you claim you told the Ethics Commission?
MR. KILEY: Objection.
THE COURT: Overruled.
A. I believe the question was asked similar to your question, did I ever have a conversation with somebody else other than Jack, and I said at the -- I believe at the Ethics Commission that Carlos asked if Jack had mentioned Senator Celona, and I said yes.
Q. Did you ever say or testify on that topic before the grand jury?
A. Well, I don't have --
MR. KILEY: Objection, your Honor.
THE COURT: Just a minute. It's a yes or no. The objection's overruled. That's a yes or no or if you don't know.
A. I don't know whether that question was asked of me at the grand jury.
MR. DAMBRUCH: May I have a moment, your Honor?
(Pause)
MR. DAMBRUCH: I would like to show the witness a copy of his grand jury transcript from Thursday, September 7, 2006.

MR. KILEY: I'm going to object, and I'd like to approach, your Honor.

THE COURT: Approach. Step down, please.

(Bench conference held on the record)

MR. KILEY: Your Honor, the import of my objections has been that I do not know whether Mr. Dambruch is trying to impeach his witness or he's trying to rehabilitate him before cross, and I think that the approach here to this witness on questions that have not been asked in other forums is just an inappropriate way of going about it.

THE COURT: Where are we going?

MR. DAMBRUCH: Your Honor, it's the Government's belief and I believe the transcript will demonstrate, that Mr. Walsh never, ever mentioned that he received a call from Mr. Walsh (sic).

THE COURT: Well, wait a minute. The question that's pending is, were you asked that question, and he said he doesn't know.

MR. DAMBRUCH: I believe the question that I asked was, did you ever tell the grand jury.

THE COURT: Well, the question should have been did anybody ask him that question. As far as I can recall, I don't think you get to volunteer much in the grand jury. So was he asked that question. And if you

have a good faith belief that he was and you want to refresh his recollection, then point me to the page and line reference.

MR. DAMBRUCH: Your Honor, just so the Court is clear, he was asked tell me when you first became aware that John Celona --

THE COURT: Just tell me the page and line reference.

MR. DAMBRUCH: Page 30, line 22 is the question.

THE COURT: Well, you have to go back to line 13.

MR. DAMBRUCH: Yes. I'm sorry, Judge.

THE COURT: The question that was posed to him was, tell me the first time somebody told you. He mentions that conversation with Kramer. There's no follow-up about who else he may have heard from. So I'm going to sustain the objection. That's not the right way to do it.

MR. DAMBRUCH: Thank you, Judge.

(End of bench conference)

Q. Just so I'm clear, Mr. Walsh, during that conversation you're testifying about today, was compensation ever mentioned?

A. No.

Q. Did Mr. Ortiz at any subsequent point in time ever

mention that Mr. Celona was being compensated by CVS to you?
A. No.
Q. Did Mr. Celona ever at any time mention to you anything about the relationship with CVS?
A. No.
Q. And, sir, how long after 2003 did you continue to work on behalf of CVS at the state legislature?
A. 2004.
Q. And did your relationship with CVS come to an end at that time?
A. Yes.
MR. DAMBRUCH: Your Honor, may I have a moment?
THE COURT: You may.
MR. DAMBRUCH: Thank you.
(Pause)
MR. DAMBRUCH: Your Honor, no further questions at this time.
THE COURT: Cross.

**CROSS-EXAMINATION**

**BY MR. CORRIGAN**:
Q. Good morning, Mr. Walsh. My name is Scott Corrigan, and I represent Jack Kramer.
A. Good morning.
Q. I'd like to go back to this conversation you had

with Jack Kramer that you just testified about. This conversation occurred in early 2000, is that your testimony, the conversation with Jack Kramer about John Celona doing something for CVS?
A. Yes, I believe that.
Q. And that conversation occurred in the State House, you said; is that right?
A. Yes.
Q. And during this conversation, Mr. Kramer said to you that he and CVS were doing something with Senator Celona?
A. Yes.
Q. And during this conversation, he said to you they were doing something with Senator Celona involving television; is that right?
A. I'm -- yes. I believe it was television or something to do with the charitable activities. Charitable activities are like the golf tournament that they run for charity, the road race, those kind of things.
Q. So in your mind as you sit here today, you think -- when you reflect back on this conversation with Mr. Kramer, you think about him telling you that Senator Celona was doing something involving television and CVS charities?

A. What I know, what I know is that he said that we're doing something with Celona and it's been approved by the Ethics Commission. And I believe that it was in the context of doing something with television or charitable, but I'm less sure about the latter part.
Q. You've been involved in Rhode Island state government for almost your entire professional career; is that correct?
A. I was involved in public life for 16 years.
Q. Can you tell us, tell the jury what public positions you've held within the State of Rhode Island.
A. Yes. I was a city prosecutor for the City of Warwick, I was a state representative for two years from '68 to 1970, I was a senator for six years from 1970 to 1976, and I was mayor of the City of Warwick from '76 to '84.
Q. And then after you finished your career in public life --
A. I lost.
Q. It's my understanding that you lost an election; is that right?
A. I did.
Q. It was a pretty big election?
A. It wasn't voluntary.

Q. After that second-place finish in that election, did you then enter into private practice with the Tillinghast firm?
A. I did.
Q. And in your role at the Tillinghast firm, you've been involved for the past greater than 20 years in Rhode Island government, is that correct, in terms of providing advice to clients about Rhode Island government?
A. I've been involved in government relations, yes.
Q. And in the course of your career, have you become familiar with what is called the Rhode Island Ethics Commission?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Just a minute. Approach. Step down, please.
(Bench conference held on the record)
MR. DAMBRUCH: Your Honor, first off, this is clearly beyond the scope. Secondly, this calls into question an open issue which I assume Mr. Corrigan is going to ask Mr. Walsh to opine about certain ethical statutes, et cetera, which is a point of controversy.
THE COURT: Where are we going?
MR. CORRIGAN: First of all, I don't believe

it's beyond the scope because Mr. Dambruch elicited during the direct examination that Mr. Kramer told him that there was Ethics Commission approval for the relationship with Senator Celona.

