IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * *     C.R. NO. 07-009ML
*
UNITED STATES OF AMERICA      *
*
VS.                           *     MAY 15, 2008
*     9:00 A.M.
JOHN R. KRAMER and            *
CARLOS ORTIZ                  *
*
* * * * * * * * * * * * * * * *     PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

**I N D E X**


| **GOVERNMENT WITNESS** | **PAGE** |
| --- | --- |
| M.J. McCusker | |
| Continued Direct Examination by Mr. Dambruch | 7 |
| Cross-Examination by Mr. Fein | 25 |
| Cross-Examination by Mr. Kiley | 124 |
| Betty Bibeault | |
| Direct Examination by Mr. Petalas | 140 |

# E X H I B I T S

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 345 | | 114 |
| 374 | | 154 |

| DEFENDANT | FOR ID | IN FULL |
|---|---|---|
| B-8 | | 64 |
| C-4 | | 108 |
| C-8 | | 41 |
| D-4 | | 82 |
| D-16 | | 94 |
| E-4 | | 89 |
| F-4 | | 83 |
| F-16 | | 68 |
| G-4 | | 86 |
| G-16 | | 68 |
| H-4 | | 84 |
| I-4 | | 87 |
| L-2 | | 72 |
| L-13 | | 58 |
| O | | 81 |
| O-7 | | 44 |
| P | | 108 |
| Q | | 102 |
| S | | 97 |
| S-3 | | 36 |
| S-4 | | 117 |
| T | | 105 |
| T-7 | | 47 |
| U | | 111 |
| U-14 | | 75 |
| V-3 | | 55 |
| X | | 96 |
| X-3 | | 109 |
| X-7 | | 48 |
| Y | | 90 |
| Y-3 | | 80 |
| Z-3 | | 80 |

15 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: Before we bring the jury in, there is a matter which the Court discussed in conference with counsel, and I understand that Mr. Fein wishes to place a motion and an agreement with regard to that motion on the record.

Mr. Fein, please.

MR. FEIN: Yes, your Honor. Would you like me to approach? Thank you, your Honor. In response to one of our motions in limine, the parties and the Court had agreed prior to trial that there would be no mention to the jury of the placement of Mr. Kramer on leave in late 2004.

Yesterday, in response to Mr. Dambruch's question regarding how long did you remain working with Mr. Kramer during your CVS career, the witness provided an answer, "From 1997 until he was placed on a leave of absence in December of 2004."

Based on the agreed-upon treatment of this information, we did not object at the time to call -- at the time of the witness's statement. We have asked your Honor, and the Government has agreed, that that answer be stricken and that -- so as to not call more attention to it, we ask that the -- your Honor make no

reference to that to the jury unless and until the jury during their deliberations requests read back or a question regarding that testimony, at which time your Honor could inform the jury that that statement was stricken pursuant to the parties' agreement.

We just would reserve the right to ask for your Honor to tell them even without a response -- even without a question from the jury depending on how the evidence develops at trial.

THE COURT: That's fine. I understand the Government is in agreement that that answer may be stricken.

I asked you to put this agreement on the record today because it's somewhat unusual in that ordinarily the Court would inform the jury that an answer has been stricken and should not be considered.

However, I understand counsels' concern that my doing that would only shine the spotlight on something you want them to forget.

So we will proceed in accordance with the agreement you have with the Government. I will not so inform them unless and until such time as a question is raised.

MR. FEIN: And Mr. Dambruch has agreed to specifically inform this and other witnesses to -- not

to mention that in their testimony.

THE COURT: Okay.

MR. FEIN: Thank you, your Honor.

THE COURT: All right. Bob, you can bring the jury in.

And is Ms. McCusker here? Why don't you bring here in.

(The jury is present for the following).

THE COURT: Good morning. We're back in business. Do you all have your own notebook? Very good.

Ms. McCusker, you are still under oath.

THE WITNESS: Yes, your Honor.

**M.J. McCUSKER, GOVERNMENT WITNESS, RESUMES**

**CONTINUED DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, ma'am.

A. Good morning.

Q. Ma'am, yesterday I had asked you a question about a calendar entry on Mr. Kramer's calendar for July 9 of 1999.

A. Yes.

Q. Do you recall those questions, that question?

A. Yes.

Q. I'd ask you now to take a look at Exhibit 375,

please. Page 1, please. I'm showing you what is labeled CVS Request for Travel Expense Reimbursement. It's dated 7/10/99. There appears to be a signature on the bottom left-hand corner, if I could have that area enlarged. Do you recognize that signature?
A. Yes.
Q. And whose signature is that, ma'am?
A. It's Jack Kramer's.
MR. DAMBRUCH: Back to the whole document, please.
THE COURT: Just a minute. Is 375 full?
MR. DAMBRUCH: Yes, I believe it's been stipulated to.
THE COURT: You're going to have to identify them, Mr. Dambruch, as such because of the confusion we have over which ones are in or out.
MR. DAMBRUCH: Yes, Judge.
THE COURT: So the jury should have that.
JUROR: Our screens were off. Now they're on.
THE COURT: They're on? Okay.
MR. DAMBRUCH: If I could have highlighted the bottom portion of the document, please.
Q. Now, again, now that the jury has the image, the signature that is -- you've identified as Mr. Kramer's, is that located here?

A. Yes, the bottom left of the document.
Q. And is this an expense report that you mentioned you handled for Mr. Kramer?
A. Yes.
Q. The type of expense report?
A. Yes.
MR. DAMBRUCH: Can I have the whole document, please.
Q. Now, ma'am, there's an entry on this document -- if I could have just the bottom half of the document magnified, please. There's an entry on this particular document for July 8th. Do you see that entry?
A. Yes.
Q. And what does that entry read?
A. It says "July 8th, legislative issues, Jack Kramer, Carlos Ortiz, Senator Celona."
Q. And there's a request for reimbursement?
A. Yes.
Q. And is there an indication as to where the location or place of the meeting was?
A. Yes. It was at our CVS cafeteria.
MR. DAMBRUCH: Ma'am, I would ask you to take a look at Exhibit Number 370, please. And this has also been stipulated to, your Honor.
Q. And this is a calendar for 9/23 to 25 of 2002. Do

you recognize the handwriting on this calendar?
A. Yes.
Q. Would it be fair to say that's Mr. Kramer's calendar for those dates?
A. Yes. It's my writing.
Q. And whose handwriting appears on the calendar?
A. It's mine.
Q. Now, I direct your attention to the bottom half of the calendar, if I could have that magnified, please. And there is an entry for September 25 at 6 p.m. Do you see that entry?
A. Yes.
Q. Who made that entry in the calendar?
A. I did.
Q. At whose request did you make that entry?
A. Jack's.
Q. And what is the entry, please, ma'am?
A. "John Celona, Providence Marriott, 6:00."
Q. And that's on September 25 of 2002?
A. Yes.
Q. I'd now ask you to take a look at Exhibit Number 89, please. And would it be fair to say that that is an invitation to a John Celona fundraiser for September 25, 2002, at 6 p.m.?
A. Yes.

Q. And that CVS responded to that invitation by sending a political action committee contribution?
A. Yes.
Q. Next exhibit I ask you to take a look at, ma'am, is Exhibit Number 91. First off, ma'am, again, is this an invitation to yet another John Celona fundraiser?
A. Yes.
Q. And would it be fair that it's a fundraiser that was scheduled for April 8th of 2003?
A. Correct.
Q. I'd ask you to direct your attention to the bottom, and I'd ask that that be magnified, please. There's a note on the bottom with some handwriting. Do you recognize any of that handwriting?
A. Well, there's an R at the bottom. So I'm guessing that might be Robin, one of Carlos' assistants.
Q. Is there some additional handwriting there as well?
A. Yes.
Q. What is the second set of handwriting?
A. Part of it looks like Jack's, and part of it was mine, I think.
Q. And the part that is Jack's handwriting, can you read for us what that says.
A. "Check with Carlos," and I can't read the other,

what it says.
Q. How about the second sentence?
A. It says, "Jack, I know yes for Carlos," and I can't read the other.
Q. Does that say "Carlos" or "Celona"?
A. It's kind of hard to see it sideways. That's better. Thank you. It says, "Check with Carlos on," it looks like, "Williamson. Jack, I know yes for Celona. How about Williamson?"
THE COURT: Please keep your voice up, ma'am.
A. I'm sorry. It says, "Yes for Celona," it looks like. "How about Williamson?"
Q. And the portion of that note where it says, "I know yes for Celona," whose handing is that, ma'am?
A. That's me. That's mine.
Q. And how is it that you knew yes for Celona?
A. I believe it might be referring to two different fundraisers. So I believe it's saying yes for Celona's fundraiser, but what about Williamson? I think it says Williamson.
Q. And what was your basis for knowing that the answer to Celona was yes?
A. Jack and Carlos must have told me yes, that they would do the Celona. There was two because it says here on this other note, it says, "M.J., can you ask

Jack if we should do checks for Celona and Williamson."
Q. And then you wrote the response; correct?
A. Yes, because he must have said yes for Celona, and I'm saying how about for Williamson. He didn't answer that question.
Q. I'd now ask you to take a look at Exhibit Number 92. This is Mr. Kramer's calendar for April 7 through 9 of 2003, and I'd direct your attention to the bottom of the page, please, if we can have that highlighted, and the entry for 6 p.m. on April 8th. Do you see that entry?
A. Yes.
Q. And who made that entry?
A. I did.
Q. At whose direction?
A. Jack's.
Q. And what does it say, ma'am?
A. "John Celona, Providence Marriott."
Q. Ma'am, I'd ask you next to look at Exhibit Number 100. Is this Mr. Kramer's calendar for January 6 through 9 of 2000?
A. Yes.
Q. And I'd ask you to focus your attention on the upper half of the calendar, if we could have that magnified, please. Now, there's an entry for 10 a.m.

on July 7th. Do you recognize that handwriting?
A. Yes.
THE COURT: July or January?
MR. DAMBRUCH: I'm sorry. January, your Honor. I misspoke.
Q. For January 7. Do you recognize that handwriting?
A. Yes.
Q. And whose handwriting is that?
A. It's mine.
Q. Did you make that entry on the calendar?
A. Yes.
Q. At whose direction?
A. Jack's.
MR. DAMBRUCH: Next move on to Exhibit Number 319.
THE COURT: This is in full?
MR. DAMBRUCH: It is. Yes, your Honor.
Q. Ma'am, directing your attention to Exhibit 319, which is a Eurest Dining Services invoice dated February 19 of '03. Do you recognize this invoice?
A. Yes.
Q. What do you recognize it to be?
A. It's an invoice from our in-house cafeteria dining service for lunch.
Q. And are there some notations made on this

particular invoice?
A. Yes.
Q. Do you recognize the handwriting?
A. Yes.
MR. DAMBRUCH: Could I have that area of the invoice, please, enlarged.
Q. Can you please read the portions of that note that you wrote, ma'am.
A. "Carlos, Senator Celona lunch, can you pay, your budget, M.J."
Q. At whose direction did you make that notation?
A. I don't recall specifically, but probably Jack maybe.
Q. And this had to -- do you recall what this particular invoice, what event it related to?
A. No.
Q. But it indicates on here your notation of "Senator Celona lunch"?
A. Uh-huh. Yes.
Q. Exhibit 331, please, which has also been marked as full, your Honor. This is Mr. Kramer's calendar for February 10 through February 12, 2003. I'm going to direct your attention to the middle of the calendar, if I can have that area enlarged, please. There is an entry for February 10 at 12 noon. Do you see that

entry?
A. Yes.
Q. Who made that entry?
A. I did.
Q. And at whose direction did you make that entry?
A. It would have been Jack's.
Q. And what does that entry read?
A. "Paul DeRoche and Senator Celona."
Q. Directing your attention to Exhibit Number 327, which I believe, your Honor, has also been marked as a full exhibit. Do you recognize this letter?
A. Yes.
Q. Is this a letter written by Jack to Senator and Mrs. Celona dated June 6 of 2002?
A. Yes.
MR. DAMBRUCH: And if the text of the letter, including the note, could be highlighted, please.
Q. There appears to be a handwritten -- a signature and a handwritten notation on the note. Do you recognize that handwriting?
A. Yes.
Q. And whose do you recognize it to be?
A. It's Jack Kramer's.
Q. And what does the note read?
A. It says, "John, going to be a great night."

MR. DAMBRUCH: And if I could have the whole letter again.
Q. And what was it that this letter related to?
A. It was the gala for the CVS Charity Classic.
MR. DAMBRUCH: If we could look at page 2, please. It would be Exhibit Number 327, page 2. Your Honor, I have a paper copy.
Q. Looking at Exhibit Number 327, page 2, do you recognize those items?
A. Yes.
Q. And what do you recognize them to be?
A. They're tickets for the Charity Classic Gala.
Q. And were those the tickets that were enclosed in the June 6, 2002, letter to Senator and Mrs. Celona?
A. I'm sure they were, yes.
Q. Now, going back to page 1 of that document, which is displayed on your screen, there's a notation at the top of the letter, "mailed 6/13." Do you recognize that handwriting?
A. Yes.
Q. And what do you recognize it to be?
A. That's my handwriting.
Q. You, in fact, mailed this letter with the tickets to Senator Celona?
A. Yes.

MR. DAMBRUCH: Exhibit 329, please.
THE COURT: Is this full?
MR. DAMBRUCH: I believe so, yes, your Honor.
Q. Looking at --
THE COURT: Just a minute, Mr. Dambruch.
(Counsel confer)
MR. DAMBRUCH: Your Honor, may I have a moment, please.
(Pause)
MR. DAMBRUCH: Your Honor, that has been agreed to as a full exhibit.
THE COURT: Okay.
Q. Showing you, ma'am, what's been marked as Exhibit Number 329, do you recognize that document?
A. Yes.
Q. It's the seating chart for the gala, is it not?
A. Correct.
Q. The same gala that we just saw the tickets from; correct?
A. Yes.
Q. And were you involved in creating this seating chart?
A. I didn't do the actual creating. Once we all -- it would be between Jack and Tom, and I would type up the list once it was all done.

Q. So you prepared the list at whose direction?
A. Jack's.
Q. Now, there's some handwriting down the bottom. Do you recognize that handwriting?
A. Yes.
Q. And whose handwriting is that?
A. It's mine.
Q. Now, directing your attention to the top of the document, there are a series of names with underlines and then names under them. Do you know what those refer to?
A. Sure. It would be Tom Ryan had two tables, and Jack had two tables, and the names under are the people who would be seated at each table.
Q. Directing you to the list that appears under Jack Kramer Number 180, do you see that list?
A. Yes.
Q. Does the name John Celona appear on that list?
A. Yes.
Q. And based upon your preparation of the document, what does the fact that his name appears on that list signify?
A. He received tickets to the gala.
Q. And where was he seated at the gala?
A. He was at Jack's table.

Q. Directing your attention to Exhibit 330. This is Mr. Kramer's calendar for January 9 through 11 of 2003. And I direct your attention to the middle portion of the calendar, which I'd ask to be highlighted. It's an entry on January 10 at 12 noon. Who made that entry?
A. I did.
Q. And at whose direction?
A. Jack.
Q. Can you read that entry for us.
A. It says, "Roger Badeau, Aurora," which would be the Aurora Club, "and Celona."
Q. And what is the Aurora Club, ma'am?
A. It's a private club in Providence. It's the Aurora Civic Association, I believe is the right name.
Q. And do you know if Mr. Kramer had some type of association with that club?
A. He did.
Q. And what was that association?
A. He was a member.
Q. And is it a place that serves meals and things of that nature?
A. Yes.
Q. Directing your attention to Exhibit Number 332. This is Mr. Kramer's calendar for June 9 to June 11 of 2003, and I'd direct your attention to the middle

portion of the document, which I'd ask to be highlighted. Focus your attention on the entry for June 9 at 12:00. Who made that entry, ma'am?
A. I did.
Q. And at whose direction?
A. Jack's.
Q. And can you please tell us what that entry says.
A. It says, "Alpine CC," which would be Alpine Country Club, "Jack, Paul, Jim and Celona."
Q. And what is is the Alpine Country Club, ma'am?
A. It's a golf club, country club.
Q. Do you know if Mr. Kramer had any association with that establishment?
A. I don't recall.
Q. But that's the entry he directed you to make for that date at that time?
A. Yes.
Q. I'd direct your attention, ma'am, to Exhibit Number 334. I'd ask you again -- excuse me. This is Mr. Kramer's calendar for August 4 to August 6th of 2003, and I'd direct your attention to the middle of the document, which I'd ask to be highlighted. I'd ask you to focus your attention on the entry for August 4 at 10 a.m. Do you recognize that entry?
A. Yes.

Q. And what do you -- do you know who made that entry?
A. Yes.
Q. And who was that?
A. I did.
Q. And at whose direction?
A. Jack's.
Q. And could you please read for us what that entry says.
A. Well, at 10 it says "Tom," which could have been a separate meeting. And then 10:30 it says, "Potowomut, Special Olympics." It was a golf event. It was Jack, John Celona, Jerry Martineau and Sean.
Q. Directing your attention to Exhibit Number 337, this is Mr. Kramer's calendar for August 21 through August 24 of 2003, and I'd ask that the top half of the document be enlarged, please. Directing your attention to the entry for August 24 at 8:15 a.m.
A. Yes.
Q. Who made that entry in the calendar, ma'am?
A. I did.
Q. At whose direction?
A. Jack's.
Q. And can you read the entry for us, please.
A. It says, "8:15, TPC, Senator Celona and DeRoche."

