IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 20, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and *<br>CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| **GOVERNMENT WITNESS** | **PAGE** |
|---|---|
| John Celona, Resumes | |
| Continued Direct Examination by Mr. Dambruch | 18 |
| Cross-Examination by Mr. Corrigan | 73 |


# E X H I B I T S


| **DEFENDANT** | **FOR ID** | **IN FULL** |
|---|---|---|
| F-19 | | 152 |

20 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: I understand that counsel have an issue that they wish to discuss at sidebar. So let me have one from each side.

(Bench conference held on the record)

THE COURT: Okay.

MR. FEIN: Thank you, your Honor. We have a more serious issue to raise today. We wanted to let you know that as a result of the direct examination yesterday of Mr. Celona, we're preparing a motion to move to dismiss with prejudice this case.

Mr. Celona on numerous critical subjects yesterday provided testimony that is completely inconsistent and contradicted by his testimony at the Urciuoli trial and his repeated testimony before the grand jury on the most critical subjects.

What that means to us is that one of two things happened yesterday. Either he testified falsely yesterday, in which case it was the Government eliciting perjurious testimony, or his prior testimony at the Urciuoli trial and in the grand jury is false, in which case the Government has not complied with your Honor's obligation to provide us with Celona's lies, they haven't complied with *Brady* and *Giglio*, and the

entire direct examination regarding Mr. Celona's continued obligation to tell the truth was a farce in terms of his direct examination.

Three critical issues I wanted to tell you about, there are others, but the three most critical ones.

Yesterday, at the direct examination, John Celona stated under oath that he did not disclose the identity of CVS to the Ethics Commission when he called the Ethics Commission.

On page 123 of the transcript, he was asked by Mr. Dambruch, "Did you identify the company during that phone call?" His answer was, "No, sir." "Why not?" "I didn't want to." "Why not?" "I wanted to give myself some cover."

This wasn't an off-the-cuff remark. This appears to have been a part of the direct examination, and they built on it with the "why not" comments following that.

In the past, as I think you know from our conferences, from our arguments, from our submissions, we have relied on the fact as a critical issue in this case that John Celona has testified consistently that he informed the Ethics Commission of the identity of CVS.

In the grand jury he did that, and he described the conversation with the Ethics Commission and their telling him, well, if it specifically deals with CVS, you can't vote on it, but if it does not specifically deal with CVS, you can vote on it. That's from the May 2nd grand jury, 2006.

THE COURT: Do you have a page and line reference?

MR. FEIN: I do, your Honor, and I have pages to hand up if your Honor would like.

THE COURT: Is it 5/2?

MR. FEIN: 5/2/06 at 49, lines 15 to 22.

Two weeks later he was called back to the grand jury, May 16, '06. At page 85, lines 7 to 13, question, "Mr. Celona, I have a couple of questions for you. You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that you had" --

THE COURT: Slow down.

MR. FEIN: Sorry. "The fact that you had consulted with the Ethics Commission regarding working for CVS as a consultant on elderly affairs; correct?" Answer, "Yes, sir."

Perhaps most egregiously on this point, your Honor, at the Roger Williams trial, at the Urciuoli

trial where perhaps he was not attempting to inculpate Mr. Kramer and Mr. Ortiz as he is now at this trial, he testified on September 18th at 212, lines 12 to 20 --

THE COURT: Twelve to 20?

MR. FEIN: Correct, your Honor, that he called the Ethics Commission to see if it was proper to do consulting work for CVS.

And then Judge Torres asked him, also on September 18th, at page 214, lines 7 to 24, "The Court: So your testimony is that you said to this person at the Ethics Commission if I have a consulting agreement with CVS, could I vote on pharmacy issues?" Answer, "Yes."

The Government knew this, your Honor, because in their pretrial memo filed to this Court just a few weeks ago, they said at page 7, "Around the time Celona gave the proposal to Kramer and Ortiz, he called an unknown member of the Ethics Commission about the possibility of work for CVS."

The second of the three things I'd like to raise with you, your Honor, is a related issue. Following this discussion where he said he did not tell the Ethics Commission about CVS, Mr. Dambruch asked Mr. Celona if he had some follow-up communication with either Mr. Ortiz or Mr. Kramer after the call with the

Ethics Commission.

Celona said he did with Mr. Ortiz, and then Mr. Dambruch asked did you have any conversation with Mr. Kramer after the EC call, and Mr. Celona's answer was, "No, sir."

That is also completely contradicted by his grand jury testimony. He takes Jack Kramer out of the notification about the call to the EC yesterday; but in the grand jury, on May 16, 2006, at page 85, lines 7 to 13, question, "Mr. Celona, I just have a couple of questions for you. You have testified in response" -- and I referred to this before.

THE COURT: Slow down.

MR. FEIN: "You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that you had consulted with the Ethics Commission regarding working for CVS as a consultant on elderly affairs; correct?" Answer, "Yes, sir."

This isn't -- these two are not tangential issues, as your Honor knows. They're absolutely critical issues that, in our view, as we've told the Court and the Government, makes this a case where the case shouldn't even go to the jury on intent to defraud or intent to deceive because of the communication with

the Ethics Commission.

Third, one final example to present to your Honor this morning is Mr. Dambruch asked John Celona about whether he did any work for CVS during the 2000 calendar year, and yesterday Mr. Celona said, "Nothing." That's at page 142, lines 23 to 25.

And specifically Mr. Dambruch asked him about visiting senior centers. "Did you represent or promote CVS during any of those appearances after you signed the agreement?" Answer, "No, sir." Once again, three times, each of these three instances it's the "no, sir."

In prior sworn testimony in the grand jury on May 16, 2006, at page 51, line 22.

THE COURT: I'm sorry, page --

MR. FEIN: Page 51, line 22, to page 52, line 6, is a description of what he did in that year, including the following testimony. "I had gone to the senior citizens' homes, high-rises, talking about the delivery programs, advocating. They had just come out with a CVS Extra Care card, to make sure that when they go to CVS they get that because it saves them money, it gives them special deals off and things like that."

In addition, your Honor, on May 2nd, 2006, at page 61, line 25, to page 62, line 17, there's a

colloquy about what he did for the money. "Did you try to do anything of a consulting nature for CVS?" "Yes," and he describes visiting the complexes, going to the road race at six in the morning, trying to get involved in a lot of things, directly contradicting his answer, "Nothing," yesterday.

But most importantly on this point was the specific testimony regarding promoting CVS at senior centers that he contradicted yesterday.

MR. TRAINI: Judge, I wanted to just add something.

THE COURT: I just want to make sure Mr. Fein is through.

MR. FEIN: Yes. That's what I wanted to inform your Honor.

MR. TRAINI: I'm not going to add another factual issue, your Honor, but what concerns me very much about this is this, as Mr. Fein said, this is not a collateral matter. It's always been central to Mr. Ortiz's defense that Celona told him that he had ethics approval on CVS, not just in generalities.

That is, in fact, the reason why you have instructed on Rhode Island state law. It is also the reason, by the way, Judge, why the Government has asked for a willful blindness instruction in this case.

There isn't anything more central to the case than this particular point.

When you look at how it happened, Mr. Celona was not testifying the way, for example, Clark Curtis did where he'd answer a question and then he'd volunteer that "because." He was asked the question, he gave an answer, he stopped. He was then asked why.

Now, in this particular one, the one that he's directly contradictory to what he did with Judge Torres, Mr. Smith objected to that question. What you chose to do was overrule it. That's fine. Had you said what you usually do, which is approach, and you would have said to Mr. Dambruch, What's he going to say, Mr. Dambruch would never have said to you, Oh, I don't know, Judge.

So it had to be deliberately elicited. It is something that he is -- so opposite to what he said, and he had to look Judge Torres in the eye two years ago because it's clear from the context --

THE COURT: What was the nature of Judge Torres asking the question? Was that during the course of trial?

MR. TRAINI: It is.

MR. FEIN: In front of the jury.

THE COURT: Really? Oh.

MR. TRAINI: He was trying to understand himself. It was in the middle of Mr. Egbert's cross, and Celona was doing what Celona does. Judge Torres got so frustrated that he wanted to get the straight answer, so he said to the witness the passage that Mr. Fein read you.

So now we've got him either lying directly to a federal court judge or he's lying to the jury, and it makes more sense that he lied yesterday rather than then because today it's material. In the other trial, it wasn't material.

And besides that, your Honor, I think we've got a judicial estoppel issue based on previous positions the Government's taken.

And I also just want to suggest to you one other thing. Even if you were not in a position to find that this was prosecutorial misconduct or deliberate action, the statement is so central and the perjury is so clear that I think you can find him not credible as a matter of law and not trustworthy and you can't foist his testimony on the jury. He tailors his testimony to be what he thinks it needs to be.

THE COURT: Okay. Let's hear from Mr. Dambruch.

MR. DAMBRUCH: Your Honor, certainly there was no intentional elicitation of perjured testimony. The

problem with Mr. Celona is, he's testified on many, many occasions, and he is consistently inconsistent on many points. For instance --

THE COURT: This is a central question, though, Mr. Dambruch, the question of what precisely he conveyed to Mr. Kramer and Mr. Ortiz when they asked the question about Ethics Commission approval, whether it was specifically with regard to working for CVS or whether it was sort of a general, oh, I know about the teachers kind of thing.

Frankly, his testimony on this point yesterday was, I thought, completely not credible because he was all over the lot; but that's for the jury to decide.

So I think -- and I think that's the strongest argument that I'm hearing today. What do you say about that?

MR. DAMBRUCH: Your Honor, in his 5/16 grand jury testimony, during that session, I believe he testified once that he told Mr. Kramer about the teacher example; and then later on in that same day during that same session when asked follow-up questions by Ms. Donovan, he indicated that what he told the CVS folks was that -- about his work for the Village at Elmhurst and that that was the example he gave. So even on that one day, there are two inconsistencies.

MR. FEIN: No, they're not inconsistent.

THE COURT: We're not going to take more time with this. The Government objects.

MR. DAMBRUCH: Yes.

THE COURT: You've taken the position this was not done deliberately, but I think you need to be very careful with this witness, Mr. Dambruch. He is just a bundle of contradictions.

MR. DAMBRUCH: I'm trying to be, Judge.

THE COURT: Yes. I'm going to take your motion under advisement. I read his grand jury testimony, all of it, over the weekend. I didn't read the Urciuoli. So I want to go back and look at those.

So I'll take your motion under advisement and deal with it tomorrow.

MR. TRAINI: Judge, just one last thing. To the extent that there are going to be any more "why" questions asked of this witness, it may not be a bad idea, I mean, I don't know whether you want us to object every time that happens or you want to bring people up here whenever he's going to do it, but I'd like to try to prevent this from continuing to happen.

THE COURT: Well, the problem with a why-did-you-do-something question is it could elicit precisely the sort of answer that I've ruled

inappropriate, such as, because that's what they wanted me to do. So I would ask you to refine your question for him as opposed to a wide-open why did you do that. Come at it a different way because I think that that invites him to blurt out something that's going to be problematic.

MR. DAMBRUCH: What I planned on asking today, your Honor, is -- about each of the official actions he took was just ask him what, if any, his motivations were for taking that official action.

THE COURT: It doesn't matter.

MR. DAMBRUCH: Your Honor, I would expect him to testify as he has in the past that one of the motivations was the fact he was being paid by CVS.

THE COURT: That doesn't matter. It's what did they do, what did they say to make him do what he did. That's what's central here.

Why he did it, I mean conceivably you could have a corrupt politician who's getting money from people who don't share that same intent. I think that's what I'm hearing from the defense side.

So why he's motivated is irrelevant unless that motivation is somehow created or caused by either an act or omission of the Defendants. Otherwise it's irrelevant.

MR. DAMBRUCH: Okay, Judge.

MR. FEIN: Especially when it's his uncorroborated testimony eight years later. It's not even something he expressed at the time.

I would also just add, your Honor, we'll put this in our papers, the Government can't just say he's consistently inconsistent and elicit and let stand testimony that is --

THE COURT: What I'm going to ask you to do, Mr. Fein, is to -- and it doesn't have to be a formal memo, but I'm going to want some law. So if you have some First Circuit recent case law directly on point, that would be most helpful.

MR. FEIN: Here is a page from the Court, Judge Torres asking Mr. Celona those questions.

THE COURT: I have a copy of that anyway. That's okay. I don't need that.

MR. TRAINI: And also, your Honor, based on what you said about the relevance, if you will -- based on what you just said about the fact that it isn't relevant what Mr. Celona thought, only what the Defendants said or did, et cetera --

THE COURT: What he thought is relevant only insofar as it's a response to some act or omission of the Defendants.

So I think you need to lay the foundation for that. If, you know, they give him the wink, they give them the high sign, whatever, and in response he does something, that's relevant. What's going on inside of his head is not.

MR. TRAINI: Well, to the extent that he testified to that yesterday, we'd also be moving to strike the testimony where he did that.

THE COURT: Well, you all have copies of dailies. So if you have specific portions you want stricken --

MR. TRAINI: We'll put it in the papers, Judge.

MR. FEIN: Thank you, your Honor.

THE COURT: Thank you.

(End of bench conference)

THE COURT: John, can you send for the witness, please.

(The jury is present for the following)

THE COURT: Good morning. I apologize for keeping you waiting this morning. There are times, however, when I need to do some things with the lawyers outside your presence. And if I think it's going to take a little bit of time, it's better for you to be comfortable over in the jury room rather than uncomfortably having to sit and wait here in the

courtroom.

Are you all rested and ready to go to work? Excellent.

Mr. Celona, you are still under oath.

Mr. Dambruch.

MR. DAMBRUCH: Thank you, Judge.

**JOHN CELONA, GOVERNMENT WITNESS, RESUMES**

**CONTINUED DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, sir.

A. Good morning.

Q. Sir, yesterday I had asked you about a March 9th, 2000, vote before the Corporations Committee. Do you recall those questions?

A. Yes.

MR. DAMBRUCH: And at this time I'd ask to bring up Exhibit 5, page 9.

Q. Sir, if you look at your screen, do you recognize this as the voting sheet for the March 9th, 2000, Corporations Committee vote on the pharmacy freedom of choice?

A. Yes, sir.

Q. And this is the date where you've previously testified that you were absent for this vote; correct?

A. Correct.

Q. Now, sir, the nature of the vote at the top of the sheet, if we could magnify that, there's a check next to "held for further study." Can you explain for us what that means.
A. By definition, it would be -- it would be held and continuously studied or continued to be studied. By nature and practicality, under the operations of the Senate at the time, "held for further study" in effect was, de facto, killing the bill.
Q. So if a senator were to vote yes in favor of holding for further study and the majority of votes was yes in that regard, what would the end result be?
A. The bill would be defeated.
Q. Now, sir, at the end of the session yesterday, I was asking you some questions about Exhibit 7. I'd ask to bring up Exhibit 7 and, more specifically, page 2. Sir, do you recognize this piece of legislation?
A. Yes, sir.
Q. And what do you recognize it to be, what type of legislation?
A. That's legislation dealing with pharmacies and the returning of recalled, outdated drugs.
Q. Who introduced or sponsored this piece of legislation?
A. I did.

Q. And when was it introduced or sponsored by you?
A. June 12th, 2001.
Q. Did anyone ask you to introduce or sponsor this legislation?
MR. CORRIGAN: Objection, your Honor. We went over this yesterday.
THE COURT: Approach.
(Bench conference held on the record)
MR. CORRIGAN: Yesterday there were a number of questions on the record about Ms. Wolf bringing this bill to Mr. Celona and having him introduce it. I don't understand why we're going over this testimony again.
MR. DAMBRUCH: Your Honor, there were objections at the end of yesterday when I asked why. I'm just trying to clarify and to cover this area without asking that question so it's clear.
THE COURT: Okay. Overruled.
(End of bench conference)
Q. Mr. Celona, did someone ask you to introduce this legislation?
A. Yes, sir.
Q. Who was that?
A. The law office of Joe Walsh.
Q. And was there a particular person from the law

office of Joe Walsh that made that request of you?
A. Yes.
Q. Who was that?
A. Ms. Gail Wolf.
Q. Was Ms. Wolf representing any particular party at that point in time?
A. Yes, sir.
Q. Who was that?
A. CVS Pharmacy.
Q. What, if anything, did you do in response to Ms. Wolf's request?
A. I introduced the legislation.
Q. Once the legislation had been introduced and was pending before the Senate, did you have any further conversations with Ms. Wolf about it?
A. Yes. I had some talking points faxed to me, and we had discussions about the merits of the bill.
Q. Talking points faxed to you by whom?
A. By the law office. I believe it was from CVS.
Q. Are you sure about that?
A. It might have been CVS or Gail Wolf.
Q. Well, at some point in time was there discussion about withdrawing or not taking action on this bill?
A. Yes.
Q. And with whom did you have those discussions?

A. Gail Wolf.
Q. And did Ms. Wolf make any requests of you in that regard?
A. Yes, to hold it for further -- to hold it.
Q. And what, if anything, did you do in response to that request?
A. I didn't take any action. I held it for further study. It was never posted for a hearing.
Q. Now, sir, towards the end of the year 2001, did you have some communication with Mr. Ortiz about payment issues?
A. Yes, sir.
Q. I'd like to show you Exhibit Number 195. If you can enlarge the top half of that, please. Do you recognize the bottom portion of that document to be an e-mail that you sent to Mr. Ortiz?
A. Yes, sir.
Q. When did you send that to him?
A. December 20th, 2001.
Q. And what topic were you addressing with him through the communication of that e-mail?
A. Outstanding invoices.
Q. At some point did you receive any contact back from either Mr. Ortiz or anyone else from CVS in response to your query?

