THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * *     C.R. NO. 07-009ML
UNITED STATES OF AMERICA *
VS. *     MAY 21, 2008
*     9:00 A.M.
JOHN R. KRAMER and *
CARLOS ORTIZ *
* * * * * * * * * * * * * * * *     PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X


| GOVERNMENT WITNESS | PAGE |
|---|---|
| John Celona, Resumes | |
| Continued Cross-Examination by Mr. Corrigan | 4 |


## E X H I B I T S


| DEFENDANT | FOR ID | IN FULL |
|---|---|---|
| B-4 | | 86 |
| D | | 101 |
| F | | 113 |
| G-18 | | 84 |
| H | | 105 |
| I-9 | | 38 |
| I-19 | | 124 |
| J | | 114 |
| J-9 | | 37 |
| J-19 | | 53 |
| J-22 | | 15 |
| K-15 | | 28 |
| L | | 108 |
| L-15 | | 29 |
| M-4 | | 63 |
| M-15 | | 30 |
| N-15 | | 31 |
| O-15 | | 31 |
| T-4 | | 133 |
| V | | 67 |

21 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning. All ready?

Mr. Corrigan, please.

**JOHN CELONA, GOVERNMENT WITNESS, RESUMES**

**CONTINUED CROSS-EXAMINATION**

**BY MR. CORRIGAN:**

Q. Good morning, Mr. Celona.

A. Good morning.

Q. Mr. Celona, do you recall testifying on Monday about a meeting that you had at the State House with Mr. Ortiz, Mr. Walsh and some of your fellow colleagues in the Senate?

A. Yes.

Q. And you also testified that your next contact with anyone at CVS took place at a fundraiser for Senator McCaffrey. Do you recall that?

A. Yes, sir.

Q. And that was a fundraiser that took place in -- on May 27th of 1999; isn't that correct?

A. If that's what the record indicates is the date, then that's what it was.

MR. CORRIGAN: Why don't we pull up a document. May we have Kramer K-2 shown to the witness and displayed for the jury. This is already in full. And

if we could show the second page of K-2 to the witness.
Q. Mr. Celona, can you see that on your screen? I'll direct your attention to the second page of that document, Mr. Celona. Do you see in the right-hand lower portion of that document that there's an invitation?
A. Yes.
Q. And that's an invitation to the McCaffrey fundraiser on May 27, 1999; correct?
A. Correct.
Q. Does that refresh your recollection that the fundraiser at which you spoke to Mr. Kramer or at least in which you testified that you spoke to Mr. Kramer was on May 27th of 1999?
A. Senator McCaffrey always had his fundraiser at that facility, at that locale, if that's what you're --
Q. I wasn't asking you about the locale of the fundraiser. I was actually asking you about the date of the fundraiser.
A. Yes.
Q. Does this document refresh your recollection that the fundraiser that you testified about occurred on May 27th of 1999?
A. Yes, the document states that it was May 27th, 1999.

Q. You can put that down, sir, and we can take that down from the screen. You previously testified, sir, that -- not in this trial, but in a grand jury, do you recall testifying that you were sitting alone at a table at that fundraiser when Mr. Kramer approached you?
A. I said there was -- as I said the other day, it was a buffet type event, and there were several round tables, and there was one round table that wasn't occupied. I wasn't just sitting there alone; but then we sat together, and that's when the conversation started.
Q. You've previously testified in the grand jury that you were sitting alone at that table when Mr. Kramer -- you've testified that he approached you; correct?
A. Yes. Someone might have just left. I wasn't just, like, sitting there alone the whole night, if that's what you --
Q. But nonetheless, it's your testimony that you and he on that date, on May 27th, 1999, were sitting alone together at a table at the McCaffrey fundraiser; is that correct?
A. Yes. Yes.
Q. If we can, sir, I'd like to now talk about that meeting that you've testified about that occurred at

the State House. Did you ever ask Mr. Walsh if you could meet with Tom Ryan?
A. No, sir.
Q. Did you ever ask Mr. Walsh if he would bring Mr. Ryan up to the State House to meet with you?
A. Mr. Walsh at one time had volunteered to say, I can even bring Tom Ryan here. I said, I don't care who you bring. I'm just going to tell them exactly the way I feel about CVS. It makes no difference to me who you bring; but I didn't specifically ask for Tom Ryan to come to the State House, no.
Q. So it's your testimony that you never asked Mr. Walsh to bring Mr. Ryan to the State House?
A. No, sir.
Q. And it is your testimony that this meeting at the State House occurred in 1999; correct?
A. Yes, after the vote. It was in the summer but before the session ended.
Q. And it's also your testimony -- let's go back to that for just one minute. You said it was in the summer after the session ended?
A. No, before the session ended, but it was in the summer after the vote on the any willing provider was in the committee.
Q. So the meeting at the State House took place

sometime in the summer; right? Is that your testimony?
A. It could have been the spring, summer. It was a warm day. I don't know the exact date when summer arrived, it was June 21st or whenever; but if we're looking at nitpicking days, it was after the vote on the any willing provider legislation in the committee but before the session ended, and it was warm weather.
Q. You know, I don't mean to be nitpicking. I just want to try to get the sequence of events down clearly for everybody. Okay?
A. Yes. It was -- as I testified, it was the vote on the any willing provider and then the meeting. The meeting was held in the Senate lounge. It was warm weather. It could have been summer, if you're looking at the exact date, or could have been late spring; but it was a warm day.
Q. But previously in this trial you testified that that meeting at the State House took place in the summer; correct?
A. Yes. I would call it a summer day. That's what I would call it.
Q. And was this a meeting that Mr. Walsh told you he wanted to set up so that he could speak with you and your colleagues in the Senate about AWP?
A. Just about the overall perception and the overall

feelings that we had towards CVS and that they had towards us.
Q. And you testified on Monday that along with Mr. Walsh, Mr. Ortiz was at that meeting; correct?
A. Correct.
Q. And you also testified that Senator Montalbano was at that meeting?
A. Yes.
Q. And you testified that Senator Alves was at that meeting?
A. Yes.
Q. You testified that Senator Walaska was at that meeting?
A. Yes, sir.
Q. And you also testified that Senator McCaffrey was at that meeting; is that correct?
A. Yes, sir.
Q. And is it your testimony that at some point during this meeting, Joe Walsh asked you if you wanted to meet Mr. Ryan?
A. No, it was beforehand, like in the corridors and things like that, but not at the meeting, no.
Q. So at the meeting, Mr. Walsh never extended an invitation to you to meet with Mr. Ryan; is that correct?

A. Not to my recollection, no.
Q. That didn't happen at the meeting; right?
A. Not to my recollection.
Q. And you've testified that this meeting took place in the Senate lounge; correct?
A. Correct.
Q. You've spoken with representatives of the Government previously about this State House meeting, haven't you, sir?
A. Yes.
Q. And do you recall that -- and during the meeting, you expressed your views on AWP; is that correct?
A. I expressed my views on a lot of things, as I testified.
Q. And one of the items that you expressed your views on was AWP; correct?
A. The general scope of the conversation, in addition to the AWP, but the general scope of the conversation in the meeting was the fact that we, as a group of senators, weren't getting treated equally as the people who were in the Kelly administration or the Kelly leadership, that CVS was according them, and we felt it should be accorded to us, being that we had the same basic number of constituents and we were senators just like everyone else and we had people that we

represented.
Q. Was there any discussion at all about AWP at that meeting?
A. There may have been.
Q. You have no recollection today about any discussion at that meeting about AWP?
A. I'm sure there was something about the vote; but the overall scope of the conversation in the meeting was, I believe, a lobbying effort by Joe Walsh to try to smooth the sailing, so to speak, and to try to unruffle the feathers because we had a feeling, and it was our feeling that -- excuse me.
MR. CORRIGAN: Your Honor, move to strike as nonresponsive.
THE COURT: Sustained. The jury will disregard the answer.
Mr. Celona, listen to the question.
THE WITNESS: Okay.
THE COURT: Answer the question.
Q. Mr. Celona, do you recall that when you met on September 1, 2004, with FBI Agent Dennis Aiken, FBI Agent Michael Kahn and IRS Special Agent Joel Burman that you said during that meeting that the only meeting with CVS over pharmacy choice was before 1999?
A. I don't recall that.

MR. CORRIGAN: May we show the witness, please, Kramer W-16.
Q. And, sir, I'd ask you to turn to the fifth page of the document that's before you, please. And I'd ask you to take a look at the one, two, three, four, the fifth hand -- the fifth entry on that document, sir. Do you see that?
A. Where it says "bulk of legislation"?
THE COURT: Don't read it. Maybe you could point it out to him, Mr. Corrigan.
Q. We've highlighted that on the screen in front of you, Mr. Celona. Do you see that, where it's highlighted in front of you?
THE COURT: On the screen.
A. Yes.
Q. Does that refresh your recollection that during this September 1, 2004, meeting with Special Agents Aiken, Kahn and Burman that you said the only meeting with CVS over pharmacy choice was before 1999?
A. If that's what it says, but I don't recollect saying that, it was before 1999.
Q. That doesn't refresh your recollection that you said to them that it occurred before 1999?
A. Yes.
MR. CORRIGAN: We can take that down.

Q. Do you recall that when you met on October 25th of 2004, again, with Special FBI Agent Aiken, IRS Agent Burman and Rhode Island State Police Sergeant Brian Casilli and Rhode Island State Police Detective Shari Russell, do you recall telling them at that meeting that you did not meet with CVS regarding freedom of choice in the spring of 1999?
A. No, I don't.
MR. CORRIGAN: May we please display for the witness only Kramer Exhibit B-17, and if we could go to the second page of that document, please.
Q. Do you see, sir, what's been highlighted for you?
A. Yes, sir.
Q. Does that refresh your recollection that at that meeting with the Government agents on October 25th of 2004 that you told them that you did not meet with any -- with CVS regarding pharmacy freedom of choice in the spring of 1999?
A. I don't recollect saying that, sir. I'm sorry.
MR. CORRIGAN: Thank you. We can take that down.
Q. Sir, it's your -- you can put that down, Mr. Celona. Thank you. It's your testimony, is it not, that you wrote the letter dated September 23, 1999, that Mr. Dambruch showed you? Let me back up a

little bit. Do you recall on your direct testimony with Mr. Dambruch looking at a letter dated September 23rd, 1999?

A. Which letter was it, sir?

MR. CORRIGAN: Can we please pull up Government Exhibit 98, and this is in full, and may we display it to the jury, please.

Q. Do you recognize that document, sir?

A. Yes, sir.

Q. And that's a document that Mr. Dambruch asked you about during your direct examination; correct?

A. Yes.

Q. And it's your testimony, is it not, that you wrote this letter in response to a request from Mr. Kramer asking you to send that letter; is that correct?

A. Excuse me, I didn't hear the last portion of that.

Q. Is it your testimony that you wrote this letter in response to a request from Mr. Kramer?

A. Yes.

Q. And it's your testimony that Mr. Kramer made this request at the meeting that took place at CVS on July 8th of 1999?

A. Yes, sir.

Q. Did you write anywhere in this letter that you were sending it pursuant to Mr. Kramer's request?

A. No, sir.
Q. You knew how to write, and in fact had written in previous letters to others, that when they'd ask you for something, you would write "per your request"; correct?
A. Sometimes. Sometimes not.
Q. But on this occasion, you did not do that; is that right?
A. No, sir.
MR. CORRIGAN: Your Honor, I'd like to have displayed for the witness only Kramer K-22. I'm sorry. It's actually J-22. Thank you. And I believe, pursuant to agreement with the Government, this is a full exhibit. Is that correct?
MR. DAMBRUCH: Yes, your Honor.
THE COURT: J-22?
MR. CORRIGAN: Yes, your Honor.
(Defendant Kramer Exhibit J-22 was admitted in full)
Q. Mr. Celona, do you recognize this document?
A. Yes, sir.
Q. This is a letter that you wrote on September 21 of 2003 to Mr. Michael Lancia; correct?
A. Correct.
Q. And Mr. Lancia was at that time the president of

Ocean State Hearing Aid Center; correct?
A. Yes.
Q. And you wrote this letter to him in connection with an effort by you to obtain a consulting agreement with him; is that right?
A. Yes.
Q. And do you see that in the second paragraph of that sentence -- that letter you wrote, "Per your instruction" --
A. Yes, sir.
Q. -- "I am forwarding a consulting agreement"?
A. Yes, sir.
MR. CORRIGAN: We can take that down, please.
Q. Mr. Celona, in the letter dated September 23rd of 1999 addressed to Mr. Kramer, you touted your experience with senior citizens; correct?
A. Yes.
Q. And you did, in fact, have a very good relationship with senior citizens in Rhode Island; isn't that right?
A. In particular in my district, yes.
Q. You worked very hard to cultivate that relationship with senior citizens; is that right?
A. Yes.
Q. You often visited senior citizens centers to meet

with the residents of those centers; is that correct?
A. Yes. Most of them saw me grow up.
MR. CORRIGAN: Your Honor, I'd move to strike the last portion of that.
THE WITNESS: I'm sorry.
THE COURT: It may be stricken.
Again, answer the question. Don't volunteer.
Q. Nonetheless, sir, it was important for you in your role as a senator to cultivate that relationship with senior citizens; right?
A. Yes, sir.
Q. And you were very proud of that, weren't you, that you had done that; correct?
A. Yes, sir.
Q. And you wrote in this letter about your personal experience that you had in marketing efforts regarding seniors for a consulting client of yours, correct, for another consulting client?
A. Yes, sir.
Q. If we take a look at the first page of the letter, do you see that in the second paragraph you wrote, "I feel that with senior citizens, a special personal approach is most successful. This approach is proven in political campaigns with candidates looking for support of the senior population, and it is successful

for a consulting client of mine in marketing assisted living facilities." Do you see that, sir?
A. Yes, sir.
Q. Also in this letter you expressed your belief that CVS's image had been tarnished as a result of the publicity campaign by the Coalition for Pharmacy Freedom of Choice; is that right? And if we could put that back up.
A. Where is it in the --
Q. If you look at the third paragraph, the first sentence, you wrote, "Since the so-called freedom of choice legislation publicity, I have found that seniors have a feel for CVS that is not what it should be." Is that right?
A. Yes, sir.
Q. And did you develop that as a result of going out and speaking with seniors in your community?
A. Yes, sir.
Q. And you suggested that CVS should make an attempt -- that CVS should attempt to make CVS more personal in the eyes of senior citizens, didn't you?
A. Yes, sir.
Q. And you also wrote that CVS should make an effort to dispel the idea that it was a -- just a corporate giant interested in making a profit; is that right?

A. I think the words were taking away their rights.
Q. If we can go to the second page of the document and look at the first full paragraph, and if we could call that out, please. Do you see, sir, that what you wrote, and I'm going to pick up about halfway through the paragraph, that you wrote, "I feel that a program as follows should be instituted in order to make CVS more personal in the eyes of the senior population while dispelling their preconceived perception that CVS is a corporate giant that cares only about building more stores and increasing the company's profit at their expense"? Do you see that, sir?
A. Yes.
Q. You didn't write anywhere in this letter that CVS was taking away their rights, did you?
A. Yes, I did.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You did write that?
A. Yes, I did.
Q. You did. I see that. And on the second page of this letter, beginning on the second page, in any event, if we could pull back from the highlighted portion, did you provide five ideas of things that CVS could do to improve its image in the senior community?

A. I believe there were five. I see four in front of me, but I believe there were five.

THE COURT: Do you have the hard copy?

THE WITNESS: No, your Honor.

