IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 23, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and *<br>CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

# I N D E X

| GOVERNMENT WITNESS | PAGE |
|---|---|
| James Smith | |
| Direct Examination by Mr. Petalas | 5 |
| Cross-Examination by Mr. Corrigan | 20 |
| Cross-Examination by Mr. Kiley | 31 |
| Todd Andrews | |
| Direct Examination by Mr. Dambruch | 41 |
| Cross-Examination by Mr. Fein | 59 |
| Cross-Examination by Mr. Kiley | 78 |
| Redirect Examination by Mr. Dambruch | 84 |
| Susan DelMonico | |
| Direct Examination by Mr. Petalas | 86 |

# E X H I B I T S

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 390 | | 104 |
| 391 | | 104 |
| 392 | | 104 |
| 393 | | 104 |
| 394 | | 100 |

| DEFENDANT KRAMER | FOR ID | IN FULL |
|---|---|---|
| A-8 | | 73 |
| A-23 | | 75 |
| E-16 | | 25 |
| Q-4 | | 63 |
| R-2 | | 27 |
| U-7 | | 70 |
| U-16 | | 20 |

23 MAY 2008 -- 9:00 A.M.

(The jury is present for the following)

THE COURT: Good morning.

MR. PETALAS: Your Honor, may I approach?

(Bench conference held on the record)

MR. PETALAS: Your Honor, I just wanted to raise with you in advance of calling Mr. Smith, who will be our first witness, the issue of the fact that I want to go into his conversations with Mr. Ortiz about the budget.

Those are the only conversations. I'm not going to go into the conversations reflected in his transcript that were sort of Monday-morning quarterbacking conversations. I'm not going to go there, but I wanted to raise the issue with you in advance --

THE COURT: What is he going to say?

MR. PETALAS: Your Honor, the witness should say that Mr. Ortiz identified John Celona in the budget review, said that it wasn't a big spend or they weren't getting their bang for the buck and that the relationship should be terminated.

MR. CORRIGAN: We have no objection to that, your Honor.

MR. KILEY: My position on all of these matters,

Judge, I have no objection to it. You understand my position, which is reflected in our position on the grand jury testimony with respect to completeness.

THE COURT: I understand. Okay.

(End of bench conference)

MR. PETALAS: Your Honor, the United States calls James Smith.

**JAMES SMITH, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: James Francis Smith, S-M-I-T-H.

THE COURT: Mr. Smith, you can adjust that microphone. It bends. We'll need you to speak directly into it and keep your voice up.

THE WITNESS: Certainly.

**DIRECT EXAMINATION**

**BY MR. PETALAS**:

Q. Good morning, Mr. Smith.

A. Good morning.

Q. Mr. Smith, would you please describe your current position.

A. My current position is I'm a pharmacy health care consultant.

Q. And, Mr. Smith, at some point did you work for CVS?

A. Yes, I did. I worked for CVS from 2000 to 2004 as senior vice president of health care services.

THE COURT: Mr. Smith, pull the microphone closer. Thank you.

Q. Mr. Smith, between 2000 and 2004, as the senior vice president for health care services, what were your duties and responsibilities?

A. My duties when I first started were pharmacy contracting, pharmacy information systems, pharmacy operations, and that was -- and we had clinical under that part and pharmacy automation.

Q. Okay. Mr. Smith, what was your background that led you to obtain that position?

A. My entire background is I started out as a pharmacist. I worked my way from being a pharmacist in a store, managing stores, being assistant district manager, district manager, regional operations manager, vice president of loss prevention and operational audit.

I was a senior vice president of mail service pharmacy group, senior vice president of managed care which was a PBM/mail service combination, then senior vice president of e-commerce.

Q. Mr. Smith, if I can just interrupt. Now, these were all positions you had prior to you arriving at

CVS; is that right?
A. That is correct.
Q. For other pharmacy companies?
A. It was one single company. It was a company called Thrift Drug. And Thrift Drug did a series of acquisitions and was owned by J.C. Penney and actually was -- J.C. Penney acquired Eckerd, and Eckerd and Thrift combined, and it became known as the Eckerd Corporation.
Q. And at some point you came to be employed at CVS?
A. That's correct.
Q. That was in 2000?
A. Correct.
Q. And you mentioned the duties that you had as the senior vice president for health care services. At some point did your duties also include government affairs?
A. Yes. Somewhere around I think 2003, I was assigned government affairs.
Q. Do you have any recollection of approximately when in 2003 that happened?
A. Not exactly the date. I believe it was somewhere in the May time frame.
Q. Okay. When you went to government affairs, what duties and responsibilities did you assume in

government affairs?
A. It was really -- government affairs consisted at that time of a couple individuals, Carlos Ortiz and Mike. Those two people would now report to me, and the pharmacy operations side reported to the -- to another individual.
Q. Okay. When you came on into government affairs, did you take over that role from anyone else?
A. Yes. Jack Kramer was previously in charge of government affairs.
Q. And what happened to Jack Kramer when you came to government affairs?
A. I don't know what all positions he took. I just assumed those responsibilities.
Q. Did he retain any responsibilities for any regions or states within government affairs?
A. Yes, he -- I received -- I took over all government affairs on the federal side, on the state side, except for the State of Rhode Island, and that remained with Jack Kramer.
Q. Okay. You said there was an individual named Mike; is that right?
A. Yeah. Mike worked for Carlos.
Q. Do you know his last name?
A. I should remember it, but I don't. I'm sorry.

Q. Is it Mike Ayotte?
A. Ayotte. Mike Ayotte. That's correct.
Q. Did you assume any responsibility for matters involving, for example, the Charity Classic that CVS runs or the Downtown 5K or anything like that?
A. No, I had none of those responsibilities.
Q. Do you know whether Jack Kramer retained those responsibilities?
A. Yes, I believe he did.
Q. What was the reporting structure when you came to government affairs? How did that work?
A. Carlos -- Mike Ayotte reported to Carlos, Carlos reported to Jack Kramer, and I'm not certain of Jack's. I think he reported to Dave Rickard.
Q. After you took over government affairs, how, if at all, did that change?
A. Carlos started reporting to me, Mike Ayotte still reported to him, and I reported to Doug Sgarro.
Q. Who is Doug Sgarro?
A. Doug Sgarro was the senior VP of -- he picked up strategy, he picked up my pieces that I have on the pharmacy negotiation side, and he had real estate also, and he was also the senior legal side.
Q. And to whom did Doug Sgarro report?
A. Doug reported directly to Tom Ryan.

Q. For matters involving Rhode Island, to whom did Carlos Ortiz report on those?
A. Carlos reported to me; but if there was anything specific on Rhode Island, Jack got involved in that.
Q. Did you know Carlos Ortiz prior to taking over the head of government affairs?
A. Yes, I did. When I was at Thrift Drug, Eckerd Drug, at national meetings when companies got together to talk about common problems, we would have both pharmacy operations, which side I was on, and many government affairs folks come together in similar meetings. I had met Carlos in those meetings before.
Q. When you became employed at CVS, did you ever have dealings with Carlos Ortiz prior to you taking over the government affairs position?
A. Yes.
Q. And what were those -- how do you characterize those dealings?
A. If there was anything that -- first of all, we were both on a -- our national association was called National Association of Chain Drugstores, NACDS. It was a very active organization for pharmacies, and we talked about common issues which we would attack.
Carlos was on the government affairs side, and I was on the operations side. We combined those into

what we call the NACDS policy council, which I was chairman of. Carlos was the other CVS representative there, and we actually had operations and government affairs talking together in one meeting about industry issues. So a dealt a lot with Carlos on those issues at those type of meetings.
Q. So it was -- pharmacy operations, is that different than government affairs responsibilities?
A. Yes, they are.
Q. Did you have any government affairs background when you became the senior vice president charged with government affairs?
A. I did not have any background running government affairs.
Q. When you had government affairs issues or questions that would arise either before becoming the -- responsible for government affairs or after, to whom would you -- from whom would you seek advice?
A. I would go to Carlos.
Q. When you took on responsibility for government affairs in or around May of 2003, were you given any directives from your supervisors about tasks that were to be accomplished there?
A. I wasn't given any specific directions. Obviously, most of the government affairs work that we

did at CVS was around pharmacy. That's my expertise, is knowledge of pharmacy, in-depth knowledge of pharmacy.

So when we had issues, Carlos and I previously would work together in developing a plan, and then Carlos would go to the government affairs -- do the government affairs side and execute those plans.

So a lot of that didn't change. I still had other responsibilities outside of government affairs. So it really didn't change that much.

Q. And in taking on management responsibilities for the government affairs section within CVS, did your boss, Doug Sgarro, indicate that he wanted you to take any first steps relating to the management or the budget of that section?

A. Yes. Immediately upon taking the government affairs part, Doug asked me to take a thorough review of the budget. We had just gone through a big issue in Massachusetts, and he was concerned about if we had the right lobbyist there and should we be -- and he wanted us to review every line item in the government affairs budget.

Q. And which budget is this that he's speaking of?

A. The government affairs budget.

Q. And for which year?

A. 2003 when I took over.
Q. So would this be the 2003 -- what remains of the 2003 budget from the time you took over until the end of the year?
A. I'm sorry. I didn't understand the question.
Q. The budget that you're talking about doing a line item review of, you come into government affairs sometime around May of 2003; is that right?
A. Correct.
Q. So the portion of the budget that you're talking about reviewing, is that what's left of the 2003 year budget?
A. Yeah. What we reviewed was the budget in total, what was budgeted for the year and where we were through May, were we at budget, below budget or above budget. And so we would review that and go forward.
Q. Was there any plan to change anything in the budget as a result of this review process?
A. My task was to come back with recommendations.
Q. Did you tell Carlos Ortiz about this?
A. Yes. I asked Carlos to prepare it for me. I had not seen the budget when I took over, and I asked Carlos to put it together with his recommendations.
Q. And did that -- did you meet with him on that matter?

A. Yes, I did.
Q. And what happened?
A. We went through every line item. We went through the lobbyist we had in the budget, and we had quite a bit of conversation about our lobbyist in Massachusetts since that was really the most recent struggle we had. And Carlos convinced me that he was the right guy for the job and we were getting value for what we were spending.
We saw the line item on John -- Senator Celona as a consultant. I asked Carlos if we're getting any value for that, for the dollars we're spending. He said no and he would recommend we terminate it, and that's the recommendation that I went back to Doug with.
Q. Okay. Let me break that down a little bit if I may. About when do you -- to the best of your recollection, do you recall this meeting occurring after you took over responsibility for government affairs?
A. To the best of my recollection, it was probably the following month. It was one of the first things I did, so it was probably June.
Q. And had you informed Mr. Ortiz in advance that this was to be a line-by-line or line item review?

A. Yes.
Q. Was there anyone else present for the meeting with Carlos Ortiz that you just described?
A. No, just Carlos and myself.
Q. Did you go over any documents related to that review?
A. I asked Carlos to prepare the budget and his recommendations. So whatever he prepared at that time is what we would have gone over. I don't recall exactly the documents which we reviewed.
Q. Okay. Do you recall whether the name John Celona was included in these documents?
A. Yeah. The consulting contract was part of the budget and was to recommend -- his recommendation was to discontinue it.
Q. And just to be clear, are we talking about a summary budget document or are you talking about a budget document that reflects item -- line item entries?
A. We're talking summary. By summary, I mean the summary would be a lobbyist from Massachusetts, our national lobbyist or a lobbyist from Rhode Island, the consulting contract and those type of items. We wouldn't say we spent $100 for whatever the task was. It was more summary at that level.

Q. So, in other words, a particular vendor, there wouldn't be an itemization of everything you received from a particular vendor?
A. That is not what I looked at, correct.
Q. But it would show the vendors?
A. Yes, it should have.
Q. And was John Celona one of the vendors or consultants that was listed on this document?
A. Yes, he was.
Q. So what exactly did Carlos Ortiz tell you about what John Celona did for CVS?
A. In each of the line items we reviewed, we asked -- the question was, are we getting value for the dollar we spend. And in the other cases, the answer was yes. In the response to value for the dollars we spend on John Celona, the answer was no.
Q. Did he explain why it wasn't a good spend?
A. He just said he didn't think we were getting the value -- to the best of my recollection, he didn't say -- he said that we weren't getting the value of the dollar we spend, and I valued Carlos' opinion. I forwarded on in those situations, and I took that recommendation.
Q. Did he explain what it was that -- what services it was that Senator Celona had been providing?

