IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA | * | |
| VS. | * | MAY 27, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and<br>CARLOS ORTIZ | * | |
| * * * * * * * * * * * * * * * * | * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

E X H I B I T S

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 363 | | 38 |
| 395 | | 39 |
| 396 | | 39 |
| 397 | | 39 |

| DEFENDANT | FOR ID | IN FULL |
|---|---|---|
| Q-24 | | 46 |
| R-24 | | 44 |
| S-24 | | 44 |
| T-24 | | 44 |

27 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: Before we bring the jury in this morning, I'll deal with the motion that was filed by the Defendants last week and which the Government responded to, I believe, over the weekend.

Which of you on this side wishes to address that motion? And I know you filed a supplemental memorandum this morning, which I've read.

MR. CORRIGAN: Yes.

THE COURT: Which of you wants to address it?

MR. CORRIGAN: I will address that, your Honor.

THE COURT: Briefly, because I think you've covered a lot of territory in your written papers.

MR. CORRIGAN: We have, your Honor. We've tried to be fulsome, although we didn't include all of the examples that we believe we could have in our papers, but we did provide two of the -- what we consider the most egregious examples.

Those are the examples relating to the Ethics Commission call and what Mr. Celona has previously testified about what he said to the Ethics Commission and, secondly, related to that call, what it is Mr. Celona reported to the Defendants about that call. That's the first, most egregious category, we believe.

The second egregious category, your Honor, has to do with the compliance of Mr. Celona with the terms of his plea agreement and specifically as it relates to his obligation to ensure that he had cleared up all outstanding tax issues prior to the time of his sentencing.

Your Honor, this is an extraordinary motion, we recognize it, and it seeks extraordinary relief; but these are extraordinary circumstances that warrant the relief that the Defendants are seeking.

The trial prosecutors in this case, your Honor, knew prior to trial that Mr. Celona had new memories, new memories about the events that had not -- never before been recorded in the multiple FBI reports about his interviews or in the multiple instances of his grand jury testimony or in his trial testimony at the Urciuoli trial.

The trial prosecutors decided not to question him about the new memories or ask him how it could be that he had arrived at these new memories in light of the prior testimony that he had given under oath.

And when they knew of the new memories, your Honor, they decided not to share those memories with counsel for the Defendants in violation of their obligations under *Brady* and *Giglio*.

Further still, the Government misled the Defendants in their trial memorandum and in their opening statement when they said, despite the fact that they knew of Mr. Celona's new memories, that he had, in fact, called the Ethics Commission and mentioned CVS in the Ethics Commission call.

Based on what had been provided to the Defendants in advance of trial regarding Mr. Celona's statements and testimony, the Defendants opened in this case about the call to the Ethics Commission, and the Government -- the trial prosecutors sat by idly while defense counsel said to the jury that they were here in this case, that Mr. Celona, as he had previously testified, had called the Ethics Commission and reported that Ethics Commission call to both Defendants.

They elicited the new memories at trial without ever having informed either the Court or the Defendants, and then in the direct examination they built upon the lies of those new memories, the trial prosecutor specifically asking twice "why not" when Mr. Celona testified under direct examination that he had not mentioned CVS during the Ethics Commission call.

Then on cross-examination, we get a different

story. When Mr. Celona was confronted with his prior testimony in the grand jury and the Urciuoli proceeding, we get a different version of the events. And if the prosecutors in preparation for -- of Mr. Celona for this trial had done the very thing that on cross-examination we had to painfully go over with Mr. Celona, they would have gotten the responses that ultimately were brought out on cross-examination.

But, your Honor, by then it was too late. The damage had already been done. On direct examination, the Government had brought out these false new memories and hammered the point home and built upon it by asking the subsequent "why not" question twice.

The prosecutors in this case readily accepted a gift that was too good to be true, an eve-of-trial transformation of Mr. Celona's memories that transformed exculpatory information into inculpatory information.

And this is not an isolated incident. Although the Ethics Commission call goes to the very heart of the matter, as your Honor has indicated during conferences with the parties and we have briefed previously, the Ethics Commission call and what Mr. Celona had previously testified about his relating that call to the Defendants goes to the heart of the

defense in this matter.

This is not some immaterial issue. It is -- it goes right to the heart of the defense. And, moreover, your Honor, it's not an isolated incident in terms of eliciting false statements from Mr. Celona on his direct examination as we point out in our papers.

It really is indicative, your Honor, of a pattern and practice that the Government has employed throughout this case and throughout this investigation in an effort to convict two innocent individuals.

MR. TRAINI: If I may, your Honor, just a couple of points. The Government seems to say in their response to our memos that it really isn't perjury that Mr. Celona committed.

I think that question is answered by the U.S. Supreme Court's decision in *Dunn v. United States*. I don't have the citation for you, but it's a 1979 Supreme Court case, your Honor. It was an 18 U.S.C. 1623 case in which the Court said that the two inconsistent statements given under circumstances where one of them has to be untrue is a perjury offense.

And so I think that deals with what I think the Government does, which is to exalt form over substance in that regard.

Secondly, Mr. Corrigan mentioned the materiality issue. The Government goes to great lengths in its memo to talk about the fact that the Ethics Commission call is not particularly materially relevant, and they say that on page 3 of their memo.

