IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| * * * * * * * * * * * * * * * * | C.R. NO. 07-009ML |
| UNITED STATES OF AMERICA * | |
| VS. * | MAY 29, 2008<br>9:00 A.M. |
| JOHN R. KRAMER and *<br>CARLOS ORTIZ * | |
| * * * * * * * * * * * * * * * * | PROVIDENCE, RI |

BEFORE THE HONORABLE MARY M. LISI,

CHIEF JUDGE

(Jury Trial)

APPEARANCES:

FOR THE GOVERNMENT: STEPHEN G. DAMBRUCH, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

DAN PETALAS, ESQ.
Department of Justice
Criminal Division - Public Integrity
1400 New York Avenue, N.W.
Washington, D.C. 20530

FOR THE DEFENDANT, KRAMER: PETER DiBIASE, ESQ.
91 Friendship Street, 3rd Floor
Providence, RI 02903

DAVID B. FEIN, ESQ.
SCOTT CORRIGAN, ESQ.
Wiggin and Dana, LLP
400 Atlantic Street
Stamford, CT 06911

FOR THE DEFENDANT, ORTIZ: MARK L. SMITH, ESQ.
Law Offices of Mark L. Smith
176 Eddie Dowling Highway
Suite 101
North Smithfield, RI 02896

ANTHONY TRAINI, ESQ.
56 Pine Street, Suite 200
Providence, RI 02903

THOMAS R. KILEY, ESQ.
Cosgrove Eiseberg & Kiley, P.C.
One International Place
Suite 1820
Boston, MA 02110

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903

29 MAY 2008 -- 9:00 A.M.

(The jury is not present for the following)

THE COURT: I understand that counsel for Mr. Ortiz wishes to address a matter to the Court outside the presence of the jury.

MR. SMITH: Yes, your Honor. Judge, I'd like to put on the record the reasons why Mr. Ortiz is not availing himself to call John Celona for cross-examination.

At the outset, I want the Court to understand that I take no pleasure in the predicament that the Government finds itself, a finding by this Court that there was a *Brady* violation of relevant and material evidence, that material was not disclosed in a timely fashion and, therefore, some prejudice ensued.

But to understand Defendant Ortiz's position, we have to look at the Government's opening. John Celona had an answer for them. I made a telephone call, I had an oral conversation with someone at the Ethics Commission, and I can work for CVS.

Attorney Fein on behalf of Mr. Kramer countered. Mr. Celona told Jack Kramer and Carlos Ortiz what the Ethics Commission had told him, that it would be okay to work for CVS and that he could vote on legislation that affected CVS so long as it didn't affect CVS

alone. So we have crossed the Rubicon, the die is cast, there's no going back.

The defense in this case is truly a partnership and joint enterprise. What Attorney Fein told this jury affects the Defendant Ortiz to the same degree.

So what remedy has the Court allowed? Perhaps a stipulation. This was tried, but the parties could not agree on the language to cure the problem. The Court has refused to dismiss the case with prejudice. The only possible remedy available to the defense was to call Celona back.

Bear in mind this is the John Celona about whom Judge Torres declared in the *Urciuoli* trial transcript of 9/29/06, page 47, that Celona exaggerated things, which it seems he clearly did, even whether he misrepresented or lied about some of those things, and certainly there's some reason to think he may have done that as well.

And I have marked as Ortiz's Exhibit A just for this motion only. It is the Government's motion for a downward departure filed in Mr. Celona's case on 1/26/07.

On page 3, the Government states, under cross-examination, Celona was forgetful, sometimes evasive, and occasionally belligerent. He developed a

combative style of responding to aggressive cross-examination. He had to rely on documents or recorded testimony in order to answer questions accurately.

On page 4, he sometimes recalled events in such a way to make it look better for himself. Page 5, under cross-examination, Celona could not or would not answer questions directly and without reference to documents.

Celona also recovered memories not previously disclosed to investigators. That is not the case here, for we already know that there was disclosure to the prosecution.

At this trial, Celona used the phrase "abstract," which I understand to mean conjectural, hypothetical, speculative, theoretical. So how will the defense counsel be able to use the disclosed information despite the delay in the disclosure? Must counsel regroup?

A continuance is to no avail for the game was played in the Government's and the defense opening. The posture of this case, more importantly the posture of this witness, denies the Defendant the opportunity to use this disclosed evidence advantageously.

The resulting circumstances of this case leaves

the Defendant with no plausible strategy option that has been provided by the Court. Even as eloquent as Mr. Kiley may be in his closing argument, this will not cure the fatal injury that the Defendant has sustained by the delayed disclosure of the *Brady* material.

With all due respect, the remedy fashioned by this Court, in the eyes of the Defendant, is no remedy at all. Therefore, the Defendant requests that the Court declare a mistrial with regard to Defendant Ortiz.

Whether such a mistrial will constitute a double jeopardy defense is a matter to be decided on another day.

For those reasons, the Defendant does not desire to call John Celona for further cross-examination. The Defendant, therefore, rests and, further, incorporates once again the Rule 29 motion for judgment of acquittal. Thank you very much, your Honor.

MR. KILEY: We will, of course, rest before the jury, your Honor.

THE COURT: I understand. I want to give the Government an opportunity to respond.

MR. PETALAS: Good morning, your Honor. Your Honor, as I believe the Court is aware, we filed a response to a jury instruction request earlier this

morning which also addressed some of the issues raised by Mr. Smith this morning. And I would refer the Court to that written response, which I think lays out our position on the question of whether any further remedy is, indeed, warranted.

To summarize, however, I'd simply state that the Court considered carefully the Defendants' motion, and the Court provided a remedy that the Court believed was tailored to the violation that the Court found.

As your Honor knows, the Government does not concede the issue that the Court ultimately reached. However, of course your Honor is the supreme finder of law in this case.

THE COURT: Not supreme.

MR. PETALAS: At least in this case.

THE COURT: Only in this room maybe.

MR. PETALAS: That's exactly what I meant, your Honor. However, I don't believe at this point there's any further reason for additional remedy given the fact that the defense has decided that it does not wish to take the Court up on the remedy the Court provided.

THE COURT: I'm sorry, Mr. Fein. I don't want to cut you off.

MR. FEIN: Thank you, your Honor. Just briefly, I want to note that, on behalf of Mr. Kramer, our

letter to chambers, which we would like to make part of the record. We could electronically file it if your Honor desires we do that.

THE COURT: You should.

MR. FEIN: Okay. We will. And we set forth the reasons in that letter why we don't think the remedy of recalling John Celona --

THE COURT: I haven't seen it, by the way.

MR. FEIN: Oh, we sent that two days ago, your Honor.

THE COURT: Okay. I thought you were talking about something new.

MR. FEIN: No, no. That was on May 27th, and I'd refer to that, the reasons stated therein, and will not occupy the Court's time further.

THE COURT: As I stated in my ruling on the Defendants' motion to declare a mistrial with prejudice in this case with regard to the late-disclosed information regarding Mr. Celona's newest memory regarding his telephone call with the Ethics Commission, I believe that the Defendants in this case were somewhat prejudiced by the Government's failure to make that disclosure in a timely fashion, i.e., in advance of trial, indeed, at the same time that the Government learned that Mr. Celona had made a

180-degree departure from his previous testimony before the grand jury and statements that he made to Government agents in the some four years now since he first began cooperating with the Government.

However, I was also aware that the Defendants in this case, in part due to their very diligence in insisting that the Government provide *Brady* material, had in their possession all of the grand jury testimony which was contrary to what Mr. Celona testified to here in his direct examination, had access to not only the typewritten 302s prepared by the agents but also the agents' notes, notes of Mr. Celona's attorney during the course of -- taken during the course of those interviews, as well as access to portions of Mr. Celona's pre-sentence report.

And so with all of that information, I felt that the Defendants in this case were certainly armed with sufficient information to impeach the witness.

The remedy I fashioned, that is, to provide the defense counsel with yet another opportunity to confront Mr. Celona with his new-found memories now some eight years after the fact, I thought would have given the Defendants the opportunity to impeach him on that score as well.

The Defendants are well within their bounds to

make a determination in the best interest of their clients to either take me up on that offer or to decline, but the fact that the Defendants have now declined that offer does not change the previous ruling of the Court with respect to the delayed disclosure *Brady* violation in this case.

And again, as I said, I think that the remedy fashioned by the Court is in keeping with First Circuit precedent on this issue.

Before I bring the jury in, let me just see counsel very quickly for scheduling.

(Bench conference held off the record)

(The jury is present for the following)

THE COURT: Good morning, members of the jury. Did you enjoy your day off? Good. Are you ready to go to work? Excellent.

As I told you at the beginning of this case, after all of the evidence has been presented, you would hear the closing arguments of counsel.

Now, that doesn't mean that the lawyers are going to stand up and have an argument with you. What it means is that each attorney will present to you an argument, that is, a summary of the evidence and an interpretation of that evidence from the perspective of the client he represents.

As I know you have throughout these proceedings, I ask that you give each of the attorneys your close and undivided attention.

I should also tell you that our schedule today will be a little bit different than it has been during trial. First, the Government will present its closing argument to you. After Mr. Dambruch is through, we will take a very brief 10-minute break to give you a chance to stretch.

When we come back, Mr. Fein will present the closing argument on behalf of Mr. Kramer. We'll then take another very brief 10-minute break, again, to give you a chance to stretch, after which we'll hear from Mr. Kiley, and the Government in criminal cases does have the right to present rebuttal argument. This is so because it is the Government's burden to prove its case beyond a reasonable doubt.

So after that second break, you will hear from Mr. Kiley on behalf of Mr. Ortiz, and then you will hear again from Mr. Dambruch.

Mr. Dambruch.

I'm sorry, Mr. Kiley? Oh, Mr. Kiley. Yes. I almost forgot about you.

MR. KILEY: Your Honor, in light of the Court's ruling, the Defendant Ortiz also rests. And, your

Honor, we renew our Rule 29 motion with the supplement.

THE COURT: That's fine.

MR. FEIN: And, your Honor, we renew our previously made motion as well.

THE COURT: Okay. Again, you'll recall that when a party rests, that means that that party has completed its presentation for you.

Mr. Dambruch, please.

MR. DAMBRUCH: Thank you, your Honor. May it please the Court, counsel and members of the jury. Good morning. As Judge Lisi just explained, this closing provides me with an opportunity to summarize the evidence presented in this case from the perspective of the Government.

I would like to do that with you this morning on a variety of topics that have been addressed by the evidence during the course of this proceeding, and the first of those topics is John Celona and his history and involvement with a series of pieces of legislation, alternatively referred to as any willing provider or freedom of choice.

In 1998 and 1999, John Celona was a supporter and vocal advocate for freedom of choice legislation. He advocated for and voted in favor of freedom of choice legislation in 1998, and you will be able to

look at the piece of legislation that he both advocated and voted in favor of in 1998 because it's Exhibit 1, House Bill 8016.

In 1999, Mr. Celona took it a step further. As well as continuing to advocate and support any willing provider or freedom of choice legislation, he actually co-sponsored two bills. You also have those available to you during your deliberations, S-008 and S-0110. They've been marked as exhibits.

He supported them both in the legislative process, and he also publicly brought attention to the fact that he was a supporter.

I'd ask you to look at your screens now at Exhibit Number 25. Exhibit Number 25 is a full exhibit. It's a press release that John Celona issued in 1999 to publicize his position on any willing provider, his support of any willing provider. He was a vocal advocate and a constant proponent of this legislation in both 1998 and 1999.

You also have available to you a third piece of 1999 freedom of choice legislation, 163. And you'll see with regard to that piece of legislation, it was that bill that actually came up for a substantive vote, an up or down vote before the Senate Corporations Committee in 1999.

And the record reflects, as outlined in the legislative history documents that are also part of that exhibit, Exhibit 4, that John Celona was present for the hearing, the vote, and voted in favor of that piece of legislation.

And in 1998 and 1999, he voted in favor, he was a vocal advocate for, he was a supporter of this piece of legislation or this type of legislation in the face of opposition from CVS.

Mr. Fegan testified about the fact that CVS was opposed to this legislation; that Carlos Ortiz, one of the two Defendants, testified against this legislation in 1998 and 1999.

That, however, did not sway Mr. Celona's support. He continued to vote in favor in 1998 and 1999.

He also took that position on any willing provider in both 1998 and 1999 in face of opposition from Corporations Committee Chairman Irons. Look at the voting sheets. Senator Irons voted against any willing provider in both of those years, 1998 and 1999, but that did not sway Senator Celona from continuing in his support.

Furthermore, he continued to support the legislation after he had been notified, in fact

notified by Mr. Ortiz in a 1998 letter to Mr. Celona, which you'll have as Exhibit 69, indicating or advocating against AWP, that the independent pharmacies had been included.

Despite that notification and that fact, Senator Celona continued in his support for any willing provider legislation in 1998 and 1999.

Then we get to 2000. Something changed in 2000. On March 9th of 2000, Senator Celona was present for the session, the Senate session, the general session. And you'll have Exhibit 12, the Senate journal for that day, that will show that he was present at the beginning of that session and participated in the last vote of the general session, after which there was an announcement by Senator Irons that the Corporations Committee would be meeting at the rise of the Senate or close of the session for that day.

You also heard testimony from Mr. Fegan that Mr. Celona was present for the start of the Senate Corporations Committee meeting on that day. He further testified that Carlos Ortiz also testified in 2000 about any willing provider, again, opposing it on behalf of CVS.

But when the any willing provider came up this year, that being in 2000, Mr. Celona had left. And

Mr. Fegan described it for you. He was there at the beginning; but when any willing provider came up, his papers remained, but he had disappeared.

In 2001, Senator Celona became chairman of the Corporations and what eventually in 2003 became the Commerce Committee of the state Senate. And during that period of time, he refused to schedule any of the any willing provider legislation for hearing.

And in particular, you'll have available to you three pieces of legislation, Senate 493, which was in 2001, H-5215 and H-5828 in 2003. And as Senator Celona did during his testimony, you can look at the stamps that are included in the legislative history and see that those pieces of legislation were referred to his committee, and nothing more happened, or as the term I believe was used at some point during the testimony in this trial, they were not going nowhere.

Now, what was the something that had changed? Well, we've heard evidence that there was one fact that was not known to John Fegan and not known to the vast majority of the citizens of the State of Rhode Island.

It was a fact, however, that was known only to a handful of CVS employees. And that fact was that in February of 2000, John Celona had become a paid consultant for CVS.

In fact, about one month prior to the date that he absented himself, talk a walk from that AWP vote on March 9th of 2000, he had signed a consulting agreement with CVS.

You'll have that consulting agreement, and I'd ask you to take a look at it now. It's Exhibit 108. And that's a consulting agreement that on February 10th of 2000 was signed by John Celona and the Defendant, Carlos Ortiz.

Now, pursuant to that agreement, CVS committed to pay Mr. Celona $1,000 per month, and the initial term of the agreement was 12 months.

Now, approximately two weeks before the March 9th committee hearing that Mr. Celona walked out of, Mr. Celona sent his first invoice to CVS requesting payment from them, the first payment. And that, if you look at the screens, was Exhibit 117 dated February 23 of 2000.

He sent that in on February 23. On March 9th, he walked out the door. And as he walked out the door of that committee room in advance of the any willing provider vote on March 9th, he was awaiting his first $1,000 payment from CVS, which was mailed to him on or about April 10th of 2000. If you look at your screens, that's the check that is Exhibit 120.

Now, John Celona told you during his testimony that he took that walk or, excuse me, that Bill Irons, Senator William Irons had requested he take a walk and that this time, unlike in '98 and '99 where he took an opposite position from Senator Irons on any willing provider, he complied. And he told you he did so because he was on the CVS payroll.

The next subject or topic I'd like to review with you, the evidence about I'd like to review with you, is how was it that CVS came to enter into that consulting agreement that was signed on February 10th of 2000, just a month before Mr. Celona took that walk.

Well, in 1999, sometime after the vote on any willing provider in that year, CVS's paid contract lobbyist, Joseph Walsh, who was being paid at minimum at the beginning of the relationship about $5,000 per month, and I believe Mr. Walsh testified that thereafter that amount of money went up as the relationship continued through the years, Mr. Walsh set up a meeting between representatives of CVS and Celona.

Now, there is some disagreement between Mr. Walsh and Mr. Celona as to the timing of the meeting. Mr. Walsh testified that the meeting took place after the legislation -- legislative session was over, and Mr. Celona testified that it occurred while

the legislature was still in session.

There's also some disagreement as to exactly who was present during the meeting. Mr. Walsh testified that Mr. Kramer, Mr. Ortiz, Mr. Celona and himself were present while Mr. Celona testified that it was Mr. Ortiz, Mr. Walsh and several senators, Montalbano, Alves, Walaska, McCaffrey and himself.

They do both agree it occurred at the State House. I think there was some disagreement as to which room, whether it was the Senate lounge or an office. And they further agree that the any willing provider legislation was discussed at that meeting.

They also agreed that during that first meeting there was no discussion by anyone about the possibility of Senator Celona becoming employed as a consultant or in any other capacity with CVS.

Now, according to Mr. Celona's testimony, he subsequently encountered Mr. Kramer at some point after this meeting at the State House at a fundraiser. It was a fundraiser for one of Mr. Celona's Senate colleagues at the time, Michael McCaffrey.

Senator Celona testified that Mr. Kramer approached him and for the first time brought up the topic of CVS being able to use another consultant.

The next meeting, according to both Mr. Celona

and the calendars of Mr. Celona and Mr. Kramer, and Mr. Kramer's calendar will be given to you as Exhibit 97, that meeting was set up by Mr. Kramer's assistant, M.J. McCusker, it was set up at CVS, and it was scheduled and took place on July 8th of 1999.

Now, during that meeting, Mr. Celona testified that he met with Mr. Kramer and Mr. Ortiz in Mr. Kramer's office and that pharmacy freedom of choice was, in fact, mentioned during the meeting.

I'd ask you to take a look at Exhibit 375. That's Mr. Kramer's expense report for the particular meeting that occurred in July of 1999. And look particularly at the purpose that Mr. Kramer listed for the meeting. It's listed as legislative issues.

However, according to the testimony of Mr. Celona, it wasn't just legislation that was discussed during this particular meeting. There also was a discussion about a consulting agreement that would be entered into or possibly entered into between Mr. Celona and CVS.

According to Mr. Celona's testimony, Mr. Kramer stated that CVS needed someone to promote with senior citizens the image of CVS and the services that CVS provides. Mr. Celona further testified that Mr. Kramer was not specific as to what exactly he expected of

Mr. Celona in that regard.

Again, according to Mr. Celona's testimony, Mr. Ortiz indicated that he knew about Celona's background with constituent services and he thought that Mr. Celona would be an asset to CVS.

Mr. Ortiz also, according to Senator Celona, did not state what would be specifically expected of Mr. Celona in his role as a CVS consultant.

Mr. Kramer then asked Mr. Celona to submit a proposal, and there was no discussion as to what that proposal should contain.

Mr. Celona took Mr. Kramer up on his request to submit a proposal. And if you look at Exhibit Number 98, which will be displayed for you, that is, in fact, the proposal letter sent by Mr. Celona to Mr. Kramer and dated September 23 of 1999.

In that proposal letter, Mr. Celona testified that he outlined what he could do for CVS. And I would point out to you that in this particular proposal letter, twice, on both page 1 and page 3, there's specific mention of freedom of choice legislation.

It was described basically as a game plan to counter the bad publicity suffered as a result of opposition to freedom of choice, specifically the impact that the negative publicity had on the senior

citizens population. And if we can flip to page 3, it states that the -- one of the goals was to eliminate any bad perception left over from freedom of choice.

I would argue to you that what's interesting about that is that here we have John Celona, who in 1998 and '99, the very year that this proposal is being submitted, is someone who has been consistently on the opposite side from CVS on this issue and was responsible in some degree for stirring up some of the very publicity that he now wants or proposes to assist them in defusing.

He did that, he made this proposal in furtherance of an attempt to secure a consulting position with CVS.

Now, admittedly, Mr. Celona testified that he actually never did any of the things that he set forth in this proposal; but CVS did, after receiving the proposal with these recommended actions or strategies, did hire him.

And the next step in that hiring process was January 7th of 2000. And in that regard you have both Mr. Celona's calendar, which is Exhibit 100, and Mr. Kramer's calendar, Exhibit -- excuse me, Mr. Celona's calendar, which is Exhibit 101, and Mr. Kramer's calendar, which is Exhibit 100, which

document the fact that a meeting took place on that day between the parties.

According to Mr. Celona, Kramer -- Mr. Kramer and Mr. Ortiz were present, and Mr. Kramer told him that he would like to have Mr. Celona come on board. There was discussion. The compensation would be $1,000 per month and that the agreement would run for 12 months.

There also was a question asked by Mr. Ortiz about an ethics opinion. And Mr. Celona, and you heard the testimony, gave his response to that question to Mr. Ortiz at the meeting where he was meeting with Mr. Kramer and Mr. Ortiz.

Excuse me, on the testimony, let me be clear, there was some back-and-forth as to whether the response occurred at the meeting or thereafter; but clearly Senator Celona indicated that he provided a response to Mr. Kramer and Mr. Ortiz, and you have the testimony as to what that response was.