THE COURT: Where are you going with your line of questioning?

MR. CORRIGAN: What I'd like to ask Mr. Walsh is whether he knew at that time that state legislators could go to the Ethics Commission and ask them questions and seek guidance from them about issues of working for private entities in Rhode Island.

MR. KILEY: It --

MR. DAMBRUCH: Your Honor, that then leads to -- it's a 403 problem because here the indication is that there was an oral opinion, not a written opinion.

THE COURT: I think it oversimplifies, and I think that it's a road that I don't think you can go down with this witness. I've told you before that if we're going to go anywhere with this, it's in the nature of jury instructions. So I don't think eliciting testimony from this witness is the way to go.

MR. KILEY: May I speak to it because this is a line I would have anticipated going down in my cross as well. This witness's prior testimony is that he assumed that there was a fee involved in this

transaction.

THE COURT: He hasn't testified to that.

MR. KILEY: Prior testimony.

MR. CORRIGAN: In the grand jury, your Honor.

MR. KILEY: And it is because that is why one would go to the Ethics Commission, and that is a line of inquiry -- if there's no money, there's no question about taking it to the Ethics Commission.

THE COURT: We don't have that on the record yet, but I think to ask it the way you're going about it now to establish the fact that you want to establish oversimplifies the whole issue. So I'm going to sustain the objection and ask you to move on.

(End of bench conference)

Q. Mr. Walsh, in the conversation that you had with Mr. Kramer at the State House in early 2000 about Senator Celona, did Mr. Kramer say to you that CVS was not paying Senator Celona?

A. The conversation -- it wasn't a conversation. It was -- a conversation is two way. Basically what he said is what I said. So you can interpret that how you want. What he said was exactly the words that he said, and that was it.

Q. And you've given us everything he said, and that did not include "we're not paying Senator Celona"?

A. Correct.
Q. The role that Tillinghast would perform for CVS during the time frame of 1998 through 2003 was to review bills that had been introduced in the General Assembly; is that correct?
A. Yes. What we would do is -- we would do it, and they would do it to some degree; but the bills would come in, and somebody in our outfit would go through every bill and see if there's something that they believe would have some effect on their business and send them the bills.
And they may do their own research, and then when they -- they would make the determination if there's a bill that they wanted to take a position on for or against.
Times have changed from the paper world to the technology. In the old days, they would put the bills in the library and you would have to go pull the bills out one at a time on paper and then transmit -- transfer them to clients.
Now people go on the Internet and they just get the bills right up; but at the time we would read the bills, send them to people, and then they would advise us what their position was.
Q. And at the time, hundreds, if not thousands, of

bills would be introduced in the General Assembly each session; is that correct?
A. Oh, correct.
Q. And so Mr. Kramer and Mr. Ortiz and CVS engaged Tillinghast to review those hundreds and thousands of bills on their behalf; is that correct?
A. Yes.
Q. And then Tillinghast would bring to the attention of Mr. Kramer and Mr. Ortiz those bills that were of interest to CVS?
A. We would send them bills that we thought would be relevant to CVS and look for them or any client to tell us -- we didn't make the judgment for clients because they're the experts in their field. So we would just pull out the headnotes or check bills that we think were relevant to each individual client and then have them tell us that they had an interest in this bill or not.
Q. And in the case of CVS, you would hear back from CVS in terms of what bills CVS was interested in; is that correct?
A. Yes.
Q. And CVS would give you its position either for or against the legislation, particular legislation that you would identify for them; is that correct?

A. Yes.
Q. And then was it up to Tillinghast to then execute upon that and take steps to either convince legislators to be in favor of the CVS position or to convince -- to support the CVS position?
A. Yes.
Q. Did you understand that CVS was a corporation at the time that you were working with them that operated in multiple states throughout the country?
A. Oh, yes.
Q. And so Mr. Kramer did not have responsibility for government affairs in Rhode Island alone; is that right?
A. We worked with Mr. Kramer and Mr. Ortiz.
Q. You worked with Mr. Kramer and Mr. Ortiz in Rhode Island; is that correct?
A. Yes.
Q. You were aware that CVS hired lobbyists to represent their interests in other states in the country; is that correct?
A. Yes.
Q. And, in fact, did you meet some of those lobbyists that CVS had hired to represent them in other states?
A. Yes.
Q. Did you represent -- did you meet a Bill Albers?

A. Yes.
Q. Did you understand that Bill Albers represented CVS's government interests, government relations interests in multiple states throughout the country?
A. Yes.
Q. And did you meet an individual by the name of Jack Brennan?
A. Yes.
Q. Did you understand that Mr. Brennan was a lobbyist who was engaged by CVS to represent their interests in the state of Massachusetts?
A. Yes.
Q. Were you invited to meetings at CVS where you would meet with these other lobbyists who were representing CVS in other areas of the country?
A. I think we did -- I think I was invited twice, if I'm not mistaken. I could be off by one. But on at least one and maybe two occasions, I think they had something at CVS where they invited other people in and we had a meeting or a session.
Q. And did you also, during your representation of CVS while working with Tillinghast, did you meet with CVS at the end of the year to discuss the efforts you had made with CVS during the course of the year? Did you have year-end wrap-up meetings?