Q. What does TPC mean?
A. It's a golf course, and I can't think of what the initials stand for.
Q. Do you know where that golf course is located?
A. It's in Massachusetts, I believe.
Q. And does either Mr. Kramer or CVS have some type of association with that particular golf course?
A. Yes.
Q. Can you tell us what that is?
A. I believe Tom Ryan and Jack had a membership there.
Q. Now, I direct your attention to Exhibit Number 341, please. I'd ask that the top part of that document be magnified, please.
MR. SMITH: Excuse me, your Honor. I missed that exhibit number.
THE COURT: I'm sorry?
MR. SMITH: I missed the exhibit number.
THE COURT: 341.
MR. SMITH: Thank you.
MR. DAMBRUCH: The entire top half, please, all the text.
Q. This appears to be an e-mail dated on September 20 of 2003 -- 26th, I believe, 2003. Do you recognize this?

A. Yes.
Q. And what is the subject matter of this particular e-mail, ma'am?
A. It looks like they were going on a trip. I believe it was to California, but I'm not sure. It's not clear on this memo.
Q. Are you --
A. Oh, it says "California trip" at the top. Sorry.
Q. And are you familiar with a California trip that Mr. Celona was going on?
A. Yes.
Q. And can you please describe that for us.
A. It was part of a sponsorship package that CVS shared with Bayer Consumer Drug to benefit the Susan G. Komen Breast Cancer Foundation.
Q. And what type of event was Mr. Celona attending in California?
A. It was a golf event.
Q. Was it just a single-day golf event?
A. I don't recall. It was part of the sponsorship.
Q. Did it involve a trip?
A. It involved -- the tickets were included to fly out there.
Q. And do you know, based upon your work for Mr. Kramer, who it was that invited Mr. Celona to

attend this particular event?
A. It was probably Jack.
Q. And that event was sometime during the fall of 2003?
A. Yes.
MR. DAMBRUCH: Your Honor, may I have a moment?
(Pause)
MR. DAMBRUCH: Your Honor, no further questions at this time.
THE COURT: Cross.
MR. FEIN: Yes, your Honor. May I have one moment?
THE COURT: Sure.
(Pause)

**CROSS-EXAMINATION**

**BY MR. FEIN**:
Q. Good morning.
A. Good morning.
Q. Ms. McCusker, you started working for Mr. Kramer in approximately 1997; is that correct?
A. Yes.
Q. When you started working for Mr. Kramer, did he tell you anything about how long he'd planned on working at CVS?
A. Yes. When I interviewed with Jack in it was

probably maybe July of 1997, he told me that he didn't know how long he would be working at CVS, he didn't plan on retiring, he didn't like the "retire" word and he had too much energy to do that; but he was up front with me because I was moving from a department that I worked at for seven years. And he said he could be there for a year, two years, three, he didn't know, as long as he enjoyed the work.
Q. And what department was he -- what departments was he in charge of at the time you started with him?
A. At the time we had the advertising department. It was community relations, customer relations, corporate events, corporate communications. It was over 100 people.
Q. Customer service as well?
A. Yes. It was -- yes.
Q. And did you know that he had come to CVS with a background in sales and marketing?
A. Yes.
Q. And did he come with a background in government affairs?
A. Not that I knew of.
Q. When he left advertising, did he maintain his position as the head of community relations?
A. Yes.

Q. And at that time he also picked up government affairs; is that right?
A. At some point, yes.
Q. And when he oversaw community relations and government affairs, did he supervise fewer people than he had in advertising?
A. Yes.
Q. About how many?
A. I'd say roughly we were still like maybe 30, 40 people, maybe a little bit less.
Q. And over time did it come that the group that he was overseeing was approximately 10 people or so?
A. Yes.
Q. And you were one of those people?
A. Yes.
Q. The government affairs department, did Mr. Kramer hire lobbyists to represent CVS's interests?
A. Yes.
Q. And were those lobbyists in different states or just in Rhode Island?
A. Different states.
Q. Because the government affairs department was responsible, were they not, for all the states that CVS did business in?
A. Yes.

Q. And Mr. Kramer hired a firm called Tillinghast to represent CVS in Rhode Island?
A. Yes.
Q. And are you familiar with a man named Bill Albers that was hired?
A. Yes.
Q. And who is he?
A. He was one of the lobbyists.
Q. From a different state?
A. Yes.
Q. For community relations, was it your understanding that Mr. Kramer was responsible for promoting CVS's image in the community?
A. Absolutely.
Q. And in connection with that work, did he attend events and conferences?
A. Yes, many.
Q. Did he do that only in Rhode Island, or did he do that around the country?
A. Around the country.
Q. Did he travel often?
A. Yes.
Q. And in Rhode Island when he was in Rhode Island, did he attend events on a daily basis?
A. Sometimes.

Q. On a nightly basis as well?
A. Absolutely.
Q. Was he out many evenings on behalf of CVS?
A. Yes.
Q. And those evenings, would those be meetings with community leaders?
A. Yes.
Q. Business leaders?
A. Yes.
Q. Government leaders?
A. Yes.
MR. FEIN: The Government showed you an entry from Mr. Kramer's calendar. I'd like to put it up, please, Government Exhibit 92.
THE COURT: Just one minute, Mr. Fein.
MR. FEIN: Yes, your Honor.
(Pause).
THE COURT: Sorry, Mr. Fein. Some technical difficulty.
MR. FEIN: Yes, your Honor. If we could put Government Exhibit 92 up on the screen.
Q. Ms. McCusker, if you remember, Mr. Dambruch directed you to one entry on this calendar page referring to John Celona. Do you remember that?
A. Yes.

MR. FEIN: I'd like to direct your attention to a few other entries on this page. Can we call out for Monday, April 7th, the middle entry at 2:00.
Q. Can you read what the 2:00 entry is.
A. It says, "Tom, Howard Sutton, Save the Bay."
Q. And what is Save the Bay?
A. It's an event in Rhode Island. I think it happens every year.
MR. FEIN: And if we could call out the entry at 6 p.m. that same day, Monday, April 7th.
Q. Can you read that entry?
A. "Bill Walaska," looks like "Basset's Inn, West Shore Road."
Q. And are you familiar that Bill Walaska is a Rhode Island state senator?
A. Yes.
Q. And that would have been an entry that Mr. Kramer, like the other entries Mr. Dambruch asked you about, asked you to put in the calendar?
A. Absolutely.
Q. And I'm not going to repeat that. Each time I assume that the entries in the calendar were the joint effort of you and Mr. Kramer.
A. Correct.
Q. For Mr. Kramer's behalf?

A. Yes.
Q. Thank you. If we look at the next day, Tuesday, April 8th. At the very top there's something that spans two days. Can you tell the jury what that says.
A. That was the Chamber Business Expo.
Q. And are you familiar with what that event is?
A. They have that every year at the Providence Chamber of Commerce.
Q. And does Mr. Kramer attend that regularly?
A. Yes.
Q. And if we look at the 11 a.m. entry for Tuesday, April 8th, can you read what that says.
A. "11:00, Rudy Giuliani at the Expo."
Q. And if we look at the following day, Wednesday, April 9th, at 12:00. Can we call that out, and could you tell us what that says.
A. It's the Economic Outlook Luncheon. It was part of one of the Chamber events over that two-day period.
Q. And 2:00, can you read what that entry says on the same day.
A. "Big Picture."
Q. Do you know what that refers to?
A. Big Picture is a school in Providence that CVS was involved with, still is.
Q. And does that entry mean that Mr. Kramer had an

appointment there?
A. Yes.
Q. And finally on this one page, could we look at the entry for 6 p.m. on Wednesday, April 9th. Can you read what that says.
A. "Rhode Island Community Food Bank reception, Federal Reserve, Governor and Mike" -- I can't read the --
Q. Might that say "Mrs."?
A. Yes, it could. My copy is blurry.
Q. Does that look like "Governor and Mrs. C will attend"?
A. Yes.
Q. And do you know what -- I should say Gov. C, do you know who that refers to?
A. I think Governor Carcieri.
Q. And would that have been an event that Jack would have gone to?
A. Absolutely.
Q. And why do you say absolutely?
A. Because it's on his calendar, and we supported the Rhode Island Community Food Bank.
Q. And would the presence of the governor have anything to do with your belief that Jack would have attended?

A. Yes.
Q. Why is that?
A. Because he knew the governor, and he may have invited him.
MR. FEIN: I'd like to call up Government Exhibit 332, another calendar entry that they showed you I think today. I'm just going to direct your attention to one entry on this calendar. On this page, if you can call out Wednesday, June 11th, at 6:30 p.m. Perhaps we could hand Ms. McCusker a hard copy of that.
THE CLERK: 332?
MR. FEIN: Yes. Thank you.
Q. Ms. McCusker, could you read to the jury what that entry says.
A. It says, "6:30, Senator Maryellen Goodwin," I believe, and I don't know -- sorry. I can't read. Mine's faded.
Q. I'm not sure I can help you on the bottom one there.
A. Maybe "Roger Williams." It was, I'm sure, a fundraiser event.
Q. And Senator Goodwin, do you recognize her as a Rhode Island state senator?
A. Yes.
Q. Thank you. Mr. Dambruch asked you about a series

of entries and documents regarding Mr. Kramer attending fundraisers for John Celona. Do you recall that?
A. Yes.
Q. Were the only fundraisers that Mr. Kramer attended those for John Celona?
A. No.
Q. Did he attend others?
A. Yes, many.
Q. Did he attend them on a frequent basis?
A. Yes.
Q. And would his wife, Lynn, accompany him as he attended these?
A. Occasionally.
Q. And did CVS make PAC contributions in connection with Mr. Kramer's attendance at these fundraisers?
A. Yes.
Q. And did he attend fundraisers for other state senators in Rhode Island?
A. Yes.
Q. And state representatives in Rhode Island?
A. Yes.
Q. And candidates for Rhode Island office?
A. Yes.
Q. Did he also attend fundraisers for federal officeholders?

A. Yes.
Q. U.S. senators?
A. Yes.
Q. U.S. congressmen?
A. Yes.
Q. Those representing Rhode Island?
A. Absolutely.
Q. And those representing other states?
A. Yes.
Q. And did he attend some of those out of state?
A. Sure.
Q. He would go to Washington, D.C., to attend fundraisers?
A. Yes.
Q. And when he attended a fundraiser, did you often have a request, an invitation to the fundraiser that accompanied the event?
A. Yes.
Q. And did you often have a request for a PAC check?
A. Yes.
Q. And did you often have a correspondence to the candidate or the candidate's campaign sending back a check and an R.S.V.P. to the event?
A. Yes.
Q. Are the fundraiser documents that Mr. Dambruch

showed you different in any way from the ones you've seen for Mr. Kramer for other candidates?
A. No.
MR. FEIN: I'd like to offer Kramer Exhibit S-3 by stipulation. This is by stipulation, your Honor. If we could offer it and show it to the witness and the jury.
(Defendant Kramer Exhibit S-3 was admitted in full)
MR. FEIN: Derek, if you could just enlarge that a little bit for Ms. McCusker to see it. Thank you.
Q. Have you had a chance to review that document, Ms. McCusker?
A. Yes.
Q. And the handwriting on the top right, do you recognize the handwriting?
A. Yes. It's Jack's.
Q. And what does it says?
A. It says, "M.J., hold for future."
Q. And what's the subject of this e-mail, Ms. McCusker?
A. It's talking about PAC statistics.
Q. And the first -- the e-mail refers to graphics. Can you --
MR. FEIN: Derek, if we could call out the part

right below that line regarding graphics.
Q. What does that refer to, Ms. McCusker?
A. It's the CVS PAC growth. In '98, it was $10,000; 1999, 30; and in 2000, it was 82,000.
Q. And did Mr. Kramer have a role in growing the CVS PAC?
A. Yes.
Q. And what did he do in that regard?
A. Well, he really put out an effort to have our CVS management across the -- all of our associates in the corporate offices and management to support the PACs.
Q. And did he and Mr. Ryan create a video to support the CVS PAC?
A. Yes.
Q. Was that video shown internally?
A. Yes.
Q. And did that include appearances on the video by Senator Reed and Governor Ridge?
A. I believe it did.
MR. FEIN: And in the section just below CVS PAC growth, if you could call that out, Fortune 100 companies.
Q. Does that show other companies and the size of their PACs?
A. Yes.

Q. And then the third column, does that show CVS's PAC in comparison to similar companies?
A. Yes.
MR. FEIN: Thank you. Take that down.
Q. Ms. McCusker, would Mr. Kramer make television appearances on behalf of CVS?
A. Yes.
Q. Did he do that locally?
A. Yes.
Q. And did he also do that outside of the Rhode Island area?
A. Not that I'm aware of.
Q. Do you recall him ever making an appearance on the Today show?
A. Yes, he did.
Q. And do you recall who he met with for the Today show or who he was interviewed by?
A. I believe it was Katie Couric at the time. We made a donation.
Q. Katie Couric?
A. I think so. I'm not positive.
MR. FEIN: If we could show Ms. McCusker Government Exhibit 369. This would be by stipulation, your Honor. It's already in full, I believe. Yes, it is, your Honor. It's one of the -- it's in full.

THE COURT: Okay.
Q. Ms. McCusker, this, too, is a calendar page that Mr. Dambruch showed you. If you could direct your attention to April 3rd, Tuesday.
A. Yes.
Q. The top half. What does that say?
A. "Today show."
Q. And do you believe that's a reference to Mr. Kramer's appearance on the Today show?
A. Yes.
Q. And did Mr. Kramer receive a videotape or make a videotape of that appearance?
A. I'm sure we did.
Q. And you referred to in connection with a donation or a benefit or something when I asked you about the Today show. What was that as best you can recall?
A. I'm sorry, I can't recall what it was. It was for a charity.
Q. In connection with CVS giving to a charity --
A. Yes.
Q. -- Mr. Kramer was given the opportunity to appear on the Today show?
A. Yes.
Q. Thank you. Did Mr. Kramer also appear on radio shows?

A. Yes.
Q. Again, to promote CVS?
A. Yes.
Q. Are you familiar with the CVS Charity Golf Classic?
A. Oh, yes.
Q. What was Mr. Kramer's role with regard to the Classic?
A. He was the executive director of the Classic.
Q. So he was in charge of the Classic?
A. Yes.
Q. Did he spend a lot of time preparing for the Classic?
A. Oh, yes.
Q. Weeks and months of the year?
A. Yes.
Q. Was it actually a year-round effort?
A. Yes. As soon as one Classic was finished, it was like the Academy Awards, we were starting for the next one again.
Q. And did he grow the event, the Classic?
A. Absolutely.
Q. Was it as large when it started in 1999 as it is today?
A. No.

Q. In order to grow the event, did Mr. Kramer hire consultants to assist?
A. Yes.
Q. And did Mr. Kramer engage and work with other people in connection with advertising and promoting the Classic?
A. Yes.
Q. And did he attend meetings in connection with that work?
A. Sure.
MR. FEIN: Your Honor, we'd offer Kramer C-8 by stipulation.
THE COURT: So this is full.
MR. FEIN: To show it to Ms. McCusker.
(Defendant Kramer Exhibit C-8 was admitted in full)
Q. If we could turn to page 2 of the document. Ms. McCusker, this is one of Mr. Kramer's expense reports; is that correct?
A. Yes.
Q. And during the period 1999 and 2000, who approved Mr. Kramer's expense reports?
A. I'm not positive, but I believe it was still Tom Ryan at this time.
Q. And who prepared the expense reports?

A. I did.
Q. And would Mr. Kramer give you receipts for expenses?
A. Yes.
Q. And then you would enter those?
A. Yes.
Q. And would you provide the description for the event?
A. Yes.
Q. You would write that. Mr. Kramer didn't write that out for you, did he?
A. Sometimes he would tell me. If I had a question, I would ask him about it.
Q. And other times you would just write it out yourself?
A. Yes.
Q. If I could direct your attention to the second expense entry, and it's for Tuesday October 23, 2001, and if we could call out the business purpose.
A. "Meeting to discuss CVS Charity Classic 2002."
Q. And if we could also call out the attendees for that meeting.
A. That would have been Jack; Ed Ellis, who was president of Peter Jacobson Productions; and John Matthews, who was the tournament director.

Q. What is Peter Jacobson Productions?
A. They were the outside consultants that we had to, I guess, you know, build the golf event. They managed the production end of it.
Q. Thank you. Did Mr. Kramer participate in lining up corporate sponsors for the CVS Charity Classic?
A. Yes.
Q. And do you recall any of the corporate sponsors for the Classic?
A. The larger ones were Bayer, Pepsi, Energizer.
Q. And would Mr. Kramer get involved in working with those corporate sponsors for their support for the Classic?
A. Yes, sometimes.
Q. Did Mr. Kramer also work on what charities would benefit from the Charity Classic?
A. Yes.
Q. Did Mr. Kramer also assist in organizing volunteers for the Classic?
A. A little bit. Some of that came from Peter Jacobson as well.
Q. Did you, in fact, participate a little bit in helping with volunteers?
A. Sure.
Q. And do you recall a volunteer night that you and

Mr. Kramer attended?
A. Yes.
Q. And what was that?
A. It was a night out in Barrington. We did that every year for the -- for all the volunteers. We'd have a -- it was like a barbecue night or a thank you event. They'd get, you know, little goody bags, maybe a shirt, hat kind of thing.
Q. And that was to thank the volunteers for participating in the event?
A. Yes.
Q. How many volunteers were there for the event?
A. A lot. I'd say close to a hundred. It's probably a lot more now.
Q. Could there be hundreds or even more than a thousand?
A. Sure.
MR. FEIN: I'd like to again offer by stipulation Kramer O-7.
(Defendant Kramer Exhibit O-7 was admitted in full)
MR. FEIN: If we could show it to Ms. McCusker and the jury, your Honor. And if we could call out under "business meeting" at the bottom of the document the July -- the entries under "business meeting."