A. Yes.
Q. Do you recall what that was?
A. That they would be forwarded to me.
Q. I'd ask you to take a look at Exhibit Number 196, please. Do you recognize this document?
A. Yes.
Q. And what do you recognize it to be?
A. It's a fax cover sheet.
Q. And this is on December 24 of 2001?
A. Yes, sir.
Q. And what were you doing when you faxed this sheet with whatever attachments?
A. It was faxed to Betty Bibeault, who was Mr. Ortiz's assistant, and it included copies of the outstanding invoices for processing.
Q. And was this related to your December 20 request for payment?
A. Yes, sir.
Q. Now, sir, moving on to the 2002 calendar year, at some point in time were you appointed to serve as a member of the Rhode Island Higher Education Assistance Authority?
A. Yes, sir.
Q. And when was it that you were appointed to that post?

A. I don't recall the exact month, quite honestly, but it was during that period.
Q. I'd like to show you Exhibit Number 15, please. Do you recognize this document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. It's an appointment letter of my appointment to the Higher Education Assistance Authority.
Q. And who appointed you to that particular position, sir?
A. Senator Michael Lenihan, who was chairman. It says chairman of the Senate Committee on Judiciary, but it should have been chairman of the Committee on Finance. I guess there was a typo underneath there on his name; but on the letterhead, it says finance. Whoever typed it, it was probably a typo.
Q. Now, sir, you were appointed -- according to this letter, you were appointed on March 1 of 2000. How long did you serve as a member of the Rhode Island Higher Education Assistance Authority?
A. Right up until 2004, until my resignation.
Q. Now, sir, as a member of the Rhode Island Higher Education Assistance Authority, did you have any role or serve in any capacity with the Rhode Island Student Loan Authority?

A. Yes, sir.
Q. And can you please describe that for us.
A. I was also a member of the board of the Rhode Island Student Loan Authority in addition to being a member of the Rhode Island Higher Education Assistance Authority board.
Q. And as a member of the Rhode Island Student Loan Authority board, did you take actions?
A. Yes, sir.
Q. And when was it that you began serving as a member of that particular board?
A. Simultaneously with the appointment of the Higher Education Assistance Authority.
Q. And was one connected to the other?
A. Yes, sir.
Q. Now, at any point in time while serving as a member of the Rhode Island Student Loan Authority board, did you raise the topic of a pharmacy student loan forgiveness program?
A. Yes, sir.
Q. I direct your attention to Exhibit Number 16. First if we could look at page 3. Sir, directing your attention to the screen which is displaying page 3 of Exhibit Number 16, would it be fair to say that these are the minutes of the Rhode Island Student Loan

Authority board meeting held on January 10 of 2002?
A. Yes, sir.
Q. And do these minutes indicate whether or not you were present for that meeting?
A. Yes, sir.
Q. I now direct your attention to page 5 of the document, please. And if I could have the second paragraph highlighted, please, or enlarged. Now, looking at this second paragraph on page 5 of the document, does this indicate whether or not you raised some type of issue with regard to pharmacy students?
A. Yes, sir.
Q. And what issue did you raise before the board on January 10th of 2002?
A. That there was a need for an increased amount of pharmacists, both statewide and nationwide; that the number of pharmacists both in those areas, statewide and nationwide, were diminishing to a great extent.
Q. And that was an issue raised by you?
A. Yes, sir.
Q. Sir, directing your attention to Exhibit Number 352. If we can have the top half of that exhibit enlarged, please. Sir, this appears to be an e-mail communication between yourself and Mr. Kramer with a carbon copy to Mr. Ortiz; is that correct?

A. Correct.
Q. And what was the date of that communication?
A. January 24th, 2002.
Q. Now, in this particular communication, you reference seeing Jack last evening at Tom's home. Can you explain that for us, please.
A. That was an event at the home of Tom Ryan.
Q. And what was the purpose of the event that you attended at Mr. Ryan's home?
A. It was a social event, I believe, for the new dean of the school of pharmacy and also about -- talking about increasing or rebuilding or developing a drive to increase the physical structure of the school of pharmacy. And it was prior to a basketball game at URI, of which I did not attend.
Q. Was there any discussion at that particular social event of this pharmacist loan forgiveness program?
A. Yes. Tom made some brief remarks to the crowd assembled, and in his remarks he thanked me for my efforts to bring forward a loan forgiveness program for the State of Rhode Island.
Q. And does the e-mail indicate whether or not you had any discussion with Mr. Kramer about the pharmacy loan forgiveness program at that social event?
A. I just want to skim through it for a second.

(Witness peruses document)
A. Yes, this is the e-mail to Mr. Kramer.
Q. Correct. I'd ask you to focus on the second sentence of that e-mail.
A. Oh, yes.
Q. Does that indicate whether or not you had any conversation with Mr. Kramer at the social event regarding the loan forgiveness program?
A. Correct.
Q. Did you have such a conversation with Mr. Kramer?
A. Yes, sir.
Q. And did you indicate to Mr. Kramer whether or not you had some association with the Rhode Island student loan association?
A. Yes, sir.
Q. Or authority. Excuse me. And, again, the date of that communication?
A. January 24th, 2002.
Q. Did you also in this e-mail reference some possible involvement of Mr. Ryan in this program or the promotion of the program or something of that nature?
A. Yes, sir.
Q. And what did you communicate to Mr. Kramer about that?
A. I communicated to Mr. Kramer that in the past that

RISLA, which is the acronym for the student loan authority, we had some public service announcements that featured both Senator Reed and then-Treasurer Tavares touting the programs we had in place for teachers and for nurses and that for the pharmacy program or the loan forgiveness program, Tom Ryan would be a perfect person to participate in that new public service announcement.
Q. Sir, I'm going to direct your attention to Exhibit Number 17, and if we could go to page 3 of the document. Sir, do you recognize this to be the minutes of the Rhode Island Student Loan Authority board meeting for March 14th of 2002?
A. Yes, sir.
Q. And I direct your attention to page 7. And on page 7, is there any indication as to whether or not the board took any action with regard to your pharmacy student loan forgiveness program?
A. Yes.
Q. And what, if any, action did the board take?
A. The board voted unanimously to develop the pharmacy reduction program.
Q. Now, with regard to the making of that motion, did you play any role in the making or seconding of the motion to adopt that program?

A. Yes, sir.
Q. And what did you do, sir?
A. I seconded it.
Q. And did you participate in that vote?
A. Yes, sir.
Q. And how did you vote with regard to that particular program?
A. I voted in the affirmative.
Q. Sir, I direct your attention to Exhibit Number 353, please. If you could highlight the top portion of that exhibit. Do you recognize this document, sir?
A. Yes, sir.
Q. Is this an e-mail that you sent to Mr. Ortiz?
A. Yes.
Q. And what information were you communicating to Mr. Ortiz on March 19th?
A. I informed him that the Student Loan Authority did, indeed, pass the loan forgiveness program.
Q. And looking at the text of this e-mail, does it make any reference to communications you had with Mr. Kramer about this same topic?
A. Yes, sir.
Q. And what specifically did you say about that?
A. I said that I was at the CVS headquarters the previous Friday and I gave the particulars to Jack

Kramer and some scripts for Tom, prospective scripts for the PSA, public service announcement.
Q. And would the previous Friday have been March 15 of 2002?
A. Counting back, yes.
Q. And was that the day after the vote on March 14th of 2002 before the board?
A. Yes, sir.
Q. Now, in the earlier e-mail you had sent to Mr. Kramer in January, there was discussion about Mr. Ryan participating in some type of promotional program?
A. Yes, sir.
Q. Are you aware whether or not that ever occurred?
A. Yes, sir.
Q. Can you describe that for us, please.
A. That was the -- a promotion where Tom Ryan was talking about the benefits of the loan forgiveness program and how Rhode Islanders that entered into the pharmaceutical program could, indeed, benefit.
And I don't particularly remember the exact script, but that, you know, he was a pharmacist, and he went up through the ranks, and it was a benefit to Rhode Island as a whole, people utilizing the pharmacy services, the services of the pharmacist, but also it

was a benefit for the pharmacy students in that they could have their interest forgiven if they made a pledge of staying in Rhode Island for a certain period of time.
Q. And did you play any role in providing Mr. Ryan with the opportunity to be the spokesperson on this issue?
A. Yes, sir.
Q. And what role was that, sir?
A. I recommended it.
Q. As a member of the board?
A. Yes, sir.
Q. Did the board go along with your recommendation?
A. Yes, sir.
Q. Now, sir, directing your attention to Exhibit Number 328. Again, if we could highlight the top portion of this exhibit. Looking at the bottom of the magnified portion, is that an e-mail communication between yourself and Mr. Ortiz?
A. Yes, sir.
Q. Now, the first line indicates you're looking forward to seeing him at the tournament. What are you referencing when you say the tournament?
A. The CVS Classic.
Q. There also is mention of a show. What are you

referencing when you speak about the show?
A. That was the show about the -- when we had the person from the NACDS on talking about the shortage of pharmacists.
Q. And would it be fair to say that you continued to invite Mr. Kramer or others onto your show during 2002?
A. Yes, sir.
Q. Now, there also is something about tickets to the Classic. What's that reference about, sir?
A. Tickets, passes to the CVS Charity Classic, which was being held at Rhode Island Country Club.
Q. And what were you asking for in this e-mail?
A. For four more tickets to the Classic.
Q. Did you receive those tickets?
A. Yes, sir.
Q. Did you pay for them?
A. No, sir.
Q. Now, lastly, there's a reference in the P.S. section of the e-mail to checking with Wally Gerndt and something to do about a taping with Tom. Can you explain that for us, please.
A. Wally Gerndt was the public relations person for the Student Loan Authority, and he was handling that process with Tom Ryan. And it was being taped up at the CVS headquarters, if memory serves me correctly,

and I just wanted to check to see how that went.
Q. Sir, moving on to the 2003 legislative session, were there any freedom of choice bills that came before the Senate Corporations Committee during that session?
A. Yes, sir.
Q. I'd ask you to look at Exhibit 8, page 2. Do you recognize that, sir?
A. Yes, sir.
Q. And what do you recognize it to be?
A. It's pharmacy freedom of choice legislation.
Q. I'd direct your attention to page 6 of that document. There appear to be some stamps on this particular page of the document, and I'd ask to highlight the stamp here. Do you recognize that stamp?
A. Yes, sir.
Q. And what do you recognize that to be?
A. That's the stamp where it was referred to the Committee on Housing -- Commerce, Housing and Municipal Government on May 15th from the Senate as a whole.
Q. And the Committee on Commerce, Housing and Municipal Government, was that what the Corporations Committee was now called during the 2003 session?
A. Yes, sir.
Q. Who was the chairman of that committee?
A. I was.

Q. Did you post this bill for a hearing?
A. No, sir.
Q. And what was the practical impact of not posting it for a hearing?
A. It was defeated.
Q. Directing your attention to Exhibit 10, page 2. Do you recognize this piece of legislation?
A. Yes, sir.
Q. And what do you recognize it to be?
A. A pharmacy freedom of choice, any willing provider piece of legislation from the House.
Q. And I direct your attention to page 10 of this document. Do you see some stamps that appear on page 10 of the document?
A. Yes, sir.
Q. If we can have that bottom portion of the document highlighted, please. Now, looking at the stamps that appear, particularly the bottom stamp, what, if any, significance does that stamp have?
A. It was referred from the entire Senate to the Committee on Commerce, Housing and Municipal Government on May 15th, 2003.
Q. And who was the chairman of that committee at that time?
A. I was.

Q. Did you post -- as chairman, did you ever post this bill for a hearing?
A. No, sir.
Q. And what was the practical impact of not posting the bill for a hearing?
A. The bill was defeated.
Q. Now, sir, I direct your attention to Exhibit Number 9 and, more specifically, page 2 of that exhibit. Actually, page 3. I apologize. Do you recognize this particular piece of legislation, sir?
A. Yes, sir.
Q. And what do you recognize it to be?
A. This would -- this is what was normally called the Canadian pharmacy reimportation bill.
Q. And directing your attention to page 7 of this document, it's Exhibit Number 9, page 7, and if you could highlight the bottom portion with the stamps, please. Now, looking at this, Mr. Celona, do these stamps indicate whether or not the House of Representatives took any action on this particular piece of legislation?
A. Yes.
Q. And what, if any, action did they take?
A. The Committee on Corporations in the House passed it, and it was placed on the House calendar, and the

House of Representatives in total read and passed it on May 13, 2003.
Q. Now, do the stamps indicate whether or not this bill was transmitted to the state Senate?
A. Yes, sir.
Q. And when it was transmitted to the Senate, to which committee was it assigned?
A. Committee on Commerce, Housing and Municipal Government.
Q. And on what date was the legislation assigned to that committee?
A. May 15, 2003.
Q. I direct your attention to Exhibit Number 358. Do you recognize this document?
A. Yes, sir.
Q. If we could highlight the top portion, please. Now, sir, is this a communication you received on 5/22 of 2003?
A. Yes, sir.
Q. Is it a fax communication?
A. Yes, sir.
Q. From whom did you receive it?
A. Jack Kramer.
Q. And what did this communication consist of?
A. Talking points on the reimportation legislation of

Canadian pharmacy.
Q. Now, there's a notation on the top of this document, H-5478.
A. Yes.
Q. Whose handwriting is that?
A. It's not mine, so I would assume it --
MR. CORRIGAN: Objection, your Honor.
THE COURT: Just a minute. Don't assume anything.
A. Okay. It's not mine.
Q. That appeared on the fax transmission?
A. Yes, sir.
Q. What was the bill that had been assigned to your committee? Do you recall the number of that particular piece of legislation?
A. I don't recall it. I don't have it in front of me.
Q. Would you look at Exhibit Number 9, page 3.
A. Yes.
Q. What was the number?
A. H-5478.
Q. And that was assigned to your committee on what date?
A. I believe it was -- I'm looking at the stamps here. It looks like Corporations in the House

recommended passage on 4/9.
Q. Directing your attention to page 7 of the document, please.
A. I was on the other legislation. I'm sorry. May 15th.
Q. And the date of the fax communication?
A. May 22nd.
Q. Now, at some point did the House Committee on Commerce vote on this particular piece of legislation, H-5478?
A. The House didn't have a Committee on Commerce.
Q. Strike that. I made a mistake. The Senate Committee on Commerce, was there a vote on this particular piece of legislation?
A. No.
Q. Are you sure about that?
A. I don't believe there was.
Q. Let me direct your attention to page 15 of the document, please.
THE COURT: Of which document?
MR. DAMBRUCH: It would be -- again, we're on Exhibit Number 9, your Honor. I apologize.
THE COURT: Thank you.
A. Okay. I'm sorry.
Q. Does this indicate whether or not there was some

type of action taken?
A. Yes, sir.
Q. Does it indicate the date that action was taken?
A. On June 26th.
Q. Of what year?
A. 2003.
Q. And what action did the committee take on 5478 on that date?
A. It was held for further study.
Q. And what was the practical impact of holding the bill for further study?
A. It would be defeated.
Q. Could we please look at page 16 of the document. Again, it's Exhibit Number 9. Does this document indicate whether or not you were present on the date of that particular vote?
A. Yes, sir.
Q. Were you?
A. Yes, sir.
Q. In what capacity?
A. As chairman.
Q. Moving on to page 17, please. Is this, in fact, the voting sheet for that particular piece of legislation?
A. Yes, sir.

Q. And how did you vote at that point in time?
A. I voted yes to hold for further study.
Q. Now, sir, directing your attention to Exhibit Number 11 and, more specifically, page 2 of that exhibit. Do you recognize this piece of legislation?
A. Yes, sir.
Q. And what do you recognize this legislation to be?
A. This was legislation that would allow for electronic or e-mailed prescriptions.
Q. Who sponsored or introduced this legislation?
A. I did.
Q. Did anyone request you to sponsor or introduce this legislation?
A. Yes.
Q. Who did that?
A. Mr. Ortiz.
Q. Directing your attention to Exhibit Number 356. If you can highlight the top portion of the document. Do you recognize this document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. It was an e-mail from Carlos Ortiz to me.
Q. And what was the topic?
A. Community pharmacy in Rhode Island, and it was -- included some slides of a PowerPoint presentation.

Q. And is there any reference in the e-mail as to what the topic or at least one topic addressed by those slides?
A. The electronic prescribing of prescriptions.
Q. And you received that from Mr. Ortiz when?
A. February 10th, 2003.
Q. If we could turn to page 23 of the document. Would it be fair to say, sir, that this is one of the slides that was attached to the e-mail?
A. Yes, sir.
Q. And what, if any, issues are addressed on this particular slide?
A. Canadian pharmacy and electronic prescriptions.
Q. And with regard to Canadian pharmacy, does this slide indicate a pro position for the legislation or anti position?
A. Anti position.
Q. How about electronic prescription?
A. It displays a pro position.
Q. Now, sir, I direct your attention to Exhibit Number 66. I'd like to have page 2 of the document, please. Do you recognize that document?
A. Yes.
Q. Is it a fax cover sheet for 2/10/03?
A. Yes, sir.

Q. Is that a transmission that was made to you?
A. Yes, it was.
Q. Do you know by whom?
A. By the office of Joe Walsh.
Q. Do you recall who from the office, if you know, transmitted this fact sheet to you?
A. I believe it was Gail Wolf.
Q. Turning to page 2 of the document. Sorry, page 3. I apologize. Do you recognize this?
A. Yes.
Q. And with regard to the last two paragraphs, if we could highlight those, is that proposed language for legislation?
A. Yes, sir.
Q. And what particular legislation does that relate to?
A. The electronic prescribing of prescriptions.
Q. Now, just so it's clear, in answer to an earlier question, you said you thought it might be Gail Wolf that faxed this to you. Do you know a person by the name of Clark Curtis?
A. Yes.
Q. And who is Clark Curtis?
A. He had just got employed by -- at the time by -- he was a lobbyist for Joe Walsh's firm.