Q. We've just gone to the last page. Do you see there is a fifth item on that last page?

A. Yes, sir.

Q. And do you recall that Mr. Dambruch asked you a series of questions about whether you personally did any of the five numbered items for CVS during the consulting relationship?

A. Yes, sir.

Q. In the letter, did you write anywhere that you personally would have a role in any of those five items?

A. I'd have to examine the letter before I could answer that.

Q. Please take your time and do that, sir.

(Witness peruses document)

A. It doesn't look to be me personally saying that I would be there.

Q. You didn't write anywhere in the letter that you would personally do any of those five items, did you?

A. Personally in the letter, but it was implied.

MR. CORRIGAN: Your Honor, I move to strike as

nonresponsive.

THE COURT: It may be stricken. The jury will disregard.

THE WITNESS: I'm sorry. I'm sorry.

Q. Senator Celona -- excuse me, Mr. Celona, you didn't write anywhere in the letter that you would personally do any of those things, did you?

A. No.

Q. You did mention certain things, though, that CVS could do; right?

A. Yes.

Q. And that included in paragraph 2 handouts could be given to seniors, such as CVS fact sheets; right?

A. Yes.

Q. And those would be fact sheets regarding the history of the company; correct?

A. Yes.

Q. And its Rhode Island heritage; correct?

A. Correct.

Q. And in the next paragraph, paragraph 3, you also wrote that -- about a film crew; correct?

A. Correct.

Q. And you wrote that a film crew can record one of these presentations for the production of a future television commercial or newspaper advertisement;

right, sir?
A. Yes, sir.
Q. And the film crew should capture CVS's commitment to the personal service that it provides to the consumers; correct?
A. Correct.
Q. If you could turn to the third page and the final page of the letter, Mr. Celona. You concluded this letter by writing that this program -- do you see where you wrote, "Jack, I feel that this program can be a relatively inexpensive way to continue to market CVS, its products and services, and provide significant positive results"? Correct?
A. Correct.
Q. And you also added, "As important, it would eliminate any bad perception left over from freedom of choice." Did you write that?
A. Yes, sir.
Q. This letter does include some of your ideas on how CVS could have improved its image among seniors; correct?
A. Excuse me? I didn't hear that.
Q. The letter does include some of your ideas about how CVS could go about improving its image among seniors; correct?

A. Correct.
Q. And you also testified on Monday, sir, that this letter included individual proposals that could be included in the consulting agreement; right?
A. Yes.
Q. Sir, this letter that you wrote on September 23rd of 1999, this was by no means a take-it-or-leave-it proposal that you were sending to Mr. Kramer, was it?
A. No, with an explanation.
Q. This was not a letter that you expected that Mr. Kramer had to accept completely; correct?
A. Correct, with an explanation.
Q. What is your explanation?
A. Correct, with an explanation that it was the foundation, in my opinion, of a consulting contract.
Q. And then there came a point where you actually discussed that consulting contract with Mr. Kramer and Mr. Ortiz; correct?
A. It was forwarded to me, and it was discussed at his office.
MR. CORRIGAN: Speaking of that consulting agreement, Senator -- Mr. Celona, may we please have Government Exhibit 108, which is in full, displayed for the jury and for the witness.
Q. Mr. Celona, do you recognize this to be the

consulting agreement that you executed with CVS?
A. Yes, sir.
Q. The consulting agreement indicates that you would be an independent contractor, doesn't it?
A. Yes.
Q. Within the very first paragraph of this document, it indicates in the last clause that it was an agreement concerning independent contractor services to be provided by consultant; correct?
A. Yes.
Q. In this agreement, you are the consultant; is that right?
A. Yes, sir.
Q. And if we can pull back and look at the second numbered paragraph of this document, the second point here, in fact, expressly states independent contractor status, doesn't it?
A. Yes, sir.
Q. And in the first -- beginning in the first line, towards the end of the first line of the paragraph, it states that, "Consultant shall act as an independent contractor." Do you see that?
A. Yes, sir.
Q. And it goes on to say, "Nothing in this agreement shall create any relationship as employer and

employee"; is that right?
A. Correct.
Q. You were not an employee of CVS; correct?
A. Under this, I was an independent contractor, correct.
Q. That's the agreement that you signed; correct? Is that right?
A. Yes.
Q. The contract goes on to state -- set forth the nature of your services for CVS; is that right?
A. You said four?
Q. Set forth. Excuse me.
A. Oh, set forth. Yes.
Q. And those services are included in the section entitled "The Project." Do you see that?
A. Yes, sir.
Q. And pursuant to the terms of this agreement, you were tasked with certain public relations services; is that right?
A. Yes, sir.
Q. And then the rest of the paragraph sets forth some of the services that were included -- to be included in what you would be doing; correct?
A. I didn't -- I'm sorry, there was a sneeze. I didn't hear. I'm sorry.

Q. Well, then the paragraph goes on to describe some of the services that you would be providing under the consulting agreement; correct?
A. Correct.
Q. And that included visiting various senior citizen apartment complexes, centers and groups to discuss health care issues; correct?
A. Correct.
Q. And the contract also mentions in this paragraph personal appearances, does it not?
A. Yes.
Q. And it also mentions TV appearances?
A. Yes, sir.
Q. This contract, however, did not limit what you would do for CVS solely to the language provided in this paragraph, did it?
A. Could you explain that to me?
Q. Sure. This contract states in the second sentence that your services are to include, but not be limited to, the items that were in the paragraph; correct?
A. Correct.
MR. CORRIGAN: If we can pull back and move back down to the second numbered paragraph.
Q. It states here that, "Consultant shall be solely responsible." Do you see where that begins? We'll

have that highlighted for you. Do you see where it says, "Consultant shall be solely responsible" --
A. Yes, sir.
Q. And that says, "Consultant shall be solely responsible for complying with all laws under the agreement"; correct?
A. Correct.
Q. And that included all income tax laws; isn't that right?
A. Yes, sir.
Q. You did pay taxes on all of the income that you earned from CVS; isn't that correct?
A. Yes, sir.
Q. In 2000, 2001, 2002 and in 2003, you received 1099 forms from CVS; correct?
A. Yes.
MR. CORRIGAN: May we have Kramer Exhibit 15 displayed for the witness, please, and I believe this is in full.
MR. DAMBRUCH: Yes, your Honor.
THE COURT: What letter is it?
MR. CORRIGAN: K-15. I apologize.
THE COURT: And this is full?
MR. CORRIGAN: This is full.

(Defendant Kramer Exhibit K-15 was admitted in full)
Q. Sir, do you recognize this as a substitute W-9 that you completed and returned to CVS?
A. Yes, sir.
Q. And do you see that this was to be returned to, if we look at the top of the first page where it says "attention, tax department," this was a form that you completed and returned to Ms. Kathy Strojny at CVS; correct?
A. Correct.
Q. And you wrote on this form. If we look at the second page of the document, do you see where you wrote in the section marked "principal business activity"? Do you see that section, which we'll highlight for you?
A. I have it on the screen; but on this hard copy, it's two of the same.
Q. Well, on the second page of the document you're looking at that's on the screen now, do you see that the -- there's a section entitled "principal business activity"?
A. Yes, sir.
Q. And that's your handwriting on this document; correct?
A. Yes, sir.

Q. And you wrote in this document that your principal business activity would be consulting, public and community relations; correct?
A. Correct.
Q. Now, this form was sent to you so that you could provide certain information to CVS; correct?
A. Yes.
Q. And that was information that CVS needed so that it could properly generate the 1099 forms related to your income; right?
A. Yes.
Q. And those were 1099 forms that were provided to you; correct?
A. Yes, sir.
MR. CORRIGAN: May we have Kramer L-15 displayed for the witness and for the jury. I believe this is in full pursuant to stipulation.
MR. DAMBRUCH: Yes, your Honor.
(Defendant Kramer Exhibit L-15 was admitted in full)
Q. Sir, do you recognize this to be the Miscellaneous Income Form 1099 that CVS issued to you for the 2000 calendar year?
A. Yes, sir.
Q. And it was sent to you at your home; correct?

A. Correct.
Q. And it provides the amount that you earned from CVS in that year, correct, of $12,000?
A. That I was -- I didn't hear that section.
Q. This form states the amount of income that you earned from CVS in 2000, does it not?
A. Yes.
Q. The amount of $12,000?
A. Yes, sir.
MR. CORRIGAN: May we have Kramer M-15 displayed for the jury.
THE COURT: Is this also in by agreement?
MR. CORRIGAN: Yes, your Honor.
MR. DAMBRUCH: Yes, your Honor.
(Defendant Kramer Exhibit M-15 was admitted in full)
Q. And, sir, again, this is A Miscellaneous Form 1099 that is for the income that you earned from CVS in 2001; correct?
A. Correct.
Q. And it contains the income that you earned from CVS in that year of $10,000; is that right?
A. Yes.
MR. CORRIGAN: Can we please have Kramer N-15 displayed. And, once again, this is a full exhibit

pursuant to stipulation.

MR. DAMBRUCH: Yes, your Honor.

(Defendant Kramer Exhibit N-15 was admitted in full)

Q. Mr. Celona, what you're now looking at is your 2002 Miscellaneous 1099 income form from CVS; correct?

A. Correct.

Q. And this indicates that you received income of $14,000 in 2001 -- excuse me, 2002; correct?

A. Correct.

MR. CORRIGAN: May we have Kramer 0-15 displayed to the jury and shown to the witness. This is in full pursuant to stipulation.

(Defendant Kramer Exhibit O-15 was admitted in full)

Q. And this is your Miscellaneous Income 1099 form from CVS for the year 2003; correct?

A. Correct.

Q. And it indicates on here that you received $9,000 in nonemployee compensation from CVS in 2003; right?

A. Yes, sir.

MR. CORRIGAN: If we could just pull back and look at the document in full on the screen.

Q. And you see that in the top left portion, Mr. Celona, of the box portion, it indicates the name

of the payor?
A. Yes.
Q. And that was CVS Pharmacy; correct?
A. Correct.
Q. And this Miscellaneous 1099 form was addressed to you; correct?
A. Correct.
MR. CORRIGAN: We can take that down.
Q. And you just previously did testify that you did pay taxes on all the amounts that you earned from CVS; correct?
A. Correct.
Q. Robert Buco was your tax accountant, was he not?
A. Yes, sir.
Q. And Mr. Buco's son, Jason Buco, works with him, does he not?
A. Yes.
Q. In each of the calendar years of 2000, 2001 and 2002, for those calendar years, either Robert Buco or Jason Buco prepared your income tax returns; correct?
A. Yes.
Q. And you gave either Robert Buco or Jason Buco each one of those Miscellaneous 1099 forms so that they could prepare your income tax returns; correct?
A. Everything that I had I would give in a package.

Q. And each year you filed, in the years 2000, 2001 and 2002, your tax returns with the federal Internal Revenue Service; correct?
A. Yes.
Q. And you also filed state income tax returns with Rhode Island's Division of Taxation; correct?
A. Yes.
Q. And on those returns in 2000, 2001 and 2002, you reported the income that you earned from CVS; correct?
A. Everything that I had given to my accountant was reported.
MR. CORRIGAN: Your Honor, may we approach for one moment.
(Bench conference held on the record)
MR. CORRIGAN: Your Honor, there are certain tax issues that I want to go into with the witness. In order to do that, there are 1099 forms that the witness received from the Village at Elmhurst and CRI Communications.
They relate to the other schemes, and I want to be very careful. I know that Mr. Dambruch has been careful about not mentioning those entities. And what I'd like to do is to try to do that with the witness by showing him the 1099 forms from those entities but not identifying who those entities are to the jury so that

we can add up --

THE COURT: What's the point of this?

MR. CORRIGAN: Well, the point of it is, on the Schedule Cs that he has to file on his tax returns, and I believe the tax returns are going to go in pursuant to stipulation -- the tax returns I think will go in full pursuant to stipulation.

THE COURT: Have they been cleaned up, the tax returns?

MR. DAMBRUCH: That's --

MR. CORRIGAN: What do you mean, cleaned up?

THE COURT: Have you taken out Social Security numbers and all that?

MR. CORRIGAN: I'll check to make sure that that has been done; but if not, we'll move on to it at a later point. There's a Schedule C on the tax returns that lists consultant income. And I do want to establish that, you know, if you add up the 1099s, he did, in fact, pay on the consultant income from CVS each year, that it's included in the Schedule C.

THE COURT: Why don't you just do that by way of a stipulation? That doesn't appear to be a disputed fact, is it?

MR. CORRIGAN: Well, I don't think that's a disputed fact, but there is another issue that we are

going to go into with the tax returns later.
THE COURT: What is it?
MR. CORRIGAN: Pursuant to his plea agreement, Mr. Celona was supposed to clean up all of his outstanding tax issues before his sentence, and it's our contention that he has not, your Honor.
He received income in 2001 and 2002 from two separate entities that are included in the stipulation about an income earned from other entities.
What Mr. Celona did prior to his sentencing was just file new returns for 2003, 2004 and 2005. He has never gone back and amended his returns for 2001 and 2002. He's in violation of his plea agreement; and nonetheless, he's gotten all the benefits that were promised to him under that plea agreement.
MR. DAMBRUCH: Your Honor, I still don't see how these two 1099s that Mr. Corrigan is referencing have anything to do with that issue.
THE COURT: If they're for the years that he didn't clean up his tax returns --
MR. DAMBRUCH: I don't believe Mr. Corrigan is alleging that there was any failure to pay taxes on the CRI and/or Village.
MR. CORRIGAN: We're not saying that; but in order to establish that Mr. Celona didn't pay income

tax for one of the entities that he received income from from 2001, we do have to add up the amounts that go on the Schedule C to establish that it did not include income from one of the entities that's in the stipulation for '01 and then the same for '02.

MR. DAMBRUCH: I'll have to look at it. It's my understanding that he had cleaned up his tax issues.

THE COURT: Why don't you move on to something else and look at it during the break.

MR. CORRIGAN: Yes, your Honor. May I just make sure that the exhibits we have that have his tax returns have removed his Social Security number?

THE COURT: You can take care of that during the break, too.

MR. CORRIGAN: We can get somebody working on it right now.

(End of bench conference)

Q. Mr. Celona, I'd like to direct your attention to some legislation that you participated in while you were a Rhode Island state senator. Do you recall that in various years in the Senate minimum wage legislation would be introduced before the Senate?

A. Yes.

Q. And you voted in favor of minimum wages legislation while you were in the Senate; isn't that

right?
A. Explain.
Q. Okay. If we can -- well, you're familiar with minimum wages legislation; is that right?
A. Yes, but minimum wage legislation could be increasing it, could be decreasing it. So I'm familiar with the general scope, but I'm asking specifics. I couldn't say until you --
Q. On minimum wage legislation that would increase the minimum wage rate, you voted in favor of those pieces of legislation; correct?
A. I believe I did.
Q. In 2000, do you recall that a minimum wages bill was introduced in the House and then came before the Senate for a vote?
A. It may have.
MR. CORRIGAN: May we have Kramer J-9 displayed for the jury and given to the witness. This is in full pursuant to stipulation.
(Defendant Kramer Exhibit J-9 was admitted in full)
Q. Do you see that this is a minimum wages bill, Senator Celona?
A. Yes, sir.
Q. And this is a minimum wages bill that would have

increased the minimum wage in Rhode Island. Do you see that?
A. Yes.
Q. And this minimum wage bill was H-6904 that came from the House; correct?
A. Yes.
Q. May we have Kramer -- do you recall that this bill, in fact, passed the House and came to the Senate?
A. No, I don't.
MR. CORRIGAN: May we have Kramer I-9, please, displayed for the witness and for the jury. This is in full pursuant to stipulation.
(Defendant Kramer Exhibit I-9 was admitted in full)
Q. Sir, do you recognize this to be a Journal of the Senate for Friday, June 30, 2000?
A. Yes, sir.
Q. And you're familiar with Journals of the Senate; correct?
A. Correct.
MR. CORRIGAN: Can we go to page 44 of that document.
Q. If you could turn to page 44 of that document, please. And I'd like to direct your attention, Mr. Celona, to item number 85. Do you see that?