A. Just that he was a consultant on senior citizens matters.
Q. Did he say anything at all about Senator Celona's then television show?
A. Not that I can remember.
Q. Did he say anything at all to you about legislative or other official acts that Mr. Celona may have taken for CVS?
A. Not that I can remember.
Q. What was your understanding of how much money was due to be paid to Mr. Celona for the rest of the 2003 budget at that time?
A. I believe it was $1,000 a month.
Q. So this is a review that, to the best of your recollection, was occurring sometime in June. About how much money are you talking about saving the government affairs budget at this point in time?
A. It would be $6,000 for -- probably $6,000 for the rest of the year.
Q. Was there any other line item that Mr. Ortiz recommended cutting?
A. No. We kept the rest of the budget in place.
Q. And you said you accepted that recommendation?
A. Yes.
Q. What did you do after Mr. Ortiz told you that the

money spent on Mr. Celona was not a value?
A. I took the entire budget, which we reviewed, and all the recommendations, and I met with Doug Sgarro, and I reviewed the entire budget and what we recommended we keep and what we recommended we get rid of.
Q. Did you tell Mr. Sgarro that you recommended terminating the contract with Mr. Celona?
A. Yes.
Q. And what happened then?
A. Doug said okay, and he asked why, and I told him that Carlos didn't feel we were getting value for the dollar, and he said he'd get back to me.
Q. Did he get back to you?
A. Yes, he did.
Q. To the best of your recollection, about how long thereafter?
A. Probably about a week, and it could vary a couple of days here or there.
Q. Do you recollect how it was that the decision to terminate Mr. Celona was effected?
A. He told -- to the best of my recollection, he told me that he would handle it with Jack and I should tell Carlos.
Q. Do you know why it was he wanted to handle that

with Mr. Kramer?
A. I do not know.
MR. KILEY: I was too late, your Honor.
Q. Did you have any further involvement in the -- in terminating the relationship with Mr. Celona?
A. I did not.
Q. During this time period when the matter of Mr. Celona being terminated is a subject matter, did you have any further discussion with Mr. Ortiz about the decision or about how to go about terminating the relationship with Mr. Celona?
A. No. Once I told Carlos that it was -- that we took -- we accepted his recommendation, that was really the last discussion we had on it.
Q. Did you inform Carlos to work with Mr. Kramer on seeing that he be terminated?
MR. CORRIGAN: Objection, your Honor.
MR. KILEY: Objection, your Honor.
THE COURT: Just a minute. Sustained. Stop leading your witness.
MR. PETALAS: Certainly, your Honor.
Q. Do you recall any other conversation with Mr. Ortiz about the decision to fire Mr. Celona during this time frame?
A. I just told him what Doug had told me, that we're

going to terminate it, he was going to work with Jack and he'd hear from Jack.

MR. PETALAS: No further questions, your Honor.

THE COURT: Cross.

**CROSS-EXAMINATION**

**BY MR. CORRIGAN**:

Q. Good morning, Mr. Smith.

A. Good morning.

Q. Mr. Smith, you testified that you believe you became head of government affairs sometime in May of 2003; is that right, sir?

A. To the best that I can remember.

MR. CORRIGAN: I'd like to have displayed for the witness and for the jury Kramer U-16. U-16 will be a full exhibit pursuant to stipulation.

THE COURT: Okay.

(Defendant Kramer Exhibit U-16 was admitted in full)

Q. Sir, this is a document that has two dates on it, May 1 of 2003 and May 2 of 2003. Do you see that?

A. Yes, I do.

Q. And it is a document entitled "Organizational Changes." Do you see that?

A. I do.

Q. And do you see that in the second full paragraph

of the document, it indicates that Mr. Ryan, who is the author of the memo, has asked you to be our new senior vice president, health care services and government affairs, reporting to Doug Sgarro, CLO and president, CVS Realty Co. Do you see that, sir?
A. I do.
Q. Does seeing this document confirm your belief that you were appointed to the position of head of government affairs in May of 2003?
A. Yes.
Q. After Mr. Sgarro's name, there are three letters, C-L-O. What do those letters refer to?
A. Chief legal officer.
Q. At the time was Mr. Sgarro the chief legal officer of CVS?
A. Yes.
Q. And did he remain the chief legal officer of CVS for the entire time that you were at CVS?
A. Yes.
MR. CORRIGAN: We can take that down. Thank you.
Q. Mr. Smith, had you interacted with Mr. Kramer at CVS prior to the time that you were appointed head of the government affairs department?
A. Probably talking to him about the CVS Classic more

than anything else but not really on the government affairs side.
Q. You had some awareness of Mr. Kramer's involvement in the CVS Charity Classic?
A. Yes.
Q. What was your knowledge of Mr. Kramer's involvement?
A. Well, he was the face of the CVS Classic, the spokesman for CVS, and we were all pretty proud of the Classic. It was a nice event.
Q. Were you aware that part of Mr. Kramer's duties and responsibilities were to promote the CVS Charity Classic?
A. Absolutely.
Q. Did you ever hear Mr. Kramer promoting the CVS Charity Classic on the radio?
A. Yes, I did.
Q. How many occasions did you hear him on the radio promoting the Classic?
A. Just a few times, usually on the way home from work if he was on a sports show or whatever talking about the pros that were playing.
Q. Mr. Smith, you discussed during the questioning of Mr. Petalas the decision to terminate the consulting relationship with Mr. Celona. Do you recall that?

A. I'm sorry. Who was the discussion with?
Q. Mr. Petalas, the lawyer who was questioning you.
A. I'm sorry. Okay.
Q. You just spoke about that; right, sir?
A. Yes. Yes.
Q. During those communications that you had with Mr. Ortiz about the relationship with Senator Celona, did the name Gordon Fox come up at all?
A. Not that I recall.
Q. When you communicated with Mr. Sgarro, the chief legal officer of the company, about the relationship with Senator Celona, did the name Gordon Fox come up at all?
A. Not that I recall.
Q. Mr. Smith, did you ever meet Senator Celona?
A. I met him one time.
Q. And do you recall --
A. To the best of my recollection, that's the only time I've met him.
Q. Do you recall the circumstances under which you met Mr. Celona?
A. Yes, I do. It was a Chamber of Commerce dinner.
Q. Was there a speaker at the Chamber of Commerce dinner?
A. Yes. It was the CEO of GTECH.

Q. Do you remember the name of the CEO of GTECH?
A. I do not remember the name. I just remember his presentation.
Q. Does the name Bruce Turner ring a bell with you?
A. I believe that was it.
Q. That was the executive from GTECH that you heard speak?
A. I believe that's so. That's correct.
Q. And this event, this Chamber of Commerce event, had CVS purchased a table at the event?
A. Yes.
Q. And certain CVS executives attended the event?
A. That's correct.
Q. Do you remember any of the CVS executives who attended the event?
A. I really don't remember who all sat at the table. I'm sure Carlos was there. I was there. I don't know who else was. And from CVS, it's hard to say. We were invited to a lot of those, and you never knew -- you had to attend some, but. . .
Q. Do you recall whether Zenon Lankowsky attended that event?
A. I don't remember for sure, but I wouldn't -- he went to a lot of those, so I wouldn't be surprised if he was there.

Q. And Mr. Lankowsky, he at the time was the general counsel of CVS; correct?
A. That's correct.
Q. Reporting directly to Doug Sgarro; is that correct?
A. Correct.
Q. In any event, there were a number of CVS executives at this table; correct?
A. Yes.
MR. CORRIGAN: May we have Kramer Exhibit E-16 displayed, and I believe this will be a full exhibit pursuant to stipulation.
MR. PETALAS: No objection.
THE COURT: It's full.
(Defendant Kramer Exhibit E-16 was admitted in full)
Q. Sir, do you recognize this document?
A. Yes, I do.
Q. Is this a document that was frequently circulated amongst executives at CVS?
A. Yes, it was.
Q. And what was the purpose of this document, sir?
A. CVS supported a lot of community events like this. And if we bought a table or we did something, they wanted someone from -- some executives from CVS to

attend these events. So if you really wanted to go to one, this was your chance to get there before you got assigned.
Q. And if -- even if you didn't want to go, there were occasions where you would be assigned; is that correct?
A. That's correct.
Q. And do you see that this document indicates certain events occurring in November of 2003?
A. Yes, I do.
Q. I'd ask you to turn to third page of the document. Do you see that there's an entry at the top of the document for the Chamber's 136th annual dinner?
A. Yes, I do.
Q. Is this the event that you were just speaking about where you met Mr. Celona?
A. Yes.
Q. And you know that because of who the keynote speaker is; correct?
A. Correct. That's the only way I would know.
Q. And it indicates that the date of this event was Monday, November 24th; correct?
A. Correct.
Q. And that would have been Monday, November 24th of 2003; right?

A. Correct.
Q. So this event occurred after you and Mr. Ortiz had spoken about the relationship with Senator Celona; correct?
A. Correct.
Q. And it also occurred after you had spoken with Mr. Sgarro about the relationship with Mr. Celona; correct?
A. Correct.
Q. While you were at this event, did you tell any of the other CVS executives who were at the event that Senator Celona had been a consultant for CVS?
A. Not that I recall.
Q. Sir, when you took over the government affairs department, part of what you've testified to this morning was -- withdrawn. When you took over for government affairs, you reviewed the budget; correct?
A. Correct.
Q. And you reviewed budget documents for the government affairs department?
A. Correct.
MR. CORRIGAN: I'd like to have displayed for the witness and the jury Kramer R-2, which will be a full exhibit pursuant to stipulation.

(Defendant Kramer Exhibit R-2 was admitted in full)
Q. Sir, do you see that this is an e-mail dated October 16th of 2003?
A. Yes.
Q. This is an e-mail from Robin Seeley. Do you see that?
A. Yes.
Q. And you know that Ms. Seeley worked for Mr. Ortiz in the government affairs department?
A. Yes.
Q. And there are other -- this was an e-mail sent to Gregory Tucker. Do you see that?
A. Yes, I do.
Q. Who is Mr. Tucker?
A. I hate to say this. I don't remember.
Q. That's okay. Do you see that the copied individuals on here are Mr. Ortiz; correct?
A. Yes.
Q. And Debra Mullin. Do you see that?
A. Yes, I do.
Q. Who is Debra Mullin?
A. She was my admin.
Q. And do you see what Ms. Seeley was doing by this e-mail was forwarding the proposed 2004 budget?

A. Correct.
Q. And if we turn to the second page of this document, and in fact, sir, if you flip through the other pages, do you see that this is the proposed budget for the government affairs department for the 2004 calendar year?
A. Yes.
Q. This is the -- some pages for the proposed budget for the government affairs department for 2004; correct?
A. Correct.
Q. I'd like you to take a look at the second page of the document, and do you see up at the top the heading is for the political contributions account?
A. Yes.
Q. And do you see that John Celona is listed in that account? Do you see that, sir? There's an entry for John Celona on the second page. Do you see that? Are you on the second page of the document? And when I say the second page, Mr. Smith, what I'm referring to is if you hold the whole document and just flip to the second page of it.
A. So it's page 1 of the document?
Q. It's page 1 at the bottom.
A. I'm on the wrong page. Sorry. Yes, I now see

that.
Q. Do you see that Mr. Celona is listed?
A. Yes.
Q. Now, Mr. Celona ultimately did not wind up being included in the budget for 2004; correct?
A. Correct.
Q. I'd ask you to turn to the next page, if you just flip to the next page of the document, and do you see that this is a continuation of the political contributions account for the budget?
A. Yes.
Q. And do you see about a third of the way down the document there's an entry for Weber Shandwick?
A. Yes.
Q. And the proposed budget spend for Weber Shandwick for 2004 was $60,000. Do you see that?
A. Yes, I do.
Q. What is Weber Shandwick?
A. We used them to help us on some PR issues in Rhode Island.
Q. When you say PR --
A. Public relations. Sorry.
Q. Weber Shandwick is a public relations firm?
A. I know that's what they helped us with. I don't know if they do anything else other than that.