But later on in the same memo, what they say is that Celona's inability to confirm that he spoke with Kramer inculpates Kramer because it undermines Kramer's ability to suggest to the jury that he relied on Celona's statements to him that he had secured Ethics Commission approval.

Obviously the materiality, your Honor, is that if we're talking about intent, it's informed to some degree by what Celona told them, particularly in this case where he said he had approval to work for CVS.

And finally, your Honor, the real issue about the inconsistency in Mr. Celona's statements is not the average case because you don't just look around for inconsistent statements.

The benchmark was established by Judge Torres in the Urciuoli trial when he asked that question and got that answer. We got an entirely opposite answer. So now we do have, in fact, the two irreconcilably inconsistent statements. And I think the fact that it was a benchmark set in this court in response to a

question from another judge brings it to another level.

And so I would ask the Court to grant the motion. Thank you, your Honor.

MR. CORRENTE: Good morning, your Honor. I suppose the first question in the Court's mind is what am I doing here and why am I arguing the motion.

The motion that has been filed obviously calls into question the actions of my office and of the prosecutors trying this case and of the entire Department of Justice if you look at the supplemental memo that was filed that we saw this morning.

We take these charges very seriously. We don't take them lightly, but we also don't take them lying down. Frankly, your Honor, I think the motion itself is outrageous.

I'm obviously at a disadvantage about the underlying facts. I have not been present for the entire trial, and I obviously don't know the background as well as the lawyers who have tried the case; but I think I know enough about it and enough about the memo that was filed last week to address the following points for the Court.

In the papers filed last week, the defense accuses the Government of acting intentionally and in bad faith by eliciting from John Celona three

perjurious statements: Number one, that when Mr. Celona called the Rhode Island Ethics Commission, he did not disclose that the company about whom he was inquiring was CVS; number two, that Mr. Celona did not tell Jack Kramer about his contact with the Rhode Island Ethics Commission; and number three, that in the year 2000, Mr. Celona did no work for CVS.

Before we look at those three pieces of testimony in detail, I think it's helpful to lay out the applicable legal standards which were curiously, I think, underplayed in the defense filing last week.

The simple fact is this. A review of the pertinent case law both from the U.S. Supreme Court and from the First Circuit Court of Appeals shows conclusively that this motion falls far short of the standards that have been applied in cases of this type.

The presentation by the defense, the motion by the defense fails even to establish that any of the challenged testimony constitutes perjury, let alone that the presentation of that testimony was in some way tantamount to prosecutorial misconduct.

Under the Supreme Court definition --

THE COURT: I think, Mr. Corrente, and I recognize, as you've conceded today, that you are not as conversant with the facts of the case as the line

prosecutors --

MR. CORRENTE: Right.

THE COURT: -- who have lived with this case for now nearly two years or more, the accusation of presentation of perjurious testimony was made prior to any disclosure by Mr. Dambruch that he knew in advance that Mr. Celona was going to respond to the ethics question, Ethics Commission question about mentioning CVS in the manner that he did at trial, which was 180 degrees in the opposite direction of the way he had answered that question on numerous occasions before the grand jury, in his conversations with Government agents and during the Urciuoli trial.

So I am, frankly, less concerned today with that accusation because it was put to rest, at least in my mind, with the belated disclosure by Mr. Dambruch that the Government knew in advance of trial that Mr. Celona had, at the very least, changed his testimony with respect to those facts.

So I don't want you to spend a lot of time talking about perjury in this case. Let's move on to what I think is the real issue, and that is whether or not the Government violated its obligations under *Giglio* and *Brady*.

MR. CORRENTE: I don't think they did. And I

think that, while I don't want to belabor a point that the Court has already moved beyond, I think that to a certain extent the two analyses are tied together.

THE COURT: And let me just tell you, from the Defendants' perspective and the Court's perspective, when we heard that testimony, it was beyond my dreams that the testimony that was elicited was known to the Government after all of the work that had been done previous to the commencement of trial on making sure that all of the *Brady*, *Giglio* disclosures had been made. It was beyond my wildest dreams that the Government had not provided that information.

And so, frankly, I think everybody, at least from the defense side and at least from where I sat, was of the mind that the Government was surprised by that answer.

It was only after the Defendants filed their motion did we learn that the Government knew that he was going to say that but had not disclosed it.

MR. CORRENTE: I don't think the record bears that out, frankly, your Honor, and here's why. If you look at the three challenged statements, let's take them in reverse order because I think two of them can be dealt with more quickly than the third.

THE COURT: I'm less concerned with the no work

and with the -- whether it was Kramer and Ortiz because on Kramer and Ortiz, what he said was, I don't recall. He acknowledged he said it before; but he said, I don't recall.

MR. CORRENTE: Right.

THE COURT: But when he was asked consistently throughout this case, grand jury testimony what he said to the Ethics Commission --

MR. CORRENTE: Right.

THE COURT: -- on numerous occasions he said he'd mentioned CVS.

MR. CORRENTE: Right. If you look at the record specifically with respect to the call to the Ethics Commission, your Honor, I think that the position the defense takes is that the prior testimony establishes a consistent pattern by Mr. Celona of saying the same thing over and over and over again. I think if you look closely at that prior testimony, that's not, in fact, the case.

This is the second trial at which Mr. Celona has testified, and obviously there have been two grand jury appearances as well. So we have multiple --

THE COURT: There have been more than two grand jury appearances.