He further went on to say that there was no further discussion after providing that response with Mr. Ortiz about the Ethics Commission until December of 2003, which was, of course, after the consulting agreement had been terminated and in conjunction with press inquiries relating to the nature of the CVS and

Celona relationship.

Mr. Celona testified that he subsequently received the consulting agreement, which we've already seen, Exhibit 108. And I'd ask again if we could call up the first page of that document. I'd ask when you look at Exhibit 108 one of the things you focus on is the project as it's described, which in summary indicates that Mr. Celona is to visit senior citizens complexes, centers and groups to discuss health care issues, to work with CVS to help educate the public on health care topics, and to accomplish that via personal and TV appearances, also to help -- excuse me, to consult on health care topics.

What you won't find in that agreement as you look through it is any reference to reporting requirements by Mr. Celona, what was he -- how often was he supposed to report and what detail, et cetera.

And as you look through that agreement, see if you can find any mention of the State House Report or cable television programs to promote the Charity Classic, the 5K, the Highlander School or any other CVS charitable event or program.

The agreement was signed on February 10 of 2000. Mr. Celona testified that after having his attorney take a look at it, he returned it to Mr. Ortiz pursuant

to the instructions he had received, and soon thereafter Mr. Celona began submitting invoices to Mr. Ortiz.

You heard testimony from Ms. Bibeault and Ms. Seeley. Mr. Ortiz began approving those invoices, and as a result payments in the form of checks began to be mailed to Mr. Celona, and those payments continued until September of 2003.

Now, the next topic I'd like to review the evidence about is how did Mr. Kramer and Mr. Ortiz handle the Celona consulting agreement situation within CVS.

Christine Egan testified that Mr. Ortiz approached her and requested a template for a consulting agreement but that there was no discussion regarding the identity of the consultant or the specifics of the project.

A final version of the agreement was prepared. Ms. Bibeault indicated that she did not assist Mr. Ortiz in that endeavor. He did, however, eventually at some point give her that final agreement to file in a file cabinet which was kept in the office area, their office area.

Now, when Ms. Bibeault received the first Celona invoice, she testified she was not expecting it and it

had not been budgeted. So she, therefore, asked Mr. Ortiz about the invoice. And Ms. Bibeault testified that Mr. Ortiz told her that it should be paid and identified what account it should be paid from, and she told you that was the political contributions account, an account that when you look at the records you will see with some rare exception was used primarily for lobbyists, a PAC accountant and similar purposes.

Mr. Ortiz explained that Mr. Celona was going to be a consultant for CVS and that this was something that Jack wanted to do. According to Ms. Bibeault, Mr. Ortiz also said that Celona was going to be the eyes and ears of CVS in the senior population.

There was, however, no mention of the television show by Mr. Ortiz at that point in time when the first invoice was received, at the creation of the agreement, no mention of the Celona State House Report in the agreement itself, no mention by Mr. Ortiz to Ms. Bibeault.

Furthermore, Ms. Bibeault testified that Mr. Ortiz did, however, say that Mr. Celona had Ethics Commission approval.

Now, on November 2001, Mr. David Rickard, the chief financial officer of CVS, took over as

Mr. Kramer's direct supervisor. So in the chain of command, there's Mr. Ortiz reporting to Mr. Kramer to Mr. Rickard.

He indicated that after taking over, there were budget reviews that were conducted that did involve the government affairs department but that he only saw summary documents and that he was never informed by Mr. Kramer or Mr. Ortiz about the Celona consulting agreement.

And back to the budget issue, the assignment of the Celona payments to this political contributions account. According to Mr. Rickard, someone in the government affairs department involved in the budgeting process could simply have requested that a new account be opened up. They didn't have to use just the accounts that existed at that point in time, but that's not what was done. The records will show that the Celona payments were placed in the political contributions account.

Mr. Rickard further testified that he met Mr. Celona at various social events during the time frame within which he supervised the government affairs department and that Mr. Kramer and Mr. Ortiz were also present for some of those events and that neither ever mentioned during those events that Mr. Celona worked

for CVS.

We also have the testimony of Robin Seeley, who in September of 2002 became a part-time legal -- not legal, legislative research assistant for Mr. Ortiz, which she described primarily as a clerical position.

And when she received one of the Celona invoices, she, like Ms. Bibeault, went to Mr. Celona (sic) and asked what Mr. Celona did. And she described his initial reaction as a gesture.

(Attorney Dambruch gesturing)

MR. DAMBRUCH: You use your common sense and decide what that gesture meant. She also said that Mr. Celona was going into the community, and she mentioned specifically North Providence, that he had had a good rapport with senior citizens and that he would speak at senior centers and talk about the benefits of CVS.

You also heard from Ms. DelMonico, Susan DelMonico, and from that testimony we learned that CVS had a community relations department and that she was the person in that community relations department that was assigned to work in Rhode Island, along with some other states, and that, interesting enough, she also reported to Mr. Kramer.

She talked about the fact that as a member of

the community relations department and assigned to Rhode Island, she did a lot of senior outreach, including visits to senior centers. And she also had responsibility as a member of the community relations department, some responsibility for both the Golf Classic and the 5K.

In light of that, ladies and gentlemen, ask yourself why was Mr. Celona assigned to be paid from the government affairs budget, to be supervised and have interaction on payment issues, et cetera, with Mr. Ortiz when there was a community relations department; when, as Ms. DelMonico described, they were going out and visiting senior centers; and they had some involvement for the promotion of the two charitable events that we've heard quite a bit of testimony about.

Mr. Todd Andrews also testified about what was going on within CVS in regard to the CVS -- excuse me, the Celona consulting agreement, specifically at around sometime, as he described it, in late winter of 2001.

He had a conversation with Mr. Ortiz at that time, which was approximately one year after the consulting agreement had been signed and the relationship had began, the paid relationship had began.

According to Mr. Andrews, Mr. Ortiz told him that Celona had been hired as a consultant. He described his duties as public relations consultant for CVS going to senior centers and talking about CVS. He further indicated that Mr. Celona was involved in Mr. Kramer's television appearances on the Celona television show.

And as I've reviewed previously, this is the first mention, there was no mention of the TV show to Ms. Bibeault, no mention to Ms. Seeley, but now a year later there is a mention to Mr. Andrews by Mr. Ortiz.

Mr. Celona had mentioned something about the TV show in the e-mail exchange we saw, which you'll have as an exhibit, which was about the same time, end of 2000, beginning of 2001, but, again, about a year after the relationship had begun.

Mr. Ortiz told Mr. Andrews that Mr. Celona had provided and was providing written and oral reports recounting what he was doing for the company.
Mr. Ortiz also mentioned to Mr. Andrews that Celona did, in fact, have Ethics Commission approval.

Now, Mr. Andrews took that information provided to him by Mr. Ortiz and prepared a document, a document that he described as talking points for potential future media inquiries, basically what to say to a

reporter when and if they called about CVS's relationship with Mr. Celona. And you'll have that document. It's Exhibit 109.

And lastly, and I would argue significantly, at the end of the conversation between Mr. Ortiz and Mr. Andrews, Mr. Ortiz asked Mr. Andrews not to tell anyone about it.

There was some subsequent communication between Mr. Ortiz and Mr. Celona, and I'd ask if we could bring up Exhibit 350. It was an e-mail exchange. It actually was begun by Mr. Celona I believe in January and not responded to by Mr. Ortiz until March. I think it was March 13th of 2001.

Mr. Ortiz says a couple of things in that e-mail. First, he explains to Mr. Celona if anyone asks what you do for CVS, you should identify your title as community service consultant. How does that sound to you? This is a year into the agreement, and they've come up with a title.

Also, there's discussion in that e-mail about some objectives for 2001 that Mr. Celona had submitted. And Mr. Ortiz in his response says basically I've made some changes, they're capitalized. And you can look at the text of what purports to be the Celona initial e-mail and see capitalized wording that's consistent

with what Mr. Ortiz said he did.

What you won't see, though, in either capital or small case with regard to what are described as objectives for 2001 is any mention of the TV show. And remember, these were objectives that may have initially been prepared by Mr. Celona but, according to the e-mail, were edited by Mr. Ortiz. And this is in March of 2001.

Now, in May of 2003, Mr. James Smith took over supervision of the government affairs department from Mr. Kramer, and in that position he began to directly supervise Mr. Ortiz in the operations of the government affairs department. He did not, however, have any responsibility for the Charity Classic or the Downtown 5K.

And soon after assuming that new position, Mr. Smith announced that he intended to do a line item review of the government affairs budget, not the summary budget. He actually was going to look at the detail.

And in that process, as he met with Mr. Ortiz and reviewed line by line the budget documentation, according to Mr. Smith, Mr. Ortiz, in response to Mr. Smith's question when they got to the Celona line item, indicated that CVS was not getting value for the

money spent on Celona, and at that point in time Mr. Ortiz recommended termination.

He further told Mr. Smith that Mr. Celona was a consultant on senior citizens matters, and Mr. Smith testified that he doesn't recall Mr. Ortiz ever mentioning anything about the TV show.

Suddenly in 2003 Mr. Ortiz has determined that CVS isn't getting value for the Celona relationship. And it's only when someone other than the initial group of people, that being Mr. Smith who's now come in, begins to conduct a line-by-line review and, therefore, would have to learn about the Celona relationship.

In fact, Mr. Smith testified that the recommendation to cut Mr. Celona from the budget, to terminate that agreement, was the only cut that was recommended by Mr. Ortiz during that budget review process.

Now, we heard testimony from Mr. Celona that Mr. Kramer delivered the news to him, that being that the consulting agreement was coming to an end, and that he did so during a round of golf hosted by Mr. Kramer at the -- I believe it's the Tournament Players Course in Massachusetts.

Mr. Celona testified that there was some mention by Mr. Kramer of the Gordon Fox situation and Mr. Fox's

alleged involvement with or relationship with GTECH and, in light of that, CVS would have to terminate their relationship with Mr. Celona.

And with regard to that event, you will have available to you Mr. Kramer's expense report for that outing. Actually, there are two expense reports, 338 and 378, that reference the outing on that date and the expenses incurred by Mr. Kramer and reimbursed by CVS for the outing.

Mr. Kramer also went on to state that, according to Mr. Celona, that CVS would continue to support Celona as a good supportive friend.

And lastly on that day, according to Mr. Celona, Mr. Kramer extended an invitation to him to attend the Susan Komen event in California. It's an event he did attend at no cost to himself. It's a celebrity golf tournament, an event that Mr. Celona attended. He was provided with air travel out to California, hotel accommodations and participation in the various events, again, at no cost to himself.

Now, later in 2003, in December in fact, you heard testimony from Mr. Andrews about a conference call that occurred between himself, Mr. Celona and Mr. Ortiz.

It was a conference call that occurred after

that call came from the media inquiring about the Celona relationship; and, in fact, that was the topic of the call, the media inquiries about Mr. Celona.

And at some point during that call, according to Mr. Andrews, Mr. Celona announced that he did not have an Ethics Commission opinion. Mr. Andrews described the reaction of all concerned. There was a long period of silence, no one spoke up, no one protested, a period of silence, and then Mr. Andrews terminated the call.

Now, in addition to the payments that Mr. Celona received from the first one in April of 19 -- excuse me, 2000 through the last one in September of 2003, evidence has been presented about other benefits, whether they be golf outings in Rhode Island, in Florida, at Doral and the D.C. Country Club or in California or whether they were tickets to the Charity Classic, to the Gala or to the Oprah television show. And one consistent thing is, Mr. Celona didn't pay a dime.

Those were expenses, with the exception of Oprah, which we learned there was no cost of the ticket, just difficult to obtain, that were incurred by CVS to the benefit of Mr. Celona.

There was also testimony about a series of political contributions made to Mr. Celona by CVS, by

the CVS political action committee during that same time frame.

The next topic I'd like to review with you is any willing provider from the perspective of Mr. Ortiz and Mr. Kramer. During the examination of Mr. Fegan and to some extent, also, I believe during Mr. Walsh, there was some discussion about what, if any, interest remained in any willing provider after the big battle in 1999.

I believe Mr. Fegan testified that while there were still some efforts being made, he was at the State House, he was attending the proceeding, it wasn't nearly what it had been before and that Stop & Shop had decided to pursue a litigation strategy.

And on this particular point as to what any willing provider meant to CVS and, more particularly, to Mr. Ortiz and Mr. Kramer, I'm going to direct you to some documents where they in their own words expressed how important it was.

I'd like to begin with Exhibit Number 102 and particularly page 13 of that document and if we look at page 13, if I can excuse myself for a moment, I want to make sure it is page 13, which is entitled at the top a self-review. Now, this is Mr. Ortiz's professional performance evaluation, and this is the portion that's

described as his self-review.

And in that self-review, he speaks about, amongst his accomplishments, the defeat of any willing provider in Rhode Island. This is his 1999 self-review. And he describes that as one of the legislative highlights and indicates that the defeat of that legislation protected millions of dollars in sales. Those are his own words, Mr. Ortiz's own words about this particular accomplishment and what in his mind it meant to CVS.

Now, if you turn to page 14 of that same document, there's a section where Mr. Kramer, Mr. Ortiz's supervisor, was allowed to make comment. And he also noted Mr. Ortiz's work on any willing provider and indicated that it was, in fact, noteworthy.

Now, the next document I'd like to direct you to is Exhibit Number 100. I apologize. I may have the wrong number on that, but -- it's not 100, so we can take that down.

But there is a document, it's an exhibit, it's the 2000 government affairs proposed budget. Excuse me, it's Exhibit Number 99. I apologize. If you can bring up 99, please. And I'd point out two things on this particular cover sheet. It's a multiple-page

document. This is the first page of the document.

First off, what it says, and this is the government affairs proposed budget, and the first section says, "1999 achievements, defeated any willing provider in Rhode Island." And it says, "Averted potential lost sales in millions."

And with regard to the 2000 initiatives listed below, "Defeat new any willing provider legislation in Rhode Island."

So touting the accomplishment in 1999, explaining the significance of that accomplishment, what at least in the opinion of the government affairs department that meant to CVS, and then listing this as part of their 2000 initiative.

I'd also direct your attention now to Exhibit Number 111 and, first, page 2 of that document. Now, this is Mr. Ortiz's 2000 professional performance evaluation document. And on page 2, in a section that's dated February 3 of 2000, amongst the things listed for 2000 are any willing provider in Rhode Island, working with lobbyists on that particular issue, along with other issues.

Page 3 of the document, which is a mid-year review dated August 31st of 2000, Mr. Ortiz touts his defeat of any willing provider in Rhode Island. And on

page 4, which is the end-of-year section of the document, there's an indication that success was demonstrated by the defeat of any willing provider in Rhode Island during the year 2000.

I now direct your attention to Exhibit 106 and page 2 of that document. This is Mr. Kramer's 2000 professional performance review or evaluation, and in this portion Mr. Kramer talks about goals for 2000 and indicates that he will assist Carlos and work with lobbyist organizations toward the following specific goals, and one of which you can see listed is defeat anticipated legislation dealing with any willing provider.

And on page 4 of the document, Mr. Kramer notes that, in fact, any willing provider was defeated in Rhode Island during 2000.

I'd next direct your attention to Exhibit Number 103. This is a memo from Mr. Ortiz to Mr. Kramer and another employee, Michael Ayotte, of the government affairs department. It indicates in the text that it's the 2001 government affairs activities, and there's a listing of 2001 goals by state. And on the first page it indicates that Mr. Ortiz is assigned to Rhode Island, along with other states.

And on page 4 of that document, when it gets to

Rhode Island, it indicates that "defeat of any willing provider, if introduced." It's a goal for Rhode Island in 2001.

Now, Exhibit Number 364 is an e-mail from Mr. Ortiz to Mr. Walsh, and he's inquiring regarding the status of any willing provider legislation, again, in 2000. He doesn't think it's going to go anywhere, but he's inquiring about it.

Exhibit Number 104, which is a memo sent from Mr. Ortiz to Mr. Kramer on April 14th of 2003. On page 2 of that memo, Mr. Ortiz states that he's fairly confident that they can kill any willing provider and Canadian pharmacy legislation in the Senate. This is in 2003.

In addition to the documents authored by either Mr. Ortiz or Mr. Kramer, we also have lobbyist reports cosigned by them. In Exhibit Number 34, page 2, which is the January, February 2000 lobbyist report of Mr. Joseph Walsh, it's cosigned by Mr. Kramer, and one of the pieces of legislation that Mr. Walsh lists on this document that he's working against is AWP legislation. The number's there. You can compare it to Exhibit Number 5. And he was doing so on behalf of CVS, and this was the person working on behalf of CVS that was being paid at minimum, at the start of the

relationship in 1998, $5,000 a month to do this work.

Also, you can take a look at Exhibit Number 43 and page 2 of that document, which is Mr. Walsh's final report for 2003. It's cosigned by Mr. Kramer. It indicates amongst the list of bills one of the any willing provider pieces of legislation, which you have as Exhibit 8. It indicates that Mr. Walsh is working against that legislation on behalf of CVS.

And lastly, Exhibit Number 57, page 2 of that document, which is the March 2003 lobbyist report filed by Gail Wolf, someone who Mr. Walsh identified as working for his firm on the CVS account.

And in this report, Ms. Wolf indicates that she's working against any willing provider legislation, which you'll see the number, it's Exhibit 10 that's been introduced, that she's doing so on behalf of CVS, and this document is cosigned by Mr. Carlos Ortiz.

AWP was important to CVS in the minds of Carlos Ortiz and Jack Kramer.

The next topic I'd like to review evidence about with you is communications and interactions between Mr. Celona, Mr. Kramer and Mr. Ortiz. You have the various calendars that show appointments that occurred over the period of time.

There are appointments, as, for example, in

Exhibit 330 on January 10 of 2003, which demonstrate a meeting between Mr. Badeau, I believe in testimony he was identified as another senator, and Mr. Celona at the Aurora Club.

In Exhibit 331, there's documentation of a meeting with regard to Mr. Celona and Mr. DeRoche on February 10 of 2003, which is, I believe, the legislative luncheon, the Celona luncheon that's referenced in other documents.

And in the -- Mr. Kramer's expense report that covers the period of July 11 of 2003, which is Exhibit 333, there's a government issues lunch meeting listed that he lists the attendees as Mr. Celona, Mr. Hagan, Mr. DeRoche and himself.

Now, with regard to direct communication on specific pieces of legislation, I'd ask you to take a look or to display Exhibit Number 358. That's a fax from Mr. Kramer to Mr. Celona. It's dated May 22nd of 2003, and it's a transmittal sheet to transmit talking points from Mr. Kramer to Mr. Celona on the issue of Canadian pharmacies.

It's dated May 22nd of 2003. And during your deliberations, I ask you to look at Exhibit 9, House Bill 5478, which is the Canadian pharmacy bill. That was introduced just a short seven days before on

May 15th -- excuse me, that was referred to Mr. Celona's committee on May 15th, 2003, just a short seven days before this fax was received.

And on June 26th of 2003, about one month after the fax was received, the committee, which at this point by now is referred to as the Commerce Committee, including Mr. Celona, voted to hold the bill for further study, which we learned through I believe it was Mr. Celona's testimony effectively killed the bill for that session.

Now, we also heard testimony about the Rhode Island Student Loan Authority, Mr. Celona's participation in that authority as a member of its board of directors, and in that regard I would refer your attention and ask to be displayed Exhibit Number 352, which is an e-mail from Mr. Celona to Mr. Kramer.

And in that e-mail, Mr. Celona memorializes the fact that he and Mr. Kramer had a discussion regarding the -- initiating the student loan reduction program for pharmacy students on the day before.

Now, Mr. Celona had first raised this issue on January 10th of 2002, and you can look at the board meeting minutes for that day and see what Mr. Celona had to say about the issue at that point in time.

But the actual vote on this particular issue before the Rhode Island Student Loan Authority board occurred on March 14th of 2003. And, again, you have the minutes for that date, and those minutes will reflect that Mr. Celona both seconded and voted on the measure that caused the Rhode Island Student Loan Authority to adopt the pharmacist student loan forgiveness program.

And lastly, I would ask you to look at Exhibit Number 353, which I would ask to be displayed, which is an e-mail from Mr. Celona to Mr. Ortiz dated March 19 of 2002 in which he informed Mr. Ortiz of the RISLA board's passage or approval of the pharmacist student loan program and, furthermore, memorialized or mentioned the fact that he had already reported that fact to Mr. Kramer on the Friday before, which was March 15th, and turns out to be the very day after the vote during which the program was approved.

Now, as well as communications from Mr. Kramer, there were also communications from Mr. Ortiz to Mr. Celona. And I begin with 384, if I could have that displayed, please.

This is a page from Mr. Ortiz's calendar for April 16th of 2002, and it indicates a meeting with Mr. Celona at his office. And when asked, Ms. Bibeault

indicated that the notation "at his office" meant at Mr. Celona's office.

356, an e-mail to Mr. Celona from Mr. Ortiz forwarding slides. And if you look at the slides that accompany that e-mail, and they are included in the exhibit, you will see there is discussion of both electronic prescription and Canadian pharmacy.

Mr. Ortiz also in that e-mail asked Mr. Celona to sponsor the electronic prescription bill, and in Exhibit -- and you'll note there's a carbon copy of that e-mail to Mr. Walsh, the CVS paid lobbyist.