A. Sometimes, but I don't remember doing that all the time. I saw that one sheet in '01, but I don't remember seeing that every year. I'm sure that there was a wrap-up either in conversation or something, but I don't remember a wrap-up meeting actually taking place every year.
Q. You testified on your direct examination about any willing provider, AWP legislation. Do you recall that?
A. Yes.
Q. And was 1999 the big year for AWP in Rhode Island?
A. Big, big, big.
Q. Was there a lot of money spent by the forces who were arrayed to try to get AWP legislation passed in Rhode Island?
A. Yes.
Q. Did they spend money on television commercials?
A. Yes.
THE COURT: Please get --
A. Yes. It was more than I've seen on anything where somebody would spend money on television, radio and newspapers, rallies, busing. We just -- usually you don't see that because it's almost like a political campaign on the outside as opposed to campaigning at the State House.
You don't usually see that, and it was a

tremendous effort that was put on by the people who were advocating it in '99.
Q. In your 40 years of involvement in Rhode Island politics, would you say that was among the largest legislative battles you've seen in Rhode Island?
A. Yes.
Q. And the outcome of that legislative -- of that campaign by those who were in favor of AWP in 1999, the ultimate outcome was AWP was defeated in '99; is that right?
A. Correct.
Q. And as a result of that, you thought that the AWP issue was off the table for the most part; is that right?
A. I did.
Q. The big battle had been fought; is that right?
A. That's what I thought, yes.
Q. And the proponents of AWP had lost that battle in '99; is that right?
A. Particularly because that -- the opposition in the legislative field kind of went away after that fight. So that was like, to me, it was over; and we didn't really pay much attention to any willing provider after '99 because as far as I was concerned, in my mind, that fight was over and unless I had some indication that

there was -- that it was going to be back on the front burner, that it was not on the front burner and it wasn't a front-burner issue.
Q. I'd like to talk to you about Senator Celona and his role in the Senate in 1999. Was Senator Celona a senator who had any legislative power in 1999?
A. Well, I would never say that any senator doesn't have any power, if I frame it that way. Every senator has power by virtue of their office. If the question was, was he on the inside in the power structure or not, the answer was not.
Q. He was on the outside of the power structure?
A. At that time.
Q. He was in a faction aligned with a Senator Montalbano in 1999; is that correct?
A. It was sort of -- you'd call it a dissident faction. You have somebody that's in authority, and then you have sometimes people that want to become the authority, and there are different factions. And he was, I believe, in the outside faction in 1999.
Q. And was Senator Montalbano in that outside faction along with Senator Celona in 1999?
A. Yes.
Q. Do you know what a political action committee is?
A. Yes.

Q. What is a political action committee?
A. A political action committee is something that's authorized where individuals can contribute to one fund and that fund then contributes to political candidates.
Q. Is a political action committee commonly referred to as a PAC?
A. Yes.
Q. Did CVS have a PAC during the time that you were representing them?
A. I believe they did, yeah.
Q. Did you understand that CVS made PAC contributions to Rhode Island legislators?
A. Yes.
Q. During the time that you worked for them?
A. Yes.
Q. And, in fact, you communicated with CVS and Mr. Kramer and Mr. Ortiz about making PAC contributions to legislators in Rhode Island; is that correct?
A. We would communicate with all clients as to what's going on and who's having fundraisers so that they would be aware of what's going on and who's having -- what events are scheduled just so they would know.
Q. And these fundraisers that you would -- you let Mr. Kramer and Mr. Ortiz know about fundraisers; is that correct?

A. Yes. That's the purpose of the PAC.
Q. And there was a -- the way to enter or the entry fee for going to one of these fundraisers was to make a PAC contribution; is that correct?
A. Well, I wouldn't call it an entry fee.
Q. Well, I don't want to --
A. If there's an event, there's a ticket price for the event. And then if people go, they pay the ticket price. Whether they do it from a PAC or personal contribution is up to them.
Q. Is it your understanding that CVS would pay those ticket prices out of its PAC?
A. My belief is they did, yeah.
Q. Have you ever been at an event at CVS where John Celona was present?
A. Yes.
Q. On how many such occasions do you recall being at CVS along with John Celona?
A. One.
Q. And was Paul DeRoche present at that -- on that occasion at CVS?
A. I couldn't tell you.
Q. On that occasion when you were present and Senator Celona was present, were there any other Rhode Island legislators present?

A. Yes, I believe yes.
Q. Do you recall how many other Rhode Island legislators were present?
A. No.
Q. You testified a bit about the e-prescription bill on your direct examination. Do you recall that?
A. Yes.
Q. The electronic prescription bill?
A. Yes.
Q. And that was a bill that you believe came from the Quality Institute; is that correct?
A. That's what I thought.
Q. And --
A. Originally.
Q. You don't think that any longer, you don't believe that --
A. No, I mean originally came from the Quality Institute.
Q. I understand. However it came into your hands, it didn't come directly from the Quality Institute?
A. Correct.
Q. But you believe it was drafted by the Quality Institute; is that correct?
A. Drafted or initiated along with the Department of Health.

Q. The Quality Institute, did you understand, was a not-for-profit corporation in Rhode Island?
A. Yes.
Q. And that was a not-for-profit corporation that included the hospitals in Rhode Island; is that right?
A. Yes.
Q. Did it include doctors in Rhode Island?
A. I assume it did because the medical society, so it was either doctors or their staff of the medical society. I'm not sure which.
Q. And it also included pharmacies in Rhode Island?
A. I assume that. I assume it included everybody in the health field.
Q. For the most part, the Quality Institute was a consortium of the health care community in Rhode Island?
A. Yes.
Q. There was no opposition to that electronic prescription bill that you know of, was there?
A. No. I believe it was unanimous on both sides.
Q. It passed unanimously in the committees in both the House and the Senate; is that correct?
A. I don't remember any opposition at all from anybody on that bill, and -- because I believe it was worked out through the Quality Institute which had all

the affected people on it, whether it was the pharmacies or the pharmacists or the doctors or the hospitals, and therefore -- and the Health Department. And I think the Health Department participated in the final draft. So that when it came out, it had the support of everybody in the field. So there was, to my knowledge, nobody that opposed that bill.
Q. And among those that were supporting the bill was CVS; is that correct?
A. Yes.
MR. CORRIGAN: Could you please put up Government Exhibit 43. And this is in full, your Honor, so may I have it displayed to the jury?
THE COURT: You may.
Q. This is one of the final lobbyist reports that Mr. Dambruch asked you about during your direct examination. Do you recall taking a look at this?
A. Uh-huh.
Q. These final lobbyist reports, these are filed with the Secretary of State of Rhode Island; is that correct?
A. Yeah.
Q. These are public disclosures; is that right?
A. Yes.
Q. On the second page of this, if you take a look at

S-568, that's the electronic prescription bill that we're talking about, did Tillinghast publicly disclose that it was working on behalf of CVS to get this bill passed?
A. This is a public disclosure of that. Of course.
Q. Similarly, the next two bills that are on this document, the 5215, that's the pharmacy freedom of choice bill, do you remember talking about that bill during your direct examination?
A. Yes.
Q. And the S-5478, that was the Canadian pharmacies bill?
A. Uh-huh.
Q. This is a public disclosure of what CVS's position was on those pieces of legislation; is that correct?
A. Yes.
Q. Going back to the 1999 session, you've testified that on various and repeated occasions Senator Celona said to you, Bring Mr. Ryan up; is that right?
A. Yes.
Q. And Mr. Ryan was Mr. Thomas Ryan, the CEO of CVS; is that correct?
A. Uh-huh. Yes.
Q. And Mr. Celona didn't ask you just one time to bring Mr. Ryan up, did he?