THE WITNESS: Yup. It's July 13th, CVS Charity Classic Volunteer Night, Jack Kramer, myself, and then afterwards we went to TGI Fridays.

Q. Thank you. Mr. Kramer promoted the Classic with television appearances?

A. Yes.

Q. And would he appear himself?

A. Yes.

Q. Did you have an understanding as to his enthusiasm for appearing on television?

A. Oh, yes.

Q. And what was that?

A. He just thought that was a great opportunity to promote CVS and the Charity Classic. It was a huge fundraiser for us and gave us the opportunity to promote back to the community and to give money back to a lot of charities in the community.

Q. Was he reluctant himself to be the person doing that promotion?

A. No.

Q. Did he seem to enjoy it?

A. Yes.

Q. Did he talk about it a lot?

A. Sure.

Q. And he promoted it on radio as well?

A. Yes.
Q. I'd like to show you Government Exhibit 97, please. You were shown this, again, for a meeting with Senator Celona, and the date of this is July 8. And this would be the questions Mr. Dambruch asked you about Mr. Celona coming to CVS headquarters. Do you recall those -- that discussion?
A. Yes.
Q. Could you read to the jury what the entry is earlier that same day.
A. It's Citadel, 7:45. It looks like 7:15, sorry, "Citadel, AM radio spots."
Q. Can you tell the jury what Citadel is, please.
A. It's a radio station.
Q. And this is in July of 1999. What would Citadel radio spots represent?
A. Well, he could have been doing a follow-up. He used to do -- he did the -- for the Charity Classic, he would do the early morning drive spots on many local stations. This is -- it sounds like this could have been after the Charity Classic, so it might have been a follow-up.
Q. And if this turns out in 1999 to be in advance of the Charity Classic --
A. Then it would have been to promote the Charity

Classic.
Q. Are you familiar with the fact that CVS bought promotional packages from NBC-10 television?
A. Yes.
Q. And that was to support the Charity Classic?
A. Yes.
Q. And the promotional packages involved a series of promotional activities, including appearances by Jack Kramer?
A. Absolutely.
Q. And did CVS also buy a promotional package from Clear Channel radio?
A. Yes.
Q. And that also would involve Jack Kramer going on radio to promote the Charity Classic?
A. Yes.
MR. FEIN: I'd like to show you -- one second, please, your Honor.
(Pause)
MR. FEIN: Your Honor, Mr. Kramer offers Kramer T-7 by stipulation.
(Defendant Kramer Exhibit T-7 was admitted in full)
Q. Ms. McCusker, does this appear to be another Mr. Kramer -- another of Mr. Kramer's expense reports?

A. Yes.
Q. And if we could call out the first entry for Tuesday, May 21st.
A. The business purpose is "radio interview, CVS Charity Classic."
Q. And can you tell what radio network this was for?
A. Citadel.
Q. And if we look at the business purpose for the next entry on Wednesday, May 22, 2002, could you tell the jury what that says.
A. Again, radio interviews for the Charity Classic.
Q. And this is on a different day; is that right?
A. Yes.
MR. FEIN: And if we could turn to page 3 of this document and the entry at the top of the page for Tuesday, June 4th, 2002. Just above that, Derek, under "comments." Thank you.
Q. Can you read what that says, Ms. McCusker.
A. It says, "Radio interviews to promote the CVS Charity Classic, John Kramer, Tuesday, 4th of June 2002."
MR. FEIN: Thank you. Your Honor, we offer by stipulation Kramer Exhibit -- Kramer X-7.
(Defendant Kramer Exhibit X-7 was admitted in full)

MR. FEIN: And if we could call out just the top of the e-mail.
Q. Does that appear to be someone from Clear Channel writing to you, Ms. McCusker?
A. Yes, Chris Harkness.
Q. And to a Mary Heath?
A. Yes.
Q. Who was Mary Heath?
A. Mary Heath was the owner of Perennial Events, and she used to help with the communication part with the press, radio stations for the Charity Classic and 5K promotions.
Q. So she was another outside consultant who assisted in promoting these events?
A. Yes.
Q. And if we could call out and if you could read the first sentence understand M.J. or first paragraph.
A. It says, "M.J., I will meet Jack at Clear Channel Communications, 75 Oxford Street, the Roland Building, at 7:15 a.m. I can be reached at 265-8893, the cell number, if he needs to get in touch with me."
Q. And this is written by Chris Harkness from Clear Channel; is that correct?
A. Yes.
Q. And this would be in connection with Jack

promoting the Classic in connection with a package that CVS had with Clear Channel?
A. Yes.
Q. At the bottom, could we call out your handwriting. I'd ask you if that is your handwriting.
A. Yes.
Q. And could you read that to the jury.
A. This says, "Jack, just received this at 5:10 p.m. You may be short on shirts. We can send them additionals, M.J."
Q. What does that refer to?
A. When Jack went to the radio stations, he would always bring some Charity Classic shirts and hats and doughnuts to the DJs.
Q. Was that typical of Mr. Kramer in connection with promoting CVS?
A. Yes.
Q. Mr. Dambruch asked you questions about Mr. Celona's request for tickets to the Classic. Do you recall that?
A. Yes.
Q. Was Senator Celona the only person that called asking for tickets to the Classic?
A. No.
Q. Were there many people who called asking?

A. Oh, yes.
Q. I think we spoke over each other.
A. Yes, there were. Very many.
Q. Did that happen every year?
A. Yes.
Q. And did you field a lot of those phone calls?
A. Oh, yes.
Q. And when you say many, can you give us an order of magnitude?
A. Hundreds. It could be a hundred.
Q. And were these people folks in the community?
A. Folks in the community, companies.
Q. Were there --
A. Legislators.
Q. Legislators?
A. Others, sure.
Q. The governor's office?
A. Yes.
Q. Businesses?
A. Yes.
Q. Not-for-profits?
A. Yes.
Q. Why do the not-for-profits call for tickets? Do they seek tickets for their own purposes?
A. Yes. Sometimes they would want to use them for

raffle tickets, you know, if they were doing a prize or something for their associates.
Q. Can you tell the jury what Mr. Kramer's typical response was to these requests when you would bring them to him.
A. Many times he said yes, as much as we could.
Q. Did Mr. Kramer respond any differently to Mr. Celona's request for tickets to the Classic than he did to other requests from state officials, local leaders, businessmen?
A. No.
Q. Nothing at all that stands out in your mind in connection with his response to Mr. Celona's request?
A. No, not at all.
Q. And when people would request tickets, would they ask for tickets both to the golf event and/or the gala dinner?
A. Yes, occasionally.
Q. Was it helpful to CVS to have prominent Rhode Island citizens attend the event?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Wait a minute. Sustained. The answer may be stricken.
Q. Do you know if Mr. Kramer wanted to have prominent

Rhode Island citizens attend the event on -- for CVS?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Did you maintain the list of -- did you maintain a list of people to whom you were giving the Classic tickets to?
A. Yes.
Q. And did you do that each year?
A. Yes.
Q. And that would include tickets to the event as well as tickets to the gala?
A. Yes.
Q. And these tickets for the people on this list were provided complimentary; is that correct?
A. Yes.
Q. And were the tickets provided to these individuals with a -- how were they sent to the individuals? How did you do that?
A. We would just send the tickets, and I probably did a cover letter. At some point we -- because it was a charity event, we started to send the tickets with a letter asking them to make a donation.
Q. Please explain that, if you would.
A. Well -- I'm sorry.
Q. The event was to raise money for charity?

A. Yes.
Q. And yet people were asking for complimentary tickets?
A. Yes.
Q. And you were providing the tickets complimentary?
A. Yes.
Q. But then at some point please explain again what you were just talking about.
A. Because it was a charity event and we were receiving so many requests, we thought it was only fair that they -- we request them to make a donation for the charities.
Q. Did you require them to make a donation when you sent them these tickets?
A. No.
Q. And you simply made it as a request in an attempt to have them make a contribution?
A. Yes.
Q. On occasion, did your invitees do that?
A. Oh, yes.
Q. And even if they did not do it in advance, were there opportunities at the event to make contributions?
A. Yes.
Q. Were there raffles and other events that people when they were in attendance could be participating in

that would raise money for charities?
A. Yes.
MR. FEIN: I'd like to offer Kramer V-3 by stipulation, your Honor, V as in Victor.
(Defendant Kramer Exhibit V-3 was admitted in full)
Q. Ms. McCusker, is this one of the spreadsheets that you would maintain in connection with ticket requests to the Charity Classic?
A. Yes.
MR. FEIN: And if we could call out the column that lists the entities, the second column.
Q. Are these entities that would seek tickets from Mr. Kramer and you for the Classic?
A. Yes.
Q. And if we could call out 10 entries down, American Heart Association Heart Ball. Is that one of the situations where they would request tickets for their own event they might raffle or give away?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: Calls for speculation. If she knows.
THE COURT: Do you know? Ma'am, do you know?

THE WITNESS: Yes. Most charities that requested tickets, they would use them for a raffle event.

THE COURT: Overruled.

Q. And if we could call out the column next to the column that lists these various entities. What does this represent, Ms. McCusker?

A. That would be the tickets that we sent to the organizations.

Q. And there are different types of tickets that you provided?

A. Yes.

Q. And a season ticket, would that refer to a ticket for the entire event?

A. Yes.

Q. Did the event last more than one day?

A. Yes.

Q. Several days?

A. Yes.

Q. If we could highlight the next column, please. Is that a dollar value that was ascribed to the tickets?

A. Yes.

Q. But the entities listed here and any of the recipients of these requests didn't actually pay those dollar values, did they?

A. No.
Q. If we could turn to page 2 of the document. If we could call out the first column under "ticket requests," there are a series of initials there. Do you recognize those initials?
A. Yes.
Q. Are some of those -- do any of those refer to you?
A. Yes.
Q. And which would that be?
A. M.J.
MR. FEIN: And if we could highlight, Derek, the row -- I think it's about the seventh row next to "M.J." with the name Senator Celona, and if we could go across to the number of tickets.
Q. Would that be an instance of Senator Celona calling and asking for tickets?
A. Yes.
Q. And you would refer to two to four tickets. Does that seem familiar?
A. Yes.
Q. Thank you. As you look down the list of requests, do you see other state officials?
A. Yes.
Q. And do you see other prominent Rhode Island citizens?

A. Yes.
Q. Friends of Mr. Kramer?
A. Yes.
Q. Thank you. The column on the far right, you maintain that -- what does that represent?
MR. FEIN: One in from that, Derek, the "approved by."
A. These are probably calls that I received. They are calls that I received, and then I would ask Jack about the tickets before sending them out.
MR. FEIN: Thank you. Your Honor, I'd like to offer by stipulation Kramer L-13.
(Defendant Kramer Exhibit L-13 was admitted in full)
Q. Ms. McCusker, what is this document?
A. This is the letter that I referred to earlier that we would send out with the tickets asking if they would like to make a donation.
Q. And would you prepare those letters for Mr. Kramer?
A. Yes.
Q. And would he sign the letters?
A. No.
Q. On occasion would he sign letters? I believe we showed you a letter earlier that was signed by

Mr. Kramer.
A. He may have. This is kind of -- I did a document that might have been an earlier letter.
Q. And when he would sign letters sending tickets out, would he often write notes on those letters?
A. Yes.
Q. Personal notes?
A. Yes.
Q. Was that a trademark of his in terms of corresponding?
A. Yes.
MR. FEIN: Thank you, Derek.
Q. We've talked about the Charity Classic. Did Mr. Kramer also have a role at the CVS 5K road race?
A. Yes.
Q. What was his role there?
A. He was in charge of the 5K as well.
Q. And did he promote the CVS 5K the same way we talked about the Classic, on television and radio, when he could?
A. Yes, absolutely.
Q. And would he attend meetings with consultants and others in preparation for the event?
A. Yes.
Q. Is that an event that CVS took over the leadership

of while you were working for Mr. Kramer?
A. Yes.
Q. And do you recall that the prior sponsor withdrew as a sponsor for the event?
A. Yes.
Q. And was the event in jeopardy?
A. Yes.
Q. And what happened?
A. CVS stepped to the plate as the major sponsor of the event. We're still doing it.
Q. Still doing it today?
A. Yes.
Q. And did Mr. Kramer grow that event as he grew the Charity Classic?
A. Absolutely.
Q. And did Mr. Kramer attend these events that he promoted and spearheaded?
A. Oh, yes.
Q. And what would he do at the events? What did he do at the events?
A. At the 5K, he was there bright and early, made sure everything was ready to go. At the children's races, he was in pictures with all the -- every -- for the children's races, the first five would get a trophy and a picture, and Jack was always in the photos with

the children.
Q. Did Mr. Kramer play a role in the CVS Highlander School?
A. Yes.
Q. What is the CVS Highlander School?
A. It's a charter school in Providence.
Q. And was it also during your time working for Mr. Kramer that CVS had -- created a partnership with the Highlander School?
A. Yes.
Q. And what was Mr. Kramer's role in the partnership?
A. He was very instrumental in that happening.
Q. In addition to making it happen, did he participate in promoting the school?
A. Yes.
Q. Did he do that also with interviews and meetings and events?
A. Yes, he did.
Q. Going back to Kramer C-8 for just a moment, if we could have that up. This was an expense report, and I showed you --
THE COURT: What letter is this, please?
MR. FEIN: I'm sorry, your Honor. Kramer C-8.
THE COURT: Thank you.
Q. We looked before at the October 23rd entry for a

meeting to discuss CVS Charity Classic. I'd like to show you on page 3 an entry about two-thirds of the way down the page, Wednesday, October 24th, 2001.

MR. FEIN: If you could call that out, Derek. One below. Actually I think, Derek, I think you were right. I think it's the event above with the comment. And if you could go to the comment, though, actually, Derek. Thank you.

Q. What does that say, Ms. McCusker?

A. It says, "To CVS Highlander School for press conference, John Kramer."

Q. At the bottom of that page is another event that he attended. Do you see the reference at the bottom, comment?

A. "To RIPEC dinner, John Kramer, 13th of November."

Q. And on the following page, page 4, if we could go to the last comment. Could you read that description.

A. "Car service for Jack and Lynn Kramer and Jennifer Veilleux to attend event for Learning Center for the Deaf honoring CVS. Car took them up and waited until event was over."

Q. Are you familiar with Learning Center for the Deaf?

A. Yes.

Q. And what was that or what is that?

A. It's a school for the deaf in Massachusetts that we've supported.
Q. And was Mr. Kramer -- did he play a role in CVS supporting that school?
A. Yes. He was an advocate for that facility.
Q. And did this involve a significant contribution in the creation of a media room at the school?
A. Yes, I believe so.
Q. And in CVS's name?
A. Yes.
Q. Did Mr. Kramer express preferences for CVS's name to be associated with these contributions?
A. Yes.
Q. And the ones we've reviewed today so far, the Charity Classic bears CVS's name?
A. Correct.
Q. The 5K bears CVS's name?
A. Yes.
Q. The Highlander School bears CVS's name?
A. Yes.
Q. And the media room at the Learning Center bears CVS's name?
A. Yes.
MR. FEIN: Your Honor, I offer Kramer B-8 on stipulation.

(Defendant Kramer Exhibit B-8 was admitted in full)
Q. If we could turn to page 3. Ms. McCusker, is this another expense report?
A. Yes.
Q. And if we could call out the middle entry for Tuesday, June 12th, 2001, and the description.
A. It's dinner with representatives of CVS and CVS Highlander School.
Q. Thank you. And also, if we could, the attendees at that event. Do you see a series of CVS employees?
A. Yes. It's Jack Kramer, Jennifer Veilleux, Lucille O'Brien, Rosemary Mede, Jim Donahue, Bob Lee, Jennifer Lee, Kelly Mirando.
Q. And do you see that Jim Donahue is listed as the superintendent of the school?
A. Yes.
Q. Was he the lead person at the school?
A. Yes.
Q. Did Mr. Kramer have interaction with him?
A. Yes.
Q. Thank you. Did you understand that Mr. Kramer had a leadership role on the CVS Charitable Trust?
A. Yes.
Q. Do you remember what that role was?

A. I believe he was chairman.
Q. Chairman. And did you understand that the Charitable Trust had millions of dollars that it made donations from to charities?
A. Yes.
Q. And did Mr. Kramer play an active role with the Charitable Trust?
A. Yes.
Q. Would -- did you, in connection with your work for Mr. Kramer, receive solicitations from various entities for contributions?
A. Yes.
Q. And did you receive solicitations from individuals seeking contributions for organizations that were special to them?
A. Yes.
Q. You discussed with Mr. Dambruch on a number of occasions packages or complimentary things that were given to CVS in connection with contributions CVS made; is that correct?
A. Yes.
Q. And is it the case that when CVS made contributions to various organizations, they would provide some form of package or event participation?
A. Yes.

Q. Would those include tables at dinners?
A. Absolutely.
Q. And that would be the equivalent of that organization's dinner the way that the Charity Classic had its gala dinner?
A. Yes.
Q. And did Mr. Kramer attend those dinners?
A. Oh, yes.
Q. In fact, did Mr. Kramer prepare and, indeed, solicit others to attend those dinner?
A. Absolutely.
Q. Would he have tables to fill?
A. Yes.
Q. Would CVS buy a table and then Mr. Kramer would take responsibility for filling that table?
A. Yes.
Q. And did you play a role in that?
A. Yes.
Q. Did that take a lot of time?
A. Yes.
Q. Was it easy to get individuals to say yes to come to the tables?
A. Sometimes.
Q. Was it sometimes difficult?
A. Depended on the event.