Q. And were you familiar or did you know whether or not Mr. Curtis, as a lobbyist with the Walsh firm, represented CVS?
A. Yes, sir.
Q. And did he do so during 2003?
A. Yes, sir. There was a vacancy, and he took that position at that point.
Q. Now, sir, again, turning back to Exhibit 11, page 2. Is there an indication on this document as to what date you introduced this particular piece of legislation?
A. February 13, 2003.
Q. Now, sir, was this referred to your committee or some other committee, if you recall?
A. It was referred to the Committee on Health and Human Services.
Q. And were you a member of that committee?
A. Yes, sir.
Q. Did you participate -- are you sure about that, sir?
A. At that point, I'm trying to think. In 2003, no, I wasn't. I was on Constitutional Gaming.
Q. Now, sir, do you know whether or not -- did you do anything, excuse me, to promote this piece of legislation before that committee?

A. Yes.
Q. And what did you do, sir?
A. I spoke with senators, and I also issued press releases on it, news releases.
Q. Now, sir, at some point did this bill come up for consideration before the Senate Committee on Health and Human Services?
A. Yes, sir.
Q. And what, if any, action did they take on the bill?
A. They passed it.
Q. I'm sorry?
A. They passed it.
Q. And following passage by the committee, did the full Senate consider this particular piece of legislation?
A. Yes, sir.
Q. And when the full Senate considered this legislation, did you participate in that proceeding?
A. Yes, I did.
Q. Did you vote on this particular piece of legislation?
A. Yes, I did.
Q. And how did you vote?
A. In the affirmative.

Q. Sir, at any point in time during your employ as a consultant with CVS, did you travel to Key Biscayne, Florida, for some type of event?
A. Yes, sir.
Q. Do you recall when that was?
A. I believe it was in November of 2001.
Q. And do you recall what that event was about? What was the purpose for traveling to Key Biscayne?
A. It was an event for the National Association of Chain Drugstores.
Q. And did you go by yourself or were you accompanied by others from Rhode Island?
A. Yes, sir.
Q. And who accompanied you from Rhode Island?
A. Specifically on the plane or while I was there?
Q. On the trip, sir.
A. On the trip, it was Jack Kramer, Carlos Ortiz, Paul DeRoche from the Greater Providence Chamber of Commerce, then-Speaker Harwood and then-Majority Leader Martineau.
Q. Now, during the course of that trip, were there any type of entertainment or athletic activities?
A. Yes, sir.
Q. And did any of those involve rounds of golf?
A. Yes, sir.

Q. And can you describe for us what you recall about those rounds of golf that occurred during the Key Biscayne trip.
A. There was a tournament put on by the NACDS, the National Association of Chain Drugstores. It was at a club called Crandon Club. And then there was another round, an independent round, at Doral Country Club.
Q. Focusing on the Doral Country Club golf outing, who, if anyone, accompanied you on that outing?
A. It was Mr. Kramer, Mr. Ortiz, Speaker Harwood, Leader Martineau, myself, Mr. DeRoche, and I believe there were two other gentlemen from New York.
Q. Did you pay for that particular outing?
A. No, sir.
Q. Do you know who did?
A. Yes.
Q. Who?
A. Jack told me he did.
Q. Now, did you pay for any portion of this particular trip to Key Biscayne?
A. No.
Q. Sir, directing your attention to Exhibit Number 327, do you recognize this letter?
A. Yes.
Q. And what do you recognize it to be?

A. It was an invitation to the CVS Charity Classic Gala on June 24th.
Q. And turn to page 2 of the letter, please. Are these tickets to that event?
A. Yes, sir.
Q. Did you receive those tickets?
A. Yes, sir.
Q. From whom?
A. Mr. Kramer.
Q. Did you pay for those tickets?
A. Initially, no.
Q. When you say initially no, at some point did you?
A. Yes.
Q. And when was it that you paid money for these tickets?
A. After the whole ethics situation cleared up publicly.
Q. So this was some type of reimbursement?
A. Yes, sir.
Q. And how much did you end up having to reimburse at that point in time?
A. It was significant. I think it was like $1,000 or so.
Q. Did you pay for the tickets when you received them and attended the event in 2002?

A. No.
Q. Did either Mr. Kramer or anyone else at CVS request payment in exchange for the receipt and use of these tickets?
A. No, sir.
Q. Did you, in fact, attend this event?
A. Yes, sir.
Q. And when you attended the event, were you seated at a particular table?
A. Yes.
Q. And do you recall whose table that was?
A. Mr. Kramer's.
Q. Directing your attention to Exhibit Number 326. Can I have the text portion of the document enlarged, please. Do you recognize this document?
A. Yes.
Q. What do you recognize it to be?
A. That was an e-mail from me to M.J. McCusker.
Q. And what was the -- what were you e-mailing and communicating with Ms. McCusker about when you sent this e-mail?
A. It was about tickets to the Oprah Winfrey Show.
Q. And why was it that you were communicating with Ms. McCusker about tickets to the Oprah Winfrey Show?
A. Well --

MR. SMITH: Objection.
THE COURT: Approach.
(Bench conference held on the record)
THE COURT: What's he going to say?
MR. DAMBRUCH: I expect that Mr. Celona will testify that he had previously spoken to Mr. Kramer about his interest in obtaining these tickets and that as a result of that discussion, he was directed to Ms. McCusker, and Ms. McCusker worked out the details.
THE COURT: Okay.
(End of bench conference)
Q. Sir, if could you answer, please.
A. Do you want me to give you the background?
Q. Yes, please.
A. Jack and I and our wives were at an event in early December of 2001. It was at the Governor's Ball in Newport. And he happened to ask me if I was all set for my wife's Christmas gifts; and I said yes, but there was one thing that she really wanted. It was just a conversation. And he said, What was that? And I said, She really wanted to go to the Oprah Winfrey Show.
And I had tried to call and make phone calls and go online and so forth and get them, and I just couldn't get them. And he offered to see if he could

get them for me through his national advertising person.

Then subsequently thereafter, a short time thereafter, I received a call that he couldn't, but then he was going to try to get them through Lisa Churchville for me. The tickets had no value, but obviously they were very difficult to get.

Q. And how was it that Ms. McCusker became involved in this process?

A. She was the contact person between her and -- myself and Jack and Lisa Churchville, who was at the time the general manager of NBC-10, and for the times and what dates would be available.

Q. And at some point were you able to obtain the tickets?

A. Yes, sir.

Q. And were you -- did you receive some direction from anyone at CVS as to how to do that?

A. Yes, sir.

Q. And what was that direction?

A. The direction was to go down to Channel 10, the office, on Kenney Drive, I believe it was, to the receptionist's office and that there would be a brown package in the front with my name on it, and in it would be like an Oprah Winfrey hat and tee-shirt so

that I could put something under the tree for my wife, and -- of which I did. I went down there and got them, and then thereafter I sent Ms. Churchville some little floral arrangement of thanks.
Q. And who was it from CVS that directed you to go to Channel 10 and see Ms. Churchville to pick up the package?
A. It was M.J. McCusker.
Q. Now, you mentioned you had attended the -- some type of charity event in December of 2000 or 2001? I'm sorry.
A. Yes.
Q. At whose invitation did you attend that event, if you recall?
A. I don't recall.
Q. Did you attend any charity events from 2000 to 2003 at the invitation of CVS?
A. From 2000 to 2003?
Q. Yes.
A. Yes.
Q. Did you ever pay to attend any of those events?
MR. SMITH: Objection.
THE COURT: Overruled.
A. No.
Q. Now, sir, directing your attention to Exhibit

Number 387, if you can highlight the top portion of that, please. And, sir, would it be fair to say this is your calendar for June 9 of 2003?
A. Yes.
Q. And I direct your attention to the entry for 12 p.m. to 7 p.m. for that particular date.
A. Yes, sir.
Q. What entry was made there?
A. It was a golf match benefiting the Sexual Assault and Trauma Resource Center at the Alpine Country Club.
Q. Okay. And in that regard, there are some names listed, Jack, Jim Hagan and Paul DeRoche. Let's begin with Jack. Who is Jack?
A. Jack Kramer.
Q. Who is Jim Hagan?
A. Jim Hagan at the time was the -- I guess the title was executive director or president of -- executive director of the Greater Providence Chamber of Commerce.
Q. And how about Paul DeRoche?
A. He was vice president at the Chamber.
Q. Do you recall at whose invitation you attended this particular event?
A. Mr. Kramer.
Q. Now, directing your attention to Government's Exhibit 388. And, again, if we could highlight the top

of that text. Do you recognize this as your calendar for August 28th of 2003?
A. Yes, sir.
MR. DAMBRUCH: Your Honor, I'm sorry. There's a mistake. This is not the exhibit. Could we have this taken down, please. Could I have a moment?
(Pause)
MR. DAMBRUCH: Your Honor, apparently the wrong exhibit was entered in as 388. I'll use the paper copy. Entered into the computer. I think the proper exhibit is before the Court.
THE COURT: Well, why don't you compare it.
THE CLERK: This is what I have.
MR. DAMBRUCH: Yes, your Honor. The proper exhibit is before the Court, and the wrong one apparently was entered into the computer.
THE COURT: Could I see it, John. Okay.
MR. DAMBRUCH: Could I have that exhibit provided to the witness, please.
Q. Sir, looking at what's been marked as Government's Exhibit 388, is that your calendar for August 4th of 2003?
A. Yes, sir.
Q. And there's an entry on the calendar for 11:30 a.m. to 8:30 p.m. for that particular date. Do

you see that entry?
A. Yes, sir.
Q. And what is that entry or what was that entry?
A. It's a golf tournament for the Special Olympics, the Rhode Island Special Olympics, at Potowomut Country Club.
Q. And does the entry reference any particular names?
A. Yes, Mr. Jack Kramer.
Q. And at whose invitation did you attend that particular event on August 4th of 2003?
A. Mr. Kramer.
Q. Now, sir, other than those two golfing events, did you attend any other events from 2000 to 2003 at the invitation of Mr. Kramer?
A. Yes.
Q. Do you recall how many?
A. Exactly, no, but quite a few.
Q. Before moving on, during the 2003 legislative session, do you recall any type of luncheon that was hosted at CVS?
A. Yes.
Q. And can you describe that for us, please.
A. That was a luncheon that, when I was chairman of the committee, I tried to take the committee on the road to visit various businesses and corporations in

and around Rhode Island, and CVS was one of those businesses. For instance, we visited the Providence Journal, we visited Amica Insurance and right down to a two-person operation on Valley Street; but we did go out to a luncheon at CVS where a presentation was made.
Q. And do you recall when that luncheon was held?
A. Exact date, I don't.
Q. And did you, in fact, attend that luncheon with other members of your Senate Commerce Committee?
A. Yes, sir.
Q. And who hosted the luncheon?
A. CVS.
Q. What, if anything, took place during the luncheon at CVS?
A. They outlined their history, again reiterated their history, where they started, how they got to where they are, where they are, where they're looking for the future, and also what goals they had for the legislative session coming up.
Q. Now, sir, you're using the term "they." Who was present at the luncheon representing CVS?
A. Carlos Ortiz and Jack Kramer, and there may have been some other staffers there.
Q. And directing your attention to Government's Exhibit Number 331, please. I'm sorry, I'm mistaken on

that. I apologize. If we could take that down. Sir, moving on to August of 2003, did you have occasion in August of 2003 to be at the -- to play a round of golf at the Norton TPC course in Massachusetts?
A. Yes, sir.
Q. And do you recall who it was you played a round of golf with at that point in time?
A. Yes. The course is called TPC Boston in Norton, Mass. And it was myself, Jack Kramer, Paul DeRoche, and I believe it was Jim Hagan.
Q. And during the course of that particular round of golf, did you have any conversations with Mr. Kramer about your consulting relationship with CVS?
A. Yes, sir.
Q. And can you please describe for us what was said during that conversation.
A. Yes. It was actually right in the --
MR. SMITH: Objection.
THE COURT: Just a minute. What's the basis for your objection?
MR. SMITH: Limiting instruction, Judge, with respect to that conversation. May we approach?
THE COURT: Overruled.
A. The conversation, first of all, occurred as we were approaching the first tee or the first green after

we had teed off. And Jack and I were in the cart together, and he had said that in light of the situation with Majority Leader Fox, that our relationship would have to be severed.

Q. What was the situation with Majority Leader Fox?

MR. CORRIGAN: Objection, your Honor.

THE COURT: Approach.

(Bench conference held on the record)

THE COURT: What's he going to say?

MR. DAMBRUCH: Your Honor, I expect he will say that the situation referred to with Majority Leader Fox involved the fact that there had been some indication or some controversy surrounding the fact that Majority Leader Fox was both representing GTECH and acting on legislation or something of that nature.

THE COURT: Where was that? Was that publicly reported?

MR. DAMBRUCH: I believe so, your Honor.

MR. CORRIGAN: It's not publicly reported, your Honor, until October 1 of 2003. We have Pro Jo articles, a Pro Jo article and an AP article marked as exhibits that indicate that the first time --

THE COURT: But if Mr. Kramer says it's with regard to Fox --

MR. CORRIGAN: Right.

THE COURT: -- then that comes in.

MR. CORRIGAN: Well --

THE COURT: Is he going to say anything else?

MR. DAMBRUCH: That's my understanding.

THE COURT: Okay.

MR. CORRIGAN: But he's asked that question.

MR. DAMBRUCH: I'll ask the question what Mr. Kramer --

THE COURT: If he said anything more about it but not what was it because that invites all the rest of the stuff to come in.

MR. SMITH: We would object for the admission against Mr. Ortiz for the purposes of the record.

THE COURT: What do you say about that?

MR. DAMBRUCH: Your Honor, it's expected that, through the testimony of Mr. Smith, there was a conversation that occurred between Mr. Ortiz and Mr. Smith at which time there was a decision made to terminate the agreement; and the assignment to do that, to communicate that to Mr. Celona was specifically given to Mr. Kramer.

I believe that's a fair accounting of what was said and what we expect Mr. Smith to say.

THE COURT: Overruled.

(End of bench conference)

Q. Sir, if I may rephrase that last question. What, if anything, did Mr. Kramer say about the Gordon Fox reference?
A. Mr. Kramer said that in light of the news that was going on, that was being reported about House Majority Leader Gordon Fox's relationship with GTECH, which at the time was really being blown up as an ethics violation and publicized, that our relationship, mine with CVS, would have to be severed.
Q. Was there any further discussion about the relationship or anything that would occur in the future?
A. Yes.
Q. And can you describe that for us, please.
A. He said that, you know, we'll continue to be good supportive friends and that he was inviting me to another event later on, within the next month or so.
Q. And what event was that, sir?
A. It was the American Airlines celebrity classic, which was in Newport Beach, California.
Q. Now, sir, when these -- this conversation was occurring between yourself and Mr. Kramer, was it just the two of you alone or were the other members of the foursome also present?
A. It was just the two of us alone in the cart, as I

stated.

Q. Now, sir, with regard to that Komen event --

A. That was just regarding the severing of the -- the severing of the contract. It was two of us in the cart alone.

Q. And the conversation that you just recounted about the Komen event, where and when did that take place?

A. That was in the cart, but then it was also talked about thereafter.

Q. And was that the two of you alone, or were there others present at the discussion of your attendance of the Komen event?

A. Mr. DeRoche, Mr. Paul DeRoche was present, also.

Q. Now, did you, in fact, attend the Komen event?

A. Yes, sir.

Q. And where did that event take place?

A. It was at -- I think it was a golf club called Pelican Hill or Pelican Hills in Newport Beach, California.

Q. Now, directing your attention to Exhibit Number 339, please. Can you highlight the top portion of that document. That's an e-mail sent to you on September 18th of 2003, is it not?

A. Yes, sir.

Q. And what's the subject of this particular e-mail?

A. It's the itinerary for the celebrity golf classic.
Q. Would it be fair to say it sets forth your airline itinerary for the travel to and from the classic?
A. Yes.
Q. Did you, in fact, fly on American Airlines both to and from the classic?
A. Yes, and it was just me, not my wife.
Q. Why didn't your wife attend?
A. She couldn't make it. We didn't have anyone to stay with our children.
Q. And did you pay for the airline tickets that are set forth in this itinerary?
A. No, sir.
Q. Moving on to Exhibit 341, please. Highlight the top portion of that document, please. Is this an e-mail communication you had from Ms. McCusker?
A. Yes.
Q. And what, if anything, is the topic of this particular e-mail?
A. It's the itinerary. And it was a situation, like I said, we couldn't get someone to stay with our children. My mother-in-law, who would sit with them, wasn't feeling well at the time.
Q. And was there also some discussion about the appropriate dress for the event?

A. Yes, sir.
Q. Now, when you attended the event, how were you housed in California?
A. It was in a hotel.
Q. Did you recall which hotel?
A. I do not recall. It was very nice.
Q. Did you pay for your accommodations during this trip?
A. No, sir.
Q. Were there any type of social or athletic events associated with this particular trip?
A. Yes, both.
Q. And can you describe those for us.
A. There were rounds of golf, and there were social events with entertainment. And I believe the -- it was a small group. There's only probably about 250 people there in total. And the entertainment, I believe, was a singer by the name of Sara Evans. And there were all sports heros from the past, like John Havlicek and Ray Bourque and Brooks Robinson and people like that.
Q. And did you have to pay any money to play golf or attend any of these events?
A. No, sir.
Q. Now, sir, directing your attention to Government's Exhibit 310, do you recognize this document?