A. Yes.
Q. That's the bill H-6904; correct?
A. Yes.
Q. That's the minimum wages bill that we were just looking at?
A. Yes.
Q. And do you see that that bill came up for a vote?
A. Yes, the Substitute A bill came up for a vote. I don't know if it's the same as the one I saw that was in front of me.
Q. This was, though, a minimum wages bill; correct?
A. The one you gave me, but this one is Substitute A.
Q. But a minimum wages bill nonetheless; right? It indicates that it's an act relating to labor and labor relations, minimum wages?
A. It's related to that; but, again, the Substitute A could totally make it different or just be a text change. With an explanation, your Honor. Until I see it --
Q. I understand that, sir.
A. -- I can't definitively say what it means. These titles have had a tendency of maintaining their existence but having the bill that was called to the legislative process gutted under Substitute A, which is an amended version, a completely amended version.

THE COURT: Would you keep your voice up, please.
A. Okay. So until I see that --
Q. In any event --
A. I'm not being argumentative or anything. I'm just trying to explain.
Q. Okay. But in any event, you did vote in favor of this minimum wages bill; correct?
A. I voted --
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Mr. Celona, do you previously recall testifying in the grand jury that you were aware that CVS was opposed to minimum wages legislation when it came before the Senate?
A. Excuse me?
Q. Do you recall testifying in the grand jury that you were aware that CVS opposed minimum wages legislation when it came before the Senate?
A. I don't specifically recall testifying that. It might have been, but I don't recall.
MR. CORRIGAN: May we give the witness his grand jury testimony from May 16 of 2006.
THE COURT: Do we have a hard copy?
MR. CORRIGAN: Yes, your Honor.

Q. Sir, I direct your attention to page 48 of your grand jury testimony on May 16th of 2006. Do you see, sir, at page 48, line 23, can I direct your attention to that?
A. Yes.
Q. Do you see where you were asked the following questions and gave the following answers?
Question, "Were there bills related to minimum wage?"
Answer, "Oh, yes, there were minimum wage. There were bills dealing with unit pricing where every can or every item in the store would have to be labeled rather than just the item, just on the bottom of the base, where it would say how much it is. And then when you go to the register, you read the barcode. They were against those."
Question, "So you were informed about CVS's position on other pieces of legislation; is that correct?"
Answer, "Yes."
Question -- I'll stop there. Sir, do you recall that that's the testimony that you gave in the grand jury?
A. Yes.
Q. And you testified in the grand jury that CVS was

opposed to minimum wage legislation; correct?
A. Yes.
Q. CVS was opposed to minimum wage legislation that would increase the minimum wage in the State of Rhode Island; correct?
A. Correct.
Q. And it's your testimony that during your years in the Senate from 2000 until 2003, you voted on minimum wage legislation that would increase the minimum wage in Rhode Island?
A. I said that I would have to see the records on all of them. I couldn't say right now. That was my testimony.
Q. Your testimony earlier this morning, was it not, sir, that you voted in favor of minimum wage legislation that raised the minimum wage in Rhode Island from 2000 until 2003?
A. I believe, Mr. Corrigan, that my testimony was that I believed that I did but that I would have to see the specific records for me to substantiate that. And, again, I'm not being obstinate.
Q. Do you recall, sir, that in 2000 a bill relating to treble damages in lawsuits came before the Senate?
A. Not specifically.
MR. CORRIGAN: May we have Kramer Y-15 displayed

for the witness and for the jury. And this is already in in full, your Honor.
Q. Senator Celona, do you recognize this to be a 2000 bill that was introduced in the Senate known as S-2255 Substitute A?
A. Yes.
Q. And do you see that the name of this bill was an act relating to commercial law, general regulatory provisions, deceptive trade practices?
A. Yes.
Q. Do you recall this bill, sir?
A. No, sir.
MR. CORRIGAN: May we have Kramer F-9 displayed to the witness and to the jury, please.
Q. Mr. Celona, do you recognize this to be a Journal of the Senate dated May 9 of 2000?
A. Yes, sir.
Q. And do you see here that on the first page of the document there's the roll call?
A. Yes.
Q. And you were present in the Senate on May 9 of 2000; isn't that correct?
A. Correct.
Q. I direct your attention to page 22 of this document, sir. Do you see there's an item 10 beginning

on page 22?
A. Yes.
Q. And that's -- item 10 relates to S-2255 Substitute A. Do you see that, sir?
A. Yes, sir.
Q. Now, that's the bill that we just looked at in the previous exhibit; correct?
A. Correct.
Q. And do you see that there was a motion to amend the bill?
A. Yes.
Q. And then do you see that there was a vote on the bill? That's on the next page, on page 23.
A. Yes.
Q. And do you see that there were 44 senators who voted in favor of that bill?
A. Yes, sir.
Q. And you were one of those senators who voted in favor of that bill; is that not right, sir?
A. Yes.
Q. Did you know that CVS was opposed to this bill?
A. Not to my recollection. With an explanation, your Honor.
THE COURT: Wait for another question.
THE WITNESS: I'm sorry.

Q. Mr. Celona, in 2002 a resolution came before the Senate relating to Canadian pharmacies. Do you recall that, sir?
A. 2002?
Q. Yes.
A. I recall the Sheehan resolution. Is that the one you're speaking of?
Q. Senator Sheehan introduced a resolution in the Senate in 2002 relating to Canadian pharmacies; is that right?
A. I believe so. I thought it was '03, but if you say it was '02.
Q. Well, do you recall that in '02 that there was a resolution introduced relating to Canadian pharmacies and that in 2003 there was a bill introduced relating to Canadian pharmacies?
A. I don't recall the exact specifics, but I know that there was a resolution introduced by Senator Sheehan.
MR. CORRIGAN: May we have Kramer B-9 displayed to the witness and the jury, and this is in in full.
Q. Do you recognize, sir, that this document is a Senate Resolution S-3018 that was introduced in 2002?
A. Yes, sir.
Q. And do you recognize that this Senate resolution

was a resolution memorializing the United States Congress to allow the State of Rhode Island to create, implement and oversee a pilot program allowing for the reimportation of prescription drugs from Canadian pharmacies? Do you see that, sir?
A. Yes, sir.
Q. Now, this resolution passed in the Senate Corporations Committee, did it not?
A. Yes. I believe I testified to that earlier.
Q. At the time that this resolution passed in the Senate Corporations Committee in 2002, you chaired that committee; correct?
A. Correct.
Q. You scheduled this resolution for a hearing and a vote; isn't that right?
A. Yes.
Q. And you voted to pass this resolution; isn't that right?
A. Yes.
MR. CORRIGAN: May we have Kramer D-9, which is already in full, displayed for the witness and the jury.
Q. Do you see, sir, that this is the vote on the resolution S-3018 on May 28th, 2002, in the Senate Corporations Committee?

A. Yes, sir.
Q. And do you see that there were yea votes to pass the bill, the resolution; is that correct?
A. Yes, sir.
Q. And you were one of the senators who voted to pass it; correct?
A. Yes. It was a resolution, not a bill.
Q. Nonetheless, it was voted and passed; correct?
A. Yes, as I testified earlier.
Q. And then do you recall that as a result of this bill passing -- excuse me, this resolution passing in your committee, that it went to the full Senate floor for a vote?
A. Yes.
Q. And when it went to the full Senate floor for a vote, you voted on the resolution, did you not?
A. I believe so.
Q. And you voted in favor of the resolution; isn't that correct?
A. Yes, sir.
Q. Did you know at the time that CVS was opposed to this resolution?
A. Yes.
Q. And nonetheless, you voted in favor of the resolution; correct?

A. Correct, with an explanation. Sir? Sir?
MR. CORRIGAN: I don't mean to be rude, Mr. Celona, but during redirect examination, Mr. Dambruch will be permitted to ask you questions to expand upon your answers.
THE WITNESS: Okay.
Q. You have testified that in 2003 the issue of Canadian pharmacies came back before the Senate; isn't that correct?
A. I believe so.
Q. And this time, as we just spoke about, it came back before the Senate as a bill and not a resolution; isn't that right?
A. I believe it did. I would have to see the records.
MR. CORRIGAN: Okay. May we have Government Exhibit 9 displayed for the witness and the jury, please. And if we could go to the second page of Government Exhibit 9.
Q. Sir, do you recognize that this -- these documents relate to the bill that was introduced, if we go to the third page, on February 6th of 2003 in the Senate related to Canadian pharmacies?
A. Excuse me, sir. That's in the House.
Q. Oh, I'm sorry. This was a House bill; correct?

A. Yes.
Q. This was a House bill on Canadian pharmacies; correct?
A. Yes, sir.
Q. And it's your understanding that no Rhode Island pharmacies were in favor of this bill; isn't that correct?
A. Yes.
Q. And this bill, sir, wasn't this bill illegal under federal law?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
MR. CORRIGAN: Your Honor, may I be heard on this?
THE COURT: Move on.
MR. CORRIGAN: May we have Kramer S-20 displayed for the witness only, please.
Q. Sir, do you recognize this to be e-mail correspondence between you and Marie Ganim at the Rhode Island State House?
A. Yes, sir.
Q. Who is Marie Ganim?
A. She was one of our legislative research assistants.
Q. And do you recall that this is an e-mail that

Ms. Ganim wrote to you in response to your request for some information from her relating to a discussion that you were going to be having at a forum before the American Association of Retired Persons?

A. Yes. I believe so, yes.

Q. And Ms. Ganim prepared those taking points for you; correct?

A. Yes. I'm just looking at the second page just to look at my e-mail to her. Excuse me, sir.

(Witness peruses document)

A. Okay.

Q. Do you recognize that that's what this document is, sir?

A. Yes, sir.

MR. CORRIGAN: Your Honor, the defense moves full Kramer Exhibit S-20.

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Approach.

(Bench conference held on the record)

MR. DAMBRUCH: Your Honor, it's the Government's position that any information provided by Ms. Ganim or, more particularly, her opinion as to a particular issue is irrelevant and immaterial, first of all.

Secondly, we would argue it's clearly hearsay. It's Ms. Ganim's out-of-court statements.

MR. CORRIGAN: Your Honor, this is a business regard. Ms. Ganim was an employee of the State House for the State of Rhode Island. In his official capacity as a senator, Mr. Celona asked her to provide him with some talking points because he was going to a forum holding himself out as a senator. This is clearly a business record.

THE COURT: The objection's sustained.

(End of bench conference)

MR. CORRIGAN: We can take that down, please.

Q. Senator Celona, this Canadian pharmacies bill received a hearing before the Senate Corporations Committee; correct?

A. I don't have the documentation in front of me to justifiably answer that, sir.

MR. CORRIGAN: May we have redisplayed for the witness and the jury Government Exhibit 9.

Q. Again, sir, this is the Canadian pharmacies bill that was introduced in the House in 2003; correct?

A. Yes.

Q. And then ultimately it was referred to your committee, the Senate Committee on Corporations; correct?

A. Yes. The title that year was Commerce. You know, if you just want to call it Corporations for expediency

sake, that's fine.
Q. You're correct. In 2003, it was the Senate Committee on Commerce, Housing and Municipal Government; correct?
A. Yes, sir.
Q. And you were chair of that committee?
A. Yes, sir.
Q. If we go to the last page of that document, there was a vote taken in your committee on this legislation; correct?
A. Yes, sir.
Q. And this was a vote "held for further study"; correct?
A. Yes, sir.
Q. And do you see that the vote to hold for further study was a unanimous vote?
A. Yes, sir.
Q. And do you see that Senator Leo Blais was one of those senators who voted to hold this bill for further study?
A. Yes, sir.
Q. Sir, Senator Blais led the effort to defeat this legislation, didn't he?
A. I don't recall.
MR. CORRIGAN: May we have Kramer J-19 displayed

to the witness, please. Your Honor, this can be published to the jury as a full exhibit.

THE COURT: Kramer J-19 is full by agreement.

(Defendant Kramer Exhibit J-19 was admitted in full)

Q. Mr. Celona, this is a document that was recovered from the hard drive of one of the computers that was maintained in your home. If you look in the center of this document, do you see there's a -- if we could call that out. Do you see that it's written here, "In fact, Senator Leo Blais, interesting enough, a pharmacist with his own independent pharmacy, led the effort to defeat the legislation"?

A. Yes.

Q. Does that refresh your recollection that Senator Leo Blais led the effort to defeat the Canadian pharmacies bill in 2003?

A. Yes. I can recall he was active in one of the hearings, so apparently it must have been this one.

Q. And do you see that it goes on to state that that legislation affected all pharmacies, not just CVS?

A. Yes.

Q. Now, sir, that's part of an e-mail that you wrote; correct?

A. I don't know who I -- if it was an e-mail or what

it was.
Q. But nonetheless, sir, it's something that you wrote that was maintained on the hard drive of your computer; is that right?
A. I don't know what the -- it doesn't say here.
Q. Sir, pursuant to stipulation reached with the Government, all documents that are labeled at the bottom SSHD were recovered from the hard drive of your computers that were seized during a search by the Rhode Island State Police.
Knowing that, does that indicate to you that these are words that you wrote?
A. If that was -- if that's what it means, then that's -- it was written there, yes.
MR. CORRIGAN: We can take that down, please.
Q. Mr. Celona, you've given previous testimony about a television show that you hosted on public access TV here in Rhode Island. Do you recall that?
A. Yes, sir.
Q. In your testimony on Monday, you referred to that show as being filmed with a camcorder. Do you recall that?
A. My testimony was when it first started, it was done with a camcorder.
Q. Initially it was done with a camcorder; right?

A. Yes.
Q. And then as time went on, the production of the show became a little bit higher quality than just taping it with a camcorder; isn't that right?
A. Yes, sir.
Q. And beginning in 2000 when Mr. Kramer started appearing on the show, it wasn't being filmed with a camcorder then, was it?
A. No, sir.
Q. And that show featured certain prominent guests on it, didn't it?
A. If you want to call them that, yes. I would think so, yes.
Q. You had on your show prominent public figures in Rhode Island, didn't you?
A. Yes.
Q. And they came on your show, and they talked to you; correct?
A. Yes, sir.
Q. And then that was broadcast on the local public access Cox channel; correct?
A. Yes, public access.
Q. Do you recall that among the prominent people who appeared on your television show was U.S. Congressman Patrick Kennedy?

MR. DAMBRUCH: Objection, your Honor.
A. Yes.
THE COURT: Basis?
MR. DAMBRUCH: Relevance.
THE COURT: Approach.
(Bench conference held on the record)
THE COURT: How far are you going with this?
MR. CORRIGAN: Well, I'd like to go through some names. The thrust of the defense, your Honor, is that we were paying to go on the show. And the Government, we believe, is trying to counter that by showing that this was not a show that was of any value and, you know, wouldn't be something that CVS would pay 12,000 a year for.
MR. DAMBRUCH: Your Honor, I would argue that who was on the show is irrelevant unless and until the defense can connect as to what Mr. Kramer's knowledge of these things were. I mean, if their defense is that Kramer thought it was a great show and that's why he hired Celona, I think there's a key component missing there unless and until they can prove that.
THE COURT: Are you going to be able to link it up?
MR. CORRIGAN: I'm not sure, your Honor.
THE COURT: Okay. I'll sustain the objection.