Q. And do you see that two lines down from Weber Shandwick there's a word "miscellaneous"?
A. Yes.
Q. And Weber Shandwick appears above the "miscellaneous" line; correct?
A. Correct.
Q. Mr. Smith, I want to take you back to that November 24, 2003, Chamber of Commerce dinner. Was Senator Celona a guest of CVS at that dinner?
A. Yes, he was.
Q. And Senator Celona sat at the CVS table at that dinner?
A. Yes, he did.
MR. CORRIGAN: One moment, your Honor.
(Pause)
MR. CORRIGAN: Nothing further, your Honor.
THE COURT: Mr. Kiley.
MR. KILEY: Thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. KILEY**:
Q. Let me introduce myself to the jurors. Good morning. And to you, Mr. Smith, my name is Tom Kiley, and I represent Carlos Ortiz. You told the jurors that you knew Carlos Ortiz before you joined CVS. Do you recall that?

A. Yes, sir.
Q. How long have you known Carlos Ortiz?
A. Wow. Before I joined CVS, probably five, seven years, somewhere in that range.
Q. And --
A. Maybe longer. I don't know.
Q. And you principally knew him through the organization that you labeled NACDS?
A. Correct.
Q. Would you tell the jurors what NACDS did.
A. NACDS was a nonprofit organization representing -- that members of retailers that had pharmacy belonged to so that they could work on common issues. It wasn't just pharmacy. It was also merchants, whether it was out front.
You had the members, which were retailers, and on the other side you had a lot of the vendors who were participants. And what it did is it provided a forum to talk about common interests in retail and especially in pharmacy.
Q. These were things that were shared by a large group of pharmacies?
A. Not only pharmacies. There was an out-front group, a merchandising group that got together; but it was a great forum to be able to talk about common

issues and common problems as long as you stayed away from pricing and issues that you couldn't talk about.
Q. And those common issues and common problems included policy matters relating to regulation or legislation, didn't they?
A. Yes, they did.
Q. And I think you told Mr. Petalas, who is the Government lawyer who examined you, that at some point a policy council was formed?
A. That's correct. You know, NACDS used to have government affairs as one group, pharmacy operations as a separate group. Larry Kocot, who was the general counsel over at the NACDS, thought it was best to bring both together since most of the government affairs work was on pharmacy. So he created what he called policy council.
Q. Now, when you were at -- was it Thrift Drug and then Eckerd? When you were at Thrift Drug and you were involved with NACDS, you were involved on the pharmacy operations side; correct?
A. That is correct.
Q. You interacted, though, with Carlos Ortiz in that capacity; correct?
A. That's correct.
Q. And he was on the government affairs side;

correct?
A. Correct.
Q. And you interacted with him on policy matters affecting chain drugstores nationally; correct?
A. Correct.
Q. And you did that for a number of years?
A. Yes.
Q. You knew him before you arrived at CVS?
A. Yes.
Q. What was the nature of the relationship? Would you please describe it to the jury.
A. Well, it was a professional relationship in meetings which we had where we discussed these issues. Carlos was, I would say, the -- of all the people in the industry, he was probably the most knowledgeable government affairs guy there.
He certainly understood pharmacy. Being a pharmacist, it helped him; but he certainly had a great grasp of issues. And when he spoke in a meeting, it was always very well thought out, and he had a great respect among his peers and people from the other organizations.
Q. And so when you came to CVS in -- was it the year 2000?
A. Yes.

Q. You were in pharmacy operations, whatever they called it at that point, you came and you did pharmacy operations?
A. Yes. It was called health care services. Right.
Q. In that capacity at health care services, did you interact with Carlos Ortiz?
A. Yes.
Q. And was it again on policy matters and -- including legislative matters?
A. Yes.
Q. I think when Mr. Petalas examined you and he asked you about your experience in government affairs, you told him you had no experience managing government affairs; correct?
A. Correct.
Q. In fact, you had a lot of experience in government affairs when you took over government affairs, didn't you?
A. I had experience from the pharmacy side in whether it's testifying or stating a case because of my knowledge of pharmacy; but as far as the inner workings of government affairs and some of the detailed issues, I didn't know.
My expertise was in pharmacy. I testified a lot for NACDS and for CVS, whether it was in state Medicaid

issues or Medicare Modernization Act, those type of things.
Q. And I think what you said to Mr. Petalas on direct is that things really didn't change much when you went to government affairs, that you had worked with Carlos on developing a plan and implementing it when you were in health services and that continued when you went over to government affairs; correct?
A. Correct.
Q. And the things you worked on in terms of developing plans were these policy matters; correct?
A. Correct.
Q. So that didn't -- that aspect of things, what you did substantively didn't change just with the title; correct?
A. Correct.
Q. What changed is you had some budgetary responsibility and oversight?
A. Exactly.
MR. KILEY: Could I have Defendant's U-16 or we're calling it Kramer U-16.
Q. And at the risk, again, of messing this up, could I direct your attention to the same paragraph that we had on the screen with Mr. Corrigan. And could I direct your attention in this line, in this paragraph,

Mr. Smith, to the last sentence, the whole last sentence, please. You had a chance to look at that, Mr. Smith?
A. Yes.
Q. And did Larry Merlo replace you in health care services?
A. No. We -- I still kept health care services, although the operational responsibilities, they combined the out-front and pharmacy under another individual. And I still had -- a very large part of what we did was network contracting, which is reimbursement from the national insurance companies and pharmacy benefit management companies. That's the part that I had to work with Larry Merlo on.
Q. What input did you have in terms of the reorganization that is reflected in U-16?
A. I really didn't have any input at all on it.
Q. Now, while you were involved with pharmacy operations, before you became Carlos Ortiz's linear supervisor, if you will, did you have any involvement with -- would you know what I meant by buy-back legislation?
A. I'm not sure what you mean. Could you --
Q. You know the phrase manufacturer's recall?
A. Yes.

Q. And would you describe for the jury what it is that you mean by manufacturer's recall?
A. Well, if there is a manufacturing issue on any particular drug or lot number, a manufacturer will issue a recall, and it could be several different classes of recall and -- but they would have a public document that came out. We would have to bring all of that product back.
Q. Was there a time when you, through the policy council at NACDS, were involved in considering payments back and forth between pharmacies and manufacturers?
MR. PETALAS: Your Honor, I'm going to object. Beyond the scope.
THE COURT: Sustained.
MR. KILEY: May we have Government Exhibit 7. May we display to the witness the text of the statute.
MR. PETALAS: Your Honor, I object.
THE COURT: Just a minute.
MR. PETALAS: Beyond the scope still.
THE COURT: Mr. Kiley, where are we going?
MR. KILEY: I intend to examine this witness with respect to buy-back, e-prescription -- thank you.
THE COURT: Would you step down for a moment, please.
(Bench conference held on the record)

MR. KILEY: Thank you for calling me up.
THE COURT: You may not thank me when I'm done.
MR. KILEY: Oh, I know that. I do intend to inquire of this witness with respect to his knowledge and participation in e-prescription, buy-back and -- how come I always forget the third one? Canadian pharmacy.
He's involved in each one of these things, and he's capable of saying, your Honor --
THE COURT: Mr. Kiley, this is way beyond the scope of direct examination. If you wish to call him as your witness, you may do so in your case; but you're not going to do it on cross. That's my ruling.
(End of bench conference)
MR. KILEY: You may give that document back to the clerk.
Q. You took over the management of government affairs sometime in May of 2003?
A. Correct.
Q. And the areas that were within that unit, the areas were new to you as well as to Doug Sgarro, your direct report?
A. Correct.
Q. And Mr. Sgarro directed you in that first month to get your arms around things and report to him?

A. Correct.
Q. And I think you've described Carlos Ortiz as your go-to guy with respect to those issues?
A. Absolutely.
Q. And that was because you valued his input?
A. Correct.
Q. Now, the budget review was one of the things you did to get your arms around things; correct?
A. Correct.
Q. And with respect to the budget review, that budget review was not restricted to lobbyists, was it?
A. No, it was not.
Q. And in your direct examination with Mr. Petalas, you did not mean to imply that Mr. Celona was characterized as a lobbyist in any way, did you?
A. I did not.
MR. KILEY: May I have one minute, your Honor?
(Pause)
MR. KILEY: No further questions, your Honor.
THE COURT: Any redirect?
MR. PETALAS: None, your Honor.
THE COURT: You may step down.
MR. DAMBRUCH: Your Honor, the Government's next witness is Todd Andrews.

**TODD ANDREWS, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Todd Andrews, A-N-D-R-E-W-S.

THE COURT: Mr. Andrews, it's a big room. We need a big voice.

THE WITNESS: All right.

THE COURT: And if you would, please, just pull the mike close enough so that you can speak directly into it.

THE WITNESS: How's this, your Honor? A little bit louder?

THE COURT: A little louder would be better.

THE WITNESS: Very good.

**DIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Good morning, sir.
A. Good morning.
Q. Sir, by whom are you employed?
A. Brown University.
Q. And in what capacity?
A. I'm vice president of alumni relations.
Q. And how long have you served as the Brown University vice president of alumni relations?
A. Approximately two-and-a-half years.

Q. Now, prior to being employed by Brown University, were you employed at some other institution or company?
A. I was employed by CVS Pharmacy.
Q. And when was it that you began your career with CVS Pharmacy, sir?
A. I believe it was in December of 1998.
Q. And when you joined the company in December of 1998, what position were you hired for?
A. Manager of corporate communications.
Q. And can you please describe for us what your duties and responsibilities were with CVS as the manager for corporate, was it, communications?
A. Correct. I would handle press inquiries and answer press calls. I also worked on internal communications, such as the employee newsletter.
Q. And were you assigned to a particular department within CVS at that point in time?
A. The corporate communications department.
Q. Now, with regard to your hiring by CVS, who was it that hired you at CVS?
A. It was -- the person who phoned me and told me I had the job was a gentleman by the name of Fred McGrail.
Q. Had you interviewed with someone else before that phone call from Mr. McGrail?

A. Yes. I interviewed with Mr. McGrail and Jack Kramer.
Q. Now, when you joined CVS and took on the position of corporate communications manager, who did you report to?
A. I reported to Mr. McGrail.
Q. And how long did you retain the title of corporate communications manager?
A. About a year, a year and a half, and then I was promoted.
Q. And when you were promoted, sir, to what position?
A. Corporate communications director.
Q. And what, if anything, changed with regard to your daily duties and responsibilities?
A. They were basically the same.
Q. And was there any change in your reporting as far as who you reported to at that point in time?
A. Yes. I reported to the senior vice president of human resources.
Q. And who was that, sir?
A. Rosemary Mede.
Q. And did you continue to report to Ms. Mede throughout the remainder of your career at CVS?
A. No. At one point Ms. Mede left the company, and I reported to Michael Ferdinandi, the senior vice

president of human resources, who replaced her.
Q. When was it that you left CVS, sir?
A. I left CVS in November 2005.
Q. And between the time you were promoted to the director of corporate communications until the time you left, was there any further change in your title?
A. No.
Q. Were there any changes in your duties and responsibilities during that time frame?
A. No.
Q. Now, while you were at CVS, did you know an individual by the name of Carlos Ortiz?
A. Yes.
Q. And during your tenure at CVS, where was it that Mr. Ortiz worked within the CVS corporate structure?
A. He worked in the pharmacy division, and he also worked in the government relations department.
Q. And did you ever have any interaction with Mr. Ortiz during the time that you both worked for CVS?
A. Yes.
Q. And did any of those involve matters relating to government affairs?
A. Yes.
Q. Did any of those interactions involve a person by the name of John Celona?

A. Yes.

MR. DAMBRUCH: Your Honor, may we approach?

THE COURT: Would you step down for a moment, please.