MR. CORRENTE: Sure, but I mean pertaining to

this point. We have multiple prior statements made by Mr. Celona. If you look closely at those transcripts, I think that, in fairness, you can only conclude that they're a bit of a mess. We do not have a clear line throughout that testimony from Mr. Celona about what he did.

At the first grand jury testimony, which was on May 2nd, which is at Exhibit A to our memo, Celona does not relate anything that he said to the Ethics Commission. What he testified to was that the Ethics Commission said, If this relates to CVS, you can't vote on it.

Now, there are a couple of different inferences there. It may have been that he told them it was CVS. It may have been that he said, Suppose I'm going to work as a consultant for a pharmacy company, and somebody at the Ethics Commission may have said, If it's CVS -- if you're working for CVS, you can't -- we just simply don't know. There are multiple different inferences you could draw there.

If you look at the second grand jury testimony, what Mr. Celona actually says in the course of that testimony about the call to the Ethics Commission is nothing. He simply doesn't mention it.

What he says is that he told Mr. Kramer and

Mr. Ortiz about the clearance that he had for Roger Williams. He's asked specifically, Did you tell them you had clearance to work for CVS? And he says, No.

So he doesn't say anything in the course of his second grand jury testimony about the substance of this call with the Ethics Commission.

Then we get to the Urciuoli trial, which is Exhibit C. When the subject matter first comes up in Urciuoli, what does he say? He denies that he ever contacted the Ethics Commission. So now we have, what, maybe a third version.

Four pages later, he acknowledges that he had testified differently to the prior grand jury. Then there's a long colloquy between Mr. Celona and Mr. Egbert about the change of plea hearing, at which he seems to suggest that he had acknowledged that he had never disclosed CVS to the Ethics Commission.

And then finally we get to the exchange that leads up to his colloquy with Judge Torres at which he finally specifies CVS by name and says, Yes, I did mention CVS.

So what do we have here? We have a complete mess. We have him saying, I never contacted the Ethics Commission; we have him saying arguably nothing in a couple of grand jury appearances; we have him hinting,

at least with respect to the change of plea hearing, that he never identified CVS; and then we have him telling Judge Torres, I did identify CVS.

We have a mess on our hands, Judge, and so for the defense to suggest that anybody is shocked to find out that Celona's recollection now is that he didn't recall having mentioned CVS to the Ethics Commission I think is disingenuous. The record is simply not clear enough to make that kind of a call.

THE COURT: I think, though, Mr. Corrente, that misses the point of *Brady* and *Giglio*. What those cases require of the Government is that when the Government is in possession of exculpatory material, and *Giglio* specifically speaks to impeachment material, particularly when it's with respect to a material matter, this is not some side issue, this goes to the heart of intent, the intent of the Defendants, the Government is required to make a timely disclosure of that material.

What's happened here is, and you may or may not agree with me, that when the Government became aware of the fact that in the spring of 2008 its star witness, now some eight-and-a-half years after the event, has taken a different position with respect to a material fact, no matter what you may think of its evidentiary

value, the Government has an obligation to make that disclosure in a timely fashion, and that wasn't done in this case.

MR. CORRENTE: Well, let me offer three sort of brief retorts to that, if I might, your Honor. First of all, the issue of materiality. I don't quarrel with the fact that the discussion between Mr. Celona and Messrs. Kramer and Ortiz is material. That's central.

Frankly, what Mr. Celona discussed with the Ethics Commission doesn't have any bearing and is simply not material --

THE COURT: I agree with you insofar as if this were a neatly parsed series of questions, but it has been consistently handled through the grand jury and throughout as a package with a clear impression being made to anyone who listens to that testimony or reads it that what he said to the Ethics Commission was then relayed to the Defendants in this case.

So I don't think you can -- as you say, it's a mess. He wasn't pinned down very well in the grand jury, but the impression that was created by those exchanges is clearly that what he said to the Ethics Commission was then repeated to the Defendants.

MR. CORRENTE: With all due respect, your Honor, that was not the impression that I think was created in

this case. In this case, those were treated as very distinct conversations. He was asked, What did you discuss with the Ethics Commission? And then separately he was asked, What did you discuss with Mr. Kramer and Mr. Ortiz? He said, I remember talking to Mr. Ortiz, don't remember Mr. Kramer.

THE COURT: Well, that's his trial testimony here, which is different from what he said in grand jury.

MR. CORRENTE: Sure. I understand that, but the fact of the matter remains that the substance of the telephone conversation eight years ago between John Celona and some unidentified person at the Ethics Commission simply does not bear on the issue of the state of mind of Mr. Kramer or Mr. Ortiz.

THE COURT: Unless, as I say, it's presented in such a fashion that it looks like a package.

MR. CORRENTE: But there's never been a presentation to this jury that says, I related chapter and verse of my conversation with the Ethics Commission. He simply didn't say that. So first I would argue that --

THE COURT: Your prosecutor said it.

MR. CORRENTE: Pardon?

THE COURT: Your prosecutor said it in his

opening statement.

MR. CORRENTE: What the prosecutor said is he conveyed to Mr. Kramer and Mr. Ortiz that he had been in touch with the Ethics Commission, not that he had had certain conversations or that he had -- he wasn't in a position at that point to convey the exact words that had transpired, and I don't think anybody's ever made that suggestion.

And, frankly, to look at the assertion that's being made here that we somehow tried to trick the jury or trick the defense or trick the Court, that simply doesn't hold up.