Now, in Exhibit 355, which is an e-mail from Mr. Ortiz to Mr. Walsh, again on February 10 of 2003, Mr. Ortiz mentions the fact that he asked Mr. Celona to sponsor the bill and requested that Mr. Walsh's office or Mr. DeRoche, whoever, deliver language to Mr. Celona.

And if we look at Exhibit Number 66, it's the exhibit that indicates that Mr. Clark Curtis, who also testified before you, in fact, faxed the proposed language to Mr. Celona, again, on February 10th of 2003.

A bill was introduced. It was introduced on February 13th of 2003. It was introduced by John Celona, it's Exhibit 11, S-568. It was introduced

three days after the request from Mr. Ortiz.

Mr. Celona also with regard to that legislation, as well as introducing it, moved for its passage and voted in favor on April 22nd of 2003. And you have the Senate journal amongst the exhibits that memorialize and document that fact.

Now, as well as contacting or having contact with Mr. Celona themselves, Mr. Ortiz and Mr. Kramer were involved with, aware of lobbyists that were acting before the Rhode Island General Assembly on CVS's behalf; and, in fact, CVS was paying them a monthly fee to do so.

We've already reviewed through the reports or some of the reports from Mr. Walsh and Ms. Wolf, and you also will have amongst the exhibits that have been marked full and, therefore, are available to you lobbyist reports from Patrick Lynch and Clark Curtis.

I'd just like to briefly speak about a couple more of those reports. With regard to Exhibit Number 38, if we could have that displayed, please, and page 2 of that document, it's a report that was filed in May or to cover the period of May 2001. It's Mr. Walsh's May 2001 lobbyist report.

You will note it's cosigned by Mr. Ortiz, and there's a specific piece of legislation identified

which Mr. Walsh indicates he's advocating on behalf of CVS in favor of, and that's S-993. And S-993, which is Exhibit 7, is the manufacturer return or recall bill. And, again, Mr. Walsh filed this document, identifies the legislation, and Mr. Ortiz cosigned that, and he cosigned it on June 7th, 2001.

I'd also direct your attention to Exhibit Number 51, which is a memo from Ms. Wolf to Mr. Walsh, and in this memo there's a description of the travel of S-993. It indicates that the bill was introduced late in the session at the request of CVS. And when you look at the bill, John Celona introduced it.

It further indicates that Celona held the bill at the request of two of the CVS lobbyists, Ms. Wolf and Mr. Walsh.

Now back to those reports in general. Again, I ask you to review all of them. You will see that from 2000 to 2003, either Mr. Kramer or Mr. Ortiz cosigned those reports. And according to the testimony of Mr. Walsh, although he had contact with both Mr. Kramer and Mr. Ortiz, I believe he described Mr. Ortiz as the principal point of contact for CVS on legislation.

These lobbyists acted on behalf of CVS, they advocated positions before the legislature for CVS, and they did so on matters that Senator Celona had some

involvement with.

Now, the next topic I'd like to discuss is the issue of disclosure, who did or didn't Mr. Kramer and Mr. Ortiz disclose the existence of the Celona consulting relationship to.

Well, Mr. Walsh testified that there was some mention by Mr. Kramer of the consulting agreement to him but no mention, no reference to the fact that Mr. Celona was being paid. I think there was some reference to he was working with CVS or -- I don't recall the exact wording, but I leave that to your recollection; but Mr. Walsh did testify. But clearly, when asked the question, Mr. Kramer did not inform him that Mr. Celona was being paid.

I would argue to you that's a very significant fact, and Mr. Walsh further described it as simply a passing remark at the State House.

There was, however, no disclosure by Mr. Ortiz to Ms. Egan when he requested the template for the consulting agreement and, further, no disclosure to her when he introduced Mr. Celona to her at an event in 2003.

There was no disclosure to Paul DeRoche, the Greater Providence Chamber of Commerce government affairs person who testified that he worked very

closely with Mr. Ortiz and CVS on legislative matters.

There was no disclosure to Mr. Rickard, the person who had supervisory responsibility for Mr. Kramer and, through Mr. Kramer, Mr. Ortiz for a period of time.

There was disclosure to Mr. Andrews one year into the agreement, but Mr. Ortiz asked Mr. Andrews not to tell anyone else about it.

And, furthermore, there was some disclosure to Ms. Bibeault, Ms. Seeley and some of the other financial support staff within CVS; but that was disclosure that was necessary because without that level of disclosure, the payments couldn't have issued.

The only way to get Mr. Celona paid was to submit the paperwork through the process so that the checks would issue, and I believe it was Ms. Bibeault that testified that what was required of that was -- simply as back-up documentation was the invoice itself.

And look at the invoices. Look at Mr. Celona's invoices. Is there any description as to what he's doing, any detail as to what's involved in his relationship with CVS, or is it just the same form over and over again with a different date?

On the Celona end of things as far as disclosure, Mr. Celona testified that in 2000, 2001 and

2002, he submitted annual financial reporting forms to the Ethics Commission and did not mention the income he received from CVS.

Now, lastly, I'd like to discuss a piece of evidence that the Court has properly instructed you you can only consider when determining Mr. Ortiz's state of mind or intent, and that is Exhibit 394. Now, that is a transcript of Mr. Ortiz's witness testimony before a state grand jury on August 4th, 2003.

And when you consider Mr. Ortiz's intent and state of mind, I'd ask you to scrutinize that transcript closely, and I ask when you do so to note that on page 7, Mr. Ortiz testified that he communicated with Mr. Walsh regarding Mr. Walsh's lobbying duties; that on page 11, when he describes the 1999 meeting at the State House which he states he believes occurred in the late fall of 1999, that in advance of that meeting, Mr. Walsh had indicated that Mr. Celona, who was a member of the Senate Corporations Committee, who did not support CVS's position with regard to any willing provider, and that Mr. Walsh suggested that there be a meeting with Mr. Celona to try to explain why CVS opposed any willing provider legislation.

On page 15 of that document, Mr. Ortiz testified

that he, Mr. Walsh, Mr. Kramer and Mr. Celona met at the State House and that there was discussion during that meeting of any willing provider legislation.

On page 16 of the transcript, Mr. Celona -- Mr. Ortiz testified that Mr. Celona said he would consider the information he had been provided, but he made no commitment to change his position.

Furthermore, on page 16, Mr. Ortiz testified that Mr. Celona subsequently came up to CVS headquarters for a second meeting or a tour of the facility.

On page 17, Mr. Ortiz recounts that Mr. Kramer, Mr. Ortiz and Mr. Celona met; that during that meeting, Mr. Celona raised the point that CVS had taken some real public relations hits and, on page 18, indicated that Mr. Celona referenced a tax on CVS in 1999 particularly.

On pages 19 and 20, Mr. Ortiz testified that Mr. Celona indicated that he felt he could benefit CVS with seniors. And on pages 20 and 21, Mr. Ortiz said that he asked Mr. Celona about the Ethics Commission. He testified about that. But he said he had a bad feeling about what Mr. Celona was proposing. He also said it didn't smell right. That was his testimony in August of 2004.

He testified on page 21 that Mr. Celona said that he had talked to the Ethics Commission, that they said there was no problem, nothing to worry about with his working for CVS, and that Mr. Celona didn't even need a written opinion.

On page 24, Mr. Ortiz testified that he went to Tina Egan, gave her the particulars, and she drafted the agreement in direct contradiction to what Tina Egan told you here from the witness stand. Mr. Ortiz never told her the particulars, Mr. Ortiz never identified who the individual was, and Ms. Egan didn't prepare that document; but in August of 2004, Mr. Ortiz told the grand jury, the state grand jury that she did.

On page 27 of the document, he indicated that there were never any formal reports from Mr. Celona. He stated every now and then he would get an e-mail about an article or some information from the Internet or asking if he saw the TV show. And on page 28, he indicated again no specific or formal reporting.

What did he say to Mr. Andrews when Mr. Andrews asked that question? He told Mr. Andrews there was regular reporting that was occurring. What did he tell the grand jury in August of 2004?

Furthermore, on page 28, Mr. Ortiz testified about the fact that Mr. Celona never consulted with him

about what message he should be communicating during his senior citizens visits, that there was no real feedback on Mr. Celona's work other than the fact that every now and then someone from CVS was on the TV show.

And furthermore, on page 28, he indicated that he thinks that Mr. Celona did change his position on any willing provider and that he no longer was voting in support of that legislation. And on pages 28 and 29, Mr. Ortiz notes that any willing provider legislation never passed the Senate.

Now, on page 30, Mr. Ortiz testifies about his meeting with Mr. Andrews. And in that testimony he indicates that both of them, both Mr. Ortiz and Mr. Andrews, had concerns about the perception if this relationship ever became public. He said it was going to smell the way it smelled.

On page 31, he went on to say he didn't think it was right. On page 33, he said he never told Joe Walsh about the Celona consulting agreement. And on page 35, he testified about the fact that there were no reports about what Mr. Celona did, he would call every now and then, mainly about the TV show, and e-mails now and then, no official reports of any kind, again, directly contradicting what he assured Mr. Andrews was happening.

On page 36, Mr. Ortiz testified that Mr. Celona came up to CVS once or twice a year, not very often, and it wasn't a report or review of what he had done.

He further testified on page 37 that after the consulting agreement was signed, Mr. Celona was much friendlier with Mr. Kramer and Mr. Ortiz.

And on pages 38 and 39, he talked about the fact that he had created a list of bills that CVS had been involved with lobbying on during the relevant time frame and recognized that 75 percent of those bills went before the Senate Corporations Committee, the very committee that in 2000 Celona was a member of and in 2001 through 2003 he was chairman.

On page 40, Mr. Ortiz acknowledged that he was aware that one way to prevent a bill from passing is that it never gets a hearing in committee. Sound familiar? Is that what happened to any willing provider in 2001 and 2003?

He went on to say on that same page that if opposed to legislation, the first and best thing to happen is if it doesn't get a hearing.

And on pages 49 and 50, he denied that CVS approached Mr. Celona to assist with legislation. And when you read that, compare and contrast that to those e-mails and the fax and the calendar meetings.

Ladies and gentlemen, based upon the evidence, all of it for Mr. Ortiz and all but Exhibit Number 394 for Mr. Kramer, the Government asks that you convict both Defendants of conspiracy, of mail fraud and of federal program bribery. Thank you very much.

THE COURT: Thank you, Mr. Dambruch.

Members of the jury, as I told you at the beginning of the day, we'll take two breaks. It's now time for break number one, about 10 minutes.

Remember, however, that you have not received instructions on the law, nor have you heard the remainder of the closing arguments. So you must not talk about the case during the recess. Please leave your notebooks on your seats.

Mike, would you see the jury out.

(The jury is not present for the following)

(Recess)

THE COURT: May I see counsel, please.

(Bench conference held on the record)

(The jury is present for the following)

THE COURT: I understand that there was reference to an exhibit that was not admitted as a full exhibit.

MR. DAMBRUCH: Your Honor, if I may explain. Your Honor, that exhibit or at least a portion of the

exhibit that I referred to was double marked as both Exhibits 104 and 116. It was admitted full under the number 116.

THE COURT: It's Number 116?

MR. DAMBRUCH: 116, and I mistakenly referred to it as 104. Just so the record is clear, 104 contained some additional attachments, but that's not the portion of the document I referred to in the closing. It was the memo itself.

THE COURT: Are counsel satisfied that that is so?

MR. FEIN: I haven't checked it, but I accept his representation.

MR. KILEY: Wasn't there a sticky that was displayed?

THE COURT: No, it wasn't.

MR. DAMBRUCH: I don't think that was the sticky document.

THE COURT: I'm going to tell the jury, then, that you misspoke, that it's 116, not 104.

MR. DAMBRUCH: 116. Yes, Judge. I apologize.

(End of bench conference)

THE COURT: Members of the jury, before I ask Mr. Fein to come forward to deliver his closing argument, we need to clarify an exhibit number that

Mr. Dambruch mentioned in his closing argument to you.

He made reference to an Exhibit Number 104 and displayed one of the pages of the exhibit to you. He misspoke. It's not 104. It's Number 116.

Mr. Fein, please.

MR. FEIN: May it please the Court, counsel and ladies and gentlemen of the jury. You have been sitting here over the last three weeks as the triers of fact in this very unusual criminal case. You may well be wondering why you're here at all, especially when you hear the judge's instructions before you begin deliberating, especially those instructions relating to Rhode Island law and intent.

I ask that you pay very careful attention to all instructions, but listen for the instructions on Rhode Island law and intent in connection with what I'm saying to you today, and you will have the opportunity to review those instructions as you deliberate.

You've been sitting here each day from 9 to 1 away from your daily activities and occupations, and you are placed in the unenviable position of assuming the responsibility of deciding a case that affects so thoroughly the lives of two fellow human beings.

It may well be the most solemn, serious, and important function that you will ever be asked to

perform in your entire lives because you are asked to make judgments on others. But I submit to you, ladies and gentlemen, that this solemn, serious and important function has been made easier for you.

It's been made easier for you by the evidence in this case, the evidence of Mr. Kramer and Mr. Ortiz's good faith intent in engaging John Celona to work for CVS.

There was something very large missing from Mr. Dambruch's summation that he just delivered to you, and it's the same something that's been missing from this entire trial. There is a lack of evidence, there is no evidence that Mr. Kramer or Mr. Ortiz had criminal intent.

As I proceed throughout my talk to you, as I did in the opening statement, I'm going to refer to Mr. Kramer and -- in the interest of time, and I know that Mr. Kiley in his address will be focusing his remarks on his client, Mr. Ortiz.

You've been sitting here attentively listening to the witnesses, reviewing the exhibits and following her Honor's instructions. At times it must have gone through your mind that this didn't seem like a criminal case at all.

Where is the evidence of criminal intent? Not

from the Government's first witness or their second witness or third witness or any witness. Where is the evidence of Mr. Kramer's criminal conduct? Not in the first 10 exhibits, not the next 10, not any exhibit.

You might have thought that rather than a criminal case you were present for an internal corporate discussion on whether Mr. Kramer's decision to engage John Celona to a $12,000 a year public relations consulting contract was a good idea or a bad idea for CVS. Was it a wise business decision or an unwise business decision?

Some might think it was a wise business decision, a modest consulting relationship to give Mr. Kramer an additional media outlet to do what he did best, appear publicly as the face of CVS and promote CVS's charitable activities. Some might think it was not a good idea to engage a senator no matter how honest your intention.

No matter the fact that Rhode Island's chosen system of government expressly provides for its legislators to work outside of the legislature, no matter that the senator specifically assured CVS that he had received oral approval from the Ethics Commission to work for CVS.

People can reasonably come down on either side

of that question, as might many of you. But that discussion belongs in a corporate office in Woonsocket, Rhode Island, not in a criminal case in the United States Courthouse in Providence.

You have been witnessed -- you have witnessed in the trial and again today in Mr. Dambruch's summation to a lecture or evidence on how one should budget expenses.

You heard about the political contributions budget account and whether the consulting payments for Mr. Celona should have been listed in that account or another account.

What I'd like to do now and throughout my talk with you is show you some of the testimony and exhibits, as well as other demonstratives. I'd like to show you a couple of slides regarding testimony about this political contributions budget account.

If we could see 40-D, please. Are you all able to see that? I may drift at times over to this monitor so I can see it as well, but I'll be sure I speak into the microphone.

Here is testimony from Betty Bibeault that you heard earlier in the trial regarding what goes into the miscellaneous corporate political contributions portion of this political contributions budget line.

Contributions that were not planned, miscellaneous money could be used toward it, but it was also used as more of a catchall; that if there was something that came in that wasn't budgeted, oftentimes it fell under that category.

If we could also see slide 40-F. Again, from Ms. Bibeault, the question was, "Political contributions account within the government affairs budget was considered to be a catchall account; is that correct?" Answer, "Yes."

You heard about Mr. Rickard, and I believe Mr. Dambruch told you that Mr. Rickard's testimony was that one could create an additional account. Let's also look at what Mr. Rickard said about his conversations on that subject with Mr. Kramer.

Slide 38-B, please. I'm sorry, that's the wrong slide. In the interest of time, I'll just tell you that Mr. Rickard testified that he did not discuss with Mr. Kramer, he did not recall discussing with Mr. Kramer the fact that Mr. Kramer could open up a new account.

So of what value is that testimony? Of what value as you consider the evidence in a criminal case that these contributions were put -- these payments were put into the contributions budget account?

Similarly, Mr. Dambruch referred today to the legislative luncheon, Mr. Celona's legislative luncheon. This, like so much other evidence in this case, has been presented to you out of context. You've heard that there was a luncheon for Senator Celona. And the suggestion must be, if you're hearing this evidence in a criminal case, if you're hearing Mr. Dambruch sum up on that fact, that there's something wrong with that.

You recall Senator Celona's testimony, John Celona's testimony on exactly that luncheon? I believe 52-A is the slide, please. We'll let them catch up to me, and I'll just tell you.

You heard on cross-examination that John Celona told you that the luncheons were his idea, that he did these luncheons at other companies, he had a circuit for his committee, he took them around to other companies, big companies like CVS, he referred to a small company. Those were his idea. There's nothing sinister about one of those lunches being hosted at CVS.

Similarly, you heard on direct examination from John Celona, Mr. Dambruch elicited that he had received slides from Mr. Ortiz, the slides that Mr. Ortiz had presented at that luncheon. But do you recall what you

heard on cross-examination about those slides?

John Celona asked Carlos Ortiz for a copy of those slides. It was John Celona's practice to get copies of those slides and keep them from these luncheons. There's nothing criminal about that whatsoever.

Soon you are going to take this case with you into the jury room to begin your deliberations with the goal of arriving at a verdict that is fair and just. What I'd like to do now is talk to you about the material portions of the evidence, apply that evidence to the instructions on the law that we anticipate Judge Lisi will give you, and discuss with you the witnesses you've heard.

What is the issue you were called upon to decide here? Are the Defendants charged with self-dealing, receiving kickbacks, stealing from their employer? No.

Are they charged with making payments in brown paper bags, stuffing cash into envelopes, wiring money to shell companies in foreign accounts? No.

They are charged with hiring a state senator on behalf of CVS Corporation, pursuant to a $12,000 a year public relations consulting agreement, with the intent, according to the prosecution, not to have him perform legitimate public relations services but as a scheme to

buy his vote for their employer, CVS.

Stripped down to its essence, the Indictment charges the Defendants with improperly influencing John Celona in his legislative capacity.

By way of assisting you in considering this issue, her Honor is going to tell you, in much greater detail than she did at the outset, about a very important rule of law that applies to every criminal case in this country.

She's going to tell you that the burden rests upon the prosecution to prove to each and every one of you the guilt of a Defendant beyond a reasonable doubt. And she will tell you as a matter of law that unless the Government has met that burden, unless the prosecution has proven to you evidence beyond a reasonable doubt that Mr. Kramer is guilty, then it is your duty and your oath as jurors to return verdicts of not guilty. That's the rule of law that applies in every criminal case.

Unless the prosecution has proven in this court, in this trial, before you, that Jack Kramer intended to deprive the citizens of Rhode Island of the honest services of John Celona, intended to bribe John Celona, unless they have done that, it is your duty under your oaths that you took on May 12 to return not guilty

verdicts on every charge.

Ladies and gentlemen, in what I submit to you is an act of complete excess, Mr. Kramer has been charged with 23 felonies, a conspiracy count, a bribery count, and then one felony count for every monthly payment to John Celona from April 2000 to September 2003.

Each one of those CVS corporate checks made out to John Celona in his name is a separate felony charge that the prosecution is asking you to find Mr. Kramer guilty of.

They have asked you to find beyond a reasonable doubt that these monthly payments, openly made pursuant to the consulting relationship, through which Mr. Kramer appeared like others of -- John Celona's many clients, on John Celona's television show to promote Mr. Kramer's employer, CVS, those payments constitute federal felonies.

Had Celona been paid weekly, Mr. Kramer could be facing 84 felony charges; but Celona was paid monthly, so the Government has brought 23 federal charges against Mr. Kramer.

And I want to say to you, I want to state our position clearly and unequivocally right at the outset. We're either guilty of everything or we're guilty of nothing.

Someone might think that a jury would consider that by finding Mr. Kramer not guilty 22 times and finding him guilty only of one charge that Mr. Kramer has achieved a victory. Not so. It would be a tragic resolution of this case, of this horrible ordeal, if that were the result.

I say to you, and I challenge Mr. Dambruch to say to you, it's all or nothing because it is all or nothing. He either had criminal intent or he didn't. Everything flows from that.

I ask you to consider before we even go further and talk about the evidence if you can possibly say in your minds and your hearts the evidence offered by the Government comes anywhere near meeting the burden of satisfying you beyond a reasonable doubt of the guilt of a man who comes into this courtroom with a presumption of innocence, who conducted himself with professionalism and integrity throughout his long career and life and during the very years at issue in this case. I suggest to you that you cannot say that. I suggest to you that it's not even close.

In a case where the Government must prove intent to defraud beyond a reasonable doubt, I submit the defense has taken the laboring oar in this trial. We have taken the mantel normally assumed by the

Government; and we have proven to you, I suggest beyond a reasonable doubt, that the only intent Jack Kramer had in this matter was an intent to get on the air and promote CVS. CVS bought air time, not votes, through this relationship.

There is no evidence whatsoever, let alone evidence that meets the Government's heavy burden, that Jack Kramer intended to defraud the citizens of Rhode Island of the honest services of John Celona.