A. No, several.
Q. And he asked you several times before the vote on AWP; is that right?
A. During the session would be before the vote, yes.
Q. And then he asked you to bring Mr. Ryan up after the vote on AWP; is that right?
A. Yes.
Q. And you decided that, well, I'm not going to bring Mr. Ryan up to see Senator Celona. That was a decision that you made; right?
A. Correct.
Q. You weren't even going to ask CVS --
A. I didn't ask.
Q. You made a decision that what you would like to do is to ask Mr. Kramer and Mr. Ortiz to attend this meeting with Senator Celona to get him to stop pestering you; is that right?
A. Well, I wouldn't put it exactly -- I wouldn't use those words, but I wanted to set up a meeting to get it over with.
Q. Well, because he kept asking you to bring Mr. Ryan up; right?
A. He did, and when he did after the vote -- when the vote happened, I thought, well, maybe that will just end that, but it didn't. So then I thought, well, I

might as well do something to get rid -- move that issue off the table.

So I asked Jack and Carlos if they would meet with him so -- and I believe I said to them what I just said to you, that, you know, he's always asking me to meet with Ryan, I never brought that back because I didn't want to, and asked to meet and we could -- it's not abnormal to have meetings. It just would have been abnormal for me to go to the CEO of a major company and say, Would you come up to the State House and meet with an individual senator. I just didn't think that was the right thing to do.

Q. And ultimately you asked Mr. Kramer and Mr. Ortiz to attend this meeting with Senator Celona?

A. I did.

Q. And the meeting took place; is that right?

A. Yes, it did.

Q. When does the Senate session end?

A. Generally at the end of June.

Q. And the meeting that you had with Senator Celona and Mr. Kramer and Mr. Ortiz at the State House, that took place after the session; is that correct?

A. Yes.

Q. So it must have taken place after May 27th of 1999?

A. Correct.
Q. It couldn't have taken place before then; is that right? It didn't take place before?
A. No, it was after the session.
Q. That -- at that meeting, was Senator Celona at all hostile to you at the meeting?
A. No.
Q. Was he hostile to Mr. Kramer or to Mr. Ortiz?
A. When you say you, you mean me personally or CVS?
Q. You personally or CVS.
A. No, he wasn't hostile to me. Whether there was something said at a meeting that somebody could have taken as hostile, I don't know; but I don't remember that. I don't think he was -- what would the whole point be of a meeting if you're going to be hostile? There was nothing pending at the time even because they're out of session.
Q. Well, you described it as a meet-and-greet; correct?
A. Yeah. That's how I looked at it.
Q. That doesn't connote hostility, does it?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Was this a cordial meeting?
A. I thought it was cordial. As far as I was

concerned it was.
Q. And did the meeting take place in the lounge of the Senate?
A. I don't believe so. The lounge is the very big room in the back of the chamber. I mean, I believe it was in a committee room or next to a committee room where they have offices on that corridor; but, you know, I'm not exactly sure where that meeting took place.
Q. To the best of your recollection --
A. Specifically.
Q. I didn't mean to cut you off. To the best of your recollection, it didn't take place in the Senate lounge; is that right?
A. I don't think so. I think I would have remembered that because it would have been out of place in that big room; but I thought it was in a committee room or an office that's next to a committee room on the second floor of the building.
Q. Were there any other senators at that meeting?
A. Not that I recollect, but it doesn't mean somebody couldn't have been walking in and out or being up there because people tend to go up there right -- you know, if it were close to after the session, people would still be around.

So could there have been somebody else in and out of places, yes, but I don't recollect anybody sitting at that meeting.
Q. Switching to the return of pharmaceuticals bill that you testified about on your direct examination, the bill that was referred to in Government Exhibit 51.
MR. CORRIGAN: Can we have Government Exhibit 51, please.
Q. And if you take a look, I believe it's S-993.
A. Okay.
Q. And just to backtrack a little bit. This is a memo that was written by Gail Wolf; is that correct?
A. Yes.
Q. And Ms. Wolf, do you know that she went to high school -- the same high school as Senator John Celona?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. This does not indicate on here that the bill, S-993, was brought to Senator Celona at the direction of anyone at CVS, does it?
A. No.
MR. CORRIGAN: May I have Government Exhibit 364.
Q. Do you recall talking about this e-mail during your direct testimony, Mr. Walsh?

A. Yes.
Q. This was an e-mail from Mr. Ortiz where he was asking about an any willing provider bill in 2001; is that right?
A. Yes.
Q. Do you see that the bill is titled H-5495?
A. Yes.
Q. Does that mean that that was a House bill?
A. Yes.
Q. And so if that bill went nowhere that year, that means it went nowhere in the House; is that correct?
A. If that bill went nowhere, it means it stayed in the House, correct.
MR. CORRIGAN: We can take that down, please. May we have Kramer F-2, and I believe this is a stip in full.
MR. DAMBRUCH: I'm sorry?
MR. CORRIGAN: F-2.
MR. DAMBRUCH: Thank you.
THE COURT: This is a full exhibit.
(Defendant Kramer Exhibit F-2 was admitted in full)
MR. CORRIGAN: May we display this to the jury? Thank you.
Q. Mr. Walsh, do you recognize this to be a