Q. And Mr. Dambruch showed you a table listing for one of the CVS galas?
A. Yes.
Q. Were there other similar situations where you would keep track of who was at the table?
A. Yes.
Q. And would that list change as people said yes or people canceled?
A. Oh, yes.
Q. And did Mr. Kramer take an interest in having that table filled?
A. Yes.
Q. Did he take an interest in having that table filled with people that he thought would be good for that event?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Did you make any efforts on Mr. Kramer's behalf in connection with where the tables -- where CVS's table would be located at the event?
A. Yes.
Q. What did you do?
A. Sometimes we would contact the organization to make sure that CVS had a prominent table at the event.

Q. And was that at Mr. Kramer's direction?
A. Yes.
MR. FEIN: Your Honor, we offer by stipulation Kramer F-16 and G-16.
(Defendant Kramer Exhibits F-16 and G-16 were admitted in full)
MR. FEIN: I'm showing the witness first Kramer F-16.
Q. This appears to be, Ms. McCusker, an e-mail from Mr. Kramer. Did Mr. Kramer write e-mails such as this, or did he type them himself?
A. No.
Q. Who typed these e-mails for Mr. Kramer?
A. I did.
Q. And yet on occasion the name would still show as Mr. Kramer?
A. Yes.
Q. And would you also receive e-mails for Mr. Kramer?
A. Oh, yes.
MR. FEIN: Could we call out the subject of this e-mail.
Q. Could you tell us what that is?
A. Providence Chamber Annual Dinner, November 24th.
Q. And this was sent to a series of CVS corporate executives; is that correct?

A. Yes.
Q. And what's the purpose of this e-mail?
A. It's for the invitation. Jack's inviting Dave Rickard, Doug Sgarro and Mike Ferdinandi to attend the Chamber dinner on behalf of Tom.
Q. And this would be an event where CVS would purchase a table?
A. Yes.
Q. And this is your effort in Jack's name to fill the table?
A. Yes.
Q. I see in the first line you're invoking Mr. Ryan?
A. Uh-huh. Yes.
Q. What's the purpose of doing that? What was your purpose in doing that?
A. Jack would direct me to say on Tom's behalf.
Q. To assist filling the table?
A. Yes.
Q. And do you see who the keynote speaker was at this event from the third paragraph?
A. Yes, W. Bruce Turner, president and COO of GTECH.
Q. And this e-mail was to -- this was an internal e-mail to CVS executives; correct?
A. Yes.
MR. FEIN: And could we call out the paragraph

below that says "the following individuals."
Q. Could you read that, please.
A. "The following individuals have been invited to join our table: Speaker William Murphy, Senator Montalbano, Senator Algiers, Representative Fox, also Judy Cullen and Melody Johnson."
Q. And is this an example of state officials being invited to join as CVS's guest at a CVS table at a public event?
A. Yes.
Q. And the next line, could you read the next sentence, please.
A. "I will let you know who is confirmed as we hear from them and get closer to the date."
Q. So what would happen on occasion is that you would invite individuals and then wait for their response?
A. Yes.
Q. And then depending on their response, continue to invite other individuals?
A. Yes.
MR. FEIN: If we could show the witness Kramer G-16, please, and if we could call out the entry on the bottom left of this page for Monday, November 24th.
Q. Ms. McCusker, the e-mail we just talked about referred to a dinner on Monday, November 24th, for the

Chamber. Does this appear to be a calendar entry relating to that?
A. Yes.
Q. And can you read -- whose handwriting is this?
A. It's mine.
Q. Could you help us read what you wrote.
A. It says, "Chamber, annual dinner, Rhode Island Convention Center, Tom, Doug, Jack, Dave, Judy Cullen, Senator Celona, Speaker Murphy, Laurie White, Senator Algiers and Representative Constantino."
Q. And some of those names we saw on the prior e-mail?
A. Yes.
Q. And some of the names are new?
A. Yes.
Q. And that would reflect the fact you were waiting for R.S.V.P.s?
A. Yes.
Q. So when you didn't get a yes, you would be inviting other people?
A. Yes.
MR. FEIN: Thank you. Your Honor, we would offer by stipulation Kramer L-2, and if we could show it to the witness.

(Defendant Kramer Exhibit L-2 was admitted in full)
Q. Ms. McCusker, does this appear to be another one of -- a page from Mr. Kramer's calendar?
A. Yes.
Q. And you'll see at the bottom of May 27 there's an entry at 7:00?
A. Yes.
Q. What does that say?
A. "M. McCaffrey, KFC, Warwick."
Q. And above that entry at 12:00 there's a reference to CM. Do you know what that refers to?
A. Cape May.
Q. And, in fact, is that written on the top of this page in the center?
A. Yes.
Q. What does Cape May mean to you in connection with your work for Mr. Kramer?
A. Jack and his wife have a home in Cape May.
Q. Is that in New Jersey?
A. Yes.
Q. And would they spend weekends there?
A. Yes.
Q. Would they spend long weekends there?
A. Sure.

Q. When did Mr. Kramer travel there, on -- for weekends?
A. Holiday weekends, a lot in the summer of course.
Q. And does this calendar entry suggest that he was leaving or left to go to Cape May on noon on the Thursday?
A. Yes.
Q. And was it Jack's -- did Jack frequently leave earlier than a Friday at 5:00 to begin his weekend?
A. Oh, yes. Well, if you're going to New Jersey you do.
Q. And would he leave on Thursdays?
A. Yes.
Q. Thank you. You testified in response to questions from Mr. Dambruch about learning of the Celona consulting relationship when you saw his name in budget documents; is that correct?
A. Yes.
Q. And you saw the name again after the initial time when you assisted on occasion in preparing those budgets?
A. Yes.
Q. Now, Mr. Celona -- Senator Celona's payments were included in the budget documents; is that correct?
A. Yes.

Q. In addition, did you process certain of Mr. Celona's invoices when -- on occasion?
A. Yes.
Q. You weren't the primary person processing those, were you?
A. No.
Q. Who was that?
A. Carlos Ortiz and his assistant, Betty Bibeault.
Q. And in Ms. Bibeault's absence, would you assist on occasion?
A. Yes.
Q. And when you did assist, you would get an invoice -- you would on occasion receive an invoice from Mr. Celona?
A. Yes.
Q. And would you prepare a check request when you received an invoice?
A. Yes.
Q. And you would use the invoice to prepare that check request?
A. Yes.
Q. And would you send that on to CVS's accounting department?
A. Yes.
Q. Did you also process other payment requests that

came in to government affairs or community relations?
A. Yes.
Q. And would you also take an invoice and turn it into a check request?
A. Yes.
Q. On the occasions when you handled Senator Celona's check request, did you handle those any differently than the other ones you handled on behalf of community relations and government affairs?
A. No.
MR. FEIN: Your Honor, I'd like to offer Kramer U-14 by stipulation.
(Defendant Kramer Exhibit U-14 was admitted in full)
Q. If you could take a moment, Ms. McCusker, and review that document.
A. Uh-huh.
Q. Who typed this letter?
A. I did.
Q. And how do you know that?
A. My initials are at the bottom.
Q. And would this be a situation when you were assisting Mr. Ortiz in Ms. Bibeault's absence?
A. Yes.
Q. And who is the letter addressed to?

A. Senator Celona.
Q. And could we call out the substance of the letter, and could we ask you to read it, please.
A. "In checking past invoices, we found that in August 2000 you were paid $3,000 instead of $1,000. A copy of the invoice is attached.
"Our accounting department picked up the incorrect number. Consulting services for August were $1,000. Instead, they added the balance forward of $2,000," in parentheses, "which checks had already been requested for, and added the two amounts together, issuing a check for $3,000.
"Unfortunately we did not catch it until your end. If agreeable to you, we will just hold back on February and March payments this year. Sorry for the inconvenience and look forward to hearing from you about the payment correction."
Q. Thank you. And if you see the handwriting below the text of the letter, what does that say?
A. That's my writing, and it just says "accounting made check for 3K instead of 1."
Q. And if we could go to the handwriting above, do you recognize that handwriting?
A. Yes. It's Carlos'.
Q. Not quite as neat as yours, is it?

A. It's sideways. Mine's not so good either.
Q. Could you help us read that, please.
A. It says, "Lisa, file with check request, Carlos."
Q. And do you know who Lisa is?
A. She was a temp that we had.
Q. And if we turn to page 2 of this exhibit, is this a copy of an invoice that Senator Celona provided to CVS for payment?
A. Yes.
Q. And you see, do you not, the consulting services for August 2000 and the reference to 1,000 --
A. Yes.
Q. -- being due for that?
A. Yes.
Q. And is that what you described in the letter previously, the 1,000 due for August?
A. Yes.
Q. But there was a balance brought forward on Senator Celona's invoice that listed 2,000 as not having been paid?
A. Yes.
Q. And what's the total amount due according to Senator Celona's invoice?
A. It says $3,000.
Q. And in your letter, in the letter that you typed

for Mr. Ortiz, does it appear that CVS mistakenly paid the $3,000 listed on Senator Celona's invoice rather than the 1,000 that was due for the month of August?
A. Yes. I took that as an accounting error. They just picked up the wrong amount.
Q. And the proposal in the letter was that we would just not pay for two months to get back on track for the 1,000 a month?
A. Yes. Right.
Q. You referred to meeting Senator Celona.
MR. FEIN: Thank you, Derek.
Q. You referred to meeting Senator Celona on one occasion; is that correct?
A. Yes.
Q. And where was that?
A. He came to CVS.
Q. And where did you meet him at CVS?
A. In our offices.
Q. Where were you when you met him?
A. At my desk. He came to my desk.
Q. And is your desk in a closed office?
A. No.
Q. Where is it?
A. It's outside of Jack's office. We all have open cubicles.

Q. And did Mr. Kramer bring Senator Celona over to introduce you to him?
A. Yes, he did.
Q. And did you know that Senator Celona had a television show?
A. Yes.
Q. And that was broadcast on the cable network here in Rhode Island?
A. Yes.
Q. And did you know that Jack Kramer appeared regularly on that show?
A. Yes.
Q. Would Senator Celona call you to schedule dates for the taping of the show?
A. Yes.
Q. On occasion would Jack Kramer ask you to call Senator Celona to schedule dates for the show?
A. Absolutely.
Q. And did you keep calendar and expense entries as we saw earlier for fundraisers, would you keep those as well for Mr. Kramer's appearances on the State House Report?
A. Yes.
MR. FEIN: Your Honor, we offer by stipulation Kramer Y-3.

(Defendant Kramer Exhibit Y-3 was admitted in full)

MR. FEIN: If we could call out for the witness, your Honor, Wednesday -- I'm trying to see the month here. One second, your Honor.

(Pause)

MR. FEIN: Excuse me, your Honor, Wednesday, November 29th. Can we call out the --

THE COURT: Do we have a year?

MR. FEIN: -- middle entry. 2000, your Honor. I apologize. Could we call out the entry on Wednesday at 11:30, please.

Q. Could you read that -- those words for us, please.

A. It says, "Senator Celona, Cox Communications, Providence, wrap up golf, 5K."

Q. And does that indicate one of Mr. Kramer's appearances on Senator Celona's show at Cox Communications?

A. Yes.

Q. And that would be a taping of one of the shows?

A. Yes.

MR. FEIN: Thank you. Your Honor, we offer Kramer Z-3 by stipulation.

(Defendant Kramer Exhibit Z-3 was admitted in full)

MR. FEIN: And this is a calendar entry for May 31st, 2001, and could we call out for Ms. McCusker the 11:00 entry on the 31st.
Q. Ms. McCusker, could you read what's written there, please.
A. It says, "Senator Celona, TV spot, Houghton Street studio," and the phone number. And underneath it says "same," and I think that's probably referencing it was the same studio as before. At one point he moved.
Q. At one point Senator Celona changed studios?
A. Yes.
Q. And Jack Kramer would go to whatever studio Senator Celona had at the time?
A. Yes.
Q. And tape the show?
A. Yes.
MR. FEIN: We offer Kramer O by stipulation. If we could show Kramer O.
(Defendant Kramer Exhibit O was admitted in full)
Q. And this would be another expense report, is it not, Ms. McCusker?
A. It is.
Q. And if we turn to page 2 and look at the comment for an event on May 31st, 2001, the description is

mileage expense, is it not?
A. Yes.
Q. And could you tell us what the comment is, what the entry is.
A. It says, "Taping of Rhode Island cable with Senator Celona promoting the CVS Charity Classic, John R. Kramer, 9 July 2001."
MR. FEIN: Thank you. We offer Kramer D-4 by stipulation.
(Defendant Kramer Exhibit D-4 was admitted in full)
Q. Ms. McCusker, this is a May 3rd, 2002, calendar entry, is that correct, in the middle column?
A. Yes.
Q. And could we call out the 10:00 entry. And what does that say, Ms. McCusker?
A. Looks like "interview, Senator Celona."
Q. While we're on this calendar page, if we go to the prior day at noon, can you read what it says at noon for May 2nd.
A. "Taping, Cox Communications, Peter Pan, Rhode Island Magazine, Joan Edwardson."
Q. Does that appear to be a different taping that Mr. Kramer did unrelated to Senator Celona?
A. Yes.

MR. FEIN: Your Honor, we offer Kramer F-4 by stipulation.

(Defendant Kramer Exhibit F-4 was admitted in full)

Q. Does this appear to be an August 2002 calendar entry, Ms. McCusker?

A. Yes.

Q. And we were just looking at a series of May and June calendar entries. Is it the case that those would be tapings in advance of the Charity Classic?

A. The May and June, yes.

Q. And the Charity Classic was often held in the June, July time period?

A. Yes.

Q. And would the August entries generally be in advance of and to promote the CVS 5K?

A. Yes.

Q. And was that often held in September?

A. Yes.

Q. If we could call out Wednesday, August 21, 3:30, if could you tell the jury what that says.

A. It says, "Hold, Senator Celona taping."

Q. And what does "hold" mean in that context?

A. Sometimes I would have a couple of dates from the senator or Jack that would be good, so I would kind of

block those dates on the calendar until we came up with a positive date.
Q. And earlier on that day, could you read what the first entry says.
A. "PJP, conference room," looks like 8:30, 8 to 8:30.
Q. And, again, PJP's role --
A. The Peter Jacobson Productions, and they worked on the golf -- Charity Classic.
Q. And if you look on the prior day, August 20, at the end of the day at 5:00, what does that entry say?
A. "Dinner in Providence with the PJP group."
MR. FEIN: Thank you. Your Honor, we offer Kramer H-4 by stipulation.
(Defendant Kramer Exhibit H-4 was admitted in full)
Q. If we could turn to page 3 of this document. In the middle, there's a reference to travel to Providence, if we could call that out. Could you read that, Ms. McCusker.
A. "Travel to Providence for tour/visit of the CVS Highlander School, preparation for taping of the Celona Report, Jack R. Kramer, Monday, 20 January 2003."
Q. Ms. McCusker, the other entries we've seen so far involved Mr. Kramer going to the studio to tape the

show. Is this one different than that?
A. Yes. I believe that one they actually went to the school.
Q. And did taping for the show at the school?
A. Yes.
Q. And Mr. Kramer attended that?
A. Yes.
Q. While we're on this document, please, on page 1, you testified earlier about the Aurora Club?
A. Yes.
Q. Do you see a reference to the Aurora Club on an expense for Friday, January 17th, 2003?
A. Yes.
Q. What does that comment say? First the purpose.
A. "Lunch meeting with Senator Reed."
Q. And who was Senator Reed?
A. He was a senator from Rhode Island.
Q. State senator or United States senator?
A. United States senator.
Q. And what does the comment say? Just one second.
A. "This lunch meeting with Senator Reed actually took place December 3rd, 2002. However, the Aurora Club bills one month later, thus billing received in 2003. The purpose of the meeting was to discuss legislative issues pertinent to CVS business,

Jack R. Kramer, Monday, 20 January 2003.
Q. Was it unusual for Mr. Kramer to do business lunches or other meals at the Aurora Club?
A. No.
Q. And he would include the expense from those meals on his expense reports and get approval at CVS; is that correct?
A. Yes.
MR. FEIN: Thank you. Your Honor, we offer Kramer G-4 by stipulation.
(Defendant Kramer Exhibit G-4 was admitted in full)
Q. And if we could call out the January 27th, 2003, entry at 10.
A. It says, "10:00, studio regarding CVS charter taping."
Q. And what does CVS charter mean to you?
A. The CVS Highlander Charter School.
Q. And this is close in time, is it not, to the taping that took place at the Highlander School that we referred to in the prior exhibit?
A. Yes.
Q. In fact, the prior taping at the Highlander School was Monday, January 20th, 2003, from the exhibit we just reviewed?

A. Yes.
Q. How much later is this studio taping about the charter school?
A. Just a few days.
Q. Is it, in fact, one week later, the following Monday?
A. Yes.
MR. FEIN: Your Honor, we offer Kramer I-4 by stipulation.
(Defendant Kramer Exhibit I-4 was admitted in full)
Q. If we could call out for Ms. McCusker the Wednesday, May 21, entry, 2003, 11:30.
A. It says, "John Celona taping."
Q. And is this another May entry that appears to be in advance of the CVS Charity Classic?
A. Yes.
Q. While we're on this document, Ms. McCusker, do you see a reference to a 2:00 meeting the prior day, May 20?
A. Yes.
Q. Where does that lunch take place?
A. At the Aurora Club.
Q. If we go back one day earlier to Monday, May 19th, at the 8:00 entry, can you read what that says.