A. Yes, sir.
Q. And what do you recognize it to be?
A. That's a statement to Carlos Ortiz from me.
Q. And is this the last statement that you sent to CVS?
A. Yes, sir.
Q. And directing your attention to Exhibit Number 315, do you recognize this document?
A. Yes, sir.
Q. What is it, please, sir?
A. It's a check. I can't read the exact dates on it, but it's a payment check.
Q. If we could please highlight the check portion of this document. Looking at it now, can you read the date of that check?
A. Yes.
Q. And is that the last check that you received from CVS?
A. Yes, I believe so. September 17th, 2003.
Q. Now, sir, as a member of the state Senate, were you required to file annual financial statements with the Rhode Island Ethics Commission?
A. Yes, sir.
Q. And as part of those statements, were you required to report income that you received during the year

covered by the statement?
A. Yes, sir.
Q. Directing your attention to Exhibit Number 359, do you recognize this document?
A. Yes, sir.
Q. And what do you recognize it to be?
A. The yearly financial statement to the Ethics Commission.
Q. And the handwriting on the document, do you recognize that?
A. Yes.
Q. And whose handwriting is that?
A. Mine.
Q. Turning to page 2 of the document, particularly Section 6, if we can have that highlighted, please. Would it be fair to say that this section required you to list any income that you, your spouse or dependent children received in excess of $1,000 during 2000?
A. Yes, sir.
Q. Did you receive more than $1,000 in income from CVS during the year 2000?
A. Yes, sir.
Q. Did you list that on this document?
A. No, sir.
Q. Turning to the last page of the document, please.

The last page, please. Is there a signature that appears on the last page of this document?
A. Yes, sir.
Q. Whose signature is that?
A. Mine.
Q. Did you file this document with the Ethics Commission?
A. Yes, sir.
Q. Directing your attention to Exhibit Number 360, do you recognize that document?
A. Yes, sir.
Q. What do you recognize that document to be?
A. The 2001 yearly financial statement.
Q. Turning to page 2 of that document, please, do you recognize the handwriting that appears on page 2?
A. Yes, sir.
Q. And if we could highlight the top portion of the document, please. Again, directing your attention to paragraph 6, does that indicate that you should list any income made by yourself, your spouse or dependent children in excess of $1,000?
A. Yes, sir.
Q. For the year 2001?
A. Yes.
Q. Did you receive more than $1,000 in income from

CVS during the 2001 calendar year?
A. Yes, sir.
Q. Did you list the income you received from CVS on -- in response to this particular question?
A. No, sir.
Q. Directing your attention to the last page of the document, does a signature appear on the last page?
A. Yes, sir.
Q. And do you recognize that signature?
A. Yes.
Q. Whose signature is it?
A. My signature.
Q. Did you file this document with the Ethics Commission?
A. Yes, sir.
Q. Directing your attention to Exhibit Number 361, do you recognize that document?
A. Yes.
Q. And what do you recognize that document to be?
A. The 2003 Ethics Commission financial statement.
Q. Turning to page 2 of the document, please. Again I'd ask to highlight the top paragraph. Looking at Section 6, does that require that you list the names of any employer who paid you, your spouse or dependent child more than $1,000 during the calendar year 2002?

A. Yes, sir.
Q. Did CVS pay you more than $1,000 during the calendar year 2002?
A. Yes, sir.
Q. And did you list CVS in that particular section?
A. No, sir.
Q. Turning to the last page of the document, did someone sign this document?
A. Yes, sir.
Q. Who?
A. I did.
Q. Did you then file this document with the Ethics Commission?
A. Yes, sir.
Q. Now, sir, at some later point in time did you file corrected versions of these same forms with the Ethics Commission?
A. Yes, sir.
Q. And when did that occur?
A. After everything started to hit the fan and became public.
Q. Now, in that regard, at some point did your relationship, your consulting relationship with CVS become a public matter?
A. Yes, sir.

Q. And did you receive any type of inquiries from the press about that particular topic?
A. Yes, sir.
Q. And do you recall when it was that you received the first inquiries from the press about your relationship with CVS?
A. I believe it was early December of '03.
Q. And do you recall from whom you received the inquiry?
A. The Providence Journal.
Q. Now, after receiving the inquiry from the Providence Journal, did you have any contact with anyone at CVS?
A. Yes.
Q. And who was it that you contacted at CVS?
A. Initially Carlos Ortiz and Todd Andrews.
Q. When you say initially Carlos Ortiz, could you explain, please.
A. Well, initially, the first one was Carlos Ortiz, and then he put me through to Todd Andrews. And then subsequently thereafter I tried contacting Jack, who I found was out of town, but I never ended up speaking with him.
Q. Focusing on the conversation you spoke of with Mr. Ortiz and Mr. Andrews, was this a joint

conversation between the three of you?
A. Yes.
Q. And what, if anything, was discussed?
A. The inquiries between the press and myself and to CVS and our relationship.
Q. Did Mr. Ortiz make any statements during that conversation?
A. Yes, he asked about any ethics rulings and things like that. Todd Andrews said that they had confirmed that they had a relationship with me.
Q. And when there was a question about the ethics ruling, what was the nature of that conversation, if you recall?
A. Something along the line of I thought you had an ethics opinion on it.
Q. And did you respond in any way, shape or form to that question?
A. My response was that I had the verbal opinion, which really wasn't an opinion. It was something that I had related to him early on a few years ago when I had made that initial phone call to the Ethics Commission.
Q. And what, if anything -- how did the conversation come to an end?
A. Basically good luck, you're on your own on this

one.

Q. Now, at some point did you respond to the press inquiries yourself?

A. Yes.

Q. And at that point in time, were you still a member of the state Senate?

A. Yes.

Q. And how long did you remain a member of the state Senate?

A. Until March of 2004.

Q. And what happened in March of 2004?

A. I resigned.

Q. Now, subsequent to your resignation in March of 2004, did you begin in the fall of 2004 to meet with representatives of the federal government and talk to them about these events?

A. Yes, sir.

Q. And at that point in time, had you pled guilty to the charges against you?

A. No, sir.

Q. Did you subsequently plead guilty to those charges?

A. Yes.

Q. And were you or have you now been sentenced both in federal and state court on those charges?

A. Yes, sir.

MR. DAMBRUCH: May I have a moment, your Honor?

(Pause)

Q. Now, sir, when you made statements to the press prior to your resignation from office, were those truthful statements?

A. No.

Q. And when you first met with representatives of the Government in the fall of 2004, were all of your statements truthful?

A. No. I could explain.

Q. Please just answer the question.

A. No.

Q. Now, sir, yesterday during my questioning of you I asked you about some events that occurred in, I believe it was, 2001; and you referenced a meeting with Mr. Ortiz and Mr. Andrews. Do you recall that?

A. Yes.

MR. DAMBRUCH: If I could have Government's Exhibit Number 109 displayed, please.

Q. I'd ask you to look at Government's Exhibit Number 109. Have you ever seen this document before?

A. No, sir.

Q. Do you know what it is?

A. Looks like a description of the scope of work for

my contractual obligation.
Q. And did either Mr. Ortiz or Mr. Andrews ever show you this document?
A. No.
MR. DAMBRUCH: Your Honor, if I may have another minute.
(Pause)
MR. DAMBRUCH: No further questions at this time, your Honor.
THE COURT: Cross. Mr. Corrigan.

**CROSS-EXAMINATION**

**BY MR. CORRIGAN**:

Q. Good morning, Mr. Celona.
A. Good morning.
Q. Mr. Celona, right at the tail end of your testimony, Mr. Dambruch showed you a document that's marked Government Exhibit 109. May we have Government Exhibit 109 on the monitors, please.
Mr. Celona, you testified in response to a question put to you by Mr. Dambruch that you had never seen this document before today. Is that your testimony?
A. Excuse me?
Q. You testified when Mr. Dambruch asked you about this document, you said to him, I've never seen this

document before; isn't that right?
A. His statement, I believe, was had you seen this document before.
Q. Well, I think that was his subsequent question; but the first question that he put to you when you had the document was, Have you ever seen this document before? And you answered, No. Wasn't that your testimony?
A. Yes, but can you explain what the reason. I don't understand your question.
Q. Well, your answer to my question is that you told Mr. Dambruch that you had never seen this document before; isn't that right?
A. Yes.
Q. You met with Government agents repeatedly throughout 2004, 2005, 2006, 2007 and this year, and you're telling this Court that at no point during any of those meetings were you ever shown this document?
A. My interpretation of the question was had you seen it during the period of time in dealing with Mr. Ortiz. That's why I said had you seen it.
Q. So now your testimony is you have seen this document before?
A. I've seen it, but I thought it was an interpretation of had you seen it.

MR. CORRIGAN: Okay.
A. That was my answer.
MR. CORRIGAN: We can take this down. Thank you.
Q. Mr. Celona, pursuant to your plea agreement, you testified in a prior trial; isn't that right?
A. Yes.
Q. That trial involved different prosecutors, didn't it?
A. Yes.
Q. Mr. Dambruch and Mr. Petalas were not the prosecutors in that trial, were they?
A. No, sir.
Q. And that trial involved different Defendants as well, didn't it?
A. Yes, sir.
Q. Mr. Kramer wasn't a Defendant in that trial?
A. No, sir.
Q. Mr. Ortiz wasn't a Defendant in that trial?
A. No, sir.
Q. The trial took place in this very courthouse, didn't it?
A. Yes, sir.
Q. The trial took place on the second floor of this courthouse?

A. The floor below it, I believe. I don't know if it was the second floor or the first floor. Whatever.
Q. Nonetheless, it was in this courthouse; right, sir?
A. Yes, sir.
Q. And there was a judge at that trial; right?
A. Yes, sir.
Q. The judge wasn't Judge Lisi, was it?
A. No, sir.
Q. It was a different judge, Judge Torres; right?
A. Yes, sir.
Q. Was there a jury at that trial?
A. Yes, sir.
Q. There were jurors at that trial, just like there are jurors here at this trial today; correct?
A. Yes, sir.
Q. And you swore an oath at that trial to tell the truth, didn't you?
A. Yes.
Q. You swore an oath to tell the truth at that trial just like you've sworn an oath to tell the truth at this trial; is that right?
A. Yes, sir.
Q. That trial took place in September of 2006, didn't it?

A. I believe so.
Q. It took place right after Labor Day in September of 2006; isn't that right?
A. Yes, sir.
Q. And you were questioned during that trial over the course of about six days; is that right?
A. If that's what you say, it was six days.
Q. You don't remember?
A. It was a few days.
Q. Pardon me?
A. It was a few days. I don't know if it was six days exactly.
Q. You don't remember how many, but it was multiple days; correct?
A. Yes, sir.
Q. Now, I want to take you back to your testimony of yesterday. You testified yesterday that you met with Mr. Kramer and Mr. Ortiz on January 7th of 2000 at CVS. Do you recall that, sir?
A. January 7th, 2000, yes.
Q. And the three of you were together on that date at CVS. You and Mr. Kramer and Mr. Ortiz were altogether at CVS on January 7th of 2000; isn't that right?
A. Yes.
Q. And while the three of you were together at CVS on

that date, you were given a draft of the consulting agreement; isn't that right?
A. I don't believe I was given it at that point. I may have.
Q. Do you recall yesterday testifying at some point yesterday that at the meeting you were given a draft of the consulting agreement?
A. I believe the final draft was sent to me in the mail and signed by Carlos Ortiz.
Q. But at the January 7, 2000, meeting, you were given a draft of the consulting --
A. I don't believe I said that yesterday.
Q. You don't believe you said that?
A. I don't recall myself saying that.
Q. Have you ever said that at any time, sir?
A. I don't recall.
MR. CORRIGAN: May we have shown to the witness his grand jury testimony from May 2 of 2006.
Q. Didn't you say to the grand jury on May 2 of 2006, Mr. Celona, that you were given a copy of the consulting agreement at the meeting with Mr. Kramer and Mr. Ortiz?
MR. DAMBRUCH: Your Honor, may we have a page and line reference, please.
MR. CORRIGAN: I'm just asking him the question.

THE COURT: Let's ask the question.
A. I don't recall that.
Q. You don't recall that, but you do recall testifying in the grand jury on multiple occasions about the events that you've testified to in this trial; correct?
A. About which trial, this trial here?
Q. About the events that you've been testifying regarding Mr. Kramer and Mr. Ortiz, you've previously testified in the grand jury on multiple occasions; correct?
A. It may have been multiple occasions.
Q. And when you testified in the grand jury, you were sworn to tell the truth, weren't you, sir?
A. Yes, sir.
Q. You took an oath to tell the truth; right?
A. Yes, sir.
Q. Did you tell the truth when you were in the grand jury?
A. To my knowledge.
MR. CORRIGAN: Mr. Duhamel, can you give this to the witness, please.
Q. Mr. Celona, I'm handing you a transcript of your grand jury testimony from May 2 of 2006. Do you see the first page there that indicates that's your grand

jury testimony? Do you see that, sir?
A. Yes, sir.
Q. You did testify in the grand jury on that date, didn't you?
A. Yes.
Q. And I direct your attention to page 49 of that grand jury testimony, and I'd direct your attention to line 9, sir. And wasn't it your testimony in the grand jury as follows?
Question, "Who presented you with that agreement?"
Answer, "It was presented at that meeting by both Jack and Carlos."
Question, "Did you sign that agreement immediately?"
Answer, "No, sir."
Question, "What did you do with that agreement?"
Answer, "After I left the meeting, I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper."
Wasn't that your testimony before the grand jury on May 2nd, Mr. Celona?
A. That's what it was.
Q. So, in fact, you did get a copy of the consulting agreement at the meeting on January 7th, isn't that

right?

A. First of all, I fully understand what you're trying to do.

Q. I'm sorry, I couldn't hear you.

A. I fully understand what you're trying to do. Second, that period in my mind was after the fact because when I was presented with the phone -- the cell phone records, I realized the fact that it was afterwards and not during that period of time.

Q. Senator Celona -- excuse me, Mr. Celona, just so that you understand what I'm trying to do, I'm trying to elicit from you testimony about January 7th of 2000.

Isn't it a fact that on January 7th of 2000 Mr. Kramer and Mr. Ortiz gave you a copy of the consulting agreement?

A. That's what was testified at that meeting.

Q. That's what you testified at the grand jury; right, sir?

A. Yes, sir.

Q. And at the grand jury, you were swearing to tell the truth; correct?

A. Yes.

Q. Did you tell the truth in the grand jury?

A. Obviously, at that point that's what I thought I had recollected.

Q. So over two years ago, in May of 2006, your recollection when you testified before the grand jury was that you were given a copy of the consulting agreement on January 7th, 2000; right?
A. Yes.
Q. And now, over two years later, your testimony is, I didn't get a copy of the consulting agreement at that meeting; is that right, sir?
A. Yes, I said I got a signed copy in the mail from Carlos Ortiz.
Q. I'd like you to focus, however, sir, on January 7th of 2000. Is it your testimony here in court today that you weren't given a copy of the consulting agreement on January 7th of 2000?
A. Sir, today I do not recollect getting a copy at that meeting of January 7th, 2001 (sic), at that meeting.
Q. So today you don't have a recollection of it; right?
A. I -- it's my opinion that I did not get one at that meeting.
Q. But it was your recollection back in May of 2006 when you swore to tell the truth to the grand jury that you did, in fact, get a copy of the consulting agreement at that meeting; isn't that right?

A. Yes.
Q. Do you have any reason to believe that over two years ago your recollection was worse than it is today?
A. Excuse me?
Q. Do you have any reason to believe that the testimony that you gave in the grand jury about receiving that consulting agreement was false testimony?
A. I didn't go in there giving false testimony. I may have not had the recollection that I have today, but I did not go in there knowingly giving false testimony.
Q. Well, today it's your -- today it's your testimony that you don't have a recollection; correct? Is that right, sir? You have to speak a yes or a no.
A. A recollection of what?
Q. Today you don't have a recollection of whether or not you were given a copy of the consulting agreement; isn't that right?
A. I said I didn't get one. I received one in the mail.
Q. But two years ago in the grand jury, when you were testifying under oath, your recollection was that you were handed a copy of the contract at the meeting; right?

A. Right.
Q. And, in fact, yesterday at this trial, didn't you testify, sir, at least initially during your testimony, that at the meeting on January 7th, 2000, that you were given a copy of the consulting agreement to review?
A. You're saying I said that yesterday?
Q. I'm asking you whether that was your testimony yesterday. Did you testify yesterday that at the January 7th, 2000, meeting, Mr. Kramer and Mr. Ortiz gave you a copy of the consulting agreement for your review?
A. I don't believe that to be my testimony from yesterday.
Q. In any event, let's try to move back to the meeting on January 7th of 2000. During that meeting on January 7th of 2000, Mr. Ortiz asked you about Ethics Commission approval, didn't he?
A. Yes.
Q. And you told him during that conversation, while the three of you were present, you, Mr. Kramer and Mr. Ortiz, that you would call the Ethics Commission to get approval; right?
A. Yes, sir.
Q. You then left the meeting; correct?
A. Yes, sir.

Q. And after you left the meeting, you called the Ethics Commission; isn't that right?
A. Yes, sir.
Q. You called the Ethics Commission, and you spoke with somebody at the Ethics Commission; isn't that right, sir?
A. Yes, sir.
Q. And do you recall yesterday that during your testimony Mr. Dambruch asked you if you identified CVS during that telephone conversation with the Ethics Commission?
A. Yes, sir.
Q. And you answered Mr. Dambruch with two words in response to that question. You responded, "No, sir." Do you recall that?
A. Yes.
Q. It was your testimony yesterday that you did not reveal that you were calling about CVS when you spoke to the person at the Ethics Commission; isn't that right?
A. Yes.
Q. Mr. Dambruch then asked you why you didn't tell the Ethics Commission that you were calling about CVS. Do you remember that?
A. Excuse me?