MR. SMITH: Judge, may I just say that I believe that the prosecution opened the door on this by asking questions concerning the show, and Mr. Ortiz feels that these kinds of questions as to who was on now is pertinent because of the fact that he brought it up.

THE COURT: If he can't link it up, it's not going to be relevant. Keep going.

(End of bench conference)

Q. Mr. Celona, you did perform work pursuant to the consulting agreement that you had with CVS; correct?

A. For example?

Q. Well, for example, do you recall testifying in the grand jury that you did try to do work of a consulting nature for CVS?

A. As I stated earlier, that I tried to do something to justify my work.

Q. And --

A. As far as -- may I continue?

MR. CORRIGAN: Sure.

A. As far as the whole scope of it or the direction, no.

Q. Well, you did educate yourself about CVS; correct?

A. I tried to on my own, yes.

Q. Do you recall that you educated yourself by going to the CVS Web site on the Internet?

A. Yes, sir.
Q. And do you also recall giving Mr. Kramer advice about the CVS Charity Classic golf tournament?
A. Yes.
Q. You gave him advice about the fact that you thought that the Charity Classic golf tournament should be expanded to include women golfers; correct?
A. Yes, definitely. I still do.
Q. And in 2000, you did visit senior complexes to talk about CVS; correct?
A. Not to my recollection, sir.
MR. CORRIGAN: May we have Government Exhibit 348 displayed for the witness.
Q. Sir, this is a document that contains a chain of e-mails between yourself and Mr. Ortiz; correct?
A. Yes. I believe we went over this in the initial testimony.
Q. And you recognize this document; right, sir?
A. Yes, sir.
Q. And do you see that beginning on the first page of this document, you wrote an e-mail dated January 3rd, 2001, at 8:46 p.m.?
A. Yes.
Q. And that e-mail carries over to the second page of this exhibit, does it not?

A. Yes.
Q. And this was an e-mail that you wrote to Mr. Ortiz describing work that you had done for CVS in 2000; correct?
A. Yes.
Q. If you look at the -- on the second page of the document, do you see, if we could display the second page for the jury, there's a sentence beginning "during the year"?
A. Yes.
Q. You wrote there, did you not, sir, that, "During the year," and the year being 2000, "I visited senior housing complexes and senior centers to explain the services provided by CVS and reiterated the prior theme of CVS as today's neighborhood drugstore"? That's what you wrote to Mr. Ortiz; correct?
A. Yes.
Q. You also, sir, are familiar with something called the CVS Extra Care Card?
A. Yes, sir.
Q. And you touted CVS's Extra Care Card, didn't you?
A. I.e.?
Q. Did you go to senior citizens' homes and complexes and talk to them about the CVS Extra Care Card?
A. I don't remember if I specifically did that. I

don't believe so.
Q. Do you recall testifying in the grand jury on May 16th of 2006 that you had gone to senior citizens' homes, high-rises, talking about the delivery programs, they had just come out with the CVS Extra Care Card, to make sure that when they go to CVS that they get that because it saves them money? Do you recall testifying that way in the grand jury, sir?
A. I honestly don't recall that at this point, sir.
MR. CORRIGAN: May we show the witness the grand jury testimony from May 16th, 2006.
Q. Sir, do you recognize that to be the grand jury testimony that you gave on May 16th of 2006?
A. Yes, sir. Yes, sir.
Q. I'd ask you to turn to page 51 of that grand jury testimony, and I direct your attention to line 20, sir. Are you with me on page 51 at line 20? Do you recall, sir, being asked the following questions and giving the following answers while you were under oath in the grand jury?
Question, "You did do some things; correct?"
Answer, "Yes."
Question, "What sort of things did you do?"
Answer, "I had done TV shows on my own concerning the road race charity. I had gone to the

senior citizens' homes, high-rises, talking about the delivery programs, advocating. They had just come out with the CVS Extra Care Card, to make sure that when they go to CVS they get that because it saves them money. It gives them special deals off and things like that. I had gone to the Lions Clubs and things along those nature."

Do you recall, sir, that being your sworn testimony in front of the grand jury on May 16th of 2006?

A. Today, sir, I don't recall that. I do recall mentioning it on the television show with Jack about the Extra Care Card and saying that what a savings it is for the consumers, in particular the seniors. I do recall that.

Q. Sir, but you just read your grand jury testimony from May 16th of 2006; and in that grand jury, under oath, you told the grand jury that as part of your work for CVS, you went to seniors and talked to them about the CVS Extra Care Card; isn't that right?

A. Yes.

Q. And do you recall, sir, that also you spoke to senior citizens about CVS's delivery service?

A. Not specifically. That would -- I'm sorry.

MR. CORRIGAN: May we have Kramer Exhibit -- may

we have Kramer Exhibit N-22 shown to the witness, please.

THE COURT: N?

MR. CORRIGAN: N, as in Nancy.

Q. And if you could turn to page 10 of that document, sir, and I'd ask you to look at the first full paragraph about midway through. And if we could call that out for the witness, please. Sir, have you had a chance to look at that paragraph?

A. No. I'm just looking at it now, sir.

Q. Okay. I'd like to pull out even further for you -- sir, I'd like you to take a look at what's going to be highlighted on your screen right now. Does that refresh your recollection that you told Government agents that you learned about the CVS delivery service from their Web site and informed the senior citizens at the senior centers about that?

A. Yes.

Q. That's what you told the Government agents; correct?

A. If -- I may have told them that. You know, I don't recall it specifically. I remember visiting the Web site in preparation for television shows.

Q. Do you also recall, sir, that you handed out CVS gift cards at a senior event?

A. For example?

MR. CORRIGAN: May we have Kramer M-4 displayed to the witness and the jury, please. This will be a full exhibit pursuant to stipulation.

(Defendant Kramer Exhibit M-4 was admitted in full)

THE COURT: What letter is it?

MR. CORRIGAN: It's M-4.

THE COURT: M?

MR. CORRIGAN: I apologize.

Q. Mr. Celona, do you recognize that this is a letter that Mr. Ortiz wrote to you on April 23rd of 2001?

A. Yes, sir.

Q. And this is a letter he wrote to you in response to a communication you had with him about the fact that you were going to a health fair on May 16th; isn't that correct?

A. Yes, sir.

Q. And that health fair on May 16th was a health fair known as HealthLink; correct?

A. Correct.

Q. And that HealthLink fair, that was a fair devoted to promoting health and wellness among the senior citizen population; correct?

A. Specifically Teamster retirees.

Q. Retirees who were senior citizens; correct?
A. Some were, and some were not.
Q. And isn't it true that Mr. Ortiz sent you CVS gift cards that you could hand out at that event for the Teamster retirees?
A. They were sent to me. I didn't personally hand them out. They were given out as door prizes.
Q. Mr. Celona, when you learned about any problems that customers were having in CVS stores, you would alert CVS to that fact, wouldn't you?
A. Yes.
MR. CORRIGAN: Can we go to Government Exhibit 348, please. May we have that displayed for the witness and the jury.
Q. If we look at the second page of that document, sir, we're back in the January 3rd, 2001, e-mail that you sent to Mr. Ortiz. Do you see -- and I'm going to ask that this be called out. Do you see that you wrote, "I was also a sounding board for situations that occurred, such as the problem that developed with the unavailability of the drug gemfibrozil," and then you wrote in parentheses, "as detailed in an e-mail to you"; correct?
A. Correct.
Q. Isn't it a fact, sir, that at some point during

the year of 2000 you wrote an e-mail to Mr. Ortiz
concerning gemfibrozil?
A. Yes.
Q. And you were reporting to Mr. Ortiz in that e-mail
about certain issues that you had identified relating
to the unavailability of that medication at CVS;
correct?
A. Yes. Can I detail for you?
MR. CORRIGAN: Well, I'll ask Mr. Dambruch to do
that for you on redirect examination.
THE WITNESS: Okay.
MR. CORRIGAN: We can take that down, please.
Q. You also, pursuant to the consulting agreement,
would call and alert CVS if there were shortages of
prescriptions or if there were problems in the stores;
correct?
A. Such as problems with?
Q. Well, if there were -- if you noticed that there
were issues shortages of prescriptions at CVS
pharmacies, wouldn't you contact CVS and tell them
about that?
A. Well, I would have no way of knowing of how many
people -- you're saying if customers brought
prescriptions to the pharmacy?
Q. No. When you understood that there were

prescriptions that couldn't be filled at CVS because of shortages of the medication at CVS, you brought that issue to the attention of CVS, didn't you?
A. That was the gemfibrozil situation.
Q. And you did that in other similar situations?
A. I may have on one other occasion, maybe.
Q. You also attended and hosted certain CVS-related events, did you not?
A. For example?
Q. Well, did you attend a ribbon cutting for the CVS support center?
A. The CVS what?
Q. A ribbon-cutting ceremony for a newly built CVS support center?
A. Oh, support center, yes. I thought you said sports center.
Q. I apologize. Support center; correct, sir?
A. Yes.
Q. You attended that ribbon cutting; correct?
A. Yes, with other senators.
Q. And you hosted a CVS-sponsored event at the Amos House?
A. I don't believe that.
MR. CORRIGAN: May we have Kramer V displayed for the witness and for the jury. This is being

admitted pursuant to stipulation, your Honor, in full.
(Defendant Kramer Exhibit V was admitted in full)
Q. Senator Celona, I'd ask you to take a look at the second page of that document. And I'm going to ask that we have the comment, the second comment pulled out for you and if we could highlight the language at the bottom. Do you see there, sir, where it says "attend CVS-sponsored event for Amos House hosted by Senator Celona," and then it gives a date of Monday, August 26th of 2002? Do you see that, sir?
A. I see that.
Q. Do you recall hosting an event at the Amos House for CVS on August 26th of 2002?
A. Not at all.
Q. And do you recall being asked to attend a press event at the State House for CVS?
A. Which press event would that be?
Q. Do you recall being asked by Mr. Kramer through his secretary, Ms. McCusker, to attend a press event at the State House on August 20th of 2002?
A. For what?
MR. CORRIGAN: Can we pull up Kramer U, please, which is already a full exhibit.
Q. Senator Celona, do you recognize -- excuse me,

Mr. Celona, do you recognize this to be an e-mail that Ms. McCusker wrote to you on August 16th of 2002?
A. Yes.
Q. And if you look at the second paragraph, do you see where it says there, "Jack would like to invite you to attend a press event for CVS on Tuesday, August 20th, at 10 a.m. at the State House"? Does that refresh your recollection about the CVS event at the State House on August 20th?
A. Quite frankly, it doesn't.
Q. You don't recall being asked to attend that event?
A. And if you're looking at the follow-up, I was busy with personal matters at the original e-mail.
MR. CORRIGAN: We can take that down, please.
Q. And, Senator Celona, you did, in fact, report to both Mr. Kramer and Mr. Ortiz on certain of the activities that you were performing for CVS; correct?
A. Excuse me?
Q. You did report to Mr. Kramer and Mr. Ortiz about things that you were doing for CVS, did you not?
A. Yes, according to Mr. Ortiz's request in those e-mails that you had just shown me a couple of times.
Q. Well, what about the e-mail about gemfibrozil that we just looked at? We don't have it, but we looked at it. You said you had sent him an e-mail about that;

correct?
A. That was in that e-mail that I said to you.
Q. And did you do e-mails to Mr. Kramer and Mr. Ortiz to report to them about your visits to senior centers?
A. Specifically, I don't recall that, no, sir.
Q. Well, you did in that January 3rd, 2001, e-mail; correct?
A. That was a complete update, I think.
Q. And throughout the year, periodically you would also send additional e-mails about things you had done; correct?
A. Specifically in senior centers?
Q. Yes.
A. I don't recall in senior centers, sir.
Q. You would speak with Mr. Kramer, Mr. Ortiz and Ms. McCusker about things that you were doing for CVS; correct?
A. Yes.
Q. And you would forward to them things that you would learn about CVS and its stores that you thought would be important for them to know; correct?
A. Again, like the gemfibrozil and things along that nature.
Q. So you did do that; correct?
A. Very little, but did.

MR. CORRIGAN: May we have GX 348, please.
Q. If we look at the first page of the document and focus again, sir, on your e-mail of January 3, 2001, you wrote to Mr. Ortiz -- if I can call out the sentence beginning "as you have seen." You wrote, "As you have seen in the viewing of the videotapes provided." You sent videotapes of Mr. Kramer's appearances on the State House Report, your television show, to CVS; correct?
A. Yes, sir.
Q. And if we go to the second page, you see that you wrote -- if we could go back to the first page, actually, to give this context. You wrote, all the way at the bottom, "To promote the programs, I placed advertisements in the Providence Journal at my cost to promote the programs and to increase their viewership. I had faxed Jack a copy of an advertisement."
You did, in fact, sir, fax Mr. Kramer a copy of an advertisement, didn't you?
A. Can you repeat the question? I'm sorry.
Q. Did you, in fact, sir, fax to Mr. Kramer a copy of an advertisement, did you not?
A. Yes, sir.
MR. CORRIGAN: If we can redisplay for the witness and the jury Government Exhibit 348. If we can

go to the first page.
Q. At the end of the year 2000, you initiated this series of e-mails with Mr. Ortiz; is that correct?
A. I'm just looking at the chain.
Q. Why don't we go to the last -- why don't we go to, actually, the sixth page of the document. Do you see that in the sixth page of the document, and because of the way it's been maintained, it's a little bit scattered, but the initial e-mail is an e-mail that you wrote to Mr. Ortiz on Sunday, December 3rd, 2000, at 7:16 p.m.?
A. Yes, sir.
Q. Do you see that? That's the initial e-mail in this series of e-mails that form this exhibit; correct?
A. I just would have to -- yes. Yes.
Q. And you initiated this series of e-mails because you wanted to renew your consulting relationship with CVS; correct?
A. I'm going back to that December 3rd one again. Excuse me. This was just an update of some -- some things that I had done.
Q. You were just sending Mr. Ortiz an update on things that you had done for CVS?
A. Just let me finish, in preparation for the renewal of the anticipated and hopeful renewal of the contract.

Q. Well, we're going to get to that. In this e-mail of December 3rd of 2000, you don't mention the renewal; is that right?
A. No.
Q. Did you initiate this chain of e-mails, though, to seek renewal of the contract?
A. To initiate them to what?
Q. To seek the renewal of your contract.
A. It was just basically telling him what was being done --
MR. SMITH: Judge, I can't hear him.
A. It was just an e-mail about what was being done, and also it was an e-mail asking about a contact for my secretary's son who was looking to have his resume circulated somewhere within the CVS family to hopefully get a job somewhere or an interview, at the very least.
Q. And we can focus on the other portions of these e-mails. All of these e-mails or many of them in this chain you wrote about the public relations services that you were providing to CVS; correct?
A. Not all of them. Not all of them. Not all parts of it either.
Q. In certain of these e-mails, you did write about the public relations services that you were providing to CVS; correct?