(Bench conference held on the record)

MR. DAMBRUCH: Your Honor, this is the point in time I would intend to get into the conversations he had with Mr. Ortiz regarding Mr. Celona and the scope of work document.

THE COURT: Okay.

MR. FEIN: And this would be the witness who I want to make sure that Mr. Dambruch does not elicit from the witness what the witness said to Mr. Ortiz. And in the grand jury, it's very clear he was asked, Did Mr. Ortiz ever say it was a bad idea, because Mr. Andrews says it's a bad idea; and he said, Not that I recall.

THE COURT: How are you going to handle that?

MR. DAMBRUCH: I'm going to ask what, if anything, Mr. Ortiz said.

THE COURT: You might want to preface that by saying, Without telling us what you said.

MR. DAMBRUCH: Yes, I will do that.

MR. KILEY: I have another issue that I want to flag with this witness. I anticipate that Mr. Dambruch

might want to ask about, because he's been asked before, about whether there was a discussion or whether Mr. Ortiz told the witness that he was working on legislation, and that would be there would be a lack of foundation for such a question, your Honor, because all the legislation we've heard about is well after the time period involving this discussion. I want to flag that for Mr. Dambruch.

MR. DAMBRUCH: I'm not sure I understand.

MR. FEIN: I think what he means is the series of questions that Mr. Sullivan would ask witnesses in the grand jury, did he tell you he was doing legislation for CVS, that kind of thing that we haven't heard in this trial, except Mr. Petalas did a little bit of that.

I just want to make sure you're not going to be, without foundation, asking him did he tell you he handled legislation.

MR. DAMBRUCH: I'm going to ask him simply what were his duties and responsibilities and did you prepare that document based upon that description, and I believe his testimony will be that the information in the document came from Mr. Ortiz and only Mr. Ortiz and that that captured the essence of it.

He also had a conversation with Mr. Ortiz or

asked Mr. Ortiz to assure him that Mr. Celona was, in fact, regularly reporting to him. And Mr. Ortiz told him that that was, in fact, the case.

Then there's a final conversation where Mr. Ortiz, according to Mr. Andrews, told him that he -- specifically in the grand jury, he recalls Mr. Ortiz telling him, Don't mention this to anybody, don't talk about this to anybody.

THE COURT: Okay.

(End of bench conference)

THE COURT: Mr. Andrews.

Q. Now, sir, without getting into the content of that conversation or conversations, was it a single conversation or multiple conversations with Mr. Ortiz on Mr. Celona?

A. I remember two conversations.

Q. Let's start with the first of those conversations. What, if anything, did Mr. Ortiz -- without saying what you said, focusing on what Mr. Ortiz said, what, if anything, did Mr. Ortiz tell you during that first conversation?

A. He told me that Mr. Celona had been hired as a consultant for CVS.

Q. Did he tell you anything else at that point in time?

A. He told me that Mr. Celona was performing some specific duties for CVS.
Q. Did he describe those duties for you?
A. Yes.
Q. What did he describe those duties as?
A. He said that Mr. Celona was acting as a public relations consultant for CVS going to senior centers, talking to seniors about CVS service issues and the service that they were getting from CVS at these senior centers.
Q. Did he indicate to you when it was that Mr. Celona had been hired for this particular responsibility?
A. A year previous to that conversation.
Q. Did Mr. Ortiz say anything else to you during that first conversation beyond what you've already recounted for us?
A. Yes.
Q. What else did he say?
A. He said that Mr. Celona was involved in preparing Mr. Kramer for the video appearances or television appearances that Mr. Kramer had on Mr. Celona's cable TV show.
Q. Any further remarks or comments by Mr. Ortiz during that first meeting?
A. He told me that Mr. Celona had an ethics committee

ruling that made that work permissible.
Q. Anything further?
A. He told me that Mr. Celona was producing written and oral reports recounting his -- what he was doing for the company.
Q. Did he say anything beyond describing those reports?
A. Not that I can recall.
Q. Now, based upon that information you received from Mr. Ortiz, did you do something?
A. Yes.
Q. And what was it you did, sir?
A. I prepared a set of talking points to be used with the press in preparation for the time that they would call and ask for specifics about Mr. Celona's employment.
Q. Now, when you say you prepared a set of talking points, what did that document consist of?
A. It consisted of his job description, basically what I just previously outlined to you with more content, and his job title.
Q. Did you -- when you say you prepared it, how was it that you prepared that document, sir?
A. I asked Mr. Ortiz what he was doing. Mr. Ortiz told me. I took some notes.

Q. And eventually was some sort of typewritten document created?
A. I went back to my office and dictated it to my administrative assistant from my notes, and that was how the document was created.
MR. DAMBRUCH: May I please show the witness Exhibit Number 109. May I have a moment, your Honor?
THE COURT: You may.
(Pause)
MR. DAMBRUCH: I apologize, your Honor.
Q. Sir, showing you what's been marked as Exhibit 109, do you recognize this document?
MR. DAMBRUCH: If we could please highlight and enlarge the text section.
THE WITNESS: Thank you.
MR. DAMBRUCH: Sorry.
THE WITNESS: That's all right.
THE COURT: Would it be easier for you if you had a hard copy?
THE WITNESS: No, this is fine now that he enlarged it. Thank you.
A. Yes, I recognize that document.
Q. And what do you recognize that to be, sir?
A. That's the document I prepared.
Q. When you say that's the document you prepared, is

that the document you've just been speaking about?
A. That's correct.
Q. And once you had prepared that document, what, if anything, did you do with it?
A. I told my administrative assistant to file it.
Q. Did you allow any opportunity for Mr. Ortiz to review this document?
A. I did.
Q. And can you describe that for us, please.
A. I provided the document to Mr. Ortiz for him to review and provide comment on.
Q. Now, sir, I noticed that there's a title at the top right here, community outreach specialist.
A. Uh-huh.
Q. Who was it that came up with that particular title?
A. I did.
Q. You mentioned that Mr. Ortiz was allowed to review the document?
A. That's correct.
Q. Did he get back to you with regard to the accuracy or appropriateness of the document?
A. Yes, he did.
Q. And what did he say?
A. He said it's fine.

Q. Now, sir, you mentioned that during your conversation with Mr. Ortiz, he brought to your attention that Mr. Celona had an ethics opinion; is that correct?
A. That's correct.
Q. Did Mr. Ortiz indicate whether that was a written or verbal opinion?
MR. KILEY: Objection.
THE COURT: Overruled.
MR. KILEY: May I be heard on it, your Honor?
THE COURT: Overruled.
A. Could you repeat the question, please.
Q. Did Mr. Ortiz indicate to you whether or not that was a written or verbal opinion?
A. He did not indicate one way or another.
Q. Now, sir, you mentioned that you had two conversations with Mr. Ortiz on this topic. Directing your attention to the second conversation, what, if anything, did Mr. Ortiz say at that point in time?
THE COURT: Could we set a time frame?
MR. DAMBRUCH: Yes.
Q. How long after the first conversation did the second conversation --
THE COURT: Well, we don't know when the first conversation was either.

Q. Do you recall the timing of these conversations?
A. The first conversation was in late winter, early spring 2001, I believe.
Q. And when you say late winter, early spring, what general months are you talking about?
A. I don't recall. I apologize. It would be February, but. . .
Q. Okay. Just so it's clear, when you say late winter, you're meaning January, February 2001 or November, December? I'm just trying to get a sense.
A. I believe February, March time frame.
Q. And the second conversation?
A. The second conversation was after I testified before the state Ethics Commission.
Q. Let's focus again on that first conversation.
A. Okay.
Q. During the course of the conversation, did Mr. Ortiz say anything about you disclosing this information to anybody else?
A. He said, Please don't tell anyone.
Q. And when was it that he told you that?
A. In that first conversation.
Q. Now, sir, at some point in time did you, in fact, receive a press inquiry with regard to Mr. Celona?
A. I did.

Q. And without getting into the content of that inquiry, do you recall the approximate time that you received that inquiry?
A. December 2003, I think.
Q. And following the receipt of that inquiry, did you have any conversation with Mr. Ortiz?
A. Yes, I did.
Q. Was that a conversation just between yourself and Mr. Ortiz, or did anyone else participate in that conversation?
A. Well, in relation --
MR. FEIN: Your Honor.
THE COURT: Just a minute.
MR. FEIN: May we approach?
THE COURT: Approach.
(Bench conference held on the record)
MR. FEIN: I assume Mr. Dambruch is not trying to elicit this, but that question is so broad, there is a conversation between Mr. Andrews, Mr. Ortiz and Senator Irons that would have no relevance to this case; but that question was just so broad.
MR. DAMBRUCH: I'll try to focus in on the Ortiz, Celona, Andrews conversation.
THE COURT: Well, counsel for the Defendants, in the interest of making sure you don't go the other way,

will allow you to lead, won't you?

MR. FEIN: Absolutely.

(End of bench conference)

THE COURT: You're getting your exercise, Mr. Andrews.

THE WITNESS: I am.

Q. Sir, let me rephrase that last question. At some point in time following that media inquiry, did you have a conversation with Mr. Ortiz and Mr. Celona?

A. Yes.

Q. Was that a telephone conversation?

A. Yes.

Q. What, if anything, was discussed during that conversation?

A. In the conversation, it was Mr. Celona and Mr. Ortiz on the phone. The phone rang, and that began the conversation. Mr. Ortiz asked me to recount for Mr. Celona the press conversation, the interview I had just completed with a reporter.

Q. And without getting into the substance, did you recount that for the folks on the phone?

A. I did.

Q. What happened next?

A. Mr. Ortiz reminded or told Mr. Celona that I had, as part of that interview, told the press that

Mr. Celona had an ethics committee ruling or ethics committee approval to work for CVS.

Q. And during that telephone conversation that you participated in, did Mr. Celona respond to that remark?

A. Yes.

Q. And what, if anything, did he say?

MR. KILEY: Objection.

THE COURT: Overruled.

A. After Mr. Ortiz made the comment about the ethics committee approval, Mr. Celona said, I don't have that, or words to that effect.

Q. Did Mr. Ortiz respond to that remark?

A. Not immediately.

Q. Did anyone speak following that remark?

A. Not for a long time.

Q. At some point did someone restart the conversation?

A. Yes.

Q. Who was that?

A. Mr. Celona.

Q. What was it that Mr. Celona said at that point in time?

A. He said, What do you think I should do?

Q. Did anyone --

A. Or words to that effect.

Q. Did anyone answer that question?
A. I did.
Q. What did you say?
A. I said, I can't help you with that, and I got off the phone.
Q. And did that terminate your participation in that conversation?
A. Yes.
Q. Now, sir, your preparation of Exhibit 109, the consulting description document, did Mr. Ortiz ever provide you with any type of consulting contract between CVS and him, Mr. Celona?
MR. KILEY: Objection. Foundation.
THE COURT: Sustained. Back up.
Q. Sir, I'd ask you to focus back on the conversation that you've spoken to us about in February, March of 2001.
A. Okay.
Q. During the course of that conversation or your communication with Mr. Ortiz on the preparation of the document, Exhibit 109 --
A. This document.
Q. -- were you ever shown a consulting contract between Mr. Celona and CVS?
MR. KILEY: I still object, your Honor.

THE COURT: Overruled.
A. No.
Q. During that same time frame within that same framework, were you ever shown a proposal letter that Mr. Celona sent to CVS?
MR. KILEY: Objection.
THE COURT: Overruled.
A. No.
Q. Now, sir, during your tenure with CVS, did you ever meet John Celona?
A. Yes.
Q. On how many occasions?
A. I don't recall. One or two.
Q. Can you describe for us those meetings that you do recall.
A. I shook hands with him at the Convention Center or the Westin at a charitable function.
Q. Was that the only meeting you had with him?
A. I may have shaken hands with him at some other points, but I don't recall with specificity where those were.
Q. Did you ever encounter him at CVS headquarters?
A. Not that I recall, but it could have happened.
MR. DAMBRUCH: May I have a moment, your Honor?
(Pause)

MR. DAMBRUCH: No further questions, your Honor.
THE COURT: Cross.
MR. FEIN: Thank you, your Honor.