THE COURT: I'm not suggesting that that's the case, Mr. Corrente. What I am suggesting, however, is this, that when it became clear to the prosecutors in this case that Mr. Celona had backed off his previous testimony to the effect that he told whomever at the Ethics Commission it was CVS and now he says he has -- he didn't say that, not that he doesn't recall it, but that he didn't say it --

MR. CORRENTE: But beyond --

THE COURT: -- your office had an obligation to turn that information over to the defense.

MR. CORRENTE: Beyond the materiality argument, your Honor, let me make just two other observations.

First of all, if you look at this under a *Brady* analysis, there's simply nothing about I told the Ethics Commission it was CVS that is in any way exculpatory with respect to either of these two Defendants. It's just not.

It has to do with Celona's state of mind maybe, but it's certainly not exculpatory with respect to either Defendant in any way, shape or form.

And second to the Court's point that we knew what Celona was going to say, with all due respect, we could never be in a position of really knowing what Celona was going to say because he had said so many different things.

THE COURT: That's missing the point again.

MR. CORRENTE: I don't --

THE COURT: The fact that in his interviews with the prosecutors he recants a portion of what he's previously testified to under oath is the piece that should have been turned over.

MR. CORRENTE: But what actually happened here, your Honor, is he told the prosecutors in the prep session that my memory now is I identified that it was CVS. That was inconsistent with some prior -- excuse me, I think I misspoke. He told the prosecutor that I don't recall having mentioned CVS.

THE COURT: Not I don't recall. I didn't say it.

MR. CORRENTE: I didn't say that, which was inconsistent with what he said before. So the prosecutor, I think quite rightly, gave him his prior grand jury testimony and said, Read this.

What did we do? In our opening statement, we presented what we expected his testimony to be, and what we said in our opening statement was consistent with his grand jury testimony. That's what we thought he was going to say. So we couldn't be sure until it came out of his mouth what exactly he was going to say at trial.

He had taken multiple different sides, and it was impossible for anyone to know exactly what he was going to say.

THE COURT: Except that if the disclosure had been made to the Defendants that he had, in fact, recanted that portion of his testimony and then the prosecutor went on to open with what his grand jury testimony had been as opposed to what the new position was, the defense would have been ready for that. That's why I say I think you're missing the point.

MR. CORRENTE: But, your Honor, our obligation to turn that over even as impeachment only has -- only

arises once it's determined that that's exculpatory evidence, and it's just not.

It's not exculpatory evidence. It has to do with Celona's discussion with the Ethics Commission. It is not -- does not go to one of the elements of the crimes that these Defendants are charged with.

So if that obligation never arises, then whether we were surprised or they were surprised or anyone else was surprised really is not the point.

I mean, and just finally, your Honor, let me just point out I think that the motion as a whole proceeds from the -- a faulty premise and that is that if you say it over and over and over again and you use enough florid adjectives, you can turn inconsistencies into perjury or into some horrible prosecutorial misconduct. The case law suggests otherwise.

This goes directly to Mr. Celona's credibility. This goes directly to issues of fact that are, frankly, not for the defense team to decide. They're for the jury to decide.

There have been multiple cases in this building, we don't have to go very far back in history, at which important witnesses have been problematic, they've been cross-examined for days on end, they may have said a variety of inconsistent things, and many of those

trials have ended up with convictions.

That's for the jury to decide. It's not for any of us to determine how the jury will see this, which inconsistencies they will think matter or, frankly, which way any of this will cut. The jury may hold Celona against the Government because he was our witness; but the jury could also look at Celona and say, you know what, the Government didn't hire him. We didn't put him on the payroll. CVS did that.

THE COURT: Well, I think you're getting -- again, I think you're getting far afield of what the issue is here.

MR. CORRENTE: Unless the Court has any other questions, I'll rest on what we filed.

THE COURT: Do you want to respond, Mr. Corrigan?

MR. CORRIGAN: Yes, your Honor. Very briefly, your Honor. As we highlight in our supplemental memo, we ask can you imagine how Mr. Corrente and his office would respond to the very argument that he just made here in this court in which there was an attempt to erase the record of prior sworn testimony in a grand jury proceeding such that a -- it is as if the prior grand jury testimony should be erased from the map and all we should be faced with is what Mr. Celona says

from the witness stand at this trial.

Moreover, Mr. Corrente contradicts himself during his argument. He begins his argument by saying that the testimony in the grand jury and the prior statements that Mr. Celona made were not inconsistent and that the new memory is not inconsistent with his prior testimony.

And now he concludes his argument by saying, well, yes, it is inconsistent with his prior testimony when you look at what happened at the Urciuoli trial and when you look at what happened with the prior grand jury testimony, and then says but the trial prosecutors could not have expected that the new version of events that was elicited at trial would come out of Mr. Celona's mouth when he took the stand in this case.

Your Honor, that just cannot be believed when we know that in April of 2008 and in May of 2008 these trial prosecutors met with Mr. Celona and heard the new version of events for the very first time and never revealed them to the defense.

THE COURT: I'll give you an answer in just a minute. I'm waiting for something.

(Pause)

THE COURT: The Defendants in this case have filed a motion seeking a rather extreme remedy. They

seek a declaration of a mistrial with prejudice or essentially that the Court dismiss the case at this juncture.