In a case where if the Government did prove intent to fraud, it would also have to prove intent to deceive, again, beyond a reasonable doubt, I submit to you that we have switched tables with the Government. We have satisfied the burden. We have proven to you this was a case about disclosure, not deceit.

Celona was engaged to a $12,000 a year contract only after Mr. Ortiz asked if it would be okay with the Ethics Commission. And Mr. Celona represented that he called the Ethics Commission, got oral approval to work for CVS. That is disclosure, not deceit.

As you may have realized, we have presented our case to you directly through the Government's own witnesses. From the very first witness, John Fegan from Stop & Shop, through the three CVS witnesses you heard last Friday, you have heard our case. We did not

need to call a single witness to make any points to you because we were able to make them all through the Government's witnesses.

Let's talk about what you learned at this trial. As I do, I'm going to hopefully refer to show you some of the actual testimony of the witnesses. As the judge will instruct you, it's the exhibits and the testimony that matter, that's what you should rely on, not the words of Mr. Dambruch or myself.

I submit to you that when you consider the actual testimony and the exhibits, you will see that not only has the prosecution thoroughly failed in meeting its burden but that we have proven to you that Mr. Kramer acted in complete and total good faith in engaging John Celona as a consultant.

In the course of reviewing the evidence with you, I'm going to start by reintroducing you to Mr. Kramer, the client that Mr. Corrigan, Mr. DiBiase and I have had the great honor to represent.

Then I will talk to you about John Celona, John Celona, the man that Jack Kramer knew from 2000 to 2003, whom CVS engaged to help Jack Kramer promote CVS; the man that Jack Kramer came to consider a friend. And then I'm going to talk to you about John Celona, the witness, the witness that the prosecution knew from

2004 through 2008; the witness whom the U.S. Attorney's Office for the District of Rhode Island made a deal with, a deal that allowed John Celona to reduce his jail time that he otherwise would have served in exchange for helping the office make cases against others, including Mr. Kramer and Mr. Ortiz; the witness who entered into a contract with the U.S. Attorney's Office, his plea agreement, and was only supposed to receive the benefit of his bargain if he held up his end.

Well, you know that CVS had a contract with John Celona. And you know that John Celona satisfied his end of the contract by, among other things, hosting Jack Kramer on the State House Report twice a year every year that he was paid. And as a result, he got his end of the bargain. He got $12,000 a year.

Based on some of the different payment errors you've seen, you know that from the 1099s it wasn't always 12,000 in a calendar year, but it works out to be $1,000 a month, and whatever he was paid in that calendar year is what shows on the 1099.

But John Celona's contract with the U.S. Attorney's Office, his plea agreement, Government Exhibit 389, in that contract John Celona did not hold up his end of the bargain. He violated that agreement,

but he was still given the benefits of the agreement by the U.S. Attorney's Office.

Let me be clear about something regarding John Celona. Even if he were credible, and we'll be discussing that shortly, even if he were credible, he wouldn't give you a basis for finding guilt in this case because, as the judge will instruct you, the Government has to satisfy its burden by proving Mr. Kramer and Mr. Ortiz's intent, not John Celona.

It's not even clear that John Celona's testimony would help them prove John Celona's intent at this point, but it doesn't help them prove Mr. Kramer and Mr. Ortiz's intent.

And so even if John Celona hadn't lied and hadn't violated his plea agreement and hadn't changed his testimony during this trial, the Government would still have failed in satisfying its burden because nothing that Celona testified to tells you that Mr. Kramer or Mr. Ortiz had bad intent. Nothing.

Now, that's not going to stop me from reviewing with you John Celona's horrendous testimony in this trial because John Celona is why we're here in the first place, and his performance on that witness stand makes your job all that much easier.

The Government should not have made a deal with

John Celona. Having made a deal with him, they should have held him to his end of the bargain. Having given him the benefits he didn't earn, they shouldn't have called him as a witness in this trial. Having called him as a witness in this trial, they shouldn't have cited his testimony today before you.

But let me turn to Jack Kramer and reintroduce you to him. He came to CVS with a background in sales and marketing, and you've heard that from 1992 to 1998 Mr. Kramer headed up CVS's large advertising department.

Over 100 people were under his direction at that time; but by 1997, near the end of his tenure as head of that large department, Mr. Kramer was 65 year old, the age when many people have already retired.

You heard evidence that Mr. Kramer and his wife had a home on the Jersey shore. If we could see slide 25-B, please, B as in boy. And this is testimony from Ms. McCusker regarding Jack and his wife's home in Cape May, New Jersey, where they would spend weekends.

Mr. Kramer could have retired and spent weeks on Cape May instead of just weekends, but he continued working because he loved what he did.

You learned that when he interviewed his new administrative assistant, Ms. McCusker, if we could see

12-A, please, Mr. Kramer told Ms. McCusker, "He told me that he didn't know how long he would be working at CVS, he didn't plan on retiring, he didn't like the word 'retire'" -- excuse me, "he didn't like the 'retire' word, and he had too much energy to do that. But he was up front with me because I was moving from a department that I worked at for seven years. And he said he could be there for a year, two years, three, he didn't know, as long as he enjoyed the work."

In 1998, just about a year after that conversation with Ms. McCusker, Mr. Kramer gave up the advertising department, remained head of community relations, and was also asked to take on government affairs.

The number of people he supervised went from about 100 to about 10. And in his role as head of government affairs, you learned that Mr. Kramer hired outsiders to assist.

You heard about Mr. Albers and a memo that Mr. Albers wrote that was a blueprint on what one should do in creating a government affairs department. That's Kramer N-8.

You learned about the Tillinghast law firm in Rhode Island, that's where Joe Walsh was the principal person, and Tillinghast was engaged to handle the

lobbying efforts in Rhode Island. You heard about other lobbyists in other states because CVS is a national corporation.

This case has been all about the activities here in Rhode Island, but it's one of over 30 states where CVS is doing business. You learned that there are approximately 40 stores of CVS here in Rhode Island out of about 4,000 nationwide. You heard reference to those numbers, in fact, on the State House Report when Mr. Kramer appeared.

You've heard from witnesses that Mr. Kramer wasn't known for and didn't show great interest in legislation. Mr. DeRoche told you that. If we could see slide 17-A.

But what you heard from witness after witness after witness when they were asked about Mr. Kramer and what they associated with him was community relations, public speaking, golf, dinners, charitable events, CVS, CVS tables at events, the Governor's Ball, the CVS Charity Classic, the CVS 5K road race, the CVS Highlander School, the Learning Center for the Deaf, the Samaritan van, the CVS Charitable Trust, television appearances, radio appearances, the evidence that these community activities and not legislation was what was important to Mr. Kramer, was what he devoted his days

to, his evenings to, his enthusiasm, his intent. That evidence is simply overwhelming in this case.

If I could just quickly show you a series of slides from a series of witnesses. Paul DeRoche, slide 14-B, please. And when people testified, it wasn't just that Mr. Kramer was involved in these activities. As you see here, he was chairman of many of the activities. This is Paul DeRoche, the witness from the Chamber.

We have testimony from Betty Bibeault, slide 15-D, please, the Charity Classic and the 5K. Dave Rickard, slide 16-B, as in boy, please. Question regarding the Charity Classic, "Well, he basically oversaw the entire thing. It's a major effort every year to put on a charitable golf tournament, and it takes a lot of planning and a lot of coordination and a lot of decision making, and he ran the whole thing."

"He did the promotion, he emceed the event when it took place, he did everything, and he did a fine job of it."

Todd Andrews, slide 15-K. This is even before Mr. Andrews came to CVS. "I knew him as the head of community relations for CVS and saw him at several functions." "In what role?" "Master of ceremonies, coordinator." Whether it's master of ceremonies or

chairman or coordinator, you saw Mr. Kramer's substantial role in these activities.

Robin Seeley, slide 15-F, please. Ms. Seeley referred to a performance that she attended at the theater, and Mr. Kramer appeared on stage to promote CVS. And note at the end of this section of her testimony, "I remember him saying when he was done, you know, Don't forget to shop at CVS."

In addition to promoting CVS's charitable events, Mr. Kramer, with a background in advertising and sales and marketing, knew also to make sure that he got people into CVS stores. And you saw that on the videos of the Celona interviews.

We can go to Jim Smith, please, at slide 15-I. Mr. Smith said, "Well, he was the face of the CVS Classic, the spokesman for CVS, and we were all pretty proud of the Classic. It was a nice event."

Witness after witness came before you and gave you this testimony. I'm not going to go through it all with you now. I will remind you, though, as Mr. Rickard said, that Mr. Kramer did a fine job.

And remember his background in sales, marketing and advertising. You saw the reference to going into CVS stores.

Let's look at slide 15-B, please. Mr. Kramer

obviously knew about branding as well and using the name CVS. And Ms. McCusker reviewed and discussed how the various activities that Mr. Kramer was involved with, and you've heard this repeatedly, bore CVS's name, the CVS Charity Classic, the CVS 5K road race, even the CVS Highlander School, and at the Learning Center there's now a room that bears CVS's name.

Slide 15-G, please. Tina Egan, the in-house lawyer who had worked with Mr. Kramer not only in recent years but prior when Mr. Kramer was in advertising. "Getting our name out there in the public view is part of advertising, and it's also part of our efforts in the community, and Jack was really at the head of both those aspects of the company."

You heard that Mr. Kramer loved being the messenger, loved going on television, on radio. In part, that's who he was, a social person; but it's not just vanity. He understood the power of the media. His years in advertising were not lost on him in community relations.

If we could see slide 16-E. Ms. McCusker told you about his -- Mr. Kramer's enthusiasm for appearing on television. "He thought it was a great opportunity to promote CVS and the Charity Classic. It was a huge fundraiser for us and gave us the opportunity to

promote back to the community and to give money back to a lot of charities in the community."

Mr. Kramer had a big budget to work with to promote CVS and its charitable activities. With that big budget, he hired consultants.

We can call up for you Kramer W-7, which is in evidence. And if we could call out for the jury the -- first, what this document is at the top. It's an income statement for the CVS Charity Classic. And if we could show the jury the numbers under total revenue, 2001 actuals, 2002 actuals and 2002 budget, over $6 million in connection with the CVS Charity Classic.

If we could show the jury Kramer C-24, please. If you could go forward, please. And here you see in the corporate relations and government affairs budget, if could you call that out, please, and these are in earlier years, in 1999 where the budget was just under 4 million and in 2000 as it grew over to 4 and over to 5 million dollars for the Classic.

You heard that during Mr. Kramer's time, he grew the Charity Classic, and you see the magnitude of the effort.

He hired consultants to assist him. If we could show you slide 16-D, please. Testimony from Ms. McCusker that Mr. Kramer hired consultants to

assist. Slide 16-L, please. Mary Heath being one of those consultant to help with the communication part, with the press, the radio stations for the Classic and the 5K. Slide 16-M, please. Another consultant that Mr. Kramer hired, Charlie Breagy, as a race director for the 5K.

And you heard that for the first two years of the CVS consulting relationship, Mr. Kramer reported directly to the CEO of the company, Tom Ryan, the CEO of what you learned from a stipulation, Government Exhibit 397, a billion dollar company, Jack Kramer reported to Tom Ryan. And in the last year plus of the relationship, he reported to Dave Rickard, the company's chief financial officer.

So you can imagine that they left Jack Kramer to decide how to promote CVS without the need for Mr. Kramer to come to Mr. Ryan, the CEO, or Mr. Rickard, the CFO, and review individual consultants.

You've heard from Mr. Rickard, and if we could show you slide 38-B, that Mr. Kramer did not, in fact, come to him to talk about consultants. "Did Mr. Kramer specifically identify the various consultants that he retained to promote the Charity Classic?" "I don't recall him having done so."

"Did he ever discuss with you the consultants he retained to promote the Downtown 5K?" "Not to my recollection."

"Did he ever discuss with you any consultants that he hired to promote the Highlander School?" "Not that I recall."

So I ask you about the quality of the evidence in this case, that Mr. Dambruch is telling you that it's evidence that you should consider that Mr. Kramer did not talk to Mr. Rickard about the consulting relationship with Mr. Celona when Mr. Rickard's own testimony was he doesn't recall Mr. Kramer talking about any of the consultants he hired, any of them.

I'd like to turn to the inception of the consulting relationship, the events that led up to engaging Mr. Celona on behalf of CVS.

Mr. Dambruch referred to this a little bit in his summation this morning. He referred to the fact that there was some disagreement between Mr. Celona and Mr. Walsh about some of the events, some disagreement between their testimony, disagreement about timing of when it took place, disagreement about who was present, disagreement about which room it took place in.

But there's one fundamental problem with Mr. Celona's testimony that Mr. Dambruch didn't refer

to, it's also a bit of a disagreement between Mr. Celona and Mr. Walsh, and that would be who asked for the meeting, whose idea was it.

You recall that John Celona's taken great pains to tell you in this courtroom that Mr. Kramer reached out to him, that this was not his idea, he didn't pursue this consulting relationship, it was Mr. Kramer's idea to engage him to a $12,000 a year contract.

Let me suggest to you again it doesn't matter because everything that John Celona has told you about those communications is that it was legitimate, it was about promoting CVS in the senior community and then going on the show. So it doesn't even matter as you consider whether there is any evidence of Mr. Kramer's bad and guilty intent, but I think it does matter as you reflect upon John Celona.

Let me suggest to you that John Celona's refusal to acknowledge that he sought out this relationship with CVS, just as he sought out other relationships with lots of other companies, is the first of many lies that I'm going to review with you today that John Celona told you right here in this trial.

His unsupported version of events is contradicted repeatedly throughout this trial by other

witnesses called by the Government, contradicted by exhibits, contradicted by common sense and, best of all, contradicted by John Celona himself.

Remember at the time John Celona was a back-bencher, he wasn't in power at this time, he was part of this dissident group, a senator with no power or sway; but like other Rhode Island legislators, he was part time and he was working outside the State House to support his family.

When the lawnmower business failed, he looked for work from companies that could earn him some money doing public relations consulting work.

Slide 8-B, please. John Celona told you he sent out lots of resumes. He sent out hundreds of resumes. He even sent a resume -- Kramer Exhibit P-18. He even sent a letter to the New York Jets to Bill Parcells looking for work. He offered his public relations skills. He offered his good relationships with senior citizens.

If I could show you slide 9-A. We're going to get to this letter, the September 23rd, 1999, letter; but Mr. Celona admitted that he touted his experience with senior citizens in that letter.

If we could have slide 44-L, please. John Celona had something else he could offer potential

consulting clients. He had a television show on cable in Rhode Island; and he featured prominent guests as well as, we'll discuss, his consulting clients.

So John Celona was looking for work; and he asked Joe Walsh, if you recall Joe Walsh's testimony, it was early in this trial, he asked Joe Walsh if Joe Walsh would bring Tom Ryan, the CEO of CVS, up to meet John Celona.

So in addition to sending out the hundreds of resumes, he asked Walsh, the top lobbyist, to introduce him to the CEO of one of the largest private employers in the area.

Slide 24-B, please. This is Joe Walsh's testimony. "On several occasions, Senator Celona would mention that he wanted me to bring Tom Ryan to the State House, bring Ryan up here, you know, I want to -- we want to talk to Ryan, that kind of thing."

You heard Mr. Walsh testify that he didn't do that but that even after the vote on AWP, even after that whole 1999 coalition campaign, Celona came up again with the idea, the same request about bringing up Ryan. "So I called either Jack or Carlos and said, Can you meet with Senator Celona? He's constantly asking to meet with Ryan."

Now, John Celona didn't just deny that he ever

asked Joe Walsh to bring Ryan up or to meet with Ryan. As you've seen throughout the trial during John Celona's testimony, he likes to gild the lily. He likes to build a lie upon a lie. So he didn't just stop at I didn't ask to meet Tom Ryan, he built on that lie and said that Joe Walsh volunteered to bring Tom Ryan to meet him.

Joe Walsh volunteered to bring Tom Ryan to meet John Celona. You heard Joe Walsh's sworn testimony that in response to John Celona's request to meet Ryan, he wasn't going to bother the CEO of CVS for this -- to go meet this dissident senator; but what John Celona tells you is that Joe Walsh was volunteering to bring Ryan up. It's ridiculous.

And Celona's response, he told you, when he says Joe Walsh asked him, Can I bring Tom Ryan to meet you, Celona's response, "It makes no difference to me who you bring." That, I submit to you, was a bald-faced lie. You know it because Joe Walsh told you constantly that constantly John Celona was asking to meet Tom Ryan. You know it because you saw and heard on the State House Report how John Celona fawned over Tom Ryan repeatedly. You know it because John Celona himself inadvertently gave you a glimpse of this.

You see, it's not easy to lie. It's

complicated, especially when the events are eight and nine years ago, especially when you've given lots of different versions to lots of different people on lots of different occasions.

But remember when Celona described the meeting at the State House and what he said his message to CVS was? Let's look at slide 26-E, please.

"The discussion centered around the fact that what I had requested the meeting for," what I had requested the meeting for, "that CVS being a corporate giant being in Rhode Island had disregarded the wishes of the people who, although not in the majority of the Senate and the leadership of the Senate, still had votes in the Senate, still had an equal number of constituents in the Senate, still represented people that shopped at CVS, and yet they disregarded our wishes and just didn't do anything right down to the end of not even hanging up a Senate resolution welcoming the CVS store into my community."

John Celona wanted to meet CVS. John Celona wanted CVS to meet him. John Celona wanted to get hired by CVS to add to his consulting clients.

Now, Mr. Dambruch is right. John Celona does have other disagreements with Joe Walsh's testimony. I suggest Mr. Walsh's testimony is far more credible for

a number of reasons, including the fact that Mr. Walsh has no motive, no reason, no interest in doing anything other than giving you his honest recollection. Mr. Walsh was called as a Government witness in this case.

I'm not going to review the various problems with Celona's recollection of the meeting, the timing that he originally said was in the summer, but then he says it's during the session; and Joe Walsh told you that's not the case, that the session would have been over.

John Celona said it was in the summer, but it was in advance of the McCaffrey fundraiser where Mr. Kramer approached him. Well, that McCaffrey fundraiser was in May.

Other problems like the presence of other senators there that Joe Walsh says that's not his recollection, it was a meeting with John Celona.

And this is an event, by the way, that John Celona -- what I'm going to get to now, the next event I'm going to talk to you about, the McCaffrey fundraiser, is an event that John Celona told you he, quote, "vividly recalled."

And that would be what the prosecutors -- what Mr. Dambruch elicited from John Celona is his presence

at the McCaffrey fundraiser in late May of 1999 where he says Mr. Kramer approached him and suggested the consulting relationship completely out of the blue.

Now, recall that John Celona doesn't even put Mr. Kramer at the State House meeting. And so Jack Kramer shows up at the McCaffrey fundraiser, sits down at a table with John Celona and suggests, We'd like you to work for CVS. It doesn't make any sense.

But it gets worse. Let's look at some CVS records for this event. Kramer K-2. This, ladies and gentlemen, is a request for a check. We asked Ms. Bibeault about this document, if you recall. It's the McCaffrey fundraiser, the McCaffrey fundraiser that John Celona told you is the place where Jack Kramer approached him.

CVS got one ticket for that fundraiser, and what happened to that one ticket? Betty's note on the right-hand side, "Given to Todd for him to attend per Jack."

If we can go to the next page of that document, please. On this page you see the invitation for the McCaffrey fundraiser on the bottom left. If we could go to the top for a moment. This is all Ms. Bibeault's very careful record keeping that she testified to you about. You see the check, $25, which is admission for

one. And then on the bottom right, please. The McCaffrey fundraiser, "Yes, Todd Andrews."

We have Ms. Bibeault's testimony, slide 25-D, regarding her handwriting on that first page that I just showed you. "What note did you write there," she was asked. "It says 5/27, given to Todd for him to attend per Jack." And honestly, in her honest testimony, because she didn't have a clear recollection, "I don't have a clear recollection of physically giving it to him that many years ago; but based on the note that I have, it was my practice to write a note after I had given somebody a check."

Now let's see where Mr. Kramer was this evening, on that particular evening. Let's look at Mr. Kramer's calendar, Kramer L-2. You'll see at the bottom left the McCaffrey fundraiser is listed on his calendar at the Knights of Columbus in Warwick, but then let's go up and see what happened to Mr. Kramer at the top.

You'll see a reference to Cape May. That's the weekend home in New Jersey. Top center, please. Thank you. You'll see the arrows for Friday and Saturday indicating the weekend on the top of the Friday Saturday portion. And then let's look at Thursday, the day of the McCaffrey fundraiser. At noon, "CM."

And let's look at what Ms. McCusker told you,

and that's slide 25-C, please. "Did Mr. Kramer frequently leave earlier than Friday to begin his weekend?" "Oh, yes. Well, if you're going to New Jersey you do." "And would he leave on Thursdays consistent with the calendar?" Answer, "Yes."

There's more. I'd like to show you Kramer M-2. You haven't had a chance to see this document yet. It was agreed to in the stipulation. This is Jack Kramer's American Express bill for Jack Kramer's American Express card. You'll see May 26th he was in Providence at the -- charging something at the Westin and then May 27 where the calendar shows Cape May, the Elmwood Barn, Elmwood Park, New Jersey.

It shows a meal at the Elmwood Barn, and I'd like to show you one more document. Actually, staying on this document for a moment, you see reference to food and beverage at the Elmwood Barn.