spreadsheet of bills that Tillinghast maintained as it was keeping track of legislation for CVS?
A. Yes.
Q. Do you see the -- and this is dated June 20th, 2002. Do you see that?
A. Uh-huh.
Q. So does this -- you have to answer.
A. Yes.
Q. So these are bills dealing with the 2002 legislative session; is that correct?
A. Yes.
Q. If you take a look at the fourth bill listed on here, S-3018. Do you see that?
A. Yes.
Q. And that was a bill that was sponsored by Senator Sheehan; correct?
A. Yes.
Q. And this was a Senate resolution memorializing the U.S. Congress to allow the State of Rhode Island to create, implement and oversee a pilot program allowing for the reimportation of prescription drugs from Canadian pharmacies. Do you see that description of the bill there, Mr. Walsh?
A. That's correct.
Q. In this position column that we have here on the

far right, does that indicate what CVS's position was on that bill?
A. Yes.
Q. And CVS's position on that bill was opposed; is that correct?
A. That's correct.
MR. CORRIGAN: May we have Kramer B-9. And again, your Honor, this is admitted in full pursuant to agreement with the Government.
(Defendant Kramer Exhibit B-9 was admitted in full)
Q. Do you see this is the S-3018 bill in 2002, Mr. Walsh?
A. I see it.
Q. That's the bill that was referenced on the exhibit that we were just looking at; correct?
A. Yes.
Q. And if we go to the second page of this document, please, if you look at the resolve paragraph, Mr. Walsh, it indicates that this Senate of the State of Rhode Island and Providence Plantations hereby memorializes the United States Congress to allow the State of Rhode Island to create, implement and oversee a pilot program allowing for the reimportation of prescription drugs from Canadian pharmacies. Do you

see that?
A. Yup.
Q. And it's your understanding that CVS at this point in time in 2002 was opposed to reimportation of prescription drugs from Canada; is that right?
A. That's correct.
MR. CORRIGAN: May we have Exhibit D-9 displayed for the jury. And, again, your Honor, this is an exhibit that is admitted in full pursuant to the agreement the parties have reached.
(Defendant Kramer Exhibit D-9 was admitted in full)
Q. Mr. Walsh, do you recognize this to be a vote sheet from the Senate Committee on Corporations?
A. Yes.
Q. And do you recognize that this is a vote on bill number S-3018, the Canadian pharmacies resolution we were just talking about?
A. Yes.
Q. And if you look in the action taken box, it says that this bill was passed as received. Do you see that, sir?
A. Yes.
Q. And if you look on the column of yeas, that means those are the people who voted in favor of passing this

bill; is that correct, sir?
A. Yes.
MR. CORRIGAN: And it looks like we have one, two -- I'm sorry, can you erase that for me. I didn't mean to touch that.
THE CLERK: Press the corner of the screen.
Q. We have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 senators who voted in favor of this resolution?
A. Yes.
Q. And among those who voted in favor of this resolution that CVS opposed was Senator John Celona; is that correct?
A. That is correct.
Q. Senator John Celona was the chairman of the committee at that time; correct?
A. Yes.
MR. CORRIGAN: May we have Kramer E-2. Again, your Honor, this is an exhibit that is admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit E-2 was admitted in full)
Q. Mr. Walsh, this is again another one of the Tillinghast spreadsheets that tracks legislation for CVS; is that correct?
A. That's correct.

Q. And do you see that the top bill is a bill entitled -- excuse me, numbered S-2255Aa/a? Do you see that?
A. Yes.
Q. Does that -- do those As symbolize that that is something known as S-2255 substitute A? Do you understand that that's what that symbol means?
A. Yes.
Q. And this is an Act relating to regulation of business practices, consumer protection treble damages?
A. Yes.
Q. And in the position section of this, it indicates priority oppose. Do you see that?
A. Yes.
Q. What does priority oppose mean?
A. It means they oppose it and it's in their higher category of concern.
Q. Stronger opposition than just regular oppose; is that correct?
A. That's correct.
MR. CORRIGAN: May we have Kramer Z-15. And, again, this has been admitted pursuant to stipulation.
(Defendant Kramer Exhibit Z-15 was admitted in full)
Q. Mr. Walsh, do you see that on the screen in front

of you?
A. I do.
Q. This is another one of your monthly lobbying reports. Do you see that?
A. Yes.
Q. And this is a monthly lobbying report for the month end June of 2000 if you look to the second page?
A. Okay.
Q. Do you see your signature's dated July 3rd of 2000?
A. Yes.
Q. And if you look on the Section 5, the legislation information, there are three bills listed in the "against" column?
A. Yes.
Q. And one of those bills is S-2255A?
A. Yes.
Q. That's the bill that we were just looking at that was a priority oppose for CVS; is that correct?
A. That's correct.
MR. CORRIGAN: Can we have displayed for the jury, please, Kramer Y-15, which, again, your Honor is admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit Y-15 was admitted in full)

Q. Mr. Walsh, do you see what's been marked as Kramer Y-15 on your screen? Do you see the bill that's on --
A. I see the bill on the screen, yes.
Q. I'm not going to ask to you read the whole bill, but can you identify this as S-2255 substitute A?
A. Yes.
Q. The bill that we've been describing?
A. Yes.
MR. CORRIGAN: Can we -- may we have displayed please Kramer F-9, which, again, your Honor, has been admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit F-9 was admitted in full)
Q. Do you recognize what the first page of F-9 is, Mr. Walsh?
A. Yes.
Q. This is a Journal of the Senate; correct?
A. Yes.
Q. This is an official record of what happened in the Senate on May 9 of 2000; is that correct?
A. Yes.
Q. And if we go to page 22 of this exhibit, do you see that in the middle there of that page there's a section that says floor amendment to S-2255

substitute A?
A. Okay.
Q. Do you see that?
A. Yes.
Q. Again, this is now a reference within the Senate journal itself of the bill that we've been discussing that was a priority oppose for CVS; correct?
A. Yes.
Q. And if we go to the next page, do you see that in the -- there's a paragraph that begins "upon motion of Senator Igliozzi"? Do you see that paragraph?
A. I do.
Q. The bill marked substitute A is read and passed as amended. Does that mean that that bill passed in the Senate on that date?
A. Yes.
Q. And if we look at the next paragraph, it indicates who the senators are who voted in favor of passing that bill, the yeas section. Do you see that, Mr. Walsh?
A. I do.
Q. And do you see that in the yea section, among the senators who voted in favor of passing that bill that was a priority oppose for CVS was Senator Celona?
A. That's correct.
MR. CORRIGAN: We can take that down.