A. It says, "Sponsor golf day."
Q. Does that appear to be a reference to an event in connection with sponsors for the CVS Charity Classic?
A. Yes.
MR. FEIN: Your Honor, we offer Kramer J-4 by stipulation.
(Defendant Kramer Exhibit J-4 was admitted in full)
Q. Is this another expense report, Ms. McCusker?
A. Yes.
Q. And if we turn to page 4 and we look at the entry for Wednesday, May 21st, 2003, can you tell us what the comment is on this entry.
A. "To film Celona show re: 2003 Charity Classic, John R. Kramer, Friday, 23rd of May 2003."
Q. While we're on that, if we could just drop down to the entry below for May 22nd, 2003. Can you read what the next entry is.
A. "To attend fundraiser for Senator Revens, John R. Kramer, Friday, the 23rd of May 2003."
Q. If we turn to page 2 of this document for Wednesday, May 14th, 2003, do you see another fundraiser that Mr. Kramer attended?
A. "To attend fundraiser for Senator Dan Issa, John R. Kramer, Friday, the 23rd of May 2003."

Q. And if you look just at this page in general, do you see attending a RIPEC meeting, making a PPAC, P-P-A-C, check presentation, attending another RIPEC meeting? Do you see all of those entries?
A. Yes.
Q. As well as the fundraiser, as well as the taping?
A. Yes.
Q. Is this a typical week in the life of Jack Kramer?
A. Yes.
Q. You've testified that on occasion you would contact Senator Celona, on occasion he would contact you regarding scheduling Mr. Kramer's tapings; is that correct?
A. Yes.
MR. FEIN: Your Honor, we offer Kramer E-4 by stipulation.
(Defendant Kramer Exhibit E-4 was admitted in full)
Q. Does this appear to be an e-mail from Senator Celona to you, Ms. McCusker?
A. Yes.
Q. Dated April 30, 2002?
A. Yes.
Q. And could you read what Senator Celona wrote to you.

A. Uh-huh. This is talking about the news conference. "That is excellent. The studio is in Downtown Providence on the fifth floor at 127 Dorrance Street in the building that the India restaurant is in and Chad's. The studio is very impressive, and I'm sure Jack will like it. FYI, my cell number is 447-3117. I look forward to seeing Jack on Friday at 10 a.m. Regards, John."
Q. Does this appear to be a reference to the switch in the studios for Senator Celona?
A. Yes.
Q. He is providing you the information so you can make sure Mr. Kramer shows up at the right place?
A. Correct.
MR. FEIN: Thank you. We offer Kramer Y by stipulation.
(Defendant Kramer Exhibit Y was admitted in full)
Q. If you could review this first page, Ms. McCusker.
A. Uh-huh.
Q. And could you read the first paragraph, please.
A. It says, "I have attached an outline that talks about CVS Highlander Charter School. As I indicated to you, I think this would make an excellent subject for the Senator Celona Hour."

Q. And, in fact, if you could read the next paragraph as well.
A. I think that we could -- "I think what we could do would be to shoot footage in the school through our audio-visual department and incorporate the video into a presentation in your studio. I believe this would certainly be interesting and news worthy. I look forward to talking to you soon."
Q. Does this appear to be a reference to the calendar entries we reviewed where Mr. Kramer went to the school to shoot video and then attended Senator Celona's studio to actually shoot the appearance on the State House Report?
A. Yes.
Q. And what is attached to this letter that went to Senator Celona? Could we turn to page 2. If you could take a look at that.
A. It's details about the CVS Highlander Charter School.
Q. And if you could turn to page 3. This appears to be a fact sheet regarding the Highlander School?
A. Yes.
Q. Being provided to Senator Celona to assist for Mr. Kramer's appearance?
A. Yes.

Q. And we have page 4 as another page on this fact sheet. And finally page 5 for this fact sheet, that is the last page, but the document that went to Senator Celona goes on to include additional pages. What does the next page appear to be, Ms. McCusker?
A. Again, it's another fact sheet about the Highlander Charter School.
Q. And page 7 appears to be the same thing?
A. Yes.
Q. Page 8, could you look at page 8, please.
A. Yes. It's a list of the board of directors at the school.
Q. And you referred before to Jim Donahue?
A. Yes.
Q. And who is he?
A. He was the director and CEO.
Q. And was there a CVS representative on the board?
A. I believe there was.
Q. Could you look at the list and see if you recognize anyone.
A. Rosemary Mede.
Q. And who is Rosemary Mede?
A. She was executive vice president of our HR department, human resources.
Q. And does page 9 of this document appear to be an

article regarding CVS Highlander School?
A. Yes.
Q. From the Providence Journal?
A. Yes.
Q. And finally page 11, what is that?
A. It's a continuation of the article.
Q. I'm sorry. That was page 10. Now we get to page 11.
A. It's a little note, "12/29, copies to Z along with appointment book copies."
MR. FEIN: Thank you.
THE COURT: Mr. Fein, we're going to take a break.
MR. FEIN: Sure, your Honor.
THE COURT: Would you step down, please.
THE WITNESS: Yes.
THE COURT: Members of the jury, we'll take our 15-minute break. Remember, you're not to talk about the case during the recess. Leave your notebooks on your seats. We'll take 15 minutes.
(Recess)
THE COURT: Mr. Fein.
MR. FEIN: Thank you, your Honor.
Your Honor, on the last exhibit I was on, Kramer Y, with agreement of the Government, we're going to

remove page 11 from that exhibit, which doesn't belong with it, and ask to strike the last question and answer regarding page 11.

THE COURT: Okay. The last question and answer will be stricken, and the jury will disregard.

MR. FEIN: Thank you, your Honor. Your Honor, we offer Kramer D-16 by stipulation.

(Defendant Kramer Exhibit D-16 was admitted in full)

Q. Ms. McCusker, does this appear to be an e-mail that you wrote?

A. Yes.

Q. And could you read the first two paragraphs, please.

A. "Jack will be taping a show with Senator Celona on Thursday, January 9th. I believe this will be at the CVS Highlander School. Lu, I think you have some details on this, also. Jack asked me to get info from all of you as he will also cover the 2003 Downtown 5K, the 2003 CVS Charity Classic and charitable giving information."

Q. And this is a reference to Mr. Kramer's appearance on the Celona State House Report?

A. Yes.

Q. And this is the appearance that we discussed

earlier where there was taping going on at the Highlander School as well as Jack's appearance at the studio?
A. Yes.
Q. And this refers to the fact, in addition to the Highlander School, other subjects were being discussed on that show?
A. Yes.
Q. And the third paragraph, could you read that as well.
A. "Also, I just found out this morning he will be in the office on Wednesday. Warning, warning, full steam ahead. If you have info, I will send him mail on Friday."
Q. Will you explain to the jury what you mean by "warning, warning, full steam ahead."
A. Because this was over the Christmas holidays. Jack was out for the holiday, and the taping was going to take place that following Wednesday when he returned. So when he came back on Tuesday, or probably Wednesday I guess it would be, he would be ready, full steam ahead, and everybody better be ready as well.
Q. He had high expectations for people who worked --
A. Oh, absolutely.
Q. Can you see that handwriting at the bottom of this

document?

A. Yes.

Q. What does that say?

A. It say, "1/7, left message for Jim Donahue regarding the taping."

Q. And this would be the same Mr. Donahue we referred to before?

A. Yes.

Q. The executive director of the Highlander School?

A. Yes.

MR. FEIN: Thank you. Your Honor, we offer Kramer X by stipulation, the letter X.

(Defendant Kramer Exhibit X was admitted in full)

Q. And, Ms. McCusker, if you could read the text of this e-mail as well.

A. This is from me to Lucille Bush. It says, "Lu, I have rescheduled the Celona taping for Monday, January 27th, at 10 a.m. Jack will tape with Celona in the studio, and senator said he will coordinate something at the school either before or after the 27th. Does Todd/Mike need to know this? M.J."

Q. And we previously saw, did we not, Ms. McCusker, a January 20th entry for Mr. Kramer going to the school in advance of the January 27th taping?

A. Yes.
Q. And could you read the handwriting on the bottom right of this document.
A. Yes. "1/7, left message for Jim Donahue," there's a phone number, "Monday p.m." -- "1 p.m.," I guess it is, and then it has 2 p.m. on the side, "visit school." And that's Lucille Bush's writing.
Q. And the last two words?
A. "Visit school."
Q. "Visit school." And the reference to Todd/Mike, do you know who you referred to in that e-mail?
A. Todd Andrews and Mike DeAngelis. They're part of our communications group at the time.
Q. Thank you. In advance of taping the show, would Mr. Kramer receive assistance from others at CVS in preparation for appearing?
A. Yes.
MR. FEIN: We offer Kramer S by stipulation, S as in Sam.
(Defendant Kramer Exhibit S was admitted in full)
Q. Ms. McCusker, if you could read the e-mail to Jack Kramer that's the second of the two e-mails.
A. This is from Lucille Bush to Jack. It says, "Thank you, everyone, for taking the time this morning

to touch base on the CVS Pharmacy Downtown 5K. Attached are the minutes from this morning's meeting. I hope everything was captured and recorded correctly. If not, don't hesitate to give me a holler. Thank you. Lucille Bush."

Q. And who is Lucille Bush?

A. Lu is our director of community relations.

Q. And do you see a reference to a document that appears to have been attached to the e-mail?

A. Yes.

Q. And then the e-mail above from Ms. Bush, could you read that as well.

A. Yes. It says, "Sorry about that, wrong attachment, wrong click. I have revised it, and here are the minutes from this morning's meeting."

MR. FEIN: You may need to read a little slower when you read for the court reporter's benefit.

THE WITNESS: Sorry.

Q. If you turn to page 2, does this appear to be the minutes of the meeting that Ms. Bush attached to the e-mail?

A. Yes.

Q. And does this reflect minutes of a meeting regarding the 5K that was held on Tuesday, July 23rd, 2002?

A. Yes.
Q. Who were the attendees at this meeting?
A. It was Jack Kramer, Charles Breagy, Diane Martin and Lucille Bush.
Q. Who is Charles Breagy?
A. Charlie Breagy is the race director for the 5K.
Q. Is he a CVS employee?
A. No.
Q. So is he another non-CVS person that Mr. Kramer and CVS had assisting with the CVS-related event?
A. Yes.
Q. And if we could call out the section below regarding advertising.
A. Uh-huh.
Q. You testified earlier that Mr. Kramer had an advertising background?
A. Yes.
Q. In fact, he headed the advertising department when you first started working for him; is that correct?
A. Yes.
Q. Even though he left advertising -- he was not part of the advertising department at this time; is that right?
A. Yes.
Q. Would he still get involved in advertising-related

efforts for the events that he covered?
A. Yes.
Q. And what are the advertising dates that are referred to here?
A. It's August 15th to September 15th to August 7th to September 7th.
Q. And is your understanding that's in advance of the running of the CVS 5K?
A. Yes.
Q. And you see your initials on the next section of this --
A. Yes.
Q. -- document? Whose handwriting is that with the letters M.J.?
A. That's Jack's.
Q. And what does this section of the document state?
A. This is public relations. "Jack/Charlie, set up time for show segment on race with Senator Celona. Jack, second point, provide points of discussion for show to Jack - Charlie."
Q. And did Jack direct your attention to this part of the agenda from the meeting?
A. Yes.
Q. And what do those bullet points mean to you?
A. That was my point to set up the appointment for

the taping of the show for the race with the senator.
Q. And this would be an occasion where Mr. Kramer, through you, initiated the scheduling of the appearance?
A. Yes.
Q. And Mr. Breagy's assignment on this bullet point was what as you understand it?
A. To provide the points of discussion for the show to Jack.
Q. To assist Mr. Kramer on the show?
A. Yes.
Q. And if we turn back to page 1 of this document, could you read the -- whose handwriting is that at the top of the page?
A. It's Jack's.
Q. Could you read that, please.
A. It says, "M.J., please note my follow-up," it looks like "slash Tom's." "Please call Senator Celona."
Q. Could that be "items"?
A. Oh, yes. I'm sorry. It looks like "items." Sideways again.
Q. And so that would be Mr. Kramer asking you to note his follow-up items?
A. Yes.

Q. And that would be a reference to the bullet point that had Jack's name on it on the page we just looked at?
A. Yes. Correct.
Q. And to please call Senator Celona to set up the taping date?
A. Yes.
Q. Is that correct?
A. Yes.
MR. FEIN: Thank you. Your Honor, we offer Kramer Q by stipulation.
(Defendant Kramer Exhibit Q was admitted in full)
Q. Could you tell the jury what this document is.
A. This is details for the Celona taping again for the Charity Classic, and it includes details about the confirmed players.
Q. And those would be golfers?
A. Yes.
Q. Including professional golfers?
A. Yes.
Q. And do you see a reference to sponsors?
A. Yes.
Q. And you've referred to Bayer in the past?
A. Yes.

Q. And in your testimony today?
A. Yes.
Q. Was Bayer an important sponsor of the Classic?
A. Yes.
Q. Do you see under "coverage"?
A. Uh-huh.
Q. Was it your understanding that the Classic was covered by ESPN?
A. Yes.
Q. Was that national coverage?
A. Yes.
Q. And you see a reference to the attendance from 2002?
A. Yes.
Q. Thirty thousand, would that be the attendees at the Classic from 2002?
A. Yes.
Q. And this is information for Mr. Kramer to use as he prepares to go on Senator Celona's show to promote the 2003 Classic; is that right?
A. Yes.
Q. And do you see a reference to new developments?
A. Yes.
Q. And what does that represent to you?
A. That would be the entertainment they probably

secured for the gala.
Q. I'm sorry.
A. They were -- they secured Hughie Lewis and the News for entertainment at the gala.
Q. These would be new developments from the prior year's Classic?
A. Yes.
Q. Finally on this document, the 2002 CVS Charity Classic, that paragraph, what is that a reference to?
A. It was how much money was raised and donated in 2002 to local charities.
Q. And this is money that was generated by the event itself?
A. Yes.
Q. The golf event as well as the gala dinner?
A. Yes.
Q. Thank you. Did you maintain for Mr. Kramer information that he could use for the next appearance on the Celona State House Report?
A. Yes.
Q. If he had talking points or briefing materials that others have given him, would you hold that for him?
A. I would hold it probably until the next event.
Q. And then once he made that appearance, discard it

and do the same for the following event?
A.    Yes.
Q.    The following appearance on the show?
A.    Yes.
MR. FEIN:  Your Honor, we offer Kramer T by stipulation.
(Defendant Kramer Exhibit T was admitted in full)
Q.    What is this document, Ms. McCusker?
A.    It's a summary of the 2002 CVS Pharmacy Downtown 5K.
Q.    And do you recognize the handwriting on the top of the document?
A.    Yes.  At the top it says "John Celona folder," and that's Jack's writing.
Q.    That is Mr. Kramer's handwriting?
A.    Yes.
Q.    Would this be an indication that he was giving you this information to put in that preparation folder for his next appearance?
A.    Yes.
MR. FEIN:  Ms. McCusker -- thank you, Derek.
Q.    Ms. McCusker, did you ever watch Mr. Kramer's appearances on the State House Report?
A.    Yes.

Q. Did you see it while it was running on television?
A. Occasionally I would see snippets of it.
Q. Did you ever see it while you were in your home watching television?
A. Yes.
Q. Is that the only way you would ever see the show?
A. No.
Q. How else would you see it?
A. Jack would have copies of the tape, and he would run it in his office.
Q. How would he run it in his office?
A. He had a TV with a VCR.
Q. He had a TV with a --
A. VCR.
Q. And would he invite people in to watch tapes of his appearances on television shows?
A. Yes.
Q. And did that include his appearances on the State House Report?
A. Yes.
Q. Did it also include his other appearances on other shows?
A. Yes.
Q. And were you one of the people that he invited in to watch those appearances?

A. Yes.
Q. Who else do you recall him inviting in to watch appearances?
A. Probably Todd Andrews, Jennifer.
Q. And when you went in to watch those appearances, did you have to watch the whole tape?
A. No.
Q. You would watch parts of it?
A. Yes.
Q. Did Mr. Kramer maintain those tapes?
A. Yes.
Q. Tapes of both the Celona State House Report as well as tapes of other appearances?
A. Yes.
Q. Where would he keep those?
A. In his office.
Q. About how many did he have?
A. It was a drawer full. It was a lot.
Q. Do you know how Mr. Kramer received copies of the tapes of his appearances on the State House Report?
A. Some were sent to him by the studios. Sometimes our communications people would obtain copies of the tape from the studios.
Q. And did Senator Celona provide copies on occasion?
A. Yes.