Q. Yesterday during your testimony, Mr. Dambruch asked you why didn't you tell the Ethics Commission about CVS. Do you remember him asking you that question yesterday?
A. Yes.
Q. And your response was, "I didn't want to." Do you recall that?
A. I didn't phrase it that way.
Q. You didn't say these very words yesterday in this courtroom in response to that question, "I didn't want to"?
A. I didn't use those exact words. I believe I did not use those exact words.
Q. In any event, it's your testimony here in this courtroom that you didn't tell the Ethics Commission that you were calling about CVS; right?
A. Correct.
Q. Did you meet with Mr. Dambruch to prepare for your testimony at this trial?
A. Yes.
Q. And how many times did you meet with Mr. Dambruch to prepare for your testimony at this trial?
A. Maybe three.
Q. During any of those three meetings with Mr. Dambruch, did the topic of your call to the Ethics

Commission come up?
A. Yes.
Q. So you discussed with Mr. Dambruch the testimony that you would be giving about the Ethics Commission call; is that right?
A. Correct.
Q. The testimony that you gave, sir, yesterday about not identifying CVS to the Ethics Commission was false, wasn't it?
A. No.
Q. Isn't it true that when you called the Ethics Commission, you told the person at the Ethics Commission that you were calling about CVS?
A. Absolutely not.
Q. Sir, let's go back to the trial, the previous trial that you testified at. We were talking about that earlier; right? Isn't it true that at that trial you testified under oath that you had identified CVS to the Ethics Commission?
A. I don't recall that.
MR. CORRIGAN: Your Honor, may we show the witness a copy of his trial testimony transcript from September 18th of 2006?
THE COURT: You may. Do you have that date, Mr. Dambruch?

MR. DAMBRUCH: Sorry?
THE COURT: September 18th, '06.
MR. DAMBRUCH: Yes, your Honor.
Q. Mr. Celona, do you recognize that to be a transcript of testimony that you gave at the previous trial that we've been talking about?
A. Yes, sir.
Q. And do you recognize that to be a transcript of testimony that you gave on September 18th of 2006?
A. Yes, sir.
Q. Mr. Celona, I'd ask you to turn to page 214 of that transcript. I'd ask you, sir, to look at line 7, and I'm going to read it to you. Okay? Do you recall giving the following testimony? Are you with me at line 7, Mr. Celona?
A. Not yet.
Q. Not yet?
A. Yes.
Q. You gave the following testimony at that trial, didn't you?
Question, "What did you say to this person at the Ethics Commission?"
Answer, "Exactly what I said."
Question, "What?"
Answer, "If I had a consulting agreement with

CVS, could I vote on issues regarding pharmacy."
Question, "If I have a consulting agreement, can I vote on that; right?"
And then there was an objection; correct?
And then do you see that the Court began asking you questions? And the Court was Judge Torres; right, Mr. Celona?
A. Yes.
Q. And Judge Torres asked you, "Did you say if you have a consulting agreement or you have a consulting agreement?"
And your testimony was then, "Because I hadn't signed it yet."
And then Judge Torres asked you, "So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?"
And your response to that question from Judge Torres was, "Yes."
And then the next line says, "I faxed it also to my attorney for his approval."
Mr. Celona, isn't it a fact that in the previous trial, you testified that you revealed to the Ethics Commission that you were calling about a consulting agreement with CVS?

A. It was a call that if I had a consulting agreement. It didn't say I had a consulting agreement.
Q. My question to you was, sir, didn't you testify in that previous trial that you told the Ethics Commission that you were calling about CVS?
A. If I had -- I said I called in the abstract and if I had a consulting agreement with CVS.
Q. You identified CVS in that call to the Ethics Commission?
A. That's what this says here, but what I'm saying is it was an abstract. It did not say I had a consulting agreement. I did not say that, and I'm not saying that now.
Q. Are you saying, as you did yesterday, that you did not use the phrase or the word CVS when you called the Ethics Commission?
A. I don't recall that at this point.
Q. But we just looked at your testimony from the previous trial. At that previous trial, you were sworn to tell the truth, weren't you?
A. Yes, sir.
Q. And at that previous trial, you testified that when you called the Ethics Commission, you said you were calling about CVS; isn't that right?
A. I said if I had a consulting agreement with CVS.

It didn't say I had a consulting agreement. To me, that's a difference.
Q. Nonetheless, sir, you told the Ethics Commission that you were calling about CVS; right?
A. I said if I had a consulting agreement about CVS.
Q. Nonetheless, sir, you told the person at the Ethics Commission that you were calling about CVS; isn't that right?
A. That's what that says at that point, but the keyword was if I had an agreement.
Q. Did you give false testimony at the previous trial?
A. No.
Q. So it's true that when you called the Ethics Commission, you identified CVS; right?
A. And it could have simply been if I had a consulting agreement with Walgreen's, if I had a consulting agreement with Rite-Aid or Brooks. It was an abstract, like I mentioned yesterday.
Q. When you called the Ethics Commission, you identified that you were calling about CVS; isn't that right, sir?
A. If that's what the testimony says.
Q. Is that what you say?
A. If. My words were if -- and I'm saying this for

the fourth time or fifth time. My words were that if I had a consulting agreement with CVS, not that I did have a consulting agreement with CVS.
Q. I'd like you, though, sir, not to focus on the "if I had" or the "did I have." Instead, I'd like you to focus on "CVS." Didn't you tell the Ethics Commission that you were calling about CVS?
A. Well, I think there's a big difference, and the focus is on the word "if" and not -- because if I did tell them I had a consulting agreement, the word "if" would not exist in there.
Q. Are you avoiding answering the question about CVS here today --
A. No.
Q. -- because yesterday you gave false testimony when you said you didn't reveal CVS to the Ethics Commission?
A. No. I'm trying to explain the differences, as you point out, because the word "if" is a large word.
Q. I don't want you to focus on "if." I really do want to --
A. Well, I want to focus on it because I think it's important to me in my mind and in my feeling.
Q. I know that's what you want to focus on, and Mr. Dambruch will have an opportunity on redirect

examination to focus you there if he likes. What I'd like is to focus on now, so that you can answer the question that I want to put to you, is on "CVS."

Didn't you tell the Ethics Commission when you called them that you were calling about CVS?

A. If I had -- if I had a contract with CVS.

Q. You revealed to the Ethics Commission that you were calling about CVS; right, sir?

A. If I had a contract with CVS.

Q. Did you reveal to the Ethics Commission that you were calling about CVS?

A. If I had a contract with CVS. It was a reviewing call.

Q. Yesterday when you told Mr. Dambruch that you didn't reveal or mention CVS at all during that conversation, was that false testimony that you gave?

A. No. It was my recollection at that point that it was an abstract call, as I felt it was then, it was an abstract call because it was if I had that contract.

Q. Having looked at your testimony from the previous trial from over two years ago when you were sworn to tell the truth, does it now refresh your recollection that you, in fact, did mention CVS during that call?

A. It was an abstract call then, as I stated it was an abstract call yesterday. It was an abstract in the

fact that it said that I said if I had a conversation -- if I had a contract with CVS, would it be permissible.

Q. And you had that contract at that point because on January 7th of 2000, as we know from your grand jury testimony, Mr. Kramer and Mr. Ortiz had given you a copy of that consulting agreement before you called the Ethics Commission; correct?

A. I don't recall that at that point.

Q. Didn't --

THE COURT: Mr. Corrigan, we're going to take a break.

Members of the jury, we'll take our morning recess, 15 minutes. Remember, don't talk about the case at all during the recess. Please fold up your notebooks, leave them on your seats.

Bob, please see the jury out.

(The jury is not present for the following)

(Recess)

Q. Good morning again, Mr. Celona.

A. Good morning.

Q. I'd like to return briefly, if I may, to yesterday's trial testimony that you gave. Do you recall --

THE WITNESS: Excuse me. May I have your name

just so I can address you properly?

MR. CORRIGAN: Oh, sure. My name is Scott Corrigan.

THE WITNESS: Scott Gordon?

MR. CORRIGAN: Corrigan.

THE WITNESS: Corrigan?

MR. CORRIGAN: Yes.

THE WITNESS: Okay. Thank you.

Q. Mr. Celona, do you recall testifying yesterday when asked by Mr. Dambruch the following question: "Did you identify the company during that phone call?"

You gave the following answer, "No, sir."

Do you recall that?

A. Yes.

Q. Do you further recall that Mr. Dambruch then asked you, "Why not?"

And your answer was, "I didn't want to."

Do you recall that?

A. Yes, sir.

Q. And then Mr. Dambruch further asked you, "Why not?"

And your response was, "I wanted to give myself some cover."

Do you recall giving that testimony yesterday?

A. Yes, sir.

Q. Now, in your meetings with Mr. Dambruch to prepare for your testimony, did you tell Mr. Dambruch during those meetings that you had not mentioned CVS during your telephone call with the Ethics Commission?
A. I don't -- can you rephrase that? Just give me that --
Q. I'll try. When you met with Mr. Dambruch, did you tell Mr. Dambruch when you spoke about the call to the EC that you had not identified CVS during the telephone call?
A. I said I spoke in the abstract.
Q. Did you tell him, though, that you had mentioned CVS during the phone call?
A. No, that the phone call was in the abstract.
Q. What were the words that you used when you said it to Mr. Dambruch before trial?
A. I believe it was the -- it was a call in the abstract.
Q. Did you tell --
THE COURT: Mr. Celona.
I'm sorry, Mr. Corrigan.
Mr. Celona, speak into the microphone, and keep your voice up.
A. I believe it was a phone call that was made, and I said to him it was in the abstract.

Q. In the abstract in the sense did you say to him if I had a consulting agreement with CVS were the words that you conveyed to the Ethics Commission?
A. I didn't use those words to Mr. Dambruch.
Q. What words did you use to Mr. Dambruch?
A. That I made phone calls in the abstract or phone call in the abstract.
Q. That's all you said to Mr. Dambruch about this topic?
A. Yes.
Q. He didn't ask you any follow-up questions --
A. Not to my recollection.
Q. Just so I can understand it, Mr. Dambruch asked you, Did you call the Ethics Commission about CVS?
A. Yes.
Q. Is that right? And you said to him, and this is before the trial, Yes, but I called in the abstract?
A. Yes.
Q. And he didn't ask you any follow-up questions about that?
A. Not to my recollection.
Q. And I just want to go back to the testimony that you gave at the trial on September 18th of 2006. So if you can take out the transcript once again for that date, that's the bigger transcript, I believe,

Mr. Celona, and if you can go back to page 214, where we were before. And let me know when you're at page 214, sir. Are you there, sir?
A. Yes, sir.
Q. And if you take a look at line 19, Judge Torres asked you on that date on September 18th, "So your testimony is that you said to this person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on pharmacy issues?"
And you answered, "Yes."
And then the next line says, "I faxed it also to my attorney for his approval."
Is that the testimony that you gave at that trial before Judge Torres?
A. Yes.
Q. Didn't you further testify at the previous trial that you told the Ethics Commission that CVS would be paying you money to do consulting work?
A. That I was under a contract with CVS. Exact specific language, I can't, you know, affirm what you're saying.
Q. Did you testify in a previous trial that you told the Ethics Commission that your relationship with CVS would be a paid relationship?
A. I don't recall that.

Q. I'd like you, sir, in that same transcript on September 18th, to turn to page 212, please, and if you can go to line 12 on page 212. Do you see that, sir?
A. Yes.
Q. Do you see that you were asked the following question?
"You said before the grand jury, I called the Ethics Commission to see if it was proper; right?"
Answer, "Yes."
Question, "What? See if what was proper?"
Answer, "To do some consulting work for CVS."
Question, "For what?"
Answer, "For CVS."
Question, "For money? For money; right?"
Answer, "Yes."
Was that the testimony that you gave in the prior trial?
A. Again, but that's in the -- that's not in the entire context, Mr. Corrigan, because, again, if I was under contract with CVS, it would be paid, obviously, for money.
Q. Sir, was that the testimony that you gave at the prior trial, that testimony that I just read to you?
A. That was the testimony.
Q. That was your testimony?

A. That was my testimony, but --
Q. And in that testimony, you said that you told the person at the Ethics Commission that CVS would be paying you money; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: The testimony speaks for itself.
THE COURT: Sustained.
Q. Did you tell the person at the Ethics Commission that CVS would be paying you money?
A. The key was that if I had a consulting agreement, obviously I would be getting paid money. That's the reason why I would be calling the Ethics Commission, because it would be for remuneration.
Q. The reason you would call the Ethics Commission was because CVS would be paying you money; right?
A. If there was a contract with CVS.
Q. So you had the contract, the draft consulting agreement --
A. I -- go ahead. I'm sorry.
Q. -- and you called the Ethics Commission and said, If I sign a consulting agreement with CVS for money, would that be okay? That was what you said to the Ethics Commission; correct?
A. No.

Q. What did you say?
A. I said it in the abstract. If there was a contract with CVS, could a senator or I as a senator or could -- if someone worked for a company like CVS, could I as a senator or a senator or an elected official vote on things specifically dealing with that company.
Q. And so you mentioned CVS in that conversation; correct?
A. If a company like that. Don't --
Q. Not a company like that. You repeatedly testified --
A. No, I was laughing at your smile. I was smiling at your smile.
Q. You repeatedly mentioned CVS, didn't you, in your prior testimony?
A. No, I'm saying what you just said, what I had said in this testimony, I was repeating the testimony. And I'm saying that if I had a contract with a company like CVS and I was paid for it, remuneration, could I or any other senator or any other elected official perform actions specifically dealing with that company, be it any company that that person would be working for. That was the intention of it.
Q. Mr. Celona, the testimony that you gave in the

prior trial wasn't if I worked for a company like CVS. The testimony that you gave in the prior trial was if -- for CVS specifically, not like CVS?
A. Well, the key question is that you almost said it, and then you withdrew it, "if."
Q. So your testimony --
A. The word "if."
Q. Your testimony is here today that you told the person at the Ethics Commission, If I had a consulting agreement with CVS, could I vote on issues affecting pharmacy?
A. My testimony -- my testimony was that it was in the abstract.
Q. In the abstract, and you say in the abstract by using the word "if"; right? That's, for you, the signal for the conversation being in the abstract; correct?
A. You're trying to expand testimony that I'm giving. You're trying to put words into my mouth. Your saying your testimony is that if you called the Ethics Commission, can you vote. First you're saying CVS, and then you're saying can I vote for a specific issue, can I vote for a pharmacy issue, can I vote for this. And it's really putting words into my mouth, Mr. Corrigan.
Q. Well, why don't I ask you in your own words to

tell us the following. Did you say to the Ethics Commission, If I have a contract with CVS, can I vote on issues affecting pharmacy?

A. It's my recollection, as it was yesterday, that I didn't mention CVS. If it was my recollection back then, but it was strictly as an abstract and not saying that I had a contract with CVS.

Q. Sir, you've not only testified at the Roger -- at the previous trial that you mentioned CVS in the ethics call and you not only mentioned it to the grand jury on May 2nd of 2006 that you mentioned CVS to the Ethics Commission, but on another date in the grand jury, on May 16 of 2006, you also testified that you mentioned CVS to the Ethics Commission; isn't that right?

A. I don't have that testimony in front of me.

Q. You're not supposed to have it. I'm asking you when you testified before the grand jury on May 16th of 2006, did you tell the grand jury under oath that you told the Ethics Commission that the agreement would be with CVS?

A. I don't recall that.

MR. CORRIGAN: May we show the witness testimony from May 16 of 2006.

Q. Sir, do you recognize that to be a transcript of grand jury testimony that you gave on May 16 of 2006?

A. Yes.
Q. Can you turn to page 84 of that transcript, please. Excuse me, 85. Please look at line 7, sir. Did you give the following testimony before the grand jury on May 16th of 2006 under oath? Question -- are you with me, Mr. Celona? I'm going to stop that. Are you --
A. I'm not.
Q. Please look at page 85, line 7.
MR. CORRIGAN: May I approach, your Honor?
THE COURT: You may.
Q. Let me see if I can help you. There's 85, line 7, right here.
A. I didn't see that there.
Q. Mr. Celona, you were under oath before the grand jury on that date, weren't you?
A. Yes.
Q. And did you give the following testimony to that grand jury?
Question, "Mr. Celona, I just have a couple of questions for you. You have testified in response to questions by Mr. Sullivan that you discussed with Carlos Ortiz and Jack Kramer the fact that you had consulted the Ethics Commission regarding working for CVS as a consultant on elderly affairs?"

And your answer was, "Yes, sir."
Was that your testimony in the grand jury, Mr. Celona?
A. Yes.
Q. That was truthful testimony, wasn't it, sir?
A. That was -- but, again, the time frame is different. And I did testify that I did tell Carlos that I had approval or that I had spoken with the Ethics Commission, and that's what that says.
Q. Yesterday you testified in this court that you told Mr. Ortiz that you had spoken with the Ethics Commission; correct?
A. Yes.
Q. And in response to questions from Mr. Dambruch yesterday, you told this Court that you never spoke to Mr. Kramer about your call with the Ethics Commission; correct?
A. I -- yesterday, I do not recollect talking to Mr. Kramer about it.
Q. Your recollection yesterday was you didn't recall speaking with Mr. Kramer about the call to the Ethics Commission; correct?
A. Yes, but this is --
Q. In this grand jury on May 2nd of 2006, when you were asked if you had spoken to them, meaning

Mr. Kramer and Mr. Ortiz, about your Ethics Commission call, you answered that you had, in fact, told both of them about the Ethics Commission call; isn't that correct?