A. Yes.
Q. And you didn't write anything in any of these e-mails anything about any prior legislation, did you?
A. Again, I'd have to look through -- you're saying in every e-mail?
Q. You didn't write anything in any of those e-mails anything about legislation, did you?
A. I don't recall. I'd have to go through them.
Q. Well, we'll try to go through some of them together. And if you see anything like that, you can let us know. Let's take a look again now at the -- how this began on December 3rd of 2000. You wrote -- and your subject line here was "taping of program," and you wrote to Mr. Ortiz, "Last week I taped the program with Jack Kramer. We touched on the history of CVS, the services that it provides, both in-store and online. Additionally, we discussed the charities that benefited from the CVS Charity Golf Classic and talked about the road race. In the future, we plan on doing a program especially for the promotion of the road race and also another show specifically centered on the $1 million CVS donation to the charter school. I will forward both you and Jack copies of the tapes."
That's what you wrote in that e-mail, sir; correct?

A. Yes, and then in addition to some other things further down, correct, about the job.
Q. So this e-mail chain began, as I think you've just testified to, as your explanation of some of the recent things that you had done for CVS; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. And Mr. Ortiz replied to your e-mail, correct, and his reply came also on Sunday, December 3rd, at 8:19 p.m.? It's on the same page where your initial e-mail begins.
A. Okay.
Q. Do you see that in reply to your e-mail, Mr. Ortiz wrote, "John, send me the resume, and I'll circulate it to our HR department"? And that's the resume that you were talking about about somebody you knew; correct?
A. Yes, sir.
Q. And he also wrote, "I'm glad the taping went well. Good luck, and I'll talk to you later. Carlos." That was his response to you; right?
A. Yes, sir.
Q. And then you responded to Mr. Ortiz's December 3rd of 2000 e-mail on December 20th of 2000; correct?
A. This is December --
Q. December 20th. Do you see that, sir?

A. I see it on here, but I'm looking for the hard copy, sir.
Q. It's on the fifth page of the hard copy, towards the bottom. Do you see what your response was?
A. Yes, sir.
Q. You wrote back to Mr. Ortiz on December 20th, "Carlos, I would like to wish you and your," and I imagine you wanted to write "yours"?
A. "Yours."
Q. "A happy holiday season and a healthy and happy new year. Sincerely, John Celona." That's what you wrote on December 20th; correct?
A. Yes. I don't know if it was necessarily in response. It might have been just a holiday e-mail greeting.
Q. It was a holiday e-mail that you picked up on -- you sent it as part of this chain?
A. I would send that along. I would send holiday greetings and e-mails to --
THE COURT: Keep your voice up.
A. I would send holiday greetings and e-mails to a lot of people.
Q. And then Mr. Ortiz responded to your holiday greeting the next day on December 21st. If you go to the fourth page at the bottom, you can see where the

header information is about his e-mail. Do you see he responds on December 21st of 2000, at 11:21 a.m.?
A. Yes, sir.
Q. And he wrote back to you, if we go to the next page, "John, first of all, I, too, hope that you and your family have a very merry Christmas," and then he wrote "Feliz Navidad" in parentheses, "and a healthy and happy new year," and in parentheses again, "prospero Ano Nuevo."
"Secondly, I want to express my sincere appreciation for the beautiful fruit basket from you and your wife. It was totally unexpected and a wonderful gesture. Thanks again and happy holidays."
He wrote that to you, sir; right?
A. Yes, and then there was another line there, too, at the end.
Q. And then at the end he wrote, "Also, congratulations on being named chairman of Senate Corporations. It couldn't have happened to a more deserving person. Good luck. Carlos." That was his response to you; right?
A. Yes.
Q. You had sent him a fruit basket; correct?
A. Yes.
Q. For the holiday season?

A. Yes.
Q. And he thanked you for it; right?
A. Yes.
Q. And he also congratulated you on being named chairman of the Corporations Committee; correct?
A. Yes, sir.
Q. And then you responded to Mr. Ortiz's e-mail on December 21st; correct? Do you see your response is on December 21st at 2:33 p.m., sir?
A. What page are we on, sir?
Q. This is on the fourth page of the document.
A. Fourth page?
Q. Yes.
A. Yes.
Q. And you wrote back to Mr. Ortiz, and you wrote, "Carlos, thank you. I want to get together to do more television programs and outreach. The latest program with Jack is still playing, and he has a copy of the tape. If you would like a copy, let me know." And then in parentheses you wrote, "The program recaps the golf tournament and the road race and previews the future events, in addition to touting the services provided by CVS. Regards, John."
That was your response to Mr. Ortiz on December 21st; correct?

A. Correct.
Q. And then Mr. Ortiz wrote back to you on the very same day; right? If you look above that.
A. Yes.
Q. And Mr. Ortiz wrote, "John, I saw a copy of the tape, and I think it was great," and he put "great" in all caps. "Regards, Carlos." He wrote that back to you; correct?
A. Yes, sir.
THE COURT: Mr. Corrigan, we're going to break.
Members of the jury, you know what that means. Fold up those notebooks. During the recess, do not talk about the case.
Bob, would you see the jury out, please. Fifteen minutes.
(Recess)
(The jury is present for the following)
Q. Good morning again, Mr. Celona.
A. Good morning, sir.
Q. If we may, I'd like to return to Government Exhibit 348. And where we left off before the break was we had just gone through Mr. Ortiz's -- excuse me, yes, Mr. Ortiz's e-mail to you on December 21st, 2000, at 2:52 p.m.
So what I'd like to do now is move forward with

you in the e-mail chain to your response on December 29th of 2000 at 8:12 p.m., and that begins -- the header information for that is on page 3. Do you see that, sir, at the bottom?
A. Yes, sir.
Q. At the bottom of page 3, and the text of your message continues or actually begins on page 4 of the document. And you wrote, "Dear Carlos, I want to wish you and your family a happy new year. Also, when you get a chance, I would like to sit down to discuss the renewal of my contract. Regards, John Celona."
That's what you wrote to him on December 29th; correct?
A. Correct.
Q. And Mr. Ortiz got back to you in the new year. He responded in an e-mail dated January 2nd of 2001; correct?
A. Yes.
Q. And in his e-mail of January 2nd of 2001, Mr. Ortiz wrote, "Happy new year, John. Why don't you e-mail me with some suggested dates, and we'll sit down and talk. I am in this entire week, but Jack is gone at the end of the week," it looks like the D was left off there, "if you would like him there. I look forward to hearing from you. Carlos."

That was Mr. Ortiz's response to you on January 2nd; correct, sir?
A. Correct.
Q. And then you responded to Mr. Ortiz on January 3rd. And your response was, "Carlos, I am available Thursday morning, tomorrow, or Friday morning or after lunch on Friday. Thursday morning, tomorrow, would be best. You can call me on my cellular phone," and it goes on, and you wrote, "thanks. John."
That was your response to him; correct?
A. Correct.
Q. And then Mr. Ortiz responded to you on January 3rd. If you go to the bottom of page 2, you can see the beginning of his e-mail response. Do you see that, Mr. Celona?
A. The January 3rd at 12:56 p.m.?
Q. Yes, sir.
A. Yes, sir.
Q. And do you see that what Mr. Ortiz wrote was, "John, I believe that Jack Kramer would like to participate in our meeting, and unfortunately he will be out of the office until Monday, January 22nd. I would like to delay our meeting until he gets back. Could you give me some dates and times that week when you might be available. I am fairly flexible that

week, and I will check on Jack's schedule once I have your availability. For the meeting, could you come prepared with a description of activities in 2000 and suggested activities for 2001. I look forward to hearing from you. Thanks. Carlos."

That was his response to you on January 3rd; correct, sir?

A. Correct.

Q. And then you responded to him later that same evening on January 3rd; correct?

A. Correct.

Q. Your e-mail on January 3rd, this e-mail, was written or sent at 8:46 p.m.; correct?

A. Yes, sir.

Q. And you wrote a number of things in this e-mail detailing what you had done during the year 2000; correct?

A. Correct.

Q. For example, you wrote, and I'm going to go to the sentence beginning "as a description," you wrote, "As a description of activities for 2000, I have hosted and produced three cable television programs." You did that, sir; right?

A. Yes, sir.

Q. And you wrote, "The programs were 30 minutes in

length and ran statewide and aired for five weeks each." That was true; right?
A. Yes.
Q. You also wrote, "In total, the programs aired six times each week at various times to maximize its reach." That was also true, wasn't it?
A. Yes.
Q. You then went on to write, "Two of the programs had Jack as a guest. The first previewed and promoted the 2000 CVS Charity Classic, and the second recapped the CVS Classic and the road race and began the promotion of the 2001 events." That's also all true as well, isn't it?
A. Yes.
Q. Then you wrote a little bit -- in the next sentence, "As you have seen in the viewing of the videotapes provided, the production of the programs was professionally performed at my cost with state-of-the-art graphics and photographs of the participating players in the golf tournament." That was true, wasn't it, sir?
A. There was no cost to me, actually. It was done at the Cox studio, if I remember right.
Q. But you wrote in this e-mail to Mr. Ortiz that it was done at your cost; correct?

A. The production -- the advertisement was at my cost.
Q. Well, in this e-mail you wrote to Mr. Ortiz, did you not, "The production of the programs was professionally performed at my cost"?
A. Yes.
Q. You then wrote, "In addition, prior to taping of the programs, I conducted preproduction meetings with the producer and developed a line of questions." You did that; right, sir?
A. Yes, sir.
Q. You then wrote, "The history and services provided by CVS was researched and integrated into the program." And that was true, also, wasn't it, sir?
A. Yes, sir.
Q. And that history research on CVS, that was research that you did; correct?
A. Online.
Q. You then went on to write, "I have received rave reviews of these programs from many viewers across the state." That was true, wasn't it, sir?
A. Yes.
Q. You then also wrote, "To promote the programs, I placed advertisements in the Providence Journal at my cost to promote the programs and to increase their

viewership." That was true as well; right?
A. Yes.
Q. You also wrote, "I have faxed a copy" -- excuse me, "I have faxed Jack a copy of an advertisement." Was that true?
A. Yes. I think we went over this a little bit before the break.
Q. But that was true as well; correct, sir?
A. Yes.
Q. And then you wrote, "Moreover, I issued news releases promoting each program," and you did that as well, didn't you, sir?
A. Yes.
MR. CORRIGAN: I'd like to have displayed for the jury and the witness Kramer G-18, which will be a full exhibit pursuant to stipulation.
(Defendant Kramer Exhibit G-18 was admitted in full)
MR. CORRIGAN: May we have G-18 for the jury, please.
Q. Now, this is a little bit difficult to read because of the quality of the copy, isn't it, Mr. Celona?
A. Yes.
Q. But if we pull it up on the screen, hopefully it

will make it a little bit better for all of us. This was an article that you placed in a local newspaper about the show featuring Mr. Kramer that aired in May of 2000; correct?
A. Yes.
Q. And this show aired on multiple occasions on the Cox Communications channels; correct?
A. Yes.
Q. And if you look at the second page of this document, you faxed this to Mr. Kramer, did you not?
A. Yes.
Q. And you wrote to Mr. Kramer on May 5th, 2000, "Attached is a copy of an article re: our program," re: meaning regarding. "I hope you like the tape. Regards, John." You wrote that to Mr. Kramer and attached this article, didn't you?
A. Yes, sir.
Q. Did you have to pay to have this article placed in the newspaper?
A. No. It was a -- that was a news release.
Q. Pardon me?
A. No. It was just done with a news release.
Q. Well, you wrote in the e-mail that it was an article; correct?
A. Yes, an article, a news article.

Q. And you didn't have to pay to have this placed?
A. No, that would be like you would send -- an explanation.
Q. You didn't have to pay to have it placed; is that what you're saying?
A. No.
MR. CORRIGAN: Let's also take a look at Kramer B-4, which will be a full exhibit pursuant to stipulation.
(Defendant Kramer Exhibit B-4 was admitted in full)
Q. Mr. Celona, do you recognize this as a news release that you issued on June 14th of 2001?
A. Yes, sir.
Q. And do you recognize this to be a news release that you issued in which you indicated that the CVS Charity Classic would be featured on Senator Celona's cable television program?
A. Yes, sir.
Q. And in this news release, you indicated that, Jack Kramer, chairman of the CVS Charity Golf Classic and senior vice president of CVS Pharmacy, will talk about the upcoming CVS golf tournament with you on the next edition of his cable television program, the Celona State House Report. You wrote that in this news

release, sir?
A. Yes, sir.
Q. And then on the back -- the second page of this document, it indicates the frequency with which this program would air; correct?
A. Yes. And then they ran much more than that, too, also.
Q. So it ran beyond this; is that correct?
A. They would run them at night and other times when there was -- Cox and the local public access stations would just plug them in at various spots, also, in addition to these times.
Q. To these shows promoting the CVS Charity Classic were being aired repeatedly on cable television in Rhode Island; correct?
A. Yes, sometimes at three in the morning or something when there was nothing on, but. . .
Q. In this document, you don't mention anything about three in the morning, do you?
A. No, because these are the times they were scheduled for.
Q. So let's talk about the times that they were scheduled for. In this news release, you indicated that the program will be shown on Sunday evenings at 9 p.m.; correct?

A. Correct.
Q. And on Monday evenings at 9:30 p.m.; correct?
A. Correct.
Q. And on Wednesday evenings at 7 p.m.; isn't that right?
A. Correct.
Q. So in 2001, you were continuing to do the promotion of the CVS Charity Classic on your television program; correct?
A. Yes.
MR. CORRIGAN: May we go back to Government Exhibit 348, please.
Q. We can go to page 2 of this document where we can pick up, Mr. Celona, on the report that you wrote to Mr. Ortiz on January 3rd of 2001. Do you see where you wrote, "The other program featured Kurt Proctor of the NACDS and centered on the shortage of pharmacists in Rhode Island"?
A. Yes, sir.
Q. You did air that program; correct?
A. Yes.
Q. Mr. Proctor appeared on your television program?
A. Yes.
Q. And the NACDS is the National Association of Chain Drugstores; is that correct?

A. Correct.
Q. And we've already gone over in the next section the visits to senior housing complexes. We spoke about that earlier today, so we won't review that again.
But then after you gave your report of the activities that you had done in 2000, you then wrote about what you planned to do in 2001; correct? Do you see where it says "for the year 2001," Mr. Celona?
A. Yes, sir.
Q. So you now gave a plan for what you would do for 2001; correct?
A. Yes. At the direction of Carlos, yes.
Q. Well, the direction from Mr. Ortiz, if we can go back to Government -- the third page on this document, Mr. Ortiz's e-mail that preceded this, do you see that Mr. Ortiz wrote, "For the meeting, could," and I think he left out "you," "could you come prepared with a description of activities in 2000 and suggested activities for 2001"? Those were his words; right?
A. Yes.
Q. He was asking you to bring that to the meeting; correct?
A. Yes.
Q. And you wrote, if we can go back to the first page of the -- excuse me, the second page of the document

beginning with "for the year 2001," you wrote, "For the year 2001, I plan on expanding the production of CVS-related programs to again preview the CVS Charity Classic and the road race." You wrote that; right, sir?
A. Yes, sir.
Q. And you wrote, "I also plan on producing a program that centers on CVS's involvement in the new charter school in the Wanskuck section of Providence and CVS's $1 million commitment to it." You wrote that, didn't you, sir?
A. Yes, sir.
Q. And you also wrote, "I plan on again producing a program dealing with the shortage of pharmacists and intend on contacting various guidance departments in area high schools to promote and encourage students toward a career as a pharmacist." Those are your words; right, sir?
A. Yes, sir.
Q. You also wrote, "And I plan on expanding my visits to senior centers and housing complexes to promote CVS." You wrote that; right, sir?
A. Yes.
Q. And then you closed your e-mail by writing, "Per your instruction, I am forwarding this report, and I am

doing so prior to the meeting to acquaint you in advance. Please advise regarding meeting date. Regards, John Celona."