**CROSS-EXAMINATION**

**BY MR. FEIN**:

Q. Good morning, Mr. Andrews.
A. Good morning.
Q. You knew Mr. Kramer, did you not, prior to being interviewed by him for your position at CVS?
A. Yes.
Q. How did you know him?
A. I knew him as the head of community relations for CVS and saw him at several functions.
Q. And what was Mr. Kramer doing at these functions when you saw him?
A. He was acting as the master of ceremonies at an event, coordinator of an event.
Q. And what were you doing employment-wise when you encountered Mr. Kramer prior to your joining CVS?
A. At that time I worked for Senator Jack Reed.
Q. Did you encounter Mr. Kramer at a groundbreaking for a new building?
A. Yes.
Q. And where was that?
A. That was at CVS headquarters.

Q. And did you see him -- did you see Mr. Kramer at Chamber of Commerce dinners?
A. Yes, I did see him at Chamber of Commerce dinners.
Q. And you understood that Mr. Kramer oversaw community relations for CVS?
A. Yes.
Q. When you joined CVS, was part of your responsibility to answer press inquiries for CVS?
A. Yes.
Q. And did you receive many of those?
A. Yes.
Q. Was that on a daily basis?
A. Yes. On a daily basis, we would receive between 10 and 20 calls on an average day.
Q. And was it part of your job to try to anticipate those press inquiries that you could anticipate?
A. Yes.
Q. And what would you do when you anticipated press inquiries? How would you prepare?
A. If we knew or anticipated an issue would arise, we would go to the executive responsible for that particular area, we would speak to that executive, get the information that we needed to respond appropriately to that reporter's question.
Q. And would you create any work product in that

regard?
A. Yes.
Q. What would you create?
A. Talking points.
Q. You testified in response to Mr. Dambruch's questions about a conversation with Mr. Ortiz in 2001; is that right?
A. Yes.
Q. In that conversation, Mr. Ortiz told you that John Celona was a consulting -- doing consulting work for CVS?
A. Yes.
Q. And in the course of that conversation, Mr. Ortiz mentioned that Senator Celona had ethics approval to do that work?
A. Yes.
Q. You had experience working for legislators prior to coming to CVS, as you've testified today; is that correct?
A. Correct.
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Is this preliminary to something?
MR. FEIN: Yes, your Honor.
THE COURT: Overruled.
Q. You had experience working for legislators prior

to coming to CVS; is that correct?
A. Correct.
Q. You worked at U.S. Congress for then Representative Reed; is that correct?
A. He was a senator then, and I also previous to that worked for Senator Claiborne Pell.
Q. So Senator Pell and Senator Reed? Excuse me.
A. Correct.
Q. And in the course of that work, you understood that legislators could receive ethics opinions orally?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained. That's U.S. senator.
MR. FEIN: I apologize if I didn't say that.
Q. When you learned from Mr. Ortiz that -- regarding the ethics approval, did you have an opinion as to whether or not reporters would be able to access information about that approval?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Mr. Andrews, was it your decision to create the talking points?
A. Yes.
Q. Was it your decision alone to do that?
A. I don't understand the question.
Q. Was -- you made the decision that you wanted to

have talking points?
A. Yes.
Q. In case the press called you regarding Senator Celona?
A. Yes.
MR. FEIN: I'd like to show the witness and offer Kramer Q-4 by stipulation.
THE COURT: This is full, Mr. Dambruch?
MR. DAMBRUCH: Yes, your Honor.
(Defendant Kramer Exhibit Q-4 was admitted in full)
Q. Mr. Andrews, this, with the exception of the handwriting on the top right, appears to be same text as the document, the talking points that the Government showed you earlier. Would you agree with that?
A. Yes.
Q. And if we could focus in on the handwriting on the top right, do you recognize that handwriting?
A. I don't.
Q. Is the April 2001 date that you see there consistent with your recollection that this occurred -- that the creation of the talking points occurred in late winter? I think you said late winter, early spring; is that correct?
MR. DAMBRUCH: Objection, your Honor.

THE COURT: Sustained as to form.
Q. Is it your testimony that you believe the -- your creation of the talking points occurred in late winter or early spring of 2001?
A. Correct.
MR. FEIN: You can take that down. Thank you.
Q. To create the talking points, you asked Mr. Ortiz to tell you what Senator Celona was doing for CVS; is that correct?
A. Correct.
Q. And Mr. Ortiz mentioned visiting senior centers?
A. Correct.
Q. And Mr. Ortiz mentioned preparing and hosting Mr. Kramer on Mr. Celona's television show?
A. Correct.
Q. In the course of that conversation, did you ask Mr. Ortiz to provide you with a copy of the contract with Mr. Celona?
A. No.
Q. Did you ask him to provide you with any of the correspondence with Mr. Celona?
A. No.
Q. When Mr. Ortiz responded to you, he responded right on the spot; is that correct?
A. Correct.

Q. In the course of the conversation with Mr. Ortiz regarding the creation of these talking points, did Senator Celona join you for that meeting?
A. No.
Q. Do you recall Senator Celona ever joining you for a discussion with Mr. Ortiz in your office?
A. No.
Q. The conversation that you've described with Mr. Ortiz, Senator Celona wasn't the only subject of that conversation, was it -- was he?
A. Correct.
Q. Did the conversation arise in the context of Mr. Ortiz discussing workplace matters with you?
A. Correct.
Q. And is it fair to say you previously described it as a gripe session?
A. Correct.
Q. Is it fair to say that the conversation was one person venting about work with a co-worker?
A. Yes.
Q. And did that venting include venting about his boss?
A. Yes.
Q. And that would be Mr. Kramer?
A. Yes.

Q. Following that conversation, you shared with your administrative assistant, did you not, information regarding Senator Celona's consulting work for CVS?
A. Yes.
Q. You did not conceal that from her, did you?
A. No.
Q. You did not ask her, did you, to conceal that from others, did you?
A. No.
Q. Did you share with your administrative assistant the fact that Mr. Ortiz was complaining about his boss?
A. No.
Q. Mr. Ortiz mentioned to you that Mr. Celona was preparing and hosting Mr. Kramer on Senator Celona's TV show. I asked you that previously?
A. Yes.
Q. Did you know at the time that Mr. Kramer was, in fact, appearing on Senator Celona's television show?
A. Yes.
Q. How did you know that?
A. I would see him on the show.
Q. And did you ever have any conversations with Mr. Kramer about Mr. Kramer's appearances on the show?
A. Yes.
Q. And could you describe those to the jury.

A. Mr. Kramer would invite me into his office to watch the show.
Q. And how did you watch the show in his office?
A. He would watch it on his monitor. He had a tape, put in the tape, and we would watch it.
Q. So Mr. Kramer had a television and a -- at the time a VCR --
A. That's correct.
Q. -- in his office? Did he also have a collection of tapes in his office?
A. I don't know.
Q. Did you bring the tape to his office, or did he have a copy of the tape?
A. He would have a copy of the tape.
Q. Did this occur on one occasion or more than one occasion?
A. More than one occasion.
Q. And did you observe -- were the occasions always regarding Mr. Kramer's appearances on John Celona's show, or were there other televised or taped appearances that you watched of Mr. Kramer?
A. If he did another TV interview, he would show it to me.
Q. Did Mr. Kramer ever provide you with copies of the tapes for you to do anything with them?

A. Yes.
Q. And what -- tell us about that, please.
A. Mr. Kramer would provide me with a VHS tape of his appearance on the Celona show, and he would ask that I have copies made so that they could be distributed to senior executives at CVS.
Q. And did you do that?
A. Yes.
Q. Who did you distribute them to?
A. Tom Ryan, the CEO. I don't recall the others. There would be a few other people.
Q. Did Mr. Kramer ask you to conceal the fact from others that Mr. Ortiz -- that Mr. Celona was being paid by CVS?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. Did you know that Mr. Kramer promoted the CVS Charity Classic on Senator Celona's TV show?
A. Yes.
Q. How did you know that?
A. He would talk about it on the show.
Q. And did you understand that the show was aired in advance of the event itself?
A. Yes.
Q. And it was promoting the event?

A. Yes.
Q. Did you understand that Mr. Kramer had a role in the event?
A. Yes.
Q. What role did you understand Mr. Kramer to have?
A. I believe Mr. Kramer was the chairman of the CVS Charity Classic, although I may be unclear on that particular title.
Q. And in that regard, did he have a public role?
A. Yes.
Q. In what way?
A. He would do interviews related to the Classic both before, during and after. He would do public events related to the charitable giving related to the event, and he would participate in the tournament throughout the course of the tournament.
Q. Did you ever assist Mr. Kramer in preparation for any of his television events?
A. Yes.
Q. What would you do?
A. Put together a briefing book usually with talking points.
Q. Would you sit and talk with Mr. Kramer in advance of some of his television appearances?
A. Yes.

MR. FEIN: I'd like to offer Kramer U-7 by stipulation and display it to the witness and the jury.

(Defendant Kramer Exhibit U-7 was admitted in full)

THE COURT: I hope you can enlarge that.

MR. FEIN: We can, your Honor.

Q. Mr. Andrews, does this appear to be an appointment entry for you?

A. Yes, that's what it appears to be.

Q. And the attendees for this appointment, can we call that out, please.

A. Under "required attendees"?

Q. Yes, sir.

A. Okay.

Q. That would include yourself, Mr. Kramer and a Roland Rudio?

A. That's correct.

Q. Are you familiar with Mr. Rudio?

A. Yes, indeed.

Q. And who is he?

A. Mr. Rudio used to work with me, and he was the videographer for the company.

Q. And what is the subject of this appointment, if we could call that out?

A. That would be a taping related to a Channel 10

program related to the CVS Charity Classic. It would be held in CVS's studio. CVS had -- has a production studio.
Q. And you see the date of June 11th, 2002?
A. Yes.
Q. Do you recognize that date as occurring near the time of the Charity Classic?
A. I don't recall the dates of the Charity Classic.
Q. Were you familiar with advertising and promotion packages that CVS purchased from Channel 10?
A. No.
Q. Were you involved in the purchasing of media for CVS promotional purposes?
A. No.
MR. FEIN: Did you know that Mr. Kramer promoted -- you can take that down. Thank you.
Q. Did you know that Mr. Kramer promoted the CVS 5K road race on Senator Celona's television show?
A. Yes.
Q. And how did you know that?
A. I saw it.
Q. And you were familiar with the road race?
A. Yes.
Q. And what did you understand Mr. Kramer's role to be in the road race?

A. He was in charge of the road race.
Q. And did he have a public role in that regard?
A. Yes. He was the master of ceremonies for the staging of the race.
Q. Did you know that Mr. Kramer promoted the CVS Highlander School on Senator Celona's television show?
A. Yes.
Q. Were you familiar with the Highlander School?
A. Yes.
Q. Can you describe CVS's involvement with the Highlander School.
A. The CVS Highlander School is a Providence charter school which received substantial financial support from CVS.
Q. And it carried CVS's name?
A. As a result, yes.
Q. And when Mr. Kramer -- and did you understand Mr. Kramer to have a role for CVS in connection with the Highlander School?
A. Yes.
Q. And what role was that?
A. He initiated and managed the relationship with the school.
Q. You mentioned reporting to Rosemary Mede during your direct examination; is that correct?