As I indicated to Mr. Corrente, initially when the Defendants filed their motion, they and the Court were not aware that Mr. Celona's recantation was actually known to the Government before it was elicited before the jury.

Under those circumstances, the Defendants argued that the Government had essentially presented perjured testimony and had not taken the necessary measures to eliminate that element from this case.

Upon being questioned by the Court with regard to the motion that the Defendants had filed, the Court and the Defendants' counsel for the first time learned that the testimony elicited by Mr. Dambruch on this question of what Mr. Celona had discussed with the unknown, unnamed person at the Ethics Commission had changed dramatically from what he had testified to under oath on numerous occasions before the grand jury and at the trial before Judge Torres.

Now, Mr. Corrente is correct. The statement as to what Mr. Celona discussed before the Ethics Commission or with the Ethics Commission standing alone is really irrelevant. It's what is in the minds of the

Defendants in this case that is relevant.

But where I part ways with Mr. Corrente is that that discussion purportedly had by Mr. Celona with the unknown, unnamed person at the Ethics Commission is almost always followed up by, And what did you say to the Defendants thereafter? In fact, it's so much a part of this case that in its opening the Government said, and this is I believe Mr. Petalas, "At some point thereafter, Carlos Ortiz, the evidence will show, asked the obvious question: What's the Ethics Commission going to say about you working for CVS?"

He went on, very next sentence, "John Celona, the evidence will show, had an answer ready for them. He said, I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and I can work for CVS."

So it's not as neat as Mr. Corrente has indicated. If it were, I don't think we would be here today. It's always presented as a package, what did he say to the person at the Ethics Commission, what did he then repeat or say to the Defendants with regard to that purported conversation.

And so I have come to the conclusion here that there was, in fact, a *Brady* violation in this case because this evidence was known to the Government well

in advance of trial and certainly should have been disclosed to the Defendants.

The evidence in this case is certainly impeachment material. It is, as I say, a new iteration of Mr. Celona's recollection of what he said, when he said it, to whom he said it. It deals with a material fact in this case because, as I say, the two conversations are almost always presented seriatim and, therefore, become a package.

The evidence was either willfully or inadvertently suppressed by the Government. It was not disclosed in a timely fashion, and I find that some prejudice has ensued.

The Defendants, had they known this fact prior to trial, might have tailored their opening differently, might have approached their cross-examination of Mr. Celona differently.

On the other hand, First Circuit case law dealing with late disclosure or delayed disclosure of *Brady* material suggests that the inquiry the Court must make is this question of whether or not there was prejudice, to what extent there was prejudice and how might it be addressed.

In this case, as I say, the record that the Defendants had of Mr. Celona's inconsistencies is

voluminous. Counsel had his prior grand jury testimony. They had his prior statements that were inconsistent with his trial testimony that he had made to Government agents. What they did not know was this last-minute turnaround that should have been provided.

And so the remedy that I believe is an appropriate remedy in this case is not as the Defendants request, although I cannot fault the Defendants for asking for a declaration of a mistrial with prejudice in this case. That's their job. They're advocates.

What I will permit as a remedy is to reopen Mr. Celona's cross-examination to permit defense counsel to elicit from him the fact that this is a renewed memory or new memory or whatever it is that he disclosed to the Government for the first time in April and early May of this year in advance of trial.

I'll meet with counsel briefly at the bench to discuss how we handle reopening his cross-examination.

(Bench conference held on the record)

THE COURT: If you -- first you need to decide whether you want to do that, and I'm not going to give you very much time to think about that.

The second question, which may actually make the first question easier for you to decide, is, we have

the jury here. You're going to close today?

MR. DAMBRUCH: Yes, your Honor. The exhibit stipulation has now been filed. I have one additional correction I need to make, and I have an additional exhibit. I've discussed with counsel the plea agreement. The version that we submitted did not have notations made after filing with the Court, apparently, and I want to make sure that's correct.

THE COURT: Okay.

MR. DAMBRUCH: And there were a couple of other stipulations that we've agreed to. So with all that taken into account and one additional exhibit, some statutes that came in as a full exhibit, with all that taken into account, we would be prepared to rest our case.

THE COURT: Okay. If you want to reopen after the Government closes, you can do that. If you want to do it today before they close, I will inquire as to whether we can get him here this morning. He won't be in a suit because we're not going to have time to go through all of that.

So I need an answer from you fairly soon. If you want to discuss it amongst yourselves, why don't you go ahead and do that. We're not on the record, by the way. Oh, I'm sorry, we are? Okay. Well, then

let's stay on.

MR. FEIN: Your Honor, we obviously need to discuss it. I don't know how we would possibly be prepared, however, to proceed today with that cross-examination when we have not prepared for it and knew that Celona had left the stand and, for all we knew, was back in Pennsylvania.

THE COURT: Is he still here?

MR. DAMBRUCH: I believe so, Judge. I believe he -- my understanding was they were going to keep him here through the end of the trial.

THE COURT: Okay.

MR. FEIN: We did not know that. So I can't imagine, speaking for myself, that we could possibly go ahead today even if we chose to do it.

What we had prepared, so your Honor knows, for today, assuming that the case was still proceeding, following the Government's close, we have a couple of stipulations, a couple of matters to take up with your Honor and then, as we've told you, the playing of the tapes.

One tape, one composite tape is one hour long; and the second tape is, I think, eight minutes long.

THE COURT: Okay.