Let's go to the second page, please. At the top, the charges, again on May 27th you see a gas charge at Sunoco in Elmwood Park, New Jersey; and then for the weekend you see a series of charges in New Jersey and then returning to Rhode Island on May 31st, getting gas again.

And you can watch the trip because you see the weekend in New Jersey, you see gas, filling up on

May 30th in Cape May, New Jersey, and you see stopping for food in Fairfield, Connecticut, on May 31st.

I'd like to show you one more document on this, Kramer N-2. It's actually the receipt from the dinner at the Elmwood Barn, and the parties have agreed that -- the parties have agreed that Kramer O-2, this is the actual receipt, and Kramer O-2 is an accurate, readable copy of the receipt so you can actually, without straining your eyes too much, see what it says.

This is a representation of the information on N-2. Both are in evidence. Date, 5/27/99, the Elmwood Barn, Elmwood Park, and on the top you see the dinner at Table 11, $42. And if you look at the top right of the receipt, you see the time, 2046, military time, 8:46 p.m.

What does that tell you about the quality of the Government's case against Mr. Kramer? What does it tell you that Mr. Dambruch would elicit from John Celona that Mr. Kramer approached him at the McCaffrey fundraiser and repeated again today when Mr. Kramer was hundreds of miles away?

I'd like to refer to the September 23rd, 1999, letter. It's kind of a third example of how Mr. Celona pursued CVS for a consulting relationship, a legitimate consulting relationship, but that he pursued CVS.

We've talked about bringing Ryan up, we've talked about the McCaffrey fundraiser, and now I'd like to talk to you about the September 23rd, 1999, letter.

Mr. Dambruch in his summation today referred to it as a proposal letter sent by Celona and referred to the after receiving the proposal. Well, ladies and gentlemen, we're fine with this letter. We're happy that it exists. It actually supports our case very much.

But you'll notice that the only evidence you have of this letter is an unsigned copy that was recovered during the state search of John Celona's home.

There's no evidence in the record that this was sent. There's no evidence that it was received. It may well have been; but you should know that, as I said, my words and Mr. Dambruch's words are not evidence. The evidence are the exhibits and the testimony.

Mr. Dambruch spent a lot of time with Mr. Celona reviewing the letter and asking him if he ever did any of those things. Do you remember that, going through those various points in the letter as if that showed some evidence of a crime?

Let's look at the letter. It's Government

Exhibit 98. It's Mr. Celona's story to you that Jack Kramer in early July asked him to write a proposal about what he could do for CVS. Several problems with that. You've gotten to know John Celona. You knew how he operated and how he was trying to get work. Do you think he waited two-and-a-half months when CVS Corporation invited him to submit a proposal for work?

Do you think when he submits that proposal he doesn't refer to the fact that you asked me to, pursuant to your request? Do you think he just left that out?

Had Mr. Kramer asked him to submit a proposal, again, not that there's anything wrong with that, but had he, don't you think Mr. Celona would have written it a little sooner than two-and-a-half months and don't you think he would have referred to the fact that Mr. Kramer asked him to do that?

If I could just have you call up Kramer Exhibit J-22. You've seen other letters that Mr. Celona wrote in attempting to gain consulting work. Here's a letter to Mr. Lancia at Ocean State. "Dear Mr. Lancia, it was nice to meet with you today and discuss the objectives of Ocean State Hearing Aid Center. Per your instruction, I am forwarding you a consulting agreement that outlines the services that I

can provide your company."

These aren't just my words. These are John Celona's words. There he followed up on the same day as the meeting, and he referred to the fact that he was asked to do it. It makes sense one would do that if one's trying to get -- if one is trying to get work and one has been invited to submit a proposal.

You'll see also, we're not going to look at it right now, but he did that in the 1/3/01 e-mail chain. He referred to Mr. Ortiz's request that he submit some information. He knew how to do that.

But let's go back to -- let's go to slide 28-E for a moment, please. Despite Mr. Dambruch's direct examination asking John Celona if he ever actually did any of those things in the letter, let's look what happened when Mr. Corrigan asked him on cross-examination.

Mr. Corrigan asked him, "In the letter, did you write anywhere that you personally would have a role in any of those five items?" Answer, "I'd have to examine the letter before I could answer that."

"Please take your time and do that, sir." "It doesn't look to be me personally saying that I would be there."

"Mr. Celona, you didn't write anywhere in the

letter that you would personally do any of those things, did you?" Answer, "No."

The September 23, 1999, letter should be seen for exactly what it is, for what the words of the letter are, not what someone's argument is about it or what John Celona's after-the-fact take is, at least on direct examination.

It's an effort by Mr. Celona to get more consulting work, perhaps a soft sell by not coming out and saying, Here's what I will do, because that's not in the letter; but he does tout himself, he touts his relationship with seniors, he refers to another consulting client, and then he suggests things that CVS could do.

The letter's also an acknowledgment that the only significance that AWP has in this case is that it gave Celona a PR opportunity. He knew that, in fact, CVS had won the legislative battle, but it had taken a black eye in the public relations fight from the coalition, especially among seniors. And that was an opportunity for him, not an opportunity to sell a meaningless vote on dead legislation, but an opportunity to offer his relationship with seniors, his PR ideas, and get another consulting relationship.

John Celona wanted you to believe that he was

pursued by CVS, he was pursued by Joe Walsh and Jack, but the evidence kept getting in the way. The prosecutors have tried to turn the letter into evidence of guilt, but to do that they had to engage in an act of misreading the letter with John Celona.

If you isolate those five items that John Celona, not Mr. Kramer, wrote at a time when John Celona had no consulting relationship with CVS, if you isolate those items and say, Did you do them when you were later engaged to work for CVS months and months later, and if the witness then dutifully says, No, no, no, no, no, to those five items, you might think it's a bad thing. You might think it might be evidence of guilt, but it's nothing of the sort.

Celona admitted on cross-examination when Mr. Corrigan asked him that the letter was not a take-it-or-leave-it proposal. He admitted that he didn't include himself in the letter, as we just reviewed. He didn't propose that he would do a single thing.

When you look at the letter and the words that are there, the actual letter and the actual words, you actually realize how powerful it is of exactly what happened in this case, the innocent thing that happened, the legitimate thing that happened, because a

good amount of what John Celona ended up doing for CVS, you see early signs of it in this letter.

Let's call it up, Government Exhibit 98, please. John Celona refers to the fact that CVS's advertising programs, though successful, are not the answer for seniors. A personal approach is most successful. That's exactly what happened on the show. It was a personal approach from John Celona to seniors.

He refers to the fact that CVS is perceived, I think this is page 2, as a corporate giant that cares only about increasing the company's profit. Think about the conversations you heard from the State House Report and what those conversations did with Jack Kramer's appearances to dispel that notion.

In these suggestions that John Celona wrote, the five that I just referred to, he includes the idea that there should be an explanation of the services that CVS provides. That's the fourth line there, explaining the services that CVS provides -- yes, right there, thank you -- and the services provided in the front store and pharmacists. A little lower. And then look at the words "perhaps a CVS infomercial."

If you go down a little further, in number two is a reference to the history of the company, getting that message out, its Rhode Island heritage, discount

coupons.

Let's keep going. In number three, there's a reference to a film crew, CVS's commitment to the personal service it provides to the customers -- to the consumers, excuse me, testimonials. And then on the next page, the presentation should be conducted annually in order to maintain consistency. Sound familiar?

This letter is not evidence of a crime. It's the beginning of what became the consulting relationship. It's the beginning of what became Jack Kramer's annual, twice-annual appearances on John Celona's show where the two of them discussed the services that CVS provides, the services provided by pharmacists, an infomercial. They discussed the history of the company, Rhode Island heritage. They discussed the Extra Care Card that gives you a discount, that gives you money back if you use it. Certainly there was a film crew, CVS's commitment to the personal services it provides to customers, testimonials, annual. All of this is evidence of innocence, not evidence of guilt.

You know that these ideas and the ideas they discussed in January of 2000, based on the evidence you've heard, you know that these ideals would have

appealed to Jack Kramer. It was consistent with his work promoting CVS, telling people that CVS was committed to more than just profit-making, how Tom Ryan cared deeply about charity and called upon Mr. Kramer to raise as much money as he could so CVS could be as generous as it could, talking about CVS's history and on.

And to do that on TV was something that you know would have particularly appealed to Jack Kramer. He enjoyed public speaking, he enjoyed being the master of ceremonies, the horn-blower, going on TV. It was an easy decision for Mr. Kramer, an easy and completely legitimate and innocent decision. It probably didn't take him very long to say yes.

And you've also learned that Mr. Ortiz looked at the world differently than Mr. Kramer. They were very different people. Mr. Ortiz didn't spend his career in marketing and advertising and community relations.

He was a pharmacist. His strengths were different than Mr. Kramer's. He didn't go out to the Rhode Island Country Club at six in the morning to be interviewed by a morning news anchor.

He was the guy who did his work in the office. He knew his business. He was trusted. He was appreciated by his co-workers. You've heard evidence

of that. You've heard that he was a well-liked boss.

His reaction to the idea of CVS paying Celona to put Mr. Kramer on television was to ask, Would that be all right with the Ethics Commission?

Mr. Petalas said in his opening statement that that was the obvious question, that Mr. Ortiz asked the obvious question. Ladies and gentlemen of the jury, that's only the obvious question if you're not engaged in a bribery scheme. It's only the obvious question if you have good intent. It's the last question you'd ask if you had bad intent.

Now, it's understandable if you're confused about what John Celona testified to regarding his conversation with Mr. Ortiz and Mr. Kramer about the Ethics Commission. You should be confused because Mr. Celona gave you multiple versions at this trial.

He didn't mention CVS, he didn't recall mentioning CVS, he mentioned CVS. He didn't tell Mr. Kramer, he doesn't recall telling Mr. Kramer, he told Mr. Kramer. You had that evolution just here in this trial, forgetting all the grand jury testimony, forgetting his trial testimony, his interview with the agents. That happened in this trial from the Government's primary witness.

Now, it doesn't even matter at the end of the

day what John Celona's testimony is about the Ethics Commission. It doesn't matter because there's no evidence, once again, of bad intent by Mr. Kramer and Mr. Ortiz.

Her Honor will tell you that unless the Government can prove beyond a reasonable doubt that they acted willfully with the intent to do something the law forbids, to act with bad purpose, you must find them not guilty.

If Mr. Kramer acted in good faith, he cannot be guilty; but the fact that Mr. Ortiz asked the question, the obvious question about the Ethics Commission and the fact that, as he ultimately came to with Mr. Corrigan's persistent questioning, the fact that, as Mr. Celona ultimately came to, that he called the Ethics Commission and he mentioned CVS and got approval to work for CVS and told those -- told that to Mr. Ortiz and Mr. Kramer, well, with those facts, that makes this case a travesty. You don't even need that conversation; but with that conversation, there can be no bad faith.

Mr. Kramer has had to endure years of investigation and prosecution for hiring a part-time legislator in a state that specifically provides for that hiring. He hired him to provide bona fide

services which, in fact, he provided, which we have on videotape. It's not often you have the bona fide services on videotape. We have them. We showed them to you.

And there is just no evidence whatsoever that Mr. Kramer or Mr. Ortiz ever used the paid relationship, the money, to try to influence John Celona as a legislator, absolutely none, forgetting the Government's heavy burden.

I'm just going to quickly review with you John Celona's testimony on the Ethics Commission because it tells you so much about the Government's case.

First, you heard Mr. Celona protesting that he didn't have a draft of the consulting agreement when he made that phone call. I'm not going to take the time now, but then elsewhere in direct examination and also in cross-examination he admitted to having a draft of the consulting agreement.

At one point in response to Mr. Corrigan, Mr. Celona even refused to acknowledge the testimony he had given the prior day, forgetting years earlier. He couldn't even recall what he testified to 24 hours earlier.

In terms of the call to the Ethics Commission, if we could see slide 11-S, please. I'll just direct

you to the bottom. Mr. Dambruch asked Mr. Celona, "Did you identify the company during that phone call?" Answer, "No, sir." Not a hard answer for him; right? It was a clear answer, "No, sir."

And also note the way he describes the conversation that he had with the Ethics Commission. "I discussed the issue in generalities." He not only takes CVS out of that conversation, he took himself out of that conversation. "If a person was in the General Assembly." He went hypothetical on himself as well as on CVS when he recounted it on direct examination.

Now let's go to slide 11-T. Even worse, even worse than telling the first lie is building on the lie and telling a lie upon a lie, and that's what he did. After saying he did not identify CVS, Mr. Dambruch asked him, "Why not?" And Mr. Celona said, "I didn't want to."

And keep in mind Mr. Celona at this point is making up this answer because he did identify CVS, as we're going to show you in a minute.

Not satisfied with the "I didn't want to," Mr. Dambruch asked another question. In fact, he asked the same question again. "Why not?" Now the answer he elicited was, "I wanted to give myself some cover."

Wholly apart from the fact that it's got nothing

to do with what's in Mr. Kramer or Mr. Ortiz's mind, it's got nothing to do with their intent, it's also completely false.

You recall Mr. Celona got a visit from prosecutors earlier this year, and they were asking him about lies he had told and could he recall the lies he had told. And Mr. Corrigan asked him if he asked whether or not he was concerned about lying about -- telling a lie about lying. I submit to you that's exactly what he did in this trial before you.

During cross-examination, Mr. Celona confirmed that during trial preparation with Mr. Dambruch he had gone over that question about the call to the Ethics Commission with the prosecutors in advance. He told you that he was shown his prior grand jury testimony, and then Mr. Corrigan confronted him with that prior testimony, including testimony he gave at a trial in response to a question put to him not by one of the parties but put to him by a judge.

Slide 11-V, please. "And then Judge Torres asked you, So your testimony is that you said to this person at the Ethics Commission if I had a consulting agreement with CVS, could I vote on pharmacy issues? And your response to that question from Judge Torres was, Yes."

John Celona said, "It was a call that if I had a consulting agreement. It didn't say I had a consulting agreement." And that's when we started with John Celona and the word "if."

If we could go to slide 11-W, please. Mr. Corrigan continued, and John Celona was unable to maintain the lies upon the lies, and he answered, "I said if I had a consulting agreement with CVS. I didn't say I had a consulting agreement. To me, that's a difference." Question, "Nonetheless, sir, you told the Ethics Commission that you were calling about CVS; right?" Answer, "I said if I had a consulting agreement about CVS."

Recall the direct testimony. He didn't mention CVS. Why not? Why not? He mentioned CVS. And then John Celona's excuse, slide 11-X, please. Mr. Corrigan asked him if he gave false testimony yesterday during direct examination when he said he didn't mention CVS. John Celona's answer was, "No. I'm trying to explain the differences, as you point out, because the word 'if' is a large word."

He went on to admit that the reason he was calling the Ethics Commission at slide 11-Y. "The key was that if I had a consulting agreement, obviously I would be getting paid money. That's the reason why I

would be calling the Ethics Commission, because it would be for remuneration."

Keep that in mind when we discuss the disclosure of this relationship, the disclosure of it to Joe Walsh. Mr. Kramer told CVS's chief lobbyist in the State of Rhode Island shortly after entering into this consulting agreement, he told about it to Mr. Walsh, and Mr. Walsh recalls we're doing something with John Celona, seniors, television, and he has Ethics Commission approval.

Mr. Dambruch wants you to focus on what Mr. Walsh doesn't recall. He doesn't recall the word "paid." Ask yourselves why would Mr. Kramer disclose this to Mr. Walsh if he was trying to deceive. He disclosed it. He disclosed it in 2000. He disclosed in the State House. He disclosed it to CVS's chief lobbyist.

And the idea that Mr. Walsh honestly is not going to say, Yes, he said "paid," when he doesn't recall the word "paid" these eight years later, but the fact is he recalls EC approval, Ethics Commission approval. Mr. Celona tells you that's the reason you call the Ethics Commission, because it involves payment.

Now I'm going to try to go more quickly through

the next lie that John Celona told about the Ethics Commission call, and that's the follow-up call when he told Mr. Ortiz and Mr. Kramer that he had called the Ethics Commission. And you'll see that this plays out in the same pattern that we just did on the call itself.

Slide 11-Z, please. "Did you have some follow-up conversation with either Mr. Ortiz or Mr. Kramer after you placed the call?" "Yes."

"Whom did you have that conversation with?" "With Carlos Ortiz."

"Did you have any conversation following your call to the Ethics Commission with Mr. Kramer on this topic?" Answer, remember those words, "No, sir."

Giving the Government what he thinks they want, trying to help the Government, trying to help the U.S. Attorney's Office that he's beholden to; but it doesn't hold up on cross-examination.

On cross-examination, Celona acknowledged that he had testified in the grand jury that he had told both Mr. Ortiz and Mr. Kramer about the call. And after further cross-examination, he admitted at this trial that he had done so.

Slide 11-AB, please. "And so after the call to the Ethics Commission, you told both Mr. Kramer and

Mr. Ortiz about what the Ethics Commission said about what you could do for CVS Pharmacy; correct?" Answer, "Yes."

I'm sorry I had to take the time to go through that with you, and I'm sorry to bring you back to John Celona's testimony; but it tells you a lot about the Government's case. It tells you a lot about what they elicited on direct examination from their witness, the witness with whom they had a contract, a plea agreement, and what happened on cross-examination upon further examination, both in relation to his prior testimony and even his relation -- his discussion of it right here in this trial, forgetting all of the prior testimony.

I'm not going to belabor the value right now that CVS received from the contract. You saw that just this week. We went through the tapes of the shows that Jack Kramer went on. You heard reference to the contract today. Mr. Dambruch said -- he referred to the fact that the first mention of TV was a year later. There's testimony from witnesses that they knew that TV was exactly what Mr. Kramer was paying for, to get on the show. They knew that as they went through the first year of the relationship.

The contract itself, consultant is tasked with

certain public relations services, these are to include but not be limited to, it goes on, and it says to do this via personal appearances, TV appearances, et cetera.

John Celona was paid pursuant to the contract. The first payment the Government mentioned, Government Exhibit 120, was dated April 10th, 2000. And guess what happened in April of 2000. Jack Kramer appeared on John Celona's show. You know that from the stipulation that dates it to April 2000.

The full transcript of the show is in evidence. You also have the videos of the shows. I'll give you the numbers if you'd like to see them. Kramer R-24 and T-24 are the excerpts of the videos that we showed you and the transcript excerpts that we have put in evidence.

Remember on Tuesday after the Government rested we offered the videos and the transcripts and played the excerpts for you. And when we finished, we rested. That's because these videos are the best evidence of Mr. Kramer's intent in this matter. They are the best evidence of why he engaged John Celona for $12,000 a year, to help Mr. Kramer promote CVS.

I would like to, but I don't have the time, to review with you all of the various things they talked

about on the show, but you saw that. You know it. You can ask to see the tapes. The Classic, the 5K, the Highlander School.

You know all of the communications back and forth, not communications about legislation but communications about scheduling the show, giving copies of the tapes of the show, making -- the expense reports about going to do the taping, getting prepared to do the show.

Mr. Kramer is certainly one who would like to be prepared, would have others give him talking points of topics. You heard Todd Andrews talk about that. You can see Mr. Kramer with the talking points on the show.

You can see John Celona did his homework, too. You can see him holding some paper, and you can hear him doing a pretty good job recounting CVS's history and helping to promote CVS.

You know from Todd Andrews that Jack Kramer pulled him into Jack Kramer's office to watch the show. This is, again, a case about disclosure, not deceit, Todd Andrews, who knew about the relationship, and he would ask him to distribute the tapes to others, including Tom Ryan.

You also know that, from evidence that you have not yet seen, that paying to go on air, Mr. Kramer

paying to get on air was something that was not uncommon at CVS and not uncommon for Mr. Kramer. He did that as he promoted CVS. It happens throughout broadcasting. There's product placement in all sorts of -- whether it's Coke on American Idol or people paying to get their interview appearances. It's completely common. It's lawful. It's got nothing to do with buying a legislator's vote.

And let me just quickly refer to you, since you haven't seen this exhibit before, Kramer S-7 is an NBC-10 package. And this would be a package that CVS engaged NBC-10 to help promote CVS. This is obviously a more expensive package that the John Celona show. It's on NBC-10.

If we could go to page 3, you'll see goals that are identified, and you'll see that these goals are consistent with what Mr. Kramer was achieving on John Celona's show.

If you go to page 7, and I'm sorry to rush you through this, there are other things I want to talk to you about, on page 7 you'll see a promotion time line. It's not that page. That's 6.

You'll see when you look at the document there's a promotion time line that will be familiar to you. These shows were going to run, as you see here, from

late April, early May, right through the event, just like John Celona's show did for CVS. And you'll see on page 9 that CVS was paying NBC-10 for, among other things, interview with Jack Kramer.

One more page, please. Would you go back a page, perhaps. Oh, there we go, the bottom of that page, interview with Jack Kramer, one of the offerings that NBC-10 was giving.

Later in the document there's a reference to Web site convergence, which is a fancy word for promoting CVS's Web site and creating links. Well, John Celona didn't have that technology, but you recall he did put the Web site up on the screen and he also promoted it and said it as well. Page 19 of this document shows that CVS provided all sorts of tickets to NBC-10, VIP tickets, hospitality, clubhouse.