Q. I'd just like to return briefly to the conversation that you had with Mr. Kramer in the State House in early 2000 when he said to you that he was doing something with Senator Celona and there was Ethics Commission approval. Did he ever tell you to keep that conversation a secret?
A. No.
Q. Did he ever at any point in time ever communicate to you in any way that you should not reveal what he had told you to anybody?
A. No.
MR. CORRIGAN: I have no further questions, your Honor.

**CROSS-EXAMINATION**

**BY MR. KILEY**:
Q. Good afternoon, Mr. Walsh.
A. Good afternoon.
Q. I'm Tom Kiley, and I represent Carlos Ortiz. Let's stay focused, if we will, on the conversations, the corridor conversation with Mr. Kramer first. Did you ask Mr. Kramer whether there was compensation flowing to Mr. Celona?
A. No.
Q. You've been around the State House for a long time?

A. Yes.
Q. Both as a lobbyist and as an officeholder. When you started, the pay was $300 a year; right?
A. That's correct.
Q. It's gone up a little bit?
A. It has.
Q. Rhode Island has remained a part-time legislature?
A. Yes, it has.
Q. You held outside employment when you were making $300 a year?
MR. DAMBRUCH: Objection.
A. Yes, I did.
THE COURT: Sustained. The answer may be stricken, and the jury will disregard.
Q. Are you aware whether Senator Celona had outside employment in 1998 other than with CVS?
MR. DAMBRUCH: Objection.
THE COURT: Approach. Step down, please.
(Bench conference held on the record)
MR. DAMBRUCH: Two objections. First is the relevance of what this witness knew. Secondly, depending on the answer, we could get into some dangerous waters if he talks about the Village at Elmhurst. If he was aware of that, then that might open some doors.

MR. KILEY: I don't want to go there. Again, where I'm going with this is what I told you when we were up here before. This gentleman made an assumption, and he's previously testified about the assumption that he made following that -- in that corridor conversation about the fact that there was fee involvement. And that's where I want to go, and that's what I signaled to you before.

THE COURT: Well, I think there's a more direct way you can do it without getting into the trouble you're going to get into if you ask it this way. So I'll sustain the objection.

MR. DAMBRUCH: As to the second point, as to the assumption, it's irrelevant and actually misleading to the jury to get into what this person assumed. It's what was communicated.

THE COURT: Did anybody ever tell him anything?

MR. DAMBRUCH: No.

MR. KILEY: He made the assumption, and then he acted on the assumption, your Honor, based upon his experience as a legislator.

THE COURT: What did he do to act on it?

MR. KILEY: He followed through on numerous matters involving Senator Celona. He's a lobbyist. He is being asked to take actions on these very bills that

have come before us.

THE COURT: I'm not understanding how his assumption that Celona was being paid by CVS somehow impacts what he's going to do as a lobbyist.

MR. KILEY: He's a lawyer and lobbyist who is aware of what the Ethics Commission can and does do. He is aware that or believes that Celona is being compensated by CVS and yet asked by CVS to take actions with Senator Celona.

Instead of running away from that and suggesting there's a problem, he follows through. That will be the ultimate argument.

THE COURT: But it's still based on an assumption. There's no fact to support that. So I'm going to sustain the objection.

MR. KILEY: Shall I ask the question to preserve the record?

THE COURT: No. I think you just have.

(End of bench conference)

Q. Do you recall being asked on direct examination whether you have ever before told anybody of the conversation between you and Carlos Ortiz with respect to the Celona relationship? "No" is I think what you're gesturing.

A. I mean, try that question again, please.

Q. Do you recall Mr. Dambruch trying to ask you the question whether you have previously said to anybody anything about the conversation you imparted today between you and Carlos Ortiz concerning the Celona relationship?

MR. DAMBRUCH: Objection, your Honor. That's not exactly what I asked.

THE COURT: Sustained.

Q. Do you recall your testimony at the Ethics Commission?

A. Yes.

Q. Do you know whether you were asked at the Ethics Commission a question about the conversation you had with Carlos Ortiz?

A. It wasn't exactly that question. The question I believe was, was there ever any conversation or communication with Carlos, and my answer was yes. At some point subsequent to my conversation with Kramer, Jack Kramer, Carlos, in a -- it wasn't a conversation set for that. It was in a conversation he asked, Did Jack ever mention to you about Celona? And I said, Yes.

Q. And you believe you said that at the Ethics Commission?

A. Yeah.

Q. And you believe that -- you placed the conversation as sometime in 2000. Is that when you dated it?
A. Best guess.
Q. And in that -- that also was a two-way conversation, like the conversation with Mr. Kramer; correct? You and Mr. Ortiz were conversing with one another?
A. It was just two, yeah.
Q. Did you ask about compensation?
A. No.
Q. Did Mr. Ortiz ask you to keep that conversation secret?
A. No.
Q. Did that discussion in 2000 precede consideration of AWP in 2000 by the legislature?
A. In two -- I believe that that conversation or those conversations were at the front end of the 2000 legislative session, and any decisions on legislation as any willing provider were probably more towards the back end of the '00 session.
Q. Can you help us with the process a little bit, legislative process now, Mr. Walsh. When are bills normally filed? Are they filed before the session?
A. You can file them before the session, but -- some

people do. Most people don't. All bills are supposed to be filed sometime in February. You can still put bills in after that deadline; but they have a deadline, and they try to get all the bills in before that deadline. Again, as I say, you can still put bills in after that.

And then all the bills are tried to get out of the house of origin, the House or the Senate, by the break.

Q. And by the break means what?

A. The break in April, the school vacation break. So between February and April, they try to hear the bills on each side. And then whatever they pass by that break goes to the other side, and that's what they try to concentrate on in the last two months, in May and June.