MR. FEIN: Your Honor, I offer Kramer C-4.
(Defendant Kramer Exhibit C-4 was admitted in full)
Q. If you could review this document, Ms. McCusker. Ms. McCusker, you opened Mr. Kramer's mail; is that correct?
A. Yes.
Q. What is this letter, please?
A. It's a letter to Jack from Senator Celona.
Q. Could you read the text of the letter, please.
A. "Enclosed please find a copy of the Celona State House Report in which you were a guest speaker. Again, thank you for taking the time to be on my show. If I can be of any assistance to you in the future, please feel free to contact me at any time. John."
Q. And could you read the handwritten note at the bottom of the letter.
A. It says, "Jack, pardon the color on the tape. I need to get a new VCR. See you Monday. John."
MR. FEIN: Thank you. We offer Kramer P by stipulation, your Honor.
(Defendant Kramer Exhibit P was admitted in full)
Q. What is this document, Ms. McCusker?
A. This is a letter to Senator Celona from Jack

thanking him for the tape.
Q. And could you read the text of the two paragraphs, please.
A. "Thank you so much for sending me the tape of our interview. You are a great friend to CVS. I appreciate the opportunities you give us to promote the CVS Charity Classic and the Downtown 5K on your show. Your new studios are fantastic. I look forward to seeing you at the Charity Classic."
Q. You testified earlier that you understood that Mr. Kramer was given the opportunities to promote CVS and these events on John Celona's show in connection with the consulting relationship?
A. Yes.
MR. FEIN: Your Honor, we offer Kramer X-3 by stipulation.
(Defendant Kramer Exhibit X-3 was admitted in full)
Q. And could you read the text of this letter, Ms. McCusker.
A. It says, "Dear Mr. Kramer, thank you again for appearing on my cable television program, the Celona State House Report. You did an excellent job. I am enclosing a copy of the program on videotape. It is the CVS tape, naturally for your review. I also want

to note that the spelling of your name will be corrected by the producer for the next viewing. Thank you again. With warm personal regards."
Q. Do you recall that on one occasion Mr. Kramer's name was spelled incorrectly on the Celona State House Report?
A. I can't say I remember off -- but that could have happened.
Q. And as you observed the shows and snippets, Mr. Kramer promoted the CVS charitable events we've been discussing this morning?
A. Yes.
Q. The Classic, the 5K and the Highlander School, among others?
A. Yes.
Q. When Mr. Kramer would appear -- would tape a show, in coming days it would then run on the air?
A. Yes.
Q. How long would the shows run for?
A. Several weeks.
Q. And were they repeated during the week on numerous occasions?
A. Yes.
MR. FEIN: We offer Kramer U by stipulation, your Honor.

(Defendant Kramer Exhibit U was admitted in full)

MR. FEIN: If it could be shown to the witness.

THE COURT: This is by agreement?

MR. FEIN: Yes, by stipulation. I'm sorry, your Honor, if I didn't say that.

THE COURT: It's not up.

THE CLERK: I have a hard copy if you want it.

MR. FEIN: Okay. We've got it. Thank you, Derek.

Q. If we could start on the e-mail at the bottom of this document, please. If you could review that first, Ms. McCusker.

A. At the bottom?

Q. Yes, please.

A. This is from Senator Celona to myself, copy to Jack. It says, "Hi, M.J. Karleen is in longer than we expected at Women & Infants. Everything is okay but slow. I think that she will be out tomorrow, so perhaps Jack and I can get together for the taping next week. I'm sorry for the lost week. Regards, John."

Q. And this would be another example of scheduling Mr. Kramer's appearances on the show?

A. Yes.

Q. And in the e-mail above it where you replied to

Mr. Celona, could we call out the second paragraph starting with "Jack would like."
A. It says, "Jack would like to invite you to attend a press event for CVS on Tuesday, August 20th, at 10 a.m. at the State House. I will fax you the details this afternoon. I apologize for the short notice, but we just found out about this yesterday."
Q. And if we can go to the next paragraph, please.
A. "Secondly, we need to set up a date for the taping of the Downtown 5K info for your show. Any chance it can be done sometime next week? Jack is out of the office the week of the 26th and most of the week September 2nd."
Q. And to the left of that, can you read that handwriting.
A. It just says "5K." I'm sorry, I can't make out the --
Q. Okay. And then finally the paragraph that begins "Jack also asked."
A. "Jack also asked me to mention to you that the CVS Charity Classic interview is still running on your cable show. Any way that can be pulled as it is very dated?"
Q. What's the date of this e-mail, Ms. McCusker?
A. August 16th, 2002.

Q. And was it the scheduling of the Classic that would have been in June or July?
A. Yes.
Q. Does this suggest that the -- that appearance that Jack Kramer appeared on was still running through the summer past the time of the Classic?
MR. DAMBRUCH: Objection.
THE COURT: Sustained.
Q. Do you recall asking that the prior appearance be pulled from the show?
A. Yes.
Q. And the last paragraph, please, on this document regarding scheduling, if you could read that.
A. "Please call or e-mail me ASAP about a taping date since Jack's schedule is very tight the next couple of weeks. I cannot believe how fast the summer has gone. Cool weather will be very welcome this fall."
Q. Thank you. You testified that you may have first learned about the Celona consulting relationship by reviewing budget documents in your department; is that correct?
A. Yes.
MR. FEIN: Could we put up, please, your Honor, Government Exhibit 345. Actually, your Honor, we offer Government Exhibit 345, which is by stipulation.

THE COURT: Okay.

(Government Exhibit 345 was admitted in full)

Q. What is this document, Ms. McCusker?

A. This is one of the breakout sheets for the political contribution line for the government affairs.

Q. And you referred to budget documents that had specific detail, and then you referred in your testimony to documents that were just summary in form?

A. Yes.

Q. Which would this be?

A. This would be a detailed.

MR. FEIN: If we could call out for Ms. McCusker starting with the line miscellaneous corporate political contributions and going to the bottom, and if we could capture -- Derek, if you can capture that across. Thank you.

Q. Do you see the entries listed here, Ms. McCusker?

A. Yes.

Q. What does the entry Albers & Company refer to?

A. They're one of our lobbyists.

Q. And do you see John Celona's name on this document?

A. Yes.

Q. And is this the type of document that you're referring to when you saw reference to John Celona's

consulting relationship with CVS?
A. Yes.
Q. And could you tell us what it says opposite "John Celona"?
A. It says $1,000 and the month, consultation fee.
Q. And then it lists it for additional months?
A. Yes, February, March, April and May.
Q. Thank you. Yesterday you described taking a call from Mr. Celona who asked if you had a contact person for the Oprah show; is that right?
A. Yes.
Q. And he said he wanted two tickets for his wife to give as a gift?
A. Yes.
Q. And you testified that you asked Mr. Kramer, and Mr. Kramer said that's fine, you can call the local affiliate?
A. Yes.
Q. And that was here in Providence?
A. Yes.
Q. You didn't call Oprah Winfrey, did you?
A. No.
Q. You didn't call Chicago?
A. No.
Q. Or the home office of the Oprah Winfrey Show?

A. No.
Q. You called the local network affiliate here in Providence?
A. Yes, Channel 10.
Q. And you gave Mr. Celona contact information?
A. Yes.
Q. And you let him proceed with the contact information?
A. Yes.
Q. You didn't arrange to get the tickets for him?
A. Not that I can recall. Just the contact.
Q. And CVS didn't pay a dollar, did they, for any tickets for Oprah Winfrey?
A. No.
Q. In fact, those tickets are free, are they not?
A. I believe they are.
Q. Was it unusual for Mr. Kramer to -- was it unusual for people to call Mr. Kramer asking for assistance in getting tickets for events?
A. No.
Q. And was it unusual for Mr. Kramer to try to help if he could?
A. No.
Q. No, it was not unusual?
A. Yes. He did assist with tickets.

Q. You testified regarding the Susan G. Komen Breast Cancer Foundation event in California.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Do you recall that American Airlines was a major sponsor of that event?
A. Yes.
Q. And do you recall that American Airlines was also a sponsor that Mr. Kramer was soliciting for the CVS Charity Classic?
A. Yes.
MR. FEIN: Your Honor, we offer Kramer S-4 by stipulation.
(Defendant Kramer Exhibit S-4 was admitted in full)
Q. What is this e-mail, Ms. McCusker?
A. This is a letter to me from Lucille Bush. She's -- do you want me to read?
Q. First the subject line, please.
A. It's the AA Celebrity Golf Tournament, which is American Airlines.
Q. And is this a reference to the Komen charity event?
A. Yes.

Q. And if you could just read the first paragraph, please.
A. "I have taken care of inserting the 30K against CVS Charity Classic donation recommendation list for 2003. Lynn has been advised to request a half-page ad from advertising using the CVS Charity Classic logo, and Robin will forward the CVS Charity Classic logo to the proper parties for insertion in the brochure and Web site."
Q. Was the 30 -- does 30K refer to $30,000?
A. Yes.
Q. And was that CVS's charitable contribution to the Komen Foundation?
A. Yes.
Q. And do you recall that CVS shared a sponsorship for this event on this occasion with another company?
A. Yes.
Q. And what company was that?
A. It was Bayer Consumer Care.
Q. Bayer Consumer Care?
A. Yes.
Q. And that's the Bayer aspirin products company?
A. Yes.
Q. And $30,000 was CVS's share of the contribution?
A. Yes.

Q. And in exchange for that contribution, did CVS receive a variety of materials and promotional opportunities?
A. Yes.
Q. And was part of that tickets to the actual event?
A. Yes.
Q. And do you know how many tickets CVS received to go to that event?
A. I believe it was four.
Q. Four, and that would be two couples or four couples of people if it was a couple? Like a husband and a wife, would that be four couples or two couples?
A. I guess four couples. It could have been two because we split with Bayer.
Q. It could have been four total with Bayer and CVS?
A. Yes.
Q. And who was the Bayer contact, the person at Bayer with whom Mr. Kramer would have worked out the share of the sponsorship?
A. Sean Flanagan.
Q. And in connection with that contribution, did CVS get to promote itself at the event?
A. Yes.
Q. And is that what's being discussed in this paragraph that you just read to the jury?

A. Yes.
Q. And what is the reference to the half-page ad from advertising?
A. It would be an ad -- they have a program book, so it would have been an ad for program book.
Q. And did the CVS Charity Classic have its own program book?
A. Yes.
Q. And would other companies, as part of their contributions to the event, get advertising space in the CVS program book?
A. Yes.
Q. And, in fact, it wasn't just CVS that was being promoted at the Komen event. It was the CVS Charity Classic in particular; is that correct?
A. Yes.
Q. And do you recall having to arrange for banners to be sent to California for this event?
A. Yes.
Q. What type of banners?
A. We have large vinyl banners that have our logos on them. We had them for the Charity Classic, we had them for our trust and for CVS Pharmacy.
Q. And what were those banners going to be used for at the Komen event?

A. For display at the event.
Q. And did you coordinate with Bayer in terms of sending the banners out?
A. I probably did.
Q. Was Bayer going to do the same thing?
A. Yes.
Q. And did Mr. Kramer attend this event with his wife, Lynn?
A. I believe so, yes.
Q. And do you know if they invited -- if the Kramers invited the Celonas to join them for this event with the other tickets that CVS had received?
A. Yes.
Q. And was Senator Celona's wife, Karleen, planning to go to the event?
A. Yes.
Q. Did she go to the event?
A. I don't believe she did. She was ill.
MR. FEIN: If we could show the witness and the jury Government Exhibit 341 already in evidence, please.
Q. This is an e-mail from you to Senator Celona you were shown by Mr. Dambruch earlier today.
A. Yes.
Q. And are you describing in that first paragraph

what the dress code would be for the event?
A. Yes.
Q. And is the second -- could you read the second paragraph, please.
A. It says, "You will owe one to Karleen. Hope she's feeling better. Not fun or easy when the mom is not feeling well."
Q. Is that a reference to the fact that Karleen Celona was not able to go to this event shortly before the event --
A. Yes.
Q. -- took place? Were you aware that Jack Kramer invited others to attend prior to inviting Senator Celona?
A. Yes.
Q. Do you recall any of the people he tried to get to come to the event?
A. I think he asked some of our officers.
Q. And what was their -- were they able to attend?
A. No.
Q. And are you aware of the fact that Jack Kramer was considering a larger role for CVS in the Susan G. Komen event in the coming years?
A. I'm not sure.
Q. Did Mr. Kramer ask you to keep quiet about the

fact that he had invited Senator Celona to the Komen event?
A. No.
Q. Did he ask you to lie about it?
A. No.
Q. Did he ask you to keep quiet about the fact that he had played golf with Senator Celona?
A. No.
Q. Or lie about that?
A. No.
Q. Did he ask you to keep quiet about the fact that you had made the call to the local affiliate about Oprah tickets?
A. No.
Q. Did he ask you to lie about that?
A. No.
Q. Did he ask you to keep quiet about the fact that there was a consulting relationship with John Celona?
A. Never.
Q. Did he ask you to lie about it?
A. No.
Q. Did he ever ask you to keep quiet about anything?
A. Yes.
Q. How many times did he do that?
A. Once.

Q. What was that?
A. His age.
Q. Is that the only occasion that Mr. Kramer asked you to conceal something from other people?
A. Yes.
MR. FEIN: May I have a moment, your Honor?
(Pause)
MR. FEIN: No further questions.
THE COURT: Mr. Kiley.

**CROSS-EXAMINATION**

**BY MR. KILEY**:

Q. Ms. McCusker, good morning. My name is Tom Kiley, and I represent Carlos Ortiz. Do you have in mind Exhibit 341 dealing with the Komen matter, the last document you looked at?
A. Yes.
Q. There was no cc on that to Carlos Ortiz, was there?
A. No.
Q. Carlos Ortiz was not among the officers invited to attend the event in San Diego, was he?
A. No.
Q. In fact, Carlos Ortiz had nothing to do with the Komen event, did he?
A. No.

Q. Carlos Ortiz had nothing to do with the Oprah tickets?
A. No.
Q. Nothing to do with the golf foursomes that you've talked about today?
A. No.
Q. You've run through numerous documents with Mr. Fein and with Mr. Dambruch before; but with respect to the documents relating to the TV shows, do you recall seeing Carlos Ortiz copied on any of those documents?
A. I don't recall.
Q. And it is the case, isn't it, that Carlos Ortiz had nothing to do with the TV show, the Celona show?
A. No, he did not.
MR. KILEY: May we have Exhibit T, Kramer T.
Q. I think you identified for us the handwriting at the top as yours, Ms. McCusker?
A. The top is Jack's.
Q. It says "John Celona folder"?
A. Yes.
Q. Did you maintain a John Celona folder?
A. I had a small one.
Q. And the small one contained only things dealing with the TV show essentially, didn't it?

A. Correct.
Q. Nothing in there concerning legislation?
A. No.
Q. Nothing in there concerning the consulting agreement?
A. No.
Q. Your dealings with Senator Celona and his staff or in connection with Senator Celona related exclusively to the matters you've talked about today and not legislation?
A. Correct.
Q. Carlos Ortiz's responsibilities at CVS during the time period you worked for Mr. Kramer related to legislation?
A. Yes.
Q. He had no PR duties; correct?
A. No.
Q. Did he have any public relations experience that you knew of?
A. Not that I knew of.
Q. And the public relations -- were there public relations people within your unit?
A. Yes.
Q. And who were they?
A. Todd Andrews and Mike DeAngelis.

Q. And we did see their names on at least one of the documents you went through; correct?
A. Yes.
Q. The first time you became aware of the financial arrangement with Mr. Celona was with respect to budget documents that you saw; correct?
A. That's what I recall.
Q. And what you recall is that those budget documents came to you from Carlos Ortiz's unit; correct?
A. Yes.
Q. And they were in the normal form for such budget documents?
A. Yes.
Q. And they were handled by you in the normal course?
A. Yes.
Q. Carlos Ortiz never asked you to hide the fact that John Celona's names were in those budget documents, did he?
A. Never.
Q. Never asked you to deceive anybody with respect to what was in it?
A. Never.
Q. Did Carlos Ortiz submit budget documents to you each year that John Celona was under agreement with CVS?

A. Yes.
Q. And was John Celona always listed in those documents?
A. Yes.
Q. And he never asked you to deceive anybody with respect to that fact?
A. No.
Q. Now, you told us, I think, that there were periods of time when Mr. Ortiz's administrative assistants might have been out.
A. Yes.
Q. And you provided assistance to Mr. Ortiz?
A. Yes.
Q. And I think you told us that when that happened, you might type letters for Carlos?
A. Occasionally.
MR. KILEY: Could I have Kramer U-14.
Q. You identified the handwriting in the upper right-hand corner, the not-so-elegant handwriting as Mr. Ortiz's?
A. Yes.
Q. Correct? That's Carlos' signature there in the top right corner?
A. Yes.
Q. And the signature on the bottom left, that's not

Mr. Ortiz's, is it?
A. No.
Q. That's a letter you signed for him?
A. I did.
Q. And were authorized to do so?
A. Yes.
Q. Senator Celona -- the salutation is to Senator John Celona; correct?
A. Yes.
Q. You knew that John Celona was a senator?
A. Yes.
Q. Indeed, in all of your communications that we saw today with Mr. Celona, he was referenced as the honorable or Senator Celona?
A. Yes.
Q. Mr. Ortiz didn't -- Mr. Ortiz approved this letter, didn't he?
A. Yes.
Q. And caused it to be directed to Senator John Celona, and it was with respect to payments; correct?
A. Yes.
Q. I want to take you back, if I may, to the initial meeting that you talked about yesterday with Mr. Dambruch, if you can remember that.
A. Yes.

Q. When Mr. Dambruch initially asked you when the meeting occur, you were unable to pinpoint the particular dates?
A. Right. Yes.
MR. KILEY: And he refreshed you by reference to a document, and that document I think was Exhibit 97. May I have 97, please.
Q. This is the document, Ms. McCusker, that refreshed your recollection, isn't it?
A. Yes.
Q. This is an entry from a calendar that was maintained in your office?
A. Yes.
Q. And I think you've -- you actually maintained two calendars within the office?
A. Yes.
Q. You used -- you and Mr. Kramer used what some people, some of us old dinosaurs talk about as being a two-book system?
A. Yes.
Q. And that's one book in the boss's office and one book in the -- at the secretary's desk?
A. Yes.
Q. And you reconcile those books regularly?
A. Yes.