A. That's what this says, but it was my recollection yesterday that it was just Mr. Ortiz.

Q. Your recollection yesterday must be faulty; correct, sir?

A. I didn't say that.

Q. Was your -- when you testified in the grand jury on May 16 of 2006, more than two years ago, were you giving truthful testimony?

A. To the best of my knowledge at that point.

Q. And in that grand jury, you told the grand jurors that you had spoken with both Mr. Kramer and Mr. Ortiz about your call to the Ethics Commission; correct?

A. Yes, in that testimony.

Q. When you spoke to the person at the Ethics Commission, Mr. Celona, you were told that you could be paid by CVS and vote on issues affecting pharmacy; correct?

A. Again, you're saying the word specifically CVS. You could work for a company. They utilized and they brought up the teacher issue. When I spoke with them, they talked about the teacher issue. They didn't go

into specifics of CVS, nor did I.
Q. Didn't the person at the Ethics Commission tell you that you could vote on issues affecting CVS?
A. No. They brought up the teacher issue. I told you. They said, You can vote on broad issues of pharmacy issues, but that would be it.
Q. So it's your testimony here today that the person at the Ethics Commission that you spoke to never mentioned CVS at all; is that right?
A. Not to my recollection because I used it as an abstract. They could have, but I used it as an abstract.
Q. Mr. Celona, I'd like you to take a look at your grand jury testimony -- withdrawn. On May 2nd of 2006, did you tell the grand jury the following, "They said," meaning the Ethics Commission, "if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it"? Did you give that testimony in the grand jury?
A. If that's what it says.
Q. Well, why don't we take a look at it.
A. And I just said if -- they may have said that. Just before you said that, I said they may have said that at that point.
Q. Well, let's take a look at your grand jury

testimony.
A. But they centered on the teacher issue more than anything else.
THE COURT: Mr. Celona, wait for a question.
THE WITNESS: Sorry.
MR. CORRIGAN: Why don't we take a look at your grand jury testimony, sir, from May 2nd of 2006. May 2nd of 2006. May I approach, your Honor, to assist the witness?
Q. Can you please turn, sir, to page 49 of that transcript, and if you'd please take a look at line 14. Do you see line 14 in that transcript, sir? Are you with me?
A. Yes.
Q. You were asked the following question while you were under oath in the grand jury:
Question, "What did you do with that agreement?"
Answer, "After I left the meeting, I left -- I, I left my cell phone in the van, the loaner van, and I called the Ethics Commission to see if it was proper. And I should have gotten a written response. I should have -- written request, but I didn't, but hindsight is 20/20. And they said, Well, if it specifically deals with CVS, you can't vote on it; but if it does not specifically deal with CVS, you can vote on it."

Wasn't that your testimony in the grand jury, sir, on May 2nd of 2006?
A. At that point, yes, but -- I'm sorry.
Q. You were giving truthful testimony under oath in the grand jury on that date, weren't you, sir?
A. To the best of my knowledge at that point.
Q. And on that date in the grand jury, you said that the person from the Ethics Commission told you about what you could and could not do for CVS; correct?
A. Yes.
Q. And you communicated that to both Mr. Kramer and Mr. Ortiz; correct?
A. I know to Mr. Ortiz.
Q. Well, didn't we also just look at testimony where you said that you talked to both of them about your call with the Ethics Commission?
A. I -- I know that, but I know specifically today I can say that I did with Mr. Ortiz.
Q. Your testimony that you gave in the grand jury about telling Mr. Kramer about the call with the Ethics Commission was not false testimony, was it?
A. No, sir.
Q. So you did tell Mr. Kramer about the call with the Ethics Commission; correct?
A. I can't recall at this point today that I did.

Q. But your testimony previously was truthful; correct?
A. If that's what the testimony says.
Q. And so after the call with the Ethics Commission, you told both Mr. Kramer and Mr. Ortiz about what the Ethics Commission said about what you could do for CVS Pharmacy; correct?
A. Yes.
Q. Did you review your grand jury testimony with Mr. Dambruch prior to testifying at this trial?
A. Yes, briefly.
Q. For how long?
A. I don't know how many hours or things like that. I can't tell you.
Q. The transcripts we've been looking at today, you looked at grand jury transcripts with Mr. Dambruch; correct?
A. Yes, sir.
Q. You read those grand jury transcripts, didn't you?
A. Yes.
Q. And those were grand jury transcripts regarding testimony that you had given related to CVS Pharmacy; correct?
A. Yes, sir.
Q. How much time did you spend reviewing those grand

jury transcripts with Mr. Dambruch?
A. I really don't recall how much time it was. It was difficult with logistics because of where I was at the time, as you know.
Q. On each of the three occasions that you met with Mr. Dambruch, did you review with him your previous grand jury testimony?
A. On each of them, no.
Q. On how many of the occasions did you review with him your previous grand jury testimony?
A. Perhaps on one occasion. It wasn't in total.
Q. When you reviewed with him your grand jury testimony about CVS, did he show you portions of your grand jury testimony?
A. Portions in what regard?
Q. The testimony as it is in the transcript. Did he show you the transcript?
A. Yes, sir.
Q. And did he ask you questions about what it was that you had said in the grand jury?
A. He had left them with me.
Q. So you read the grand jury transcripts in toto; is that correct?
A. As best I could.
Q. You read them all; is that right?

A. As best I could, yes.
Q. When was that that you read the grand jury transcripts?
A. A couple months ago.
Q. You didn't review them at all in the days or weeks preceding this trial?
A. Not too much, sir, no.
Q. Did you review them at all?
A. Not too much, no. Like I told you, the logistics were difficult.
Q. In the preceding days and weeks leading up to this trial, immediately preceding this trial, did you sit down with Mr. Dambruch and review your previous grand jury testimony?
A. Specifically, no. We went over prep for this trial, but that was about it.
Q. But he, several months ago, had given you copies of your grand jury testimony; is that right?
A. Yes, and then they were taken back.
Q. When were they taken back?
A. About a month or so ago.
Q. So in the past month, you have not had copies of your grand jury testimony?
A. No, sir.
Q. But prior to that time, you read that grand

jury -- those grand jury transcripts; correct?
A. Yes, sir.
Q. So you did not only tell Mr. Kramer and Mr. Ortiz that you could, based on what the Ethics Commission told you -- withdrawn. You told Mr. Kramer and Mr. Ortiz that the Ethics Commission had given you advice about what matters you could and could not vote on that dealt with CVS; correct?
A. I said that it's my recollection that I gave it to Mr. Ortiz, and I wasn't sure about giving it to Mr. Kramer.
Q. But sitting here today, having looked at your grand jury testimony, you have no doubt that you did tell Mr. Kramer; correct?
A. No. I still can't completely recollect that, sir.
Q. You don't recollect it, but you did testify about that in the grand jury; correct?
A. In the past, but I can recollect specifically telling Mr. Ortiz.
Q. You don't deny telling Mr. Kramer about that conversation, do you?
A. I can't recollect that I did.
Q. You don't recollect it, but you did testify that you told him in the grand jury; correct?
A. You asked me that three times.

Q. Is the answer the same, you did tell him?
A. It is what it is.
Q. The answer is that you did tell him; right?
A. It was in the minutes, in the transcripts.
Q. And you were telling the truth then; correct?
A. Yes. It's in the transcripts.
Q. Sir, Rhode Island has a part-time legislature; isn't that correct?
A. Correct.
Q. In 2000, when you called the Ethics Commission about the CVS consulting relationship, Rhode Island had a part-time legislature, didn't it?
A. Yes, sir.
Q. Rhode Island legislators work part time, don't they?
A. That's what a part-time legislature is.
Q. You were a part-time legislator the entire time that you served in the Rhode Island Senate; correct?
A. Yes.
Q. And because of the fact that it's a part-time legislature, almost all of the legislators in the General Assembly hold jobs outside of the Senate or the House; correct?
A. Correct.
Q. There are teachers who serve in the legislature?

There are police officers who serve in the legislature? You're going to have to answer for the record.
A. I'm sorry. Yes. I thought you were just going on and on.
Q. Are there teachers who serve in the legislature?
A. Yes.
Q. Are there police officers who serve in the legislature?
A. Yes.
Q. Are there lawyers who serve in the legislature?
A. Yes.
Q. There are businessmen and businesswomen who serve in the legislature?
A. Yes.
Q. There are people from all walks of life and all professions who serve in the legislature; isn't that correct?
A. Yes, sir.
Q. And legislators may talk with their employers about their -- about legislation; isn't that right?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You spent some time on your direct testimony, Mr. Celona, talking about any willing provider legislation; correct?

A. Yes, sir.
Q. You also spoke about -- it's also called freedom of choice legislation; is that right?
A. Yes.
Q. If I refer to them as AWP and FOC, will you understand what I mean?
A. Excuse me?
Q. If I refer to those bills and pieces of legislation as AWP and FOC, will you understand what I mean?
A. Yes.
Q. From 1995 through 1998, AWP bills were introduced in the House of Representatives each year, weren't they?
A. I believe they were.
Q. And in each of those years, those AWP bills passed overwhelmingly in the House, didn't they?
A. I don't know the exact votes each and every year. I can't say overwhelmingly. I don't know the exact votes.
Q. But it did pass each year in the House from --
A. I believe they did. Again, I'm not sure totally of each and every year from '95; but I'm, you know, confident that they did.
Q. When you were serving in the Senate from 1995

through 1997, AWP legislation never came up for a vote in the Senate, did it?
A. Excuse me?
Q. AWP legislation never came up for a vote in the Senate between 1995 and 1997; isn't that correct?
A. Correct, not to my recollection.
Q. The first time that it came up for a vote in the Senate it was in 1998; correct?
A. During my tenure. It may have been other times, also, but. . .
Q. From the time of 1995 to when you left, the first year that it came up for a vote in the Senate was 1998; correct?
A. To my recollection, yes.
Q. And that came up for a vote before the Senate Corporations Committee; correct?
A. Correct.
Q. And you were a member of that committee?
A. Yes, sir.
Q. And the legislation was defeated in that Senate Corporations Committee vote by a tally of 11 to 4 in 1998; isn't that correct?
A. Correct.
Q. Despite the strong support that it was getting in the House, it didn't become law because it couldn't

pass in the Senate between 1995 and 1998; correct?
A. Correct.
Q. Up through the 1999 legislative session, you were in what you've described as a minority faction in the Senate; isn't that correct?
A. Correct.
Q. You were not part of the establishment or the leadership within the Senate; is that right?
A. Correct.
Q. And you previously have given testimony that you characterized yourself as a back-bencher; isn't that right?
A. Yes.
Q. What's a back-bencher?
A. Someone as you just described, not in the leadership, a person that didn't enjoy the perks of the -- the benefits of the leadership, such as --
MR. SMITH: Your Honor, could he use the mike a little closer, please.
THE COURT: Would you speak up, please.
A. Someone that you just described as a person not in leadership, a person -- an elected official that would not get the perks of anything from an office to maybe even a page position.
Q. Basically someone without power within the Senate?

A. Within the structure, within the structure.
Q. And that meant you weren't part of the inner power circle within the Senate; correct?
A. Within the structure.
Q. The structure at that time from 1995 through 2000 was that Senator Kelly was the majority leader of the Senate; correct?
A. Correct.
Q. And Senator Kelly had what you call a majority faction; correct?
A. Correct.
Q. And that faction is the faction that drove what legislation would and would not pass in the Senate; correct?
A. Correct.
Q. Your minority faction had no power whatsoever to get legislation passed within the Senate, did it?
A. Correct.
Q. And the majority -- the majority faction in the Senate of Senator Kelly, they were against AWP legislation from 1995 through 1998 -- 1999; correct?
A. Yes.
Q. Every year they were against AWP legislation; correct?
A. Correct.

Q. And isn't it true that, as part of the minority faction, you would take certain positions on legislation just to be opposite the majority faction?
A. Myself personally?
Q. Yes.
A. Not all times.
Q. But sometimes you did; correct?
A. But not arbitrarily, and this certainly was not one.
Q. But you did take positions on legislation simply to be in opposition to the majority faction; isn't that correct?
A. Myself, arbitrarily, no.
Q. But on occasion you did take positions against legislation simply because you wanted to be against the majority faction; isn't that right?
A. If you can give me specifics, then I can relate that to you.
Q. You don't recall that?
A. There were times that I would vote in the minority; but just to say arbitrarily I would just vote anti the Kelly faction, I can't say that I personally did that. Up and down the line, I didn't do it, and I don't recall doing it.
Q. Senator --

A. I'm sorry. Go ahead.
Q. Senator Montalbano was part of the minority faction from 1995 through 1999; correct?
A. Correct.
Q. Senator Montalbano was a good friend of yours; correct?
A. Very good friend.
Q. You looked up to Senator Montalbano?
A. I think we looked equally at each.
Q. Had he been in the legislature before you arrived in 1995?
A. Yes.
Q. He was more senior to you in the Senate?
A. In the Senate, yes.
Q. You and he were both from North Providence; is that correct?
A. Yes, sir.
Q. And as a result, Senator Montalbano took you under his wing when you arrived in the Senate; correct?
A. Yes.
Q. And you were within his faction; correct?
A. Yes.
Q. And he was part of the faction that as opposed to Senator Kelly's faction; correct?
A. Yes, sir.

Q. Isn't it true that from 1995 until sometime in 1998, Rhode Island independent pharmacies were strong supporters of AWP legislation?
A. Yes.
Q. And you supported the Rhode Island independent pharmacies during that period of time; correct?
A. From the years when to when, please?
Q. From 1995 through 1998.
A. Yes.
Q. And do you recall that in 1999 there was a major public relations battle waged over AWP legislation?
A. Yes, sir.
Q. You testified yesterday about the Coalition for Pharmacy Freedom of Choice. Do you recall that?
A. Yes, sir.
Q. And Stop & Shop was one of the members of that coalition?
A. Correct.
Q. And Walgreen's was one of the members of that coalition?
A. Yes.
Q. And that coalition took out advertisements in the Providence Journal and other newspapers in support of AWP; is that right?
A. Yes.

Q. And they also put television commercials on local television stations in support of AWP legislation; correct?
A. Correct.
Q. And they also, on radio, had radio commercials supporting AWP; isn't that right?
A. Right.
Q. This was a big battle over the piece of legislation, wasn't it?
A. Yes, it was.
Q. The coalition was not led by the independent pharmacy chains, was it?
A. It was led by the big -- the big pharmacy chains, Walgreen's, Stop & Shop. Ann & Hope was involved at the time, and I forget the others that were involved.
Q. Yesterday you testified that some independents were in the coalition in 1999. Do you recall that?
A. I believe it was earlier than that. When the coalition had started, the independents were very active. They even had their own association that they were involved with to try to get into the system because the independents were dying, quite honestly, because they were giving -- were getting eaten up by the larger pharmacies in the state.
Q. But by 1999, the independents were not part of the

coalition, were they?
A. I believe they were brought on board prior to that.
Q. In 1999, were the independents part of the coalition against pharmacy freedom of choice?
A. I don't believe they were. I stand to be corrected.
Q. They weren't because in 1998 they were let into the network; isn't that correct?
A. If that was the year, then that's correct.
MR. CORRIGAN: May we have Government Exhibit 24, please, which is already in full, shown to the witness and displayed for the jury, please.
Q. Mr. Celona, do you recall that Mr. Dambruch showed you this letter yesterday?
A. Yes.
Q. And this is a letter to you dated May 15 of 1998; correct?
A. Yes.
Q. If you would look down at the bottom of this letter --
JUROR: Are we supposed to have this?
MR. CORRIGAN: Yes.
Q. This is a letter that Mr. Ortiz wrote to you dated February 15, 1998. Excuse me, May 15, 1998; correct,

Mr. Celona?
A. Oh, I thought you were -- I'm sorry. Yes.
Q. And if you go to the next-to-last paragraph of the letter, do you see where Mr. Ortiz wrote to you on that date, "Finally, I would bring your attention to the fact that negotiations with pharmacies in Rhode Island has created a network whereby all 42 Brooks pharmacies and 41 independent pharmacies are part of the network that will service pharmacy managed care programs. This means that every domestically incorporated pharmacy in Rhode Island is part of the network"? Do you see that, sir?
A. Yes, sir.
Q. Does that refresh your recollection that as of that time on May 15 of 1998, all of the independent pharmacies incorporated within Rhode Island had become part of the network?
A. Yes.
Q. So in 1999, the independents were no longer supporting AWP; correct?
A. Correct.
Q. Because if they had been in support of AWP, it would have been contrary to their own interest of being in the network; right?
A. Correct.

Q. As a result, in 1999, the House Committee on Corporations voted against AWP; correct?

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Basis?

MR. DAMBRUCH: Competency of this witness to testify.

THE COURT: Rephrase.

Q. Isn't it true, Mr. Celona, that in 1999, after the independents had been let into the network, the House Corporations Committee voted against pharmacy freedom of choice?

A. I can't stand here and say that they did or they did not -- sit here and say that. I don't have any documentation.

Q. You don't have any recollection that in 1999 the House Corporations Committee voted 17 to 0 to defeat pharmacy freedom of choice legislation?

A. I recollect that many times during the course of this whole issue that the House would pass it and the Senate would defeat it and the Senate would pass it or the Senate would not pass it, it would pass and it would -- many issues like that. One year the House would pass a bill, and it would die in the Senate and vice versa.