And if we can go back to what you wrote for the year 2001, in that section, where you wrote you planned on expanding the production of the CVS-related programs to preview the CVS Charity Classic, you did do that in 2001; correct? You did a show on the Charity Classic in 2001; correct?

A. Yes.

Q. And Mr. Kramer appeared as a guest?

A. Yes.

Q. And also in 2002, you did a program on the Charity Classic, and Mr. Kramer appeared as a guest; correct?

A. Yes.

Q. And then in 2003, once again, Mr. Kramer appeared on your show and promoted the Charity Classic; correct?

A. Yes.

Q. Let's talk about the road race. You also wrote in this e-mail that you planned on expanding the program to preview the road race; and in 2001, Mr. Kramer went on your show to promote the CVS Downtown 5K road race, did he not?

A. Yes, sir.

Q. And in 2002, he also went on your show to promote

the CVS Downtown 5K road race, did he not?
A. I can't definitively say in 2002. I know there was at least one or two years. I know there was at least -- 2001 I believe was the first year they took it over or maybe the second year.
Q. Well, do you recall, sir, that CVS took over the Downtown 5K road race in 2000 and that you then recapped that Downtown 5K road race on a show with Mr. Kramer on November 29th of 2000?
A. Yes. And the 2000 one occurred just days after September 11th, I remember. The race occurred.
Q. Okay. Well, you're not talking about September 11th, 2001. September 11th of 2000 is what you're referring to?
A. No, I'm referring to September 11th, 2001. I thought you were talking about 2000 and 2001.
Q. No. I'm talking about that in November of 2000, Mr. Kramer came on your show to recap the CVS Downtown 5K that had been run the previous September. Do you recall that?
A. Yes.
Q. And you also aired a television program that featured Mr. Kramer, he was a guest on the program, that did highlight the CVS charter Highlander School; correct?

A. Correct.
Q. Why don't we go back to the first page of Government Exhibit 348. Mr. Ortiz responded to your January 3, 2001, e-mail; correct? Do you see that, sir?
A. Yes.
Q. He responded on January 4th at 11:02 a.m.?
A. Yes, sir.
Q. And he wrote back, "John, I would like to schedule the meeting for Thursday morning, January 25th, at 9:30 a.m. If this is okay with you, please e-mail me and M.J. Thanks. Carlos." He wrote that; right?
A. Excuse me, who wrote that?
Q. Mr. Ortiz wrote that; correct?
A. Yes, sir.
Q. And M.J. is -- was Mr. Kramer's secretary; correct?
A. Yes, sir.
Q. And you wrote back, at the top of this, "Dear Carlos, that date and time is fine, and I have scheduled it in. Regards, John Celona." And that was the end of the e-mail chain; correct?
A. Correct.
Q. You didn't write anything anywhere in any of these e-mails about prior legislation, did you?

A. In those e-mails, no.
Q. You didn't write anything anywhere in these e-mails about any upcoming legislation, did you?
A. No.
Q. And you did have a meeting with Mr. Kramer and Mr. Ortiz towards the end of January of 2001; correct?
A. It was in that area. I don't know if it was at the end of January, but it was in that area of time.
Q. I'm sorry?
A. It was in that area of time.
Q. And during that meeting, you discussed the new consulting relationship; correct?
A. Correct.
Q. And it was, in fact, renewed, was it not?
A. I was kept on.
Q. You continued being paid $1,000 a month to promote CVS; correct?
A. I was continued to be paid the $1,000 a month in accordance with the contract that was originally given to me.
Q. Mr. Celona, I'd like to take some time to review with you Mr. Kramer's appearances on your television program, the State House Report. During the course of the consulting relationship with CVS, Mr. Kramer appeared on your show eight times; isn't that right?

A. I don't know the exact times, but it was several.
Q. Would it surprise you to know that a stipulation has been entered into and the parties in this case -- it wouldn't surprise you to hear that the parties have entered into a stipulation in this case indicating that Mr. Kramer appeared on your television program, the State House Report, eight times during the period 2000 through 2003?
A. In legal words, does that mean both sides agreed to the fact that he was on eight times?
Q. Yes.
A. Okay.
Q. So it wouldn't surprise you to learn that that's what the parties agreed to; correct?
A. It was several times. If it was eight and they agreed on it and they researched it, that's fine.
Q. What did you and Mr. Kramer talk about when Mr. Kramer appeared on your show?
A. Talked about the Charity Classic, talked about the golfers on the Classic, talked about the benefits to the community, talked about the road race, talked about in the aftermath who won the race, the pairings on each golf tournament, who was playing who. For instance, the Quigleys always would play with one another and if Brad Faxon was playing with Arnold Palmer and so forth

and so on, it would be promoted for that year's event, where it would be, what time it would be, where you could buy the tickets and so forth.
Q. And Mr. Kramer, he was the tournament chairman of the CVS Charity Classic; correct?
A. Yes, sir.
Q. And do you know that more than 20,000 people attended the Charity Classic each year during the period 2000 through 2003?
A. It wouldn't surprise me.
Q. As you mentioned, top professional golfers from the PGA tour appeared at the Charity Classic; correct?
A. Yes.
Q. Including the top professional Rhode Island golfers; correct?
A. Yes.
Q. This event, CVS Charity Classic, it was broadcast nationally on ESPN, wasn't it?
A. It was broadcast nationally. I think it was either the Golf Channel or ESPN or both. I think it was a Monday event.
Q. And it was broadcast nationally; correct?
A. Yes.
Q. And it was one of the biggest annual sporting events in New England, was it not?

A. Well, I don't know if it was one of the biggest sporting events in New England. If you put it up there with the Red Sox and the Patriots, I don't know if it was one of the biggest ones, you know, the Deutsche Bank Classic. It was, you know, probably in the top 10 if you lump Red Sox games and Patriots games as one. I don't know how you would lump that as one of the top events in New England.
Q. In any event, sir, many of Mr. Kramer's appearances on your show were timed to promote the Charity Classic; correct?
A. Yes.
Q. And there were times when Mr. Kramer or his assistant would initiate his appearances on your show; correct?
A. I don't recall, quite honestly.
MR. CORRIGAN: May we have Kramer Exhibit E-4, which is in full pursuant to stipulation.
Q. Do you see that document on your screen, sir?
A. Yes.
Q. That's an e-mail to you from Ms. McCusker on April 30th of 2002. Do you see that?
A. Yes.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Basis?

MR. DAMBRUCH: It's not an e-mail to him from Ms. McCusker. It's the other way around.

MR. CORRIGAN: I apologize. Thank you.

Q. I misspoke. I'm sorry, Mr. Celona. This is an e-mail from you to Ms. McCusker on April 30th of 2002; correct?

A. Yes.

Q. And this is an e-mail regarding scheduling Mr. Kramer's appearance on your show; correct?

A. It's regarding the location of the taping of the show.

Q. And is that because the studio where you taped the show changed locations?

A. It may have at that time.

Q. So does --

A. I'm sorry.

Q. Go ahead.

A. As far as the scheduling, I'd have to see prior e-mails. I don't know because it looks like it's the end of the e-mail. And as far as who initiated it, because you asked me who initiated it, I can't say yes or no looking at this e-mail.

Q. So looking at this e-mail, it's your understanding that there were previous e-mails related to scheduling Mr. Kramer on this show?

A. Yes, especially if you look at the subject line.
Q. It's a "re:" subject line; correct?
A. Well, it's "re: re:"
Q. So there were earlier e-mails in the chain; correct?
A. Yes. So --
MR. CORRIGAN: May we have Kramer U displayed for the jury and the witness, and this is a full exhibit pursuant to stipulation. And this time I'll try to get it right in terms of who's writing to whom.
Q. The top e-mail, the one at the very top, is an e-mail from Ms. McCusker to you; is that right, Mr. Celona?
A. Yes.
Q. And do you see there's a paragraph beginning "secondly"?
A. Excuse me?
Q. There's a paragraph beginning with the word "secondly"?
A. Yes.
Q. And in that paragraph, Ms. McCusker wrote, "Secondly, we need to set up a date for the taping of the Downtown 5K info for your show. Any chance it can be done sometime next week?" Do you see that?
A. Yes.

Q. That was Ms. McCusker initiating an appearance or a taping of a show that Mr. Kramer would appear on; correct?
A. Yes.
MR. CORRIGAN: And we can take that down. Thank you. May we display for the jury and give to the witness Kramer Y, which will be admitted in full pursuant to stipulation.
Q. Mr. Celona, do you see that this is a letter that Mr. Kramer wrote to you on December 12th of 2002?
A. Yes, sir.
Q. And this was a letter, was it not, in which he wrote that he thought that the CVS Highlander Charter School would make an excellent subject for the Senator Celona Hour; is that right?
A. Yes.
Q. And then subsequently, in early 2003, Mr. Kramer did appear on your television program to promote the CVS Highlander Charter School; isn't that right?
A. I believe if that was the time line. I don't know the exact date.
MR. CORRIGAN: We can take that down. Thank you, Mr. Celona. May we have Kramer D-20, which will be a full exhibit pursuant to stipulation, displayed to the jury and given to the witness. I'm sorry, I said

D-20. I apologize. Kramer D.

MR. SMITH: I'm sorry, your Honor, what's the exhibit number?

THE COURT: D.

MR. CORRIGAN: Letter D.

(Defendant Kramer Exhibit D was admitted in full)

Q. Senator Celona, this is a transcript of Mr. Kramer's appearance on your television program that was aired beginning in May of 2000 to promote the Charity Classic, and I would direct your attention to page 8.

A. Page what? Excuse me?

Q. Page 8 of this document.

A. Eight?

Q. Uh-huh. This show was designed to promote the Charity Classic; and if you look at the bottom of the document, beginning on line 24, do you see you said, "CVS has the Charity Classic of which you are the chairperson of"?

And then you went on to ask Mr. Kramer, "Can you tell our viewers something about that. It's a fabulous event that we have in Rhode Island."

This was part of your promotion of the CVS Charity Classic; correct?

A. Yes, in talking about an event and the benefits it had for Rhode Island, yes.
Q. And Mr. Kramer went on to describe down at the bottom, beginning at line 16, that, "There was an opportunity here to bring a sports event to Rhode Island that would put us on the map, that would put the State of Rhode Island on the map and at the same time service a lot of our major charities here in the State of Rhode Island. In fact, last year, we were fortunate enough to be able to give $350,000 to 19 charities right here in Rhode Island."
Do you recall Mr. Kramer talking about that on this program?
A. Yes.
Q. And you then said on page 10 of this transcript, if we can go to the next page, down at the bottom, you said, Senator Celona, "Now, you mentioned Rhode Island is being showcased. It's going to be broadcast nationwide, I believe on ESPN again?" You asked that question; isn't that right, sir?
A. Excuse me. If that's what it says, I did, yes.
Q. And Mr. Kramer answered, "Yes, national television on ESPN."
And part of the description here was to, if we move forward a little bit on to page 11, to feature

Rhode Island itself. And Mr. Kramer said, "And as you know, we have such a beautiful state that it brings national interest. It brings tremendous economic impact to our state and because people see it and they want to come here and visit, and that's great for our economic growth."

And then do you recall that on this show you promoted selling the tickets for the Charity Classic on the television program?

A. Excuse me?

Q. Do you recall promoting the sale of tickets for the Charity Classic on this program?

A. I believe there may have been a time where I said where can people buy tickets for this event or how can they go to the event.

Q. Well, if we turn to page 19 of this exhibit, do you see, and this is towards the top, Mr. Kramer is speaking, and he said, "But, again, we're going to talk a little bit, I hope, about the tickets and when they go on sale," and you said, "Yes."

Mr. Kramer responded, "Because we think it's important to sign up early, again, because of the limitation of just how many tickets we can sell."

And then on the next page, you went on to ask Mr. Kramer at line 4 of page 20, "Where should they

call or what should they do to get tickets?" You were promoting the sale of tickets on the show, weren't you?
A. Yes, I was asking for people to -- if they wanted to go, to buy their tickets early.
Q. Right. And on page 21, in fact, Mr. Celona, you said to your viewing audience, "And this money, the money for the tickets, is going to a great cause. And for three days of golf for $100, I think that's a great bargain, in my opinion." Those were your words; right, Mr. Celona?
A. Again, that's the transcript of what I said, of your tape, but I don't know exactly if they were my words. It's your transcript.
Q. Do you deny saying those words, Mr. Celona?
A. I'm not denying saying it, but saying them verbatim -- again, I'm not being argumentative at all. I'm just saying that -- I'm sure I said something along those lines; but exactly, I don't know. I can't say yes.
Q. You have no reason to doubt the accuracy of that, do you?
A. I don't know the company, but I would say that I would have had the occasion to say that it was important to buy your tickets early because it was a good event.

Q. And then also during this program you talked about how CVS's commitment to the Charity Classic wound up benefiting charities. Do you recall that?
A. Excuse me?
Q. Do you recall talking about how CVS's Charity Golf Classic wound up benefiting charities?
A. Well, that's what it was for.
Q. And you said on -- if we can go to page 23 of the transcript, "Obviously, you could run a golf tournament and not have any charities benefit and basically reap the harvest; but to CVS's credit, they are looking towards giving the money to charity." Did you say that, sir?
A. Yes. I would say something along those lines.
MR. CORRIGAN: If we could take that down and have displayed for the jury and the witness Kramer H, which will be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit H was admitted in full)
Q. Senator Celona, this is a transcript of Mr. Kramer's appearance on your television program in May of 2001 to, once again, promote the Charity Classic, this time the 2001 Charity Classic. Do you recall Mr. Kramer being on your show in 2001 to promote the Charity Classic?

A. I'm sure he was.
Q. And you said during this program, on page 2 of the transcript, you previewed for your viewers what the show would be about down at the bottom. "Tonight on the Celona Report, we're going to step back a little bit from government and, as we do each and every year, and talk about a wonderful event that is happening in the State of Rhode Island and has happened for the past few years, and that's to talk about the CVS Charity Golf Classic." And that's what this show was about; right, Mr. Celona?
A. Yes, sir.
Q. And Mr. Kramer would do his very best on these programs to promote the show, as you can see down at the bottom of page 4, Mr. Celona, where at the bottom of page 4, running into page 5, Mr. Kramer said, "And I think, Senator, it," "it" being the Charity Classic, "has become the number one sports event in the State of Rhode Island. And this year again on July 8th, 9th and 10th, at Rhode Island Country Club, we'll have the opportunity to see the CVS Charity Classic."
MR. DAMBRUCH: Your Honor, was that a question?
Q. Did Mr. Kramer say that on your program, sir?
MR. DAMBRUCH: Objection. The document speaks for itself.

THE COURT: It does. If you have a question, pose the question.

MR. CORRIGAN: I will.

Q. Again, in 2001, Mr. Kramer came on your program to promote the Charity Classic; correct?

A. Yes.

Q. And you talked about ticket sales for the Charity Classic, do you recall?

A. I'm sure we did.

Q. And you also talked about the success of the tournament in the year of 2000?

A. Again, I haven't gone through the transcript, but I'm sure we did.

Q. Well, if we go to page 18 of the transcript, and at page 11 -- excuse me, line 11, you said to Mr. Kramer, "And you know, of course, I don't know how many thousands of people were there last year on the last day, 20,000 or something like that." And Mr. Kramer responded, "Well, the overall tournament was in excess of 25,000 people."

Does that refresh your memory that on this program you talked about the success of the tournament in the prior year?