A.    That's correct.
Q.    Are you familiar with the fact that Rosemary Mede at some point joined the board of the CVS Highlander School?
A.    Yes.
Q.    As a CVS representative?
A.    Yes.
Q.    Had you been involved with Mr. Kramer in helping to promote the CVS Highlander School?
A.    Yes.
MR. FEIN:  If we could show the witness Kramer A-8, which we offer by stipulation.
(Defendant Kramer Exhibit A-8 was admitted in full)
Q.    If you could just turn the pages so you're familiar with this document, Mr. Andrews.  Do you have a hard copy there?  Thank you.
(Witness peruses document)
Q.    Okay?
A.    Yes.
Q.    Could you summarize or describe what this document is, please.
A.    Just give me a minute.
Q.    Sure.
(Witness peruses document)

A. Could you repeat the question, please.
Q. Yes, if you could just summarize briefly for the jury what this document is.
A. This is a document that appears to be prepared jointly by the public relations and community relations people about options to publicize the CVS Highlander School and appears to be options to publicize the initial naming of the CVS Highlander School.
Q. And is this an example of what you referred to before as ways that you would be involved with Mr. Kramer in promoting the Highlander School?
A. Yes.
Q. And, in fact, this is a memo in which you are a co-author; is that right?
A. Yes.
Q. So the reference to Todd in the "from" line would be Todd Andrews?
A. Yes.
Q. And the memo is being provided to Mr. Kramer?
A. Yes.
Q. The Jack in the "to" line would be Jack Kramer?
A. Yes.
Q. Do you recognize the handwriting on the right-hand side of the first page and going down the next couple of handwritten entries as well?

A. I don't.
Q. You don't recognize Mr. Kramer's handwriting?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained. The jury will disregard.
Q. Did you ever -- were you familiar with Mr. Kramer's handwriting?
A. Yes.
Q. Do you think -- are you able to recognize it today?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Overruled. It's a yes or no.
A. No.
Q. On occasion, did you visit the Highlander School with Mr. Kramer?
A. Yes.
Q. And was that in preparation for a taping of John Celona's television show?
A. I don't recall a visit being done for that purpose.
MR. FEIN: I'd like to show the witness Kramer A-23 and offer it by stipulation and, therefore, show it to the jury as well, please, your Honor.
(Defendant Kramer Exhibit A-23 was admitted in full)
THE WITNESS: Thank you. I'm fine. Thanks.

Q. Mr. Andrews, do you recognize this as another appointment entry?
A. Yes.
Q. And on this occasion the entry organizer is a Lucille Bush?
A. Yes.
Q. Do you know who Ms. Bush is?
A. She worked in the community relations department.
Q. And on this occasion the required attendees are Ms. Bush, yourself and Mr. Kramer; is that correct?
A. Correct.
Q. And what is the subject for this appointment entry?
A. Visit CVS Highlander Charter School in preparation for the Senator Celona taping.
Q. Does that refresh your recollection at all as to whether or not you had visited the school with Mr. Kramer in preparation for a taping for the Senator Celona -- for Senator Celona's television show?
A. No.
MR. FEIN: Did you know that -- you can take that down. Thank you.
Q. Did you know that Mr. Kramer promoted CVS's charitable giving on Senator Celona's television show?
A. Yes.

Q. And did you know that Mr. Kramer promoted CVS itself on the show?
A. Yes.
Q. He encouraged people to shop at the CVS stores?
A. Yes.
Q. And use their Extra Care Card?
A. Yes.
Q. He spoke of the company's history?
A. I don't recall that.
Q. Its placement in Rhode Island?
A. Yes.
Q. Mr. Andrews, sometime following your conversation with Mr. Ortiz and the creation of the talking points, did you have occasion to mention the Celona relationship to Mike Ferdinandi?
A. Yes.
Q. And who is Mike Ferdinandi?
A. He was the senior vice president of human resources.
Q. And at that time were you reporting to him?
A. Yes.
MR. FEIN: On that occasion, did you -- withdrawn. May I have one moment, your Honor?
THE COURT: You may.
(Pause)

MR. FEIN: No further questions.

**CROSS-EXAMINATION**

**BY MR. KILEY**:

Q. It will take me a minute to get up here, Mr. Andrews. Mr. Andrews, my name is Tom Kiley, and I represent Carlos Ortiz. Good morning.

A. Good morning.

Q. You just told Mr. Fein about a discussion with Mr. Ferdinandi. When did you become Mr. Ferdinandi's -- when did you directly report to Mr. Ferdinandi?

A. I don't recall a specific date.

Q. Can you place the disclosure to Mr. Ferdinandi in time relative to when you became a direct report of his?

A. I can't.

Q. Can you place it in time relative to when Mr. Kramer came out of the direct supervision of government affairs?

A. The conversation occurred on the day that it was announced in the company that Mr. Kramer would be stepping away from the government relations responsibilities.

Q. Now, I want to try and help you place the time of the original conversation with Mr. Ortiz concerning

Mr. Celona as well, as my brothers have done with you. You place it late winter, early spring of 2001?
A. Correct.
Q. In addition to the job description being your idea, was the title your idea?
A. Correct.
Q. And the title was community outreach specialist; correct?
A. Correct.
Q. It was a title of your wordsmithing, or the choice of words was yours?
A. Yes, sir.
MR. KILEY: Could we have Government Exhibit 350.
Q. May I direct your attention to the date at the top of this memorandum and may I ask you to read, then, to yourself the first -- the text of the message.
(Witness peruses document)
Q. Does the date March 13 help you place in time when you had the conversation with Mr. Ortiz?
A. No.
MR. KILEY: You may take it down, then.
Q. The discussion -- strike that. With respect to the title, did you have any discussion with Carlos Ortiz about the particulars of the title?

A. Not that I recall other than to suggest it.
Q. And Mr. Fein asked you whether you had a meeting with Mr. Ortiz and Mr. Celona at which you discussed the job description. Did you have a meeting with Mr. Celona and Mr. Ortiz in which the subject of a title came up?
A. No.
Q. It never happened?
A. (No verbal response).
Q. With respect to this first conversation that you testified to with Mr. Dambruch, the Government prosecutor, do you have a specific memory, that's seven years ago, do you have a specific memory of the words that were said at the particular meeting?
A. Some of them.
Q. And much of what you remember is the context of the meeting; correct?
A. Correct.
Q. And the context informs the words of that particular meeting; correct?
A. I don't know.
Q. Let me ask another question. You've previously characterized this event as a gripe session, as you told Mr. Fein; correct?
A. Correct.

Q. And you told Mr. Dambruch that Mr. Ortiz asked you at the end of the meeting, Please don't tell anyone about this; correct?
A. Correct.
Q. And in the context of the discussion, you took that to be griping about his boss; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You've previously -- strike that. The job description and title that you prepared was in order to talk to the press when, not if, an inquiry was made about Mr. Celona; correct?
A. Correct.
Q. And, indeed, you used it for that purpose; correct?
A. Correct.
Q. It was always intended to be something you talked about; correct?
MR. DAMBRUCH: Objection, your Honor.
THE COURT: Sustained.
Q. You also discussed -- you also dictated the content of the job description and the title to your administrative assistant?
A. Correct.
Q. You placed it in a file that was then accessible

to you thereafter?
A. Correct.
Q. You talked about it with Mr. Ferdinandi when he was your direct supervisor?
A. Correct.
Q. You also talked about the talking points themselves with Mr. Kramer, didn't you?
A. Not that I recall.
Q. You don't recall that?
A. Not -- no.
MR. KILEY: May I have a minute, your Honor? I want to think about something.
THE COURT: You may.
(Pause)
MR. KILEY: I think I'm going to ask for the witness to have his state grand jury transcript before him. I'm sorry. Is the ethics deposition in the binder, your Honor?
THE COURT: It is.
MR. KILEY: May he have his ethics deposition, please.
THE COURT: Do you have a copy for the witness?
MR. KILEY: I'm sorry, I don't. Maybe we can take a break, and I'll get one.
THE COURT: Mr. Petalas has a copy. This is

May 19, '04?

MR. KILEY: And I believe it's page 15, your Honor.

THE COURT: I'm asking about the date, May 19, '04?

MR. KILEY: Yes. I'm going to withdraw the question. It's not adequate to refresh, your Honor.

THE COURT: Okay.

Q. Your relationship with Carlos Ortiz, you had offices -- you shared physical space, your offices were adjacent to one another; correct?

A. No.

Q. Was there a time that you were in the same general area?

A. Yes.

Q. He was a person that you interacted with frequently in the company?

A. Yes.

Q. You interacted with him on matters of policy? You interacted with him on questions related to policy?

A. Yes.

Q. And he always provided you whatever information you requested for press releases?

A. Yes.

MR. KILEY: And your -- no further questions on

that, your Honor.

THE COURT: Redirect?

MR. DAMBRUCH: Yes, your Honor.

**REDIRECT EXAMINATION**

**BY MR. DAMBRUCH**:

Q. Mr. Andrews, during that first conversation that you have described for us with Mr. Ortiz, who raised the topic of John Celona?

A. Mr. Ortiz.

Q. And was that one of the topics that you discussed with Mr. Ortiz at that meeting?

A. Yes.

Q. And was it at the end of the meeting that Mr. Ortiz spoke to you about keeping it quiet, or exactly what did he say?

A. The way you characterize it.

Q. Did Mr. Ortiz indicate to you that you should only keep a portion of the meeting quiet but yet share another portion?

A. No. I don't think I understand the question. I apologize.

Q. Did Mr. Ortiz, when he asked you to keep it quiet, did he specify that you should only keep a portion of the discussion quiet but not some other portion?

A. My recollection is that he said, Don't talk about

this with anyone.
Q. Did he -- when he said "this," did he describe specifically only one portion of the meeting?
A. No, he did not.
Q. And that was at the end of the meeting you've described for us when you discussed, among other things, Mr. Celona; correct?
A. Yes, sir.
MR. DAMBRUCH: No further questions, your Honor.
THE COURT: Anything further?
MR. FEIN: No, your Honor.
THE COURT: Mr. Kiley?
MR. SMITH: May we have a moment, please, Judge?
THE COURT: Sure.
(Pause)
MR. KILEY: No questions.
THE COURT: You may step down. And I think this is a good time for us to take our break.
Members of the jury, you know the drill. Fold up your notebooks, leave them on your seats. We'll take a 15-minute recess to give you a chance to stretch and have a cup of coffee. Do not talk about the case at all during the break.
(Recess)
MR. PETALAS: Your Honor, the next witness will

be Susan DelMonico.

**SUSAN DelMONICO, GOVERNMENT WITNESS, SWORN**

THE CLERK: Would you please state your name and spell your last name for the record.

THE WITNESS: Susan DelMonico, D-E-L capital M-O-N-I-C-O.

**DIRECT EXAMINATION**

**BY MR. PETALAS**:

Q. Good morning, Ms. DelMonico.

A. Good morning.

Q. Ms. DelMonico, how are you employed?

A. I work for CVS Pharmacy.

Q. How long have you worked for CVS?

A. Twenty-two years.

Q. How did you begin with CVS?

A. I began in February of 1986 as a staff pharmacist.

Q. What was -- where did you move from there?

A. I went to law school in the evening, and in 1999 I became manager of community relations, approximately a year later I became director of community relations, and then in March of 2001 I became director of regulatory compliance, which is my current position.

Q. Who hired you when you went to community relations?

A. Jack Kramer.

Q. And what were your duties and responsibilities as a manager, then director in community relations?
A. Together with another partner, I managed the CVS Charitable Trust, managed corporate giving programs and community outreach programs.
Q. Can you describe the corporate outreach programs you mentioned.
A. There are many. We had people in the field who had a small budget who would actually go out into the field and work with the community and serve the areas -- serve in the areas that needed community assistance.
We did a lot of senior outreach. We had field people, and sometimes I would go to various senior centers, including Jack, Jack went, too, to talk about CVS. And in those situations, we had what was called brown-bag programs.
Q. And were those programs directed at seniors?
A. That's correct.
Q. Did you also have any responsibilities or duties relating to the CVS Downtown 5K road race or the CVS Charity Classic?
A. I had some responsibilities, yes.
Q. Who did you report to?
A. I reported directly to Jack Kramer.