MR. FEIN: I do think we will need time to

discuss --

THE COURT: I mean, I'm concerned because we have the jury here, and I don't want to waste their time; but by the same token, I don't want to shortchange you. So if you decide that you want to -- and there's an alternative to reopening his cross-examination and that is if you want to enter into a stipulation that this was new evidence or a new version that was not known until he said it.

I don't know how you could handle it that way. That's the only concern. I leave it to you to figure out whether or not you can do that so that the record is clear.

But why don't we go ahead, then, and if your -- if what I'm hearing from you, then, is that you have no objection to having the Government go ahead and close subject to reopening his cross-examination should you choose to go that route, that's what we will do.

We'll bring the jury in, have the Government close, put in whatever it is you're going to put in before you close, rest, and then you've got the tape, which is really nobody testifying.

MR. FEIN: Correct.

THE COURT: It would take up some time.

MR. KILEY: What we haven't discussed is the

Rule 29 arguments, and we do want to make some.

THE COURT: I understand that. I thought you were going to submit those in writing.

MR. FEIN: We are, as soon as the Government rests.

THE COURT: Okay.

MR. FEIN: We couldn't submit them in advance of the Government resting.

THE COURT: Do you have them here with you?

MR. FEIN: We've asked to have them -- we've prepared them. We've asked to have them here by 10:00.

THE COURT: My concern there is, I understand that they're substantial, rather than take a lot of time with them, to have you simply make them orally, refer to the written materials, and then we can move on. I assume the Government will object.

MR. DAMBRUCH: Yes, and Mr. Petalas is prepared to object.

THE COURT: All right.

MR. FEIN: Is that satisfactory?

MR. KILEY: Yes. We do want to be able to make the oral conclusion.

THE COURT: Absolutely. I understand that. And, again, that's also subject to the decision on whether or not you're going to reopen his cross.

MR. FEIN: Yes. And we will take seriously your Honor's suggestion of a stipulation and see if we can attempt to --

THE COURT: I don't know how you can, but if you think you can --

MR. KILEY: It also might affect our -- the ruling today might reflect on our instructions.

THE COURT: The instructions are definitely going to be affected.

MR. FEIN: Yes.

THE COURT: Yes. Okay. If you're prepared, then, with your stipulation, your exhibits and all of that, I'll have the jury brought in now.

MR. DAMBRUCH: Yes, Judge. All of the exhibits have been filed and have been approved, so I think we should be all set.

THE COURT: Okay. But you need to admit those while the jury is here. Make sure all of that's cleaned up before you rest.

MR. DAMBRUCH: Yes, your Honor.

THE COURT: But, again, you're resting subject to the Defendants' decision to reopen Celona's cross-examination on that limited area. We're not going to go through another four days with him, but on that limited area.

MR. FEIN: Your Honor, the stipulation agrees to the introduction of a large number of exhibits, both Government and defense. I don't know how you want to handle that, but it might just be that you read that.

THE COURT: Do you have it handy? Is this it? I don't think it would be helpful for me to read this to them. I think I will simply say that there is a stipulation, Number 363, that deals with exhibits that have been admitted by agreement and that they are listed. There are how many of them here, do you know offhand?

MR. CORRIGAN: The exact number, no, but there are several hundred.

THE COURT: A lot. Okay.

MR. KILEY: May I ask one question that then bears on what we do going forward? Again, after we're -- we'll be going, obviously, after Mr. Kramer's defense. The Government and I explored stipulations that might have obviated our presenting the four witnesses that I identified up here.

THE COURT: Can we do this after? Can we have this conversation after? I don't want to keep the jury waiting any longer this morning. They've been told it was going to be a while; but I think now that we're ready to go, let's do that.

Now, this tape that you have is an exhibit, a full exhibit in the case?

MR. FEIN: Yes. It's stipulated to.

THE COURT: And so Karen doesn't need to take down what's said.

MR. CORRIGAN: No, she does not.

THE COURT: On the tape.

MR. CORRIGAN: I don't believe so because we actually have a redacted version of the -- that transcribes what's being said. I don't believe we've marked that as an exhibit.

THE COURT: You should.

MR. CORRIGAN: We can do that.

THE COURT: You should.

MR. FEIN: We can say that when we play it so Karen does not need to -- it will not be an enjoyable exercise for Karen.

THE COURT: She's nodding her head in the affirmative. Okay. Step back.

(End of bench conference)

THE COURT: Mike, would you bring the jury in, please.

(The jury is present for the following)

THE COURT: Good morning. I apologize for keeping you waiting. However, as I'm sure you have

figured out with the Court on occasion meeting with counsel here at sidebar, there are some things that occur during the course of trial that the Court must take up with the lawyers outside of your presence.

If it's a short matter, we do it here at sidebar. If we think it's going to be longer than the two, three, four, five minutes that a sidebar generally takes, I find that jurors are much more comfortable in the jury room than you are sitting here.

And so we conducted our business this morning that the rules require us to conduct outside your presence. I want to make sure you know that, that we weren't off having a three-and-a-half-day long weekend instead of just three days.

I trust all of you enjoyed your weekend, notwithstanding the Red Sox and the Celtics. There's always next year.

Mr. Dambruch, please.

MR. DAMBRUCH: Yes, your Honor. Your Honor, prior to resting, the Government would just confirm for the record that there has been a stipulation entered with regard to the admission as full exhibits of the bulk of the Government's exhibits. And that's been filed as Exhibit Number 363.