And I'm going to just quickly refer to and just give you the number but not show you Kramer F-23, another example of CVS paying for Mr. Kramer to get on air. In this case it's radio, 790 The Score, and it includes an interview with Jack Kramer.

There is evidence before you that other companies did the same thing that CVS did, paid John Celona to get their principal person or one of their people on air and to promote the business.

HealthLink did that for $17,000 in 2001. New England Ambulance did it, Certified Cleaning, InterCity Maintenance. These later companies did it for $14,400 for a year, and they were given one appearance a year.

Let's just look quickly at Kramer Z-6 for New England Ambulance. Fourteen thousand four hundred a year is $1,200 a month, slightly more than CVS was paying.

Recall at around this time, 2002, John Celona asked for a raise, perhaps to bring the number closer in line to what he was charging other consulting clients. Indeed, he was charging them for one appearance a year, Mr. Kramer had two.

But you see this is a real value, a real service that other companies were paying for just like CVS was to promote. And you'll see references in these documents, Kramer Z-6, F-7, H-7. These are all contracts with other companies to put them on air, each of those for $14,400 a year.

The January 2001 e-mail chain between Mr. Ortiz and Mr. Celona, again, like the September 1999 letter, somehow the Government tries to take this document and turn it into evidence of a crime. It is so far from that that I commend your attention to it again and again and again, Government Exhibit 348.

At the outset of it, early in December, John Celona's providing Mr. Ortiz with a written report of what he did for CVS in the prior week, taped a program with Jack Kramer, we touched on the history of CVS, the service that it provides both in-store and online, we discussed the charities, and we talked about the road race.

Celona is reporting this to Mr. Ortiz, Mr. Ortiz, who's not as familiar with the shows as Mr. Kramer was.  He didn't appear on the shows.  He didn't value those appearances the way Jack Kramer did, not surprisingly.

But John Celona is reporting to him.  We've heard about reports, were there any reports.  It's a report to Mr. Ortiz.  Even before we get the extensive report, this is a report on exactly what he's doing on a show that just played.

You'll see holiday greetings being exchanged and Mr. Ortiz thanking Mr. Celona for sending Mr. Ortiz and Mr. Ortiz's wife a fruit basket for the holidays. Doesn't sound like the conduct of someone who's bribing a senator; but instead it sounds like the conduct of someone who's providing consulting services to a company, thanking them with a fruit basket at holiday time.

On December 21, again, before the extensive report he provides on January 3rd, on December 21 he wrote again saying he wanted to do more television programs and outreach, more. Not start doing it, not start doing that in 2001. He wanted to do more.

He referred to the fact that Jack has a copy of the tape and what the show does. The program recaps the golf tournament and the road race and previews the future events, in addition to touting the services provided by CVS.

And then he asks if we can talk about renewing the contract. And how does Mr. Ortiz respond? If you were in a bribery scheme, you'd say, Yes, of course, we're going to keep doing this.

But if you're in a legitimate PR consulting relationship and the benefit of those services is being provided to your boss, Mr. Kramer, who goes on air all the time, you say, Let's sit down, let's see if Jack can join us, let's schedule a meeting. A month later they have the meeting. It doesn't show evidence of any bad intent. It shows evidence of legitimate intent.

And in the e-mail, Mr. Ortiz says to Mr. Celona, "Come to the meeting prepared with a description of activities in 2000 and suggested activities in 2001." Again, the prosecutors have tried to make something of

this completely innocent, understandable statement by Mr. Ortiz asking a consultant who wants to talk about renewing the relationship to come prepared to discuss what you did for us last year and what you're going to do next year if we continue the relationship.

He didn't ask to have it in writing. He didn't ask, Send it to me right away, I need something for the file. He said, Come prepared to discuss it. Mr. Celona, anxious to continue the relationship, wrote back right away and said, Here's a description. He wrote it. Celona's own words.

And I commend you to read it yourself. I don't have time to go through it with you. Mr. Corrigan spent quite a lot of time with Mr. Celona showing all of the various things Mr. Celona wrote that he did in 2000, things you know he did that are corroborated by so much of the evidence we've seen and some things that we didn't even know about, like the gemfibrozil e-mail that he refers to, that he admits to, that we don't even have a copy of.

Legitimate services he provided, putting Jack on the show twice, putting the fellow from the NACDS on the show, but remember the direct examination when Mr. Dambruch asked John Celona, What did you do for CVS in 2000?

He couldn't really say, "No, sir," because of the way the question was asked, but he gave the answer that he thought the Government wanted. "Nothing." Nothing, John Celona testified in this courtroom, did he do in 2000. Look at that e-mail. Look at the tapes.

Quickly, John Celona's story about the termination of the relationship, Mr. Dambruch referred to it today. He elicited from John Celona in testimony, slide 11-BE, trying to make something sinister, trying to create something where there's nothing.

John Celona told you that Jack Kramer said to him that he had to be terminated because of the news that was going on, which at the time was really being blown up and publicized, all about Gordon Fox. The news that was going on which at the time was really being blown up and publicized.

The Government elicited that testimony from John Celona and then signed a stipulation that provides the earliest press reports regarding Gordon Fox's relationship with GTECH were published on October 1st, 2003.

That's more than a month after the August golf game where John Celona puts those words in Mr. Kramer's

mouth, those words that are completely false, not to mention the fact that Mr. Smith told you that he was responsible with Mr. Ortiz for ending the relationship and it had nothing to do with Gordon Fox.

There were parts of John Celona that Mr. Kramer didn't know about during the time that he knew him, that Mr. Celona's other PR clients didn't know about, that his viewing public didn't know about, that his constituents and colleagues didn't know about.

But you now know and the Government knows and knew that John Celona improperly used campaign funds for personal purposes, he didn't declare to the IRS the full extent of his outside income, he evaded taxes on some of his income, he didn't list any of his many consulting clients on his state official disclosure forms.

You've heard reference to those forms as if CVS was the only name left off; but on cross-examination, you learned, and you can see the forms yourself, there was only one name put on and all of the rest were left off. CVS in very good company with Certified Cleaning and New England Ambulance and all of the other consulting clients. He only listed his first client from years earlier. He didn't list all of the ones he picked up along the way.

These were John Celona's problems. John Celona had legal problems. They weren't Jack Kramer's problems. They weren't even part of Jack Kramer's knowledge of John Celona. They were not part of the -- of the person that Jack Kramer admired or thought he admired from 2000 to 2003.

And those problems can't be visited on Mr. Kramer or Mr. Ortiz. They tell a story. They explain to you why, when confronted by investigators over and over again in 2004 and in the years later, knowing he was in trouble, knowing he was facing prosecution and prison, he was offered the opportunity to make it better for himself. He could spend less time in prison if he made a deal and helped -- tried to help prosecute other people. And as part of that, Mr. Kramer and Mr. Ortiz are here today.

It would be one thing if in doing that Mr. Celona turned over evidence of a crime, memos, e-mails, cash, envelopes, something; but of course he couldn't because there was no crime with Mr. Kramer and Mr. Ortiz.

I'm not going to have time to talk to you about his tax issues. You've heard a lot about them. They're pretty significant. They're significant because the deal he made with the Government was that

he would have to fix his tax problems, he would have to clean them up by the time of sentencing, and if he did, he would get the benefit of an additional two levels off his sentence in addition to the four levels off he was getting for cooperating and providing information, and he would not be prosecuted for tax crimes.

Well, he told the Government that he had complied. They didn't do what we did here on cross-examination and before you and reveal to you and reveal to her Honor the various tax problems that he maintained. He hadn't paid interest and penalties. He hadn't paid '01 and '02 income. He violated the terms of his agreement, wholly apart from his truth-telling obligations which he violated time and time again at this trial.

In contrast, you've got Mr. Kramer and Mr. Ortiz administering a consulting relationship honestly and openly.

I'm not going to have time to review with you the entire payment process. Mr. Dambruch said to you they had to engage in that payment process to make this work. They had to tell other people about it.

Well, that doesn't make any sense. A thousand dollars a month, they didn't need to bring that $1,000 a month bribery scheme into the corporate office of

CVS. Of course, they could have paid cash. You can imagine Mr. Celona, who only paid taxes, and not always, if he got a 1099, would have been open to that if this was a bribery scheme; but that's not what it was.

And there was a significant payment process at CVS where lots of people learned about it. Let's just quickly show you the number of people because I think Mr. Dambruch referred to it as a handful today. It wasn't a handful. It was a lot of people.

If we could show you a demonstrative slide, please, about the number of people who heard about it. You've heard a lot of these names, and some of them are on documents, exhibits that you have. Others are part of the testimony or both.

On the left-hand side are a series of people who helped process this, the invoices. On the right-hand side, people from the accounting department, people from the tax department. On the bottom left you have significant officers at CVS who knew of the relationship while it existed.

You heard about Todd Andrews. Todd Andrews told Mike Ferdinandi, the director of HR. You heard about Jim Smith, who Mr. Ortiz began reporting to in the middle of 2003. And he talked about it with Doug

Sgarro, the chief legal officer at the company. You heard about Joe Walsh who Mr. Kramer told. Mr. Marzilli and Buco and Buco, Robert Buco and Jason Buco, accountants for John Celona and his lawyer, the Rhode Island Ethics Commission, the IRS.

And this isn't exhaustive. This is what you learned based on the trial record here. This is a case, again, about disclosure, not deceit.

Did Clark Curtis, who worked for Joe Walsh, know about the relationship? Does it matter? Joe Walsh knew. Joe Walsh didn't need to know, but Joe Walsh knew. Mr. Kramer mentioned it to him in 2000. So I suggest to you this argument by the Government takes you nowhere.

Tina Egan, the Government wants to tell you, was not told the identity of John Celona -- you can take that down, thank you -- when Mr. Ortiz went to her for a template. Let's just recall Tina Egan's testimony that Mr. Ortiz never needed to go to her in the first place for a template. He could have proceeded with an invoice, gotten that paid, and on his way.

Why would he go and get a contract if he's engaged in a bribery scheme? Is he going to sue on the contract if the person he bribes doesn't do what he wants? Of course not.

He went to the lawyer to ask for a template, and this conversation occurred eight years ago. And far from "he never told me," Ms. Egan's testimony is, "I don't recall that." And she said you don't recall -- she was asked, "You don't recall any of the specifics of the discussion; right?" "No."

And I think it's fair to say that her "no" answer to that means I don't recall the specifics of the conversation with Mr. Ortiz.

I'd like to briefly refer to AWP. I spent a good amount of time in my opening statement to you on AWP. I talked about -- we showed you the demonstrative and the history of AWP and how at the end of the 1999 legislative session, after consecutive years of defeat in the Senate, after now a record of defeats in the House, after the big effort by the coalition and a defeat once again, it's the last time somebody -- Mr. Kramer would set out to go bribe a senator to help CVS on AWP legislation that the Government's own witnesses told you, right from the start of the trial, the legislation was dead.

Mr. Fegan from Stop & Shop conceded that. And what did Stop & Shop do at the end of that session? At the very time that the Government would have you believe Mr. Kramer decides to go spend $1,000 a month

to try and bribe a state senator, near the end of his career, near the end of a very successful career where he can retire whenever he wants to, he's going to go out and offer $12,000 to a state senator whose vote didn't matter on this legislation. It didn't make the day. It was defeated. It was defeated again and again and again.

Well, at that very moment that the Government would have you believe, again, the McCaffrey fundraiser, Mr. Kramer is in New Jersey, at that very moment that he's making the initial offer to John Celona, that's when Stop & Shop decides we're going to pursue a litigation strategy instead of a legislative strategy because the legislative strategy is done. It's not working.

And they brought a lawsuit. They ultimately lost that lawsuit, but the point is that's what they chose to do. You have that document in evidence. That essentially is a white flag on the legislation.

So Mr. Dambruch asked you today about why John Celona didn't vote in the year 2000. And he sets it up in a way that, well, CVS was in favor -- excuse me, John Celona had been in favor in the years before, and CVS was opposed, and then something changed in 2000, he said.

What changed in 2000? Well, we know what happened in 1999, and I'd like to show you how much changed in 2000. Let's look at the list of sponsors of the legislation from 1999, again, not just try and show you what John Celona did, but put it in context.

Let's look at the list of sponsors from 1999 in the Senate, and remember that that's not a full list because it says "et al" after the sponsors' names. Those are the sponsors from '99. Do they come back in 2000 to sponsor the legislation? No.

Senator Montalbano, whose faction Celona belonged to, also didn't sponsor in 2000 and also didn't vote in 2000. The answer as to whatever John Celona did and why he did it in 2000 lays much more with his colleague, Montalbano, than it does with CVS, and it lays much more with Senator Irons who told him to take a walk.

It's astounding to me that we're even here talking about AWP in 2000 when you have evidence in this record that Celona was told to take a walk by Senator Irons, not by CVS, Senator Irons, who later became the leader and rewarded John Celona with a chairmanship, a chair of a committee.

And those subsequent years of AWP, well, you heard John Celona, his pitch to Irons when he wanted to

be a Corporations chairman, I will follow your direction, I will do what you want to do, I will not schedule hearings if you don't want me to.

Well, Senator Irons had been opposed to AWP throughout this period. So is it any surprise that he's against it, you know that for years, it's got nothing to do with Mr. Kramer and Mr. Ortiz, he asks John Celona to take a walk, and Celona does. And in the subsequent years, it's NGN per Irons. It's not going nowhere per Irons. Of course it's not. And that's the story of AWP.

I don't have time to go through the other pieces of legislation with you; but the very notion that a fax from Mr. Kramer of some talking points about Canadian pharmacies would be a dirty legislative communication, would be evidence of a crime, that doesn't hold. That doesn't make sense.

If you look at that fax of talking points where Mr. Kramer writes on the front page, "It should be enough that this is illegal under federal law," you've heard witnesses testify about the fact that it's illegal under federal law, and there are talking points attached.

That's Mr. Kramer sending talking points to a senator. He's allowed to do that. He's allowed to do

it with somebody who CVS has a financial relationship with. The judge will instruct you on that. What he can't do is try to coerce a result, is try to use the money to subvert the system, and there's just zero evidence of that in this case.

I'd like to but don't have the time to talk to you about the various tickets that you've heard about, the Oprah tickets that John Celona called M.J. McCusker and said he would like to get some tickets and she gave him a contact person at NBC-10. That's a great bribe. Let's refer him to NBC-10, a news station.

They referred to golf games. Remember on the show Jack Kramer and John Celona talked about playing golf together? They said they had only done it a couple of times, but we should get out there and do it again some more.

Well, the evidence in this case, I'm not going to have time to go through it with you, is that's correct. They had played twice before, and then they played several times following that May 2003 taping.

Again, disclosure, not deceit. Let's play golf. Let's get out there. We have played golf. Let's play some more.

The Classic tickets, I can't tell you -- I can't go through the details right now with you. We have it

in evidence, the list of people who called M.J. McCusker and Jack Kramer asking for tickets and who Jack Kramer said yes to. It says on the document a whole series of people, including all sorts of state officials, the governor.

They show you a letter, again, out of context, a letter that Jack Kramer wrote to John Celona enclosing his tickets. Let me just pull up that letter to show you one example of why you need to see all the evidence.

It's a letter to Governor Almond; and if I can find the number, I'll get to show it to you. I don't think I'm going to find it quickly. So I can tell you there is in evidence a letter to Governor Almond, just like the letter to -- and another legislator as well, a separate letter, just like the letter you saw enclosing the tickets to John Celona. And you've seen the list of people. You've seen M.J. McCusker's testimony about that.

The NACDS conference, one of the other things of value to John Celona. There's no evidence, in fact, there is evidence -- there's no evidence that CVS paid for that trip. The evidence is that NACDS paid for that trip. And the NACDS invited a whole series of state organizations to bring senators with them, all in

the same arrangement, down to that conference.

You heard about that on cross-examination, that this was part of the NACDS's conference and they invited lots of states to bring lots of senators.

The Komen trip, by the fall of 2003, as you could see on the videos, Mr. Kramer and Mr. Celona were friendly. They liked each other. They refer to each other's wives. You've heard testimony that they had dinner together. They were at dinners together.

So Mr. Kramer invites John Celona to join what was a package that CVS received as a result of a contribution to the Komen center related to the Charity Golf Classic, and there is a document in evidence that shows you that John Celona wasn't even the first person he asked. He was going to be asking other people at CVS first.

You're going to hear, as I mentioned earlier, about Rhode Island law. I'd ask you to recall when we started this journey together your jury questionnaire, and you sat -- you filled out the jury questionnaire in the privacy of your home, and then you came in here and you sat alone in this box and the judge asked you some questions about the case and asked you if you could be fair and impartial and could you put aside what you had read or heard about things like other state government

issues, other cases, other news coverage, and you all said you could.

You took an oath that you could, as important as the oath taken by the witnesses in this case. You said you would not base your decision on headlines or talk radio, you would not base your decision on personal feelings.

And, importantly, I want to say you may not like the system of government in Rhode Island. You may not like the part-time legislature. You may, and it's a system that other states have as well; but people differ on whether or not there should be part-time legislators and there should be part-time legislators working for companies.

But as the judge is going to instruct you, for the case that involves Mr. Kramer and Mr. Ortiz, their lives, their careers, their legacies, that is not the debate that you're to have.

It's not a debate about whether or not you think there should be part-time legislators, not a debate about whether they should be able to work, whether they should be able to vote on legislation that affects their clients so long as it doesn't single out their clients.

That's something that can happen in a

referendum, that's something that can happen in a voting booth, but not in the jury deliberations room. Again, Mr. Kramer can't be held responsible for Mr. Celona's crimes, nor can he be held responsible for someone's like or dislike of the system of government that Rhode Island has chosen.

Tomorrow her Honor is going to instruct you on the law. And what she says, what her Honor says to you is the law of the case. It's the law that under your oath as jurors that we just talked about you're bound to follow.

She's going to tell you that good faith is a complete defense to the charges in the Indictment since good faith on the part of the Defendant is inconsistent with the element of willfulness, which is an essential part of each of the charges.

The burden of proof is not on the Defendant to prove his good faith because he has no burden to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted willfully. That hasn't happened. It hasn't happened to any extent, let alone beyond a reasonable doubt.

I hope I haven't exhausted you with the number of exhibits and slides of testimony. Even with the great number I've reviewed with you, there are many,

many more I'd like to have time to show you. In fact, there isn't one exhibit that I wouldn't want to talk to you about. There's not an exhibit or line of testimony that, if true and real, cannot lead you to find verdicts of not guilty.

We've been together for several weeks. Soon you're going to be back home with your jobs and your families, the prosecutors will go on to new cases, her Honor will go on to the rest of her docket, and this will become a memory. What you do in the jury room will mark permanently the life of my client, Jack Kramer, a man who has lived a full and successful life, a man admired by his co-workers, who came to Rhode Island to work for CVS and became a prominent citizen of Rhode Island.

But now this, and tomorrow, is the most important thing and day that's ever happened in his life. What you do tomorrow will be the most important thing ever in the life of Jack Kramer and his family.

I implore you to be right, to be just, to be fair. A good batting average is not good enough in this situation. As jurors in a criminal case, you cannot be right most of the time or some of the time. You must be right this time. You must be morally certain, convinced beyond a reasonable doubt in Jack

Kramer's guilt before you ever consider voting to convict him.

That is the reason we have the protection of proof beyond a reasonable doubt. That's why we have the presumption of innocence, protection against guessing, protection against sensing, protection against innuendo, protection against a witness like John Celona.

The prosecutor need not be convinced beyond a reasonable doubt. The judge need not be convinced beyond a reasonable doubt. Those are not their obligations. You, and only you, carry that obligation. There are no erasers on your decision, no do-overs. Yours is the final decision.

Jack Kramer holds his heads up high today, his mind is clear, his heart is without fear because he has engaged in no crime, he has stolen no honest services, he has deceived no one.

I said to you this was a unique and unusual criminal case. It's an unusual criminal case because it's missing the crime. It's missing criminal intent. It's missing criminal deceit. I submit to you that we have proven our case to you through every one of the Government's witnesses, including John Celona, once we had a chance at cross-examination, through all of these

exhibits, through the videotapes we showed you on Tuesday.

But please don't forget that even though I submit that we have proved our case to you, the burden of proof is on the Government to prove its case. And I submit to you that they have fail, that they have failed so completely in proving their case that you should not hesitate to return not guilty verdicts.

I won't have the chance to speak to you again. As the Court told you, in our system the Government gets the final address. I ask you to listen to what the Government attorneys says in his closing remarks and ask yourself what would Mr. Kramer's lawyer say about that.

I can assure you there's nothing that he can say that we wouldn't have a lot to say in response. Think about the exhibits, think about the testimony from what you've heard.

Although this case is called United States versus Jack Kramer, the United States will not lose when you return not guilty verdicts. The United States will win.

In the Department of Justice in Washington, there is a sign that reads, "United States of America wins its cases when justice is done one of its

citizens." If you do justice, equal justice under the law to Jack Kramer in this criminal case and acquit him of all charges, the United States of America will win.

The United States will win because the liberty of one of its citizens will have been preserved against an unjust conviction.

I ask you in the name of justice, in the name of fairness, in the name of equal justice under the law to return a verdict not guilty on all counts. Thank you.

THE COURT: Thank you, Mr. Fein.