Q. Is there any way looking at the 2000 legislation dealing with AWP that you could tell us when the bills were filed, the bills --

A. I could if I saw the bill because on the bill note or on the computer, it will tell you when the bills were introduced.

Q. Would it be obvious to anybody monitoring the legislation whether Senator Celona was a sponsor of a bill?

A. Well, you would know that by looking at the bill because on the bill, right under it, it says "sponsored by" and then it lists the names.
Q. And there's a public record, is there not, at the outset for you as a lobbyist and others to look at that tells you what bills are coming up and where they are?
A. Yes. When the bills are introduced, they get printed, and now they're on the computer; but the printing of the bill will say, you know, bill introduced by, and then it has the names and where the bill goes to what committee.
Q. Who makes the decision as to assignment to committee?
A. The presiding officer of the respective party.
Q. And then how does it get determined whether a bill gets a hearing or not?
A. If a bill is in the house of origin, I believe the rules are that anybody can get a bill heard out of the house of origin. When they cross, there's -- I don't believe that that role exists. So there can be a hearing or there doesn't have to be a hearing.
Q. Are requests made in writing all the time with respect to hearings?
A. I guess one could make a request in writing. I'm not familiar with requests in writing.

Q. Is part of the calculus in determining whether a bill gets a hearing or not its likelihood of passage?
A. No. Sometimes yes, sometimes no.
Q. Now, you paid attention to --
A. That's a good point because in the old days they would only hear bills --
MR. DAMBRUCH: Your Honor, I'm going to object as being nonresponsive.
THE COURT: You're volunteering.
THE WITNESS: Okay. Sorry.
THE COURT: Wait for another question.
Q. You monitored AWP and lobbied AWP for CVS from '98 for a period of years; correct?
A. Our entity, yes.
Q. Did the votes remain relatively constant from '98 to '99 in the Senate Corporations Committee?
A. Yes.
Q. And did they remain relatively constant from 1999 to 2000?
A. Yes.
Q. Was it your understanding that AWP was not going nowhere in 2000?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained as to form.
Q. Did you have an understanding with respect to the

prospects of passage of AWP in 2000?
A. I wouldn't use the word understanding. Did I have -- my position was I believed that after 1999 that issue was going to be a back issue because when you go through a major battle, a major war, and the vote was, I believe, 12 to 4, so it was a significant win on our side, that I did not believe that that would be a real competitive issue in the future.
And I was correct. The people who were on the other side kind of walked away from that legislative process, and it wasn't competitive, and it wasn't a front-burner issue. And my position with our people was, you don't have to pay attention to that anymore unless and until somebody basically -- you learn that it's now back as a front-burner issue. So you don't need to concentrate on it as we did in the past.
Q. Moving away from AWP, does the phrase message bill mean anything to you?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: Relevance.
THE COURT: Well, we'll see where he's going with it. It's a yes or no.
A. I've heard the phrase recently, yes.
Q. In what context, sir?

A. Well, somebody else asked me the same question that you just asked me; but before that, I hadn't heard the phrase.
Q. It wasn't your lawyer, was it? I don't want to know what you've been asked by other lawyers. Were you ever asked to file -- were you or your colleagues at Tillinghast asked to file a message bill on behalf of CVS?
A. I don't know what a message bill -- I took the position every bill is a message bill. Every bill gives a message to somebody, a good message or a bad message. So I don't know what a message bill is because every bill, in my mind, gives a message. So I don't know if that answers your question or not.
MR. KILEY: Perfect. Anything you say is an answer to me, Mr. Walsh. Thank you.
I'm going to ask for GX-51.1. I'd ask that the matter be published, your Honor. It's a full exhibit.
THE WITNESS: Yes, I've seen this.
THE COURT: It's not up on the screen yet. Okay.
Q. And on direct examination, I believe you testified with respect to the third bullet, Senate Bill 993. Do you recall that?
A. Yes.

Q. Was it your testimony that your firm was not asked to have this bill filed by Senator Celona?
A. I'm sorry. Could you rephrase the question.
Q. Were you directed by anybody at CVS to have Senator Celona file this bill?
A. No.
Q. Now, was there at some point a specific request made of Senator Celona with respect to the bill?
A. Yes. Yes, I believe so.
Q. And what is your memory of what the ask was of Senator Celona?
A. My memory and belief is that we, our office, was -- received a request late in the session from CVS to introduce -- to have a bill introduced. And somebody in our office I believe went up to the State House to get the bill introduced, I believe, and in conversation, that it was late in the session, just make sure the client knows that they put a bill in late, there's virtually no chance of passage if it's controversial, but if they ask to get a bill in, fine, put a bill in.
The bill was requested to be put in, and it was put in. And then subsequently there was a hearing scheduled. A report came back that it was controversial. So we took the position to forget the

bill, that it can't pass, it's late in the session and you can't pass a controversial bill late in the session that was put in late. So forget it, and it was withdrawn.

Q. Did your office consult with Senator Celona to get his permission to withdraw the bill?

A. Yes.

Q. And the bill was held without testimony?

A. Correct.

Q. And put into study, which you've already explained means not passed that year?

A. Correct.

MR. KILEY: You've also -- that's all with that exhibit, your Honor.

Q. With respect to meetings at CVS in which Senator Celona was involved, have you attended meetings hosted by the Greater Providence Chamber of Commerce that occurred on the premises of CVS headquarters?

A. I could have, but it doesn't ring a bell. I wouldn't be surprised because they were very active with the Chamber. I just don't know what particular meeting. It doesn't ring a bell.

Q. You recall a meeting that you attended at which Senator Celona and perhaps other legislators -- and other legislators may have been present; correct?