Q. Now, is there some particular thing about this entry that refreshes your recollection that it is a meeting with Senator Celona and Carlos Ortiz?
A. It just says Senator Celona. It just says Senator Celona here.
Q. Thank you. And when you were preparing these books, were the books maintained ahead of time? Were they -- the schedule was to tell Mr. Kramer what he was going to be doing?
A. Yes.
Q. And if I may direct your attention to the middle of the next page, the next column, the middle of the day. Do you see that entry?
A. Uh-huh.
Q. That's a reference to Carlos, isn't it?
A. Yes.
Q. And that's an indication that Jack Kramer and Carlos Ortiz would be meeting at that time?
A. Correct.
Q. Now, another document that we saw today that relates to this July 8th was I think Government Exhibit 375. May I have that, please. Do you recall looking at Exhibit 375 earlier today?
A. Yes.
Q. And I think you told us with respect to the entry

on the bottom of the page, if we may highlight that last box, please, all the way up, can we take it all the way out, that there was something in it that suggested to you that the meeting occurred at the CVS cafeteria?
A. Yes.
Q. Is there a particular thing in there, Ms. McCusker, that suggests the cafeteria other than the price?
A. No.
Q. And the notation there is "J. Kramer, C. Ortiz, Senator Cenona," who we all take to be Senator Celona, and it's $11.70. Do you see that?
A. Yes.
Q. From your own experience, Ms. McCusker, what does a sandwich and a soda cost at the CVS cafeteria?
A. Oh, I'd say about four or five bucks.
Q. And three sandwiches and three sodas, between 12 and 15 bucks?
A. Could be.
Q. Now, I don't think we looked with Mr. Dambruch at page 2 of this exhibit. Can I have that, please. Now, on the left side of the page, I see, "Lunch, Senator Celona, C. Ortiz, J. Kramer"; correct?
A. Yes.

Q. And there's no pricing information under that notation; correct?
A. Correct.
Q. On the right side of the page, we see a Moon's Restaurant event?
A. Yes.
Q. On July 6th?
A. Yes.
Q. And that's not in the $11 amount, is it?
A. No.
Q. Is there no record, then, of a contemporaneous -- well, strike that. Is this the only back-up that exists for the ticket item on page 1 of the -- of Exhibit 375 dealing with the luncheon on July 8th?
A. I don't know. That's all that's here, but it doesn't coincide. So it seems like there's something -- I think in the past exhibit there was a luncheon from Eurest. I don't know if that was the same amount.
Q. Maybe we can ask about that one in a second. What is Eurest?
A. That is our catering service at CVS.
Q. Are the two documents that you have looked at over the course of time that refresh your recollection that the meeting might have occurred on July 8th this set of

invoices, expense accounts, and the calendars?
A. I'm sorry, can you --
MR. KILEY: I'll withdraw it.
A. I'm confused.
Q. As you sit here today, do you have any memory whatsoever about when the meeting occurred?
A. No.
Q. It could have been at any one of several dates?
A. Yes.
Q. Let's go to I think that Eurest document, and I think -- I hope it was Exhibit 319. Do you have that document in front of you? Is this the one you were recalling?
A. I don't think it's this one.
Q. Well, let's stay on this one, then. Eurest is your catering company?
A. Yes.
Q. And this is a bill for 15 people; correct?
A. Yes.
Q. If we can go down to the bottom of the page, this is something that was for the Senator Celona lunch; correct?
A. That's what it says there.
Q. And that's something you wrote to Carlos?
A. Yes.

Q. And the request was whether he could pay using his budget?
A. Yes.
Q. And the date of the event, is that shown on the document up at the top, that's February 10th?
A. Yes.
Q. The invoice date is February 19th, and the date of the luncheon is February 10th, 2003?
A. Yes.
Q. Do you know that that was the day in which Carlos Ortiz presented a slide show to legislators and Paul DeRoche and others?
A. Yes, it could have been. Yes.
Q. I'm sorry, Ms. McCusker --
A. Yes. Sorry.
Q. And a bill like this comes after the fact?
A. Yes.
Q. So from this invoice, which is an internal invoice, you know there were 15 people there?
A. Yes.
Q. Thank you. You told us, I think, that at the outset when you and Mr. Kramer went to the new unit and left your prior unit or the new unit was formed around you, it included community relations, government affairs and corporate events; correct?

A. Yes.
Q. And I think you used the phrase director to explain what Mr. Ortiz was at the time, did you not?
A. Yes.
Q. Would you please explain to the jury the hierarchal terms used at CVS. What does a director mean?
A. Directors are monthly salaried personnel, and then it goes -- from directors, there's different levels of directors, and then it goes to VPs.
Q. And is a manager below a director?
A. Yes.
Q. And it would go manager, director, VP, senior VP?
A. Yes.
Q. So at the time Carlos Ortiz was a monthly salaried employee?
A. Yes.
Q. And he was a director of a unit of how many, two?
A. Two.
Q. Did you meet Mr. Ortiz for the first time when you went into that unit?
A. No.
Q. How long had you known Mr. Ortiz?
A. Carlos worked at CVS over 20 years. I've been there 18. I knew him when he was in the pharmacy area.

Q. Did you work together?
A. No.
Q. What did you know of him? What did you know of the work that he did?
A. That he was an outstanding employee. He was a long-term employee.
Q. Do you know his educational background? Do you know what his training is in?
A. I knew he was a pharmacist.
Q. Do you know whether he has any training in government relations?
A. I don't know.
Q. And Mr. Ortiz's responsibilities with respect to government relations, like Mr. Kramer's, extended way beyond Rhode Island, didn't they?
A. Yes.
Q. Do you know how many states he had responsibility for?
A. I would assume as many as we had stores.
Q. And he had federal responsibility as well as state responsibility?
A. Yes.
Q. And did Mr. Ortiz frequently travel to those other states as well?
A. Yes.

Q. And that's something you know both from your budgetary matters and when you were assisting him when his AAs were out, if you will?
A. Yes.
Q. How much -- can you give us an estimate of how much of Mr. Ortiz's time was spent on Rhode Island matters when you were functioning as his assistant?
A. I couldn't say because I only helped out intermittently.
Q. With respect to the political action committee that you saw some slides on today, it is the case, isn't it, that CVS has multiple political action committees?
A. Yes.
Q. A federal political action committee?
A. Yes.
Q. Had one in Massachusetts?
A. Yes.
Q. Has the one in Rhode Island? Do you know whether the chart with respect to CVS's PAC activity that you saw is a -- whether it's a combined amount or focused on Rhode Island in particular?
A. I don't know.
Q. You don't know. I saw the name Edward Sturgeon on the political action checks.

A. Yes.
Q. Who is Edward Sturgeon?
A. He was either -- I think he was a director in our tax area.
Q. And he was the signatory on your PAC account, at least in Rhode Island?
A. Yes.
Q. And was he the signator on your PACs outside of Rhode Island as well, do you know?
A. I believe so.
Q. And did you have accounting on -- accountants performing work with respect to your PACs, by that I mean the CVS PACs?
A. Yes.
Q. And were they within your unit?
A. No.
Q. They were external? Were the invoices that you processed as provided by Mr. Ortiz also passed on to others within CVS?
A. Yes.
Q. Were they handled in the normal course?
A. Yes.
Q. Did Mr. Ortiz ever ask you to do anything out of the ordinary with any of those accounts?
A. No, never.

Q. Did he ever ask you to do anything out of the ordinary on anything?

A. Never.

MR. KILEY: No further questions.

THE COURT: Redirect?

MR. DAMBRUCH: No, your Honor.

THE COURT: You may step down.

MR. PETALAS: Your Honor, the Government's next witness will be Betty Bibeault.

**BETTY BIBEAULT, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: My name is Betty Ann Bibeault, B-I-B-E-A-U-L-T.

THE COURT: Ms. Bibeault, even with the microphone, you have to keep your voice up. So if you would, project out to the back of the courtroom.

**DIRECT EXAMINATION**

**BY MR. PETALAS:**

Q. Good afternoon, Ms. Bibeault.

A. Good afternoon.

Q. How are you employed?

A. I work part time at CVS.

Q. How long have you worked there?

A. Twenty-five years.

Q. What position do you work in at CVS?
A. I am currently a legal assistant.
Q. And how long have you done that work?
A. The last 10 years.
Q. When did you begin at CVS?
A. In 1983.
Q. And what was your position when you came into CVS?
A. I started as a part-time temporary employee taking store orders electronically.
Q. How long were you part time?
A. I think about six months.
Q. And following that, you became a full-time employee?
A. Correct.
Q. And what did you do when you became full time?
A. There was a short time where I keypunched third-party claims, and then after that I became an administrative assistant in the third-party department.
MR. SMITH: Excuse me, your Honor. Could the witness get a little closer to the mike, please.
THE COURT: Even with the microphone, you have to yell.
THE WITNESS: It's not my nature.
THE COURT: Well, do your best.
Q. Ma'am, your last answer was?

A. That I worked as an administrative assistant in the third-party department.
Q. At some point did you begin to work for Mr. Carlos Ortiz?
A. I did.
Q. When about was that?
A. Early 1985 in the pharmacy operations department.
Q. And just about how many years did you work for Mr. Ortiz?
A. Since that time.
Q. Would it be fair to say that you worked for him for a matter of 20 or more years?
A. Correct.
Q. What was your working relationship with Mr. Ortiz like?
A. Very good.
Q. You enjoyed working for Mr. Ortiz?
A. Very much.
Q. What is your understanding of Mr. Ortiz's responsibilities at CVS?
THE COURT: At what point in time, Mr. Petalas?
MR. PETALAS: I'll change the question.
THE COURT: Let's get to the --
Q. Was Mr. Ortiz involved in government affairs at CVS?

A. Yes, he was.
Q. And did you work for him as his assistant relating to government affairs matters?
A. Yes, I did.
Q. And let me invite your attention to the period between 1998 until 2003. In 1998, was Mr. Ortiz involved in government affairs at CVS?
A. He was just beginning the government affairs department at that point.
Q. So what happened in 1998 that you say changed?
A. Prior to 1998, we were still part of the pharmacy operations department where the legislative portion was a small part of his job. And in 1998, that's when he started to report to Jack and the government affairs department was born.
Q. Was Mr. Ortiz a -- have a government affairs title prior to the time that he began reporting to Jack Kramer in 1998?
A. I'm trying to think what his prior title was. Director of professional and government -- no, not government.
Q. Perhaps I could ask it this way. At some point was he a manager of government affairs?
A. Yes, he was.
Q. And then in 1998, did he receive a new title?

A. He was director of government affairs.
Q. And was he also vice president at that point?
A. That did not come until 2000.
Q. In 2000, he became vice president?
A. Correct.
Q. Was that also related to government affairs matters?
A. Yes, it was.
Q. In the period between '98 and 2003, what were your job responsibilities in working with Mr. Ortiz?
A. In an administrative assistant position, answering phones, scheduling his appointments, maintaining his calendar, typing legislation for him when he was testifying, registrations for various conferences that he might attend.
Q. Did you open his mail for him?
A. Yes, I did.
Q. Did you have access to his e-mail when e-mails would come in?
A. I had access to it, but he maintained his own. I didn't monitor them or do anything with it unless he was out for an extended period of time.
Q. When Mr. Ortiz was out on travel, what -- would your job responsibilities include maintaining his incoming correspondence and handling his paperwork?

A. Yes, I would.
Q. And would you confer with Mr. Ortiz while he was out of town to make sure that you were doing as he wished you to do?
A. Yes.
Q. As part of your job, did you also handle invoices that would come in relating to Mr. Ortiz's section?
A. Yes, I would.
Q. And what was Mr. Ortiz's role in retaining outside vendors or others that would submit invoices? What was his level of authority in that?
A. To pay invoices that were coming in?
Q. No, to retain the people who would submit invoices to him.
A. I'm not sure I follow the question.
Q. Did he have hiring authority?
A. Yes, he did.
Q. Would you describe the process of how incoming invoices would be handled when you received them.
A. Sure. I would open them, and if it was something that was budgeted, then oftentimes I already knew which account numbers that they should be charged to; but in any event, he did need to put his authorizing signature on it.
Q. And you say if a matter had been budgeted. What

do you mean by that?
A. There was a budget that we worked from that was always prepared the previous year. So if it was an item that was already budgeted, then I'd already know which account number to charge it to.
MR. SMITH: Your Honor, I'm sorry. She's fast, and she's not close enough to the mike for me. Perhaps it's my hearing.
THE COURT: Please try to keep in mind it's a very big room. Try to keep your voice up. Just pull that microphone a little closer. There you go. And just slow it down a little bit.
Q. You mentioned the budget. Who was responsible for preparing the budget related to government affairs?
A. Carlos would prepare it and review it with Jack.
Q. Did you have any role in that process?
A. From an administrative assistant standpoint.
Q. And what does that mean? What would you do to assist him?
A. Create the files, maintain the files. He would sit with me, and we would just go line by line as to what he wanted budgeted for the following year.
Q. When you say files, would you prepare electronic files?
A. It was usually an Excel file that I maintained.

Q. I'd like to show you what's been marked as Government's Exhibit 345, which is a full exhibit. That should come up on your monitor. Do you see that document?
A. Yes, I do, but it's very small.
THE COURT: We can give you a hard copy.
Q. Do you recognize that?
A. Yes, I do.
Q. What is it?
A. It's the Excel file that I just referred to. It's a working document that we always would log in invoices that were paid, when they were paid, how much we paid, and oftentimes I would put a comment as to what it was.
Q. What do you mean by working document?
A. Working document is that I would work with it throughout the year. As invoices were paid, I would update this file. And then at the -- in the fall when Carlos would begin the budgeting process, he would work from this document.
Q. And let me direct your attention to the bottom of page 1, if we could magnify the bottom part. Right there. Thank you. Do you see the -- is your name indicated on that?
A. Yes, it is.
Q. What does it say?

A. "Prepared by Betty Bibeault."
Q. Does it provide a date?
A. June 28th, 2000. That date would be the day it was printed.
Q. So this is a document that you maintained?
A. Yes, it is.
Q. And where was it kept? Where was this electronic file kept?
A. On my computer.
Q. And as you print it, the date will correspond to the date which you printed it; is that correct?
A. Correct.
Q. Is it fair to say this is a snapshot of what that document looked like on the date indicated at the bottom?
A. Correct.
MR. PETALAS: Can you bring up the full document again.
Q. Calling your attention to the top of the document, it indicates political contributions. Do you see that?
A. Uh-huh.
Q. And do you see a number in parentheses beside that?
A. Yes, I do.
Q. What does that refer to?

A. That would be the account number.
Q. And how is an account number obtained?
A. I believe it's through the accounting department.
Q. Were there occasions at which you would -- you or Mr. Ortiz, to your knowledge, would need to obtain additional budget account numbers?
A. I wasn't a part of that process, no.
Q. How many budget lines are part of Carlos -- the budgets that you helped Carlos Ortiz prepare in government affairs?
A. How many account numbers?
Q. Yes.
A. He had five.
Q. What were those five account numbers? Not the numbers, but what are the budget lines associated with those five numbers?
A. I'm glad you don't need the numbers because I'm not sure I remember those. He had dues, lobbying, subscriptions, political contributions and political charitable contributions.
Q. Ms. Bibeault, what sort of items would fall under the dues category in the budget?
A. That would be a lot of the state associations that we belong to, pharmacy associations. So it would be the annual dues.

Q. And what about lobbying, that line item in the budget?
A. Lobbying is the CVS-hired lobbyist.
Q. And the other one you mentioned was subscriptions. What does subscriptions apply to?
A. Subscriptions would be publications to a magazine, to a newspaper.
Q. And political contributions, is that what is itemized on this document in front of you?
A. Yes, it is.
Q. Government's 345. And what sort of items fall within political contributions?
A. Political contributions would be contributions that were being made to political parties, political -- to politicians as a result of fundraisers, but there was also a bottom portion to that account number which said miscellaneous.
MR. PETALAS: And what -- Ms. Draughn, if you could highlight bottom section of that document or magnify it. If you can get the title of that section as well, please. Magnify it as much as you can.
Q. There's a section on the document entitled miscellaneous corporate political contributions; is that correct?
A. Yes.

Q. Is that what you're referring to as a separate piece within the political contributions budget line?
A. That is.
Q. And what goes in the miscellaneous corporate political contributions portion of the political contributions budget line?
A. That would be contributions that we had received that were not planned so that they weren't actually line item budgeted at the top.
Q. So these --
A. And so there was miscellaneous money that could be used towards that, but it was also used as more of a catchall; that if there was something that came in that wasn't budgeted that needed to be paid, oftentimes it fell under that category.
Q. So unbudgeted expenses would go in the miscellaneous category?
A. Correct.
Q. And you say there were items that would come in from time to time that were unbudgeted that would go in there; is that right?
A. Correct.
Q. And continuing to page 2 of the document, is that more of the same miscellaneous unbudgeted expenses that were put in that budget line?