As far as the exact vote total, I can't sit here

and say it was 17 to nothing that they defeated that bill in 1998. I cannot say that without seeing documentation. If I saw it, you know, I would definitely. . .
Q. In the interest of time, if I told you that a stipulation has been read into the record in this case in which it has been established and the Government has agreed that the House Corporations Committee voted 17 to nothing to defeat AWP legislation in 1999, would you agree with that?
A. If that's your stipulation and it was agreed by both sides and it was read into the record, then I would agree with it.
Q. And that was the first time, in 1999, in five years that AWP had lost in the House; correct?
A. Again, I don't know.
Q. Well, you had testified earlier that it passed in the House from '95 through '98; correct?
A. Yeah, but you're saying the first time.
Q. Let me rephrase. That's a fair point. The first time since 1995 that it lost in the House Corporations Committee was in 1999; correct?
A. Yes, assuming what I had just stated.
Q. Was correct?
A. Correct.

Q. And I will tell you that the stipulation that we've read in the record also establishes that you are correct about that. Would you agree then?
A. If it's in there, I would agree, yes.
Q. So after the House Corporations Committee had voted to defeat AWP legislation in 1999, the ensuing Senate vote in the Senate Corporations Committee on AWP didn't matter at all, did it?
MR. DAMBRUCH: Objection.
THE COURT: Basis?
MR. DAMBRUCH: Relevance.
THE COURT: Overruled.
Q. Mr. Celona, since the legislation, AWP, had lost in the House in 1999, the ensuing vote in the Senate in that same year in the Senate Corporations Committee on AWP didn't matter at all, did it?
A. That's a matter of opinion.
Q. Well, even if the Senate passed the Senate Corporations Committee voted in favor of the legislation in 1999, it could not have become law because the House had already voted it down; correct?
A. To get into generalities or specific-wise, it could not become law; but to get into generalities and other -- excuse me for using the word abstract issues, there have been cases where one bill has been defeated

in one body of the House -- of the legislature, it's gone over to the other body, the body has amended it, has worked with the parties concerned, both the advocates, the proponents and the opponents, come up with a substitute version, they've passed it, then they've sent that bill back to the originating body and it's passed.

So can it happen, yes. Has it happened, yes. Will it continue to happen, yes. But to say that it wasn't going to happen in this case, I cannot say that because who knows what would have happened had it been amended or tweaked as I just explained as other bills have.

Q. Are you aware of what you've just described in the abstract ever having happened when a committee in either chamber has voted unanimously to defeat a bill?

A. Yes.

Q. It wasn't going to happen this year with AWP in 1999, though, was it?

A. I'm not a prognosticator. I couldn't tell that.

Q. Well, it wasn't going to happen in 1999 because, in fact, in 1999 the Senate Corporations Committee once again voted to defeat AWP legislation; correct?

A. In 1999 they voted to defeat it, yes.

Q. And the vote in 1998 was 11 to 4. Do you recall

that?
A. I believe that's what it was.
MR. CORRIGAN: Can we have Government Exhibit 1.13 displayed for the witness and the jury, please.
Q. Do you remember -- excuse me, do you recognize this to be the vote sheet from the Senate Committee on Corporations for pharmacy freedom of choice in 1998? You'll see the vote sheet at the thirteenth page of the document, Mr. Celona.
A. I'm just looking at the House. The House, I guess, passed it 10 to 1, not 17 to 1. Is that the year you were saying 17 to 1?
Q. The House passed it in 1998. That's a stipulation that's been entered into the record. It was in 1999 when the House defeated it 17 to nothing, Mr. Celona.
A. Okay. Yes.
Q. So here in 1998, the Senate Corporations Committee voted on AWP; correct?
A. Yes.
Q. And you'll see that the action taken was defeated. We have a check mark there. Do you see that?
A. Yes, sir.
Q. It was defeated. And then down below we have the roll call of the votes; correct?

A. Correct.
Q. And if we could just scroll up a little bit so we can see the yeas and the nays. And you're one of the nays; correct?
A. Correct.
Q. And there are three other nays; right?
A. Three other yeas.
Q. Three other yeas. Pardon me. Senators Issa, Montalbano and Palazzo; correct?
A. Yes.
Q. So you and Senator Montalbano both voted in favor of this legislation in 1998; correct?
A. Correct.
MR. CORRIGAN: May we have Government Exhibit 4, please, and may we have that displayed for the jury.
THE WITNESS: And this is a --
THE COURT: Wait for a question.
THE WITNESS: Sorry.
Q. Do you recognize Government Exhibit 4 to be the 1999 freedom of choice legislation that was voted on in the Senate Corporations Committee?
A. Yes, sir.
Q. Could you please turn to page 12 of that document, and may we display that for the jury. And do you see once again the action that was taken, Mr. Celona, is

that this legislation was defeated in the Senate Committee on Corporations in 1999?
A. Yes, sir.
Q. And, once again, there were four votes in favor of the legislation?
A. Yes, sir.
Q. There were 12 votes against it; correct?
A. Correct.
Q. And among the four votes, once again, is you, right, and also Senator Montalbano? Do you see that?
A. Yes, but those votes didn't go along the anti-Kelly lines right down the line.
Q. I didn't ask you that question, sir. I simply asked you if Mr. Montalbano voted again the legislation.
A. Yes.
Q. He did, didn't he?
A. Yes.
Q. In fact, you and Mr. Montalbano were half of the Senate votes in favor of AWP in both 1998 and 1999; correct?
A. If it were four and four, it was half, yes.
Q. So coming out of the -- we can take that down, please. Coming out of the Senate vote on April 28th of 1999, the legislation had been defeated handily in both

chambers; correct?
A. Yes.
Q. And the independents were no longer in favor of AWP in 1999; correct?
A. Correct. They had no position.
Q. The House was now opposed to it; is that right?
A. Correct.
Q. And Senate leadership continued to be opposed to it; correct?
A. Correct.
Q. Stop & Shop and Walgreen's had taken a pretty good shot at this legislation in 1999, hadn't they?
A. Yes.
Q. They spent a lot of money on the Coalition for Pharmacy Freedom of Choice; right?
A. Yes.
Q. And they lost, didn't they?
A. Yes.
Q. And as a result of that, they abandoned the legislative pursuit that they had undergone in 1999 and instead filed a lawsuit. Do you recall that?
A. Briefly I do. I can't specifically say that I do.
Q. You do recall that at some point in 1999, after AWP was defeated, Stop & Shop and Walgreen's sued CVS and other Rhode Island -- and Blue Cross. Do you

recall that?
A. Yes.
Q. And they sued because they wanted, through a lawsuit, to try to get into the network?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. After the Senate committee vote on AWP in 1999, AWP legislation was all but dead, wasn't it?
A. In that year?
Q. In that year and going forward.
A. Well, again, you can't prognosticate; but as history proved, it was dead, yes.
MR. CORRIGAN: May we show the --
Q. Do you recall that there was an article written in the Pro Jo, the Providence Journal, about the vote on AWP in the Senate Corporations Committee on April 28th of 1999?
A. I can't recall -- specifically recall that.
Q. Do you not recall being photographed in the paper with a representative from the Coalition for Pharmacy Freedom of Choice after that vote?
A. I can't specifically recall that, no.
MR. CORRIGAN: May we have displayed for the witness only Kramer R-15, which has been marked for identification.

Q. Do you recognize this document, sir?
A. Yes.
Q. This is a document that was found in your home after the -- during the state search of your home. Do you remember the Rhode Island State Police searched your home, sir?
A. Yes, sir.
Q. And they found this article during that search. Do you recall that?
A. I apparently had it, but I don't recall that I had it, but I apparently had it.
Q. Is this a copy that the personnel who worked in the Senate press office gave you?
A. To me it looks like it was.
Q. There was a press service within the Senate; correct?
A. Yes.
Q. And that service would provide to the various members of the Senate copies of newspaper articles which featured the member; correct?
A. Yes.
Q. And this is an example of just that type of article; correct, sir?
A. Yes, sir.
Q. And you were given this article by the Senate

press personnel; correct?
A. Yes.
Q. And you maintained it in your home for at least five years; correct?
A. Yes.
MR. CORRIGAN: Your Honor, the Government -- excuse me, Kramer offers R-15.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Approach.
(Bench conference held on the record)
MR. DAMBRUCH: Your Honor, the contents of this article are clearly hearsay. The contents were not created in the regular course of Mr. Celona's business; and, therefore, they don't fall within the business records exception.
MR. CORRIGAN: I'm not offering it, your Honor, under the business records exception. I'm offering it not for its truth. I'm offering it for Mr. Celona's intent.
This is an article in which the Providence Journal wrote the final nail had been driven into the coffin of AWP. Mr. Celona maintained this article and kept it.
His intent is at issue here, and the Government has spent a long time in its case putting on evidence

to try to establish --

THE COURT: I think that's a -- unless you can prove a connection between him and what's contained in the text of the article, I think the objection is well taken.

So if you can, you can lay some foundation; but to just dump it at this point I don't think is appropriate. That's my ruling. The objection is sustained. Lay some foundation.

MR. SMITH: May I say something, Judge? I would suggest that it is kept in the ordinary course of the business. He said that the House press corps keeps these in the ordinary course of business and gave it to him. So my suggestion is --

THE COURT: His keeping it is different. That's my ruling.

(End of bench conference)

MR. CORRIGAN: We can take that down, please.

Q. In 2000, the legislative year 2000 and the calendar year 2000, AWP legislation was, for all intents and purposes, a nonissue; isn't that correct, Mr. Celona?

A. It was still an issue, but it didn't have the publicity that it had in prior years; but it was still an issue with constituents.

Q. Do you recall telling the Government during interviews with them in 2004 that in 2000 AWP was a nonissue?
A. I don't recall specifically those words.
MR. CORRIGAN: May we have shown just to the witness Kramer L-17, please.
THE COURT: I don't think I have a copy of that, Mr. Corrigan.
Q. Sir, I'd direct your attention to the fourth page of this document, and I'd like you to take a look at the portion right there. Do you see that, sir?
A. Okay.
Q. Does that refresh your recollection that when you met with Government agents you told them that AWP was a nonissue in February of 2000?
A. I don't recall that. Those aren't my words, and I don't know the justification, the substantiation of it; but that isn't my handwriting or anything like that.
Q. You have no recollection of telling Government agents --
A. I may have said that something like it didn't have the publicity that it had in years prior; but it still had merit, like I just said.
Q. You didn't say that it was a nonissue?
A. I don't recall that. And, again, that's not a

quote. That's not in my handwriting. So I really don't know.
Q. If you could turn back to that page, sir. Do you also recall telling the Government agents that you had changed your position on -- and you changed it from fighting for freedom of choice to being neutral? Do you recall telling agents of the Government that?
A. I don't recall that, sir, no.
Q. Did you tell the Government in the interviews that you had with the Government that the bill no longer mattered?
A. Not to my -- not to my knowledge.
Q. You don't recall telling Government agents that the bill no longer mattered in 2000?
A. Not to my knowledge.
Q. Do you recall telling the Government that you changed your position on pharmacy freedom of choice legislation because the independents had been let into the network?
A. Yes.
Q. And you changed your position in 2000; correct?
A. Yeah. I had the time frame off when I was meeting with the Government.
Q. But you did change your position because the independents were let in; correct?

A. That's what I told them. Initially, that's what I told the Government.
Q. And in 2000, you were -- you weren't alone in no longer supporting AWP; correct? And what I mean by that, sir, is that a number of the previous Senate supporters of AWP legislation in the previous years no longer supported AWP in 2000; isn't that correct?
A. Well, if you looked at the prior votes, they were -- like you said in the committee, there were four members of the committee that voted for it. I think there were a few more than four that continued to support it.
Q. Well, in 1999, there were a number of AWP bills that were introduced in the Senate; correct?
A. Yes.
Q. And there were a number of different sponsors on each one of those AWP bills; correct?
A. Correct.
Q. And you were among those sponsors on some of those bills; right?
A. Correct.
MR. CORRIGAN: May we have GX-2, Government Exhibit 2 displayed for the witness and the jury.
Q. Do you see, sir, if we go to page 2 of this document --

A. Yes, sir.
Q. -- that this is a pharmacy freedom of choice bill that was introduced in the Senate on January 8th of 1999?
A. Yes, sir.
Q. And do you see here that it was introduced by Senators Raptakis -- if you stay just on the second page, Mr. Celona. It's introduced by Senators Raptakis, Graziano, Celona, Alves and Montalbano. Do you see that?
A. Yes.
MR. CORRIGAN: Could we also have Government Exhibit 3 put up, please, and may we have the second page of Government Exhibit 3 displayed, please.
Q. Sir, do you see that this is another version of an AWP bill that was introduced in the Senate on January 12th, 1999? Do you see that, sir?
A. Yes, sir.
Q. And now this bill is introduced by Senators Raptakis, Montalbano, Celona, Igliozzi and Graziano. Do you see that?
A. Yes, and others.
Q. More than that; correct? That's what the "et al" means?
A. Yes, as the previous one stated.

Q. So on the previous AWP bill, there were more than five sponsors; correct? Is that right?
A. Yes.
Q. And on this current or the bill that we're looking at now, there were more than five sponsors of the legislation; correct?
A. Correct.
MR. CORRIGAN: May we have Government Exhibit 4 displayed for the jury.
Q. And if you take a look at the second page of this document, this is another version of AWP; correct?
A. Correct.
Q. Introduced by different senators on January 19th of 1999; correct?
A. Correct.
Q. Who were the senators who introduced the bill on January 19th of 1999?
A. Senators Walsh, Paiva-Weed, Perry, Cicilline, Gallo and others.
Q. So this is a third bill, AWP bill that was introduced in the Senate in 1999; correct? Is that right, sir?
A. Yes, sir.
Q. And if we just look at the names that were listed on here, not even counting the et als, the ones that

aren't named here, we have 11 different senators who sponsored freedom of choice legislation in 1999; isn't that correct?
A. Yes.
Q. How many of those 11 senators sponsored any version of AWP in 2000?
A. I don't -- I can't tell you that. I don't know.
Q. Well --
A. I don't have them in front of me.
Q. Didn't you testify yesterday that there was one AWP bill introduced in the Senate in 2000 and that was a bill that was introduced by Senator McDonald alone?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: That's not the testimony.
THE COURT: Approach.
(Bench conference held on the record)
THE COURT: Do you have the transcript?
MR. CORRIGAN: Well, I can just show him the exhibit.
MR. DAMBRUCH: He didn't testify as to the number of bills that were introduced. He testified about his actions with regard to a bill.
THE COURT: Okay.
MR. CORRIGAN: I'll just show it to him.

THE COURT: Okay. Just show it to him.
(End of bench conference)
MR. CORRIGAN: We can take this down, please, Government Exhibit 4, and can we display Government Exhibit 5 for the jury.
Q. Mr. Celona, do you recognize Government Exhibit 5?
A. Yes, sir.
Q. This is a document that Mr. Dambruch showed you yesterday and you testified about; correct?
A. Yes.
Q. And this is a version of AWP that was introduced in the Senate in 2000. Do you see that?
A. Yes, sir.
Q. How many sponsors are there on that legislation?
A. One sponsor.
Q. This was the only bill that was introduced in the Senate regarding AWP in 2000; isn't that correct?
A. I didn't search the archives; but if you allude to that fact, then that was it.
MR. DAMBRUCH: Objection, your Honor. Move to strike the answer as not responsive.
THE COURT: It may be stricken. If you don't know the answer, just say you don't know it. Don't volunteer anything.
A. I don't know.

Q. You're not aware of any other AWP bill being introduced in the Senate in 2000, are you?
A. I don't know.
Q. Are you aware of any other AWP bill that was introduced in the Senate in 2000?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. The only sponsor on this AWP bill in 2000 is Senator Patrick McDonald; correct?
A. Correct.
Q. None of the other 11 sponsors that we saw on the 1999 bills sponsored AWP in the Senate in 2000, did they?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Do you know if any of the other 11 senators who sponsored AWP in 1999 sponsored the legislation in 2000?
A. I don't know.
Q. You haven't seen any evidence that indicates that any did, have you?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
MR. CORRIGAN: We can take down Government Exhibit 5, please.

Q. There was a vote on the AWP bill in 2000, correct, in the Senate Corporations Committee?
A. I believe so. I would just like to double check.
Q. I don't know that you have the 2000 bill in front of you, Mr. Celona, and I haven't asked to have it be put in front of you yet. Do you have Government Exhibit 5, sir?
A. The McDonald bill?
Q. Yes.
A. 2774?
Q. That bill came up for a vote in the Senate Corporations Committee in 2000, didn't it?
A. Yes.
Q. This is the bill that we were just looking at sponsored by Senator McDonald; correct?
A. Yes, sir.
Q. And if you turn to the last page of that document, and can we display that for the jury, please, Government Exhibit 5.9, this was the bill that you testified about earlier that was held for further study; correct?
A. Yes, sir.
Q. And you told Mr. Dambruch that, in effect, holding this bill for further study defeated the bill in 2000; correct?

A. Correct.
Q. And do you see that there were 12 votes, yea votes, in favor of holding the bill for further study?
A. Yes.
Q. And those were 12 votes against the legislation; correct?
A. Yes.
Q. There were two nay votes; correct?
A. Correct.
Q. Those were two votes in favor of the legislation; right?
A. Correct.
Q. And do you see that there were two individuals absent?
A. Yes.
Q. You're one of the individuals who was absent; correct?
A. Correct.
Q. Who was the other individual who was absent?
A. Senator Montalbano.
Q. Senator Montalbano, who in 1998 and 1999 had voted in favor of freedom of choice; correct?
A. Yes.
Q. So in 2000, both you and Senator Montalbano did not vote on the legislation; correct?