A. Yes, it's -- if that's what's reported. Again, I'm confident that I mentioned something like that,

again; but verbatim, I can't attest to that, but I'm confident that I talked about something like that.
Q. Do you recall Mr. Kramer appearing on your program on May 21st of 2003 or taping it on May 21st of 2003 to promote the 2003 Charity Classic?
A. Exact dates, Mr. Corrigan, I don't recall exact dates like May 21st, 2003, you said?
Q. Yes.
A. I don't know the exact date, no.
MR. CORRIGAN: Well, if we could show the witness Kramer L, please, and display that for the jury. And that is also a document that will be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit L was admitted in full)
Q. Now, you may not recall the exact date, Mr. Celona, but Mr. Kramer did appear on the program in 2003 to promote the Charity Classic; is that right?
A. According to the document, yes.
Q. Do you have any recollection of him appearing on the program in 2003?
A. Yes. Yes.
Q. Do you recall him appearing on the program in 2003 to promote the Charity Classic?
A. Yes.

Q. And, again, this show was devoted to promoting the Charity Classic, was it not?
A. Excuse me?
Q. This show was devoted to promoting the CVS Charity Classic in 2003, was it not?
A. Again, I didn't go through the transcript of it; but if it speaks for itself, it does.
Q. Why don't we just go to a couple of excerpts to see if it refreshes your memory that the show was devoted to the CVS Charity Classic.
A. That's fine.
Q. If we go to page 4 of the document. Do you recall saying to Mr. Kramer, "And the CVS Charity Classic is right around the corner. So --" and Mr. Kramer said, "It is." And then you said, "First of all, tell us about it, when it is and where it is." Do you recall discussing that with Mr. Kramer?
A. Yes. Generally speaking, yes, that's what I would say.
Q. And then do you recall discussing with Mr. Kramer that the biggest winners from the CVS Charity Classic were the charities in Rhode Island? Why don't we go to page 5, Mr. Celona.
A. Okay.
Q. If you look down at the bottom of the page, do you

see where you said, "Well, the biggest prize winners are the people in the state and the charities." Do you recall saying that on your program, sir?
A. I'm sure I said it. I still believe that.
Q. And then if we go to the top, Mr. Kramer picks up on promoting the charities as well. Mr. Kramer said, "Absolutely. Absolutely. We're thrilled this year. Last year we were able to give 800,000, over 800,000 to charity." Do you recall Mr. Kramer talking about that $800,000 number?
A. Not exactly that number, no, sir.
Q. You're not surprised, though, that that's how much the CVS Charity Classic raised in 2002 for charities?
A. The previous year was three or four hundred thousand dollars. So I don't know if it jumped up that much. I don't know.
Q. Well, do you recall Mr. Kramer talking on your show about how he was promoting the event and growing it bigger and bigger each year in Rhode Island?
A. The event was growing bigger and bigger; but the exact dollar figures, I don't remember the exact dollar figures.
Q. Well, do you recall Mr. Kramer talking about a goal of raising a million dollars for charities in Rhode Island in 2003?

A. The million-dollar goal that I always remembered talking about the show was the million-dollar commitment to the charity school, that million-dollar figure. That's not saying that it wasn't said; but the million-dollar figure that I remember was the million-dollar figure given to the charter school.
Q. That's something separate, another charitable contribution that CVS made; correct?
A. Yes.
Q. And that's a charitable contribution that was -- a million-dollar charitable contribution that CVS made to the Learning Center for the Deaf; correct?
A. As we went over.
Q. And Mr. Kramer talked about that on your television program; correct?
A. Yes.
Q. Well, we also -- if we can look at this, maybe this will refresh your recollection. Do you remember him on the program for the Charity Classic in 2003 saying, "This year I think we're going to push right up very, very close to a million dollars. I've committed to Tom Ryan that we'll get as close to that million dollars as we possibly can"? Do you recall him saying that on your show?
A. Not specifically, sir. Again, I don't want to be

obstinate or argumentative, but not specifically.
Q. Do you recall that on this program you, once again, promoted ticket sales for the CVS Charity Classic?
A. I'm sure that I did as a closing end of it.
MR. CORRIGAN: If we can go to page 31 of the transcript.
Q. Are you at page 31, sir?
A. I'm getting there.
Q. And do you see that on this show you once again promoted ticket sales and you said, "Speaking of that, where can we get some tickets? How can you get tickets and --" Mr. Kramer cut you off and said, "Tickets are available at your local CVS store."
Was that typical that on the programs that Mr. Kramer appeared on to promote the Charity Classic that you would discuss ticket sales with him?
A. The Charity Classic, we would always say where can you get the tickets.
MR. CORRIGAN: We can take that down, please. If we could have Kramer H displayed for the witness and the jury. I'm sorry, can we actually have Kramer F. I apologize. And, your Honor, this will be admitted in full pursuant to stipulation with the Government.

(Defendant Kramer Exhibit F was admitted in full)

Q. And, Mr. Celona, do you recall that this is the show in late 2000, or do you recall the show in late 2000 where Mr. Kramer appeared to recap both the Charity Classic and the Downtown 5K?

A. Where's the date on the front of this, sir?

Q. Well, do you recall Mr. Kramer appearing on the show in late 2000 to promote the Charity Classic and the Downtown 5K?

A. I know he appeared, but I don't know if it was late 2000 or 2001; but I don't know the date of this transcript.

Q. All right. Well, regardless of the date, if we could just -- do you recall discussing with him the Downtown 5K on any program where he recapped the 5K that had already occurred?

A. I know that we had promoted the or talked about the 5K road race and perhaps recapped one of them.

Q. Well, if we could turn to page 24, please. And this is Mr. Kramer speaking at the top. Do you recall him saying, "And last year was thrilling. It was a family race. We had a children's race first"? Are you with me, Mr. Celona?

A. They were sticking. I'm sorry.

Q. Take your time.
A. Okay.
Q. Do you recall Mr. Kramer appearing and saying, "And last year was thrilling. It was a family race. We had a children's race first, and we had a women's race, and we had a men's race, and the whole family turned out. It was just an exciting day in Downtown Providence that exposed our area and the tourism to a really world-class race in the Downtown Providence area"?
Do you recall him saying that on that show, Mr. Celona?
A. Similar statements, yes. And what year was this, you're saying?
MR. CORRIGAN: It's my understanding that this was in late 2000, sir.
And if we may have for the witness and the jury Kramer J, please, which will be admitted pursuant to stipulation in full.
(Defendant Kramer Exhibit J was admitted in full)
Q. Senator Celona, do you recall, as you've testified earlier, that Mr. Kramer appeared on your show in early 2003 to talk about the CVS Highlander Charter School?
A. I don't believe I said the date, Mr. Corrigan.

Q. But it was after the December 2002 letter that we looked at earlier; correct?
A. Yes. I would assume so, yes.
Q. So it wouldn't surprise you to learn that the show was taped in January of 2003?
A. Yeah, but I'm just looking for dates on this document, but I don't see any.
Q. I don't know that you'll find any.
A. Excuse me?
Q. I don't know that you'll find any on here.
Mr. Celona, do you recall that in connection with the show for the CVS Highlander School, that a film crew went to the CVS Highlander Charter School and filmed some segments there?
A. I don't recall that, sir.
MR. CORRIGAN: Can we go to Kramer J at page 5, please.
Q. Are you there, sir?
A. Yes.
Q. And if we could just not highlight that, if we don't highlight that for a moment. I just want to orient you, Mr. Celona. If you go to line 7, you said, "Well, speaking of that, the educational end, the CVS Highlander Charter School in Providence," and Mr. Kramer said, "Yes."

Does this orient you to the -- to this transcript being your discussion with Mr. Kramer about the CVS Highlander School on your program?

A. Yes, we did have a program about the CVS Highlander School.

Q. And do you see down below beginning at line 17, you said, "But before we talk in depth of that, our cameras had the chance to go out to the charter school on location and to take a tour, and now we will switch to that tape so the viewers can get a firsthand look at what the CVS Highlander Charter School is all about"?

Does that refresh your recollection that a camera crew went to the CVS Highlander Charter School?

A. I know a camera -- now that I can remember this, a camera crew went out. Whose camera crew it was, I don't recall; but we had a tape of something played about the charter school and what was going on in there.

Q. So an on-location tape shot at the school aired as a segment during your show that Mr. Kramer appeared on; correct?

A. Yes.

Q. And in addition to promoting the Charity Classic, the 5K and the CVS Highlander School, Mr. Kramer promoted CVS itself on the show, didn't he?

A. Yes, I believe he did. Yes.
Q. For example, if we could have Kramer D given to the witness, and if you go to -- this is for the 2000 Charity Classic, sir. If you go to page 3 of that at the bottom, do you recall Mr. Kramer saying on that program, and this was his first appearance on your program, "Usually people are a little bit confused when you say CVS unless they've been around a little bit in Rhode Island, as you have. They're not sure what CVS stands for, and it does stand for Consumer Value Stores, although of late, from a marketing perspective, we've changed it to mean convenience, value and service"?
Do you recall him saying that on your program, sir?
A. Not specifically, but -- I don't specifically remember that being said. And what year was this from?
Q. This was in early 2000, sir.
A. Is this one dated at all? No?
Q. And Mr. Kramer also promoted the charities when he appeared on your show, didn't he, sir?
A. Excuse me?
Q. Mr. Kramer promoted the various charities that CVS contributed to when he appeared on your show?
A. Yes.

Q. And when Mr. Kramer appeared on your show, not only did he promote CVS, but you also promoted CVS, didn't you?
A. Yes.
Q. You talked about how CVS was one of the largest employers in Rhode Island; correct?
A. Yes.
Q. And you spoke about how when you would go outside of Rhode Island, you were proud that there would be CVS stores in other parts of the country because CVS was a Rhode Island company?
A. Yes.
Q. You spoke about the good people who worked at CVS, didn't you?
A. I'd have to specifically see where that would be.
MR. CORRIGAN: If we could show the witness Kramer D, please. I believe the witness has that.
Q. If we could go to page 27. Page 27, please. Thank you. And do you recall -- are you there, Mr. Celona?
A. I'm getting there.
Q. Okay.
A. Okay.
Q. Do you recall, Mr. Celona, that during this program, beginning at line 16, you said, "And certainly

Tom Ryan, yourself and all the people up at CVS are good people, good human beings"? Do you recall saying that, sir?
A. Again, I'm sure I was complimentary. Exact words I don't know because I don't know what show this is from or if it's -- you know, exactly, but I'm sure I was complimentary.
Q. You don't doubt that you said those words, do you?
A. I don't doubt that I was complimentary.
Q. And when Mr. Kramer appeared on your program, you would also speak about how CVS cared about its customers, didn't you?
A. I.e.? For instance?
Q. You don't have any recollection of speaking about how CVS cared about its customers when Mr. Kramer appeared on your program?
A. Could I see some examples? Again, I'm not being --
MR. CORRIGAN: May we display for the witness page 28 of the document that he has in hand.
THE COURT: It's Kramer D?
MR. CORRIGAN: Kramer D at page 28, please.
Q. Do you see where at page -- at line 12, Senator Celona, you said, "So I urge all of my viewers, all of our viewers out there, get on board and also,

selflessly speaking, stop into CVS because they really -- they really have the people in mind"? Do you recall saying that, sir?
A. Probably something along that line in light of their charitable events, yes.
Q. Did you also speak about the personal attention that customers received at CVS?
A. Again, I'd have to be -- you know, see the context and how that was.
MR. CORRIGAN: May we show the witness Kramer F, please.
Q. Sir, this is, again, a transcript of one of your programs that Mr. Kramer appeared on. And can you turn to page 3 of that document, please. And if you look at line 20, sir, do you recall saying, "When you walk into a CVS, you get that personal attention, and I think that was right from Tom Ryan, yourself, and all of the other people who are, indeed, people-oriented, customer-oriented, and it shows"? Do you recall saying that on your program, sir?
A. Not specifically, but I'm sure I was complimentary.
Q. You don't deny saying those words, do you?
A. Not specifically, but I'm sure I was complimentary.

Q. You also spoke about --
A. I can't say that I specifically said this without, you know, seeing it nor have it attested to or dated or anything like that; but I'm saying that I'm sure I was complimentary.
Q. Did you speak about how CVS was a great place to shop during the holidays?
A. I may have.
MR. CORRIGAN: If we turn to page 28 of the document in front of you, Mr. Celona.
MR. DAMBRUCH: Your Honor, I'm going to object at this point in time. The document speaks for itself. I would also object based on the fact that this has become cumulative.
THE COURT: Approach.
(Bench conference held on the record)
THE COURT: How much more?
MR. CORRIGAN: I'll move on very quickly.
THE COURT: I think it is cumulative. Let's go.
MR. CORRIGAN: Yes. Yes.
(End of bench conference)
Q. Mr. Celona, just one last question about these transcripts. If you could turn to page 28 of the transcript that you have there.
A. The 5K?

Q. The CVS Charity Classic and Downtown 5K road race.
A. Okay. Page 28?
Q. Page 28. And if you'd look at line 18 once you get there. Do you recall saying, "Well, thank you very much. And during the holiday season, CVS has everything. So I'll just put that plug in because they do a great job and, again, we're thankful"? Do you recall saying that, sir?
A. I'm sure I was complimentary along those lines.
Q. Do you recall you also discussed -- and we can take that down. You discussed health care issues when Mr. Kramer appeared on your television program?
A. I can't specifically say at this point.
Q. You don't deny that you talked about health care issues when --
A. I'd have to see substantiation, sir.
Q. After you would record a show that Mr. Kramer appeared on, you would provide CVS with a tape of the show; correct?
A. Prior to? After it was aired?
Q. Yes.
A. Yes. I would send them along to both Carlos and Jack or both or one or whomever.
Q. And then you would follow up with them to see that they had received the tape; correct?

A. Not all times, no.
Q. On certain occasions did you do that?
A. Sometimes I would, you know, send off an e-mail and ask if they liked the or if they received the tape and if they had liked it and so forth.
Q. So you did communicate with them about the tapings of the programs after they had been aired; correct?
A. Periodically.
Q. And on occasion the programs that you had taped with Mr. Kramer would even run beyond the events that they were promoting; correct?
A. As is the nature of cable television and public access.
Q. It cost you money to produce these television programs, didn't it?
A. Excuse me?
Q. It cost you money to produce these programs, didn't it?
A. Very little, if any.
MR. CORRIGAN: And -- I'll withdraw that last "and." I'd like to have displayed for the witness Kramer I-19, please.
Q. Mr. Celona, do you recall that in 2004 you had certain communications with others about the CVS relationship that you had?

A. For instance?
Q. For instance, did you write e-mails to people?
A. Yes.
MR. CORRIGAN: I believe Kramer I-19 will be admitted as a full exhibit pursuant to stipulation.
MR. DAMBRUCH: Yes, your Honor.
THE COURT: I-19, then, is full.
(Defendant Kramer Exhibit I-19 was admitted in full)
Q. Senator Celona, this is e-mail correspondence between you and William Dimitri; correct?
A. Yes, which I thought was lawyer/client privilege, but --
Q. Mr. Dimitri was your attorney?
A. Yes.
MR. DAMBRUCH: Your Honor, may we approach?
THE COURT: Just a minute. Please.
(Bench conference held on the record)
THE COURT: Has he waived?
(Attorney Corrigan hands document to Court)
THE COURT: This doesn't talk about a waiver of the attorney/client privilege.
MR. CORRIGAN: Your Honor, but it's certainly a waiver in the sense that there was no effort to maintain the privilege. The items were produced to the

Federal Bureau of Investigation, giving them unlimited use of the documents and materials, and then the Government produced them to us. So to the extent that there was any claim of privilege, it has been waived.