Q. You said you had a partner. Who was that?
A. Jennifer Veilleux.
Q. Was she also in the community relations section?
A. Yes, she was.
Q. Were her duties similar to yours?
A. Yes, it was. We split the country. I had the northern half of the chain at the time, and she had the southern half of the chain.
Q. So who had Rhode Island?
A. I did.
Q. In your work in community relations -- withdraw that. You also said you went to regulatory compliance around March of 2001; is that correct?
A. That's correct.
Q. In a nutshell, what did you do in regulatory compliance?
A. My current position?
Q. Yes.
A. I handle board of pharmacy issues, and I'm in charge of DEA issues. I deal with the regulatory agencies. Pharmacy is a very highly regulated industry, and so I handle just the pharmacy regulatory compliance aspect.
Q. And in your duties in regulatory compliance, do you interact with the government affairs section at

CVS?
A. Yes, I do.
Q. When you were in community relations, did you work with or interact with Carlos Ortiz?
A. Carlos was in -- Carlos reported to Jack, and so did I. We interacted at various staff meetings; and we had lunch together, the whole group, almost every day.
Q. How often would the department -- is this the corporate relations department?
A. It was the department that Jack was in charge of. I'm not sure what it was called.
Q. Within that department, Carlos Ortiz was in government affairs while you and your partner were in community relations; is that right?
A. That's correct.
Q. And you mentioned meetings. Are these staff meetings at which -- who attended these meetings?
A. Jack's direct reports.
Q. And those were?
A. At the time it was Jennifer, myself, Carlos, I believe Mark Koligian, who was in customer relations, and at some point there was Fred McGrail when I first started who was in charge of like public relations, public affairs.
Q. So this is still after you had started in

community relations beginning somewhere around 1999?
A. That's correct.
Q. Did you ever attend functions or events on behalf of CVS with either Jack Kramer or Carlos Ortiz?
A. Yes, I did.
Q. Can you describe those events.
A. I attended various political fundraisers and also various charitable events.
Q. Do you recall any particular events that you attended with them?
A. There were many.
Q. At any of those events in which you were in the company of either Carlos Ortiz or Jack Kramer, would you see John Celona?
A. I saw him at a few events, yes.
Q. And did you know who John Celona was?
A. Yes, I did.
Q. Who did you understand him to be?
A. He was a senator from North Providence.
Q. When you would see Senator Celona at events that you attended with Carlos Ortiz or Jack Kramer, at any time did anyone tell you that then Senator Celona was a paid consultant for CVS?
MR. KILEY: Objection.
THE COURT: Sustained.

Q. Did you have any conversations with Carlos Ortiz about John Celona at any of these events?

MR. KILEY: Objection.

THE COURT: It's a yes or no.

A. No.

Q. Same question as to Mr. Kramer, did you have any conversations with Mr. Kramer when you would see John Celona about John Celona when you would see him at these events in Mr. Kramer's company?

MR. KILEY: Objection.

THE COURT: Yes or no.

A. Yes.

Q. And what were those conversations?

MR. KILEY: Objection, and a limiting instruction if appropriate.

THE COURT: Approach, please.

Would you step down for a moment.

(Bench conference held on the record)

THE COURT: What's her answer?

MR. PETALAS: The answer I'm trying to get to is that Jack Kramer, and I don't know what her answer is as to what specifically Jack Kramer said about Celona except that it did not include that he was a paid consultant for CVS. So that's all I really want to bring out.

MR. KILEY: It's the direct question that you've excluded.

THE COURT: Well, he was leading his witness.

MR. PETALAS: That's all I want to ask her.

THE COURT: What's the point of this?

MR. PETALAS: That she, director of community relations, didn't know -- who was in this section didn't know that Celona was a consultant.

MR. KILEY: Judge, there's no basis for a notion that this person below Jack would have any business knowing that. We don't have any such foundation.

MR. PETALAS: I think that --

THE COURT: You need to lay some foundation.

MR. PETALAS: The foundation I was trying to lay was when she mentioned that she had responsibility for senior citizens.

MR. FEIN: She testified in the grand jury, your Honor, that she wouldn't have expected Jack to tell her that kind of thing.

MR. PETALAS: She says that he didn't tell her everything, he wouldn't tell her everything, he was a parochial manager, he didn't --

THE COURT: What is the point of this?

MR. PETALAS: Well, I'm happy for that to come out, your Honor, but the point is that she is

specifically charged --

THE COURT: Now wait a minute. If in her grand jury testimony she has already said either I wouldn't have expected him or it wasn't his practice to tell me everything, what is the point of the Government eliciting from her that she didn't know?

MR. PETALAS: Her job duties include the fact that she is charged with senior citizens.

THE COURT: That's what you say, but you've got to look at what her grand jury testimony is. I will tell you, Mr. Petalas, I don't know if you've looked at the defense motion that was filed the other day regarding what the Government did with Celona. You're in very, very treacherous territory right now.

MR. PETALAS: I'm not trying to -- I'm being very careful.

THE COURT: What's the point of it? This is ridiculous. If in her grand jury she says he never told me things or he didn't tell me everything and all you're going to do is elicit from her that he didn't tell her this, how is that inconsistent with what she's already said before the grand jury?

If she had said before the grand jury I would have expected to know this because I was intimately familiar with these kinds of things, and she -- you

then elicit from her she didn't know anything, that has some evidentiary value.

But just simply putting before the jury I didn't know and not being able to establish that I would, should and could have known doesn't complete the picture. I just, frankly, don't see where you're going.

MR. PETALAS: Just --

THE COURT: I think you're creating a false impression on the basis of the record that you already have.

MR. PETALAS: I just want to show that this is the area that she worked in. She worked closely with Carlos. Socially -- she also worked for Jack, and in these natural occasions where it would be natural to mention --

THE COURT: You've got to establish that it would be natural. On the basis of what was elicited from her at her grand jury testimony, it's not natural. So I think you're going down the wrong road.

MR. PETALAS: May I speak with Mr. Dambruch, too, because I want to make sure we don't misstep?

THE COURT: Go ahead.

(End of bench conference)

(Pause)

MR. PETALAS: Your Honor, no further questions.
MR. FEIN: May I have one moment, your Honor?
(Pause)
MR. FEIN: No questions, your Honor.
MR. KILEY: No questions, your Honor.
THE COURT: You may step down.
MR. DAMBRUCH: Your Honor, may we approach?
THE COURT: You may.
MR. KILEY: Your Honor, may I bring Mr. Traini up with me on this one?
(Bench conference held on the record)
THE COURT: Why don't you step aside so Mr. Fein can get in.
MR. FEIN: Thank you, your Honor.
MR. DAMBRUCH: Your Honor, at this point in time, the Government would be introducing the transcript of Mr. Ortiz's state grand jury.
THE COURT: The transcript only comes in as ID if you're going to play it.
MR. DAMBRUCH: Your Honor, based upon the poor audio quality of the tape recording, the parties have agreed that we would -- with the Court's permission, that we would simply introduce the transcript as an exhibit. The transcript that's been prepared was actually -- this version was prepared by Mr. Kiley with

input from all.

It is a not only redacted version, but we each went through it with headsets and listened and made the appropriate corrections.

I've talked to Mr. Kiley. It would be my intention just to announce before the jury that the Government is introducing as Exhibit Number 394 the testimony of Carlos Ortiz before the state grand jury on August 4th of 2004. I think the parties agreed --

THE COURT: Are we making it clear that he was called as a witness -- was he a witness?

MR. DAMBRUCH: He was.

THE COURT: He wasn't identified as a target or a subject?

MR. DAMBRUCH: He is, in fact, right on the front of it identified as witness Carlos Ortiz.

THE COURT: And you're not going to have it read?

MR. DAMBRUCH: Just introduce it. That was the agreement between the parties.

MR. KILEY: That is the agreement, your Honor. But you told us when this was going in to come prepared to make our objections, the completeness objections, so we should put them on the record.

MR. TRAINI: Your Honor, just so that we're

clear, this relates back to several instances on which we've addressed the Court previously. The agreement, if you will, to allow the transcript to go in does not detract from the original objections that we made that we didn't want any of Mr. Ortiz's grand jury testimony in in the first place; that we then went to the next level, which was Mr. Fein's redactions, which were partially allowed.

So we just want to reiterate all of the record positions that we've taken previously relative to this and to the objection we had to completeness as it relates back to some other testimony that's come in during the course of the trial.

THE COURT: I understand. Mr. Fein.

MR. FEIN: Yes, your Honor. We maintain our *Bruton* objection in light of your Honor's allowance of certain of the passages that we had objected to. And so we object to the introduction of this. Understanding your Honor's ruling, we would ask, consistent with the prior discussions, that a limiting instruction be given because this is not coming in against Mr. Kramer.

THE COURT: Okay.

MR. TRAINI: Your Honor --

MR. FEIN: We had given you one regarding

testimony that we're about to hear. Since they're not going to hear it, I've adapted it so your Honor can do that as well.

THE COURT: Very good.

MR. TRAINI: I don't know what's going to happen after Steve puts the transcript in, your Honor. Are we coming back up? We have one other legal issue that we want to discuss with you on the record.

THE COURT: Are you going to rest after this?

MR. DAMBRUCH: Your Honor, I was going to ask your permission to officially rest on Tuesday. I want to resolve an exhibit issue before resting my case, and there was one other possible stipulation with regard to Mr. Celona's position as a member of the RISLA board.

And I've provided Mr. Fein and I'm talking to Mr. Fein about how we can do that by stipulation. If not, we would be introducing some certified copies of statutes. His appointment was to -- his Senate appointment was to the Rhode Island Higher Education Assistance Authority. By operation of statute at that point in time, he was, therefore, a member of the RISLA board as well.

THE COURT: Instead of putting more paper in front of this jury, I can either do it in a jury instruction or do it by way of stipulation.

MR. FEIN: Mr. Dambruch raised that this morning, and we're happy to explore a stipulation to avoid more paper. Your Honor, in light of the jury's presence here, there are four stipulations that have not yet been read to the jury. And we thought this would be a good time, if your Honor agreed, to read them to them. And those would be 390, 391, 392 and 393.

THE COURT: 391, 392. I don't think I have 393. That was the one I think I told you to rework, isn't it?

MR. FEIN: No, that was the Gordon Fox.

THE COURT: That 392, that's the one --

MR. FEIN: We did redo it.

THE COURT: So if you can dig out clean ones and hand them up, I can do those after you submit the grand jury transcript.

MR. DAMBRUCH: Okay, Judge.

MR. TRAINI: And we'll come back after the jury leaves, your Honor, so I can raise that other question? We don't need the jury for that.

THE COURT: There's another issue I want to raise after the jury leaves as well, so yes.

MR. FEIN: Your Honor, here is 392 from Mr. Duhamel. Do you also need 393?

THE COURT: This is what?

MR. FEIN: That's 392. That's the improved version per your Honor's suggestion.

THE COURT: And I need 393.

MR. FEIN: Here is 393, your Honor, from Mr. Duhamel. So there are four in total.

THE COURT: Okay.

MR. FEIN: Thank you, your Honor.

(End of bench conference)

MR. DAMBRUCH: Your Honor, at this point in time the Government would offer as an exhibit, specifically Exhibit Number 394, a transcript of Carlos Ortiz's testimony as a witness before the state grand jury on August 4th of 2004.

MR. KILEY: And we've objected to that at the bench; but otherwise, no further objection.

THE COURT: That's fine.

(Government Exhibit 394 was admitted in full)

THE COURT: Members of the jury, the Government, as you've just heard, is submitting for your consideration a transcript, that is, a typewritten transcription of the oral testimony given by Mr. Ortiz at the state grand jury.

You'll have a copy of that transcript to read during the course of your deliberations. It's been

admitted here as Exhibit Number 394. And as you know, John is keeping all of these in order so you'll be able to find whatever you need maintained in that numerical order.

With respect to this particular exhibit, I have a special instruction which I will read to you now and ask you to keep in mind as you consider the contents of that transcript.

As you know, there are two Defendants on trial here, John Kramer and Carlos Ortiz. Each Defendant is entitled to have his case decided solely on the evidence which applies to him.

Some of the evidence in this case is limited under the Rules of Evidence to only one of the Defendants and cannot be considered against the other Defendant.

The transcript which has been admitted into evidence as Government's 394 contains certain statements that Mr. Ortiz has allegedly made in the past. You may consider those statements by Mr. Ortiz only in the case against him and not against Mr. Kramer.

You may not consider or discuss those statements in any way when you are deciding if the Government has proved beyond a reasonable doubt its case against

Mr. Kramer.