THE COURT: Let me deal with that one first,

Mr. Dambruch, because I believe that this one was revised.

MR. DAMBRUCH: It was, your Honor, with the addition of some additional exhibits on both sides.

THE COURT: Right. Members of the jury, you may recall several days ago when I read to you a rather lengthy stipulation regarding the admission of exhibits. And in this case, Exhibit Number 363, you may recall, is itself a stipulation that summarizes by number and letter the exhibits that the parties have agreed may be admitted as full exhibits, that is, exhibits which you may consider in the course of your deliberations.

That Exhibit Number 363 has been revised now to reflect the additional exhibits which the parties had agreed to. It's very lengthy. And rather than read those numbers and letters to you here this morning, I will simply tell you that in the course of your deliberations, you can use it as an index, essentially, to find the numbers and letters of exhibits that have been admitted as full exhibits in the case.

(Government Exhibit 363 was admitted in full)

MR. DAMBRUCH: Your Honor, in addition to the Government exhibits outlined in the stipulation, which runs up to Exhibit Number 393, the Government has

previously moved Exhibit Number 394 over objection, and I believe that's been admitted as full. That was the Ortiz grand jury transcript.

THE COURT: The Ortiz grand jury transcript was admitted as a full exhibit, as redacted.

MR. DAMBRUCH: Yes, your Honor. Judge, today also there are three additional exhibits, two of which are stipulations. The stipulations are Exhibits Number 396 and 397. In addition to the stipulations, we also are moving in full Exhibit Number 395, which are two sections of the Rhode Island General Laws.

(Government Exhibits 395, 396 and 397 were admitted in full)

THE COURT: Okay. Again, members of the jury, when -- let me deal first with Number 395. As Mr. Dambruch has just described it, these are excerpts of the Rhode Island General Laws which you will be able to read during the course of your deliberations. That's Exhibit Number 395.

Exhibit Number 396 is a stipulation. Again, this is an agreement between the Defendants and the United States agreeing that there were certain videotapes that were found in the home and office of John R. Kramer, and they are listed Numbers 1 through 48. That's Exhibit Number 396, the stipulation

regarding those videotapes.

Exhibit Number 397 is another stipulation, that is, agreement between the parties, as it relates to CVS Caremark Corporation's annual operating profits. And those profits are listed for the years 1998 through 2003, inclusive.

MR. DAMBRUCH: Your Honor, with the admission of those exhibits, the Government would now rest its case.

THE COURT: Members of the jury, when a party rests, that means that that party has completed the presentation of its evidence.

Mr. Fein, please.

MR. FEIN: Your Honor, we will approach later or now?

THE COURT: Why don't you approach now.

Just give us a moment, members of the jury.

(Bench conference held on the record)

MR. FEIN: Your Honor, pursuant to Rule 29, the parties move for a judgment of acquittal. And we have stated the basis of our motion in extensive memorandum for your Honor's consideration.

MR. TRAINI: Your Honor, if I might just add with respect to the motion which has been filed on behalf of both of the Defendants, the memorandum does state the basis.

I have an additional argument that I would make to the Court specifically directed to the lack of evidence of a conspiracy between these two Defendants. It's something that I can elaborate on in greater detail when we reargue these motions at the close of all the evidence.

I just want to make sure that, for purposes of the record, that I have brought to the Court's attention that there is an argument that I just didn't get a chance to fit into the paper version that I would like to make and as long as the Court will take it as of the close of the Government's case even if I make it later on.

THE COURT: That's fine.

MR. FEIN: And, your Honor, we also move pursuant to *Petrozziello* to ask your Honor to reconsider her rulings permitting certain co-conspirator statements that came in during the trial.

We believe there's been an utter lack of a showing of a conspiracy or that those statements were in furtherance of a conspiracy. We do address in the brief some -- we do address some of the conspiracy issues in this memorandum.

THE COURT: Okay. I take it that you're joining

Mr. Traini's additional ground, and that is the lack of evidence of a conspiracy?

MR. FEIN: Yes, although I do believe that we've addressed that in the motion, but we certainly join that there has been a thorough lack of evidence on any conspiracy.

MR. PETALAS: Your Honor, for the United States, we object to the motion. It will be our purpose to respond in writing as well, with the Court's permission. If the Court wishes to hear further from me orally now, I'm prepared to do so. Otherwise, I would simply incorporate our written response to the motion of the defense.

THE COURT: I think that's fine. Okay.

MR. FEIN: Would your Honor like me to hand up a copy my motion at this time or just electronically file it?

THE COURT: I'll take it. Thanks. You're going to file that electronically, I hope.

MR. FEIN: Yes, your Honor.

THE COURT: Thank you.

(End of bench conference)

THE COURT: Mr. Fein, please.

MR. FEIN: Thank you, your Honor. Your Honor, at this time, on behalf of Mr. Kramer, we offer by

stipulation Kramer R-24, which is a video composite, including excerpts from previously admitted exhibits Kramer C, Kramer E, Kramer G, Kramer I and Kramer K.

Related to the offer of Kramer R-24, the video, we offer Kramer T-24, which is a transcript of the video excerpts contained in Kramer R-24. And we ask at this time to play Kramer R-24 to the jury.

THE COURT: You may. I take it there's no objection to either R or T-24.