Members of the jury, as I told you this morning, we would take a second break. We'll do that now. Please leave your notebooks on your seats. Again, I remind you that you must not talk about the case at all during the recess. We'll take 10 minutes.

(Recess)

THE COURT: Mr. Kiley, please.

MR. KILEY: Thank you, your Honor. Good afternoon. The stenographer hopes that I can sum this up in eight words, Joe Pesci style. I'm much more Fred Gwynne-like than I am Joe Pesci, so we're going to be here a little while.

But I'm still the low-tech guy from the back of the courtroom, and we're not going to have an extensive slide show as you had with either one of these

gentlemen, except Mr. Fein will kill me if I do not do a few of the things that he was unable to do.

This is, in some senses, not just a unique case, as Mr. Fein says, but the strangest and weirdest bribery case that you are ever going to hear.

The witness, John Celona, talked to the Government on 25 occasions. He testified here for almost a week. And in the entire time that he testified before you, he didn't tell you of one single conversation that he had with either of the two Defendants who are on trial here today in which they asked him to do anything with respect to legislation. Not one conversation. And that's, ladies and gentlemen, because it never happened.

It is a weird deceit case. It is a strange deceit case because the only instance that you have ever heard of anybody asking anybody not to talk about anything comes in a conversation that Carlos Ortiz initiates with the chief spokesman for CVS, the person who interacts with the press, who is going to speak about the item when, not if, the press comes knocking on their door.

It is, to borrow Mr. Fein's phrase, a case about disclosure, not deceit. It is a strange theft of honest services case because there is no instance where

the individuals from CVS in the entire time period of the relationship ask Mr. Celona to do something against his will, to alter any position.

Now, I could, or maybe I couldn't, I could have asked you or asked of the witnesses all of the same questions, gone over all of the same items that my colleagues, Mr. Fein and Mr. Corrigan, did throughout the course of this trial.

We sat relatively quietly in the back because, frankly, they don't leave much for us to do. They have been as thorough as thorough can be in preparing this case. But you need to know that the evidence that you hear here today, whether it's about -- the evidence you've heard for these three weeks, the statements, the arguments fully apply to Carlos Ortiz as they do to Jack Kramer, as the arguments that I'm going to advance on behalf of Mr. Ortiz also apply to Mr. Kramer.

And I want you to know that the challenge that Mr. Fein issued to Mr. Dambruch is a challenge that we, too, embrace. This is an all-or-nothing case. This is a case about intent. And what you will hear from me today, as you heard from me in the opening, is argument about how you should discern what the intent of these individuals is.

There is one difference between the two men, and

it relates to their background and it relates to their positions within the company. Mr. Fein posited at the beginning of his argument to you today that this discussion about the wisdom of hiring John Celona is one that belonged in the boardroom in Woonsocket and not in the criminal case, not in this courtroom, not putting you on the hook to decide the fate of two men, not for the rest of their lives.

What you know, and you know because you've heard it from the witnesses and you know because you're going to read it as you read Carlos Ortiz's grand jury testimony, you know that Carlos Ortiz would have voted differently.

Carlos Ortiz's vote, if this was a vote within the company, as to whether to hire John Celona would have been no. And you know from everything that you've heard the reason why that is, and it is that he simply didn't value the performance of Mr. Kramer on the TV shows to promote the CVS charities' interests.

That, ladies and gentlemen, at the end of the day, a disagreement over a business decision, the wisdom of a business decision, that is not a crime.

Contrary to what the prosecutors told you at the beginning of this case, they have not proven, not beyond a reasonable doubt, they haven't even shown an

unreasonable doubt that Carlos Ortiz and his boss, Jack Kramer, entered into a nefarious criminal, organized attempt to deprive the citizens of the State of Rhode Island of their honest services.

Now, I told you at the beginning in my opening that the filter that I was going to use with you in asking my questions and the filter that I would return to you on this day with would be common sense, and that is the filter that I am going to apply.

And I'm going to ask you to analyze, using your common sense, whether, as the judge will inform you, Carlos Ortiz had a specific intent when this contract came into being with John Celona to bribe him to carry CVS's legislative water.

And, again, what you're going to have to find in order to find that that occurred is that what is put on paper is a sham, and you're going to have to find that it's a sham notwithstanding the fact that nobody sat on that stand and told you it was a sham.

I told you, and I intend to demonstrate it today, that if you want to determine what somebody's intent was, that the way you should apply that filter is to look at what the person did and what the person said at the contemporaneous points in time when there was no motivation, no reason for them to lie, and that

will be what we will demonstrate to you today.

In doing that, as we run through the story, as we run through the events, the Joe Pesci screenplay or whatever it is, it's important that you understand also the characters in the screenplay. It's why they have credits at the beginning of the film. It's why when Shakespeare writes a play he's got a cast at the beginning. It's to explain to you who those individuals are.

The most important people in this screenplay are John Kramer and Carlos Ortiz; but there is a third principal, and it's John Celona, and you need to know who was John Celona when the relationship with CVS began.

And I submit to you that he was not then the shell of a man that sat before you for four days and couldn't answer a straight question with a straight answer if his life depended on it. "If" this and "with an explanation" that were the words you heard from John Celona.

That John Celona was not the John Celona that Jack Kramer wanted to hire in the outset of this arrangement. The John Celona that Jack Kramer wanted to hire is the John Celona you saw on your monitors earlier this week when Mr. Fein presented to you the

videotapes.

He was comfortable in his role, he was communicative, he was effusive in his praise with CVS, and he understood his audience. He was self-assured and polished, maybe not Johnny Carson-like, but he wasn't being paid Johnny Carson money; and he provided the forum for Jack Kramer to perform his Ed McMahon-like function. He provided the forum for Jack Kramer to extoll CVS and CVS's charitable undertakings.

Now, what you also know is that at the time that he was doing that, marketing his TV persona and marketing the TV show to Jack Kramer and others, he was consciously entering into a new phase in his life.

He told you that the lawnmower business had failed. He told you that he had literally sent out hundreds of resumes, unsolicited, to businesses around not just New England but around the country soliciting PR business. One that comes to mind is the one you saw. I'm a football fan, so I remember it. It's the one to Bill Parcells of the Jets that uses that name, The Image Group, that he described as the one-time event.

He started out with a camcorder, he told you. That's all it was, was a camcorder. And over the course of time, he built that business so that when you

watched that videotape that Mr. Fein showed you the other day, the productions got better and better.

He's the guy that sent Jack the proposal on September 23rd, 1999, laying out, and you saw the exhibit, it's Exhibit 98, laying out the inexpensive way that he proposed to polish CVS's image with seniors.

His ability to build on his special relationship with seniors was the special skill that he marketed to CVS and others. That was the John Celona that Jack Kramer wanted to hire, not the liar who sat on the stand for four days.

There was, though, another side to John Celona even then, and it's the citizen legislator that Mr. Fein alluded to. The Government wants you to believe that that's the John Celona that Kramer wanted to hire, despite the mountain of evidence to the contrary in terms of what it is that he really did do and the total absence of any evidence that suggests that he was hired for legislation.

He was at the time of the hire a third-term senator, I think was what we heard, who told you when he sat there that he was a back-bencher who was so far out of the power structure of the Senate that he couldn't even get a citation hung in his local CVS.

Rodney Dangerfield, he couldn't get any respect.

When the Government did its search and when the state did its search of his computer and recovered from that computer fragments of his letters to his -- his writings prior to the problem arising, he described himself -- and I know I promised David to try this, non-technology guy that I am. I'm going to ask for fragment, I guess it's -- don't hold me to this. I'm the non-techie, remember? Can I have K-19 please.

And I'm going to direct your attention to the bottom of page 19 where the language begins, the last paragraph begins, "It must be noted that I was offered the contract by CVS while I was in a Democratic faction in the Senate that was in the minority."

And I'm going to ask also for the continuation of that, which is Kramer K-20. And it continues, "Therefore, I had no influence whatsoever because of my affiliation with the then so-called Montalbano faction as opposed to the faction that was in control with Senator Paul Kelly as the then majority leader. So there was absolutely nothing that I could have done to influence legislation, and I was contracted by CVS as an independent contractor to do just what the contract stated, nothing to do with legislation." Those are John Celona's words written at a point in time before

he had to sing for his supper.

And I ask you, I ask you to ask yourself if you are going to bribe somebody to carry your legislative water, are you going to hire somebody who is a back-bencher with no power to do anything and are you going to fire that person three, three-and-a-half years later when he now has a position of power and he now can do something for you? Because that's exactly what happened in this case.

John Celona was hired when he was a powerless back-bencher, and in 2003 his relationship was terminated. His termination, the timing of the termination is very interesting for a couple of reasons.

Joe Walsh stood on that stand -- sat on that stand and told you that during the course of the relationship, the years that CVS had a relationship with John Celona, they never asked John Celona to file -- CVS, Jack and Carlos, never asked Celona to file any legislation except for one bill.

That one bill was what we described as electronic prescription. And that was the bill that we've seen slides on today that allowed physicians, allowed pharmacies to fill prescriptions based upon an electronic signature.

The exhibit is before you. I think it's Exhibit 9. Let me just check that for a second. It's Exhibit 11. That's the bill that passed the Senate, passed the House unanimously. That's the bill on which you saw the communication indicating that Carlos had transmitted his slides to John Celona.

And John Celona sat on that stand and told you that the slides were a natural thing for him to request when he took his committee on tour, when he took his committee to GTECH and Amica and the Pro Jo. I'm even beginning to sound like a Rhode Islander. And he asked for the slides on numerous occasions. That was his norm.

And you know that occurred on February 13th because that's the testimony and that's the e-mail. And when you read that e-mail that Mr. Dambruch put up on the screen on the one occasion when John Celona was asked to do something, to file that bill that had the endorsement of the Department of Public Health, et cetera, everybody, no opposition, that that was a result of a request from the senator in part for his slides. And what the Government has shown you is that the bill was filed shortly thereafter.

And when they talk about other legislation, they've asked you to look at the time stamps that are

on the exhibit to show you how the bill progressed; but they didn't ask you to look at the time stamps on this one, and I'm going to ask you to look at the time stamps because what the time stamps are going to show you, and it's on Government Exhibit 11.9, is that this bill passed, was signed into law in August of 2003.

That's after May of 2003 when Jim Smith takes over the management of the government affairs unit in CVS, that's after the June discussion when Carlos Ortiz suggests to him that we're not getting anything out of John Celona, and that's after the decision is made to terminate John Celona.

So at the time the decision is made to terminate John Celona, the one and only bill that Carlos Ortiz has asked John Celona to take action on is pending.

What that suggests to me, ladies and gentlemen, and I ask you to draw this inference when you use that common sense filter, what that suggests to me is what John Celona put in that fragment that's on his computer and that is his contract had nothing to do with legislation.

The Canadian pharmacy bill, what is the evidence that's before you with respect to Carlos Ortiz's communication on Canadian pharmacy? Again, it's that he sent the slides, the slides that were a part of his

presentation. The presentation was just like any other presentation that John Celona received, and the essence of the evidence that you have on Canadian pharmacy is that Carlos Ortiz did not ask John Celona for anything on Canadian pharmacies.

Yes, yes, you have evidence that Jack sent him talking points that raised the question of legality. The legality of the Canadian import bill, Canadian pharmacy bill is manifest on the face of the legislation itself.

When you get into that grand jury room and you pile -- you parse your way through that mountain of exhibits that you have, the 400 Government exhibits, it's Government Exhibit 9.

On page 4 of Government Exhibit 9, the text of the bill is laid out; and in bold, black letters you are going to see in the text of the bill the point that Jack Kramer made in that e-mail dealing with the legality of this proposal that was being laid out in the Rhode Island legislation under federal law. Nothing revolutionary that Jack Kramer was sending to Senator Celona in March of 2003.

The legislation itself that you will be considering, your Honor is going to -- her Honor is going to be instructing you with respect to the Rhode

Island law. And she is going to be telling you not just about the citizen legislature and the fact that people, as she has already told you, can work for people, that part-time legislators hold other jobs, but she is also going to talk to you about the class exception, which is a part of your law in Rhode Island.

And you heard John Celona on that stand, and you heard John Celona tell you what it is that he understood the class exception to be.

He talked about it as the teacher exception or the teacher rule, and he said -- and he said it to Carlos Ortiz. There may be some questions with all of his answers about some, you know, abstract questions, what he actually said to whom; but there is no doubt the one thing that is crystal clear is that he told Carlos Ortiz that he could act on matters involving CVS by virtue of this teacher exception because while he couldn't vote on matters involving CVS alone, he could vote on matters affecting the industry as a whole.

And when you look at this legislation and apply the law that the judge is going to instruct you on and your common sense, the filter that I'm going to ask you to look at, it will be crystal clear to you, as it was to Carlos, that the class exception applies.

The class exception and the advice that comes --

the words that come from John Celona to Carlos Ortiz at the beginning of the relationship are the lens that you have to look at everything else that occurs between the two men as you consider what occurred.

As I told you at the outset, as is clear here, virtually the first words out of Carlos Ortiz's mouth when this relationship starts, when the proposal is being made, when a contract is being considered, are, Do you have ethics approval?

As Mr. Fein suggested, and I've got to go over this, I can't skip over this just because of time, as Mr. Fein suggested to you, that's not an obvious question for a person who is about to engage in a bribe.

That is an obvious question to be asked by a man who wants to comply with the law. That's the right kind of question for an innocent man to pose. It is not the question you want to pose when you are trying -- when you are about to engage a person to engage in illicit activity, and that is because you don't know where that is going to lead.

Now, when I talk about contemporaneous events, I need you to walk your way through the way the relationship evolved. I'm not going to go over it at great length. I'm not going to repeat what Mr. Fein

said to you about the various events. But the McCaffrey fundraiser, which is where John Celona tells you the discussion first occurs, that's on May 27th of the relevant year.

You didn't hear from anybody that Carlos Ortiz was at that meeting. There's no calendar, there's no exhibit, there's no nothing that places him at that meeting.

There is a discussion, you've heard testimony from Mr. Walsh, you've heard testimony from Mr. Celona, about a State House meeting; and that occurs, according to Mr. Celona, on a summer day, summer-like day while the session is going on. At one point he told us it was after May 27th.

Now, that isn't necessarily the story he told us throughout. So there is a real "if," not a Celona "if," as to whether or not that discussion ever occurred.

There is, as Mr. Fein has said, no evidence that suggests that Carlos Ortiz ever received the subsequent proposal, Exhibit 98, that deals with the inexpensive way that we could deal with seniors, that CVS could deal with its senior problems with the PR hits that were described in the letter and that are also explained in Carlos Ortiz's grand jury testimony that

I'm going to ask you to focus on.

When Mr. Dambruch ran through that grand jury testimony, if you look at it, there are going to be a lot of things that he didn't highlight in there. The reality, of course, with respect to the nature of the case that we have is because there is no direct evidence of an ask, a quid pro quo, that the Government is going to ask you to draw inferences based upon circumstantial evidence.

And in that kind of a scenario, there is no "gotcha" kind of moment. There is no denouement, to use a filmmaker's phrase. There's no climax. So what they're going to ask you to do is draw inference upon inference upon inference.

And what they did here today for the first time in this case is they asked you to treat Carlos Ortiz's grand jury testimony as that climactic moment. And they put their own spin on that, the inflections, the words chosen, in some instances accurate, in some instances not accurate.

But one of the things that we glossed over in Mr. Dambruch's presentation with respect to that grand jury testimony was Carlos Ortiz's articulation of what the PR hits were that came out of the aftermath, the follow-up of the 1999 PR debacle that CVS encountered

as a result of Stop & Shop's bad business judgment, pulling out of the United Healthcare network.

When you get to this transcript, if you ever read it, look at pages 11 and 12. Look at the explanation in terms of how CVS had been harmed with seniors. What he says in the transcript is, there were two things that they were being blamed for that had -- in that PR thing that had nothing to do with AWP. They were a pricing system used by CVS and a pricing system, my words, not the words that you're going to read in the grand jury testimony, followed by Blue Cross where Blue Cross was imposing an artificial cap on its clientele and imposing and suggesting to the seniors of Rhode Island that CVS was charging things that CVS was not charging.

The concept of these health care networks Carlos Ortiz explains in that grand jury, and the concept is that health care providers, pharmacies, provide at a cheaper price in order to get volume a product, in this case pharmaceuticals.

Carlos Ortiz explains that in this grand jury in a way that anybody can understand and points out how it is that the senior outreach that is described in that 9/28 or 9/23 proposal that is Exhibit 98 makes sense. Please read that if you read the grand jury transcript.

The suggestion that the Government wants to make -- wants you or the conclusion that they want you to draw is because Carlos Ortiz testified in this grand jury and talked about this bad decision that he disagreed with, that he thought that it smelled, that it stunk, that it necessarily was illegal.

When you read the material, you will draw the exact opposite conclusion. He disagreed with the decision, yes; but then you know what, you know that, and you know that from the direct evidence that has been put in in this case.

You know it because he told the people in the office who testified before you that it was Jack's idea. "Jack wanted to do it" was the phrase he used with Betty Bibeault. You know it because he was griping about it with Todd Andrews at a later point in time. You know it because he didn't give Celona a raise in the middle of the arrangement.

You remember the exchange with Mr. Smith. He had no chance of getting the raise. There was no way he was getting the raise. He wanted a $200 raise in the middle of the relationship, and Carlos Ortiz told him it's not budgeted for, and he didn't get it. He didn't move from the thousand a month that he was -- that CVS was paying him to the 1,200 a month figure

that you saw in the other contracts when he was putting a person on his show one time. No chance.

And you know it because when May of 2003 came around and there was now a question of whether Carlos Ortiz and the government affairs budget itself should pay for Mr. Celona's services and it was no longer a question of Mr. Kramer and the charities, you know it because he told his new boss, Jim Smith, that they would not get a bang for the buck.

Now, when I talked to you about who the people were, who John Kramer was, Jack Kramer was, who John Celona was, I also need you to focus on Carlos Ortiz and who Carlos Ortiz was and who the man is that was described to you by the witnesses on the stand.

At the time this contract was formed, he had the title of director of government affairs. Sounds pretty good. Titles didn't mean a whole lot in CVS. Legislative research assistants didn't do legislative research. In this case, director didn't mean much.

And you're going to know that, again, when you read Carlos Ortiz's grand jury where he's going to tell you that words like "director" and "department" may have been an exaggeration because the department consisted of Carlos Ortiz and two part-time assistants who job shared.

And Carlos Ortiz, in that position as director of government affairs, had responsibility for the federal legislative program of CVS and responsibility, without anybody under him, for between 25 and 30 states over the course of time throughout the United States.

And he had dedicated lobbyists in only a handful of those states, Rhode Island, the home state, being one where Joe Walsh was the principal lobbyist for CVS.

He was director, and you know a whole lot more about him from the witnesses who were on the stand than that.

You know that he was a trained pharmacist. And when you read the grand jury, he's going to distinguish between a pharmacist and a lawyer or a lobbyist, and he's going to do that in the context of the comments that the Government wants to load so much into.

He's going to tell you that, as you read his transcript, that after John Celona told him in the first real meeting that he remembers that he had Ethics Commission approval, he really didn't think about it a whole lot more than that. He accepted it at face value. There was no reason for him to inquire further.

Those are not passages that the Government has highlighted for you, but you can read them, and you're going to read them because they're right after the

statements about whether the thing smelled or not.

Now, the Government witnesses, the witnesses that the Government paraded up there to convince you that this man was bribing this back-bencher, they didn't say that at all.

John Fegan, the individual from Stop & Shop who was the first witness to take the stand, told you that he knew Carlos from National Association of Chain Drugstores events. He was the very first witness that they put up.

He told you that Carlos was highly respected in the industry. And he told you that as part of the pharmacy profession, and I'm quoting, so I'm reading here, "Our network of pharmacy, there are many issues that confront us, and Carlos was a well-spoken person who kept pharmacy moving in the right direction on many of those issues." And he clarified that by right direction on the issues he meant on policy grounds.

What he had to say, what Mr. Fegan had to say was echoed by Jim Smith, who came at you toward the end of the case. And Jim Smith, you will remember, is the person who took over from Jack Kramer the supervision of Carlos Ortiz in a May 2003 reorganization.

He knew Carlos, he told us, before he came to CVS. And, again, he told you that it was before --

that it was based upon contact principally from the National Association of Chain Drugstores, and he told you that from that he valued Carlos' opinion.

What he told you was that of all the government affairs people in that organization, all of them, he was probably the most knowledgeable. What he said was, when he spoke in a meeting, it was always very well thought out and he had great respect from many of his peers and people from other organizations.

If I were sitting in your chair, I would have wondered whether I was listening to defense witnesses instead of Government witnesses.

But the praise you heard for Carlos was not limited to the people who came from the outside world, and it didn't necessarily just come from his bosses. It came from the people who worked with him, and it came from the people who worked for him.

We talked today about Tina Egan. That's the attorney whose template was used to create the contract that is before you as -- I guess it's Exhibit 108. When she sat on that stand and talked about Carlos, she literally lit up. She told you that he was extremely experienced, and her words were "highly trustworthy." She told you he was the kind of a person that she would entrust her templates with.

Robin Seeley sat there and told you that he was the best boss she ever had. The superlatives rolled off of her tongue like they were a class superlative thing from when we were seniors in high school. He was the most friendly, he was the most cooperative, he was the most helpful.