A. Yes, I do.
Q. Was e-prescription discussed at that -- electronic prescribing discussed at that meeting?
A. I couldn't tell you. I don't know.
MR. KILEY: You previously looked at Government Exhibit or G-354. May I have that, please, and have it published.
THE WITNESS: Okay.
Q. The bill that you looked at earlier today, Senate Bill 299, was an electronic prescription bill? You won't see it on that paper. I'm testing your memory, Mr. Walsh, and not in a bad way.
A. It says -- this says, "Paul and Joe, this is a bad bill we need to oppose." That's the Rhode Island reimportation, which is Canadian. And then at the end it says, "Also been introduced in the Senate is 299." That would give the impression that 299 was the Canadian pharmacy bill.
MR. KILEY: And on -- and we've also looked at G-358.1. May I have that, please. If that is 358.1, I'm looking at the wrong one again, your Honor.
Q. Do you recall looking at an e-mail dealing -- dated February 10th, 2003? This is where my technological challenge comes in. February 10th, 2003, e-mail to Joe Walsh and Gail Wolf, among others.

THE COURT: You're looking for an e-mail?
MR. DAMBRUCH: I believe it's 355, Judge.
THE COURT: 355.
A. Yes, I remember this.
Q. Was the electronic prescription matter roughly contemporaneous with the Canadian reimportation matter in February of '03?
A. Yeah, I mean, because it's around the same time frame, in February, I guess.
Q. Is the electronic prescription bill the only bill which during your representation as an agent of CVS you were asked to have Senator Celona file?
A. Yes.
Q. There was never another occasion during the period of 1998 forward when you were representing them that you were asked to have him file a bill for you?
A. Correct.
Q. Was it ever suggested to you that John Celona would be CVS's go-to guy on all legislative matters?
A. No.
Q. Was it ever suggested to you on any other matter other than e-prescription that John Celona had agreed to do anything for CVS?
A. Correct.
Q. Now, with respect to e-prescription -- strike

that, your Honor. You talked very briefly on cross-examination by my brother, Mr. Corrigan, about the dissident faction that existed in the Senate, people who might be looking to posture a little bit differently, and you identified Senators Montalbano and Celona as being a part of that group. Do you recall that?

A. Uh-huh. Yes.

Q. In 1998, would you characterize Senator Issa, I-S-S-A, as being inside or outside of that group? And if you don't know, that's a perfectly acceptable answer.

A. You know what, I wouldn't guess. I would be guessing.

Q. And could you give us an answer if I'm asking the same question with respect to Senator Palazzo? Do you know one way or another?

A. I wouldn't guess because sometimes those things change, so I'm not sure -- I'd rather not guess.

Q. Just like positions on bills, they change?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained. The jury will disregard.

MR. KILEY: No further questions, your Honor.

THE COURT: Redirect?

MR. DAMBRUCH: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Mr. Walsh, during his cross-examination of you, Mr. Corrigan, on behalf of Mr. Kramer, asked you some questions about a Senate resolution that was introduced memorializing Congress to do something on --
A. I remember, yup.
Q. -- Canadian reimportation. Do you recall those questions?
A. Yes.
Q. What's the practical impact of a Senate resolution memorializing Congress?
A. Well, it's a difference -- there's a difference between a law and a resolution. A law is a law. A resolution is a request that goes to somebody to say we would ask you to consider our position on this.
Q. So practically speaking, the passage of the resolution, would that have allowed reimportation of Canadian pharmaceuticals?
A. In and of itself, no. It would be a resolution to go to the body, in that case I guess it's Congress, that could have done something if they so choose; but the resolution didn't have any bearing on that. It's a position of -- it's your position, and you're advising somebody of your position.

Q. So it's something, then, some document just sent down to Congress, and Congress is then made aware that the Rhode Island state Senate --

A. Correct.

Q. -- thinks this might be a good idea?

A. Correct.

Q. But as far as practical impact, would the passage of that resolution have allowed for reimportation of pharmaceuticals from Canada?

A. In and of itself, no.

Q. How does that compare with the Canadian importation legislation, the actual bill, not the legislation, that I discussed with you on direct examination?

A. Well, that's an interesting question because I was under the assumption that there was a federal law that restricted it. So even if Rhode Island took the position to do it, I didn't think that would have an effect because of the federal law anyway, but -- because there was a -- I'm not an expert, but I believe there was a federal law that precluded the Canadian importation.

And that's why it didn't make a lot of sense for the state to pass a law saying it's okay when the federal -- they would be in conflict with the federal

law saying that it's not. So, that said, I'm not sure where I'm going with this answer.

Q. My question was, how would the bills that we talked about during my direct examination, how were they different than a resolution?

A. Bills are laws, and laws supposedly -- forget what I said about whether it could have happened or not, but laws take effect as a law.

A resolution is a -- is giving your position to somebody who has some authority to do something or not to do something.

Q. Would it be fair to say that the passage of bills has an immediate practical effect on a situation, a resolution does not?

A. Yes, it's fair.

MR. DAMBRUCH: May I have a moment, your Honor?

(Pause)

MR. DAMBRUCH: No further questions, your Honor.

THE COURT: Anything further, Mr. Corrigan?

MR. CORRIGAN: No, your Honor.

THE COURT: Mr. Kiley?

MR. KILEY: Nothing, your Honor.

THE COURT: You may step down.

May I see counsel, please.

(Bench conference held on the record)

THE COURT: This may be a good time to break for the day.

MR. DAMBRUCH: I have no problem with that, Judge. My next witness is Mr. Curtis. He can simply come back tomorrow. He would have to come back tomorrow anyway.

THE COURT: You're not going to finish him today?

MR. DAMBRUCH: No. By the time we got through direct and cross, it would be more than 15 minutes.

THE COURT: Why don't we break for the today; and after I let the jury go, I'll have you come back up.

(End of bench conference)

THE COURT: Members of the jury, it's quarter to one, and I'm told that the next witness will take longer than 15 minutes. So it seems like a good point to break for the day. You get an extra 15 minutes.

Remember, don't read, listen to or watch any accounts about the case. Don't talk to anyone about it. If your friends and family want to know what you've been doing all day, tell them politely, but firmly, that you are not going to talk about this case.

Please leave your notebooks on your seats. We'll begin again tomorrow morning at 9 a.m. and go

until about 1:00.

Bob, would you see the jury out, please.

(The jury is not present for the following)

(Bench conference held off the record).

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date