A. Yes, it would be.
Q. Okay. Within that miscellaneous corporate political contributions, do you see any reference to any consultants on either page 1 or page 2?
A. Going back to page 1, under miscellaneous there was John Celona.
Q. Okay. And are there any other consultants mentioned?
A. Just below that there's a Kaizen Consulting, and I believe on the second page the last entry was Washington Strategies.
Q. And what is Kaizen Consulting, ma'am?
A. Kaizen Consulting was a firm that had worked with us when we were working on our PAC, CVS PAC, which stands for political action committee; and they helped design the logo for the PAC.
Q. I'm sorry. I don't mean to cut you off. You can continue.
A. They also helped -- we wanted to do a solicitation on behalf of the PAC, and they helped us with that as well.
Q. So CVS has a political action committee; right?
A. We actually had three at that time.
Q. And these expenses for Kaizen Consulting were related to Mr. Ortiz's efforts relating to that

political action committee?
MR. KILEY: Objection.
THE COURT: Sustained.
Q. Did Kaizen Consulting do anything other than work on the political action committee matters?
A. That's what I remember them doing. I'm not sure if there were other things that they did.
Q. What about Washington Strategies, ma'am?
A. Washington -- my recollection is Washington Strategies and the Kaizen Consulting worked together, and I was never really clear on which group did what.
Q. Also under miscellaneous corporate political contributions, there's a reference to Albers & Company at the top of that subline item on page 1. Do you see that?
A. Yes, I do.
MR. PETALAS: And if Ms. Draughn could pull up page 1 again.
Q. What is Albers & Company?
A. Albers & Company is one of CVS's lobbyists.
Q. The other items listed in miscellaneous political contributions, are any of those related to any services or payments of a nonpolitical nature?
A. The first one, Aging 2000.
Q. And what is Aging 2000?

A. I wish I could remember.
Q. You don't know?
A. I don't remember.
Q. Okay. Now, this line item also includes mention of John Celona; is that correct?
A. Yes, it does.
Q. And what does it describe about John Celona?
A. Consulting fees.
MR. PETALAS: If I could pull up Government's Exhibit -- actually, your Honor, I need to find out if this is a stipulated exhibit. 374?
MR. FEIN: I believe so.
MR. PETALAS: If we can pull up Government's 374.
THE COURT: Is this by agreement?
MR. CORRIGAN: No objection, your Honor.
THE COURT: Okay.
MR. KILEY: No objection, your Honor.
(Government Exhibit 374 was admitted in full)
Q. Ms. Bibeault, are you familiar with this document?
A. It keeps flashing in front of me. Do you have a paper one that maybe I could --
THE CLERK: Yes.
THE WITNESS: Is it supposed to flash like this?
THE COURT: Are any of the monitors in the jury

box flashing on and off?

JUROR: No.

THE COURT: The answer is no, it's not supposed to flash like that; but mine was, too.

THE WITNESS: Thank you.

THE COURT: But we'll give you the paper.

Q. Do you recognize that document?

A. Yes, I do.

Q. What does it appear to be?

A. It's a consulting agreement between CVS and Washington Strategies and Kaizen Consulting.

Q. Does that document indicate what tasks Kaizen Consulting and Washington Strategies will be undertaking on behalf of CVS?

A. Yes, it does.

Q. Drawing your attention to the second paragraph of the document. Is that the paragraph in which the consultants' obligations are outlined?

A. I'm just reading it through before I answer. Yes, it is what they were working on.

Q. And this is a document -- what's the date of this document, ma'am?

A. March 31st, 2000.

Q. And is this a letter written -- addressed to Mr. Ortiz?

A. Yes, it is.
Q. And on the final page, is this -- if you take a look at that, and pull up page 4, please, do you see a signature line there?
A. Yes, I do.
Q. And do you recognize the signature?
A. There's three signatures, but are you referring specifically to Carlos'?
Q. Yes, the signature line for Carlos Ortiz. Do you recognize that signature?
A. Yes, I do.
Q. Is that Mr. Ortiz's signature?
A. Yes, it is.
Q. And it indicates he signed it on April 27, 2000?
A. That would be my handwriting, yes.
Q. Were you -- did you assist him in preparing this or working on this matter?
A. I don't recall.
Q. But at any rate, you're the one who wrote in the date there?
A. Yes.
Q. If we can pull up Government's document 347, which is a full exhibit. Do you recognize that document, ma'am?
A. Do you have a paper one for me, please?

THE COURT: Just a minute. We'll get it for you. Is it still flashing? John, maybe you can turn her screen off.
Q. Do you recognize that document, ma'am?
A. Yes, I do.
Q. What is it?
A. Looks like it would be the 2001 budget for the political contributions account.
Q. Does John Celona's name appear in this budget document?
A. Yes, it does.
Q. Where does it appear?
A. Maybe the sixth or seventh entry down.
Q. So it's no longer in the miscellaneous account; is that right?
A. Right.
Q. That indicates it was a budgeted expense?
A. Correct.
Q. This is 2001. The one we were looking at previously was before that; is that right?
A. Yes.
Q. Is this document also a document prepared by you?
A. Yes, it would be.
Q. And is this also a document that you would keep on your computer?

A. Yes.
Q. Do you know where -- how this and the prior Government's exhibit would be used by Mr. Ortiz in his duties for overseeing the budget in government affairs?
MR. CORRIGAN: Objection, your Honor. I believe the prior Government exhibit was a Kaizen Consulting contract.
THE COURT: Sustained.
Q. Poorly asked. Let me correct that. Is this the same -- is this document kept in the same way as the Government's exhibit for the 2000 political contributions budget line?
A. Would I have maintained it at the same place?
Q. Right.
A. Yes.
Q. And both of these were prepared by you?
A. Correct.
Q. In coordination with Mr. Ortiz?
A. Absolutely.
Q. How did Mr. Ortiz use these documents?
A. During the course --
THE COURT: Which documents are you referring to now?
Q. Referring to Government's 347 and Government's 345, the two political contributions budget line

documents for 2000 and 2001.
A. This one?
Q. Yes. Drawing your attention to those two exhibits, how would Mr. Ortiz use those exhibits in the budgeting process for his section?
A. So not during the course of the year but during the budgeting process?
Q. Yes, ma'am.
A. During the budgeting process, he would take the document as I had it maintained through usually September; and then he would see what had been paid, what was still outstanding. He would go through it line by line to see if there would be any increases for the following year, and then we would create a new file working off of those numbers.
Q. And who was involved in that process?
A. He and I.
Q. Do you know whether or not he used these documents -- he showed these documents to any of his superiors?
A. I'm not sure if during the budgeting process he would bring those with him or not. I'm not sure.
Q. Who would he work with in determining the government affairs budget?
A. Once he had prepared it, then he would meet with

his boss, Jack.
Q. Is that Jack Kramer?
A. Kramer, yes.
Q. Do you know whether or not these documents were used beyond -- further up the chain than Jack Kramer?
A. I wouldn't know that.
MR. PETALAS: I'd ask to show the witness Government's Exhibit 99, which is a full exhibit.
Q. Do you recognize that document, Ms. Bibeault?
A. No, I don't.
Q. Have you ever seen that before?
A. I don't believe I have.
Q. Is that a document relating to the 2000 proposed budget for government affairs?
A. It's what it says at the top.
Q. Does it list achievements in '99 and initiatives in 2000?
MR. KILEY: Your Honor, if she doesn't recognize the document --
THE COURT: Sustained. If it's in as a full exhibit, it should speak for itself.
MR. PETALAS: Very well.
Q. Ms. Bibeault, in the political contributions -- strike that. Was Mr. Ortiz's -- your understanding of Mr. Ortiz's role in government affairs, did that

include anything to do with community outreach services?
A. Community outreach? Jack was also responsible for community relations. Is your question related to whether he would be involved with community relations in that way?
Q. No. My question is, as a vice president and as a supervisor in government affairs, was Carlos Ortiz responsible for community relations matters?
MR. CORRIGAN: Your Honor, only at the time when he was a vice president? Is that what we're limiting this to?
Q. From 19 --
THE COURT: That's what he asked.
MR. PETALAS: Let me correct that.
Q. From 1998 to 2003, did Carlos Ortiz have any responsibility within the corporate relations section for the community relations matters of the section?
A. I don't believe so.
Q. Were there directors in the section who had that responsibility?
A. Yes, there were.
Q. Who were they?
A. Who made up the community relations department?
Q. Yeah. Who were the directors in that department?

A. That would have been Jennifer Veilleux and Susan Delmonico, and they both reported to Jack.

Q. And Carlos Ortiz was the director who reported to Jack on government affairs?

A. Correct.

MR. PETALAS: Your Honor, we may want to approach at this point.

(Bench conference held on the record)

MR. PETALAS: Your Honor, I think it's time we just move to the point about John Celona's invoices coming in, which is going to raise -- I believe which will elicit the conversations she had with Mr. Ortiz about paying the invoices. So I'm going to raise that with you now before I go into that.

THE COURT: What is -- what are you going to ask her, and what is she going to respond?

MR. PETALAS: I'm going to begin by asking if she received invoices from Senator Celona, and then I'm going to ask her if she had any -- if she discussed that fact with Mr. Ortiz.

I expect her to respond that she did, that she asked him words to the effect of is this okay or why are we paying him. I expect the response from Mr. Ortiz, according to her testimony, will be that this was a contractual arrangement entered into by

Mr. Kramer.

I also expect her to say that she's had more than one occasion to have conversations with Mr. Ortiz about these payments. I expect that she would testify that during those conversations, Mr. Ortiz informed her, again, that it was an agreement that Mr. Kramer had entered into, that Mr. Ortiz also had concerns about it, and I expect that she would testify also that Mr. Ortiz told her he had asked the same question to Senator Celona and that Senator Celona said he had ethics approval.

THE COURT: Well, that's a lot.

MR. CORRIGAN: It is. And what I'm confused about is that why this is being done by showing her the invoices and then it could be -- it could come out at any point about the conversation. Why isn't it just a direct question about did you have a conversation with Mr. Ortiz about Senator John Celona, and that way we know when the conversations are coming in. Otherwise we have no idea of when the limiting instruction can be properly given.

MR. PETALAS: Let me propose --

THE COURT: Don't you think you have a *Bruton* problem also?

MR. PETALAS: Well, *Bruton* applies to

nonhearsay -- to hearsay, but *Bruton* absolutely does not apply when the co-conspirator exception or other nonhearsay exceptions apply. That's not *Bruton*. If I may explain why it's not *Bruton*.

THE COURT: I think what you're going to do is, you're going to take the next 10 minutes and walk her through the invoices and don't ask her these questions. And I think you better think long and hard about *Bruton*. Step back.

(End of bench conference)

Q. Ms. Bibeault, at some point between the period of 1998 and 2003, did you receive invoices from John Celona directed to Mr. Ortiz?

A. Yes, I did.

Q. How did those invoices come in to you?

A. They came through the mail.

MR. PETALAS: If I may pull up Government's Exhibit 117, which is a stipulated exhibit. In fact, your Honor, for the convenience of the clerk, I'll be going through Exhibits 117 through 120, inclusive, all of which are stipulated.

THE COURT: Why don't you, John, if you could hand those up to Ms. Bibeault.

And, Ms. Bibeault, so you know, when Mr. Petalas talks about an exhibit number, you'll see a sticker on

there, and that has the number on it. So you'll be able to tell what he's talking about.

THE WITNESS: Thank you.

THE COURT: Okay.

Q. Do you see that, Ms. Bibeault?

A. Yes, I do.

Q. Do you recognize that?

A. Yes, I do.

Q. What is it?

A. That, I believe, is the first invoice that I had seen.

Q. What's the date on that invoice?

A. February 23rd, 2000.

Q. Does it indicate what the invoice is for?

A. It says consulting services for February of 2000.

Q. Did you receive any other documents relating to what services had been provided by Mr. Celona with this invoice?

A. Documentation with this, no. It just came in an envelope.

Q. Was there any itemization of what services had been provided?

A. There was not.

Q. Do you see that there's handwriting on the document?

A. Yes, I do.
Q. Do you recognize what that is?
A. Uh-huh.
Q. Whose handwriting is that?
A. That would be Carlos'.
Q. And what does it say?
A. "Okay to pay."
Q. Does it provide an account number?
A. Yes, it does.
Q. Is that the account number related to the political contributions account line that we talked about earlier?
A. No, it's not. He had indicated to me he wanted the invoice to be charged to the political contributions account, and that is -- that was a mistake. It should be 72001. And I had caught that mistake prior to it going to accounting.
Q. Let me ask you to look at Government's 118.
A. Okay.
Q. What is that?
A. That would have been the manual check request form that I would have written as a result of that invoice that we just saw.
Q. And what is the purpose of that form?
A. That would be giving accounting the authorization

to pay it.
Q. And what information -- did you fill out this form?
A. Yes, I did.
Q. And I notice you leave the vendor number blank. What is a vendor number?
A. A vendor number would be a number that's identified or assigned to a particular vendor or someone that we would be paying invoices to or expenses to.
Q. What is the process for obtaining a vendor number?
A. In obtaining one?
Q. Yes.
A. There have been different ways through the years. I think at this point there's actual paperwork that we need to submit that would have a name, an address and sometimes I think a tax ID number or a Social Security number before our accounting department actually assigns a vendor number.
Q. So this paperwork is submitted to whom?
A. To our accounting department, accounts payable.
Q. Does that paperwork include any requirement that you explain or justify why you are retaining this particular vendor?
A. I don't recall if that's on there or not. I know

there's like terms of payment on there.
Q. Is there some authorization that's required before you send that paperwork over to accounting?
A. An authorizing signature.
Q. And who would be an authorizing signature for that purpose?
A. In a case like this, it would have been Carlos.
Q. On this record, does this indicate the information from the invoice you received from John Celona?
A. Yes.
Q. Is that in line 1 of this document?
A. So line 1 would be the invoice number -- the invoice date?
Q. Right. Is that correct?
A. Yes.
Q. And the account number is 72001. Is that the political contributions budget?
A. Yes, it is.
Q. And was this a document that Carlos Ortiz signed?
A. Yes, it is.
Q. Is that his signature at the bottom?
A. Yes, sir.
Q. Looking at Government's 119, what is that document?
A. That would have been the envelope that I would

have prepared and attached to the invoice when it went to accounting so that they could put the check in there and mail it in that envelope.
Q. Does this document indicate that it was, in fact, mailed?
A. Yes, it would.
Q. Is that what the postage stamp at the top right is for?
A. At the time that I submitted it to accounting, it wouldn't have had that; but certainly it would show that now.
Q. So the document indicates it was mailed?
A. Yes.
Q. And finally, turning to document number 120. Do you see that?
A. Yes, I do.
Q. And what is that?
A. That would be the CVS check for $1,000.
Q. Who is that payable to?
A. To John A. Celona.
Q. Is this check issued as a result of this other paperwork that you prepared?
A. Correct.
Q. Now, Ms. Bibeault, at some point there was a change to the way the process worked for having

invoices paid; is that correct?
A. That's correct. It went from a manual process to an electronic process.
Q. In focusing on the manual process, the documents we just went through, Government's 117 through 120, does that -- is that the typical way that you would handle invoices coming in from John Celona?
A. It would be the way I would handle any invoice coming in to CVS.
Q. And relating to invoices from Mr. Celona, you followed that regular practice?
A. As I follow any, yes.
Q. Were there occasions when you had communications with Mr. Celona about issues of payment?
A. There were a few occasions where he had called questioning where his check was, that he had not received it yet.
Q. And showing the witness Government's Exhibit 136, do you recognize that document?
A. Yes, I do.
Q. What is that?
A. That would have been the invoice from July 25th of 2000.
Q. Is this also for consulting services for John Celona?

A. Yes, it is, consulting for July.
Q. And you notice there's another line entry about a balance brought forward. Do you see that?
A. Yes.
Q. So he requested a total amount of $2,000; is that right?
A. That's correct.
Q. And there's also some other marks on this document at the bottom. Do you see the stamp at the bottom?
A. Correct.
Q. What is that?
MR. PETALAS: If we can highlight the bottom half of the document.
A. That portion captures the same information as what our check request would capture.
Q. Who affixes that stamp with the blanks in it to the document?
A. I would have.
Q. And did Carlos Ortiz sign this record?
A. Yes, he did.
Q. Now, there's also what appears to be the outline of a Post-It note. Is that what it is?
A. Yes, it is.
Q. What is the purpose of that note or, I'm sorry, do you recognize the handwriting?

A. Yes. It's my handwriting.
Q. What was the purpose of that note?
A. I had attached a note only because the accounting department actually picked up and paid the lower line where it says total amount due of 2,000 instead of the $1,000 that was actually being billed for that month.
Q. Do you see the date on this note is July 26, 2004?
MR. CORRIGAN: Objection, your Honor. May we approach or may I speak to Mr. Petalas on this?
THE COURT: Go ahead.
(Counsel confer)
MR. PETALAS: Ms. Bibeault, I'd also like you to look at Government's -- I'm sorry, your Honor. I'll withdraw that question, and I'd like to move to Government's Exhibit 195, which is also a stipulated exhibit.
Q. Do you recognize that?
A. Not right off the bat. I'm reading it. Just give me one second. Okay. I've read it. Thank you.
Q. What is that?
A. It's an e-mail from John Celona to Carlos saying that he hasn't received a check in two months and can you check into it, and then Carlos forwarded it to me to follow up.
Q. So did you follow up on that?

A. I'm sure I did.
Q. Does Government's Exhibit 136 and 195, do those documents relate to conversations you had with John Celona about payment issues with regard to his invoices to CVS?
A. I'm sorry --
THE COURT: Just a minute.
MR. KILEY: Objection.
THE COURT: Sustained. And I think we'll end here for the day.
Would you step down, please.
Members of the jury, it's time for you to go home. Remember, don't talk about the case with anyone, don't read or listen to any news accounts about the case. Instead, get a good night's sleep. Hopefully our electricity stays on and we'll have another nine to one day tomorrow. Please leave your notebooks on your seats, and we'll see you at 9 a.m. tomorrow morning.
Bob, would you see the jury out, please.
(The jury is not present for the following)
THE COURT: May I see counsel, please, for scheduling.
(Bench conference held off the record).
(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky_______________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date