A. Correct.
Q. Was that because you and Senator Montalbano were still in the same faction in 2000?
A. I don't believe Senator Montalbano was at the session that day.
Q. Senator Montalbano had been a strong proponent of freedom of choice in the past; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?
MR. DAMBRUCH: Relevance of Senator Montalbano.
THE COURT: I don't know where you're going with this.
MR. CORRIGAN: If I can continue, your Honor.
THE COURT: Go ahead.
Q. Senator Montalbano had been a supporter along with you of AWP in the past; correct?
A. Yes.
Q. In any event, in 2000, he did not vote on the bill?
A. Right.
Q. Both you and he were absent?
A. At the committee -- at the committee meeting.
Q. Neither one of you appeared at the committee meeting to vote on AWP; correct?
A. Correct.

Q. You didn't actually change your vote in 2000, did you? Let me put it to you this way. You didn't actually change your vote, you just didn't vote?
A. As I stated earlier, I took a walk.
Q. And you took a walk because Senator Irons told you to take a walk; isn't that right?
A. And I also wanted to leave the room, too.
Q. Senator Irons told you to take a walk, and you understood him to mean don't vote on AWP legislation; correct?
A. Correct.
Q. He told, You don't be at the hearing; right?
A. Correct.
Q. Senator Irons told you to take a walk on this legislation before the hearing even occurred; correct?
A. Just prior to it, yes.
Q. You became chairman of the -- withdrawn. When Senator Irons told you to take a walk, he never explained to you why he wanted you to take a walk, did he?
A. No, sir.
Q. You became chairman of the Corporations Committee in 2001; correct?
A. Correct.
Q. And your colleague, Senator Montalbano, he was

elevated into a leadership position in 2001, wasn't he?
A. Yes.
Q. What leadership position did Senator Montalbano take on in 2001?
A. Chairman of the Judiciary Committee.
Q. And at some point thereafter, did Senator Montalbano also become majority leader of the Senate?
A. Yes, sir.
Q. And those changes, the leadership changes that you just testified to regarding Senator Montalbano and yourself, those were affected because Senator Irons became the majority leader of the Senate; correct?
A. Correct.
Q. When you were the chairman of the Corporations Committee, you took direction from Senate leadership, didn't you?
A. On general issues, yes.
Q. Senator Irons was the majority leader of the Senate; correct?
A. Yes.
Q. And you answered to him; right?
A. Yes.
Q. And you also answered to Senator Montalbano?
A. In some regards, yes.
MR. CORRIGAN: May we display Kramer N-22 for

the witness, please, for the witness only.
THE COURT: Again, I don't think I have a copy of that.
MR. CORRIGAN: Withdrawn. I'm going to withdraw that question.
Q. While you were chairman of the Corporations Committee, you considered Senators Irons and Montalbano to be your bosses, didn't you?
A. In some regards, yes.
Q. You answered to them?
A. Yes.
Q. You followed their directions, didn't you?
A. In some regards, yes.
Q. And you referred to them as your bosses; right?
A. I don't know if I referred to them as my bosses, but they were the leadership. And the leadership, you know, he being the majority leader in the level of succession as far as authority goes, it's the majority leader and then so forth on down.
Q. You did what Senator Irons told you to do, didn't you?
A. Yes.
Q. You even told Senator Irons in connection with -- withdrawn. Did you have to interview with Senator Irons to become chairman of the Senate Corporations

Committee?
A. Yes.
Q. You and a number of other senators were being considered for the position of chairman of Senate Corporations Committee; correct?
A. I believe so.
Q. And you had to sit down with Senator Irons and explain to him why he should select you as the chairman of the Corporations Committee; correct?
A. Correct.
MR. CORRIGAN: And can we have Kramer F-19 displayed, and this is being admitted in full pursuant to stipulation, your Honor.
(Defendant Kramer Exhibit F-19 was admitted in full)
Q. Senator Celona, Kramer F-19 is a document that was recovered from your computers after the Rhode Island State Police searched your home. Do you recognize this to be a document that you wrote in connection with your interview with Senator Irons to become chairman of the Corporations Committee?
A. Yes.
Q. And did you write at the top of that document, "First of all, as chairman of the Corporations Committee, approval of all legislation must and will be

cleared with you prior to passage. My loyalty is and will be to you as a majority leader that I believe in"? Did you write those words, Senator Celona?
A. Yes, sir.
Q. And when you interviewed with Senator Irons, did you tell him those words?
A. Yes.
Q. And it's true, then, that as you served as chairman of the Senate Corporations Committee, any and all legislation that came before your committee you cleared with Senator Irons before its passage; isn't that right?
A. It worked through a process.
Q. The process was, before any legislation could pass before your committee, it had to be approved by Senator Irons; isn't that correct?
A. If legislation of major import. We'd have -- there was a structure involved between the majority leader's office and the chairman's office. And how it would work, there was a legislative aide, liaison, Ms. Calista, that would work with us. And she would report to us what bills are being heard, and then she would report back to the leadership or to the leader as far as what bills are being heard and what the action is. And then we'd have leadership meetings, regular

leadership meetings.
Q. AWP was a significant bill; correct?
A. Yes.
Q. And in these leadership meetings, was there a phrase that was used within those meetings, a phrase known as NGN?
A. Not so much in the meetings, no.
Q. You understand what that phrase means, though, don't you?
A. Yes.
Q. That phrase, NGN, means not going nowhere, doesn't it?
A. Yes.
Q. And in your discussions with Senator Irons and Senator Montalbano about legislation that would be pending before the Senate Corporations Committee, did you use the words "not going nowhere" for certain bills?
A. I never used it. That was a phrase that was coined by the late Senator Badeau.
MR. SMITH: Your Honor, may he use the microphone, please.
A. That was a phrase that was coined by the late Senator Badeau. And Linda Calista, who was our legislative aide that would meet with us, if she had

met with the leader, the majority leader, and he felt that the bill wasn't necessary for passing or he wasn't in favor of it, she would put NGN on the report to us when she would come and meet with us in our weekly or biweekly basis when we'd go over the legislation that was pending before our committees, and that's how that phrase was used.

But I -- you know, that's how the phrase was coined. I won't take ownership in that one.

Q. It's not a phrase that you used, but it was used in the Senate; correct?

A. Excuse me?

Q. It's not a phrase that you used, but it was a phrase that was used in the Senate?

A. Yes, within the leadership but nothing prevalent. It was on those reports, but that was about it.

Q. And if a bill was listed as NGN that was on one of those reports, that meant it shouldn't pass; correct?

A. Yes.

Q. And that meant if a bill was listed as NGN on a report that was referred to your committee and that bill was referred to as NGN, you weren't supposed to let it pass; correct?

A. Correct.

Q. During your tenure as Senate Corporations

Committee chairman, any time an AWP or freedom of choice bill came up in the Senate, it was marked NGN by the leadership, wasn't it?
A. I don't recall if it was specifically marked. I don't have those documents in front of me, and I don't recall if it was specifically marked as NGN on those bills. I really don't.
Q. But you do recall, nonetheless, that Senators Irons and Montalbano didn't want AWP or freedom of choice legislation to pass while you were chairman of the Corporations Committee?
A. More so Senator Irons.
Q. Senator Irons; correct?
A. Yes.
Q. And Senator Irons communicated to you that you were not supposed to let AWP legislation pass in your committee; correct?
A. Yeah. Any bill of that nature was, as Ms. Calista would testify or would say to us, they fly at a higher altitude.
Q. So that was a bill that was looked at at this higher altitude; correct?
A. Figuratively and literally.
Q. And if Senator Irons told you not to post the bill, you wouldn't post it; correct?

A. Yes.
Q. And that was the case for AWP legislation; correct?
A. Correct.
Q. And --
A. I'm sorry.
Q. And even if you had posted a bill for a vote in your committee, the Senate leadership, including Senator Irons and Senator Montalbano, they had the power to remove that bill from the hearing calendar, didn't they?
A. I don't recall the rules at the time. I really don't.
Q. Well, you didn't have the ultimate authority to post the bills for hearings; isn't that right?
A. I would post the bills 48 hours in advance. I would sit with Ms. Calista and go over the posting of the bills. I would sit with senators. Senators would come in to me and ask what their legislation -- when their bills were being heard, and I would see if they would get posted.
But Senator Irons was a big proponent of e-mail, and he would e-mail back and forth and express his opinions both to Ms. Calista and to myself and to other chairmen and women.

But at the time Senator Montalbano, at the early structure, was just the majority -- excuse me, the judiciary chairman. So under the rules of the Senate, he didn't have, like, official leadership authority, although he did have it de facto, as Senator Irons often said.

Q. So either by e-mail or by some other means of communication for the period 2001 through 2003 while you were Senate Corporations Committee chairman, Senator Irons let you know that you were not supposed to post AWP bills for a hearing in your committee; correct?

A. Specifically, I don't believe he did. I can't recall.

MR. CORRIGAN: May we have shown to the witness only Kramer N-22.

THE COURT: Do you have a date on that, please?

MR. CORRIGAN: Yes. 11/19/04.

Q. Do you recall telling the Government, sir, that in 2001 when you became chairman of the Senate Corporations Committee you asked Senator Irons what you were going to do about pharmacy freedom of choice legislation?

A. I don't recall that, no.

MR. CORRIGAN: Can we display --

Q. Can you take a look at page 4, sir. And if you look all the way down at the bottom, the last paragraph. Does that refresh your recollection that in 2001 when you became chair of the Corporations Committee you asked Senator Irons what you were going to do about freedom of choice legislation?
A. Yes.
Q. And Senator Irons told you that those bills on AWP would not be given a hearing or would they pass because no one was clamoring for them; isn't that right?
A. Yes.
Q. Each AWP bill was NGN pursuant to Senator Irons' directive; isn't that right?
A. Yes.
Q. And isn't it true that, pursuant to that directive, after you became chairman of the Corporations Committee, no AWP bill got a hearing in your committee?
A. Excuse me?
Q. Isn't it true that while you were Senate Corporations Committee chairman, because Senator Irons was opposed to AWP legislation, those bills never got posted for a hearing in your committee?
A. Not in total, no.
Q. You didn't tell the Government that?

A. Excuse me?
Q. You didn't tell the Government what I just asked you, that the reason the bills weren't posted was because they were NGN as per Senator Irons?
A. I personally didn't want them posted either. I thought that was what your question was.
Q. But Senator Irons told you not to post them; correct?
A. Right, and I didn't want them either.
Q. But in each year from '01 to '03, Senator Irons told you not to post those bills; correct?
A. Correct.
MR. CORRIGAN: We can take this down, please.
Q. Mr. Celona, who is Frederick Marzilli?
A. He was my attorney at the time, high school and college friend.
Q. He's a good friend of yours; is that right?
A. Yes. Yes.
Q. And he served as your lawyer in 2000; is that correct?
A. Yes.
Q. And you communicated with him about your CVS consulting relationship, didn't you?
A. Yes, sir.
Q. You faxed him a copy of the CVS consulting

agreement that Mr. Kramer and Mr. Ortiz had given to you; is that right?
A. Yes, as I stated earlier.
Q. And you faxed that to him after the January 7, 2000, meeting where they gave you the contract; correct?
A. Well, whenever I received the contract, I faxed it to him.
Q. And you then spoke with Mr. Marzilli about your consulting contract with CVS, didn't you?
A. I believe I did, yes.
Q. And Mr. Marzilli told you that the consulting agreement appeared to be a standard consulting contract; isn't that right?
A. Yes.
Q. And then you also discussed with Mr. Marzilli any potential conflict issues that might arise because of a paid relationship with CVS, didn't you?
A. I don't recall that, sir.
MR. CORRIGAN: Can we show the witness the same document, Kramer N-22.
Q. I believe you have it there, sir, and if you could turn to page 8 of that document and if you can look at the last full paragraph on that page, sir. Does that refresh your recollection -- have you had a chance to

read that, sir?
A. No.
Q. Okay. Please take the opportunity to read that. I don't want to rush you.
(Witness peruses document)
A. Okay.
Q. Isn't it true, sir, that you told Government agents that you discussed the potential conflict of interest that the CVS consulting agreement posed with your attorney, Mr. Marzilli?
A. It said -- it says in here --
Q. I don't want you to read the document, sir.
A. I know. I'm not. I'll put it away. I'll turn this, you know. . .
Q. But isn't it true that you did discuss the potential conflict of interest of the CVS consulting agreement with Mr. Marzilli?
A. Yeah. It says after I received the contract from Mr. Ortiz, either mailed or faxed from him, I faxed it to my attorney and I discussed it as far as legal form and some ethics provisions. I don't recall speaking with him about the ethics provisions at that time, but I do recall faxing it to him and asking him about the legal provisions of it.
Q. Well, isn't it true that you did tell Government

agents that you discussed the ethical implications of the CVS consulting agreement with Mr. Marzilli?
A. Yes, that's what's in here. Yes.
Q. And isn't it also true that during that conversation with Mr. Marzilli about the ethical implications of the consulting agreement, that he told you that as long as you did not vote on something that affects CVS alone, there would be no conflict of interest?
A. That's what it says in here.
Q. And that's what he told you; correct, sir?
A. That's similar to the teacher provision that I spoke of.
Q. In fact --
MR. SMITH: I'm sorry, your Honor. I can't hear him.
A. That's similar to the teacher provision that I spoke of.
Q. In fact, it's nearly identical to the advice that the Ethics Commission gave you when you spoke to the person at the Ethics Commission; correct?
A. Yes.
Q. Is that something that's known as the class exception?
MR. DAMBRUCH: Objection, your Honor.

THE COURT: Overruled.
A. I don't know what the class exception is.
Q. Well, in any event, it was your understanding, Mr. Celona, after speaking with the person at the Ethics Commission and after consulting with your lawyer that you could participate in legislation that affected CVS; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Overruled.
A. Specifically -- could you restate that question.
Q. I'll try to do the best I can.
A. Yeah.
Q. It was your understanding in 2000 -- in the year 2000, Senator Celona, before you signed the CVS consulting agreement, after you had spoken to the person at the Ethics Commission and after you had consulted with your attorney, Mr. Marzilli, that you could, in fact, vote on legislation that affected CVS while under a contract with CVS?
A. Not all legislation.
Q. Not all legislation. What you couldn't do was you couldn't vote on legislation that affected CVS alone; right?
A. Again, that was an opinion given on the telephone, and it's an opinion that I should have received in

writing.
Q. But it was an opinion that you got on the telephone that you communicated to Mr. Kramer and Mr. Ortiz; right?
A. Right.
Q. And now --
A. Mr. Ortiz. Mr. Kramer I don't recollect totally.
Q. I know you don't recollect, but we spent a lot of time this morning --
A. I understand.
Q. -- going over previous sworn testimony in which you said you did talk to Mr. Kramer about it; right?
A. I understand what you're saying.
Q. And so you communicated to Mr. Kramer and to Mr. Ortiz that you could work as a consultant for CVS and you could participate in legislation that affected CVS as long as the legislation didn't affect CVS alone; isn't that right?
A. I used the teacher -- I used the teacher example.
Q. And the teacher example that you gave to them is that teachers could vote on matters that affected teachers and teaching as long as it didn't affect the particular teacher alone; correct?
A. Yes.
Q. And what you told Mr. Kramer and Mr. Ortiz was the

advice that you had received from the Ethics Commission; correct?
A. Mr. Ortiz, and Mr. Kramer I'm not sure of.
Q. And that's also identical to the advice that your own personal attorney gave you; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Your attorney did tell you that you could vote on matters that affected CVS as long as they did not affect CVS alone; correct?
A. I don't recall that.
Q. We just looked at -- withdrawn. Could we go back to Kramer N-22. That's the document in front of you, sir, page 8. And we looked at that, and isn't it true that your attorney told you that you could have the consulting agreement with CVS and vote on matters that affected CVS as long as it didn't affect CVS alone?
A. You're saying that -- you're saying that that's true because it's in here; am I right?
Q. Isn't that what you said to Government agents?
A. And it also says earlier than that that Ortiz mailed or faxed me the consulting contract.
Q. I understand. So that's consistent with your recollection; correct?
A. That's my recollection.

Q. You had a copy of the consulting contract; right, sir?
A. I just wanted to say that I had it -- it was mailed or faxed to me. That's the first line of that paragraph.
Q. Okay. Senator -- Mr. Celona, if I could just try to get your attention for one moment. You did have a copy --
A. You have my attention.
Q. You did have a copy of the consulting agreement; correct?
A. Yes.
Q. And then you spoke to your attorney about it; correct?
A. Correct.
Q. And you told Government agents that your attorney told you that you could have the consulting agreement with CVS and you could vote on matters that affected CVS as long as those matters didn't affect CVS alone; correct?
A. I don't recall saying that my attorney said that. I do recall that -- my attorney saying that he approved it as far as legality, as being a standard consulting agreement.
Q. You don't deny that you told Government agents

that Mr. Marzilli talked to you about what you could and could not vote on while being under a consulting agreement with CVS?

MR. DAMBRUCH: Objection.

THE COURT: Overruled.

A. I can't recall saying that -- I can't recall saying that I spoke with my attorney saying that he said that I could vote on this issue and I couldn't vote on that issue at particular points in time.

Q. You don't recall it, but you don't deny saying it; right?

A. I would pretty much deny saying that he would say that. I would say that the Ethics Commission were the ones that had said it.

THE COURT: Mr. Corrigan, we're going to end for the day.

Members of the jury, we'll break for the day. Please leave your notebooks on your seats. Remember that you're not to talk about the case at all with anyone. Do not read, listen to or watch any news accounts involving this case or anything even remotely touching on it in any way.

Instead, enjoy your afternoon, rest, and we'll see you tomorrow morning at 9:00.

Bob, would you see the jury out.

(The jury is not present for the following)

THE COURT: May I see counsel, please.

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date