MR. DAMBRUCH: Your Honor, my concern was this is the second time the witness made that argument or representation during his examination. So I was just concerned that it doesn't seem like he's aware of -- that he waived the privilege.

We did disclose it in discovery as material we received. Pursuant to this, we disclosed it. Now, what impact that has on his waiver, I don't know. I don't represent him, Judge, so I'm just concerned.

Yesterday he mentioned it at one point in time, and this is the second time. He was a little more explicit this time. So I just wanted to raise the issue.

Again, I don't represent him, so I can't argue on his behalf about privilege; but he has mentioned it twice, and this document doesn't specifically address it.

THE COURT: Well, what did you do with respect to having him waive attorney/client privilege? You turned over Bill Dimitri's notes.

MR. DAMBRUCH: My understanding is Bill Dimitri

turned over or somehow the defense in the Roger Williams case obtained copies of Bill Dimitri's notes. It was not from the Government. They were turned over in this case by Mr. Sullivan to defense.

THE COURT: Okay.

MR. DAMBRUCH: So I --

THE COURT: Do you have anything else to do with him other than this?

MR. CORRIGAN: I can do a few things, your Honor, yes.

THE COURT: Because I think you need to figure this one out.

MR. CORRIGAN: Your Honor, we can figure this out, but I think the law is clear in this circuit.

THE COURT: We need to establish precisely how he's -- what he says here is he's consenting to the search, he's consenting to the seizure. What he doesn't talk about specifically in the document you've handed me is a waiver of the attorney/client privilege. He's raised it. You'd better get Dimitri in here.

MR. DAMBRUCH: Yes, your Honor. I will say that there was some communication between Mr. Sullivan and Mr. Dimitri; but from what he's saying, it's unclear whether he has participated in that. That's what I'm not sure about.

THE COURT: Leave this for now. Go to something else. I'll tell the jury to disregard it.

(End of bench conference)

THE COURT: Would you take that down that exhibit, please. Members of the jury, please disregard the last comment of the witness.

Q. Mr. Celona, you testified on direct examination that Mr. Kramer said to you that, in August of 2003, that he was terminating the relationship, the consulting relationship, because of publicity surrounding the Gordon Fox/GTECH relationship; isn't that correct?

A. Yes, sir.

Q. And it's your testimony that he said to you because of the press reports about that relationship between Gordon Fox and GTECH, he wanted to terminate the relationship?

A. Something along -- the name Fox and the reasoning for it, that was it.

Q. And this took place, this communication, conversation with Mr. Kramer took place in August of 2003; correct?

A. I believe that was the time of the year, yes.

Q. At that time, Mr. Fox was a legislator; correct?

A. Yes.

Q. And are you aware, sir, that the first press reports about the relationship between Mr. Fox and GTECH were published on October 1st of 2003?
A. No.
MR. CORRIGAN: May we show the witness Kramer I-22, and just the witness, please.
Q. Mr. Celona, I'd like you to take a look at that document, please. Sir, does that --
THE COURT: Just a minute, Mr. Corrigan. Let me find it. Go ahead.
Q. Sir, does that refresh your recollection that the initial press reports about Mr. Fox's relationship with the Rhode Island company GTECH were not published until October 1st of 2003?
A. If this was the initial one, I don't know; but I also know that there was talk around the corridors of the State House for several weeks before anything came out that there was something brewing on it, as you would always hear in the State House. And I do know that that was the reason given.
Q. And --
A. Without a doubt.
Q. And this document doesn't refresh your recollection that the first press reports about the Gordon Fox/GTECH relationship appeared beginning

October 1 of 2003?
A. Not to my recollection, no.
MR. CORRIGAN: We can take that down, please.
Q. And it was your testimony on direct examination that Mr. Kramer, on the very same day that he told you that the relationship would be discontinued, on that very same day he invited you to a golf tournament in California; correct?
A. Yes.
Q. Do you recall previously telling the Government that you were invited to the event in California before the contract was terminated?
A. Not to my recollection, sir.
MR. CORRIGAN: May we show the witness Kramer X-16, please.
Q. Mr. Kramer --
THE COURT: Just a minute.
MR. CORRIGAN: I'm sorry, your Honor.
Q. Mr. Kramer -- Mr. Celona, do you recall when you met with FBI Special Agent Dennis Aiken and IRS Special Agent Joel Burman on September 7th of 2004 that you told them that Mr. Kramer had mentioned the trip to California before the termination?
A. Not to my recollection, no, sir.
Q. Can you turn to the ninth page of this document,

please, and I'll have called out for you on the screen the portion I'd like you to take a look at. Do you want to take a look at what it says on the screen, Mr. Celona? Does that refresh your recollection that you did tell the agents on September 7th, 2004, that Mr. Kramer mentioned the trip to California before the termination of the relationship?

A. No. This isn't my writing, so I don't -- it doesn't reflect or jog my memory at all.

MR. CORRIGAN: You can put that down. You can put that down, sir. Thank you.

Q. Mr. Kramer invited you as a guest to that event in California; correct?

A. Yes.

Q. And you were aware that CVS had paid a $30,000 charitable contribution or made a $30,000 charitable contribution to obtain the tickets to that event?

A. I didn't know that they had -- I knew they were a sponsor, but I didn't know what the amount was or contributor in exchange for tickets or anything like that. I didn't know.

Q. You did know that it was a charitable event; correct?

A. Yes. It was the Susan B. Komen Breast Cancer Foundation.

Q. Did you know that CVS didn't pay for the tickets directly, that the tickets were given as part of a charitable promotion?
A. No.
Q. Were you aware that Mr. Kramer had tried to get other people at CVS to join him on this trip before he invited you?
A. No.
Q. Mr. Kramer invited your wife to attend with you on this trip; correct?
A. She wasn't someone else at CVS. Is that what you mean, someone else at CVS?
Q. Mr. Kramer invited your wife to accompany you on the trip to California; correct?
A. Yes. I went over that earlier, yes.
Q. And your wife and Mr. Kramer's wife, Lynn, they had met before; correct?
A. Yes, sir.
Q. They had met on a number of occasions?
A. Yes, a few occasions.
Q. And you testified earlier that your wife could not attend. You testified I believe yesterday that your wife could not attend because you couldn't get a baby-sitter for your children; correct?
A. Yes.

Q. But did you inform Ms. McCusker that the reason why your wife could not attend was because she was ill?
A. My mother-in-law was ill.
MR. CORRIGAN: Can we have Government Exhibit 341 displayed, please.
Q. Do you recall seeing this e-mail when Mr. Dambruch showed it to you in your direct examination?
A. Yes.
Q. And this is about the trip to the California golf event; correct?
A. Yes.
Q. Is that right, sir? And do you see that Ms. McCusker wrote, "Should be a fun trip. You will owe one to Karleen"? Karleen is your wife; is that right?
A. Excuse me?
Q. Karleen is your wife; is that correct?
A. Yes.
Q. And Ms. McCusker went on to write, "Hope she is feeling better. Not fun or easy when the mom is not feeling well." Do you see that, sir?
A. Yes. It was --
Q. Had you, in fact, told Ms. McCusker that your wife was ill and that's why she could not attend the trip?
A. Her mother was ill. We only have two people

baby-sitting for our children when they were younger, my father-in-law and my mother-in-law. And my father-in-law was playing in a senior softball tournament out of town, and that left my mother-in-law, and that was it.
Q. So you didn't tell Ms. McCusker that your wife was ill?
A. No.
Q. At some point you did have a ticket for your wife to attend the event; is that correct?
A. I don't recall. I may have had one and sent it back or something, but --
MR. CORRIGAN: May we have Kramer T-4, which I believe will be admitted in full pursuant to stipulation.
(Defendant Kramer Exhibit T-4 was admitted in full)
Q. Senator Celona -- excuse me, Mr. Celona, do you see here that this is a September 18th, 2003, e-mail from a Debbie Klouse regarding the celebrity golf event in 2003?
A. Yes.
Q. And do you see here that this is an itinerary that was booked for you for that occasion?
A. Yes.

Q. And do you see that it included not only yourself but your wife?
A. Yes.
Q. These were tickets for your wife to go to the event, correct, American Airlines --
A. Yes.
Q. -- plane tickets? Is that correct?
A. Yes.
Q. So you did receive plane tickets for your wife to attend the event; correct?
A. I received confirmation; but it was sufficiently changed in time where no plane tickets or anything, I was told, were not issued. I didn't receive any. I know that. Neither did she.
MR. CORRIGAN: We can take that down.
Q. Mr. Celona, when you were at the event in California, and that was an event, a breast cancer foundation event for Susan Komen breast cancer -- the Susan Komen Breast Cancer Foundation; correct?
A. Correct.
Q. And did you make a $500 charitable contribution when you were at that event?
A. Yes.
Q. Did you make that contribution from your campaign funds?

A. Yes, sir.
Q. Mr. Celona, you were the owner and operator of a family business for quite some time, weren't you?
A. With my brother and first my father.
Q. What was the name of that business?
A. Celona, Incorporated.
Q. And in the time period of 1996 to 1997, Celona, Incorporated, owned a store; correct?
A. Yes.
Q. And that store sold power equipment?
A. Yes.
Q. And in that period of time, 1996 and 1997, the business started to perform poorly; isn't that correct?
A. Yes.
Q. There were other large chain stores that were selling the equipment that your store was selling at lower prices; correct?
A. They were selling less -- they were selling them to the public less than what we could buy them for.
Q. So they were selling them at prices that were undercutting your prices; correct?
A. Yes, sir.
Q. And it became very difficult for your business to compete against those large chain stores; isn't that right?

A. Right.
Q. And eventually did you have to close down the store?
A. Yes, sir.
Q. And did that happen in 1997?
A. I think it was '97 or '98.
Q. And in 1998, your income from the Rhode Island state Senate was $10,500; correct?
A. I believe that's what it was, yes.
Q. And that wasn't enough to sustain your family, was it?
A. No.
Q. And with the business, your Celona, Inc., having to close the store, you needed to earn additional income to support your family; isn't that right?
A. Yes.
Q. And you started looking for work, didn't you?
A. Yes.
Q. And you sent out hundreds of resumes in an attempt to gain employment, didn't you?
A. Yes.
Q. Did you send a letter to Bill Parcells at one point?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Approach.

(Bench conference held on the record)

MR. DAMBRUCH: Your Honor, I object on relevance grounds. Whether or not Mr. Celona sent a letter seeking employment to Bill Parcells is clearly irrelevant to the matters before the Court.

THE COURT: Where are we going? Are you going to go through all 100 letters?

MR. CORRIGAN: No. I just want to do this one, and here's why. This is a letter that --

THE COURT: Let me just read it.

(Pause)

THE COURT: Okay.

MR. CORRIGAN: Part of the importance for this letter from the defense, your Honor, is that you'll see that the letterhead is The Image Group. Now, one of the elements of the charges that the Defendants are facing is that there would have to be an intent to deceive. And an easy way to deceive the public and anyone else about a consulting relationship would be to do it in a fictitious or a phony name.

CVS did not do that. CVS paid Mr. Celona in his very own name, issued 1099s in his name. And he, before entering into the relationship with CVS, was touting himself as The Image Group. I think it's relevant.

THE COURT: This is the only one?

MR. CORRIGAN: It will be. One other matter, your Honor. I did speak to Mr. Dambruch about the taxes issue, and I think that what we can do is issue a revised stipulation.

THE COURT: Let's do this afterwards. Why don't you go through this, and then we'll break.

MR. CORRIGAN: I can do one other short thing.

THE COURT: Okay. Let's do that and then break.

(End of bench conference)

MR. CORRIGAN: May we please display for the witness and the jury Kramer P-18, please.

Q. Mr. Celona, do you recognize this to be a letter that you wrote to Bill Parcells on March 10th of 1997?

A. Yes.

Q. And this was a letter in which you wrote to Mr. Parcells that, "With perceptions so important, we at The Image Group can train you and your team to manage" --

MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained. Just ask a question.

Q. Mr. Celona, do you see that the name at the top of this letter, the letterhead is The Image Group?

A. Yes.

Q. What is The Image Group?

A. That was a one-time thing that I had just mailed out at that point.
Q. That was a name that you had made up?
A. I was just going to start something, and then I never got it off the ground.
Q. And you never used that name, The Image Group, again?
A. No, not to my knowledge.
Q. You never used that name, The Image Group, with CVS, did you?
A. No.
MR. CORRIGAN: Mr. Celona -- we can take that down, please.
Q. You began meeting with the Government and agents from the Government sometime in the fall of 2004; isn't that correct?
A. Excuse me?
Q. You began meeting with representatives of the Federal Government beginning in the fall of 2004; correct?
A. I would say around that time.
Q. And you spoke to them on various occasions about your consulting relationship with CVS; correct?
A. Yes.
Q. Do you recall that you spoke with them on nine

occasions in 2004?
A. Not specifically. I'd have to be shown, but not specifically nine.
Q. Do you have any recollection that you spoke with them on six different occasions in 2005?
A. I can't specifically state the numbers.
Q. You met with them again on multiple occasions in 2007; isn't that right?
A. 2007? I don't believe it was multiple occasions in 2007. It may have been. What do you determine as multiple?
Q. More than one.
A. It may have been. I'd have to see the dates.
Q. I think I skipped 2006. You did meet with the Government agents on multiple occasions in 2006, didn't you?
A. Yeah, I would assume that. But, again, is multiple in your determination more than one? Is that how you determine it?
Q. Yes. I believe that's what I just said to you.
A. Perhaps, yes; but, again, I'd have to see the dates and the times.
Q. Well --
A. To specifically say yes to each one.
Q. You wouldn't be surprised to hear, then, that the

parties have entered into a stipulation in this case, the Government and the lawyers for the Defendants, that you met with Government agents on nine times in 2004?
A. I wouldn't be surprised?
Q. You wouldn't be surprised to hear that was the number?
A. Are you saying that they did enter that -- into a stip -- is that what it's called, a stipulation?
Q. Yes, that's what it's call.
A. If that's what it is, that's what it is. It is what it is.
Q. And you wouldn't be surprised to hear that the stipulation indicates that you met with Government agents on six times in 2005?
A. Again, if that's what the records indicate.
Q. And you also met with them, the stipulation indicates, on seven times in 2006?
A. Again, if that's what the records indicate.
Q. And in 2008, you met with Government representatives, correct, to prepare for this trial?
A. Yes.
Q. In fact, you met with the representatives of the Government as recently as this past Sunday, May 18th; isn't that right?
A. Yes, sir.

Q. And that was the day before you gave your direct examination at this trial; correct?
A. Yes, sir.
Q. Would you agree with me that you've met with the Government for more than -- on more than 25 occasions since 2004?
A. You'd have to add up the times. I wasn't adding them up as you were going down the lines; but whatever they add up to, that's what they are.
Q. And we've never spoken at all, have we, before I began questioning you yesterday; isn't that right?
A. Not at all.

THE COURT: We're going to break. We'll break for the day.

Members of the jury, that concludes today's session. Please leave your notebooks on your seats. Remember, don't talk about the case at all with anyone.

I know it becomes increasingly more difficult to follow that instruction as the case goes on, but it would be a violation of your oath as jurors if you were to begin talking about the case before the end. So don't do it.

Instead, enjoy the rest of the day, rest up, come in tomorrow morning. I expect we'll go again from 9 to 1. Please leave your notebooks on your seats.

Bob, you may see the jury out.

(The jury is not present for the following)

THE COURT: May I see counsel, please, to talk about scheduling tomorrow.

(Bench conference held off the record).

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date