Now, there are some additional stipulations that the parties have entered into which I will read to you now but which will, as will the others that have been admitted, be available to you in the jury room as written exhibits in the case.

The first is Exhibit Number 390. Again, it is a stipulation regarding John Kramer and the Celona State House Report. The Defendants and the United States agree and stipulate that between the year 2000 and 2003, John Kramer appeared as the guest on eight occasions on John Celona's State House Report television program.

The tapings for those appearances occurred on or about the following dates: April 2000; November 29, 2000; May 31st, 2001; August 20th, 2001; May 3rd, 2002; August 21, 2002; January 27, 2003; and May 21st, 2003.

Exhibit Number 391 is a stipulation that reads as follows: The Government and the Defendants agree to the following. For each of the years 2000, 2001, 2002 and 2003, the State of Rhode Island received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or some other form of federal assistance.

Exhibit Number 392 is a stipulation regarding

the first published reports of a relationship between Gordon Fox's law firm and GTECH. The Defendants and the United States agree the earliest press reports regarding Gordon Fox's relationship with GTECH were published on October 1, 2003.

Exhibit Number 393 is a stipulation regarding John Celona's income in the years 2000, 2001, 2002 and 2003.

Paragraph 1. On or about August 10, 2001, John Celona reported $54,400 in gross business income for calendar year 2000 on his federal tax return. His gross business income in 2000 consisted of $42,400 from a company referred to herein as Company A and $12,000 from CVS Pharmacy.

On or about August 13, 2002, John Celona reported $56,400 in gross business income for calendar year 2001 on his federal tax return. His gross business income in 2001 consisted of $46,400 from Company A and $10,000 from CVS.

In addition to Mr. Celona's reported business income, he earned $17,000 in business income in 2001 from HealthLink.

On or about August 1, 2003, John Celona reported $73,453 in gross business income for calendar year 2002 on his federal tax return. His gross business income

in 2002 consisted of $56,138 from Company A, $14,000 from CVS and $3,315 from a company referred to herein as Company B.

In addition to Mr. Celona's reported business income, he earned $14,400 in business income in 2002 from New England Ambulance.

On or about November 1, 2006, John Celona reported $107,305 in gross business income for calendar year 2003 on his federal tax return. His gross business income in 2003 consisted of $47,000 from Company A, $14,400 from New England Ambulance, $14,400 from Certified Cleaning and Restoration, $10,500 from The Discovery Group, $9,000 from CVS and $8,405 from Company B and $3,600 from InterCity Maintenance.

(Government Exhibits 390, 391, 392, and 393 were admitted in full)

Now, I understand that we've run out of witnesses for today. Is that right, Mr. Dambruch?

MR. DAMBRUCH: That is correct, your Honor.

THE COURT: Okay. That's good news for you. I understand it's a three-day weekend. Is that right?

JUROR: Oh, yes, that's right, your Honor.

THE COURT: For you it's three-and-a-half days. We will not be in session on Monday.

JUROR: Aw.

THE COURT: We could change that. Monday, as you know, is Memorial Day, and we will not be in session. We will resume on Tuesday morning at 9 a.m.

Again, as I've told you throughout this trial, it would be a violation of your oath as jurors to talk about the case amongst yourselves, to talk with anyone else about it until such time as you begin deliberations.

So over the weekend, put it out of your minds. I hear it's supposed to be some pretty nice weather. So if the weather people are right, you should spend a lot of time outside, as I said, not thinking about this case at all. Instead, enjoy your weekend. We'll see you Tuesday morning at 9:00 ready to go to work.

Bob, would you see the jury out.

(The jury is not present for the following)

THE COURT: May I see counsel, please.

(Bench conference held on the record)

MR. TRAINI: Your Honor, the issue that I wanted to bring up was, I think it was during Mr. Fein's cross-examination of Mr. Andrews, that issue came up about the fact that Senator Reed is a U.S. senator. And I at least got the impression, and I don't think the Court was trying to leave the jury with this impression, but I think they may also have the

impression that a United States senator as distinguished from a state senator can get a verbal opinion.

THE COURT: That was not the intention. What I was saying to Mr. Fein is, because I thought he was going down the road, and you know that they -- you know what ethics opinions are, but it's a different process altogether.

MR. TRAINI: And that's my point, Judge. I could not tell from the way you handled that whether or not you are expecting us to introduce evidence on that point or if you're going to instruct on that as a matter of law.

THE COURT: I can instruct the jury on that point.

MR. TRAINI: We wanted to iron that out.

THE COURT: My concern was, it sounded like Mr. Fein was trying to elicit from the witness, having worked for two United States senators, that he understood what an ethics opinion was from the state ethics.

MR. FEIN: Your Honor, what he testified in the grand jury was that he understood senators could call, get guidance, and that there would then be a writing.

THE COURT: But the problem is, he didn't work

for state senators.

MR. FEIN: I understand. The only point was --

THE COURT: You had asked him -- he had said I worked for Pell and Reed when they were in the United States Senate, and that's a different process.

MR. TRAINI: That's right. And one thing we just wanted to make clear was that the process for whether or not you need a written opinion or how you get a written opinion, those are set forth in the statute and that's a matter of state law. I always assumed that you would be instructing on that if we prepared the appropriate instruction rather than introducing evidence on it.

THE COURT: I don't think it's something to introduce evidence on, but I was concerned about where Mr. Fein was going with that. And that's why I said to Mr. Fein they were U.S. senators. If he had worked for somebody up on the hill here and had some personal experience to draw on, that's different; but when he says, I worked for Pell and Reed in Washington, that's a different ball game.

MR. FEIN: And at the moment I thought you were correcting me on my not properly identifying Senator Reed. The only intent was that his experience was that when there's an oral inquiry, he understands that

there's a written --

THE COURT: But what informs his understanding is his experience on the federal side.

MR. TRAINI: The state of the evidence right now, Judge, is that Mr. Celona has testified that he got a verbal and that I think he made a remark somewhere in his testimony --

THE COURT: Sort of.

MR. TRAINI: -- that he should have gotten it in writing or whatever. So we want to make sure that the Court is going to instruct the jury on the way it really works in the state.

THE COURT: Give me something to work with.

MR. TRAINI: Okay.

THE COURT: I have some questions for Mr. Dambruch.

MR. DAMBRUCH: Yes, Judge.

THE COURT: Have you had a chance to read the Defendants' motion for declaration of a mistrial with prejudice?

MR. DAMBRUCH: I have, and Ms. Donovan from our office is preparing a written response; but I have read the motion.

THE COURT: Is that written response -- when do you expect it's going to be filed? Well, let me tell

you when it's going to be filed. I want it no later than Tuesday before we start.

MR. DAMBRUCH: Yes, Judge. I think she's finishing it up today.

THE COURT: If she can file it today, all the better. I will tell you candidly I have some grave concerns regarding the exchange you had with Mr. Celona about whether or not CVS was identified in his telephone call with the Ethics Commission, whether that was an imaginary call, whether it really happened, because of the Government's knowledge of his previous testimony, grand jury and during Urciuoli, that he had mentioned CVS.

The concern I have specifically, and you can ask her to address this in her response, was that once you elicited from him the "no" answer, I believe you had an obligation under 3.3 of the Rules of Professional Conduct, 3.3(a)(4), to correct the record.

Instead, what you did was you underscored that false answer by asking him the series of "why not" questions, which then his responses were basically shoveling more dirt on the grave of the Defendants.

I need an explanation, and I'll hear what you have to say in terms of what remedy I should employ; but I will tell you, I'm deeply disturbed by it.

If you want to make a comment now, you can. If you want to wait until your written submission, that's fine. And I don't mean to suggest that I've decided that you have committed any sort of a violation. I'm merely pointing out the rule to you and your obligation and the concern I have in terms of how it affects the trial.

MR. DAMBRUCH: Your Honor, all I can say, and I believe Ms. Donovan will address this in our response, is that my questions to him were founded upon my interactions with him at the three trial preparation sessions; that the first time I met with him in regard to this case was in Pennsylvania and that when I asked him questions about that call, he indicated to me that he -- that his recollection at this point in time was that he had not mentioned the name of CVS.

And he was very specific about that. He persisted in that recollection at each and every one of the two subsequent trial preparation proceedings.

I know he had said some different things before, and we had provided those documents to defense counsel. So when I asked that question, I had a good faith belief that that was what he was reporting his recollection was, and I did not believe that to be perjured testimony. I understand it was inconsistent,

but I did not believe it to be perjured testimony.

THE COURT: That's why I've said I'm not suggesting that I've made such a determination, but I am concerned with the way this thing came out. Even in your pretrial memo, as the Defendants point out, you report that conversation as how he said he had something to do with CVS.

Did you in your meetings with him when he persisted in this now 2008 recollection remind him of what he had said before the grand jury?

MR. DAMBRUCH: We asked him to read his grand jury testimony between the first and second day. He also had some issues with regard to his memory of whether or not he had ever discussed that opinion with Mr. Ortiz or Mr. Kramer.

We asked him again to read his grand jury testimony. After he read it, he assured -- in fact, when I left Pennsylvania, he was still within the position that he didn't recall ever discussing it with the two Defendants.

When he came here to Rhode Island, he indicated that he now did recall that he had discussed the matter with Mr. Kramer -- Mr. Ortiz but couldn't recall the presence of Mr. Kramer. So we asked him to read his grand jury testimony. I didn't point him to specific

sections, Judge.

THE COURT: That's what I'm asking you. Did you point it out to him and say, Look, on five different occasions under oath at a time closer, and also you've got the 302s from the FBI agents, you said you talked -- you mentioned CVS? Did you do that?

MR. DAMBRUCH: I did not specifically point to him. What I did is I asked him to read his testimony. I'll be honest, Judge, my concern was I did not want to tell him how to testify or that he had to testify consistently with anything else.

I asked him a question. We asked him to review his grand jury transcripts over the night. And then as we left, we had asked to take those with us because of his concerns, et cetera. So that was what I did, and I based my questions on those preparation sessions.

THE COURT: I have to tell you, it does not look good. I am less concerned with the exchange regarding whether or not it was Kramer and Ortiz or just Ortiz because the line of questioning there was not as, I think, direct.

But I am concerned with the fact that once you elicited from him, No, I never said CVS, that there were the follow-up questions which were clearly designed to elicit from him a response that was I think

very powerful evidence of criminal intent.

So I'll wait to see the response, but I'm going to take this up on Tuesday, and I will make a determination as to what remedy, if any, I will employ. And the sooner she can get that response in, the better.

MR. TRAINI: Judge, if I can, just a couple of things. One is that regardless of --

THE COURT: Speak up a little.

MR. TRAINI: Regardless of whatever determination you make about Mr. Dambruch's comment, we still obviously believe we're entitled to some kind of relief anyway.

THE COURT: Well, I haven't suggested whether or what I will do. I think he has a right to provide a response, and that's why I wanted to make sure you knew before you left today that it's something I will take up. I'm not going to let this one slide.

MR. TRAINI: Well, we also -- I don't know how quickly the Government will get its response in. We'd like to be able to see it, and we certainly want to be heard on Tuesday.

THE COURT: Absolutely. I wanted to make sure Mr. Dambruch knew because he's involved in the middle of trial and sometimes you don't have the chance

because you're preparing and doing other things to read everything that's filed during the course of a trial like this, but I wanted to make sure he understood that.

I read it yesterday afternoon and became very concerned and then looked at what the rules are on what you do when you've got testimony that you know to be false.

He was a horrible witness. I can't imagine how difficult it was to have to deal with him. But I do think when he's committed under oath and then he gives you testimony that's in the opposite direction, that it's certainly something that needs to be scrutinized carefully.

MR. FEIN: Your Honor, I would add one more thing. I'm not going to address our brief that you just read, but what I've just heard from Mr. Dambruch is the first time we've heard what he just described in terms of his knowledge of these events. We were not provided this as *Brady* or *Giglio* in advance of the witness's testimony. In addition to the professional rules, I think there are *Brady* and *Giglio* issues there as well.

THE COURT: I'll see you Tuesday.

(End of bench conference)

(Adjourned)

* * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date