MR. DAMBRUCH: No, your Honor. These were included in our stipulation.

MR. KILEY: And, your Honor, as with all of the exhibits, these are exhibits for both Defendants, your Honor. So they should apply to Mr. Ortiz as well.

THE COURT: Okay.

MR. FEIN: Just for the record, I don't believe Kramer T-24 is mentioned in the stipulation; but that's by agreement.

MR. DAMBRUCH: We do agree. I apologize. I thought that was mentioned in the --

THE COURT: Okay. So R-24 and T-24 are full exhibits.

MR. DAMBRUCH: Yes, your Honor, without objection.

(Defendant Kramer Exhibits R-24 and T-24 were admitted in full)

THE COURT: Okay. What that means, members of the jury, is that you're going to have a disk, Mr. Fein? I have to get up on the technology. I almost said videotape.

MR. FEIN: Yes, your Honor.

THE COURT: It's a disk, and you'll have the ability to watch it in the jury room. You will also, however, be provided with T-24, which is a transcript of what you're going to see on the videotape or disk.

MR. FEIN: And then with some technical assistance, we'd like to play that now, your Honor.

THE COURT: Okay. So this is R-24.

(Defendant Kramer Exhibit R-24 was played)

THE COURT: How much longer do you have?

MR. FEIN: On this video, your Honor, this is the last segment, just a few minutes.

THE COURT: Members of the jury, I'll leave it to you. Do you want to break now or watch this last segment and then break? Watch and then break? Go ahead.

MR. FEIN: Thank you, your Honor.

(Defendant Kramer Exhibit R-24 was played)

THE COURT: Is that it?

MR. FEIN: That's it, your Honor.

THE COURT: Members of the jury, now we'll take our break. Remember, 15 minutes. Please fold those notebooks up, leave them on your seats. Do not talk about the case at all during the recess.

Mike, can you see the jury out.

(The jury is not present for the following)

THE COURT: May I see counsel quickly, please, just on scheduling.

(Bench conference held off the record)

(The jury is present for the following)

THE COURT: Mr. Fein, please.

MR. FEIN: Thank you, your Honor. Your Honor, we offer, pursuant to stipulation, Kramer Q-24, which is a disk containing excerpts of videos that relate to the stipulation your Honor read to the jury earlier today, stipulation that is Government Exhibit 396, and this is approximately an eight-minute collection of excerpts from certain videos; and we offer Kramer S-24, which is a transcript of the excerpts.

THE COURT: Okay.

MR. FEIN: With your Honor's permission, we would now play that video for the jury.

THE COURT: And both Q-24 and S-24 are in by agreement.

MR. DAMBRUCH: That's correct, your Honor. Q-24 is in the stipulation, and S-24 we have no objection to.

THE COURT: So they're both full.

(Defendant Kramer Exhibits Q-24 and S-24 were admitted in full)

THE COURT: Same as the last video that you watched, ladies and gentlemen of the jury, you will get the disk. You will also get a printed transcript of what you're seeing and hearing on the video.

(Defendant Kramer Exhibit Q-24 was played)

THE COURT: Is that it?

MR. FEIN: It is, your Honor.

THE COURT: Okay.

MR. FEIN: Your Honor, pending the discussion with your Honor the parties had and with the admission of the exhibits that the defense offered in the stipulation on behalf of Mr. Kramer, we rest.

THE COURT: Okay. May I see counsel, please.

(Bench conference held off the record)

THE COURT: Members of the jury, more good news. You get to go home early again today. Now, tomorrow I'm not quite sure whether we will need to have you here or not, and we will not know that until later this afternoon.

What I will ask you to do is this. We'll make arrangements for a phone number for you to call in to receive further instructions about tomorrow. If you are going to be here tomorrow, I should tell you we'll need you here at 9:00; but I will tell you it will be a relatively short day. I don't think you'll be here until 1.

If you are not going to come in tomorrow, I will need you here on Thursday at 9:00; and I should tell you that Thursday may be a little bit longer than 1 p.m. So please plan accordingly.

I should also tell you that once you begin your deliberations, as you, I'm sure, have guessed by now, we're getting very close to the end of the trial, once you begin your deliberations, and that may be as soon as Friday, you'll be staying here all day as opposed to going home at 1:00. So, again, please plan accordingly. When I say all day, that means until around 4:15 or 4:30 in the afternoon.

So with those instructions, again, if you are not -- if you are going to be here tomorrow, 9:00, short day. If you are not going to be here tomorrow, you'll need to be here Thursday morning at 9. Plan on spending maybe a little bit longer than 1:00. And then perhaps as early as Friday you may begin your

deliberations, and you will be here until perhaps 4:30 or so in the afternoon.

You'll receive instructions from Ron Fortes downstairs as to the phone number to call into and when to call in today to find out whether you need to be here tomorrow.

Now, as I've told you every day, don't talk about the case amongst yourselves or with anyone else. And I know it becomes harder and harder to abide by that instruction as you get closer to the end of a case; but that's your oath, and that's the rule. Don't break it.

If anybody asks you what's going on, tell them you're not going to talk about it. Instead, relax, get some rest. Don't read, watch or listen to anything dealing with the case in any way.

So if I don't see you tomorrow, enjoy your day off. If I do see you, I'll see you at 9:00.

Mike, you may see the jury out.

(The jury is not present for the following)

(Bench conference held off the record)

(Adjourned)

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date