There was no mistaking the body language of the women who made the government affairs unit run and hum under Carlos and Jack Kramer.

Ms. McCusker, Mary Jane McCusker, M.J. I think she was called in some of the memos, said that he was an outstanding employee. And Betty Bibeault, who was obviously uncomfortable talking about other things, lit up when she talked about Carlos. And she said of him that he never told her a lie and not even a white lie about anything, an outstanding person.

So in considering the fact that this individual never asked John Celona to do anything about AWP in 2000 and did not ask him to do anything until 2003 with respect to the most noncontroversial bill that passed both branchs unanimously after Celona was fired, how can you infer from those facts an intent to buy John Celona's vote?

The facts, I submit to you, ladies and gentlemen, are exactly the opposite from what it is

that the Government would like to portray.

Mr. Fein has alluded to the fact, and I think Mr. Dambruch did as well, to the fact that he, Mr. Dambruch, put the question to Mr. Celona whether he complied with, whether he performed the tasks that were laid out in his proposal.

Again, logic, ladies and gentlemen. That's a proposal. The proposal was never accepted. Why would you ask anybody whether they performed tasks in a proposal? The question, the right question is, did you perform the services that were laid out in the contract? And, again, Mr. Celona's answer to that was yes.

Now, if you ask, as the Government did, a parade of questions as did you do this, did you do this, did you do this when you're dealing with an exhibit like 98, the inference that you are going to be drawing as jurors has got to be, well, that matters. He should have been doing that.

I submit to you, ladies and gentlemen, that the far more relevant question than the litany that Mr. Dambruch ran through with Mr. Celona was the litany of questions that Mr. Corrigan ran through with him on what is Exhibit 348. And you had that before you today.

That's the e-mail chain that's got the nine e-mails or ten e-mails that starts in December with holiday greetings and builds up through January, that meeting of January 25th, that goes between Carlos Ortiz and John Celona.

And Mr. Fein only briefly got to allude to it in his closing because he felt pressed for time. When we were here on cross-examination, with respect to the e-mail on January 3rd, Mr. Corrigan and then Mr. Smith ran through with John Celona all of the things that he said he did for CVS in 2000. And the answers to whether he had done those things was yes, yes, yes, yes, with one reservation. He lied about whether he paid for everything out of his pocket. But all of the things that he said he did, the communications, the TV shows, they are all things he did.

Now, I think you must look at that document again for the words that are in it because the Government wants to suggest to you that there was something deceitful about the document that's prepared by Todd Andrews and the suggestion that there is reporting going on between Celona and Mr. Ortiz.

Look at the way that e-mail chain goes. Look at the subject lines. The subject lines say report. They don't say it at the beginning, it's holiday greetings;

but the sixth or seventh e-mail from Mr. Celona labels what is being sent a report, meeting/report, and the last several e-mails on that chain are about a report or about reports.

When you look at Exhibit 109, which is the talking points prepared by Mr. Andrews, when you have that document that they want to suggest to you is deceitful in front of you, remember when it was written.

It's written in the late winter of 2001, according to Mr. Andrews. One of the documents has an April 1, '01, date on it. The e-mail they showed you today asking politely whether the title was okay is dated March 13th. You know from the e-mail chain and from the calendars you saw and the testimony you heard that the meeting that occurred with respect to the renewal occurred on January 25th of 2003.

Now, Mr. Celona tells you that following that meeting on January 25th, 2003, maybe that day or maybe thereafter, he went into Mr. Andrews' office to talk about his title and to -- and that he was accompanied by Mr. Ortiz.

And Mr. Dambruch has pointed out to you a supposed direct conflict between the testimony of Tina Egan and the testimony of Carlos Ortiz with respect to

the preparation of the contract.

There is a direct conflict in the case between the testimony of the witnesses. It isn't between Tina Egan, who couldn't remember the exact parameters of the discussion with Carlos Ortiz on the contract. It's between John Celona and Todd Andrews.

Todd Andrews tells you that the meeting that John Celona vividly recalled did not occur. He never met with John Celona to talk about his job. That's a conflict, not a conflict about whether a person can remember whether John Celona's name was mentioned or not.

When you look at the e-mail exchange, Government Exhibit 348 and compare it to Government Exhibit 109, you are going to see a direct correlation between those things, and they are the things that John Celona sat on that stand and told you he had done in 2001.

Now, I'm bouncing all over a lot of my sequence, but I want to talk about the sequence of events. The first meeting at which the Ethics Commission question arises, January 7th of 2000, somewhere in or around that time frame, there is a communication with Christine Egan about a contract.

And as Mr. Dambruch points out, in the grand jury testimony, Carlos Ortiz says that he went to Tina

Egan and Tina Egan drafted the contract, filled things in. Tina Egan thinks she sent the template, she remembers something, she can't remember the whole conversation.

Whatever, whatever the right story is, and inconsistencies always occur when something is eight years old, we couldn't sit here and tell each other what occurred two weeks ago, much less eight years ago, whatever the situation is, the bottom line is that when first faced with the proposition of going forward with a relationship with John Celona, Carlos Ortiz reached out to the legal department.

And when that happened, a dialogue opened with a woman who trusted him implicitly, who believed that he was highly trustworthy. When that dialogue opened, there was, as there was when there was a suggestion of Ethics Commission approval, no way of saying where that dialogue would end, no way to say that it wouldn't result in question after question. That is inconsistent with the notion that you were trying to sweep something under the rug and create a bribe.

Now, my brothers, both Mr. Dambruch and Mr. Fein, directed your attention to the project description that's in that contract. When I cross-examined the witness, I pointed to something else

that's in the document, and I did it at the risk of making a fool of myself again on something technological. I talked about what is the footer, the thing that's at the bottom of the page.

I don't know if you call it a footer, I don't know if you call it a path, but it is the thing that is down at the bottom of the page that talks about consulting agreement PR doc. And what that witness told you was that the purpose of such a thing, one purpose of such a thing was to enable you to find it, to search for it.

And if Carlos Ortiz created that contract, and we don't know that he did, that you don't know, I don't know, Christine Egan thinks he might have, whoever created that document created a path to find it. And whoever created that document used the name John Celona, not The Image Group, not some phony name to mask something.

And what you also know from Christine Egan or Tina Egan, as Carlos refers to her in the grand jury, what you also know from her is that they didn't even need to have a written contract in the first place.

So, again, the conclusion the Government wants you to draw is that he went, he initiated the contact with Tina Egan, a lawyer, he put something in writing,

he filed it and he did that because he wanted to cover something up. That just doesn't make any sense, as it doesn't make any sense that you would go to the spokesman for the company and gripe knowing that -- and, again, think about in this gripe session that occurs in the 2001 time frame. Think about the way the testimony came in.

The Government wants to suggest to you that Carlos Ortiz said at the end of the meeting, Don't tell anybody about this, and the "this" is the relationship with Celona. But as it developed on cross-examination, there were multiple subjects in this gripe session.

It was a gripe session about Jack Kramer. What person in this world gripes about his boss and doesn't say, Don't tell my boss?

Todd Andrews understood fully that what he was doing was preparing documents to be disclosed to the press when the question arose, not keep it secret, tell them, tell them what occurred, and that's what he did.

And he also told Mike Ferdinandi, the head of HR, about the agreement. He did not keep it secret. Nobody kept it secret. It was told to the Providence Journal in December.

And look at that conversation, again, the same way you look at the conversation that Carlos initiates

with Tina Egan. When you say something to the spokesperson of the company, the person who is not the face of the company the way Jack was in Rhode Island, but when you say something to the person who is the mouthpiece, the person who is going to speak, that is the opposite of trying to keep something quiet. The Government's case just doesn't make sense.

The only evidence they have with respect to trying to keep something quiet that I think you ought to consider at all, and I would argue to you that you should consider, is what the meaning is of this Todd Andrews piece.

And I want to discount as completely as I can the notion that, the fact that Paul DeRoche, the lobbyist for the greater Boston -- there I go, the Greater Providence Chamber of Commerce, wasn't told or that Joe Walsh wasn't told there was a paid relationship or the handful of people that they paraded before you were not told of the relationship.

When you -- when a lawyer, when I ask a question that relates to a negative, your natural conclusion is going to be, well, gee, should they have? The reality here is that not one of the individuals, not one of them who came before you and said they were not told of the relationship with Celona, not one of them said that

they asked about it.

Not one of them, in no instance did the Government tie the notion that they were not told to some obligation to tell, to some established practice between the parties.

I stand before you today, and I haven't told any one of you whether I'm married, and I don't think you need to know; but I'm not deceiving you because I haven't told you. If we had something, a relationship where you should know it, maybe I am.

But the fact that somebody isn't told something when there is no reason to believe they should, ladies and gentlemen, that's treacherous territory. You're on dangerous ground when you argue or want a conclusion drawn from that fact.

Now, the reality of the way the witnesses were examined in this case with respect to that question, did anybody introduce him to you, tell you what he was, that was a wrap-up question. That was a question that was asked of several witnesses at the end of each one of the sessions, same question as to each one of them.

In no instance, in no instance was there a person who said to you, I asked him, and he lied to me. In no instance was there a layout of a history of disclosures of that type.

Why would -- ask yourself this, why would anybody tell Clark Curtis, who works for Joe Walsh, about a relationship that Joe Walsh already knows about? The reality is that all of the people who needed to know, nobody who asked, Betty Bibeault, Robin Seeley, anybody who asked was told. And there was volunteering of information to people like Todd Andrews. Deceit, no.

Now, again, the way lawyers ask questions. Mr. Dambruch told you today that the CVS relationship wasn't on John Celona's annual financial disclosure statements, and those were exhibits that were here before you today. And he ran through a whole litany of questions with here's box 6 on this questionnaire, did you receive more than $1,000 in income from CVS in this year? No. Yes, I mean. I'm sorry. Yes, I did. And was it a result of a contractual relationship? Yes. Did you report that on your annual financial statement? No. And at some point did you amend? Yes.

Now what's the inference he wants to -- what's the inference you're supposed to draw from that, at some later point in time he amended and he disclosed CVS after the Providence Journal was aware of the fact?

That's the inference that you're supposed to draw. That isn't what he did. The exhibits are before

you. I think they're K A-18, B-18 and C-18. There's no disclosure of CVS on those amendments. What John Celona did after the fact was he deleted the reference to the one entity that had been there.

When we ask negative questions and pose questions to you did he, did he, did he, you've got to make sure that the questions that are being posed are connected.

And in reality, in this case the Government has piled question upon question to try and get you to draw a conclusion that the simple facts do not support.

The bottom-line inference that they want you to draw is that John Celona was doing CVS's legislative legwork, he was our lapdog, he did everything for us. You have testimony before you that is to the opposite effect.

During the consulting relationship, John Celona acted against CVS's interests on several occasions, every bit as many as the ones that they have listed for you in the Indictment in which he supposedly acted in our interests.

There's a treble damages bill. It's Kramer E-2 and Kramer F-9. Those are the documents I want you to look at when you're looking at the exhibits that are in there, a bill that in the Tillinghast report is labeled

a priority oppose. And within three months of the formation of the consulting arrangement, John Celona voted adversely to the interest of CVS on that bill.

He testified -- John Celona testified about minimum wage legislation, Kramer F-2. That, too, was a measure that mattered to CVS. And we've talked about Canadian pharmacies, and you remember that there were two different measures that dealt with Canadian pharmacies, and one of them was a resolution, and he voted against our interests on the Canadian pharmacy resolution as well.

They make a big to-do about the AWP legislation, and I'm not going to bore you with going over that AWP legislation over and over. But look at the vote and think about the vote that was taken on that matter that everybody wants to attach so much significance to.

When John Celona sat on that stand on cross-examination, he told you that after the pharmacies -- the independent pharmacies were put in the bill or, I'm sorry, were put in the program, put in the network, that he became neutral.

And he also told you when he talked to the agents he initially got it wrong, and he got it wrong because of the timing. And Mr. Dambruch has alluded to the letter that was sent to Mr. Celona in 1998 about

that, and that's the same letter that went to everybody else from CVS.

The vote, I submit to you, ladies and gentlemen, or what the vote total shows on AWP in 2000 is neutrality. It's not that he's carrying CVS's water. When you look at that vote sheet, what you're going to see is it's not a vote on the merits as it was in '98 or '99. It's a vote on whether to put the matter into further study. And in order to put the bill into further study, the witnesses told you that what you need is a majority vote from the senators, and there were a number of votes from the senators to put that bill into further study.

John Celona's absence, his absence is no different in terms of CVS's position on the legislation than as if he had voted no. It was meaningless. This great big shift in position, John Celona might have had a motive for it, he might not have wanted people to know he was with CVS, I don't know what his motivation was, but it was not a shift to CVS's position.

At the end of the day here, you are asked to judge two men who have very different perspectives on this arrangement. I think it ironic, and it's something I want you to look at when you look at Carlos Ortiz's grand jury, I think the most interesting line

in the whole grand jury testimony comes on page 27, and it -- Carlos Ortiz is asked about seeing the show, and he says, I never saw the show. I live in Massachusetts. We don't get Cox Cable. I never saw the show.

And the examiner, I think it's Mr. Youngs, says, Would you like to see it? We can show it to you. And there's laughter. The line says "laughter."

This is no laughing matter. This is as serious a matter as it gets. Carlos Ortiz never saw the TV programs that you saw, never appreciated their value.

There was no reason for him to appreciate the value of those shows. He had nothing to do with the public relations function.

Jack Kramer was his boss, and I'm not going to -- I'm not saying to you that because he's his boss, he's supposed to do whatever his boss wanted. Don't misunderstand me for a minute. There was, however, a decision made by Jack that Carlos did not value, did not appreciate.

And as I told you at the beginning of the day, beginning of my argument today, he would have been a no vote if we were having this vote in Woonsocket. But I can't stand here today and tell you he would still be a no vote after watching the tapes yesterday and seeing

how much money was generated for CVS's charities, how much publicity was generated, whether Jack was justified or not in making a decision that he wanted to be on the air and spend $12,000 to make umpty-ump millions for Rhode Island charities.

You cannot make assumptions from a snippet in a grand jury testimony that because somebody thought a decision was lousy, A, that it was lousy, that he had the right perspective on it or, B, that it was illegal.

And what you're asked to do, and when the judge charges you what you're going to be asked to do is figure out what was in Carlos Ortiz's mind. Did he have a specific intent, did he conspire with Jack, did they concoct a scheme when they were hiring this individual to deprive the citizens of honest services, to bribe him, to bribe him for what, a powerless back-bencher, a powerless man to effect legislation on an AWP bill that was dead and not in a position -- and he was not in a position to revive it.

More importantly, that there was no ask. Twenty-five Government interviews with the witness, all the pressure that comes from a plea agreement, four days on the stand, they never asked him, you heard nothing about him being asked to do anything on AWP after the contractual arrangement was signed.

Ladies and gentlemen, there is no case here, not a case beyond a reasonable doubt, not a case with an unreasonable doubt. If there is anything deceitful here, it is a case in which you are being asked to pile inference upon inference upon inference with no direct evidence of any wrongdoing. And that, ladies and gentlemen, is against your oath.

I thank you for your attention, I look forward to your verdict of not guilty, and I appreciate your time. For Carlos Ortiz, for Mark Smith, for Tony Traini and myself, thank you.

THE COURT: Thank you, Mr. Kiley.

(Pause)

THE COURT: Mr. Dambruch.

MR. DAMBRUCH: Thank you, Judge. Mr. Kiley just made a very telling remark. He told you that Carlos Ortiz had nothing to do with PR at CVS. So isn't it interesting that what the Defendant claim was a relationship all about public relations would be placed with an individual who had nothing to do with that topic, whose function focused on government affairs, interacting with various components of the government, dealing with lobbyists, attempting to influence legislation.

And who chose to put Mr. Celona there, to select

that budget as the place where the payments would come from to fund this consulting agreement? It was CVS, the Defendants.

So why was Mr. Celona being paid from a political contributions account, which, yes, the testimony was was occasionally used if there was an unbudgeted expense, and maybe that covers the year 2000, but how about in 2001, 2002 and 2003? Why was he put there?

Could it be that this was about government affairs, this was about legislation, that's what was at the core of this agreement?

Did CVS really need John Celona to do television work? They had Frank Carpano, the various members of the NBC-10 team, ESPN, professional media consultants.

You saw John Celona. You saw the show. This is, as Mr. Fein told you, a billion dollar corporation. They're going to hire John Celona to put themselves on some public access show when they have all these other resources available to them. Does that make sense?

Did CVS need John Celona to reach out to the senior community? Susan DelMonico told you that she was doing just that for CVS, that she was visiting senior centers, that she was also responsible in some way for the Classic and the 5K. So did they need him

for that purpose?

The one thing, however, he could offer was his position on legislation, not only his vote but his ability to speak out, to draw attention, to attract publicity with regard to an issue, for instance AWP, something he had done, had been very vocal about in 1998 and 1999.

Now, defense counsel have argued to you, well, by 2000, look, there's only one sponsor, things have changed. Maybe there was only one sponsor, but look at what John Celona did. He didn't stay at the hearing and vote the opposite. He didn't abstain. He was at that committee hearing, at that meeting, Mr. Fegan told you so, and he walked out, and he walked out when that one piece of legislation came up.

And in doing so, he did two things. He silenced himself, and he didn't vote. And that was only after -- approximately one month after he became a paid consultant for CVS.

Now, with regard to what else happened during that consulting arrangement, reporting, the meetings that occurred at the State House, as to Mr. Ortiz, I implore you to read his grand jury transcript and look what he has to say about how that meeting at the State House came about, what Mr. Walsh said to him in setting

that meeting up, look at what he said in his own words about whether or not John Celona reported on a regular basis about what he was doing, and then decide as to Mr. Ortiz was this about PR work, senior citizens or was it about legislation.

And with regard to the case as a whole, again, consider did CVS need John Celona for his television experience? What evidence is there about any prior connection between CVS and John Celona with television?

But there is evidence that shows that there was a prior connection between CVS and, in particular, Mr. Kramer and Mr. Ortiz and John Celona as a legislator.

Mr. Ortiz testified in years past. Mr. Ortiz sent letters -- sent a letter to John Celona advocating on AWP. There was a PAC contribution made in 1998. There was a PAC contribution made in 1999, and the records show that Mr. Kramer actually attended that fundraiser.

By the way, it was on May 25th of 1999, a couple of days before the McCaffrey fundraiser. Could there have been some confusion as to what event it was? That's for you to decide.

There was a history, a connection with regard to legislation. Look at that letter, that September 23rd

letter. The defense want you to or, alternatively, either disregard it or somehow read into it the Celona State House Report. Please look at it and ask yourselves is there any mention of a cable access television show in that proposal or, rather, doesn't it focus on the publicity surrounding freedom of choice.

Isn't that what John Celona says in the letter? There's no mention of a cable television show. And when you look at that proposal, compare and contrast it. I invite you to compare and contrast it to the proposals that were talked about and introduced, Certified Cleaning or whatever these other companies are. Look at those. They specifically say the TV show.

Try to find that in that letter. And, furthermore, try to find that in the consulting agreement that's signed on February 10th of 2000.

At some point in time did CVS receive some small benefit from the TV show? Possibly so. John Celona said and testified that he actually developed that idea, CVS was interested after the relationship began, but think to yourselves is that what was the genesis of the relationship?

You can't just look a year later and then try to rewrite what happened before. And ask yourself wasn't

the true benefit to CVS the legislative benefits. That's what John Celona was. He was a legislator. That had been the prior history between John Celona and CVS.

Ladies and gentlemen, based upon the evidence, and I ask you to review all of the evidence, and I also ask, and I think the law requires, that you do review each and every charge separately and that you look at each Defendant separately, you take that evidence, you look at the charge, you weigh it and you determine it.

I think at the end of that process, I would argue to you, that you will find that the Government has proven its case against both Mr. Ortiz and Mr. Kramer beyond a reasonable doubt with regard to their conspiracy, with regard to their honest services mail fraud and with regard to their bribery.

And as a result, I ask, on behalf of the Government, that you convict both of them for each and every count. Thank you very much.

THE COURT: Thank you, Mr. Dambruch.

Members of the jury, I warned you yesterday that today would be a little bit longer session than the 9 to 1 sessions we've had through trial, and I appreciate the fact that you've made the time to stay longer today.

I also will remind you that I told you you would return tomorrow to receive those final instructions on the law which will guide your deliberations.

Now, you've heard all the evidence, you've heard the arguments of counsel, but you have not yet received those instructions on the law. And so it would be a violation of your oath as jurors if you were to begin to talk about this case without having received those instructions.

And so, perhaps for the last time, I will instruct you not to talk about the case with anyone, including your fellow jurors, not to read, listen to or watch any news accounts about the case.

Instead, you all deserve some rest. Come in tomorrow refreshed, ready to listen to that charge and then to begin your deliberations.

So you may go home now and, as I say, rest up. Remember that once you begin your deliberations, you'll be here through the day. So make whatever arrangements you will need to make with your family and friends.

Mike, would you see the jury out, please.

Please leave your notebooks on your seats.

(The jury is not present for the following)

THE COURT: May I see counsel on one housekeeping matter.

(Bench conference held off the record)

(Adjourned)

* * * * * * * * *

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Karen M. Wischnowsky________________

Karen M. Wischnowsky, RPR-RMR-CRR

June 13, 2008

Date